CASE NO. 1:16-cv-08423

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

*In re:* CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL., *Debtors.*

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,  *Appellants*,

*v.*

BOKF., N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG / SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC AND FREDRICK BARTON DANNER, *Defendants-Appellees*.

Appeal from the United States Bankruptcy Court for the
Northern District of Illinois, Case No. 15-01145, Adv. Pro. No. 15-00149
(Goldgar, J.)

## UNSECURED NOTES DEFENDANTS'[1] OBJECTION TO DEBTORS' EMERGENCY MOTION FOR ADMINISTRATIVE RELIEF

DRINKER BIDDLE & REATH LLP
Timothy R. Casey
191 North Wacker Drive, Suite 3700
Chicago, IL  60606
(312) 569-1000

James H. Millar
Kristin K. Going
Frank F. Velocci
1177 Avenue of the Americas, 41st Floor
New York, NY  10036-2714
(212) 248-3140

---

[1] The Unsecured Notes Defendants are, collectively, Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds and Trilogy Portfolio Company, LLC ("Unsecured Notes Defendants").

*Counsel for Appellees Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust, and Trilogy Portfolio Company, LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-08423 |
| BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC, AND FREDERICK BARTON DANNER, | ) ) ) ) ) ) ) ) | Judge Robert W. Gettleman |
| Defendants-Appellees. | ) ) ) ) | |

## UNSECURED NOTES DEFENDANTS'[1] OBJECTION TO
## DEBTORS' EMERGENCY MOTION FOR ADMINISTRATIVE RELIEF

The Unsecured Notes Defendants respectfully submit this objection (the "Objection") to

the Debtors' Emergency Motion for Administrative Relief ("Emergency Motion").[2]

### A.    There is No Authority for an "Administrative Stay" in the Northern District of Illinois.

In the Emergency Motion, the Debtors request an "administrative stay" pursuant to Rules

---

[1] The Unsecured Notes Defendants are, collectively, Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds and Trilogy Portfolio Company, LLC ("Unsecured Notes Defendants").

[2] The Unsecured Notes Defendants also object to the submission and the Court's consideration of any statement or response submitted in support of the Emergency Motion by entities that are not party to the underlying adversary proceeding or the appeal, such as the Ad Hoc Bank Lender Committee, the Ad Hoc Committee of First Lien Noteholders, and the Statutory Unsecured Claimholders' Committee.

8007(b)(1) and 8013(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")
extending an injunction enjoining the Unsecured Notes Defendants from prosecuting litigation
against non-debtor Caesars Entertainment Corporation ("CEC") pending in the United States
District Court for the Southern of New York (the "Unsecured Notes Defendants' Action").
However, neither Bankruptcy Rule 8007(b)(1) nor 8013(d) provide for the relief requested.
Bankruptcy Rule 8007(b)(1) allows a party to move the district court for "a stay of a judgment,
order, or decree of the bankruptcy court pending appeal." Fed. R. Bankr. P. 8007. Presumably,
that is what the Debtors will seek in their forthcoming "Emergency Motion to Enjoin the
Guaranty Actions Pending Appeal." Bankruptcy Rule 8013(d) simply provides the procedure
governing emergency motions. The Bankruptcy Rules furnish no basis for the intermediate relief
sought by the Debtors, that is, a stay pending ruling on a to-be-filed emergency motion for a stay,
and, accordingly, the Emergency Motion must be denied.

The non-Seventh Circuit cases cited by the Debtors in support of their request are
inapposite. For example, in *Brady v. National Football League*, 638 F.3d 1004 (8th Cir. 2011),
the temporary stay was granted pursuant to Rule 27A(b)(4) of the Eighth Circuit Local Rules,
which expressly authorize the court to "order[] a temporary stay of any proceeding pending the
court's determination of a stay application."[3] *See also In re Grand Jury Proceedings*, 841 F.2d
230, 232 (8th Cir. 1988). Similarly, *Cobell v. Norton*, No. 03–5262, 2004 WL 603456 (D.C. Cir.
2004) and *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1137 (D.C. Cir. 1988) are

---

[3] In his dissent, Judge Bye noted that application of the rule is only appropriate in "true
emergencies," such as the imminent deportation of an immigrant or the midnight execution of a
criminal defendant. *Brady*, 638 F.3d at 1005-06 (Bye, dissenting). CEC, who hopes to avoid
oral argument on long-pending motions for summary judgment, "is certainly not in the same
emergency position as an immigrant about to be removed, or an individual about to be executed,
who cannot so easily reverse the consequences of initially allowing a district court's order to take
effect." *Id.* at 1006.

decisions by the United States Court of Appeals for the District of Columbia Circuit, whose procedures provide for such relief. *See Cobell*, 2004 WL 603456 at *1 (citing *D.C. Circuit Handbook of Practice and Internal Procedures* 32-33 (2002)).

The Debtors have not, and cannot, cite to any local rule of the United States Bankruptcy Court or District Court for the Northern District of Illinois equivalent to the rules of the Eighth Circuit and the D.C. Circuit. The Debtors' citation to *St. John's United Church of Christ v. City of Chicago*, 401 F.Supp.2d 887 (N.D. Ill. 2005) is misleading. In *St. John's*, the court simply noted, in passing, that the D.C. Circuit previously granted the petitioners an administrative stay pending resolution of their motion for a stay pending appeal. *See id.* at 893. The court neither entertained a request for nor opined on the availability of an administrative stay.

### B. The Debtors Are Not Entitled to a Stay Pending Appeal.

Given that there is no authority for an "administrative stay" in the Northern District of Illinois, the best the Debtors can hope for is a stay pending appeal pursuant to Bankruptcy Rule 8007(b)(1). "The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction." *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). Thus, a court must consider: "1) whether the appellant is likely to succeed on the merits of the appeal; 2) whether the appellant will suffer irreparable injury absent a stay; 3) whether a stay would substantially harm other parties in the litigation; and 4) whether a stay is in the public interest." *In re 203 N. LaSalle St. P'ship*, 190 B.R. 595, 596 (N.D. Ill. 1995). Here, this Court has all the information it needs to reject such a request outright.

First, the Debtors are not likely to succeed on the merits on their appeal. The district court reviews the denial of an injunction by a bankruptcy court for an abuse of discretion. *See In re Caesars Operating Co., Inc.*, 2015 WL 5920882 at *3 (citing *In re Rimsat, Ltd.*, 212 F.3d

1039, 1049 (7th Cir. 2000); *In re Brittwood Creek, LLC*, 450 B.R. 769, 744 (N.D. Ill. 2011)).  A bankruptcy court abuses its discretion when "it commits an error of law or makes a clearly erroneous finding of fact." *Kress v. CCA of Tenn.*, LLC, 694 F.3d 890, 892 (7th Cir. 2012). Under this standard, this court should reverse "only where no reasonable person could take the view adopted by the [bankruptcy] court." *Bedrossian v. Northwestern Memorial Hospital*, 409 F.3d 840, 845 (7th Cir. 2005).  Furthermore, the district court judge is required to accept the bankruptcy judge's findings on questions of fact as long as they are not clearly erroneous.  *See Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).  "The clearly erroneous standard requires this court to give great deference to the bankruptcy court, the trier of fact." *Matter of Love*, 957 F.2d 1350, 1354 (7th Cir. 1992).

      Here, the bankruptcy court's decision to deny the Debtors' motion for an Order extending the section 105 injunction was supported by extensive factual findings developed during the three-day evidentiary hearing.  As Judge Goldgar stated while denying the Debtors' oral motion for a stay pending appeal:

> Also, I do not believe you have even a reasonable likelihood of success on appeal. This was the very factual determination that the court of appeals said that I had to make. Findings of fact are determined under a clearly erroneous standard. The exercise of my discretion in granting an injunction requires an abuse of discretion - in other words, a showing that no reasonable person could have made the decision that I made. And that's a really hard standard to meet. And, not surprisingly, I think what I did was reasonable or I wouldn't have done it. But I think you're quite unlikely to meet that standard.

August 26, 2016 Hearing Tr. at 28:10-22 (a copy of the transcript, which the Debtors failed to attach to the Emergency Motion and Notice of Appeal, is annexed hereto as Ex. A).  This Court should not second guess the bankruptcy court's determination that, based on three evidentiary hearings on this issue and its 20-month history with the case, the Debtors are not entitled to an extension of the section 105 injunction.

- 4 -

Second, there is no risk of irreparable harm. The "looming catastrophe" is merely oral argument on motions for summary judgment, which the Honorable Jed S. Rakoff, the United States District Court Judge presiding over the Unsecured Notes Defendants' Action, has scheduled for August 30, 2016. For the second time, the Debtors seek to indefinitely postpone these proceedings on the eve of argument for the benefit of non-debtor CEC. It is worth noting that CEC itself has never seen fit to petition Judge Rakoff for such relief. In any event, to the extent the Unsecured Notes Defendants' action poses any threat to CEC or the Debtors, which is unlikely given that it is undisputed that CEC can pay $14 million and still make the contemplated contribution to the Debtors' restructuring, the purported risk lies in the enforcement of a judgment, not the adjudication of the pending motions. If a judgment is entered in favor of the Unsecured Notes Defendants, there are avenues available to CEC, such as a bonded appeal, to prevent the parade of horribles invoked by the Debtors. In these circumstances, the Debtors are not entitled to the "extraordinary remedy" of a stay pending appeal. *Adams v. Walker*, 488 F.2d 1064, 1065 (7th Cir. 1973).

The final two factors also weigh against granting any stay, be it an "administrative stay," a stay pending appeal or the *de facto* "automatic stay" in favor of non-debtor CEC the Debtors seek in requesting an injunction through confirmation. The potential harm to the Debtors is remote, since there is no question CEC can satisfy a $14 million judgment and still contribute to the Debtors' reorganization. The public interest also does not support a further stay because, as Judge Goldgar found, a successful reorganization is possible, with or without an injunction, and, to date, the injunction has proven more of an impediment than an aid to settlement in this matter. August 26, 2016 Hearing Tr. at 16:17-17:1. Each of the previous two times the Debtors sought an injunction from the bankruptcy court, they claimed it would facilitate a settlement with the

Unsecured Notes Defendants.  Judge Goldgar found precisely the opposite—following the entry of the second injunction on June 15, 2016, the Unsecured Notes Defendants "practically begged for an opportunity to discuss settlement but did not gain an audience until August 2."  August 26, 2016 Hearing Tr. at 9:17-20.  Because "it isn't injunctive relief that promotes settlement here, but rather its absence," the public interest does not support the granting of a stay.  August 26, 2016 Hearing Tr. at 10:2-4.

For the foregoing reasons, the Court should deny the Emergency Motion, and grant such other and further relief as the Court deems just and proper.

Dated:  August 28, 2016        Respectfully submitted,
       Chicago, IL

**DRINKER BIDDLE & REATH LLP**

By:   */s/ Timothy R. Casey*
      Timothy R. Casey (ARDC # 6180828)
      191 N. Wacker Drive, Ste. 3700
      Chicago, IL 60606
      Telephone: (312) 569-1201
      Facsimile: (312) 569-3201
      timothy.casey@dbr.com

      -and-

      James H. Millar
      Kristin K. Going
      Frank F. Velocci
      1177 Avenue of the Americas
      41st Floor
      New York, NY 10036
      Telephone:  (212) 248-3140
      Facsimile:  (212) 248-3141
      james.millar@dbr.com
      kristin.going@dbr.com

      *Counsel to Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust, and Trilogy Portfolio Company, LLC*

- 6 -

## **CERTIFICATE OF SERVICE**

      I, Timothy R. Casey, an attorney in the law firm of Drinker Biddle & Reath LLP, certify that on this 29th day of August 2016, a true and correct copy of the foregoing ***Unsecured Notes Defendants' Objection to Debtors' Emergency Motion for Administrative Relief*** was served (i) via operation of the CM/ECF System for the United States District Court for the Northern District of Illinois on all registered users thereof and (ii) via First Class U.S. Mail and e-mail as indicated on the attached Service List.

                      By:      /s/ Timothy R. Casey
                                  Timothy R. Casey

<u>SERVICE LIST</u>

| | |
|---|---|
| Andrew I. Silfen<br>Mark. B. Joachim<br>Michael S. Cryan<br>Arent Fox LLP<br>1675 Broadway<br>New York, New York 10019<br>Telephone: (212) 484-3900<br>Facsimile: (212) 484-3990<br>E-mail: andrew.silfen@arentfox.com;<br>       mark.joachim@arentfox.com;<br>       michael.cryan@arentfox.com<br><br>***Via First Class Mail and E-mail*** | Mark F. Hebbeln<br>Harold L. Kaplan<br>Lars A. Peterson<br>Foley & Lardner LLP<br>321 N. Clark Street, Suite 2800<br>Chicago, Illinois 60654<br>Telephone: (312) 832-4500<br>Facsimile: (312) 832-4700<br>E-mail: mhebblen@foley.com<br>       hkaplan@foley.com<br>       lapeterson@foley.com<br><br>***Via First Class Mail and E-mail*** |
| Timothy W. Hoffmann<br>Jones Day<br>77 West Wacker Drive<br>Chicago, Illinois 60601<br>Telephone: (312) 782-3939<br>Facsimile: (312) 782-8585<br>E-mail: thoffmann@jonesday.com<br><br>***Via ECF*** | Jackson D. Toof<br>Arent Fox LLP<br>1717 K Street, N.W.<br>Washington, D.C. 20006<br>Telephone: (202) 857-6000<br>Facsimile: (202) 857-6395<br>E-mail: Jackson.Toof@arentfox.com<br><br>***Via First Class Mail and E-mail*** |
| Edmund S. Aronowitz<br>Grant & Eisenhofer P.A.<br>30 North LaSalle Street<br>Suite 2350<br>Chicago, Illinois 60602<br>Telephone: (312) 214-4000<br>Facsimile: (312) 214-001<br>E-mail: earonowitz@gelaw.com<br><br>***Via First Class Mail and E-mail*** | Gordon Z. Novod<br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue<br>29th Floor<br>New York, New York 10017<br>Telephone: (646) 722-8523<br>Facsimile: (646) 722-8501<br>E-mail: gnovod@gelaw.com<br><br>***Via First Class Mail and E-mail*** |

| | |
|---|---|
| Mark C. Gardy<br>James S. Notis<br>Meagan Farmer<br>Gardy & Notis, LLP<br>Tower 56<br>126 East 56th Street, 8th Floor<br>New York, New York 10022<br>Telephone: (212) 905-0509<br>Facsimile: (212) 905-0508<br>E-mail: mgardy@gardylaw.com<br>        jnotis@gardylaw.com<br>        mfarmer@gardylaw.com<br><br>***Via First Class Mail and E-mail*** | James H.M. Sprayregen, P.C.<br>David R. Seligman, P.C.<br>David J. Zott, P.C.<br>Jeffrey J. Zeiger, P.C.<br>Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>E-mail: jsprayregen@kirkland.com<br>        dseligman@kirkland.com<br>        dzott@kirkland.com<br>        jzeiger@kirkland.com<br><br>***Via ECF*** |
| Nicole L. Greenblatt, P.C.<br>Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP<br>601 Lexington Avenue<br>New York, New York 10022-4611<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>E-mail: nicole.greenblatt@kirkland.com<br><br>***Via ECF*** | John C. O'Quinn<br>Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP<br>655 Fifteenth Street, N.W.<br>Washington, D.C. 20005-5793<br>Telephone: (202) 879-5000<br>Facsimile: (202) 879-5200<br>E-mail: john.oquinn@kirkland.com<br><br>***Via ECF*** |

86400449.1

# EXHIBIT A

1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE NORTHERN DISTRICT OF DIVISION
 2                       EASTERN DIVISION

 3

 4   CAESARS ENTERTAINMENT OPERATING )
     COMPANY, INC., ET AL.,          )
 5                                   )  No. 15 A 00149
                       Plaintiff,    )
 6                                   )
                                     )
 7            vs.                    )
                                     )
     BOKF, N.A., ET AL.,             )  Chicago, Illinois
 8                                   )  August 26, 2016
                       Defendant.    )  3:00 p.m.
 9   ----------------------------    )
                                     )
10   CAESARS ENTERTAINMENT OPERATING )
     COMPANY, INC., ET AL.,          )  No. 15 B 01145
11                                   )
                       Debtor.       )
12

13           TRANSCRIPT OF PROCEEDINGS BEFORE THE
                HONORABLE A. BENJAMIN GOLDGAR

14

15   APPEARANCES:

16

17   For the Plaintiff/Debtor:      Mr. David Zott;

18   For the Second Lien Noteholders:  Mr. Tim Hoffman;

19

20

21

22

23

24

25
```

1           This matter is before me for ruling

2    after a three-day evidentiary hearing on the motion

3    of debtors Caesars Entertainment Operating Co. (or

4    "CEOC") and its subsidiaries to extend the section

5    105 injunction I issued on June 15.  The injunction

6    expires on August 29.  The injunction halted civil

7    actions against non-debtor parent company Caesars

8    Entertainment Corp. (or "CEC") seeking to reinstate

9    and recover on CEC's guarantees of various CEOC

10   notes.  Most of those actions are pending in the U.S.

11   District Court for the Southern District of New York.

12   One is pending in the Delaware Chancery Court.  There

13   are fully-briefed cross-motions for summary judgment

14   pending in all the actions, and the district court

15   has set oral argument on the motions for August 30,

16   the day after the current injunction expires.  The

17   debtors would have me extend the injunction and

18   enjoin the guaranty plaintiffs - the defendants here

19   - from pursuing the actions until a decision on plan

20   confirmation in the underlying bankruptcy cases.

21                   The findings in my opinion dated

22   July 22, 2015, the first injunction order dated

23   February 26, 2016, and my ruling on June 15, 2016,

24   addressing the second injunction request, are

25   incorporated.  Today's decision assumes familiarity

3

1   with those decisions, the identities of the many

2   parties, and the identities of the various witnesses

3   at the hearings.

4                       For the reasons I will now

5   discuss, the debtors' motion to extend the existing

6   injunction will be denied.

7                       The premise of all of the

8   debtors' requests for injunctive relief has been that

9   the bankruptcy estates have claims against CEC, just

10  as the guaranty plaintiffs do, and the estates'

11  claims against CEC are assets of the estates.  The

12  court of appeals described the rest of the debtors'

13  theory this way.  "If before CEOC's bankruptcy is

14  wound up," the court said, "CEC is drained of capital

15  by the lenders' suits to enforce the guaranties that

16  CEC had given them, there will be that much less

17  money for CEOC's creditors to recover in the

18  bankruptcy proceeding. . . . The less capital CEC has

19  for CEOC to recapture through prosecution or

20  settlement of its fraudulent-transfer claims, the

21  less money its creditors will receive in the

22  bankruptcy proceeding."  Caesars Entm't Operating

23  Co., Inc. v. BOKF, N.A. (In re Caesars Entm't

24  Operating Co.), 808 F.3d 1186, 1189 (7th Cir. 2015).

25  What's more, the court continued, "[o]ne can envision

4

1    a situation in which CEC, having both obligations on

2    the guaranties it issued to CEOC's lenders, and

3    obligations to CEOC arising from the latter's

4    fraudulent-transfer claims, would lack the money to

5    satisfy all its obligees."  Id.  The court of appeals

6    noted CEOC's contention "that if the guaranty

7    litigation against CEC can be frozen for a time . . .

8    , the bankruptcy examiner's report analyzing the

9    disputed transactions will provide the parties with

10   information they need to have a clear shot at

11   negotiating an overall settlement."  Id.

12                   That was in response to the

13   debtors' first motion for injunctive relief.  The

14   motion sought an injunction only until 60 days after

15   the examiner issued his initial report, or May 9,

16   2015, whichever was greater.  On remand from the

17   court of appeals, I granted the motion and issued the

18   injunction, noting that the injunction was only

19   temporary and designed to promote a resolution of

20   these cases through a consensual plan.  A month after

21   the first injunction expired, the debtors sought a

22   second one on an emergency basis.  The premise:  That

23   progress on the settlement front justified additional

24   relief, this time through a decision on confirmation.

25   After an evidentiary hearing, I granted the motion,

5

1    despite deficiencies in the evidence, because enough

2    progress was demonstrated to warrant relief.  But the

3    injunction was given an August 29 expiration date. I

4    warned that the chances of further relief were slim,

5    and the August 29 date should be treated as a

6    deadline.

7              Despite that warning, on August 8

8    the debtors moved to extend the current injunction,

9    again asking for relief through a decision on plan

10   confirmation.  The confirmation hearing is set to

11   begin January 17, 2017.  There is, of course, no date

12   for a decision on a hearing that has yet to be held.

13             The requirements for a section

14   105 injunction differ somewhat from the requirements

15   necessary for injunctive relief in other contexts.

16   Rather than a likelihood of success on the merits,

17   the debtor must show a likelihood of a successful

18   reorganization.  The debtor must also show that the

19   denial of relief threatens the reorganization.  Or,

20   as the court of appeals put it here, the question the

21   debtors raise is "whether the injunction sought by

22   CEOC is likely to enhance the prospects for a

23   successful resolution of the disputes attending its

24   bankruptcy.  If it is, and its denial will thus

25   endanger the success of the bankruptcy proceedings,

6

```
1   the grant of the injunction would, in the language of
2   section 105(a) be 'appropriate' . . . ."  BOKF, 808
3   F.3d at 1188-89.  The debtor must also show that the
4   public interest favors relief.  And, I will now
5   conclude, the debtor must show that the balance of
6   equities weighs in its favor.  There is no
7   irreparable harm requirement.
8                    A section 105 injunction is
9   considered a drastic and extraordinary remedy, one
10  rarely sought and even more rarely granted.  That's
11  the case because an injunction confers one of the
12  principal benefits of bankruptcy - protection from
13  the collection efforts of creditors - on someone who
14  has not chosen to assume the burden of filing a
15  bankruptcy case of his own.  It's also the case
16  because the injunction impairs the rights creditors
17  have under state law and interferes with the work of
18  other courts - in this case the work not only of a
19  U.S. district court but the court of another
20  sovereign, the state of Delaware.  To me, that last
21  point is critical and makes a section 105 injunction
22  a remedy never to be granted lightly.  As with all
23  injunctions, a section 105 injunction is an equitable
24  remedy.  Whether an injunction should be granted is
25  thus a matter for my discretion.
```

1          In this case, the evidence
2  supports only one of the four elements necessary for
3  the relief the debtors want.  The other elements
4  weigh in favor of a denial.
5          First, the evidence showed, as it
6  has shown at past hearings, that the debtors do have
7  a likelihood of reorganizing successfully.  The
8  debtors have a strong business that has done well
9  since these cases were filed.  The evidence showed
10 that the debtors have outperformed projections during
11 the first half of this year and have met projections
12 in June and July.  David Hilty, the defendants'
13 expert, agreed there is a likelihood of a successful
14 reorganization here.
15          But I'm no longer convinced, as I
16 had been in the past, either that an injunction is
17 likely to enhance the success of a reorganization or
18 that its denial will endanger that success.
19          First, I can't find, given the
20 history of the parties' negotiations, that an
21 injunction is likely to enhance the prospects for a
22 successful resolution of the disputes in these
23 bankruptcies.  Most of the deal-making that has
24 happened here has occurred when no injunction was in
25 effect.  This is particularly true of events in late

8

May and early June of this year.  The progress on
settlement that I found justified a second injunction
this past June all took place when CEC had no
protection from an injunction and deadlines in the
guaranty litigation were looming.  As for what
happened after the June 15 injunction the answer is:
Not that much.  The post-June 15 progress the debtors
cite consists mostly of restructuring support
agreements (or "RSAs") previously reached being
executed or becoming effective.  That can't be
dismissed entirely, but it's the reaching of an
agreement in principle that matters most, not its
execution.  The RSAs with CEC, the UCC, the SGNs, and
the first lien notes were all reached before June 15.
As of June 15, negotiations with the first lien banks
were continuing, but an agreement was reached just 5
days later, suggesting one was well in the works as
of the injunction date.

Since June 22, the debtors can
point only to the Danner RSA and the second lien
notes RSA.  But the significance of the Danner RSA is
doubtful.  As for the second lien notes RSA, that RSA
is not effective, won't ever become effective (given
the cooperation agreement among the dissident
noteholders requiring them not to sign it), and has a

9

1   $950 million funding shortfall.  Whether that

2   shortfall will be made up – and if so, when and by

3   whom – is purely speculative.

4                        Negotiations with the guaranty

5   plaintiffs, both the second lien noteholders and the

6   unsecured noteholders, have also proceeded at a pace

7   that shows no real urgency on the part of the

8   debtors' camp.  Although there have been five

9   mediation sessions involving the second lien

10  noteholders, the first new proposal to them was not

11  made until August 2.  The noteholders countered that

12  day but never received a response.  Since August 17,

13  when I gave another thinly-veiled warning that

14  further injunctive relief was unlikely, the second

15  lien noteholders have offered to meet, but CEC

16  refused to participate in a meeting unless the

17  parties' mediator could participate.  The unsecured

18  noteholders, meanwhile, practically begged for an

19  opportunity to discuss settlement but did not gain an

20  audience until August 2.  Ultimately, they were told

21  that further settlement discussions were pointless

22  until a deal with the second lien noteholders was

23  struck.

24                        The pace of discussions does not

25  show that the current injunction is helping or that

10

1 its expiration gives the parties much cause for

2 concern.  Given this history, in fact, it appears

3 that it isn't injunctive relief that promotes

4 settlement here but rather its absence.  The

5 deadlines in the underlying guaranty litigation are

6 what prompt the parties to act.

7                      The debtors disagree, pointing to

8 the mediator's assertion in a written statement that

9 the parties have made "material progress."  Again,

10 however, the mediator didn't testify, so there was no

11 opportunity to probe that assertion.  His written

12 statement seems to assume that progress consists

13 primarily of frequent meetings and discussions, since

14 that takes up the majority of his statement.

15 Certainly, it's better for the parties to meet and

16 discuss than not, but meeting and discussing alone,

17 without more, isn't progress.  His statement fails to

18 describe the discussions themselves, the dates or

19 locations when they took place, any proposals

20 exchanged, or any distance remaining between the

21 parties.  The only actual progress, in the sense of

22 an agreement, that the mediator cites, is the second

23 lien notes RSA.  It's hard to conclude that that RSA

24 represents much progress toward a settlement here.

25                      Almost 20 months have passed

1   since these bankruptcy cases have been filed.  During

2   that time, the debtors and CEC have had the benefit

3   of two injunctions totaling 5 months, both issued in

4   2016.  The first extended from February 26 to May 9,

5   the second from June 15 to August 29.  During that

6   time, no consensual resolution of these cases has

7   been reached, although that was unquestionably what

8   the court of appeals had in mind.  The debtors have

9   had the "clear shot" the court mentioned.

10                  Particularly disturbing is that

11  none of the targets of the estates' claims arising

12  from the disputed transactions – targets that include

13  the ultimate owners of the Caesars enterprise, Apollo

14  and TPG – are making any financial contribution to

15  the reorganization, although the proposed plan would

16  release all the claims against them (both the

17  estate's claims and the claims in the guaranty

18  litigation).  James Millstein, the debtors'

19  restructuring advisor, was asked about this at the

20  first hearing in June 2015 and again at the second

21  hearing this past June.  At both hearings, he

22  admitted that the only party providing a contribution

23  was CEC.  Incredibly, the testimony this week was

24  that the targets of these claims were not even

25  approached about making a contribution until two

12

1  weeks ago.  These parties are the same ones the

2  examiner concluded in his report are potentially

3  liable to the estates for $3.6-5.1 billion.  Yet

4  asked at his deposition whether any of these parties

5  had been approached, Ronen Stauber testified: "I

6  don't know."  This, from a member not only of the

7  CEOC Board but the Board's restructuring committee.

8  Worse still, Brendan Hayes,

9  another of the debtors' restructuring advisors,

10  testified that when Apollo and TPG were at last

11  approached about funding the $950 million "hole" in

12  the second lien notes RSA, they refused, saying

13  essentially that it was "a CEC problem."  Stauber's

14  testimony confirms Hayes's version of events.

15  Stauber's only explanation of the

16  debtors' failure to pursue the objects of the

17  estate's claims is that the debtors have always

18  looked at the funding of the plan "holistically,"

19  meaning the overall amount of the funding, seemingly

20  unconcerned about where that funding would come from.

21  Ignoring these obvious and significant sources of

22  recovery for more than a year and a half is nothing

23  less than stunning and makes clear that further

24  injunctive relief is unwarranted.

25  The debtors argue, though, that

1   Apollo and TPG are making a contribution.  Their

2   contribution consists of the reduction in the value

3   of their ownership interest in CEC from $4 billion to

4   $2 billion under the plan.  But the evidence showed

5   that the $4 billion valuation is a fiction, that the

6   real value is actually below the value of Apollo and

7   TPG's interest in "new CEC" under a confirmed plan.

8   Apollo and TPG do currently hold a controlling

9   interest in CEC and stand to lose control if the plan

10  is confirmed.  That loss has a value of some kind.

11  But no one could quantify its value, and the debtors

12  themselves never mentioned this as a contribution.

13              The debtors took the position in

14  closing argument that their injunction request isn't

15  about settlement at all, that it's about protecting

16  the contribution to the plan from CEC.  The debtors

17  are indeed trying to protect that contribution.  But

18  the point of the injunction has always been not only

19  to protect the CEC contribution but to gain time to

20  reach a settlement.  And to be clear, a settlement

21  means a consensual plan.  It does not mean a cramdown

22  plan confirmed after a contested confirmation

23  hearing.  Gaining time to reach a settlement was the

24  goal the debtors advanced at the first injunction

25  hearing.  It was the goal the debtors advanced in the

14

1   court of appeals.  It has always been the point of

2   the debtors' requests for injunctive relief.

3                 An injunction through a decision

4   on confirmation is a non-starter in any event and

5   always has been – not because bankruptcy courts lack

6   the power to grant one, but because these sorts of

7   injunctions are, as I said, drastic remedies and so

8   almost always temporary, rarely more than a few

9   months.  A soup-to-nuts injunction – one running from

10   petition date through effective date – is, as Hilty

11   noted, tantamount to the automatic stay.  Had

12   Congress intended to permit that sort of remedy for

13   non-debtors, it would have provided it.  Except in

14   chapter 12 and 13 cases, it hasn't done so.  The two

15   decisions – only two – that the debtors cite in which

16   courts granted an injunction of that duration

17   involved plans under which the creditors enjoined

18   would be paid 100%, not the situation here.

19                Just as the issuance of an

20   injunction isn't likely to enhance the prospects for

21   a successful resolution of the disputes in these

22   cases, I'm no longer convinced that the denial of an

23   injunction will endanger the reorganization.  As I

24   noted in my June 15 ruling, Millstein has always

25   acknowledged that a reorganization of these debtors

1  based on a CEC contribution is only one way to
2  reorganize them, and a reorganization can in fact be
3  accomplished without a contribution.  As early as the
4  first hearing in June 2015, he testified that it
5  would be perfectly possible to reorganize around the
6  value of the debtors themselves and to assign the
7  estate's claims to a litigation trust and pursue the
8  claims that way.  Millstein thought only that the
9  attendant administrative costs made that option less
10 desirable.  At the second hearing this past June,
11 Millstein went further, refusing even to say that the
12 denial of an injunction would rule out a
13 reorganization that relied on a contribution from
14 CEC.  He could say with certainty only that
15 consummation of the plan would be substantially
16 delayed.
17                    Not even a CEC bankruptcy is a
18 foregone conclusion, Millstein admitted.  Both
19 Millstein and Hilty testified, both at the June 2016
20 hearing and in Hilty's case at the latest one, that
21 in the event of an adverse judgment in the guaranty
22 litigation there were alternatives, including the
23 possibility of a forbearance agreement and even a
24 stay pending appeal.  At most, Millstein said, a
25 bankruptcy would "put in jeopardy" CEC's

1   contribution. The debtors' offered no additional

2   evidence on these points at the latest hearing,

3   certainly nothing to support the prediction in the

4   closing argument of a "catastrophe" if the current

5   injunction weren't extended.

6                 In my June 15 ruling, I noted all

7   of this evidence and the weaknesses in the debtors'

8   case but said that "on the whole the debtors'

9   progress on the settlement front" was enough to

10   justify further relief. That's no longer true.

11                 The public interest doesn't favor

12   an extension of the injunction, either. Two

13   interests have been cited here, and I mentioned both

14   in my earlier rulings. They are the public interest

15   in successful reorganizations and the public interest

16   in settlements.

17                 The interest in successful

18   reorganizations doesn't support further relief

19   because a successful reorganization is possible here

20   even if the injunction is not extended, and a denial

21   of an extension seems unlikely to imperil the

22   debtors' efforts to reorganize. As for settlement,

23   past experience in this case has shown that

24   settlements result when no injunction is in place.

25   The injunctions I've issued have been more of an

1  impediment than an aid.  The interest in settlement

2  actually counsels against extending the current

3  injunction.

4                    That brings me to the balancing

5  of the equities.  Although I've previously questioned

6  whether balancing is necessary in a section 105

7  context, I now conclude that it is.  I reach that

8  conclusion for several reasons.  First, balancing

9  isn't mentioned as a requirement in the Seventh

10  Circuit decisions - but neither do those decisions

11  prohibit balancing.  The question simply goes

12  unaddressed.  Second, as I've observed before,

13  balancing is a traditional part of the injunction

14  question.  Third, other circuits do require balancing

15  when a section 105 injunction is sought, and

16  Collier's describes balancing as "arguably the most

17  critical element of a section 105 injunction . . . ."

18  Faced squarely with the question, the Seventh Circuit

19  would likely find balancing necessary.

20                    Balancing requires a comparison

21  of the harm to the movant if relief is denied and the

22  harm to the non-movant if relief is granted.  The

23  debtors risk harm in a number of respects if the

24  injunction is not extended.  They face the

25  possibility that there will be an adverse judgment in

the guaranty litigation and the resulting loss of the
CEC contribution.  If that happens, they risk the
possibility that all the work put in on the RSAs with
other segments of the creditor body will go for
naught.  And they face the possibility that a CEC
bankruptcy will indeed produce one of "the great
messes of our time," Millstein's phrase, because of
the litigation that could ensue and the
administrative costs that litigation could entail.

But how great are these risks?
Not so great.  Millstein acknowledged that they were
just possibilities.  CEC might win the guaranty
litigation.  Even if CEC loses, CEC might not file
bankruptcy.  (After all, CEC was threatening to file
a bankruptcy case last June and the testimony at the
June 2015 hearing was that it might do so even if no
judgment were entered.  More than a year later, no
bankruptcy case has been filed.)  Even if CEC files
bankruptcy, there might still be a reorganization
involving a CEC contribution.  And even if the
contribution disappears, there can still be a
successful reorganization.  Denial of further relief
may risk the success of the current plan of
reorganization; a reorganization itself is not at
risk.  Meanwhile, allowing the injunction to expire

1  now appears more likely to produce a resolution than

2  extending the injunction.

3                    The defendants, meanwhile,

4  themselves face risks if the injunction is extended –

5  particularly if it's extended as long as the debtors

6  would like.  The defendants will be stymied in their

7  ability to seek restoration of the CEC guarantees and

8  enforcement of their rights under them.  As the court

9  in Saxby's Coffee Worldwide observed, creditors have

10 a substantial interest in the enforcement of

11 bargained-for rights that should not be minimized.

12 As the Saxby's court also  observed, litigants always

13 face some risk in their ability to succeed in

14 litigation because of the delay an injunction

15 produces in obtaining a prompt resolution.

16                    In Saxby's, the court discounted

17 those interests because no "particularized harm" had

18 been identified, and none has been identified here.

19 No one has identified any witnesses who are in danger

20 of disappearing or dying, for example.  On the other

21 hand, Saxby's granted a 7-month injunction because it

22 was relatively early in the case, and the injunction

23 involved a "relatively modest, finite period of

24 time."  It is not early in this case – quite the

25 contrary – and the debtors have already been the

1   beneficiaries of 5 months of injunctions.  The

2   injunction they want is neither modest nor finite,

3   since it would run through a decision on

4   confirmation.  When that decision will be issued is

5   anyone's guess, but it won't be soon.  The hearing

6   itself could prove interminable (and the delay in a

7   decision even more so), given that 68 parties (not

8   counting the debtors) have given notice of their

9   intent to participate.  Those parties currently

10  intend to call 57 fact witnesses and 10 experts.  Far

11  from 5 months or 7 months, the injunction the debtors

12  are asking for could last a year or more.

13                    The defendants here also run

14  another risk of sorts.  The claims that some of them

15  are asserting are brought under the Trust Indenture

16  Act of 1939.  The evidence showed that CEC has used

17  past injunctions to lobby Congress to amend the TIA

18  to eliminate the claims in the guaranty litigation.

19  This isn't much of a risk, since the evidence also

20  showed that no bill had even been introduced, let

21  alone voted on, and in a presidential election year

22  it seems unlikely Congress will pass an amendment to

23  the TIA – or pass much else for that matter.  But

24  it's unseemly – and so inequitable – for CEC to

25  employ an injunction in its favor to gain an

21

1   advantage in litigation over parties whose hands the

2   injunction has tied.  Injunctions should preserve the

3   status quo; the status quo was evidently not enough

4   for CEC.

5                    In closing, counsel for the

6   debtors placed the blame on CEC and also asserted

7   that CEC really had "nothing to do" with the debtors'

8   request to extend the injunction.  But CEC has

9   everything to do with that request.  The injunction

10  halts litigation against CEC, not against the

11  debtors.  (The bankruptcy cases helped the debtors,

12  after all.)  CEC therefore benefits directly from the

13  injunction.  If that weren't the case, CEC wouldn't

14  have insisted in its own RSA that the debtors

15  continue to pursue injunctive relief.  A section 105

16  injunction is also known as a "third party

17  injunction" for a reason.

18                    Although the call is a close one,

19  the balance of the equities tips in favor of the

20  defendants here.

21                    In concluding, it's helpful to

22  keep in mind what the often-cited Saxby's decision

23  says about section 105 injunctions:

24                    "The § 105 injunction should not

25  provide nondebtors with a comfortable, 'free ride' on

1 the coattails of the debtor. The issuance of a § 105
2 injunction should not eliminate the keen sense of
3 urgency that insider nondebtors would otherwise have
4 to resolve, as promptly as possible, the outstanding
5 legal and monetary disputes that gave rise to the
6 bankruptcy case. Stated another way, the nondebtors
7 should continue to feel pressure to expedite the
8 reorganization process so that the injunction may be
9 lifted as soon as possible and the ordinary legal
10 relationships among the nondebtors restored."

11 The injunctions here have provided
12 CEC, Apollo, and TPG, a comfortable, free ride on the
13 debtors coattails. They have shown no keen sense of
14 urgency to resolve the outstanding disputes that gave
15 rise to the bankruptcy case – and frankly, neither
16 have the debtors, at least where the disputed
17 transactions are concerned. CEC, Apollo, and TPG
18 have evidently felt no particular pressure to
19 expedite the reorganization process. Now perhaps
20 they will.

21 Whether to grant or deny
22 injunctive relief requires a trial judge to reach a
23 decision "based on a subjective evaluation of the
24 import of the various factors and a personal
25 intuitive sense of the nature of the case." Lawson

23

1  Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th
2  Cir. 1986).  Because in my judgment, and based on my
3  sense of these bankruptcy cases, the debtors have
4  managed to establish only one of the four elements
5  necessary to have the existing injunction extended, I
6  will exercise my discretion and deny the debtors'
7  motion.

8              MR. ZOTT:  Your Honor, can I have a
9  moment?

10              THE COURT:  It depends on what for,
11  Mr. Zott, because I'm done with this matter now.

12              MR. ZOTT:  I could not hear you, Your
13  Honor.

14              THE COURT:  I said it depends on what
15  for, Mr. Zott, because I am done.

16              MR. ZOTT:  Okay.  Well, here is our
17  issue, Your Honor.  As you know -- I understand and I
18  appreciate Your Honor taking the time and effort, as
19  I said yesterday in closings.  So now at this point,
20  with the injunction having been -- our request to
21  extend the injunction having been denied --

22              THE COURT:  Yes.

23              MR. ZOTT:  -- then the guaranty
24  summary judgments will go forward on August 30th.

25              THE COURT:  Presumably.

24

1          MR. ZOTT:  We intend to appeal from
2  Your Honor's order.

3          THE COURT:  Sure.

4          MR. ZOTT:  And to seek an expedited
5  appeal.  The challenge, of course, is that the
6  summary judgment ruling could come as early as
7  August 30th at 4:00 p.m.  I know Your Honor is of the
8  view that it probably wouldn't come then.

9          THE COURT:  No.

10          MR. ZOTT:  We don't have that
11  confidence, given the fact that the district court
12  has had it under advisement for a long time, set it
13  one day after the injunction has been expired, and
14  set it at 4:00 p.m.  And I think the testimony was no
15  one knows when the court will rule.  Even if it's a
16  week later, that still wouldn't be enough time to
17  actually prosecute an appeal, even an expedited
18  appeal.

19          So, we are requesting, Your Honor, and
20  moving, and we'll do it with papers, but moving
21  orally under Bankruptcy Rule 8007(a)(1) to extend the
22  injunction pending appeal.  This is not, obviously,
23  to extend it through confirmation.  This is to extend
24  it just to give us the right to have a court review
25  the substance of Your Honor's decision without

25

1   mooting it out through having the guaranty litigation
2   go forward.  And I'm prepared to address the
3   standards here, Your Honor.  We're prepared to file
4   papers today.

5          I would also note, Your Honor, that --
6   should I keeping going, Judge?

7          THE COURT:  Yes, please.

8          MR. ZOTT:  Okay.  So, with respect to
9   the stay of the injunction pending appeal, Your
10  Honor, we respectfully submit that the key issue here
11  is to allow, given the complexity and the difficulty
12  and the importance of the issues, to have -- to
13  permit an appellate court, the district court, and/or
14  the Seventh Circuit to review this decision before
15  the potential for irreparable harm can occur to the
16  debtors.

17         As Your Honor noted and has always
18  been the case, we at least believe that the judgments
19  threaten the $4 billion contribution that is the
20  linchpin of the plan.  We believe, as the evidence
21  showed, it's supported by $14 billion in capital
22  structure.  We believe that the prospect of a CEC
23  bankruptcy could be very, very harmful.  Again, that
24  in our view alone would be enough to get the
25  injunctive relief simply during the period that an

26

1   appellate court would review.  I'm not talking about

2   for the entire length, obviously, to confirmation, or

3   even for 30 days.  We also believe we'd have

4   irreparable harm just from not being able to have an

5   appellate court review the court's decision.

6                   In terms of the balance of the harm,

7   Your Honor, we believe that the potential prejudice

8   to debtors and to all of the creditors who support

9   the plan far, far outweigh the harm that the

10  litigants showed, the guaranty plaintiffs, who told

11  the court their main harm would be having to reargue

12  the issue again in court, which is what they told you

13  at the closing.

14                  On the public interest, Your Honor

15  knows the standards there.  We believe that there is

16  a strong public interest in a successful

17  reorganization and promoting settlement.

18                  Finally, on likelihood of success,

19  Your Honor, this is a little different.  This would

20  be the likelihood of success on appeal.

21                  THE COURT:  Right.

22                  MR. ZOTT:  Not the likelihood of

23  reorganizing.

24                  THE COURT:  Right.  I'm quite familiar

25  with the standards.

1          MR. ZOTT:  Okay.  So, you also know

2   then that it's a sliding scale, so the greater the

3   harm, the less of a showing.  We believe the Seventh

4   Circuit already has weighed in and ruled once in this

5   case.

6          THE COURT:  On a rather different

7   issue, I might say.

8          MR. ZOTT:  Well, that's really the

9   issue that the Seventh Circuit would have to decide.

10  We don't agree with that, Your Honor.

11         THE COURT:  Well, you think they've

12  already ruled on the issue that I just discussed?

13         MR. ZOTT:  I think in part they have.

14  I think they ruled on the standard to apply.

15         THE COURT:  I think I applied that

16  standard, Mr. Zott.

17         MR. ZOTT:  Okay.  And I respect that,

18  Your Honor.  And I understand that, and I'm not here

19  today to in any way --

20         THE COURT:  Well, let me cut you off.

21  There is no such thing in this court as an oral

22  motion, number one.  So, I am not in a position to

23  address a request for a stay that you're making from

24  the lectern.  There are parties who are not even in a

25  position to oppose your request because no one

28

1    contemplated that you would make such a request.

2                    Number two, it seems to me that it is

3    not possible to get a stay of the denial of an

4    injunction pending appeal because that's tantamount

5    to getting the injunction.  If I were to extend the

6    injunction through an appeal, not only to the

7    district court but beyond, it would essentially be

8    granting you exactly what you wanted that I said you

9    couldn't have.

10                   Also, I do not believe you have even a

11   reasonable likelihood of success on appeal.  This was

12   the very factual determination that the court of

13   appeals said that I had to make.  Findings of fact

14   are determined under a clearly erroneous standard.

15   The exercise of my discretion in granting an

16   injunction requires an abuse of discretion – in other

17   words, a showing that no reasonable person could have

18   made the decision that I made.  And that's a really

19   hard standard to meet.  And, not surprisingly, I

20   think what I did was reasonable or I wouldn't have

21   done it.  But I think you're quite unlikely to meet

22   that standard.

23                   So, you know, if you want to file a

24   motion, I'll consider it as promptly as I can, but

25   I'm not prepared even to enter an order one way or

1    the other right now.

2              MR. ZOTT:  All right, Judge.  The only

3    issue is -- and I appreciate that, but the problem we

4    have, of course, is we think a ruling could come as

5    early as Tuesday.

6              THE COURT:  I think that's really

7    unlikely.  I mean, he's going to have the argument at

8    4:00 o'clock in the afternoon his time.  What's the

9    likelihood that Judge Rakoff actually issues a

10   decision that day?

11             MR. ZOTT:  I think there is a

12   substantial chance of that, I honestly do, because I

13   don't think he would set something for 4:00 p.m. on

14   all those motions.

15             THE COURT:  Well, if you want to file

16   a motion today - I mean, I hesitate to do this

17   because it's completely out of order.  I mean,

18   ordinarily you would have to have an application to

19   file an emergency motion.  You haven't even done

20   that.  And I really hope to be out of here soon, to

21   be perfectly honest.

22             MR. ZOTT:  I know.

23             THE COURT:  It's been a long week.

24             MR. ZOTT:  I know.

25             THE COURT:  But I understand what

30

1   you're doing, and I don't blame you for trying to do

2   it.  And the only question is how I can accommodate

3   you.  And I just don't want to address an oral motion

4   for a stay pending appeal.

5              MR. ZOTT:  Can I raise one other

6   point?

7              THE COURT:  Sure.

8              MR. ZOTT:  There's also another

9   procedure, Your Honor.  It's an administrative stay

10  pending briefing on the stay.  So, in other words,

11  there is authority that even before briefing the stay

12  pending appeal, the court has the ability to enter a

13  brief administrative stay that would just freeze

14  everything while the parties brief whether or not to

15  enter a stay pending appeal.

16             And that's permitted under the same

17  rule, Rule 8007(a)(1).  And we could file that brief

18  within an hour.  It then would grant the court

19  somewhat more time to consider the factors.  Now, I

20  understand -- and so that's one option, which would

21  be to have the court enter a temporary stay, just

22  administrative relief, so that you could consider the

23  stay pending appeal with something more than a day or

24  two.

25             THE COURT:  You anticipated my

1  decision, did you?

2          Could you point me to the rule that

3  talks about an administrative something-or-other?

4          MR. ZOTT:  The rule I'm relying on is

5  Rule 8007(a)(1).

6          THE COURT:  Yes.

7          MR. ZOTT:  And then there's under --

8  and then applying that rule, because I agree it

9  doesn't specifically refer to an administrative stay.

10 But there is a substantial body of law, and I've got

11 the cases I could cite to Your Honor, which recognize

12 the authority to give an administrative stay, the

13 purpose of which is to give the court sufficient

14 opportunity to consider the merits of a motion for a

15 stay pending appeal.

16         THE COURT:  Well, I don't think that

17 you have a chance of getting a stay, and I would

18 rather deny your motion as fast as I can so that you

19 can take it to the district court.

20         MR. ZOTT:  That's the other thing I

21 was going to raise, Your Honor.  I would then request

22 that you deny the motion, as well as the request for

23 administrative relief, and we can go right to the

24 district court.  Because, I mean, it sounds like

25 that's what you want to do, and I appreciate that,

32

1  and I respect it, and this is all about us trying to

2  do our job and you trying to do your job.

3          THE COURT:  Yes.  Mr. Zott, I don't

4  blame you for trying to do your job, and I never

5  have.  You have to understand that.  As for what I

6  want, it's not a matter of what I want.  I have no

7  desire particularly other than to go home at a

8  certain point today.

9          MR. ZOTT:  Poor phrasing, Judge.

10         THE COURT:  It's what I think is

11 appropriate given the facts and the law.

12         MR. ZOTT:  Okay.

13         THE COURT:  Can I have counsel's

14 appearance, please.

15         MR. HOFFMAN:  Your Honor, Tim Hoffman

16 on behalf of the second lien noteholders.  The people

17 from Jones Day who tried this case are, obviously,

18 not in the courtroom.

19         THE COURT:  No, they didn't anticipate

20 this.

21         MR. HOFFMAN:  The theory was -- and I

22 think we have only listen-only lines.

23         THE COURT:  Yes, we do.

24         MR. HOFFMAN:  So they cannot

25 participate.  If the debtors would like some relief

33

1  from you, I think they have to file a motion.

2                THE COURT:  Well, what if I were to

3  dispense with whichever local rule requires a written

4  motion, and simply deny it as an oral motion right

5  now?  I mean, they're going to have to file something

6  in the district court, not to mention a notice of

7  appeal, I suspect.  And then everybody will get to

8  see that.

9                So if I deny the motion, then (A)

10  nobody is really prejudiced by the fact that no one

11  can participate because the non-participants will

12  win; and (B) it gets the debtors to a court that may

13  be more hospitable, although I doubt it, than this

14  one.

15                MR. HOFFMAN:  Your Honor, I think

16  there is some prejudice in the fact that we --

17                THE COURT:  How so?

18                MR. HOFFMAN:  -- haven't seen the

19  motion.  We don't know what the --

20                THE COURT:  Well --

21                MR. HOFFMAN:  -- basis is, we don't

22  know what the law is to be.  I mean, I think --

23                THE COURT:  Well, sure, neither have

24  I.  I'm talking about the argument that Mr. Zott just

25  made.  In the district court, there isn't this

34

1    opportunity for an oral motion.  You have got to get

2    your foot in the door first.  That's going to require

3    some paper and you'll see the paper.  So in that

4    respect, I don't think you're going to be harmed.

5    The question is whether you have an objection to my

6    simply denying their oral motion for a stay now.

7                    MR. HOFFMAN:  I mean --

8                    MR. ZOTT:  Well --

9                    MR. HOFFMAN:  I think the answer is

10   yes, we do.

11                   MR. ZOTT:  Well --

12                   THE COURT:  Well, let him finish,

13   Mr. Zott.

14                   MR. HOFFMAN:  And it's based upon the

15   fact, as you just stated, Your Honor, that there are

16   no oral motions in this court.

17                   THE COURT:  There really aren't.

18                   MR. HOFFMAN:  They have papers ready.

19   I think they should have to file a motion, and they

20   should have to go through the procedural

21   requirements.  And I say that especially because of

22   the fact that our view of this hearing was the fact

23   that it was just you were going to read the decision,

24   and there was going to be no participation.  There

25   was going to no anything else.

1          THE COURT:  Yes.  It's not even the

2    local rules.  It's Bankruptcy Rule 9013.

3          MR. ZOTT:  Right.

4          THE COURT:  "Shall be by written

5    motion, unless made during a hearing."  But this

6    isn't a hearing.  This was just a ruling date.

7          MR. ZOTT:  Well --

8          THE COURT:  You know, believe it or

9    not, Mr. Zott, I'd like to help you with this.  I

10   understand about stays pending appeal.  And I would

11   like to send you somewhere else because I know you're

12   not going to get anything out of me.  But I don't

13   know that I can.

14         MR. ZOTT:  All right.  Well, Your

15   Honor, I mean, we're in a situation now where they're

16   obviously not going to agree to the motion I brought.

17   So, I mean, they obviously oppose it.  And Your Honor

18   is obviously going to deny it because of the

19   rationale that you gave, which I totally respect.

20         So now we -- and yet if Your Honor

21   doesn't deny it, and they obviously oppose it, then,

22   you know, it seems like it's -- I'm going to be

23   potentially denied the ability to appeal what could

24   be a $14 billion disaster against my clients.  So, I

25   mean, I think the fair thing to do is to deny it,

1   Judge.

2               And I also think this would be

3   construed as a hearing sufficiently enough for an

4   oral motion.  When else would you bring a motion for

5   an emergency stay other than when you lose on the

6   issue?  I don't see how else it could happen.  And

7   it's Thursday, tomorrow is Friday, and the ruling

8   comes in Tuesday.

9               So at least with respect to the

10  district court -- and you did mention that one of the

11  reasons in your ruling was respect for other courts.

12  So at least allow the district court the ability to

13  look at this issue.  All they're trying to do now is

14  a pocket veto, and that is not right.  I mean, it's

15  fine to deny it, let us go to the district court, and

16  they can make all the arguments there that they want

17  to make.

18              THE COURT:  All right.  I am

19  persuaded.  This is --

20              MR. HOFFMAN:  Your Honor --

21              THE COURT:  No.  We're done.  I'm

22  persuaded this is a hearing.  I have an oral motion

23  for a stay pending appeal.  For the reasons I've

24  described, the motion is denied.  I'll enter an

25  order.

37

1          MR. ZOTT:  Thank you Your Honor.  I

2     appreciate it.

3          MR. HOFFMAN:  Thank you, Your Honor.

4          (Which were all the proceedings had in

5          the above-entitled cause, August 26,

6          2016, 3:00 p.m.)

7     I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
      THAT THE FOREGOING IS A TRUE AND ACCURATE
8     TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
      ENTITLED CAUSE.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25