No. 1:16-cv-08423

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE: CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,

*Debtors.*

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,

*Plaintiffs-Appellants,*

v.

BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC, AND FREDRICK BARTON DANNER,

*Defendants-Appellees.*

On Appeal from the United States Bankruptcy Court for the
Northern District of Illinois (Goldgar, J.)
Chapter 11 Case No. 15-01145
Adversary Proceeding No. 15-00149

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

John C. O'Quinn
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
655 15th Street, N.W.
Washington, D.C. 20005
Tel:   (202) 879-5000
Fax:   (202) 879-5200
john.oquinn@kirkland.com

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
601 Lexington Avenue
New York, N.Y. 10022
Tel:   (212) 446-4800
Fax:   (212) 446-4900

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Tel:   (312) 862-2000
Fax:   (312) 862-2200

*Counsel for Debtors/Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Plaintiffs-Appellants make the following disclosure:

1.      Eighty-nine and three tenths percent (89.30%) of the equity of CEOC is directly owned by Caesars Entertainment Corporation, a publicly-held corporation, and no other publicly-held corporation owns more than ten percent (10%) of CEOC's equity.

2.      One hundred percent (100%) of the equity of 190 Flamingo, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of 190 Flamingo, LLC.

3.      One hundred percent (100%) of the equity of 3535 LV Corp. is directly owned by CEOC, and no publicly-held corporation owns any equity of 3535 LV Corp.

4.      One hundred percent (100%) of the equity of 3535 LV Parent, LLC is directly owned by 3535 LV Corp., and no publicly-held corporation owns any equity of 3535 LV Parent, LLC.

5.      One hundred percent (100%) of the equity of AJP Holdings, LLC is directly owned by AJP Parent, LLC, and no publicly-held corporation owns any equity of AJP Holdings, LLC.

6.      One hundred percent (100%) of the equity of AJP Parent, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of AJP Parent, LLC.

7.      One hundred percent (100%) of the equity of B I Gaming Corporation is directly owned by Harrah's International Holding Company, Inc., and no publicly-held corporation owns any equity of B I Gaming Corporation.

8.      One hundred percent (100%) of the equity of Bally's Midwest Casino, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Bally's Midwest Casino, Inc.

9. One hundred percent (100%) of the equity of Bally's Park Place, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Bally's Park Place, Inc.

10. One hundred percent (100%) of the equity of Bally's Las Vegas Manager, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Bally's Las Vegas Manager, LLC.

11. One hundred percent (100%) of the equity of Benco, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Benco, Inc.

12. One hundred percent (100%) of the equity of Biloxi Hammond, LLC is directly owned by Grand Casinos of Biloxi, LLC, and no publicly-held corporation owns any equity of Biloxi Hammond, LLC.

13. One hundred percent (100%) of the equity of Biloxi Village Walk Development, LLC is directly owned by Grand Casinos of Biloxi, LLC, and no publicly-held corporation owns any equity of Biloxi Village Walk Development, LLC.

14. One hundred percent (100%) of the equity of BL Development Corp. is directly owned by Grand Casinos, Inc., and no publicly-held corporation owns any equity of BL Development Corp.

15. One hundred percent (100%) of the equity of Boardwalk Regency Corporation is directly owned by Caesars New Jersey, Inc., and no publicly-held corporation owns any equity of Boardwalk Regency Corporation.

16. One hundred percent (100%) of the equity of BPP Providence Acquisition Company, LLC is directly owned by Bally's Park Place, Inc., and no publicly-held corporation owns any equity of BPP Providence Acquisition Company, LLC.

17. One hundred percent (100%) of the equity of Caesars Air, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Air, LLC.

18. One hundred percent (100%) of the equity of Caesars Baltimore Acquisition Company, LLC is directly owned by CEOC, and

iii

no publicly-held corporation owns any equity of Caesars Baltimore Acquisition Company, LLC.

19. One hundred percent (100%) of the equity of Caesars Baltimore Development Company, LLC is directly owned by Caesars Baltimore Acquisition Company, LLC, and no publicly-held corporation owns any equity of Caesars Baltimore Development Company, LLC.

20. One hundred percent (100%) of the equity of Caesars Baltimore Management Company, LLC is directly owned by Caesars Baltimore Acquisition Company, LLC, and no publicly-held corporation owns any equity of Caesars Baltimore Management Company, LLC.

21. One hundred percent (100%) of the equity of Caesars Entertainment Canada Holding, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Entertainment Canada Holding, Inc.

22. One hundred percent (100%) of the equity of Caesars Entertainment Finance Corp. is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Entertainment Finance Corp.

23. One hundred percent (100%) of the equity of Caesars Entertainment Golf, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Entertainment Golf, Inc.

24. One hundred percent (100%) of the equity of Caesars Entertainment Retail, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Entertainment Retail, Inc.

25. One hundred percent (100%) of the equity of Caesars Entertainment Windsor Limited is directly owned by Caesars World, Inc., and no publicly-held corporation owns any equity of Caesars Entertainment Windsor Limited.

26. One hundred percent (100%) of the equity of Caesars Escrow Corporation is directly owned by Caesars Operating Escrow LLC, and no publicly-held corporation owns any equity of Caesars Escrow Corporation.

27. One hundred percent (100%) of the equity of Caesars India Sponsor Company, LLC is directly owned by California Clearing Corporation, and no publicly-held corporation owns any equity of Caesars India Sponsor Company.

28. One hundred percent (100%) of the equity of Caesars License Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars License Company, LLC.

29. One hundred percent (100%) of the equity of Caesars Marketing Services Corporation is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Marketing Services.

30. One hundred percent (100%) of the equity of Caesars Massachusetts Acquisition Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Massachusetts Acquisition Company, LLC.

31. One hundred percent (100%) of the equity of Caesars Massachusetts Development Company, LLC is directly owned by Caesars Massachusetts Acquisition Company, LLC, and no publicly-held corporation owns any equity of Caesars Massachusetts Development Company, LLC.

32. One hundred percent (100%) of the equity of Caesars Massachusetts Investment Company, LLC is directly owned by Caesars Massachusetts Acquisition Company, LLC, and no publicly-held corporation owns any equity of Caesars Massachusetts Investment Company, LLC.

33. One hundred percent (100%) of the equity of Caesars Massachusetts Management Company, LLC is directly owned by Caesars Massachusetts Acquisition Company, LLC, and no publicly-held corporation owns any equity of Caesars Massachusetts Management Company, LLC.

34. One hundred percent (100%) of the equity of Caesars New Jersey, Inc. is directly owned by Caesars World, Inc., and no publicly-held corporation owns any equity of Caesars New Jersey, Inc.

35.     One hundred percent (100%) of the equity of Caesars Operating Escrow LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Operating Escrow LLC.

36.     One hundred percent (100%) of the equity of Caesars Palace Corporation is directly owned by Caesars World, Inc., and no publicly-held corporation owns any equity of Caesars Palace Corporation.

37.     One hundred percent (100%) of the equity of Caesars Palace Realty Corporation is directly owned by Caesars Palace Corporation, and no publicly-held corporation owns any equity of Caesars Palace Realty Corporation.

38.     One hundred percent (100%) of the equity of Caesars Palace Sports Promotions, Inc. is directly owned by Desert Palace, Inc., and no publicly-held corporation owns any equity of Caesars Palace Sports Promotions, Inc.

39.     Eighty-two percent (82%) of the equity of Caesars Riverboat Casino, LLC is directly owned by Roman Holding Corporation of Indiana, and eighteen percent (18%) of the equity of Caesars Riverboat Casino, LLC is directly owned by CEOC.  No publicly-held corporation owns any equity of Caesars Riverboat Casino, LLC.

40.     One hundred percent (100%) of the equity of Caesars Trex, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars Trex, Inc.

41.     One hundred percent (100%) of the equity of Caesars United Kingdom, Inc. is directly owned by Caesars World, Inc., and no publicly-held corporation owns any equity of Caesars United Kingdom, Inc.

42.     One hundred percent (100%) of the equity of Caesars World Marketing Corporation is directly owned by Caesars World, Inc., and no publicly-held corporation owns any equity of Caesars World Marketing Corporation.

43.     One hundred percent (100%) of the equity of Caesars World Merchandising, Inc. is directly owned by Caesars World, Inc., and no

publicly-held corporation owns any equity of Caesars World Merchandising, Inc.

44. One hundred percent (100%) of the equity of Caesars World, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Caesars World, Inc.

45. One hundred percent (100%) of the equity of California Clearing Corporation is directly owned by Desert Palace, Inc., and no publicly-held corporation owns any equity of California Clearing Corporation.

46. One hundred percent (100%) of the equity of Casino Computer Programming, Inc. is directly owned by Horseshoe Gaming Holding, LLC, and no publicly-held corporation owns any equity of Casino Computer Programming, Inc.

47. One hundred percent (100%) of the equity of CG Services, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of CG Services, LLC.

48. One hundred percent (100%) of the equity of Chester Facility Holding Company, LLC is directly owned by Harrah's Chester Downs Investment Company, LLC, and no publicly-held corporation owns any equity of Chester Facility Holding Company, LLC.

49. One hundred percent (100%) of the equity of Christian County Land Acquisition Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Christian County Land Acquisition Company, LLC.

50. One hundred percent (100%) of the equity of Consolidated Supplies, Services and Systems is directly owned by CEOC, and no publicly-held corporation owns any equity of Consolidated Supplies, Services and Systems.

51. One hundred percent (100%) of the equity of Corner Investment Company Newco, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Corner Investment Company Newco, LLC.

52.     One hundred percent (100%) of the equity of Cromwell Manager, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Cromwell Manager, LLC.

53.     One hundred percent (100%) of the equity of CZL Development Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of CZL Development Company, LLC.

54.     One hundred percent (100%) of the equity of CZL Management Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of CZL Management Company, LLC.

55.     One hundred percent (100%) of the equity of DCH Exchange, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of DCH Exchange, LLC.

56.     One hundred percent (100%) of the equity of DCH Lender, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of DCH Lender, LLC.

57.     Eighty percent (80%) of the equity of Des Plaines Development Limited Partnership is directly owned by Harrah's Illinois Corporation, and twenty percent (20%) of the equity of Des Plaines Development Limited Partnership is directly owned by Des Plaines Development Corporation.   No publicly-held corporation holds any equity of Des Plaines Development Limited Partnership.

58.     One hundred percent (100%) of the equity of Desert Palace, Inc. is directly owned by Caesars Palace Corporation, and no publicly-held corporation owns any equity of Desert Palace, Inc.

59.     One hundred percent (100%) of the equity of Durante Holdings, LLC is directly owned by AJP Holdings, LLC, and no publicly-held corporation owns any equity of Durante Holdings, LLC.

60.     One hundred percent (100%) of the equity of East Beach Development Corporation is directly owned by CEOC, and no publicly-

held corporation owns any equity of East Beach Development Corporation.

61.  One hundred percent (100%) of the equity of FHR Corporation is directly owned by Parball Corporation, and no publicly-held corporation owns any equity of FHR Corporation.

62.  One hundred percent (100%) of the equity of FHR Parent, LLC is directly owned by FHR Corporation, and no publicly-held corporation owns any equity of FHR Parent, LLC.

63.  One hundred percent (100%) of the equity of Flamingo-Laughlin Parent, LLC is directly owned by Flamingo-Laughlin, Inc., and no publicly-held corporation owns any equity of Flamingo-Laughlin Parent, LLC.

64.  One hundred percent (100%) of the equity of Flamingo-Laughlin, Inc. is directly owned by Parball Corporation, and no publicly-held corporation owns any equity of Flamingo-Laughlin, Inc.

65.  One hundred percent (100%) of the equity of GCA Acquisition Subsidiary, Inc. is directly owned by Grand Casinos, Inc., and no publicly-held corporation owns any equity of GCA Acquisition Subsidiary, Inc.

66.  One hundred percent (100%) of the equity of GNOC, Corp. is directly owned by Bally's Park Place, Inc., and no publicly-held corporation owns any equity of GNOC, Corp.

67.  One hundred percent (100%) of the equity of Grand Casinos of Biloxi, LLC is directly owned by Grand Casinos, Inc., and no publicly-held corporation owns any equity of Grand Casinos of Biloxi, LLC.

68.  One hundred percent (100%) of the equity of Grand Casinos of Mississippi, LLC—Gulfport is directly owned by Grand Casinos, Inc., and no publicly-held corporation owns any equity of Grand Casinos of Mississippi, LLC—Gulfport.

69.  One hundred percent (100%) of the equity of Grand Casinos, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Grand Casinos, Inc.

70.     One hundred percent (100%) of the equity of Grand Media Buying, Inc. is directly owned by Grand Casinos, Inc., and no publicly-held corporation owns any equity of Grand Media Buying, Inc.

71.     One hundred percent (100%) of the equity of Harrah South Shore Corporation is directly owned by Harveys Tahoe Management Company, Inc., and no publicly-held corporation owns any equity of Harrah South Shore Corporation.

72.     One hundred percent (100%) of the equity of Harrah's Arizona Corporation is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Arizona Corporation.

73.     One hundred percent (100%) of the equity of Harrah's Bossier City Investment Company, L.L.C. is directly owned by Harrah's Shreveport/Bossier City Investment Company, LLC, and no publicly-held corporation owns any equity of Harrah's Bossier City Investment Company, L.L.C.

74.     One hundred percent (100%) of the equity of Harrah's Bossier City Management Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Bossier City Management Company, LLC.

75.     One hundred percent (100%) of the equity of Harrah's Chester Downs Investment Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Chester Downs Investment Company, LLC.

76.     One hundred percent (100%) of the equity of Harrah's Chester Downs Management Company, LLC is directly owned by Harrah's Chester Downs Investment Company, LLC, and no publicly-held corporation owns any equity of Harrah's Chester Downs Management Company, LLC.

77.     One hundred percent (100%) of the equity of Harrah's Illinois Corporation is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Illinois Corporation.

78. One hundred percent (100%) of the equity of Harrah's Interactive Investment Company is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Interactive Investment Company.

79. One hundred percent (100%) of the equity of Harrah's International Holding Company, Inc. is directly owned by CEOC, and and no publicly-held corporation owns any equity of Harrah's International Holding Company, Inc.

80. One hundred percent (100%) of the equity of Harrah's Investments, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Investments, Inc.

81. One hundred percent (100%) of the equity of Harrah's Iowa Arena Management, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Iowa Arena Management, LLC.

82. One hundred percent (100%) of the equity of Harrah's Management Company is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Management Company.

83. One hundred percent (100%) of the equity of Harrah's Maryland Heights Operating Company is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Maryland Heights Operating Company.

84. One hundred percent (100%) of the equity of Harrah's MH Project, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's MH Project, LLC.

85. Ninety-nine percent (99%) of the equity of Harrah's NC Casino Company, LLC is directly owned by CEOC, and one percent (1%) of the equity of Harrah's NC Casino Company, LLC is directly owned by Harrah's Management Company. No publicly-held corporation owns any equity of Harrah's NC Casino Company, LLC.

86. One hundred percent (100%) of the equity of Harrah's New Orleans Management Company is directly owned by CEOC, and no

publicly-held corporation owns any equity of Harrah's New Orleans Management Company.

87. One hundred percent (100%) of the equity of Harrah's North Kansas City LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's North Kansas City LLC.

88. One hundred percent (100%) of the equity of Harrah's Operating Company Memphis, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Operating Company Memphis, LLC.

89. One hundred percent (100%) of the equity of Harrah's Pittsburgh Management Company is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Pittsburgh Management Company.

90. One hundred percent (100%) of the equity of Harrah's Reno Holding Company, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Reno Holding Company, Inc.

91. One hundred percent (100%) of the equity of Harrah's Shreveport Investment Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Shreveport Investment Company, LLC.

92. One hundred percent (100%) of the equity of Harrah's Shreveport Management Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Shreveport Management Company, LLC.

93. One hundred percent (100%) of the equity of Harrah's Shreveport/Bossier City Holding Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Shreveport/Bossier City Holding Company, LLC.

94. Eighty-four and three tenths percent (84.30%) of the equity of Harrah's Shreveport/Bossier City Investment Company, LLC is directly owned by Harrah's Shreveport Investment Company, LLC, nine and eight tenths percent (9.80%) of the equity of Harrah's

Shreveport/Bossier City Investment Company, LLC is directly owned by Harrah's Shreveport/Bossier City Holding Company, LLC, nine tenths of one percent (0.90%) of the equity of Harrah's Shreveport/Bossier City Investment Company, LLC is directly owned by Harrah's Shreveport Management Company, LLC, and five percent (5%) of the equity of Harrah's Shreveport/Bossier City Investment Company, LLC is directly owned by Harrah's New Orleans Management Company. No publicly-held corporation owns any equity of Harrah's Shreveport/Bossier City Investment Company, LLC.

95. One hundred percent (100%) of the equity of Harrah's Southwest Michigan Casino Corporation is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Southwest Michigan Casino Corporation.

96. One hundred percent (100%) of the equity of Harrah's Travel, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's Travel, Inc.

97. One hundred percent (100%) of the equity of Harrah's West Warwick Gaming Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Harrah's West Warwick Gaming Company, LLC.

98. One hundred percent (100%) of the equity of Harveys BR Management Company, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Harveys BR Management Company, Inc.

99. One hundred percent (100%) of the equity of Harveys C.C. Management Company, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Harveys C.C. Management Company, Inc.

100. One hundred percent (100%) of the equity of Harveys Iowa Management Company, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Harveys Iowa Management Company, Inc.

101.  One hundred percent (100%) of the equity of Harveys Tahoe Management Company, Inc. is directly owned by HTM Holding, Inc., and no publicly-held corporation owns any equity of Harveys Tahoe Management Company, Inc.

102.  One hundred percent (100%) of the equity of H-BAY, LLC is directly owned by Caesars Entertainment Operating Company, Inc.

103.  One hundred percent (100%) of the equity of HBR Realty Company, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of HBR Realty Company, Inc.

104.  One hundred percent (100%) of the equity of HCAL, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of HCAL, LLC.

105.  One hundred percent (100%) of the equity of HCR Services Company, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of HCR Services Company, Inc.

106.  One hundred percent (100%) of the equity of HEI Holding Company One, Inc. is directly owned by B I Gaming Corporation, and no publicly-held corporation owns any equity of HEI Holding Company One, Inc.

107.  One hundred percent (100%) of the equity of HEI Holding Company Two, Inc. is directly owned by B I Gaming Corporation, and no publicly-held corporation owns any equity of HEI Holding Company Two, Inc.

108.  One hundred percent (100%) of the equity of HHLV Management Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of HHLV Management Company, LLC.

109.  One hundred percent (100%) of the equity of HIE Holdings Topco, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of HIE Holdings Topco, Inc.

110. One hundred percent (100%) of the equity of Hole in the Wall, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Hole in the Wall, LLC.

111. Ninety-one and ninety-two hundredths percent (91.92%) of the equity of Horseshoe Entertainment is directly owned by New Gaming Capital Partnership, and eight and eight hundredths percent (8.08%) of the equity of Horseshoe Entertainment is directly owned by Horseshoe Gaming Holding, LLC. No publicly-held corporation owns any equity of Horseshoe Entertainment.

112. One hundred percent (100%) of the equity of Horseshoe Gaming Holding, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Horseshoe Gaming Holding, LLC.

113. One hundred percent (100%) of the equity of Horseshoe GP, LLC is directly owned by Horseshoe Gaming Holding, LLC, and no publicly-held corporation owns any equity of Horseshoe GP, LLC.

114. One hundred percent (100%) of the equity of Horseshoe Hammond, LLC is directly owned by Horseshoe Gaming Holding, LLC, and no publicly-held corporation owns any equity of Horseshoe Hammond, LLC.

115. One hundred percent (100%) of the equity of Horseshoe Shreveport, L.L.C. is directly owned by Horseshoe Gaming Holding, LLC, and no publicly-held corporation owns any equity of Horseshoe Shreveport, LLC.

116. One hundred percent (100%) of the equity of HTM Holding, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of HTM Holding, Inc.

117. One hundred percent (100%) of the equity of JCC Holding Company II Newco, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of JCC Holding Company II Newco, LLC.

118. One hundred percent (100%) of the equity of Koval Holdings Company, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Koval Holdings Company, LLC.

119. One hundred percent (100%) of the equity of Koval Investment Company, LLC is directly owned by Koval Holdings Company, LLC, and no publicly-held corporation owns any equity of Koval Investment Company, LLC.

120. One hundred percent (100%) of the equity of Las Vegas Golf Management, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Las Vegas Golf Management, LLC.

121. One hundred percent (100%) of the equity of Las Vegas Resort Development, Inc. is directly owned by Winnick Parent, LLC, and no publicly-held corporation owns any equity of Las Vegas Resort Development, Inc.

122. One hundred percent (100%) of the equity of Laundry Parent, LLC is directly owned by Parball Corporation, and no publicly-held corporation owns any equity of Laundry Parent, LLC.

123. One hundred percent (100%) of the equity of LVH Corporation is directly owned by Parball Corporation, and no publicly-held corporation owns any equity of LVH Corporation.

124. One hundred percent (100%) of the equity of LVH Parent, LLC is directly owned by LVH Corporation, and no publicly-held corporation owns any equity of LVH Parent, LLC.

125. One hundred percent (100%) of the equity of Martial Development Corp. is directly owned by Caesars New Jersey, Inc., and no publicly-held corporation owns any equity of Martial Development Corp.

126. One hundred percent (100%) of the equity of Nevada Marketing, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Nevada Marketing, LLC.

127. Ninety-nine percent (99%) of the equity of New Gaming Capital Partnership is directly owned by Horseshoe Gaming Holding,

LLC, and one percent (1%) of the equity of New Gaming Capital Partnership is directly owned by Horseshoe GP, LLC. No publicly-held corporation owns any equity of New Gaming Capital Partnership.

128. One hundred percent (100%) of the equity of Ocean Showboat, Inc. is directly owned by Showboat Holding, Inc., and no publicly-held corporation owns any equity of Ocean Showboat, Inc.

129. One hundred percent (100%) of the equity of Octavius Linq Holding Co., LLC is directly owned by Caesars Palace Realty Corporation, and no publicly-held corporation owns any equity of Octavius Linq Holding Co., LLC.

130. One hundred percent (100%) of the equity of Parball Corporation is directly owned by CEOC, and no publicly-held corporation owns any equity of Parball Corporation.

131. One hundred percent (100%) of the equity of Parball Parent, LLC is directly owned by Parball Corporation, and no publicly-held corporation owns any equity of Parball Parent, LLC.

132. One hundred percent (100%) of the equity of PH Employees Parent LLC is directly owned by PHW Manager LLC, and no publicly-held corporation owns any equity of PH Employees Parent LLC.

133. One hundred percent (100%) of the equity of PHW Investments, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of PHW Investments, LLC.

134. One hundred percent (100%) of the equity of PHW Las Vegas, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of PHW Las Vegas, LLC.

135. One hundred percent (100%) of the equity of PHW Manager, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of PHW Manager, LLC.

136. One hundred percent (100%) of the equity of Players Bluegrass Downs, Inc. is directly owned by Players Holding, LLC, and no publicly-held corporation owns any equity of Players Bluegrass Downs, Inc.

137. One hundred percent (100%) of the equity of Players Development, Inc. is directly owned by Players International, LLC, and no publicly-held corporation owns any equity of Players Development, Inc.

138. One hundred percent (100%) of the equity of Players Holding, LLC is directly owned by Players International, LLC, and no publicly-held corporation owns any equity of Players Holding, LLC.

139. One hundred percent (100%) of the equity of Players International, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Players International, LLC.

140. One hundred percent (100%) of the equity of Players LC, LLC is directly owned by Players Holding, LLC, and no publicly-held corporation owns any equity of Players LC, LLC.

141. One hundred percent (100%) of the equity of Players Maryland Heights Nevada, LLC is directly owned by Players Holding, LLC, and no publicly-held corporation owns any equity of Players Maryland Heights Nevada, LLC.

142. One hundred percent (100%) of the equity of Players Resources, Inc. is directly owned by Players International, LLC, and no publicly-held corporation owns any equity of Players Resources, Inc.

143. One percent (1%) of the equity of Players Riverboat II, LLC is directly owned by Players Riverboat Management, LLC, and ninety-nine percent (99%) of the equity of Players Riverboat II, LLC is directly owned by Players Riverboat, LLC. No publicly-held corporation owns any equity of Players Riverboat II, LLC.

144. One hundred percent (100%) of the equity of Players Riverboat Management, LLC is directly owned by Players Holding, LLC, and no publicly-held corporation owns any equity of Players Riverboat Management, LLC.

145. One hundred percent (100%) of the equity of Players Riverboat, LLC is directly owned by Players Holding, LLC, and no publicly-held corporation owns any equity of Players Riverboat, LLC.

146. One hundred percent (100%) of the equity of Players Services, Inc. is directly owned by Players International, LLC, and no publicly-held corporation owns any equity of Players Services, Inc.

147. One hundred percent (100%) of the equity of Reno Crossroads LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Reno Crossroads LLC.

148. One hundred percent (100%) of the equity of Reno Projects, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Reno Projects, Inc.

149. One hundred percent (100%) of the equity of Rio Development Company, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Rio Development Company, Inc.

150. Ninety-nine percent (99%) of the equity of Robinson Property Group Corp. is directly owned by Horseshoe Gaming Holding, LLC, and one percent (1%) of the equity of Robinson Property Group Corp. is directly owned by Horseshoe GP, LLC. No publicly-held corporation owns any equity of Robinson Property Group Corp.

151. One hundred percent (100%) of the equity of Roman Entertainment Corporation of Indiana is directly owned by Caesars World, Inc., and no publicly-held corporation owns any equity of Roman Entertainment Corporation of Indiana.

152. One hundred percent (100%) of the equity of Roman Holding Corporation of Indiana is directly owned by Caesars World, Inc., and no publicly-held corporation owns any equity of Roman Holding Corporation of Indiana.

153. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 1, LLC is directly owned by Showboat Atlantic City Mezz 2, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 1, LLC.

154. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 2, LLC is directly owned by Showboat Atlantic City

Mezz 3, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 2, LLC.

155. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 3, LLC is directly owned by Showboat Atlantic City Mezz 4, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 3, LLC.

156. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 4, LLC is directly owned by Showboat Atlantic City Mezz 5, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 4, LLC.

157. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 5, LLC is directly owned by Showboat Atlantic City Mezz 6, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 5, LLC.

158. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 6, LLC is directly owned by Showboat Atlantic City Mezz 7, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 6, LLC.

159. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 7, LLC is directly owned by Showboat Atlantic City Mezz 8, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 7, LLC.

160. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 8, LLC is directly owned by Showboat Atlantic City Mezz 9, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 8, LLC.

161. One hundred percent (100%) of the equity of Showboat Atlantic City Mezz 9, LLC is directly owned by Ocean Showboat, Inc., and no publicly-held corporation owns any equity of Showboat Atlantic City Mezz 9, LLC.

162. One hundred percent (100%) of the equity of Showboat Atlantic City Operating Company, LLC is directly owned by Ocean

Showboat, Inc., and no publicly-held corporation owns any equity of Showboat Atlantic City Operating Company, LLC.

163. One hundred percent (100%) of the equity of Showboat Atlantic City Propco, LLC is directly owned by Showboat Atlantic City Mezz 1, LLC, and no publicly-held corporation owns any equity of Showboat Atlantic City Propco, LLC.

164. One hundred percent (100%) of the equity of Showboat Holding, Inc. is directly owned by CEOC, and no publicly-held corporation owns any equity of Showboat Holding, Inc.

165. One hundred percent (100%) of the equity of Southern Illinois Riverboat/Casino Cruises, Inc. is directly owned by Players Holding, LLC, and no publicly-held corporation owns any equity of Southern Illinois Riverboat/Casino Cruises, Inc.

166. One hundred percent (100%) of the equity of Tahoe Garage Propco, LLC is directly owned by Harveys Tahoe Management Company, Inc., and no publicly-held corporation owns any equity of Tahoe Garage Propco, LLC.

167. One hundred percent (100%) of the equity of The Quad Manager, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of The Quad Manager, LLC.

168. One hundred percent (100%) of the equity of TRB Flamingo, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of TRB Flamingo, LLC.

169. One hundred percent (100%) of the equity of Trigger Real Estate Corporation is directly owned by CEOC, and no publicly-held corporation owns any equity of Trigger Real Estate Corporation.

170. One hundred percent (100%) of the equity of Tunica Roadhouse Corporation is directly owned by CEOC, and no publicly-held corporation owns any equity of Tunica Roadhouse Corporation.

171. One hundred percent (100%) of the equity of Village Walk Construction, LLC is directly owned by Grand Casinos of Biloxi, LLC,

and no publicly-held corporation owns any equity of Village Walk Construction, LLC.

172. One hundred percent (100%) of the equity of Winnick Holdings, LLC is directly owned by Winnick Parent, LLC, and no publicly-held corporation owns any equity of Winnick Holdings, LLC.

173. One hundred percent (100%) of the equity of Winnick Parent, LLC is directly owned by CEOC, and no publicly-held corporation owns any equity of Winnick Parent, LLC.

## STATEMENT REGARDING ORAL ARGUMENT

The Court has already scheduled oral argument in this appeal for October 5, 2016, and the Debtors believe that argument will materially assist the Court in its analysis of the disputed issues presented on appeal.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION .......................................... 6

STATEMENT OF THE ISSUES ............................................... 7

STANDARD OF REVIEW .......................................................... 7

STATEMENT OF THE CASE AND THE FACTS ................ 8

I.  BACKGROUND ................................................................... 8

   A.  The Debtors ................................................................. 8

   B.  The Guaranty Litigation ........................................ 12

   C.  The Guaranty Litigation Threatens
   The Debtors' Restructuring ...................................... 15

   D.  The Guaranty Litigation Will Adjudicate Issues
   Closely Related to the Bankruptcy Proceeding .................. 18

II.  PRIOR PROCEEDINGS IN THIS CASE ........................ 20

SUMMARY OF ARGUMENT ................................................ 26

ARGUMENT .............................................................................. 31

I.  SECTION 105(A) INJUNCTIONS OF THIRD-PARTY ACTIONS
ARE NOT FOR THE SOLE PURPOSE OF FACILITATING FULLY
CONSENSUAL REORGANIZATIONS ................................... 31

   A.  This Court's Well-Established Standard For § 105(a) Injunctions
   Is To Protect The Integrity Of The Estate, And Is Not Limited To
   Promoting Settlements ................................................ 32

   B.  The Bankruptcy Court's "Fully Consensual Plan" Requirement
   Is Unprecedented, Unworkable, And Inconsistent With
   The Bankruptcy Code ................................................ 35

   C.  The Seventh Circuit's *Caesars* Decision Does Not Support,
   Much Less Require, The Bankruptcy Court's
   "Consensual Reorganization" Requirement ........................ 42

   D.  The Bankruptcy Court's Analysis Improperly Starts
   From The Premise That Section 105 Relief Is Limited To
   Facilitating Settlements ............................................. 46

II.  ENJOINING THIRD-PARTY ACTIONS THROUGH PLAN CONFIRMATION SHOULD NOT BE A "NON-STARTER" IN BANKRUPTCY PROCEEDINGS ............................................................ 49

III. THE DEBTORS ARE ENTITLED TO AN INJUNCTION ............. 53

   A.  The Guaranty Actions Threaten The Integrity Of The Bankruptcy Estate ........................................................ 54

   B.  The Debtors Have A Reasonable Likelihood Of Successfully Reorganizing ................................................. 62

   C.  The Public Interest Favors Issuing The Requested Injunction .... 64

   D.  Balancing The Harms Is Not Part Of The § 105 Analysis, But The Balance Strongly Favors The Debtors ................................... 65

CONCLUSION ........................................................................ 71

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A & F Enterprises, Inc.,*
742 F.3d 763(7th Cir. 2015)..........................................................64, 66

*In re Agnew,*
144 F.3d 1013 (7th Cir. 1998)................................................................8

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.*
*P'Ship,*
526 U.S. 434 (1999) ..............................................................60, 61, 64

*Bertstrom, Inc. v. Glaciery Bay, Inc.,*
2010 WL 257253 (N.D. Ill. Jan. 22, 2010)...........................................41

*In re Brittwood Creek, LLC,*
450 B.R. 769 (N.D. Ill. 2011) ..................................................................7

*In re Caesars Entm't Operating Co., Inc. (Caesars II),*
2015 WL 5920882 (N.D. Ill. Oct. 6, 2015) ..............................10, 11, 21

*Caesars Entm't Operating Co., Inc. v.*
*BOKF, N.A. (Caesars III),*
808 F.3d 1186 (7th Cir. 2015)......................................................*passim*

*In re Casse,*
198 F.3d 327 (2d Cir. 1999) .................................................................33

*Christmas v. City of Chicago,*
682 F.3d 632 (7th Cir. 2012)..................................................................8

*Clark v. Stapleton Corp.,*
957 F.2d 745 (10th Cir. 1992)..............................................................40

*In re Eagle-Picher Indus., Inc.,*
963 F.2d 855 (6th Cir. 1992)................................................................35

*In re Energy Co-Op, Inc.,*
886 F.2d 921 (7th Cir. 1989).........................................................33, 43

*In re Excel Innovations*,
    502 F.3d 1086 (9th Cir. 2007).........................................................35, 36

*In re Fabtech Indus., Inc.*,
    2010 WL 6452908 (9th Cir. B.A.P. July 19, 2010) .................36, 52, 69

*Fisher v. Apostolou*,
    155 F.3d 876 (7th Cir. 1998)...........................34, 44, 51, 52, 53, 58, 65

*In re Gander Partners, LLC*,
    432 B.R. 781 (Bankr. N.D. Ill. 2010) .....................34, 35, 53, 62, 63, 64

*In re Gathering Rest., Inc.*,
    79 B.R. 992 (Bankr. N.D. Ind. 1986)..................................................63

*Harman v. Moore*,
    547 U.S. 250 (2006).........................................................................68

*Heckler & Koch, Inc. v. German Sport Guns GmbH*,
    2014 WL 533270 (S.D. Ind. 2014) ......................................................41

*Iqbal v. Patel*,
    780 F.3d 728 (7th Cir. 2015)............................................................43

*John Allan Co. v. Craig Allen Co. L.L.C.*,
    540 F.3d 1133 (10th Cir. 2008).........................................................49

*In re Kham & Nate's Shoes No. 2, Inc.*,
    97 B.R. 420 (Bankr. N.D. Ill. Mar. 3, 1989) ...........................34, 52, 62

*Kress v. CCA of Tenn., LLC*,
    694 F.3d 890 (7th Cir. 2012)...............................................................8

*In re L & S Indus., Inc.*,
    989 F.2d 929 (7th Cir. 1993)......................................33, 43, 65, 66, 67

*League of Wilderness Defenders/Blue Mountains
    Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014)............................................................70

*In re Lemco Gypsum, Inc.*,
    910 F.2d 784 (11th Cir. 1990)...........................................................56

xxvii

*In re Lyondell Chem. Co.*,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009)..................................................35

*In re Monroe Well Serv., Inc.*,
   67 B.R. 745 (Bankr. E.D. Pa. 1986)....................................................35

*New West, L.P. v. City of Joliet*,
   491 F.3d 717 (7th Cir. 2007)................................................................67

*In re Otero Mills, Inc.*,
   21 B.R. 777 (Bankr. D.N.M.),
   *aff'd* 25 B.R. 1018 (D.N.M. 1982) ................................................52, 63

*In re Paul R. Glenn Architects, Inc.*,
   2013 WL 441602 (Bankr. N.D. Ill. Feb. 5, 2013) ..........................33, 62

*Pueblo of San Ildefonso v. Ridlon*,
   90 F.3d 423 (10th Cir. 1996)................................................................40

*In re Regency Realty Assocs.*,
   179 B.R. 717 (Bankr. M.D. Fla. 1995)..................................................54

*In re Rimsat, Ltd.*,
   212 F.3d 1039 (7th Cir. 2000) ................................................................7

*In re Saxby's Worldwide, LLC*,
   440 B.R. 369 (Bankr. E.D. Pa. 2009)....................................................50

*In re Sentinel Mgmt. Grp., Inc.*,
   728 F.3d 660 (7th Cir. 2013).......................................................8, 9, 49

*In re Teknek, LLC*,
   563 F.3d 639 (7th Cir. 2009).........................................................44, 58

*In re Teligent, Inc.*,
   640 F.3d 53 (2d Cir. 2011) ...................................................................41

*Virgin Enters., Ltd. v. Nawab*,
   335 F.3d 141 (2d Cir. 2003) .................................................................70

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008)...........................................35, 36, 37

*In re Western Real Estate Fund, Inc.,*
  922 F.2d 592 (10th Cir. 1993) (per curiam) .................................. 50, 52

*Zerand-Bernal Group, Inc. v. Cox,*
  23 F.3d 159 (7th Cir. 1994) .......................................... 34, 44, 49, 54, 56

**Statutes**

11 U.S.C. § 105(a) ......................................................................... *passim*

11 U.S.C. § 362 ..................................................................... 29, 49, 50

11 U.S.C. § 1126 ............................................................................... 37

11 U.S.C. § 1126(b) .......................................................................... 38

11 U.S.C. § 1129(a)(8) ................................................................. 38, 42

11 U.S.C. § 1129(b) .......................................................................... 37

11 U.S.C. § 1129(b)(1) ................................................................. 38, 42

28 U.S.C. § 157(b)(2)(A) ..................................................................... 6

28 U.S.C. § 158(a)(1) .......................................................................... 7

28 U.S.C. § 1334(a) ............................................................................. 6

**Rules**

Fed. R. Bankr. P. 8002(a)(1) ............................................................... 6

Fed. R. Evid. 408 ............................................................................... 40

N.D. Ill. L.R. 16.3(c) ........................................................................ 40

**Other Authorities**

C. Booth, *The Cramdown on Secured Creditors: An Impetus
  Toward Settlement*, 60 Am. Bankr. L.J. 69, 105 (1986) ..................... 38

E. Warren, *A Theory of Absolute Priority*, 1991 Ann. Surv.
  Am. L. 9, 31-32 (1992) ............................................................... 37, 38

xxix

Fed. R. Evid. 408, 1972 Adv. Cmte. Notes ............................................... 41

R. Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Imperative*, 39 Bus. Law. 441, 454 (1984) ........................................................................................ 38

S. Rep. No. 989, 95th Cong., 2d Sess 51 (1978) ...................................... 50

xxx

## INTRODUCTION

The central question this appeal presents is whether the bankruptcy court correctly held that 11 U.S.C. § 105(a) is only available to enjoin third-party litigation that affects the integrity of a bankruptcy estate if the injunction would enhance the prospects for a fully consensual reorganization—and that even then an injunction can last only a few months at most.  The answer is plainly no.  Nothing in the bankruptcy code or in precedent purports to limit § 105(a) to promoting fully consensual restructurings, and numerous cases have recognized that injunctive relief through confirmation is not only appropriate, but often necessary to prevent the harm to the bankruptcy estate that § 105(a) is supposed to prevent.

Here, the bankruptcy court reached inconsistent conclusions in applying § 105(a)—twice granting injunctive relief to halt third-party guaranty actions, but now denying it.  The bankruptcy court previously recognized that those actions endangered the prospects for a successful reorganization, that denying relief could potentially bring on "one of the great messes of our time," and that the balance of the harms "heavily favors" the Debtors.  Its most recent decision, however, reached *the*

*opposite conclusions based on the same evidence.* A court cannot change its factual findings simply to suit its preferred outcome, particularly where it incorporated its previous findings into its most recent decision by reference. The only thing the bankruptcy court identified as having changed were the prospects of a fully consensual reorganization. The bankruptcy court thus reached the wrong conclusion because it asked the wrong question. The question is not whether a § 105(a) injunction can foster settlement, but whether it will protect the integrity of the estate, such that there is a likelihood of a successful reorganization.

Even worse, the bankruptcy court's unprecedented approach creates perverse consequences. By its logic, a small group of hold-out creditors have license to unravel deals supported by the vast majority of creditors by engaging in value-destroying collateral litigation in other forums. By limiting § 105 relief to fully consensual reorganizations, the bankruptcy court effectively allowed holdouts to veto any § 105 injunction. One non-consenting creditor could block distributions to the vast majority of creditors. This result is inconsistent with the bankruptcy code and its cramdown provisions, which are designed to eliminate holdout leverage and thereby encourage settlement.

Removing the threat of injunctive relief to prevent holdouts from racing to seek a preferential recovery outside the bankruptcy process before a cramdown occurs thus reduces the incentive to settle.  The bankruptcy court's decision to tie § 105 relief to the progress of settlement talks, moreover, requires debtors seeking § 105 relief to disclose sensitive settlement negotiations that the law normally presumes are confidential and that this Court's mediation protocol specifically protects.  The most recent evidentiary hearing was a constant parade of witnesses disclosing settlement communications, and the bankruptcy court faulted the Debtors for not disclosing more.

In defense of its approach, the bankruptcy court points to the Seventh Circuit's earlier decision in this case, in *Caesars Entm't Operating Co., Inc. v. BOKF, N.A. (Caesars III)*, 808 F.3d 1186, 1188 (7th Cir. 2015).  But nothing in that opinion supports an artificial limitation on the purpose or duration of § 105(a) injunctions—quite the opposite.  The Seventh Circuit rejected the bankruptcy court's previous "cramped interpretation" of § 105, explaining that it provides a "broad grant of power" to issue "*any* order … that is necessary or appropriate"

to protect the bankruptcy estate and carry out the provisions of the bankruptcy code. That is exactly what is at stake here.

Applying the Seventh Circuit's standard, this case presents the classic scenario for an injunction against third-party actions. The bankruptcy court itself twice called this a "textbook case" for such relief. Appellees are themselves second-tier junior creditors of the Debtors, who are pursuing third-party litigation against the Debtors' ultimate parent company, Caesars Entertainment Company ("CEC"), in state and federal court to reinstate and enforce CEC's guaranty of certain of the Debtors' debt obligations. At the time CEC acted as a guarantor to the Debtors in transactions with Appellees, CEC had no independent assets other than its ownership interest in the Debtors. It was only later that CEC siphoned off assets from the Debtors—giving rise to the estate's claims. The recovery now sought by Appellees in their guaranty actions against CEC would thus come *directly from the very same assets* that CEC fraudulently transferred from the Debtors; without those fraudulent transfers, CEC would have nothing from which Appellees could recover.

That directly affects not just the amount of property in the Debtors' estates, but the allocation of property among creditors. In addition to thwarting the Debtors' largely consensual multi-billion-dollar restructuring effort, which depends on a substantial contribution from CEC on account of the estate claims, the upshot of Appellees' actions is to let them jump in line in front of other creditors, including more senior ones. In effect, it gives them priority in recovering against assets that should be part of the Debtors' estate and to which more senior creditors should have priority—but now are in the hands of CEC.

Under the correct legal standard, the Debtors are entitled to an injunction through plan confirmation as a matter of law, and it is time for Appellees' race to judgment to come to an end. With a contribution from CEC, the Debtors have a reasonable likelihood of successfully reorganizing. Without it, the bankruptcy process threatens to spiral out of control—at a minimum, were CEC to enter bankruptcy it would make any attempt at reorganization far more complicated and far more protracted. Indeed, as the bankruptcy court previously found, it could devolve into "one of the great messes of our time." The public interest and the balance of the harms also strongly favor moving forward with a

5

reorganization that is supported by \$14 billion of the Debtors' \$18 billion capital structure. Appellees will suffer no harm at all other than the lost opportunity to thwart the bankruptcy process by diverting exclusively to themselves recoveries otherwise earmarked for equitable distribution to all creditors. Indeed, the only harm Appellees face is the potential that the plan is found to be fair and equitable to them, and confirmed over their objections. Whatever their complaints are with the plan, that is a dispute for the confirmation proceeding and not a basis for denying § 105(a) injunctive relief. This Court should reverse and remand with instructions to immediately enter the injunction requested by the Debtors.

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court for the Northern District of Illinois (Goldgar, J.) had jurisdiction over this core adversary proceeding "concerning the administration of the estate" under 28 U.S.C. §§ 157(b)(2)(A) and 1334(a). The bankruptcy court entered a final order denying all requested relief on August 26, 2016, A0097, and the Debtors timely filed their notice of appeal that same day. A2869; *see also* Fed. R. Bankr. P. 8002(a)(1). This Court has jurisdiction to

hear this appeal from the bankruptcy court's final order under 28 U.S.C. § 158(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the bankruptcy court erred in concluding that an injunction should not be granted under 11 U.S.C. § 105(a) to enjoin an action against a non-debtor that threatens the integrity of a debtor's bankruptcy estate or the administration of the estate unless it enhances the prospects for a fully consensual reorganization.

2. Whether the bankruptcy court erred in concluding that an injunction through plan confirmation enjoining an action against a non-debtor that threatens the integrity of a debtor's bankruptcy estate or the administration of the estate is a "non-starter" under 11 U.S.C. § 105(a).

3. Whether the Debtors are entitled to injunctive relief.

## STANDARD OF REVIEW

This Court reviews the denial of an injunction under 11 U.S.C. § 105(a) for an abuse of discretion. *See In re Rimsat, Ltd.*, 212 F.3d 1039, 1049 (7th Cir. 2000); *In re Brittwood Creek, LLC*, 450 B.R. 769, 774 (N.D. Ill. 2011). A bankruptcy court abuses its discretion

when "it commits an error of law or makes a clearly erroneous finding of fact." *Kress v. CCA of Tenn.*, *LLC*, 694 F.3d 890, 892 (7th Cir. 2012); *Christmas v. City of Chicago*, 682 F.3d 632, 638 (7th Cir. 2012). This review is "not toothless," as this Court "can examine the record to see whether the facts actually support the decision," *In re Agnew*, 144 F.3d 1013, 1014 (7th Cir. 1998), and any "internally inconsistent factual findings … are, by definition, clearly erroneous," *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 670 (7th Cir. 2013).

## STATEMENT OF THE CASE AND THE FACTS

## I.     BACKGROUND

### A.     The Debtors

Caesars Entertainment Operating Company ("CEOC") and its debtor affiliates (collectively, the "Debtors") are the primary operating units of CEOC's parent, Caesars Entertainment Corporation ("CEC"). A0238. CEC is not a debtor. CEC and its affiliates (collectively, "Caesars") own, operate or manage 50 casinos in five countries. A0239. Caesars employs more than 68,000 people, provides 3 million square feet of gaming space, and has 39,000 hotel rooms. A0239-40. The Debtors themselves own, operate or manage 38 casinos in 14 states.

8

A0240-41.  In the 2014 fiscal year, Caesars had more than $8 billion in revenues, of which the Debtors contributed more than $5 billion.  *Id*. Since then, the Debtors' financial performance has continued to be strong.  A2772:5-73:3.

The Debtors' capital structure is a legacy of one of the largest leveraged buyouts in history.  On January 28, 2008, affiliates of Apollo Global Management LLC and TPG Capital, L.P., along with certain co-investors (collectively, the "Sponsors"), acquired Caesars for approximately $30.7 billion.  A0241.  The Sponsors contributed approximately $6.1 billion in cash to fund the LBO.  *Id*.  The remainder was funded through the issuance of approximately $24 billion in debt. *Id*.

The Debtors have positive cash flow before debt service but a number of economic factors and industry trends have left them unable to support their overleveraged capital structure and extraordinary interest expense.  A0241-42.  Over the past several years, Caesars has undertaken numerous initiatives to manage the Debtors' debt maturities and interest expense.  In addition to certain operational initiatives and property closures, Caesars has engaged in more than 45

capital markets transactions, including asset sales, exchange and tender offers, debt repurchases and refinancings. A0243.

Certain of these transactions (collectively, the "Disputed Transactions") were highly controversial and transferred billions in value from the Debtors to CEC and its non-debtor affiliates. *See* A0243-44; A0268-75; A0765-66. Two of the Disputed Transactions released CEC's guaranties of the Debtors' debt obligations. As part of the B-7 refinancing transaction, through which CEOC refinanced certain debt through a new $1.75 billion loan, CEC sold five percent of its shares of CEOC common stock to unaffiliated investors, which triggered a release of CEC's guaranty of certain first lien and second lien debt because CEOC ceased to be a wholly owned subsidiary of CEC. A 2014 senior unsecured notes transaction in turn amended CEOC's senior unsecured notes indentures to, among other things, release CEC's guaranty of the senior unsecured debt as part of a transaction retiring roughly $600 million in senior unsecured debt. A0243-44; A0268-75; A0765-66.

Prior to the Disputed Transactions, CEC was simply a holding company with its sole assets consisting of ownership of the Debtors. *In re Caesars Entm't Operating Co., Inc. (Caesars II)*, 2015 WL 5920882, *2

10

(N.D. Ill. Oct. 6, 2015). At the time it guaranteed both the Senior Unsecured Notes and the second lien notes, it owned nothing other than its ownership interest in the guaranteed Debtors. *Id*. It was *only* as a result of the Disputed Transactions that CEC came to possess assets independent of its ownership interest in the Debtors—namely the assets that were transferred to it from the Debtors. *Id*.; A0119.

In summer 2014, when the Debtors started engaging with their stakeholders regarding a potential restructuring, the CEOC Board of Directors formed a Special Governance Committee consisting of two recently-appointed independent directors. The Special Governance Committee was tasked with, among other things, conducting an independent investigation into potential claims the Debtors and their creditors may have against CEC or its affiliates. A0275-76. Based on its investigation, the Special Governance Committee concluded that the Debtors' claims are worth between $3.6 and $5.1 billion. A2077:20-78:1; 2079:13-18. CEC has agreed to settle the Debtors' claims against CEC, its affiliates, and certain other non-debtors related to the Disputed Transactions by providing substantial financial contributions and credit support to the Debtors' restructuring—contributions with a midpoint

11

valuation of $4 billion.  A2798:7-25.  This settlement is reflected in the Debtors' current proposed plan of reorganization.  A2836:2-12; A2240. No one, including Appellees, has proposed a viable alternative plan without a significant recovery from CEC.

### B.   The Guaranty Litigation

Both before and after the Petition Date, certain of the Debtors' junior creditors commenced litigation against CEOC and its non-debtor parent, CEC.  Though the bankruptcy filing automatically stayed all actions against the Debtors, the lawsuits against CEC were not stayed.

The litigation against CEC at issue here principally relates to the pre-Petition Date release of CEC's guaranties of certain CEOC debt as a result of the B-7 Refinancing and Senior Unsecured Notes Transaction, and includes the following lawsuits:

WSFS Action.   On August 4, 2014, Wilmington Savings Fund Society, FSB ("WSFS"), indenture trustee for certain of the Debtors' second lien notes with an outstanding principal balance of approximately $3.7 billion, sued CEOC and CEC in Delaware Chancery Court.  *See* A0174 ¶ 44; A0796:2-21.  WSFS asserts claims for breach of contract, violations of the Trust Indenture Act of 1939 (the "TIA"), and

declaratory relief with respect to the release of CEC's guaranty of this second lien debt. *See* A0217-0223 ¶¶ 128-154.

Unsecured Notes Actions. On September 3, 2014, Trilogy Capital Management and other creditors who are not parties here filed a lawsuit against CEOC and CEC in the U.S. District Court for the Southern District of New York ("SDNY"). *See* A0484. On October 2, 2014, Frederick Barton Danner, individually and on behalf of all others similarly situated (along with Trilogy Capital Management, the "Unsecured Notes Defendants"), also sued CEOC and CEC in the SDNY. *See* A0537. The Unsecured Notes Defendants allege that CEC's release of the guaranty of approximately $130 million of CEOC's unsecured debt violated the TIA. *See* A0521-23; A0562-63.

BOKF Action. On March 3, 2015, BOKF, as indenture trustee to certain second lien debt, commenced an action against CEC in SDNY. *See* A0573. BOKF seeks to enforce CEC's previously released guaranty of approximately $750 million of the Debtors' second lien debt. *See* A0637. BOKF alleges that any out-of-court transactions that CEC asserts released CEC's guaranty are void as they violated the TIA. *See* A0632-34.

13

UMB Action.  Following a June 2015 trial before the bankruptcy court in this adversary proceeding, UMB Bank, N.A., as indenture trustee to certain first lien debt, sued CEC in SDNY on June 16, 2015. *UMB Bank, N.A. v. Caesars Entertainment Corporation*, Case No. 15-cv-4634 (S.D.N.Y.).  The lawsuit seeks to reinstate CEC's guaranty on an additional $6.3 billion of first lien notes.  Complaint (Dkt. No. 1), *UMB Bank, N.A. v. Caesars Entertainment Corporation*, Case No. 15-cv-4634 (S.D.N.Y.).  Although UMB is not a defendant in the adversary proceeding, it has agreed to be bound by any injunction entered with respect to the guaranty litigation.

Wilmington Trust Action.  To protect the interests of certain senior unsecured creditors, Wilmington Trust, N.A., as successor trustee for those creditors, sued CEC in SDNY on October 21, 2015. *Wilmington Trust, N.A. v. Caesars Entm't Corp.*, No. 15-cv-8280 (S.D.N.Y.).  The lawsuit seeks to reinstate CEC's guaranty on $500 million in senior unsecured notes.  Complaint (Dkt. No. 1), *Wilmington Trust, N.A. v. Caesars Entm't Corp.*, No. 15-cv-8280 (S.D.N.Y.); A2069:10-17.  Like UMB, Wilmington Trust has agreed to be bound by any injunction entered with respect to the guaranty litigation.

14

Thus, taken together, these six actions seek to reinstate CEC's guaranties of certain first lien, second lien and unsecured debt and recover more than *$11 billion* from CEC. *See* A2637; A0767.07:18–.08:14; A2801:8-19; A2852:5-12.

## C. The Guaranty Litigation Threatens The Debtors' Restructuring

The Debtors possess two principal assets around which to reorganize: an operating business and their estate claims. *See* A0767.01-:14–.02:2; A0767.05:20–.07:3. To fulfill their duty to maximize value, the Debtors must recover on estate claims against CEC—through litigation or otherwise—that CEC itself has concluded are worth settling for no less than $4 billion. *See* A2798:9-25. Appellees themselves contend "that CEC is liable to the bankruptcy estate for the billions of dollars of fraudulent conveyances it orchestrated through 'controversial' prepetition transactions." A0760 ¶ 37. The Debtors, as discussed above, entered into a restructuring support agreement ("RSA") with CEC to consensually resolve those valuable estate claims and provide a viable path toward a successful reorganization. A2081-82; A2790:1-7.

However, litigation by Appellees—a minority of the Debtors'

creditors—threatens to render CEC insolvent and deprive the Debtors of the ability to recover their assets from CEC. Appellees' claims on the previously released guaranties arise from their relationship as creditors of Debtor CEOC (the primary obligor on their notes). It is undisputed that both the Debtors' estate claims and these junior creditors' guaranty claims seek to recover from the same limited pool of assets from the same entity (CEC). *See* A0777:24–78:7; A0788.01:25–.02:15; A0788.03:24–.04:4; A0797.01:9–.02:13. Indeed, CEC's assets are the very assets that Debtors allege were fraudulently transferred to CEC. A0119; A0778:12-79:13. In other words, any relief Appellees obtain in the guaranty actions ultimately will come from the very assets that were improperly taken from the Debtors by CEC.

Moreover, two of the Disputed Transactions specifically "*led to the lawsuits that Debtors seek to enjoin.*" A0241 (emphasis added). According to the Appellees' own complaints in the underlying actions, their claims arise from the same "aggregate plan or scheme" as the Debtors' estate claims based on the Disputed Transactions:

- "In sum, the foregoing *course of conduct*, including the Agreement at issue in this Complaint, constituted *an aggregate plan or scheme* by CEC and CEOC to restructure CEOC's $19.8 billion debt out of court to stack the deck against certain

16

creditors, such as Plaintiffs and the Disenfranchised Noteholders, in advance of CEOC's recently-filed bankruptcy that will favor CEC and other stakeholders and insiders and *allow CEC to evade its irrevocable guarantee of the Notes*." A0508 ¶ 85 (emphasis added); *see also* A0489, A0503-04, A0517-16 ¶¶ 14, 62, 117.

- "*After removing CEOC's most valuable assets* and saddling it with debt and other liabilities, *CEC concocted its final strategic maneuvers* to preserve the value it created in 'Good Caesars' and *ensure that creditors of CEOC or 'Bad Caesars' had no chance of recovery on the Parent Guarantee*." A0596 ¶ 70 (emphasis added); *see also* A0575 ¶ 3.

- "Lastly, *the [guaranty] Amendments are part of Caesars' larger plan to move CEOC's most valuable assets beyond the reach of creditors*, thus enriching CEC, its shareholders and its affiliates at the expense of CEOC's creditors. . . ." A0542-43 ¶ 12 (emphasis added); *see also* A0554 ¶ 50.

- "*This action arises from a series of self-dealing transactions* . . . . The purpose and effect of the transfers was to enrich CEC and its affiliates and shareholders at the expense of CEOC and *to move CEOC's assets beyond the reach of CEOC's creditors*." A0159-60 ¶ 1 (emphasis added).

Thus, the very objective of the creditors' litigation against CEC is for certain creditors to jump to the front of the line by obtaining a judgment outside of the bankruptcy process based on claims that are substantially intertwined with the Debtors' estate claims and seek to recover against certain of the same assets that the Debtors concluded were wrongly removed from their estate. *See* A0777:24–79:13; A0788.01:25–.02:15.

17

CEC, however, lacks the ability to both satisfy the guaranty claims and make any meaningful contribution in settlement of the estate's claims. A0115; s*ee* A0767.09:17–.11:22; A0788.05:11–.06:2. The six actions brought by Appellees, UMB, and Wilmington Trust threaten to render CEC insolvent and leave the Debtors without *any* meaningful recovery from CEC. A0115; A0788.03:21–.04:1. CEC has publicly disclosed as much, stating that, "[s]hould a court find in favor of the claimants in some or all of the Noteholder Disputes, such determination would likely lead to a CEC reorganization under Chapter 11 of the Bankruptcy Code," and "would raise substantial doubt about CEC's ability to continue as a going concern." A2637; *see also* A2669.

### D. The Guaranty Litigation Will Adjudicate Issues Closely Related to the Bankruptcy Proceeding

The fact that the guaranty actions are intertwined with the issues before the bankruptcy court is highlighted by late 2015 rulings in the Southern District of New York. As that court observed, questions at the heart of Appellees' guaranty actions include whether the disputed transactions were "routine corporate transactions … undertaken in an effort to *improve* [Debtor] CEOC's financial condition or whether the transactions were undertaken as part of a plan to accomplish an out-of-

court restructuring of all CEOC debt." *BOKF*, 2015 WL 5076785 at *11 (internal quotations omitted; emphasis in original). The Disputed "transactions *must be analyzed as a whole* to determine if the overall effect was to achieve a debt restructuring." *Id.* (emphasis added). The factfinder in the guaranty actions will specifically have to consider whether Debtor "CEOC h[e]ld talks with creditors in order to make arrangements for maintaining repayments," and whether it did so in an "attempt to extend the life of a company facing bankruptcy." *Id.* In other words, CEC's liability depends on the factfinder's assessment of the Debtors' actions and motives in the disputed transactions. All of these are issues intertwined with the Debtors' potential claims against CEC.

An adverse ruling against CEC could be imminent. The case-dispositive summary judgment motions in the Southern District of New York have been fully briefed since June, and that court previously expressed skepticism about CEC's position that the guarantees were released, suggesting CEC's reading of the relevant provision is "an extraordinary proposition." A0642. The Southern District has scheduled argument on the motions pending in that Court for October

19

6—*the day after the current stay pending appeal is set to expire*—and the Delaware Chancery Court has scheduled argument on WSFS' case-dispositive summary judgment motion for the next day, October 7. There is thus a real risk CEC will face an adverse judgment soon.

## II.  PRIOR PROCEEDINGS IN THIS CASE

Given the risk that the guaranty actions pose to the Debtors' ability to reorganize by recovering on one of its principal estate assets, and to protect that asset from being diverted to only a minority of the Debtors' junior creditors, the Debtors commenced an adversary proceeding in March 2015 seeking to enjoin the continued prosecution of those actions against CEC through plan confirmation.  *See* 0644.  The Debtors ultimately requested an injunction until sixty days after a court-appointed examiner issued his report on the value of the Debtors' claims against CEC.  *See Caesars* 808 F.3d at 1188.  Because certain creditors disputed whether CEC's contribution at the time was substantial enough, the Debtors hoped the examiner's report would help the parties negotiate a consensual reorganization.  *Id.*

On July 22, 2015, the bankruptcy court denied the Debtors' request for a § 105(a) injunction of the guaranty actions.  *See* A0156-57.

20

Although the bankruptcy court observed that the Debtors' motion presented a "familiar"—indeed, "*textbook*"—pattern for which § 105(a) relief is frequently granted in other circuits (and has previously been granted by lower courts in this circuit), it nonetheless denied relief based on the conclusion that "the Seventh Circuit has a different textbook." A0150. Under the bankruptcy court's reading of Seventh Circuit precedent, "[u]nless the debtor's estate has a claim against the non-debtor, and unless that claim is based on the same acts and would be paid from the same assets as the third party's claim against the non-debtor, no relief is possible." *Id.* After expedited briefing and argument, this Court affirmed on appeal. *See Caesars II*, 2015 WL 5920882 at *1.

The Seventh Circuit, however, reversed. It held "nothing in 11 U.S.C. § 105(a) authorizes the limitation on the powers of a bankruptcy judge that CEC's creditors … successfully urged on the judges below." *Caesars III*, 808 F.3d at 1188. Rejecting the bankruptcy court's "cramped interpretation of section 105(a)," the Seventh Circuit explained that § 105 grants bankruptcy courts "broad" and "extensive equitable powers" to protect the integrity of the bankruptcy estate. *Id.*

21

According to the Seventh Circuit, the critical question is therefore "whether the injunction sought by CEOC is likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy" and whether a "denial w[ould] thus endanger the success of the bankruptcy proceedings." *Id.* CEOC's interest in preventing Appellees from siphoning off assets all of CEOC's creditors would otherwise recover, the Seventh Circuit observed, "would be furthered by a temporary injunction staying [the guaranty] lawsuits against CEC." *Id.* at 1189. The Seventh Circuit nonetheless remanded for the bankruptcy court to decide in the first instance whether to enter the injunction the Debtors sought. *Id.* at 1191.

On remand, the bankruptcy court initially entered an injunction giving the parties breathing room to resolve their disputes. A0122. The bankruptcy court's remand opinion reiterated that the facts here "describe a 'textbook case' for a section 105(a) injunction." A0115. All three of the relevant factors, in the bankruptcy court's view, supported an injunction: it would "likely enhance the prospects for a successful reorganization," "serve the public interest," and grant relief to the party whom "the equities [] heavily favor[]." A0113, 0119.

22

That injunction worked, as the Debtors made significant progress in negotiations with CEC to substantially increase its contribution and reached settlements with various creditor groups. A2064:7-64.01:18, 64.02:21-.04:15; A0101. The courts in which the guaranty actions were pending, however, soon announced they would hold argument or issue decisions on case-dispositive summary judgment motions in June or July 2016.

Because an adverse judgment in the guaranty actions threatened to derail the Debtors' significant progress towards a confirmable plan, the Debtors moved for an injunction through plan confirmation on June 6, 2016. The bankruptcy court again enjoined Appellees from prosecuting their actions against CEC, this time through August 29, 2016. A0099. Based on the evidence presented at a three-day evidentiary hearing, the bankruptcy court found "the prospect that a CEC bankruptcy will bring on 'one of the great messes of our time' … remains plausible" and "denying relief would thus endanger the success of the bankruptcy proceedings." A0102.

Thereafter, the Debtors entered into new RSAs with the statutory unsecured claimholders committee and certain second lien noteholders,

an amended RSA with their first lien bank lenders, and a settlement agreement with Appellee Frederick Barton Danner. A2187; A2582; A2081; A2690. The Debtors' existing RSAs with CEC, one of CEC's affiliates, and certain holders of the Debtors' subsidiary guaranty notes also went effective. A2540; A2209; A2561. All of these agreements— plus a pre-existing RSA with the first lien noteholders—are effective except for the second lien RSA. A2768; A2776:22-23; 2779:1-4; 2782:15-17; 2785:12-14; 2788:5-7.

In all, holders of over $14 billion of the Debtors' $18 billion capital structure now have agreed to a consensual resolution of the bankruptcy. A confirmable plan with broad creditor support thus already exists, and a fully consensual plan is within reach. However, the settlements reached with many lenders are "fragile," with their RSAs expiring should § 105 injunctive relief terminate. *See, e.g.*, A2758.

On August 8, 2016, the Debtors asked the bankruptcy court to protect the prospects for a successful reorganization on terms most creditors overwhelmingly support by extending the injunction through plan confirmation. The bankruptcy court denied the Debtors' request on August 26, A0097, and subsequently denied the Debtors' motion for a

24

temporary extension of that injunction pending appeal, A0098.  It did so despite recognizing *both* that "there is a likelihood of a successful reorganization here," A0066, *and* that terminating the injunction would "risk harm" through the "loss of the CEC contribution" and "all the work put in on the RSAs," A0076-77.  As an initial matter, it categorically rejected "[a]n injunction through a decision on confirmation" as a "non-starter."  A0073.  It further denied any relief because it believed granting injunctive relief would not "enhance the prospects for" a *fully* "*consensual* resolution of these cases."  A0064-65; A0066-70 (emphasis added).  According to the bankruptcy court, the injunction served "to gain time *to reach a settlement*" and "the current injunction is [not] helping" achieve that result.  A0072 (emphasis added).  The court held the public interest in settlement did not support an injunction for much the same reason, and dismissed the public interest in successful reorganizations by speculating that the Debtors theoretically could reorganize without a CEC contribution.  A0075-76.

This Court extended the injunction originally set to expire on August 29 through at least October 5, and this appeal now follows.

## SUMMARY OF ARGUMENT

The bankruptcy court's decision, denying a stay of the guaranty actions, is based on an inappropriately rigid and narrow interpretation of 11 U.S.C. § 105(a) and Seventh Circuit precedents, which has no basis in law and that ultimately makes no sense. Because of its legally erroneous understanding of § 105(a), the bankruptcy court allowed actions in other courts to proceed that will undermine—if not render completely unworkable—the Debtors' widely supported proposed plan of reorganization, and that will allow one set of junior creditors to potentially raid the very assets of the Debtors' estates that were fraudulently transferred to CEC. This untenable result is exactly what § 105(a) is supposed to prevent. The Debtors are entitled to the requested injunction.

1.  The bankruptcy court's decision is flawed first and foremost because it cannot be reconciled with the Seventh Circuit's well-established precedent that bankruptcy courts have broad authority to enjoin third-party actions that would defeat or impair the court's jurisdiction or otherwise threaten the integrity of the bankrupt's estate. Nothing in this standard suggests a bankruptcy court's authority under § 105 is limited to facilitating fully consensual reorganizations.

26

Instead, bankruptcy courts have the power *and* responsibility to exercise their broad power whenever a third-party action may affect the amount of property in the bankrupt estate or the allocation of property among creditors. This is such a case.

The absence of any precedent for the bankruptcy court's novel approach—and the existence of cases enjoining third-party actions when a contentious confirmation hearing appears inevitable—is no accident. Making the prospects of a fully consensual reorganization a major factor in the § 105 analysis would grant enormous power to hold-out creditors. The voting rules and cramdown provisions in the bankruptcy code are specifically designed to eliminate hold-out leverage. But the bankruptcy court's approach undoes that carefully designed statutory scheme by granting a small group of creditors the power to use the threat of value-destroying litigation against a third party to extract hold-out value without fear of a cramdown. Moreover, the bankruptcy court's approach puts mediation and settlement discussions on trial. Because of the bankruptcy court's myopic focus on a fully consensual reorganization, the details of the parties' mediation and settlement discussions were a central focus of the most recent

27

three-day evidentiary hearing. This perniciously *discourages* parties from engaging in robust settlement negotiations to avoid having those discussions used against them in subsequent judicial proceeding and upends the bedrock public policy that mediation and settlement discussions are confidential.

The bankruptcy court's decision hinges entirely on a fundamental misreading of the Seventh Circuit's decision in *Caesars III*. That decision did not adopt the "fully consensual reorganization" requirement the bankruptcy court imposed. To the contrary, *Caesars III* reaffirms that § 105(a) confers "broad" and "extensive equitable powers" with few limits. 808 F.3d at 1188. And it did so while rejecting the bankruptcy court's previously "cramped" interpretation of § 105 that imposed a rigid "same acts" requirement. *Id.* To hold, as the bankruptcy court did, that the Seventh Circuit adopted a novel legal rule limiting § 105 relief to a narrow set of circumstances in the very opinion that rejected a different artificial limitation is far-fetched.

The bankruptcy court's legally erroneous focus on whether an injunction would foster settlement between the Debtors and Appellees infected its entire analysis. Its conclusion that a further stay of the

28

guaranty actions is unlikely to enhance the prospects for a successful resolution of this bankruptcy case flowed directly from that flawed premise. So did the bankruptcy court's shifting views on the threat the guaranty actions pose and whom the equities favor. It reached opposite conclusions from those it reached in February and June *based on exactly the same facts*, and candidly acknowledged the only difference was the parties' progress on the settlement front. These internally inconsistent factual findings are the definition of an abuse of discretion.

2. The bankruptcy court's categorical insistence that an injunction through confirmation "always has been" off the table is another example of that court fundamentally misunderstanding its authority and responsibility under § 105(a). Section 105 complements the automatic stay in 11 U.S.C. § 362 of actions directly against a debtor, and there is no indication Congress intended these complementary provisions to have different time horizons: that a stay under § 362 extends through confirmation, but a stay under § 105 must be categorically limited to a few months. Recognizing the duration of a § 105 injunction should reflect the expected duration of the threat to the bankruptcy estate, the Seventh Circuit and courts across the country have enjoined third-party

actions against non-debtors through plan confirmation. The bankruptcy court should have likewise done so here.

3. The Debtors' request for a temporary injunction should thus be granted. The guaranty actions affect the amount of property in the bankruptcy estate, the allocation of property among creditors, and threaten to delay and potentially entirely derail these bankruptcy proceedings. There can be no dispute that, with a contribution from CEC, the Debtors have a reasonable likelihood of successfully emerging from bankruptcy, and that the public interest and the balance of the harms strongly favors not derailing the Debtors' reorganization. That reorganization is supported by $14 billion of the Debtors' $18 billion capital structure and will benefit over 32,000 employees and multiple communities across the country. The bankruptcy court's contrary conclusions rest on its myopic focus on the settlement negotiations between the Debtors and Appellees. It flips the § 105 analysis on its head by discounting any threats and looking for any far-fetched scenarios under which the guaranty actions might not threaten a reorganization. And it impermissibly holds *CEC*'s decision to engage in protected First Amendment lobbying against the Debtors.

30

Under any reasonable interpretation of § 105(a) and Seventh Circuit precedent, the Debtors are entitled to an injunction temporarily staying the guaranty actions through plan confirmation. That will provide an opportunity to confirm a plan that maximizes recoveries for *all* creditors, rather than allowing a few holdouts to claim a significant portion of the estates' assets for themselves. Because any other conclusion is based on an erroneous view of the law and would amount to an abuse of discretion, this Court should direct the bankruptcy court on remand to immediately enter the Debtors' requested injunction.

## ARGUMENT

### I. Section 105(a) Injunctions Of Third-Party Actions Are Not For The Sole Purpose Of Facilitating Fully Consensual Reorganizations

The bankruptcy court refused to maintain the stay of the guaranty actions for legally irrelevant reasons that cannot be sustained. Rather than follow the well-established standard for assessing whether to enjoin an action against a non-debtor—namely whether the action threatens the integrity of the estate when there is likelihood of a successful reorganization—the bankruptcy court once again imposed a new rigid legal limitation, requiring that the Debtors' contemplated

31

reorganization must be a *fully consensual* one to obtain § 105 relief. A A0066-70. The bankruptcy court's factual findings all flowed from that flawed understanding. The bankruptcy court otherwise *based its findings on the same evidence it previously found warranted injunctive relief in June.* Indeed, the only new evidence the court relied upon related to the prospects for a settlement between the Debtors, CEC, and Appellees. But the bankruptcy court's newly-minted requirement is not an accurate statement of the law. The inability to bring the final hold-outs opposing a consensual reorganization on board is not grounds to deny injunctive relief and threaten the availability of billions of dollars of value to the estate and all other creditors—quite the opposite. Otherwise, § 105 would *hinder* settlement by encouraging hold-outs engaged in third-party litigation, who would literally have nothing to lose.

### A. This Court's Well-Established Standard For § 105(a) Injunctions Is To Protect The Integrity Of The Estate, And Is Not Limited To Promoting Settlements

The bankruptcy court fundamentally misunderstood the scope of a bankruptcy court's power to enjoin third-party actions. Section 105(a) grants courts the authority to "issue *any* order … that is necessary or

32

appropriate" to protect its jurisdiction and "carry out the provisions of" the bankruptcy code. 11 U.S.C. § 105(a). It has been analogized to the All Writs Act, providing "the basis for a broad exercise of power in the administration of a bankruptcy case." *In re Casse*, 198 F.3d 327, 336 (2d Cir. 1999). And in the prior appeal reversing a "cramped" interpretation of §105, the Seventh Circuit reiterated that it is a "broad grant of power." *Caesars III*, 808 F.3d at 1188. Consistent with this broad authority, bankruptcy courts have the power to enjoin third-party actions against non-debtors that "would defeat or impair its jurisdiction," *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993), or otherwise "threaten the integrity of the bankrupt's estate." *In re Energy Co-Op, Inc.*, 886 F.2d 921, 929 (7th Cir. 1989).

Nothing in this standard, or in any prior case, suggests a bankruptcy court's authority under § 105 is limited to facilitating fully consensual reorganizations. Instead, it encompasses a broad array of situations, depending on the potential impact on the bankruptcy proceedings and the estate. *See, e.g.*, *In re Paul R. Glenn Architects, Inc.*, 2013 WL 441602, *3 (Bankr. N.D. Ill. Feb. 5, 2013) (enjoining litigation that would distract the debtor's principal from the

reorganization efforts); *In re Gander Partners, LLC*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010) (injunction to protect a "vital" "source of funds for the Debtors' reorganization efforts"); *In re Kham & Nate's Shoes No. 2, Inc.*, 97 B.R. 420, 428-29 (Bankr. N.D. Ill. Mar. 3, 1989) (injunction to protect "crucial" assets the loss of which would "have a direct impact upon the bankruptcy estate"). As the Seventh Circuit has observed, the quintessential case for exercising this broad power is where it "may affect the amount of property in the bankrupt estate," *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161 (7th Cir. 1994), or "the allocation of property among creditors," *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

This is such a case. Allowing the guaranty actions to proceed will interfere with the Debtors' ability to marshal and protect estate assets, threaten the Debtors' efforts to reorganize, and at a minimum will derail the bankruptcy proceedings. *See infra*, § III.A. The bankruptcy court thus has both the "*power* and the *responsibility*" to "preliminarily enjoin" the guaranty actions. *Fisher*, 155 F.3d at 823 (emphasis added). Previously recognizing the threat the guaranty actions pose, the bankruptcy court itself twice acknowledged this is a "textbook case" for

34

injunctive relief. A0115; A0149. The ability or inability to achieve a *fully consensual* reorganization—as opposed to a successful reorganization—should have no bearing on the analysis.

## B. The Bankruptcy Court's "Fully Consensual Plan" Requirement Is Unprecedented, Unworkable, And Inconsistent With The Bankruptcy Code

Rather than simply applying the Seventh Circuit's well-established standard to enjoin the guaranty actions, the bankruptcy court invented a new requirement that a § 105 injunction must "enhance the prospects for" a *fully* "*consensual* resolution of th[e]" bankruptcy proceeding. A0066, A0070. This requirement has no basis in principle or precedent. No court has ever distinguished between partially contested and fully consensual plans in their § 105 decisions. *See, e.g.*, *In re Excel Innovations*, 502 F.3d 1086, 1096 (9th Cir. 2007); *In re Eagle-Picher Indus., Inc.,* 963 F.2d 855, 859-60 (6th Cir. 1992); *Gander Partners*, 432 B.R. at 788; *In re Lyondell Chem. Co.*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009); *In re W.R. Grace & Co.*, 386 B.R. 17, 33 (Bankr. D. Del. 2008); *In re Monroe Well Serv., Inc.*, 67 B.R. 745, 751 (Bankr. E.D. Pa. 1986). Courts instead focus on whether an injunction would preserve estate assets (or the allocation of assets

35

among creditors) and on a debtor's revenues, cash flow, and other financials to determine whether a reorganization *of any kind* could result in a viable post-confirmation business. *See Excel*, 502 F.3d at 1096; *In re Fabtech Indus., Inc.*, 2010 WL 6452908, *4-5 (9th Cir. B.A.P. July 19, 2010). In other words, courts consider precisely the factors one would expect under the broad standard the Seventh Circuit and every other circuit to consider the question have adopted.

Decisions from the Ninth Circuit Bankruptcy Appellate Panel and from Delaware have in fact enjoined third-party actions against non-debtors where a contested plan confirmation hearing appeared inevitable. *See Fabtech*, 2010 WL 6452908, *4-5; *W.R. Grace*, 386 B.R. at 33. Neither court even mentioned the prospect of a consensual resolution as a factor. In *Fabtech*, a creditor objected to certain third-party releases in the debtor's proposed plan and asked the court to vacate the § 105 injunction because those releases meant the plan "cannot be confirmed." 2010 WL 6452908 at *4. The Ninth Circuit Bankruptcy Appellate Panel nonetheless upheld the § 105 injunction, dismissing the objection to the releases as an issue for the plan confirmation hearing. *Id.* at *4-5 ("Whether the Plan … meets the

36

requirements for confirmation … is not before us now."). In other words, the court recognized the confirmation would be contested and deemed that fact irrelevant. *W.R. Grace* similarly enjoined actions that would "negatively impact[] the Debtors' reorganization" even though "[c]ompeting plans ha[d] been filed." *W.R. Grace*, 386 B.R. at 33.

The absence of any precedent for the bankruptcy court's novel approach is no accident. Making the prospects of a fully consensual reorganization a major factor in the § 105 analysis would grant enormous power to hold-out creditors. Such creditors would perversely have more freedom than creditors who are seeking a negotiated compromise to pursue third-party actions against non-debtors that thwart the bankruptcy court's jurisdiction and threaten to derail the bankruptcy proceedings. Nothing in § 105 or the bankruptcy code in general suggests Congress intended to give hold-out creditors this preferential treatment.

To the contrary, the voting rules in 11 U.S.C. § 1126 and the cramdown provisions in 11 U.S.C. § 1129(b) are specifically designed to eliminate hold-out leverage. *See* E. Warren, *A Theory of Absolute Priority*, 1991 Ann. Surv. Am. L. 9, 31-32 (1992). Section 1126 deems

an entire class of creditors to accept their treatment under a proposed plan despite the objections of some class members if the plan has sufficiently broad support within the class. *See* 11 U.S.C. §§ 1126(b), 1129(a)(8). Section 1129 in turn allows a bankruptcy court to confirm a plan over the objections of an entire class of creditors if the plan treats those creditors "fair[ly] and equitabl[y]." 11 U.S.C. § 1129(b)(1).

As Professor Warren explained, these rules "prevent[] a creditor class from demanding a premium to consent to the plan." Warren, *A Theory of Absolute Priority*, 1991 Ann. Surv. Am. L. at 31. Others have similarly noted "[t]he threat of a cramdown [is] an important factor encouraging settlement." C. Booth, *The Cramdown on Secured Creditors: An Impetus Toward Settlement*, 60 Am. Bankr. L.J. 69, 105 (1986). The alternative to settlement is a valuation dispute that "sophisticated participants in any significant chapter 11 reorganization avidly desire to avoid." R. Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Imperative*, 39 Bus. Law. 441, 454 (1984).

The bankruptcy court's approach, however, effectively eliminates cramdowns for creditors holding claims against a third party vital to a

38

successful reorganization, such as with CEC here. A small group of creditors holding such claims can instead use the threat of value-destroying litigation against the third party to extract hold-out value without fear of a cramdown. Because they do not consent to the plan, they cannot be enjoined from unraveling the reorganization no matter how many other creditors support the proposed plan. That cannot be the law.

The bankruptcy court's approach, moreover, creates pernicious effects that *discourage* consensual resolution by putting mediation and settlement discussions on trial. This is starkly demonstrated by the spectacle of the bankruptcy court's most recent evidentiary hearing on extending the injunction. That hearing largely focused on what settlement offers the parties had made and the additional concessions each side would demand before a settlement could be reached. A2794-95; A2808-12; A2815-33; A2840-47; A2855-58; A2861-63. The bankruptcy court even faulted the mediator's statement—from a former federal chief judge—for not "describ[ing] the discussions themselves," disclosing "any proposal[s] exchanged," or divulging how much

additional money the Debtors would need to offer to satisfy Appellees. A0069; *see also* A2711.

The bankruptcy court's approach, if accepted, would turn mediation on its head. These are sensitive settlement negotiations that the law normally presumes are confidential and that this Court's mediation protocol specifically protects. *See* N.D. Ill. L.R. 16.3(c) (for mediations in Lanham Act cases, "[a]ll mediation proceedings, including any statement made by any party, attorney or other participant, shall, in all respects, be privileged and not reported, recorded, placed in evidence, made known to the trial court or jury, or construed for any purpose as an admission"); *Clark v. Stapleton Corp.*, 957 F.2d 745, 746 (10th Cir. 1992) ("[R]evealing statements or comments made at a settlement conference is a serious breach of confidentiality."); *cf.* Fed. R. Evid. 408. Indeed, courts generally *cannot* learn the details of what is said and done during mediation. *See, e.g.*, *Pueblo of San Ildefonso v. Ridlon*, 90 F.3d 423, 424 n.1 (10th Cir. 1996) (requiring three-judge panel to recuse after learning confidential mediation information).

There is a reason sensitive settlement negotiations are presumed confidential. "Without confidentiality, the discussions and exchange of

40

information necessary to the settlement process may not occur."
*Bertstrom, Inc. v. Glaciery Bay, Inc.*, 2010 WL 257253, *2 (N.D. Ill. Jan.
22, 2010). Good-faith negotiations between the various parties in a
bankruptcy case would be chilled because no stakeholder would want
their offers or statements used against them in subsequent litigation.
*See Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2014 WL
533270, *2 (S.D. Ind. 2014); *cf.* Fed. R. Evid. 408, 1972 Adv. Cmte.
Notes. Reliance on hearsay reports from the parties' mediation
discussion further empowers hold-out parties. And the chilling effect
would be even worse if, as the bankruptcy court held, a request for a
§ 105 injunction subjects the mediator to cross-examination and
potentially requires divulging even confidential communications with
the mediator that were never shared with the other side. A0069. This
would make settlements *less likely*, which undermines the bankruptcy
court's mistaken rationale for the "fully consensual plan" requirement
in the first place. *See In re Teligent, Inc.*, 640 F.3d 53, 57-58 (2d Cir.
2011) (holding courts must "vigorously enforce" confidentiality to
encourage settlement discussions). Further proving the folly of the
bankruptcy court's approach, the mediator recently chose to resign

rather than follow the bankruptcy court's atypical view that mediation should occur without any assurance of confidentiality. (Bankr. Ct. No. 15-1145, Dkt. No. 4885). The Court should thus decline the bankruptcy court's invitation to adopt an arbitrary legal rule that completely upends settled practice treating mediation and settlement discussions as confidential.

### C. The Seventh Circuit's *Caesars* Decision Does Not Support, Much Less Require, The Bankruptcy Court's "Consensual Reorganization" Requirement

The primary basis for the bankruptcy court's emphasis on consensual plans is its erroneous interpretation of *Caesars III*. In the bankruptcy court's view, when stating that the relevant question under § 105 is whether an injunction "is likely to enhance the prospects for a successful resolution of the disputes attending [the Debtors'] bankruptcy," 808 F.3d at 1188, "consensual resolution … was unquestionably what the court of appeals had in mind," A0070; *see also* A0103. But there is no reason to limit "successful resolution[s]" to *fully* negotiated settlements. The bankruptcy code recognizes contested and consensual plans are both legitimate ways to resolve bankruptcy disputes and reorganize a debtor. *See* 11 U.S.C. §§ 1129(a)(8), (b)(1).

The Seventh Circuit's statement was simply another way of asking whether the guaranty actions threatened the integrity of the estate by "drain[ing]" away assets CEC would otherwise contribute to fund the Debtors' reorganization. *Caesars III*, 808 F.3d at 1188-89. That is the critical question, not whether the reorganization will be fully consensual. *L & S Indus.*, 989 F.2d at 932.

Indeed, finding a "fully consensually reorganization" requirement lurking in *Caesars III* would require reading that decision to overrule past Seventh Circuit precedent. For decades before that decision, the Seventh Circuit recognized that bankruptcy courts have broad authority to enjoin third-party actions against non-debtors that "would defeat or impair its jurisdiction," *L & S Indus.*, 989 F.2d at 932, or otherwise "threaten the integrity of the bankrupt's estate," *Energy Co-Op*, 886 F.2d at 929. That broad standard—applicable across a wide variety of fact-patterns—is irreconcilable with the "fully consensual reorganization" requirement the bankruptcy court read into *Caesars III*. Because one Seventh Circuit panel cannot overrule the decision of a prior panel, *see Iqbal v. Patel*, 780 F.3d 728, 729 (7th Cir. 2015), this

only further demonstrates that Appellees are reading into *Caesars III* a legal rule that does not exist.

*Caesars III* instead specifically embraces the well-established standard discussed above. In formulating its standard for enjoining third-party actions, the Seventh Circuit cited its earlier decision in *Zerand-Bernal*, 23 F.3d at 161-62. *Zerand-Bernal* reflects an expansive view of a court's authority to enjoin third-party litigation, holding courts have the power to stay *any litigation* "related to" the bankruptcy proceedings. *Id.* at 162. And the Seventh Circuit's decision in *Caesars III* discussed and analogized this case to *Fisher*—a decision that, like the Seventh Circuit's other recent § 105 decisions, quotes and builds upon *Zerand-Bernal*. *Fisher*, 155 F.3d at 882; *see also In re Teknek, LLC*, 563 F.3d 639, 648 (7th Cir. 2009).

*Caesars III* likewise reaffirmed that § 105 provides a "broad grant of power." 808 F.3d at 1188. In doing so, the Seventh Circuit observed that § 105 "grants [ ] extensive equitable powers" with few limits beyond "tak[ing] an action prohibited by another provision of the Bankruptcy Code." *Id.* There is no reason to believe that in *Caesars III*, the Seventh Circuit engaged in the artificial line-drawing ascribed

44

to it by the bankruptcy court. The Seventh Circuit's decision instead *rejected* the artificial "same acts" requirement the bankruptcy court previously adopted, holding that "nothing in 11 U.S.C. § 105(a) authorizes th[is] limitation on the powers of a bankruptcy judge." *Id.* It would be beyond strange to treat the Seventh Circuit's decision as imposing a new limitation on the powers of a bankruptcy judge in an opinion rejecting a different artificial limitation as inconsistent with the extensive authority § 105 confers.

To be sure, the Seventh Circuit also acknowledged that the Debtors "hope[d]" an injunction "might help the parties negotiate a reorganization of the bankrupt estate" and that an injunction might provide "a clear shot at negotiating an overall settlement." *Id.* at 1188, 1189. The Debtors did originally hope an injunction would lead to consensus—and they have been tremendously successful in seeking consensus, bringing the holders of approximately $14 billon of their capital structure to agreement and execution of RSAs. The issuance of (and threat of) injunctive relief has, thus, fostered consensual resolution in this case. But those settlements will be for naught—indeed, by their terms will unravel—if a group of hold-outs are allowed to exercise a veto

45

over injunctive relief pending a confirmation hearing. Nothing in the *Caesars III* decision—nor any other decision—requires *full* consensus to be achievable to obtain or maintain injunctive relief. When a third-party action against a non-debtor seeks vital funds without which a consensual reorganization would fall apart, it is often self-evident how the action could threaten the integrity of the bankruptcy estate. But that is just one way to satisfy the test, it is not the test itself. After all, the purpose of § 105(a) is not to foster settlements, but to empower a court to protect the bankruptcy process and thereby promote successful reorganizations.

### D. The Bankruptcy Court's Analysis Improperly Starts From The Premise That Section 105 Relief Is Limited To Facilitating Settlements

The bankruptcy court's legally erroneous focus on whether an injunction would foster settlement between the Debtors and Appellees infected its entire analysis. The fundamental premise of the bankruptcy court's decision is that "the point of the injunction has always been … to gain time to reach a settlement" through "a consensual plan"—"not [ ] a cramdown plan confirmed after a contested confirmation hearing." A0072. And its conclusion that a further stay of

46

the guaranty actions is unlikely "to enhance the prospects for a successful resolution" (by which it meant a fully-consensual resolution) followed directly from that flawed premise. A0066. For example, the bankruptcy court found "the debtors' progress on the settlement front" was no longer "enough to justify further relief" based on "the history of the parties' negotiations." A0066, A0075. Almost all of the court's analysis on likelihood of success then recounted those negotiations, A0066-72, including its ultimate conclusion "that it isn't injunctive relief that promotes settlement here but rather its absence," A0069. Whether an injunction would foster further settlements and the bankruptcy court's blow-by-blow account of the parties' negotiations are irrelevant to a proper § 105 analysis that focuses on the threat to the bankruptcy court's jurisdiction and to the assets of the Debtors' estate.

The bankruptcy court's shifting views on the threat the guaranty actions pose and who the equities favor likewise rest on its erroneous emphasis on settlement. It reached opposite conclusions *based on exactly the same facts*, the only change being its assessment of what would foster a fully consensual reorganization. For example, in August, the bankruptcy court relied on the testimony of the Debtors' expert at a

47

June evidentiary hearing, to conclude that the denial of an injunction would not endanger the reorganization. A0073-75. Yet in June the bankruptcy court found that "the prospect that a CEC bankruptcy will bring on 'one of the great messes of our time' … remains plausible" and that "denying relief would [ ] endanger the success of the bankruptcy proceedings" *based on the same evidence*. A0102; *see also* A0075 (recognizing "in my June 15 ruling, I noted all of this evidence" relied upon to reach the opposite result in August).

The bankruptcy court similarly found in its August decision that the equities narrowly favored Appellees largely because the potential harm to the Debtors is "[n]ot so great" and based on events that are "just possibilities." A0077. In doing so, the bankruptcy court relied exclusively on the June 2016 testimony of the Debtors' expert. *Id.* Once again, however, the bankruptcy court previously found *the same evidence* demonstrated that "the debtors stand to suffer a very real harm" and that "[t]he balance of equities [ ] heavily favors" staying the guaranty actions. A0119; A0102. The only thing that changed between June and August, as the bankruptcy court candidly acknowledged, was "the debtors' progress on the settlement front." A0075.

48

The bankruptcy court's findings based on a legally erroneous interpretation of the law deserve no deference. Indeed, because the bankruptcy court incorporated its previous findings by reference, A0061, these "internally inconsistent factual findings" based on the same evidence are reason alone to set aside the bankruptcy court's decision as an abuse of discretion. *See Sentinel Mgmt. Grp.*, 728 F.3d at 670; *John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1139 (10th Cir. 2008).

## II.   Enjoining Third-Party Actions Through Plan Confirmation Should Not Be A "Non-Starter" In Bankruptcy Proceedings

Compounding its error, and further permeating its flawed reasoning, the bankruptcy court categorically rejected the notion of granting a stay through confirmation as a "non-starter." A0073. Calling a stay halting litigation against CEC through plan confirmation "tantamount to the automatic stay" in 11 U.S.C. § 362 (applicable to suits against a debtor), the bankruptcy court held that "[h]ad Congress intended to permit that sort of remedy for non-debtors, it would have provided it." *Id.* But Congress did provide such a remedy by enacting § 105(a), which "complements the automatic stay," *Zerand-Bernal*, 23 F.3d at 162.

49

There is no indication Congress intended these complementary provisions to have different time horizons, with a stay under § 362 extending through confirmation while a stay under § 105 is *categorically* limited to "a few months," A0073. Rather, the key difference between the two provisions is that an injunction under § 105 is not "automatic" and instead requires a debtor "move the court into action." S. Rep. No. 989, 95th Cong., 2d Sess 51 (1978). The duration of an injunction under § 105(a) thus turns on a case-by-case determination about when the third-party action will no longer threaten the bankruptcy estate. *See id.*; *cf. In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 599 (10th Cir. 1993) (per curiam) (holding whether to temporarily block litigation that threatens the estate and for how long is necessarily a "case by case decision[]").[1] Because holders of more than 50% of the Debtors' second-lien debt (including creditors for whom Appellees BOKF and WSFS act as trustees) have contractually agreed

---

[1] *In re Saxby's Worldwide, LLC* did not, as the bankruptcy court implies, hold that the duration should be tied to keeping pressure on the nondebtor to expedite the proceedings regardless of when the threat will dissipate. *See* 440 B.R. 369, 386 (Bankr. E.D. Pa. 2009). *Saxby's* limited the injunction to a few months because the basis for injunctive relief in that case—a need to protect management from distraction— expired when the debtor proposed a plan. *Id.*

not to support the Debtors' plan, A2785:23-86:11; A2528, the threat the guaranty actions pose here will not dissipate until plan confirmation.

The bankruptcy court's insistence that an injunction through confirmation "always has been" off the table is thus another instance of the court fundamentally misunderstanding its authority and responsibility under § 105. A0073. What the Seventh Circuit described as a "broad grant of power," *Caesars III*, 808 F.3d at 1188, the bankruptcy court (once again) treated as reserved for rare, "drastic" situations, A0073. But, of course, it is simply not the case that courts have declined to grant § 105 injunctions through confirmation where the recovery of estate assets or the allocation of assets among creditors were in jeopardy. Quite the opposite.

For example, the Seventh Circuit in *Fisher* affirmed an injunction staying litigation against third parties brought by defrauded investors "pending the outcome of the bankruptcy proceeding." 155 F.3d at 883. This injunction was necessary, the Seventh Circuit held, because both the estate and the investors were going after "the same limited pool of money, in the possession of the same defendants" to recover assets

51

plundered from the debtors. *Id.* at 882-83; *see also id.* at 878-79. The same is true here.

Courts across the country have likewise enjoined third-party actions through plan confirmation. *In re Western Real Estate Fund* enjoined a third-party action "during the pendency of th[e] bankruptcy proceeding" to protect the debtor "during preparation and confirmation of a reorganization plan." 922 F.2d at 600, 602. The third party sought a judgment for which the debtor in that case was obligated to indemnify. *Id.* at 599. The court in *Otero Mills* permanently enjoined an action to enforce a guaranty by foreclosing on property the debtor's president intended to sell to fund distributions to all of the debtor's creditors. *In re Otero Mills, Inc.*, 21 B.R. 777, 779 (Bankr. D.N.M.), *aff'd* 25 B.R. 1018 (D.N.M. 1982); *see also Kham & Nate's*, 97 B.R. at 428-29 (enjoining third-party action against guarantor whose assets were "crucial" to the reorganization). *In re Fabtech Industries* similarly affirmed an injunction blocking a guaranty action against the debtor's CEO until plan confirmation to spare the CEO the distraction during the reorganization process. 2010 WL 6452908, *2, 7. The consequences of allowing the guaranty actions to go forward here—the potential loss

52

of a contribution worth *billions*—are significantly more severe than this minor distraction. In sum, the bankruptcy court's view of the authority and wisdom to enjoin third-party actions through plan confirmation is wrong as a matter of law and, when this Court applies *de novo* review to this legal issue, should be reversed.

## III. The Debtors Are Entitled To An Injunction

Once the bankruptcy court's legal errors are corrected, the Debtors easily satisfy the standard for a § 105(a) injunction to stay the guaranty actions that threaten to destroy creditor value and imperil the Debtors' reorganization. Indeed, the bankruptcy court's prior findings, which it incorporated into its most recent ruling, make this abundantly clear. A0061. To enjoin proceedings in another court, a debtor need only show that (1) the proceedings threaten the integrity of the bankruptcy estate; (2) the debtor has a reasonable likelihood of a successful reorganization; and (3) an injunction is in the public interest. *See Fisher*, 155 F.3d at 882; *Gander Partners*, 432 B.R. at 788. Each of those requirements is satisfied here. And although a balancing of the harms is not required under Seventh Circuit precedent, that balance plainly favors the Debtors.

### A. The Guaranty Actions Threaten The Integrity Of The Bankruptcy Estate

It is beyond dispute that allowing the guaranty actions to proceed will threaten and at the very least materially delay the Debtors' efforts to reorganize and successfully emerge from bankruptcy. Those actions seek assets from CEC that are vital to the Debtors' proposed plan of reorganization, and no one has proposed a viable alternative plan without a significant recovery from CEC. A0117 (calling a CEC contribution "critical"). This is the "classic scenario" for a § 105 injunction against third-party actions. *In re Regency Realty Assocs.*, 179 B.R. 717, 719 (Bankr. M.D. Fla. 1995). Indeed, the bankruptcy court itself has repeatedly called it the "textbook" scenario for injunctive relief. A0115; A0149.

*First*, the guaranty actions will unquestionably "affect the amount of property" in the Debtors' estate. *Zerand-Bernal*, 23 F.3d at 162. It is undisputed that one of the estate's two primary assets is its claims arising from the Disputed Transactions. A0767.01:20-.02:3; A0767.05:14-.07:2. Appellees themselves contend "that CEC is liable to the bankruptcy estate for ... billions of dollars" on account of these claims. *See* A0760 ¶ 37. Through their guaranty actions, however,

54

Appellees seek to obtain that value from CEC for themselves. Indeed, as the bankruptcy court found, the transactions giving rise to the estate's claims against CEC are the very reason that CEC has any value at all. *See* A0131 ("Before the transactions, however, CEC was a holding company that owned 100 percent of CEOC; CEC had no other assets. Only as a result of the assets that CEC obtained through the various transactions did it come to have 'independent value,' meaning value beyond its ownership interest in CEOC.") (internal citations omitted). The estate's claims and Appellees' claims both seek to recover from the same limited pool of assets from the same entity (CEC)— assets that originally came from the Debtors themselves. And if Appellees are successful, CEC will have no meaningful value to contribute to the estate for the benefit of all its creditors—thus directly affecting the amount of property in the Debtors' estate. *See* A0767.09:17-.11:22; A0788.05:11-788.06:2.

No one—not even Appellees—contend the guaranty actions pose no threat to CEC's contribution and consequently the amount of property in the Debtors' estate. The bankruptcy court's decision found an adverse judgment in the guaranty litigation would "risk" the "loss of

the CEC contribution." A0076:22-77:2; *see also* A0119 (after an adverse judgment, "[t]he chances of a settlement that CEC funds will be nil."). The bankruptcy court simply deemed that risk irrelevant by looking for any conceivable reason the loss of CEC's contribution may not come to pass. *See* A074-75. But that approach flips the Seventh Circuit's standard on its head. The question is whether the guaranty actions "*could conceivably have an effect*" on CEC's contribution and thus "on the estate," *In re Lemco Gypsum, Inc.*, 910 F.2d 784, 788 (11th Cir. 1990) (emphasis added), not whether there is any scenario under which the guaranty actions could proceed and CEC could still make a significant contribution. *See also Zerand-Bernal*, 23 F.3d at 162 (relying on *Lemco*).

Applying the proper standard, the Seventh Circuit previously recognized the significant effect the guaranty actions would have on the amount of property in the Debtors' estate:

> If before CEOC's bankruptcy is wound up CEC is drained of capital by the lenders' suits to enforce the guaranties that CEC had given them, there will be that much less money for CEOC's creditors to recover in the bankruptcy proceeding…. The less capital CEC has for CEOC to recapture through prosecution or settlement of its fraudulent-transfer claims, the less money its creditors will receive in the bankruptcy proceeding.

56

*Caesars III*, 808 F.3d at 1189.  Nothing has changed.

*Second*, the guaranty actions will affect the allocation of property among the Debtors' creditors.  Indeed, that is the whole point of those actions.  Appellees include certain unsecured creditors and indenture trustees for second lien noteholders.  A0650 ¶ 16.  Under the bankruptcy code's statutory priority scheme, Appellees would all recover only after satisfaction of the Debtors' nearly $12 billion in first lien debt.  A0245.  The very purpose of the guaranty actions is to jump to the front of the creditor line, in turn depriving the estate of a substantial contribution from CEC for distribution to all of its creditors. *See* A0777:24-79:13; A0788.01:25-.02:15.  Whatever recoveries exist to particular classes of creditors under the Debtors' plan currently on file, the availability, amounts, and timing of those recoveries will be dramatically different if the Appellees are allowed to jump the line and proceed directly against CEC and its assets.  A2066:4-70:19; *see also* A0114-15.

The Seventh Circuit once again recognized this reality, stating that "were guarantor liability to be imposed on CEC, CEC's ability to satisfy CEOC's fraudulent-conveyance claims against it—*and thus pay*

57

*other creditors*—would be impaired." *Caesars III*, 808 F.3d at 1191 (emphasis added). That too threatens the integrity of the bankruptcy process. Bankruptcy is intended to prevent "race[s] to the courthouse" by creditors, which ultimately destroy the value of the estate and impair an equitable distribution of assets to *all* creditors. *Fisher*, 155 F.3d at 883; *see also Caesars III*, 808 F.3d at 1190 ("The usual purpose of bankruptcy is to allocate the distribution of the bankrupt's assets among creditors."); *Teknek*, 563 F.3d at 650 (finding absence of other creditors "relevant" given trustee's duty to "marshal the estate's assets for a pro rata distribution to all creditors").

*Third*, the guaranty actions could "derail the bankruptcy proceedings." *Fisher*, 155 F.3d at 883. The Debtors and $14 billion of their $18 billion capital structure have agreed on the terms of a consensual restructuring, as documented in the various RSAs and the Debtors' proposed plan. The Debtors and the vast majority of their creditors thus believe the framework outlined in the Debtors' proposed plan is the blueprint for maximizing creditor recoveries in these cases— and there is no evidence otherwise. A2792:4-12. Votes are already being solicited on this plan, and the confirmation hearing is slated to

begin in January 2017. This framework is premised, however, on CEC making substantial contributions to the estate in exchange for a release of claims against it. A2790:1-7. Without CEC's contribution, the Debtors' plan—and the largely consensual reorganization it entails—will crumble. Indeed, without a stay of the guaranty actions, the RSAs by their terms expire, causing the broad consensus that Debtors have been able to obtain to unravel, based on the intransigence of a few hold-outs.

The guaranty actions plainly put CEC's contribution at risk, as the bankruptcy court itself previously acknowledged in February and June in granting injunctive relief. A0119-20; A0102; A0076:22-77:2. CEC's public statements make clear an adverse ruling in the guaranty actions will likely force CEC to make its own bankruptcy filing soon after an adverse judgment is entered *regardless of when the judgment is executed upon*. A2637, A2667. As the Seventh Circuit recognized, CEC "would th[en] become the badminton birdie in a contest between the two groups of claimants." *Caesars III*, 808 F.3d at 1189. This contest between the Debtors and their junior creditors over CEC's limited assets would create "one of the great messes of our time" by unleashing

years of costly litigation that, at a minimum, will greatly disrupt and delay the Debtors' reorganization efforts. A0769:23-70:21, A0773:15-76:8, A0782:21-83:11, A0790:4-92:4; A2066:4-2070:1; *see also* A0102. Meanwhile, the delay alone would destroy roughly $3.5 million in value *every day* because of additional administrative expenses and accumulating interest—eliminating more than $1.3 billion in value each additional year this bankruptcy case drags on. A2066:24-70:4. Permitting the guaranty actions to put that much value at risk is contrary to Chapter 11's "recognized policy" of "maximizing property available to satisfy creditors." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

In response to this evidence—evidence the bankruptcy court itself previously relied on to grant an injunction—the bankruptcy court essentially flipped the inquiry on its head. In its (latest) view, injunctive relief was not necessary so long as the *possibility* of a reorganization remained. *See* A073-75. In other words, instead of asking whether the guaranty actions could threaten the integrity of the estate, the bankruptcy court found it was enough that they *might* not,

because other hypothetical restructuring alternatives could possibly be pursued. *Id.* That is not the test.

But even if it were, although other restructuring alternatives may exist, the Debtors' ability to formulate *any* plan of reorganization heavily depends on the ability to recover on their estate claims against CEC. *See* A0767.03:23-.07:3; A2804:16-2805:6. The bankruptcy court did not disagree. It previously found the claims against CEC are "a critical component of any reorganization." A0117. And the only reorganization alternative the court suggested—a plan "assign[ing] the estate's claims to a litigation trust" and giving creditors a stake in that trust, A0074—still depends on a significant recovery from a solvent CEC. A0117.[2] The bankruptcy court's speculation that the Debtors could seek a contribution from the Sponsors instead, A0071-72, ignores that the Sponsors and CEC's other affiliates *are* making contributions by "giv[ing] CEC access to resources it currently doesn't have to … fund its contribution." A0786:7-87:7.[3] And even if other alternative

---

[2] This "standalone" reorganization option also reduces the Debtors' value by approximately $1.5 billion, which would significantly reduce creditor recoveries.

[3] The bankruptcy court faulting the Sponsors for not making a *direct* contribution contradicts its previous recognition that it does not matter

61

restructuring approaches could prove successful or other funding sources did exist, starting from scratch would delay resolution by months if not years, all at great expense to the estates. A2066:24-70:4.

In short, an injunction that preserves CEC's ability to participate in the Debtors' restructuring provides a path toward "a prompt and orderly wind-up of the bankruptcy." *Caesars III*, 808 F.3d at 1190. The alternative would substantially delay and potentially derail the entire proceedings by casting doubt over the current alternatives for a confirmable plan. A.0770:23-71:9; A0771.01:8-14; A2802:5-03:16, A2804:16-05:6. That is precisely what § 105(a) is supposed to prevent. *See, e.g.*, *Paul R. Glenn*, 2013 WL 441602, at *3; *Gander Partners*, 432 B.R. at 784-85; *Kham & Nate's*, 97 B.R. at 428-29.

## B. The Debtors Have A Reasonable Likelihood Of Successfully Reorganizing

Courts in this Circuit and elsewhere have routinely held that, in the context of a § 105 injunction, likelihood of success on the merits

---

where the contribution comes from so long as it is fair and reasonable. 6/7/2016 Hr'g Tr. at 65:11-66:23 ("[I]f somebody sued me and all of my staff, and I wanted to settle it on behalf of all of us by paying some money, that would be a perfectly enforceable contract, even though my law clerks didn't pay anything, and I fronted all the money for the settlement.").

means a reasonable likelihood of a successful reorganization. *See Gander Partners*, 432 B.R. at 788; *Otero Mills*, 21 B.R. at 779 ("Success on the merits has been defined as the probability of a successful plan of reorganization."); *In re Gathering Rest., Inc.*, 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986) (similar). Here, the bankruptcy court and Appellees do not dispute that the Debtors are likely to successfully reorganize. A066.

The Debtors operate one of the strongest casino companies in the United States, with a "diversified footprint of casinos across a number of states," a strong brand name, and an iconic presence in Las Vegas. A0797.03:17-.04:20; A2062:8-63:6. Nor is there any dispute that the Debtors have a strong operating business that consistently outperforms expectations and generates substantial earnings before interest, taxes, depreciation, and amortization (EBITDA)—approximately $800 million—and free cash flow after capital expenditures. A2516; A0771.02:12-.03:19; A2062:8-63:6. Moreover, restructuring support agreements are in place with almost all major creditor groups. A2768. The Debtors' primary problem is over-leverage, but that is a problem a Chapter 11 reorganization is well-suited to address. A0771.02:12-.03:19; A0797.05:14-19; A2063.

63

## C.  The Public Interest Favors Issuing The Requested Injunction

The injunction the Debtors seek also is in the public interest. "Promoting a successful reorganization is one of the most important public interests." *Gander Partners*, 432 B.R. at 789.  Indeed, "Chapter 11 is premised on giving debtors a full opportunity to reorganize," *In re A & F Enterprises, Inc.*, 742 F.3d 763, 767(7th Cir. 2015), and "maximizing [the] property available to satisfy creditors." *203 N. LaSalle*, 526 U.S. at 453.  Staying the guaranty actions will foster both of those goals.  The most realistic alternative is a race to the courthouse that destroys the value of the estate and impairs and equitable distribution to all creditors.

This interest in promoting reorganization does not disappear, as the bankruptcy court held, simply because one could imagine other alternatives in which the Debtors could hypothetically reorganize without a contribution from CEC. A0075-76.  Again, those alternatives are speculative possibilities.  No one has proposed a viable plan that does not depend on a substantial contribution (through litigation or settlement) from CEC.  A substantial contribution from CEC thus

remains the only way to *ensure* a successful reorganization that maximizes creditor recoveries.

The bankruptcy court likewise too quickly dismissed "the public interest in settlements." A0075. Because the bankruptcy court believed the Debtors and Appellees were unlikely to settle while an injunction is in place, it held this interest "actually counsels against extending the injunction." A0076. But the bankruptcy court completely overlooked the public interest in preserving the Debtors' existing settlements with the holders of approximately $14 billion in debt, all of which are at risk if the guaranty actions move forward. Staying the guaranty actions, in other words, has fostered settlements with all but a few hold-outs. Section 105 should not be applied, as the bankruptcy court did below, to give those hold-outs a heckler's veto.

### D. Balancing The Harms Is Not Part Of The § 105 Analysis, But The Balance Strongly Favors The Debtors

The bankruptcy court also found a stay is unnecessary because "the balance of the equities tips in favor of [Appellees] here." A0080. But the balance of the equities or the harms is not a factor in the § 105 analysis. *See, e.g.*, *Fisher*, 155 F.3d at 882; *L & S Indus.*, 989 F.2d at

932; *see also In re A & F Enterprises, Inc.*, 742 F.3d 763, 766 (7th Cir. 2015) (outside the § 105 context, holding injunctive relief requires balancing "the irreparable *harm* that will result to each side") (emphasis added). Such balancing is not mentioned in the Seventh Circuit's decisions—a point the bankruptcy court conceded, A0076—and a balancing inquiry is inconsistent with the Seventh Circuit's clear guidance that a debtor need not establish irreparable harm. *L & S Indus.*, 989 F.2d at 932. Absent a showing of irreparable harm to the debtor, there is nothing to balance.

But even if a balancing of harms is a relevant consideration, the balance of harms clearly favors the Debtors in this case. The Debtors face the risk of very real and irreparable harm absent a stay of the guaranty actions. Through the guaranty actions, Appellees seek to sidestep the bankruptcy process and claim exclusively for themselves the very assets from CEC that the Debtors seek for equitable distribution to *all* creditors. This would permanently reduce and reallocate the property of the Debtors' estate. Such a blatant attempt to "defeat or impair" the bankruptcy court's jurisdiction over the estate property and the bankruptcy process itself is precisely when a court

66

*should* exercise its § 105 authority. *Id.* The bankruptcy court minimized the harm to Debtors based on its view that allowing the injunction to lapse *might* increase the chances of achieving a *fully consensual settlement.* A0069, A0077. But, again, there is no basis for the bankruptcy court's myopic focus.

Regardless, given there is unquestionably risk to Debtors, the balance of harms favors injunctive relief unless there is a greater harm to Appellees. There is none. To the contrary, as the bankruptcy court itself previously acknowledged, Appellees "will suffer no particular harm" if a stay is granted. A0119. Indeed, even in its most recent ruling, the bankruptcy court dismissed the only specific harm Appellees identified—that *CEC* may successfully "lobby Congress to amend the [Trust Indenture Act] to eliminate the claims in the guaranty litigation"—as not "much of a risk." A0079. It nonetheless found that this weighed against an injunction because it viewed CEC's behavior as "unseemly." *Id.* As an initial matter, to penalize a party based on protected First Amendment conduct raises serious constitutional concerns. *See New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). Courts have no license to deem the exercise of

constitutionally protected rights "inequitable," A0079, or to otherwise hold the exercise of those rights against the Debtors or CEC. *Cf. Harman v. Moore*, 547 U.S. 250, 256 (2006) ("Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'").

But whatever the bankruptcy court thought about *CEC's* behavior, that cannot be held against the parties seeking the injunction—the *Debtors*—or the creditors holding $14 billion in claims who support the entry of an injunction. Any equitable balancing should focus on the parties in this adversarial proceeding. The Debtors seek an injunction to protect their claim to their assets, which they assert were fraudulently transferred to CEC. And the Debtors have not engaged in the conduct that the bankruptcy court criticized.

In any event, appearances aside, the bankruptcy court found there was no real risk to Appellees, and as the bankruptcy court recognized, Appellees have not identified any other cognizable harm that they would suffer from a stay of the guaranty actions through plan confirmation. A0078; A2866-67 (identifying only the need to prepare again for summary judgment arguments in the guaranty actions).

Rather, the Appellees real reason for opposing injunctive relief is they want to thwart Debtors' attempt to get to confirmation. They are counting on the guaranty actions driving CEC into bankruptcy, or otherwise obstructing the proposed plan, because if confirmation proceedings go forward, they fear the bankruptcy court will determine the plan is fair and equitable to them and confirm a plan to which they object that releases their claims against CEC and its affiliates.

Indeed, in the prior appeal and at hearings on a stay pending appeal, Appellees have made it abundantly clear that their purported harm flows from plan confirmation while the guaranty actions remain pending. A2876:23-77:1, 2879:24-80:4. They have done everything possible to put the confirmation hearing off—even asking the bankruptcy court to delay the confirmation hearing by the number of days any injunction is in place—to preserve their holdout leverage and avoid any need to compromise. But that is no basis for denying a § 105 injunction. Any complaint about the plan, plan confirmation, or the contemplated releases is a dispute for the bankruptcy court to resolve in the context of the already-scheduled plan confirmation proceedings. *See Fabtech*, 2010 WL 6452908 at *4; 6/72016 Hr'g Tr. at 64:10-14 ("The

69

validity of the release is a matter for confirmation."). In short, once CEC's legally irrelevant lobbying activities are set aside, Appellees' side of the scale is empty and the balance of the harms tips decidedly in favor of the Debtors.

*          *          *

The bankruptcy court's refusal to enjoin the guaranty actions through plan confirmation once again turns entirely on a mistaken and once-again "cramped" understanding of § 105(a) that transforms that provision from a robust tool for protecting the integrity of a bankruptcy estate into a craven guard that is unavailable when needed most. This remains a clear-cut case for injunctive relief under § 105 after the bankruptcy court's legal errors are corrected. The Court should therefore reverse and order entry of that injunction immediately. *See, e.g.*, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 767 (9th Cir. 2014) ("We remand to the district court with instructions for it to enter a preliminary injunction."); *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 142-43 (2d Cir. 2003) ("We find that the plaintiff is likely to succeed on the merits and was entitled to a preliminary injunction. We therefore reverse and

70

remand with instructions to enter a preliminary injunction."). At a minimum, the Court should leave the current injunction in place until seven days after the bankruptcy court issues a decision on remand.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions to immediately enjoin the guaranty actions through plan confirmation.

Dated:  September 9, 2016        */s/ John C. O'Quinn*
James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

John C. O'Quinn
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200

*Counsel to Debtors / Appellant-Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. Bankr. P. 8015(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. Bankr. P. 8015(a)(7)(B)(iii), the brief contains 13,660 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook font. As permitted by Fed. R. Bankr. P. 8015(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


Dated: September 9, 2016          */s/ John C. O'Quinn*
                                   John C. O'Quinn

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2016, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all CM/ECF participants, resulting in service upon all counsel of record.


/s/ John C. O'Quinn
John C. O'Quinn