## No. 1:16-cv-08423

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE: CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Debtors.*

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Plaintiffs-Appellants*,

v.

BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC, AND FREDRICK BARTON DANNER,
*Defendants-Appellees.*

On Appeal from the United States Bankruptcy Court for the
Northern District of Illinois (Goldgar, J.)
Chapter 11 Case No. 15-01145
Adversary Proceeding No. 15-00149

## PLAINTIFFS-APPELLANTS' APPENDIX VOL. I, PP. A1-536

John C. O'Quinn
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
655 15th Street, N.W.
Washington, D.C. 20005
Tel:    (202) 879-5000
Fax:    (202) 879-5200
john.oquinn@kirkland.com

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
601 Lexington Avenue
New York, N.Y. 10022
Tel:    (212) 446-4800
Fax:    (212) 446-4900

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Tel:    (312) 862-2000
Fax:    (312) 862-2200

*Counsel for Debtors/Plaintiffs-Appellants*

# TABLE OF CONTENTS

Docket Sheet
(September 9, 2016) .................................................................A1

Oral Decision Denying Motion to Extend § 105 Injunction
 (August 26, 2016) [Bankr. Ct. Dkt. No. 354] .............................A60

Order Denying Denying Motion to Extend § 105 Injunction
(August 26, 2016) [Bankr. Ct. Dkt. 342] ....................................A97

Order Denying Oral Motion for Stay Pending Appeal
(August 26, 2016)  [Bankr. Ct. Dkt. No. 343] .............................A98

Order Granting Plaintiffs' Emergency Motion for Temporary
Restraining Order and Preliminary Injunction
(June 15, 2016)  [Bankr. Ct. Dkt. No. 274] .................................A99

Order Granting in Part and Continuing in Part Debtors' Motion to Stay
or in the Alternative for Injunctive Relief
(February 26, 2016)  [Bankr. Ct. Dkt. No. 214] .........................A105

Memorandum Opinion
(July 22, 2015)  [Bankr. Ct. Dkt. No. 158] .................................A123

Order Denying in Part and Denying in Part as Moot Debtors' Motion to
Stay, or in the Alternative, for Injunctive Relief
(July 22, 2015)  [Bankr. Ct. Dkt. No. 159] .................................A156

Complaint, *Wilmington Savings Fund Society, FSB v. Caesars
Entertainment Corp., et al.*, No. 1004 (Del. Ch.)
(August 4, 2014) [DJX 44] .......................................................A158

Memorandum in Support of Chapter 11 Petitions
(January 15, 2015) [MC Ex. 19] ...............................................A238

Amended Complaint, *Meehan Combs v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, No. 14-cv-7091 (S.D.N.Y.) (January 29, 2015) [PX 2] ........................................................... A484

Amended Complaint, *Frederick Barton Danner v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, No. 14-cv-7973 (S.D.N.Y.) (February 19, 2015) [PX 3] ........................................................ A537

Complaint, *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-cv-1561 (S.D.N.Y.) (March 3, 2015) [PX 4] .............................................................. A571

Excerpted Hearing Transcript (April 6, 2016) ...................................................................... A640

Complaint (March 11, 2015) [Bankr. Ct. Dkt. No. 1] ..................................... A644

Answer to Complaint by Wilmington Savings Fund Society, FSB (April 10, 2015) [Bankr. Ct. Dkt. No. 75] .................................. A661

Answer to Complaint by Frederick Barton Danner (April 10, 2015)  [Bankr. Ct. Dkt. No. 76] .................................. A674

Answer to Complaint by BOKF, N.A. (April 10, 2015) [Bankr. Ct. Dkt. 77] ......................................... A692

Answer to Complaint by CFIP Ultra Master Fund, Ltd., *et al.* (April 10, 2015) [Bankr. Ct. Dkt. No. 78] .................................. A727

Defendants' Joint Brief (May 29, 2015) [Bankr. Ct. Dkt. No. 132] .................................. A749

Plaintiffs' Demonstrative Exhibit 84 "Likelihood of Successful
Reorganization"
(June 3, 2015) [PX 84] ................................................................. A765

Plaintiffs' Demonstrative Exhibit 81 "Indenture Language"
(June 3, 2015) [PX 81] ................................................................. A766

Excerpted 2015 Bench Trial Transcript, Day 1
(June 3, 2015) .............................................................................. A767

Excerpted 2015 Bench Trial Transcript, Day 2
(June 4, 2015) .............................................................................. A794

Joint Opening Brief of Appellees
(September 2, 2015) [D. Ct. Civ. No. 15-cv-06504, Dkt. No. 34] ............... A1590

Fifth Amended Restructuring Support and Forbearance Agreement
(October 7, 2015) [PX 9] ............................................................... A1598

Excerpted June 2016 Hearing Transcript, Day 1
(June 7, 2016) .............................................................................. A1914

Excerpted June 2016 Hearing Transcript, Day 2
(June 8, 2016) .............................................................................. A2060

Excerpted June 2016 Hearing Transcript, Day 3
 (June 9, 2016) ............................................................................. A2071

Excerpted June 2016 Hearing Transcript, Day 4
(June 13, 3016) ............................................................................ A2075

First Amended Restructuring Support and Forbearance Agreement
between and among CEOC, CEC, and the Consenting Bank Creditors
(June 20, 2016) [PX 4] ................................................................. A2081

Restructuring and Support Agreement between and among CEOC,
CEC and the Statutory Unsecured Claimholders' Committee
(June 22, 2016) [PX 5] ................................................................. A2187

First Amended and Restated Restructuring Support and Forbearance
Agreement between and among Certain Holders of SGN Claims
(June 21, 2016) [PX 1] ................................................................. A2209

Debtors' Second Amended Joint Plan of Reorganization Pursuant to
Chapter 11 of the Bankruptcy Code
(June 28, 2016) [PX 30] ............................................................... A2240

Disclosure Statement for the Debtors' Second Amended Joint Plan
of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code
(June 28, 2016) [PX 12] ............................................................... A2510

Cooperation Agreement between and among the Cooperating
Noteholders and Signature Pages
(July 5, 2016) [PX 10; PX 10A] .................................................... A2528

First Amended and Restated Restructuring Support, Settlement and
Contribution Agreement between and among CEOC and CEC
(July 6, 2016) [PX 2] ................................................................... A2540

Amended and Restated Restructuring Support Agreement between and
among CEOC and CAC
(July 9, 2016) [PX 3] ................................................................... A2561

Restructuring and Support Agreement between and among CEOC,
CEC, and the Consenting Second Lien Creditors
(July 31, 2016) [PX 6] ................................................................. A2582

Caesars Entertainment Corp. Form 10-Q
(August 2, 2016) [PX 17] .............................................................. A2620

Letter Agreement between and among Danner and CAC
(August 15, 2016) [PX 8] .............................................................. A2690

Mediator Statement Submitted by Joseph J. Farnan
(August 19, 2016) [Dkt. No. 293] .................................................. A2711

iv

Statement of Frederick Barton Danner
(August 19, 2016) [Dkt. 298] ........................................................A2714

Statement of Wilmington Trust, National Association
(August 19, 2016) [Dkt. 315] ........................................................A2747

Statement of Caesars Entmt. Corporation
(August 19, 2016) [Dkt. 317] ........................................................A2751

Statement of First Lien Noteholders
(August 21, 2016) [Dkt. 319] ........................................................A2756

Millstein & Co Summary of RSAs Demonstrative
(August 23, 2016) [PDX1]..............................................................A2768

Millstein & Co. Approximate Cost to Sponsors/Hamlet Demonstrative
(August 23, 2016) [PDX2]..............................................................A2769

Excerpted August 2016 Hearing Transcript, Day 1
(August 23, 2016)...........................................................................A2770

Excerpted August 2016 Hearing Transcript, Day 2
(August 24, 2016)...........................................................................A2838

Excerpted August 2016 Hearing Transcript, Day 3
(August 25, 2016)...........................................................................A2850

Notice of Appeal
(August 26, 2016) [Dkt. 344] ........................................................A2869

Excerpted District Court Hearing Transcript
(August 30, 2016)...........................................................................A2874

APPEAL

# U.S. Bankruptcy Court
## Northern District of Illinois (Chicago)
## Adversary Proceeding #: 15-00149

*Assigned to:* Honorable Judge A. Benjamin Goldgar        *Date Filed:* 03/11/15
*Lead BK Case:* 15-01145
*Lead BK Title:* Caesars Entertainment Operating Company,
Inc.
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:*  91 Declaratory judgment
                      72 Injunctive relief - other


*Plaintiff*
-----------------------
**Caesars Entertainment Operating Company,**        represented by **David R Seligman**
**Inc., et al.**                                    Kirkland & Ellis LLP
One Caesars Palace Dr.                              300 North LaSalle Street
Las Vegas, NV 89109                                 Chicago, IL 60601
                                                    312 862-2000 Ext. 2463
                                                    Fax : 312 862-2200
                                                    Email: dseligman@kirkland.com

                                                    **Jeffrey Zeiger**
                                                    Kirkland & Ellis LLP
                                                    300 North LaSalle
                                                    Chicago, IL 60654
                                                    312-862-3237
                                                    Email: jzeiger@kirkland.com
                                                    *LEAD ATTORNEY*

                                                    **David J Zott**
                                                    Kirkland & Ellis, LLP
                                                    300 North LaSalle
                                                    Chicago, IL 60654
                                                    312-862-2428
                                                    Email: dzott@kirkland.com


V.


*Defendant*
-----------------------

**BOKF, N.A.**                          represented by **Mark F Hebbeln**
                                                        Foley & Lardner LLP
                                                        321 North Clark Street
                                                        Suite 2800
                                                        Chicago, IL 60610
                                                        312-832-4394
                                                        Fax : 312-832-4700
                                                        Email: mhebbeln@foley.com

                                                        **Timothy W Hoffmann**
                                                        Jones Day
                                                        77 W Wacker
                                                        Chicago, IL 60601
                                                        312 269-4376
                                                        Fax : 312 782-8585
                                                        Email: thoffmann@jonesday.com

                                                        **Lars A Peterson**
                                                        Foley & Lardner, LLP
                                                        321 N. Clark St., Ste. 2800
                                                        Chicago, IL 60654
                                                        (312) - 8325394
                                                        Email: lapeterson@foley.com


*Defendant*
-----------------------
**Wilmington Savings Fund Society, FSB**    represented by **Philip LeB Douglas**
                                                            Jones Day
                                                            222 East 41st Street
                                                            New York, NY 10017-6702
                                                            212-326-3611

                                                            **Timothy W Hoffmann**
                                                            (See above for address)

                                                            **Mark Page**
                                                            Kelley Drye & Warren LLP
                                                            333 West Wacker Drive
                                                            Suite 2600
                                                            Chicago, IL 60606
                                                            312 857-7073
                                                            Fax : 312 857-7095
                                                            Email: mpage@kelleydrye.com

                                                            **David I Zalman**
                                                            Kelly Drye & Warren LLP
                                                            101 Park Ave
                                                            New York, NY 10178

212-808-7800
Email: dzalman@kelleydrye.com

**Defendant**
-----------------------
**MeehanCombs Global Credit Opportunities**          represented by **Timothy R Casey**
**Master Fund, LP**                                                 Drinker Biddle & Reath LLP
                                                                    191 N Wacker Dr Suite 3700
                                                                    Chicago, IL 60606-1698
                                                                    312-569-1000
                                                                    Email: timothy.casey@dbr.com

                                                                    **Timothy W Hoffmann**
                                                                    (See above for address)

                                                                    **James H. Millar**
                                                                    Drinker Biddle Reath LLP
                                                                    1177 Avenue of the Americas
                                                                    New York, NY 10036
                                                                    (212) 248-3264
                                                                    Email: james.millar@dbr.com

**Defendant**
-----------------------
**Relative Value-Long/Short Debt Portfolio, A**      represented by **Timothy R Casey**
**Series of Underlying Funds Trust**                                (See above for address)

                                                                    **Timothy W Hoffmann**
                                                                    (See above for address)

                                                                    **James H. Millar**
                                                                    (See above for address)

**Defendant**
-----------------------
**SB 4 CF LLC**                                       represented by **Timothy R Casey**
                                                                    (See above for address)

                                                                    **Timothy W Hoffmann**
                                                                    (See above for address)

                                                                    **James H. Millar**
                                                                    (See above for address)

**A0003**

*Defendant*
-----------------------
**CFIP Ultra Master Fund, Ltd.**                    represented by **Timothy R Casey**
                                                    (See above for address)

                                                    **Timothy W Hoffmann**
                                                    (See above for address)

                                                    **James H. Millar**
                                                    (See above for address)


*Defendant*
-----------------------
**Trilogy Portfolio Company, LLC**                  represented by **Timothy R Casey**
                                                    (See above for address)

                                                    **Timothy W Hoffmann**
                                                    (See above for address)

                                                    **James H. Millar**
                                                    (See above for address)


*Defendant*
-----------------------
**Frederick Barton Danner**                         represented by **Edmund Aronowitz**
                                                    Grant Eisenhofer P.A.
                                                    30 North LaSalle Street
                                                    Chicago, IL 60602
                                                    (312) - 2140000 Ext.
                                                    Email: earonowitz@gelaw.com

                                                    **Timothy W Hoffmann**
                                                    (See above for address)


*Creditor Committee*
-----------------------
**Official Committee of Second Priority**           represented by **Timothy W Hoffmann**
**Noteholders**                                     (See above for address)


*Creditor Committee*
-----------------------
**The Statutory Unsecured Claimholders'**           represented by **Brandon Levitan**
**Committee of Caesars Entertainment**              Proskauer Rose LLP
**Operating Company, Inc., et al.**                 70 W. Madison St. Suite 3800

Chicago, IL 60602
(312) - 9623521
Email: blevitan@proskauer.com

**Paul V Possinger**
Proskauer Rose LLP
70 W. Madison Street, Suite 3800
Chicago, IL 60602
(312) - 9623550
Email: ppossinger@proskauer.com

| Filing Date | # | Docket Text |
|---|---|---|
| 03/11/2015 | 1<br>(17 pgs) | Adversary case 15-00149. (91 (Declaratory judgment)), (72 (Injunctive relief - other)): Complaint by Caesars Entertainment Operating Company, Inc., et al. against BOKF, N.A., Wilmington Savings Fund Society, FSB, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, CFIP Ultra Master Fund, Ltd., Trilogy Portfolio Company, LLC, Frederick Barton Danner. Fee Amount $350. Status hearing to be held on 3/25/2015 at 01:30 PM at 219 South Dearborn, Room 2525, Chicago, Illinois 60604. (Zeiger, Jeffrey) (Entered: 03/11/2015) |
| 03/11/2015 | 2<br>(8 pgs) | Summons Issued on BOKF, N.A. Answer Due 04/10/2015; Wilmington Savings Fund Society, FSB Answer Due 04/10/2015; MeehanCombs Global Credit Opportunities Master Fund, LP Answer Due 04/10/2015; Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust Answer Due 04/10/2015; SB 4 CF LLC Answer Due 04/10/2015; CFIP Ultra Master Fund, Ltd. Answer Due 04/10/2015; Trilogy Portfolio Company, LLC Answer Due 04/10/2015; Frederick Barton Danner Answer Due 04/10/2015 (Zeiger, Jeffrey) (Entered: 03/11/2015) |
| 03/11/2015 | 3 | Receipt of Complaint(15-00149) [cmp,cmp] ( 350.00) Filing Fee. Receipt number 28736195. Fee Amount $ 350.00 (re:Doc# 1) (U.S. Treasury) (Entered: 03/11/2015) |

**A0005**

| | | |
|---|---|---|
| 03/11/2015 | [4](22 pgs; 2 docs) | Notice of Motion and Motion To Stay Continued Prosecution of Four Lawsuits in two Federal and State Courts, Notice of Motion and Motion to Enforce the Automatic Stay Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. Hearing scheduled for 3/25/2015 at 01:30 PM at 219 South Dearborn, Room 2525, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order) (Zeiger, Jeffrey) (Entered: 03/11/2015) |
| 03/11/2015 | [5](447 pgs; 13 docs) | Declaration Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (RE: 4 Motion To Stay, Enforce). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Exhibit K # 12 Exhibit L) (Zeiger, Jeffrey) (Entered: 03/11/2015) |
| 03/12/2015 | [6](10 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 2 Summons Issued, 4 Motion To Stay, Enforce, 5 Declaration). (Steele, Benjamin) (Entered: 03/12/2015) |
| 03/17/2015 | [7](44 pgs; 4 docs) | Objection to (related document(s): 4 Motion To Stay, Enforce) Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (Attachments: # 1 Exhibit A - New York Opinion # 2 Exhibit B - February 3, 2015 Scheduling Order # 3 Exhibit C - January 19, 2015 Article) (Casey, Timothy) (Entered: 03/17/2015) |
| 03/17/2015 | [8](18 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 7 Objection). (Casey, Timothy) (Entered: 03/17/2015) |
| | | |

| | | |
|---|---|---|
| 03/17/2015 | <u>9</u><br>(2 pgs) | Notice of Appearance and Request for Notice for Jeffrey E. Altshul and Kurt M. Carlson Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018. (Altshul, Jeffrey) (Entered: 03/17/2015) |
| 03/17/2015 | <u>10</u><br>(3 pgs) | Notice of Filing Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: <u>9</u> Notice of Appearance and Request for Notice). (Altshul, Jeffrey) (Entered: 03/17/2015) |
| 03/17/2015 | <u>11</u><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018. (Altshul, Jeffrey) (Entered: 03/17/2015) |
| 03/17/2015 | <u>12</u><br>(3 pgs) | Notice of Filing Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: <u>11</u> Notice of Appearance and Request for Notice). (Altshul, Jeffrey) (Entered: 03/17/2015) |
| 03/18/2015 | <u>13</u><br>(4 pgs) | Corporate Ownership Statement filed. Filed by Timothy R Casey on behalf of MeehanCombs Global Credit Opportunities Master Fund, LP. (Casey, Timothy) (Entered: 03/18/2015) |
| 03/18/2015 | <u>14</u><br>(4 pgs) | Corporate Ownership Statement filed. Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust. (Casey, Timothy) (Entered: 03/18/2015) |
| 03/18/2015 | <u>15</u><br>(4 pgs) | Corporate Ownership Statement filed. Filed by Timothy R Casey on behalf of SB 4 CF LLC. (Casey, Timothy) (Entered: 03/18/2015) |
| | <u>16</u><br>(4 pgs) | Corporate Ownership Statement filed. Corporate parents added to case: CFIP Ultra Overseas Fund Ltd.. Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd.. (Casey, Timothy) |

| 03/18/2015 | | (Entered: 03/18/2015) |
|---|---|---|
| 03/18/2015 | 17<br>(4 pgs) | Corporate Ownership Statement filed. Filed by Timothy R Casey on behalf of Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 03/18/2015) |
| 03/18/2015 | 18<br>(14 pgs) | Objection to (related document(s): 4 Motion To Stay, Enforce) Filed by Edmund Aronowitz on behalf of Frederick Barton Danner (Aronowitz, Edmund) (Entered: 03/18/2015) |
| 03/18/2015 | 19<br>(90 pgs; 10 docs) | Declaration Filed by Edmund Aronowitz on behalf of Frederick Barton Danner (RE: 4 Motion To Stay, Enforce, 18 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I) (Aronowitz, Edmund) (Entered: 03/18/2015) |
| 03/18/2015 | 20<br>(15 pgs; 2 docs) | Notice of Motion and Motion to Intervene Complaint for Declaratory and Injunctive Relief Filed by Timothy W Hoffmann on behalf of Official Committee of Second Priority Noteholders. Hearing scheduled for 3/25/2015 at 01:30 PM at 219 South Dearborn, Room 2525, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order) (Hoffmann, Timothy) (Entered: 03/18/2015) |
| 03/18/2015 | 21<br>(97 pgs; 3 docs) | Objection to (related document(s): 4 Motion To Stay, Enforce) Filed by Timothy W Hoffmann on behalf of Official Committee of Second Priority Noteholders (Attachments: # 1 Exhibit A # 2 Main Document) (Hoffmann, Timothy) (Entered: 03/18/2015) |
| 03/18/2015 | 22<br>(186 pgs; 7 docs) | Objection to (related document(s): 4 Motion To Stay, Enforce) Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB (Attachments: # 1 Declaration of Kristin S. Elliott # 2 Exhibit A - Part 1 # 3 Exhibit A - Part 2 # 4 Exhibit A - Part 3 # 5 Exhibit B # 6 Exhibit C) (Page, Mark) (Entered: 03/18/2015) |
| | 23 | Notice of Filing Filed by Mark Page on behalf of |

| 03/18/2015 | (11 pgs) | Wilmington Savings Fund Society, FSB (RE: 22 Objection). (Page, Mark) (Entered: 03/18/2015) |
| 03/18/2015 | 24 (19 pgs) | Objection to (related document(s): 4 Motion To Stay, Enforce) Filed by Mark F Hebbeln on behalf of BOKF, N.A. (Hebbeln, Mark) (Entered: 03/18/2015) |
| 03/18/2015 | 25 (9 pgs) | Joinder Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 24 Objection). (Altshul, Jeffrey) (Entered: 03/18/2015) |
| 03/18/2015 | 26 (3 pgs; 2 docs) | Notice of Filing Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 25 Joinder). (Attachments: # 1 Certificate of Service)(Altshul, Jeffrey) (Entered: 03/18/2015) |
| 03/18/2015 | 27 (3 pgs) | Objection to (related document(s): 4 Motion To Stay, Enforce) Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National Association (Johnston-Ahlen, Julie) (Entered: 03/18/2015) |
| 03/18/2015 | 28 (9 pgs) | Certificate of Service Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National Association (RE: 27 Objection). (Johnston-Ahlen, Julie) (Entered: 03/18/2015) |
| 03/18/2015 | 29 (4 pgs) | Objection to (related document(s): 4 Motion To Stay, Enforce) Filed by Paul V Possinger on behalf of The Statutory Unsecured Claimholders' Committee of Caesars Entertainment Operating Company, Inc., et al. (Possinger, Paul) (Entered: 03/18/2015) |
| 03/18/2015 | 30 (4 pgs) | Statement Pursuant to Bankruptcy Rule 2019 Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018. (Altshul, Jeffrey) (Entered: 03/18/2015) |
|  | 31 | Notice of Filing Filed by Jeffrey E Altshul on |

| | | |
|---|---|---|
| 03/18/2015 | (3 pgs; 2 docs) | behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 30 Statement). (Attachments: # 1 Certificate of Service)(Altshul, Jeffrey) (Entered: 03/18/2015) |
| 03/18/2015 | 32 (7 pgs) | Notice of Filing Filed by Mark F Hebbeln on behalf of BOKF, N.A. (RE: 24 Objection). (Hebbeln, Mark) (Entered: 03/18/2015) |
| 03/19/2015 | 33 (1 pg) | Order requiring briefing on standing of non-parties (RE: 1 Complaint). Memorandum due by 3/22/2015. Signed on 3/19/2015 (Huley, Linda) Modified on 3/19/2015 to include text requiring briefing on standing of non-parties (Brown, Venita). (Entered: 03/19/2015) |
| 03/19/2015 | 34 | CORRECTIVE ENTRY: to include text requiring briefing on standing of non-parties (RE: 33 Order Scheduling). (Brown, Venita) (Entered: 03/19/2015) |
| 03/19/2015 | 35 (1 pg) | Appearance for Monika Wiener Filed by Timothy W Hoffmann on behalf of Official Committee of Second Priority Noteholders. (Hoffmann, Timothy) (Entered: 03/19/2015) |
| 03/19/2015 | 36 (10 pgs) | Certificate of Service Filed by Edmund Aronowitz on behalf of Frederick Barton Danner (RE: 18 Objection). (Aronowitz, Edmund) (Entered: 03/19/2015) |
| 03/19/2015 | 37 (1 pg) | Appearance for Sidney Levinson Filed by Timothy W Hoffmann on behalf of Official Committee of Second Priority Noteholders. (Hoffmann, Timothy) (Entered: 03/19/2015) |
| 03/19/2015 | 38 (11 pgs) | Affidavit of Service Filed by Kurtzman Carson Consultants LLC (RE: 20 Motion to Intervene, 21 Objection). (Kass, Albert) (Entered: 03/19/2015) |
| 03/19/2015 | 39 (12 pgs) | Affidavit of Service Filed by Kurtzman Carson Consultants LLC (RE: 29 Objection). (Kass, Albert) (Entered: 03/19/2015) |
| | 40 | Affidavit of Service Filed by Jeffrey E Altshul on |

| | | |
|---|---|---|
| 03/19/2015 | (9 pgs; 2 docs) | behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 25 Joinder). (Attachments: # 1 Mailing Matrix) (Altshul, Jeffrey) (Entered: 03/19/2015) |
| 03/19/2015 | 41 (1 pg) | Appearance Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 03/19/2015) |
| 03/19/2015 | 42 (1 pg) | Appearance Filed by James H. Millar on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. (Millar, James) (Entered: 03/19/2015) |
| 03/20/2015 | 43 (2 pgs) | Corporate Ownership Statement filed. Filed by Lars A Peterson on behalf of BOKF, N.A.. (Peterson, Lars) (Entered: 03/20/2015) |
| 03/20/2015 | 44 (1 pg) | Appearance for Andrew I. Silfen Filed by Lars A Peterson on behalf of BOKF, N.A.. (Peterson, Lars) (Entered: 03/20/2015) |
| 03/20/2015 | 45 (1 pg) | Appearance for Jackson D. Toof Filed by Lars A Peterson on behalf of BOKF, N.A.. (Peterson, Lars) (Entered: 03/20/2015) |
| 03/20/2015 | 46 (1 pg) | Appearance for Mark B. Joachim Filed by Lars A Peterson on behalf of BOKF, N.A.. (Peterson, Lars) (Entered: 03/20/2015) |
| | 47 (8 pgs; 2 docs) | **Incorrect Event Entered, Filer Notified to Re-file** Brief In Support of The Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 Relating to Standing to Participate in Adversary Proceeding and Motion to Intervene Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018. |

| | | |
|---|---|---|
| 03/20/2015 | | (Attachments: # 1 Proposed Order) (Altshul, Jeffrey) Modified on 3/23/2015 (Brown, Venita). (Entered: 03/20/2015) |
| 03/20/2015 | 48 (2 pgs) | Notice Memorandum In Support of The Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 Relating to Standing to Participate in Adversary Proceeding and Motion to Intervene Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 47 Brief). (Altshul, Jeffrey) (Entered: 03/20/2015) |
| 03/20/2015 | 49 (3 pgs) | Notice of Filing Notice and Motion In Support of The Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 Relating to Standing to Participate in Adversary Proceeding and Motion to Intervene Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 47 Brief). (Altshul, Jeffrey) (Entered: 03/20/2015) |
| 03/22/2015 | 50 (6 pgs) | Memorandum of Law in Support of Statutory Unsecured Claimholders' Committee's Right to Appear and Be Heard in Adversary Proceeding Filed by Brandon Levitan on behalf of The Statutory Unsecured Claimholders' Committee of Caesars Entertainment Operating Company, Inc., et al. (RE: 33 Order Scheduling). (Levitan, Brandon) (Entered: 03/22/2015) |
| 03/22/2015 | 51 (6 pgs) | Memorandum Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al. (RE: 33 Order Scheduling). (Zott, David) (Entered: 03/22/2015) |
| 03/22/2015 | 52 (6 pgs) | Memorandum in Support Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National Association (RE: 33 Order Scheduling). (Johnston-Ahlen, Julie) (Entered: 03/22/2015) |
| 03/22/2015 | 53 (9 pgs) | Certificate of Service Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National Association (RE: 52 Memorandum). (Johnston-Ahlen, Julie) (Entered: 03/22/2015) |

| 03/23/2015 | 54<br>(1 pg) | Appearance Filed by Edmund Aronowitz on behalf of Frederick Barton Danner. (Aronowitz, Edmund) (Entered: 03/23/2015) |
| --- | --- | --- |
| 03/23/2015 | 55<br>(1 pg) | Appearance for Gordon Z. Novod Filed by Edmund Aronowitz on behalf of Frederick Barton Danner. (Aronowitz, Edmund) (Entered: 03/23/2015) |
| 03/23/2015 | 56<br>(4 pgs) | Objection to (related document(s): 20 Motion to Intervene, 47 Brief) Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al. (Zott, David) (Entered: 03/23/2015) |
| 03/23/2015 | 57<br>(1 pg) | Appearance for James S. Notis Filed by Edmund Aronowitz on behalf of Frederick Barton Danner. (Aronowitz, Edmund) (Entered: 03/23/2015) |
| 03/23/2015 | 58<br>(1 pg) | Appearance for Meagan Farmer Filed by Edmund Aronowitz on behalf of Frederick Barton Danner. (Aronowitz, Edmund) (Entered: 03/23/2015) |
| 03/23/2015 | 59 | CORRECTIVE ENTRY : Incorrect Event Entered, Filer Notified to Re-file(RE: 47 Brief). (Brown, Venita) (Entered: 03/23/2015) |
| 03/23/2015 | 60<br>(6 pgs) | Memorandum of Law in Support of the Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018s Notice and Motion to Intervene Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 20 Motion to Intervene). (Altshul, Jeffrey) (Entered: 03/23/2015) |
| 03/23/2015 | 61<br>(2 pgs) | Proposed Order - Memorandum of Law in Support of the Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018s Notice and Motion to Intervene Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 60 Memorandum). (Altshul, Jeffrey) (Entered: 03/23/2015) |

| | | |
|---|---|---|
| 03/23/2015 | 62<br>(3 pgs) | Notice of Filing Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 60 Memorandum, 61 Proposed Order). (Altshul, Jeffrey) (Entered: 03/23/2015) |
| 03/23/2015 | 63<br>(9 pgs; 2 docs) | **Docketed On Wrong Case, Filer Notified to Re-file** Affidavit of Service Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 47 Brief). (Attachments: # 1 Mailing Matrix) (Altshul, Jeffrey) Modified on 3/24/2015 (Brown, Venita). (Entered: 03/23/2015) |
| 03/24/2015 | 64<br>(11 pgs) | Affidavit of Service Filed by Kurtzman Carson Consultants LLC (RE: 50 Memorandum). (Kass, Albert) (Entered: 03/24/2015) |
| 03/24/2015 | 65 | CORRECTIVE ENTRY :Docketed On Wrong Case, Filer Notified to Re-file (RE: 63 Affidavit of Service). (Brown, Venita) (Entered: 03/24/2015) |
| 03/24/2015 | 66<br>(6 pgs) | Reply in Support to (related document(s): 20 Motion to Intervene) Filed by Timothy W Hoffmann on behalf of Official Committee of Second Priority Noteholders (Hoffmann, Timothy) (Entered: 03/24/2015) |
| 03/24/2015 | 67<br>(9 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 56 Objection). (Steele, Benjamin) (Entered: 03/24/2015) |
| 03/25/2015 | 68<br>(15 pgs) | Affidavit of Service Filed by Kurtzman Carson Consultants LLC (RE: 66 Reply). (Kass, Albert) (Entered: 03/25/2015) |
| 03/25/2015 | 69<br>(10 pgs; 2 docs) | Affidavit of Service Filed by Jeffrey E Altshul on behalf of Ad Hoc Committee of Holders of the 12.75% Second Priority Senior Secured Notes Due 2018 (RE: 47 Brief). (Attachments: # 1 mailing matrix) (Altshul, Jeffrey) (Entered: 03/25/2015) |
| | 71 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 06/01/2015 at 01:30 PM at |

| | | |
|---|---|---|
| 03/25/2015 | | Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 03/25/2015. (Castellano, Nancy) (Entered: 03/31/2015) |
| 03/25/2015 | 72 | (E)Hearing Continued (RE: 4 Stay). hearing scheduled for 06/01/2015 at 01:30 PM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 03/25/2015. (Castellano, Nancy) (Entered: 03/31/2015) |
| 03/25/2015 | 73 (1 pg) | Order Denying for the Reasons Stated on the Record in open court Motion To Intervene (Related Doc # 20), and Motion to Intervene (Related Doc # 60). Signed on 3/25/2015. (Ross, Demetrius) (Entered: 04/03/2015) |
| 03/25/2015 | 74 (1 pg) | Order - Objections overruled for the reasons stated on the record. (RE: 21 Objection, 25 Joinder, 27 Objection, 29 Objection). Signed on 3/25/2015 (Ross, Demetrius) (Entered: 04/03/2015) |
| 03/26/2015 | 70 (4 pgs) | Final Pre Trial Order (RE: 4 Motion To Stay, Enforce). Evidentiary hearing scheduled for 6/1/2015 at 01:30 PM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Discovery Cutoff 5/18/2015. Signed on 3/26/2015 (Ross, Demetrius) (Entered: 03/26/2015) |
| 04/10/2015 | 75 (13 pgs) | Answer to Complaint Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB. (Page, Mark) (Entered: 04/10/2015) |
| 04/10/2015 | 76 (18 pgs) | Answer to Complaint Filed by Edmund Aronowitz on behalf of Frederick Barton Danner. (Aronowitz, Edmund) (Entered: 04/10/2015) |
| 04/10/2015 | 77 (35 pgs) | Answer to Complaint Filed by Lars A Peterson on behalf of BOKF, N.A.. (Peterson, Lars) (Entered: 04/10/2015) |
| | 78 (22 pgs) | Answer to Complaint and Jury Demand Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of |

| | | |
|---|---|---|
| 04/10/2015 | | Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 04/10/2015) |
| 04/10/2015 | 79 (14 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 78 Answer to Complaint). (Casey, Timothy) (Entered: 04/10/2015) |
| 04/13/2015 | 80 (7 pgs) | **Incorrect Event Entered, Filer Notified to Re-file** Affidavit of Service Filed by Edmund Aronowitz on behalf of Frederick Barton Danner (RE: 76 Answer to Complaint). (Aronowitz, Edmund) Modified on 4/14/2015 (Brown, Venita). (Entered: 04/13/2015) |
| 04/14/2015 | 81 | CORRECTIVE ENTRY:Incorrect Event Entered, Filer Notified to Re-file (RE: 80 Affidavit of Service). (Brown, Venita) (Entered: 04/14/2015) |
| 04/14/2015 | 82 (7 pgs) | Affidavit of Service Filed by Edmund Aronowitz on behalf of Frederick Barton Danner (RE: 76 Answer to Complaint). (Aronowitz, Edmund) (Entered: 04/14/2015) |
| 04/15/2015 | 83 (7 pgs) | Statement Corporate Disclosure Statement of Wilmington Savings Fund Society, FSB pursuant to Federal Rule of Bankruptcy Procedure 7007.1 Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB. (Page, Mark) (Entered: 04/15/2015) |
| 04/15/2015 | 84 (27 pgs) | Amended Answer to Complaint Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB. (Page, Mark) (Entered: 04/15/2015) |
| 04/20/2015 | 85 (2 pgs) | Motion for Leave to Appear Pro Hac Vice Filed by David I Zalman on behalf of Wilmington Savings Fund Society, FSB . (Seamann, Pamela) (Entered: 04/21/2015) |
| | 86 | (E) Order Granting Motion for Leave To Appear |

| | | |
|---|---|---|
| 04/20/2015 | | Pro Hac Vice (Related Doc # 85). Signed on 4/20/2015. (Seamann, Pamela) (Entered: 04/21/2015) |
| 04/29/2015 | 87 | Hearing Continued (RE: 1 Complaint). Status hearing to be held on 5/6/2015 at 10:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 04/29/2015) |
| 05/01/2015 | 88<br>(4 pgs) | **Incorrect Event Entered, See Entry #91** Notice of Motion and Joint Motion to Compel Caesars Entertainment Operating Company, Inc. and debtors to submit to discovery Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB. Hearing scheduled for 5/6/2015 at 10:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Page, Mark) Modified on 5/4/2015 (Brown, Venita). (Entered: 05/01/2015) |
| 05/01/2015 | 89<br>(166 pgs; 18 docs) | Declaration of Todd R. Geremia In Support of Defendant's Joint Motion to Compel Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB (RE: 88 Motion to Compel). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17) (Page, Mark) (Entered: 05/01/2015) |
| 05/01/2015 | 90<br>(17 pgs) | **Incorrect Event Entered, See Entry #91**<br>Supporting Attachment(s) Defendant's Joint Motion to Compel Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB (RE: 88 Motion to Compel). (Page, Mark) Modified on 5/4/2015 (Brown, Venita). (Entered: 05/01/2015) |
| | 91<br>(21 pgs; 2 docs) | Notice of Motion and Joint Motion to Compel Caesars Entertainment Operating Company, Inc. and debtors to submit to discovery Filed by Mark Page on behalf of Wilmington Savings Fund Society, FSB. Hearing scheduled for 5/6/2015 at 10:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 |

| 05/04/2015 | | Proposed Order) (Page, Mark) (Entered: 05/04/2015) |
| 05/04/2015 | 92 (15 pgs) | Affidavit of Service Filed by Kurtzman Carson Consultants LLC (RE: 88 Motion to Compel, 89 Declaration, 90 Attachment). (Kass, Albert) (Entered: 05/04/2015) |
| 05/04/2015 | 93 | CORRECTIVE ENTRY: Incorrect Event Entered, See Entry #91 (RE: 88 Motion to Compel, 90 Attachment). (Brown, Venita) (Entered: 05/04/2015) |
| 05/05/2015 | 94 (15 pgs) | Affidavit of Service Filed by Kurtzman Carson Consultants LLC (RE: 91 Motion to Compel). (Kass, Albert) (Entered: 05/05/2015) |
| 05/05/2015 | 95 (11 pgs) | Objection to (related document(s): 91 Motion to Compel) Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (Zeiger, Jeffrey) (Entered: 05/05/2015) |
| 05/05/2015 | 96 (348 pgs; 24 docs) | Declaration Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (RE: 95 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M # 14 Exhibit N # 15 Exhibit O # 16 Exhibit P # 17 Exhibit Q # 18 Exhibit R # 19 Exhibit S # 20 Exhibit T # 21 Exhibit U # 22 Exhibit V # 23 Exhibit W) (Zeiger, Jeffrey) (Entered: 05/05/2015) |
| 05/05/2015 | 97 (2 pgs) | Appearance Filed by Daniel R Murray on behalf of Caesars Entertainment Corporation. (Murray, Daniel) (Entered: 05/05/2015) |
| 05/05/2015 | 98 (2 pgs) | Appearance Filed by John D. VanDeventer on behalf of Caesars Entertainment Corporation. (VanDeventer, John) (Entered: 05/05/2015) |
| 05/05/2015 | 99 (2 pgs) | Appearance Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation. (Lazar, Vincent) (Entered: 05/05/2015) |

| | | |
|---|---|---|
| 05/05/2015 | 100<br>(2 pgs) | Appearance for Lewis Clayton Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation. (Lazar, Vincent) (Entered: 05/05/2015) |
| 05/05/2015 | 101<br>(2 pgs) | Appearance for Michael Gertzman Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation. (Lazar, Vincent) (Entered: 05/05/2015) |
| 05/05/2015 | 102<br>(2 pgs) | Appearance for Jeffrey Saferstein Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation. (Lazar, Vincent) (Entered: 05/05/2015) |
| 05/05/2015 | 103<br>(2 pgs) | Appearance for Jonathan Hurwitz Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation. (Lazar, Vincent) (Entered: 05/05/2015) |
| 05/05/2015 | 104<br>(11 pgs) | Brief in Opposition to (related document(s): 91 Motion to Compel) Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation (Lazar, Vincent) (Entered: 05/05/2015) |
| 05/05/2015 | 105<br>(2 pgs) | Declaration of Steven Zelin in Support of Caesars Entertainment Corporation's Opposition to Defendants' Joint Motion to Compel Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation (RE: 104 Brief). (Lazar, Vincent) (Entered: 05/05/2015) |
| 05/05/2015 | 106<br>(231 pgs; 21 docs) | Declaration of Jonathan H. Hurwitz in Support of Caesars Entertainment Corporation's Opposition to Defendants' Joint Motion to Compel Filed by Vincent E. Lazar on behalf of Caesars Entertainment Corporation (RE: 104 Brief). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20) (Lazar, Vincent) (Entered: 05/05/2015) |

| | | |
|---|---|---|
| 05/05/2015 | 107<br>(2 pgs) | Motion for Leave to Appear Pro Hac Vice Filed by Philip LeB Douglas on behalf of Wilmington Savings Fund Society, FSB . (Seamann, Pamela) (Entered: 05/06/2015) |
| 05/06/2015 | 108 | (E) Order Granting Motion for Leave To Appear Pro Hac Vice (Related Doc # 107). Signed on 5/6/2015. (Seamann, Pamela) (Entered: 05/06/2015) |
| 05/06/2015 | 109 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 05/11/2015 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 05/06/2015. (Castellano, Nancy) (Entered: 05/06/2015) |
| 05/06/2015 | 110 | (E)Hearing Continued (RE: 91 Compel). hearing scheduled for 05/11/2015 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 05/06/2015. (Castellano, Nancy) (Entered: 05/06/2015) |
| 05/07/2015 | 111<br>(20 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 95 Objection, 96 Declaration). (Steele, Benjamin) (Entered: 05/07/2015) |
| 05/11/2015 | 112 | Hearing Set (RE: 1 Complaint). Trial date set for 6/3/2015 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 05/11/2015) |
| 05/11/2015 | 113 | Hearing/Trial Scheduled for 6/1/2015 is Stricken (RE: 1 Complaint, 4 Motion To Stay, 70 Trial Order). (Castellano, Nancy) (Entered: 05/11/2015) |
| 05/11/2015 | 114<br>(3 pgs) | Order Granting Motion To Compel (Related Doc # 91). Signed on 5/11/2015. (Huley, Linda) (Entered: 05/11/2015) |
| 05/11/2015 | 115 | Hearing Continued (RE: 4 Motion To Stay). Hearing scheduled for 6/3/2015 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 05/11/2015) |
| | | |

| | | |
|---|---|---|
| 05/11/2015 | 116<br>(4 pgs) | Amended Final Pretrial Order (RE: 4 Motion To Stay, Enforce). Evidentiary hearing scheduled for 6/3/2015 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Brief or Memorandum due by 5/29/2015. Discovery Cutoff 5/22/2015. Objections due by 5/29/2015. Witness List due by 5/12/2015. Exhibit List due by 5/26/2015. Signed on 5/11/2015 (Huley, Linda) (Entered: 05/11/2015) |
| 05/12/2015 | 117<br>(4 pgs) | List of Witnesses Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Zeiger, Jeffrey) (Entered: 05/12/2015) |
| 05/14/2015 | 118<br>(20 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 117 List of Witnesses). (Steele, Benjamin) (Entered: 05/14/2015) |
| 05/14/2015 | 119<br>(4 pgs) | List of Witnesses Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 05/14/2015) |
| 05/14/2015 | 120<br>(3 pgs) | List of Witnesses Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 05/14/2015) |
| 05/14/2015 | 121<br>(14 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 120 List of Witnesses). (Casey, Timothy) (Entered: 05/14/2015) |
| 05/15/2015 | 122<br>(2 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (RE: 119 List of Witnesses). (Hoffmann, Timothy) (Entered: 05/15/2015) |
| | 123 | Joint List of Exhibits Filed by Timothy W |

| | | |
|---|---|---|
| 05/26/2015 | (10 pgs) | Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 05/26/2015) |
| 05/26/2015 | 124<br>(4 pgs) | Supplemental List of Exhibits Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 05/26/2015) |
| 05/26/2015 | 125<br>(14 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 124 List of Exhibits). (Casey, Timothy) (Entered: 05/26/2015) |
| 05/26/2015 | 126<br>(7 pgs) | List of Exhibits Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Zeiger, Jeffrey) (Entered: 05/26/2015) |
| 05/27/2015 | 127<br>(20 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 126 List of Exhibits). (Steele, Benjamin) (Entered: 05/27/2015) |
| 05/29/2015 | 128<br>(432 pgs; 10 docs) | Notice of Motion and Joint Motion in Limine to Limit Testimony of James E. Millstein. Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. Hearing scheduled for 6/3/2015 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order # 2 Exhibit A # 3 Exhibit B, Part 1 # 4 Exhibit B, Part 2 # 5 Exhibit B, Part 3 # 6 Exhibit B, Part 4 # 7 Exhibit B, Part 5 # 8 Exhibit B, Part 6 # 9 Exhibit C) (Hoffmann, Timothy) (Entered: 05/29/2015) |
| 05/29/2015 | 129<br>(16 pgs) | Brief in Support to (related document(s): 4 Motion To Stay, Enforce) Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al. (Zott, David) (Entered: 05/29/2015) |

| | | |
|---|---|---|
| 05/29/2015 | 130 (15 pgs) | Objection to (related document(s): 123 List of Exhibits, 124 List of Exhibits) Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (Zeiger, Jeffrey) (Entered: 05/29/2015) |
| 05/29/2015 | 131 (71 pgs; 7 docs) | Notice of Motion and Motion in Limine to Exclude the Introduction of Evidence or Testimony Regarding the Alleged "Distraction" to the Debtors' Efforts to Reorganize. Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. Hearing scheduled for 6/3/2015 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order # 2 Exhibit A - Excerpt from May 6, 2015 Hearing Transcript # 3 Exhibit B - Excerpt from May 11, 2015 Hearing Transcript # 4 Exhibit C - Debtors Witness List # 5 Exhibit D - Debtors' Responses and Objections to WSFS's First Set of Requests for Production # 6 Exhibit E - Debtors' Objections and Responses to BOKF's Interrogatories) (Casey, Timothy) (Entered: 05/29/2015) |
| 05/29/2015 | 132 (21 pgs; 2 docs) | Brief Joint Pretrial Brief Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Attachments: # 1 Exhibit A) (Hoffmann, Timothy) (Entered: 05/29/2015) |
| 05/29/2015 | 133 (12 pgs) | Brief (Pretrial), Memorandum Objecting to Jurisdiction and Joinder to Pretrial Brief of Wilmington Savings Fund Society, FSB and BOKF, N.A. Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., Frederick Barton Danner, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 05/29/2015) |
| | 134 (14 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., Frederick |

| | | |
|---|---|---|
| 05/29/2015 | | Barton Danner, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 133 Brief). (Casey, Timothy) (Entered: 05/29/2015) |
| 05/29/2015 | 135 (4 pgs) | Joint Objection to (related document(s): 126 List of Exhibits) Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (Hoffmann, Timothy) (Entered: 05/29/2015) |
| 06/01/2015 | 136 (160 pgs; 6 docs) | Objection to (related document(s): 128 Motion in Limine) Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E) (Zeiger, Jeffrey) (Entered: 06/01/2015) |
| 06/01/2015 | 137 (8 pgs) | Objection to (related document(s): 131 Motion in Limine) Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (Zeiger, Jeffrey) (Entered: 06/01/2015) |
| 06/01/2015 | 138 (21 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 129 Brief, 130 Objection). (Steele, Benjamin) (Entered: 06/01/2015) |
| 06/02/2015 | 139 | Hearing Set (RE: 1 Complaint, 4 Motion To Stay). Continued Trial date set for 6/4/2015 at 09:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Continued Trial date set for 6/5/2015 at 09:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 06/02/2015) |
| 06/02/2015 | 140 | Hearing Continued (RE: 1 Complaint, 4 Motion To Stay). Continued Trial date set for 6/8/2015 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Continued Trial date set for 6/9/2015 at 09:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 06/02/2015) |
| | 141 (21 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 136 Objection, 137 Objection). (Steele, Benjamin) |

| 06/02/2015 | | (Entered: 06/02/2015) |
|---|---|---|
| 06/03/2015 | 142<br>(2 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (RE: 128 Motion in Limine, 132 Brief, 135 Objection). (Hoffmann, Timothy) (Entered: 06/03/2015) |
| 06/03/2015 | 143 | Evidentiary Hearing Continued **(Scheduled to begin at 9:00 a.m.)** (RE: 1 Complaint, 4 Motion To Stay). Evidentiary hearing scheduled for 6/4/2015 at 09:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 06/03/2015) |
| 06/03/2015 | 144 | (E)Order Denying for the Reasons Stated on the Record Motion In Limine (Related Doc # 128 ). Signed on 06/03/2015. (Castellano, Nancy) (Entered: 06/03/2015) |
| 06/03/2015 | 145<br>(2 pgs) | Order Granting Motion In Limine (Related Doc # 131). Signed on 6/3/2015. (Huley, Linda) (Entered: 06/04/2015) |
| 06/04/2015 | 146 | Hearing/Trial (Continued Dates) Scheduled for 6/5/2015, 6/8/2015, and 6/9/2015 are Stricken. (Trial concluded on 6/4/2015, (Re: 1 Complaint, 4 Motion to Stay)). (Castellano, Nancy) (Entered: 06/04/2015) |
| 06/04/2015 | 147 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 07/22/2015 at 01:30 PM at Courtroom 2525 219 S Dearborn, Chicago, IL, 60604.. Signed on 06/04/2015. (Castellano, Nancy) (Entered: 06/04/2015) |
| 06/04/2015 | 148 | (E)Hearing Continued (RE: 4 Stay). (Ruling) hearing scheduled for 07/22/2015 at 01:30 PM at Courtroom 2525 219 S Dearborn, Chicago, IL, 60604.. Signed on 06/04/2015. (Castellano, Nancy) (Entered: 06/04/2015) |
| | 149<br>(1 pg) | Order Scheduling (RE: 4 Motion To Stay, Enforce). Post-trial briefs due by 6/26/2015. Ruling Set for 7/22/2015 at 01:30 PM at 219 South Dearborn, Room 2525, Chicago, Illinois |

| | | |
|---|---|---|
| 06/04/2015 | | 60604. Signed on 6/4/2015 (Huley, Linda) (Entered: 06/05/2015) |
| 06/26/2015 | 150<br>(803 pgs; 3 docs) | Request - Debtors' Request for Judicial Notice Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Zeiger, Jeffrey) (Entered: 06/26/2015) |
| 06/26/2015 | 151<br>(29 pgs; 2 docs) | Brief in Support to (related document(s): 4 Motion To Stay, Enforce) Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al. (Attachments: # 1 Exhibit 1) (Zott, David) (Entered: 06/26/2015) |
| 06/26/2015 | 152<br>(70 pgs; 6 docs) | Brief Joint Post-Trial Brief of WSFS and BOKF Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E) (Hoffmann, Timothy) (Entered: 06/26/2015) |
| 06/26/2015 | 153<br>(27 pgs; 2 docs) | Brief (Post-Trial) Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., Frederick Barton Danner, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC. (Attachments: # 1 Exhibit A - Chart of Unsecured Notes Defendants' Claims) (Casey, Timothy) (Entered: 06/26/2015) |
| 06/26/2015 | 154<br>(14 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., Frederick Barton Danner, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 153 Brief). (Casey, Timothy) (Entered: 06/26/2015) |
| 06/29/2015 | 155<br>(17 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 150 Request, 151 Brief). (Steele, Benjamin) (Entered: 06/29/2015) |
| | 156 | Response to (related document(s): 150 Request) |

| | | |
|---|---|---|
| 07/08/2015 | (5 pgs) | Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., Frederick Barton Danner, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (Casey, Timothy) (Entered: 07/08/2015) |
| 07/08/2015 | 157 (14 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., Frederick Barton Danner, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 156 Response). (Casey, Timothy) (Entered: 07/08/2015) |
| 07/22/2015 | 158 (33 pgs) | Memorandum Opinion (RE: 4 Motion To Stay, Enforce). (Ross, Demetrius) (Entered: 07/22/2015) |
| 07/22/2015 | 159 (2 pgs) | Order Denying in Part and Denying in Part as Moot Debtor's Motion to Stay, or in the Alternative, for Injunctive Relief (RE: 4 Motion To Stay, Enforce). Signed on 7/22/2015 (Ross, Demetrius) (Entered: 07/22/2015) |
| 07/24/2015 | 160 (47 pgs; 4 docs) | Notice of Appeal to District Court. Filed by David R Seligman on behalf of Caesars Entertainment Operating Company, Inc., et al.. Fee Amount $298 (RE: 159 Order (Generic)). Appellant Designation due by 08/7/2015. Transmission of Record Due no later than 08/24/2015. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Civil Cover Sheet)(Seligman, David) (Entered: 07/24/2015) |
| 07/24/2015 | 161 | Receipt of Notice of Appeal(15-00149) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number 29770301. Fee Amount $ 298.00 (re:Doc# 160) (U.S. Treasury) (Entered: 07/24/2015) |
| | 162 (25 pgs; 3 docs) | Application to Set Hearing on Emergency Motion Filed by David R Seligman on behalf of Caesars Entertainment Operating Company, Inc., et al.. |

| | | |
|---|---|---|
| 07/24/2015 | | (Attachments: # 1 Proposed Order # 2 Exhibit B - Emergency Motion) (Seligman, David) (Entered: 07/24/2015) |
| 07/24/2015 | 163<br>(2 pgs) | Order Granting Application to Set Hearing on Emergency Motion (Related Doc # 162). Signed on 7/24/2015. (Seamann, Pamela) (Entered: 07/24/2015) |
| 07/24/2015 | 164<br>(20 pgs; 2 docs) | Notice of Motion and Emergency Motion for Certification of Direct Appeal to Appeal Court Filed by David R Seligman on behalf of Caesars Entertainment Operating Company, Inc., et al.. Hearing scheduled for 7/29/2015 at 09:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order) (Seligman, David) (Entered: 07/24/2015) |
| 07/24/2015 | 165<br>(6 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 160 Notice of Appeal, 162 Application to Set Hearing on Emergency Motion, 163 Order on Application to Set Hearing on Emergency Motion, 164 Motion for Certification of Direct Appeal). (Steele, Benjamin) (Entered: 07/24/2015) |
| 07/27/2015 | 166<br>(6 pgs) | Certificate of Service (RE: 160 Notice of Appeal). (Poindexter, Haley) (Entered: 07/27/2015) |
| 07/27/2015 | 167 | Transmittal of Notice of Appeal to District Court (RE: 160 Notice of Appeal). (Poindexter, Haley) (Entered: 07/27/2015) |
| 07/27/2015 | 168<br>(1 pg) | Notice of Docketing Notice of Appeal to District Court . Case Number 15cv06504 Assigned to Judge: Robert W. Gettleman (RE: 160 Notice of Appeal). (Poindexter, Haley) (Entered: 07/27/2015) |
| 07/28/2015 | 169<br>(16 pgs) | Objection to (related document(s): 164 Motion for Certification of Direct Appeal) Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Frederick Barton Danner, Wilmington Savings Fund Society, FSB (Hoffmann, Timothy) (Entered: 07/28/2015) |
| | | |

| | | |
|---|---|---|
| 07/28/2015 | 170<br>(1 pg) | Appearance for Sidney P. Levinson Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 07/28/2015) |
| 07/28/2015 | 171<br>(3 pgs) | Objection to (related document(s): 164 Motion for Certification of Direct Appeal) Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (Casey, Timothy) (Entered: 07/28/2015) |
| 07/28/2015 | 172<br>(14 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of CFIP Ultra Master Fund, Ltd., MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC (RE: 171 Objection). (Casey, Timothy) (Entered: 07/28/2015) |
| 07/29/2015 | 173<br>(1 pg) | Appearance for James O. Johnston Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 07/29/2015) |
| 07/29/2015 | 174 | (E)Order Denying for the Reasons Stated on the Record Motion for Request for Certification of Direct Appeal to Appeal Court (Related Doc # 164 ). Signed on 07/29/2015. (Cox, Adam) (Entered: 07/29/2015) |
| | 175<br>(220 pgs) | Transcript regarding Hearing Held 06/03/2015. Remote electronic access to the excerpt/transcript is restricted until 10/27/2015. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 115 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 8/5/2015. Redaction Request Due By 08/19/2015. Redacted Transcript Submission Due By 08/31/2015. Transcript access will be restricted through 10/27/2015. (DeFini, Jackie) |

| 07/29/2015 | | (Entered: 07/29/2015) |
|---|---|---|
| 07/29/2015 | 176<br>(338 pgs) | Amended Transcript regarding Hearing Held 06/04/2015. Remote electronic access to the excerpt/transcript is restricted until 10/27/2015. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 139 Hearing (Adv Other) Set). Notice of Intent to Request Redaction Deadline Due By 8/5/2015. Redaction Request Due By 08/19/2015. Redacted Transcript Submission Due By 08/31/2015. Transcript access will be restricted through 10/27/2015. (DeFini, Jackie) (Entered: 07/29/2015) |
| 07/30/2015 | 177<br>(16 pgs) | Appellant Designation of Contents for Inclusion in Record and Statement of Issue On Appeal Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (RE: 160 Notice of Appeal). Appellee designation due by 08/13/2015. (Zeiger, Jeffrey) (Entered: 07/30/2015) |
| 07/31/2015 | 178<br>(25 pgs) | **Docketed On Wrong Case, Filer to be Notified to Re-file** Affidavit of Service Filed by Prime Clerk (RE: 177 Appellant Designation and Statement of Issue). (Steele, Benjamin) Modified on 8/4/2015 (Weston, Carel Dell). (Entered: 07/31/2015) |
| 07/31/2015 | 179<br>(16 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 177 Appellant Designation and Statement of Issue). (Steele, Benjamin) (Entered: 07/31/2015) |
| 08/04/2015 | 180 | CORRECTIVE ENTRY Docketed On Wrong Case, Filer to be Notified to Re-file (RE: 178 Affidavit of Service). (Weston, Carel Dell) (Entered: 08/04/2015) |
| | 181<br>(10 pgs) | Transcript regarding Hearing Held 07/29/2015. Remote electronic access to the excerpt/transcript is restricted until 11/5/2015. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, |

| | | |
|---|---|---|
| 08/07/2015 | | Telephone number 312-987-9722. (RE: related document(s) 164 Motion for Certification of Direct Appeal). Notice of Intent to Request Redaction Deadline Due By 8/14/2015. Redaction Request Due By 08/28/2015. Redacted Transcript Submission Due By 09/8/2015. Transcript access will be restricted through 11/5/2015. (DeFini, Jackie) (Entered: 08/07/2015) |
| 08/12/2015 | 182 (3 pgs) | Appellee Designation of Contents for Inclusion in Record of Appeal Filed by Timothy W Hoffmann on behalf of BOKF, N.A., CFIP Ultra Master Fund, Ltd., Frederick Barton Danner, MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, SB 4 CF LLC, Trilogy Portfolio Company, LLC, Wilmington Savings Fund Society, FSB. (RE: 160 Notice of Appeal, 177 Appellant Designation and Statement of Issue). (Hoffmann, Timothy) (Entered: 08/12/2015) |
| 08/24/2015 | 183 | Transmittal of Record on Appeal to District Court (RE: 160 Notice of Appeal). (Poindexter, Haley) (Entered: 08/24/2015) |
| 08/24/2015 | 184 (1 pg) | Notice of Docketing Record on Appeal to District Court Case Number 15cv06504. (RE: 160 Notice of Appeal). (Poindexter, Haley) (Entered: 08/24/2015) |
| 08/24/2015 | 185 (1 pg) | Addendum to Record on Appeal . (RE: 160 Notice of Appeal). (Poindexter, Haley) (Entered: 08/24/2015) |
| 09/10/2015 | 186 (2 pgs) | Notice of Withdrawal Filed by John D. VanDeventer on behalf of Caesars Entertainment Corporation (RE: 98 Appearance). (VanDeventer, John) (Entered: 09/10/2015) |
| 10/08/2015 | 187 (1 pg) | Order By District Court Judge Robert W. Gettleman, Re: Appeal on Civil Action Number: 15-cv-06504, Dated 10/6/2015. The decision of the bankruptcy court is affirmed. (RE: 160 Notice of Appeal). Signed on 10/8/2015 (Cowan, Marlan) (Entered: 10/08/2015) |
| | | |

| | | |
|---|---|---|
| 12/17/2015 | 188<br>(1 pg) | Received Notification of Transmittal of Record from The U S District Court to The U S Court of Appeals Dated 10/09/2015. USDC Case Number: 15cv06504, USCA Case Number: 15-3259 (RE: 160 Notice of Appeal). (Poindexter, Haley) (Entered: 12/17/2015) |
| 12/28/2015 | 189<br>(26 pgs; 3 docs) | Application to Set Hearing on Emergency Motion Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Attachments: # 1 Proposed Order # 2 Exhibit B - The Motion) (Zeiger, Jeffrey) (Entered: 12/28/2015) |
| 12/28/2015 | 190<br>(1 pg) | Order Denying Without Prejudice Application to Set Hearing on Emergency Motion (Related Doc # 189). Signed on 12/28/2015. (Huley, Linda) (Entered: 12/28/2015) |
| 02/02/2016 | 191<br>(1 pg) | Order Scheduling (RE: 1 Complaint). Status hearing to be held on 2/3/2016 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Signed on 2/2/2016 (Huley, Linda) (Entered: 02/02/2016) |
| 02/02/2016 | 192<br>(1 pg) | Amended Order Scheduling (RE: 191 Order Scheduling). Status hearing to be held on 2/3/2016 at 11:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Signed on 2/2/2016 (Huley, Linda) (Entered: 02/02/2016) |
| 02/02/2016 | 193<br>(2 pgs) | Appearance Filed by Angela M Allen on behalf of Caesars Entertainment Corporation. (Allen, Angela) (Entered: 02/02/2016) |
| 02/02/2016 | 194<br>(2 pgs) | Appearance for Charles B. Sklarsky Filed by Angela M Allen on behalf of Caesars Entertainment Corporation. (Allen, Angela) (Entered: 02/02/2016) |
| 02/03/2016 | 195<br>(1 pg) | Appearance for Morgan Hirst Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 02/03/2016) |
| | 196 | Order dispensing with Amended Case |

| | | |
|---|---|---|
| 02/03/2016 | (1 pg) | Management Procedures . Signed on 2/3/2016 (Huley, Linda) (Entered: 02/03/2016) |
| 02/03/2016 | 197<br>(1 pg) | Order Scheduling (RE: 4 Motion To Stay, Enforce). Hearing scheduled for 3/2/2016 at 10:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Signed on 2/3/2016 (Huley, Linda) (Entered: 02/05/2016) |
| 02/09/2016 | 198<br>(3 pgs) | Notice of intent to take judicial notice of certain facts. (RE: 197 Order Scheduling Ruling Date). Objections,if any, to judicial notice of certain facts are due by 2/17/2016. If any party objects, the evidence will be reopened, and the evidentiary hearing on the debtors' motion will resume on February 22, 2016, at 10:30 a.m. in courtroom 642. Signed on 2/9/2016 (Huley, Linda) (Entered: 02/09/2016) |
| 02/11/2016 | 199<br>(15 pgs; 3 docs) | Notice of Motion and Motion to Approve To Take Judicial Notice Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC. Hearing scheduled for 2/17/2016 at 09:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Exhibit 1 - Excerpts from November 10, 2014 Transcript # 2 Proposed Order) (Casey, Timothy) (Entered: 02/11/2016) |
| 02/11/2016 | 200<br>(9 pgs) | Amended Certificate of Service Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (RE: 199 Motion to Approve). (Casey, Timothy) (Entered: 02/11/2016) |
| 02/15/2016 | 201<br>(48 pgs; 3 docs) | Partial Objection to (related document(s): 199 Motion to Approve) Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Zeiger, Jeffrey) (Entered: 02/15/2016) |
| | 202<br>(2 pgs) | Notice of Non-Opposition of WSFS and BOKF to Notice of Intent to Take Judicial Notice of Certain Facts Filed by Timothy W Hoffmann on behalf of |

| | | |
|---|---|---|
| 02/16/2016 | | BOKF, N.A., Wilmington Savings Fund Society, FSB (RE: 198 Order Scheduling). (Hoffmann, Timothy) (Entered: 02/16/2016) |
| 02/16/2016 | 203 (81 pgs; 4 docs) | Request for Judicial Notice Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Hoffmann, Timothy) (Entered: 02/16/2016) |
| 02/16/2016 | 204 (23 pgs; 3 docs) | Notice of Motion and Motion for Leave to to File Supplemental Post-Trial Brief Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB. Hearing scheduled for 2/22/2016 at 09:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order # 2 Exhibit 1) (Hoffmann, Timothy) (Entered: 02/16/2016) |
| 02/17/2016 | 205 (1 pg) | Order Granting in part, Denying in part Motion to Approve (Related Doc # 199). Signed on 2/17/2016. (Rowe, Victoria) (Entered: 02/17/2016) |
| 02/17/2016 | 206 (18 pgs) | Affidavit of Service Filed by Prime Clerk (RE: 201 Objection). (Steele, Benjamin) (Entered: 02/17/2016) |
| 02/19/2016 | 207 (28 pgs; 5 docs) | Objection to (related document(s): 203 Request, 204 Motion for Leave) Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D) (Zeiger, Jeffrey) (Entered: 02/19/2016) |
| | 208 (33 pgs) | Transcript regarding Hearing Held 02/03/2016. Remote electronic access to the excerpt/transcript is restricted until 05/23/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722⚙. (RE: related document(s) 191 Order Scheduling). Notice of Intent to Request Redaction Deadline Due By 3/7/2016. Redaction Request Due By 03/14/2016. Redacted Transcript Submission Due By |

| 02/22/2016 | | 03/24/2016. Transcript access will be restricted through 05/23/2016. (DeFini, Jackie) (Entered: 02/22/2016) |
|---|---|---|
| 02/22/2016 | 209 (11 pgs) | Transcript regarding Hearing Held 02/17/2016. Remote electronic access to the excerpt/transcript is restricted until 05/23/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 198 Order Scheduling). Notice of Intent to Request Redaction Deadline Due By 3/7/2016. Redaction Request Due By 03/14/2016. Redacted Transcript Submission Due By 03/24/2016. Transcript access will be restricted through 05/23/2016. (DeFini, Jackie) (Entered: 02/22/2016) |
| 02/22/2016 | 210 (6 pgs) | Transcript regarding Hearing Held 02/22/2016. Remote electronic access to the excerpt/transcript is restricted until 05/23/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 204 Motion for Leave). Notice of Intent to Request Redaction Deadline Due By 3/7/2016. Redaction Request Due By 03/14/2016. Redacted Transcript Submission Due By 03/24/2016. Transcript access will be restricted through 05/23/2016. (DeFini, Jackie) (Entered: 02/22/2016) |
| 02/22/2016 | 211 | (E)Order Denying for the Reasons Stated on the Record Motion for Leave (Related Doc # 204 ). Signed on 02/22/2016. (Castellano, Nancy) (Entered: 02/22/2016) |
| 02/22/2016 | 212 (16 pgs) | Affidavit of Service of Ingamar D. Ramirez Regarding Plaintiff Debtors' Objection to Motion of WSFS and BOKF for Leave to File Supplemental Post-Trial Brief and Partial Objection to Request for Judicial Notice Filed by Prime Clerk (RE: 207 Objection). (Steele, Benjamin) (Entered: 02/22/2016) |

| | | |
|---|---|---|
| 02/24/2016 | 213<br>(1 pg) | Order By District Court Judge Robert W. Gettleman, Re: Appeal on Civil Action Number: 15-cv-06504, Dated 2/18/2016. In accordance with the mandate issued by the Seventh Circuit, this case is remanded to the bankruptcy court for further proceedings consistent with the Seventh Circuit's opinion issued on December 23, 2015. (RE: 160 Notice of Appeal). (Fairley, Lesley) (Entered: 02/24/2016) |
| 02/26/2016 | 214<br>(18 pgs) | Order granting in part and continuing in part debtors' motion to stay or in the alternative for injunctive relief. (Related Doc # 4). The motion of debtors Caesars Entertainment Operating Co., Inc. and subsidiaries to stay or in the alternative for injunctive relief is granted in part and continued in part. As to defendant BOKF, N.A., the motion is granted. BOKF, N.A. is enjoined from pursuing the action styled BOKF, N.A. v. Caesars Entm't Corp., No. 15-cv-1561 (SAS)(S.D.N.Y.), until (a) 60 days after the examiner files his initial report in the bankruptcy case, or (b) May 9, 2016, whichever comes first. As to the remaining defendants, the motion is continued for further status. A separate scheduling order will be entered. Signed on 2/26/2016. (Huley, Linda) (Entered: 02/26/2016) |
| 02/26/2016 | 215<br>(1 pg) | Order Scheduling - The court having granted in part and continued in part the pending debtors' motion to stay or in the alternative for injunctive relief, the ruling date of March 2, 2016, is stricken. (RE: 4 Motion To Stay, Enforce). The balance of the motion is continued for further status to 5/4/2016 at 10:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Signed on 2/26/2016 (Huley, Linda) (Entered: 02/26/2016) |
| 02/29/2016 | 216 | Hearing Continued (RE: 4 As to the balance of Motion To Stay). Hearing scheduled for 5/4/2016 at 10:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 02/29/2016) |
| | 217<br>(11 pgs; 2 docs) | Notice of Motion and Motion for Relief from Judgment or Order (Rule 9024) (related document |

| | | |
|---|---|---|
| 03/02/2016 | | (s): 214 Order on Motion to Stay) Filed by Mark F Hebbeln on behalf of BOKF, N.A.. Hearing scheduled for 3/16/2016 at 01:30 PM at 219 South Dearborn, Room 2525, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order) (Hebbeln, Mark) (Entered: 03/02/2016) |
| 03/09/2016 | 218 (2 pgs) | Response to (related document(s): 217 Motion for Relief from Judgment or Order (Rule 9024)) Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (Zeiger, Jeffrey) (Entered: 03/09/2016) |
| 03/10/2016 | 219 (2 pgs) | Order Modifying Preliminary Injunction. (Related Doc # 217) Motion is construed as a motion to modify preliminary injunction and is granted. Signed on 3/10/2016. (Huley, Linda) (Entered: 03/10/2016) |
| 03/10/2016 | 220 (15 pgs) | Affidavit of Service of Ingamar D. Ramirez Regarding Debtors Response to Motion of BOKF for Order Clarifying the Courts Order Granting in Part and Continuing in Part Debtors' Motion for Stay or in the Alternative in the Alternative for Injunctive Relief Filed by Prime Clerk (RE: 218 Response). (Steele, Benjamin) (Entered: 03/10/2016) |
| 03/29/2016 | 221 (2 pgs) | Appearance Filed by Angela M Allen on behalf of Caesars Entertainment Corporation. (Allen, Angela) (Entered: 03/29/2016) |
| 03/29/2016 | 222 (2 pgs) | Appearance Filed by Catherine L Steege ESQ on behalf of Caesars Entertainment Corporation. (Steege, Catherine) (Entered: 03/29/2016) |
| 03/29/2016 | 223 (2 pgs) | Appearance for Charles B. Sklarsky Filed by Catherine L Steege ESQ on behalf of Caesars Entertainment Corporation. (Steege, Catherine) (Entered: 03/29/2016) |
| | 224 (16 pgs; 2 docs) | Notice of Motion and Motion to Withdraw as Attorney Filed by Angela M Allen on behalf of Daniel R Murray. Hearing scheduled for 4/13/2016 at 01:30 PM at Special Location. (Attachments: # 1 Proposed Order) (Allen, |

| | | |
|---|---|---|
| 03/29/2016 | | Angela) (Entered: 03/29/2016) |
| 04/05/2016 | 225<br>(2 pgs) | Motion for Leave to Appear Pro Hac Vice Filed by Haig M. Maghakian on behalf of Caesars Entertainment Corporation . (Huley, Linda) (Entered: 04/06/2016) |
| 04/05/2016 | 226<br>(2 pgs) | Motion for Leave to Appear Pro Hac Vice Filed by Paul S. Aronzon on behalf of Caesars Entertainment Corporation . (Huley, Linda) (Entered: 04/06/2016) |
| 04/05/2016 | 227<br>(2 pgs) | Motion for Leave to Appear Pro Hac Vice Filed by Thomas R Kreller on behalf of Caesars Entertainment Corporation . (Huley, Linda) (Entered: 04/06/2016) |
| 04/06/2016 | 228 | (E)Order Granting Motion for Leave To Appear Pro Hac Vice (Related Doc # 225), Granting Motion for Leave To Appear Pro Hac Vice (Related Doc # 226), Granting Motion for Leave To Appear Pro Hac Vice (Related Doc # 227). Signed on 4/6/2016. (Huley, Linda) (Entered: 04/06/2016) |
| 04/06/2016 | 229<br>(1 pg) | Appearance for Paul S. Aronzon Filed by Angela M Allen on behalf of Caesars Entertainment Corporation. (Allen, Angela) (Entered: 04/06/2016) |
| 04/06/2016 | 230<br>(1 pg) | Appearance for Thomas R. Kreller Filed by Angela M Allen on behalf of Caesars Entertainment Corporation. (Allen, Angela) (Entered: 04/06/2016) |
| 04/06/2016 | 231<br>(1 pg) | Appearance for Haig M. Maghakian Filed by Angela M Allen on behalf of Caesars Entertainment Corporation. (Allen, Angela) (Entered: 04/06/2016) |
| 04/07/2016 | 232<br>(4 pgs; 2 docs) | Certification of No Objection Filed by Angela M Allen on behalf of Caesars Entertainment Corporation (RE: 224 Motion to Withdraw as Attorney). (Attachments: # 1 Proposed Order) (Allen, Angela) (Entered: 04/07/2016) |
| | | |

| Date | Doc | Description |
|---|---|---|
| 04/08/2016 | 233<br>(21 pgs) | Certificate of Service Filed by Angela M Allen on behalf of Caesars Entertainment Corporation (RE: 232 Certification of No Objection). (Allen, Angela) (Entered: 04/08/2016) |
| 04/11/2016 | 234<br>(1 pg) | Order Granting Motion To Withdraw As Attorney (Related Doc # 224). Signed on 4/11/2016. (Huley, Linda) (Entered: 04/12/2016) |
| 04/28/2016 | 235<br>(12 pgs) | Statement REGARDING STATUS OF BOKF SDNY ACTION IN ADVANCE OF STATUS CONFERENCE ON THE NON-ENJOINED ACTIONS Filed by Lars A Peterson on behalf of BOKF, N.A.. (Peterson, Lars) (Entered: 04/28/2016) |
| 05/04/2016 | 236 | (E)Hearing Continued (RE: 4 Stay). hearing scheduled for 05/25/2016 at 01:30 PM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 05/04/2016. (Myers, Melissa) (Entered: 05/04/2016) |
| 05/18/2016 | 238<br>(1 pg) | Order Scheduling (RE: 4 Motion To Stay, Enforce). Hearing continued on 6/7/2016 at 01:30PM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. Signed on 5/18/2016 (Ross, Demetrius) (Entered: 05/19/2016) |
| 05/19/2016 | 237 | Hearing Continued (RE: 4 Motion To Stay). Hearing scheduled for 6/7/2016 at 01:30 PM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Cox, Adam) (Entered: 05/19/2016) |
| 06/06/2016 | 239<br>(32 pgs; 3 docs) | Application to Set Hearing on Emergency Motion Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Attachments: # 1 Proposed Order # 2 Exhibit B) (Zott, David) (Entered: 06/06/2016) |
| 06/06/2016 | 240<br>(2 pgs) | Order Granting Application to Set Hearing on Emergency Motion (Related Doc # 239). Signed on 6/6/2016. (Seamann, Pamela) (Entered: 06/06/2016) |
| | 241 | Notice of Motion and Emergency Motion for |

**A0039**

| | | |
|---|---|---|
| 06/06/2016 | (25 pgs; 3 docs) | Temporary Restraining Order, in addition to Notice of Motion and Emergency Motion for Preliminary Injunction Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al.. Hearing scheduled for 6/8/2016 at 10:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order - Proposed Order Granting Temporary Restraining Order # 2 Proposed Order - Proposed Order Granting Preliminary Injunction) (Zott, David) (Entered: 06/06/2016) |
| 06/06/2016 | 242 (2 pgs) | Statement Mediator's Statement Filed by Timothy W Hoffmann on behalf of Joseph J. Farnan, Jr.. (Hoffmann, Timothy) (Entered: 06/06/2016) |
| 06/06/2016 | 243 (12 pgs) | Transcript regarding Hearing Held 05/04/2016. Remote electronic access to the excerpt/transcript is restricted until 09/6/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 216 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 6/20/2016. Redaction Request Due By 06/27/2016. Redacted Transcript Submission Due By 07/7/2016. Transcript access will be restricted through 09/6/2016. (DeFini, Jackie) (Entered: 06/06/2016) |
| 06/07/2016 | 244 (417 pgs; 13 docs) | Request / Debtors' Request for Judicial Notice Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D-1 # 5 Exhibit D-2 # 6 Exhibit D-3 # 7 Exhibit D-4 # 8 Exhibit D-5 # 9 Exhibit D-6 # 10 Exhibit D-7 # 11 Exhibit D-8 # 12 Exhibit E) (Zott, David) (Entered: 06/07/2016) |
| | 245 (19 pgs) | Affidavit of Service Of Joshua L. Karotkin Regarding Notice of Debtors' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining Defendants from Further Prosecuting Their Guaranty Lawsuits Filed by Prime Clerk (RE: 241 Motion |

| 06/07/2016 | | for Temporary Restraining Order, Motion for Preliminary Injunction). (Steele, Benjamin) (Entered: 06/07/2016) |
|---|---|---|
| 06/07/2016 | 246 | (E)Hearing Continued (RE: 1 Scheduling). Status hearing scheduled for 06/08/2016 at 10:30 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/07/2016. (Castellano, Nancy) (Entered: 06/07/2016) |
| 06/07/2016 | 247 | (E)Hearing Continued (RE: 4 Stay). hearing scheduled for 06/08/2016 at 10:30 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/07/2016. (Castellano, Nancy) (Entered: 06/07/2016) |
| 06/07/2016 | 248 (6 pgs) | Objection to (related document(s): 244 Request) Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (Casey, Timothy) (Entered: 06/07/2016) |
| 06/07/2016 | 249 (308 pgs; 7 docs) | Request DEFENDANTS REQUEST FOR JUDICIAL NOTICE Filed by Lars A Peterson on behalf of BOKF, N.A., Frederick Barton Danner, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC, Wilmington Savings Fund Society, FSB. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F) (Peterson, Lars) (Entered: 06/07/2016) |
| 06/07/2016 | 250 (5 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (RE: 248 Objection). (Casey, Timothy) (Entered: 06/07/2016) |
| 06/08/2016 | 251 (24 pgs) | Affidavit of Service of Ingamar D. Ramirez Regarding Debtors' Request for Judicial Notice Filed by Prime Clerk (RE: 244 Request). (Steele, Benjamin) (Entered: 06/08/2016) |
| | | |

| | | |
|---|---|---|
| 06/08/2016 | 252 | (E)Hearing Continued (RE: 241 Temporary Restraining Order). hearing scheduled for 06/09/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/08/2016. (Castellano, Nancy) (Entered: 06/08/2016) |
| 06/08/2016 | 253 | (E)Hearing Continued (RE: 1 Scheduling). Status hearing scheduled for 06/09/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/08/2016. (Castellano, Nancy) (Entered: 06/08/2016) |
| 06/08/2016 | 254 | (E)Hearing Continued (RE: 4 Stay). hearing scheduled for 06/09/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/08/2016. (Castellano, Nancy) (Entered: 06/08/2016) |
| 06/08/2016 | 255 (1 pg) | Certificate of Service Filed by Timothy W Hoffmann on behalf of Official Committee of Second Priority Noteholders (RE: 242 Statement). (Hoffmann, Timothy) (Entered: 06/08/2016) |
| 06/09/2016 | 256 (43 pgs; 4 docs) | Supplemental Brief in Opposition to (related document(s): 241 Motion for Temporary Restraining Order, Motion for Preliminary Injunction) Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Hoffmann, Timothy) (Entered: 06/09/2016) |
| 06/09/2016 | 257 (15 pgs; 3 docs) | Request for Judicial Notice Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB. (Attachments: # 1 Exhibit A # 2 Exhibit B) (Hoffmann, Timothy) (Entered: 06/09/2016) |
| 06/09/2016 | 258 (11 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB (RE: 256 Brief, 257 Request). (Hoffmann, Timothy) (Entered: 06/09/2016) |
| | 259 | (E)Hearing Continued (RE: 4 Stay). hearing |

| | | |
|---|---|---|
| 06/09/2016 | | scheduled for 06/13/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/09/2016. (Dragonetti, Alex) (Entered: 06/09/2016) |
| 06/09/2016 | 260 | (E)Hearing Continued (RE: 241 Temporary Restraining Order). hearing scheduled for 06/13/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/09/2016. (Dragonetti, Alex) (Entered: 06/09/2016) |
| 06/09/2016 | 261 | (E)Hearing Continued (RE: 1 Scheduling). Status hearing scheduled for 06/13/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/09/2016. (Dragonetti, Alex) (Entered: 06/09/2016) |
| 06/10/2016 | 262 (98 pgs; 5 docs) | Second Request For Judicial Notice Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D) (Hoffmann, Timothy) (Entered: 06/10/2016) |
| 06/11/2016 | 263 (8 pgs) | Supplemental Memorandum / Debtors' Supplemental Memorandum Regarding the Scope of the Court's Section 105 Authority Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Zott, David) (Entered: 06/11/2016) |
| 06/12/2016 | 264 (5 pgs) | Objection to (related document(s): 241 Motion for Temporary Restraining Order, Motion for Preliminary Injunction, 256 Brief Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (Casey, Timothy) (Entered: 06/12/2016) |
| 06/13/2016 | 265 (11 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB (RE: 262 Request). (Hoffmann, Timothy) (Entered: 06/13/2016) |
| | | |

| | | |
|---|---|---|
| 06/13/2016 | 266 | (E)Hearing Continued (RE: 241 Temporary Restraining Order). hearing scheduled for 06/15/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/13/2016. (Castellano, Nancy) (Entered: 06/13/2016) |
| 06/13/2016 | 267 | (E)Hearing Continued (RE: 4 Stay). hearing scheduled for 06/15/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/13/2016. (Castellano, Nancy) (Entered: 06/13/2016) |
| 06/13/2016 | 268 | (E)Hearing Continued (RE: 1 Scheduling). Status hearing scheduled for 06/15/2016 at 10:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 06/13/2016. (Castellano, Nancy) (Entered: 06/13/2016) |
| 06/14/2016 | 269 (3 pgs) | Statement Regarding The Debtors' Emergency Motion For A Temporary Restraining Order And Preliminary Injunction Enjoining The Defendants From Further Prosecuting Their Guaranty Lawsuits Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National Association (RE: 241 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). (Johnston-Ahlen, Julie) (Entered: 06/14/2016) |
| 06/14/2016 | 270 (17 pgs) | Certificate of Service Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National Association (RE: 269 Statement). (Johnston-Ahlen, Julie) (Entered: 06/14/2016) |
| 06/14/2016 | 271 (23 pgs) | Affidavit of Service of Justin J. Ra Regarding Debtor's Supplemental Memorandum Regarding the Scope of the Court's Section 105 Authority Filed by Prime Clerk (RE: 263 Memorandum). (Steele, Benjamin) (Entered: 06/14/2016) |
| 06/14/2016 | 272 (4 pgs) | Statement in Support Filed by Brian L Shaw on behalf of Ad Hoc Committee of First Lien Bank Lenders (RE: 241 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). (Shaw, Brian) (Entered: 06/14/2016) |
| | | |

| | | |
|---|---|---|
| 06/15/2016 | 273 | (E)Hearing Continued (RE: 1 Scheduling). Status hearing scheduled for 08/17/2016 at 01:30 PM at Courtroom 2525 219 S Dearborn, Chicago, IL, 60604.. Signed on 06/15/2016. (Dragonetti, Alex) (Entered: 06/15/2016) |
| 06/15/2016 | 274 (6 pgs) | Order Granting Motion for Temporary Restraining Order (Related Doc 241), Granting Motion for Preliminary Injunction (Related Doc 241).The plaintiffs in the following actions are enjoined from prosecuting the actions against Caesars Entertainment Corp. from the date of this order until the close of business on August 29, 2016; BOKF, N.A. v. Caesars Entm't Corp., No. 15-cv-1561 (JSR) (S.D.N.Y.); Triology Portfolio Co. v. Caesars Entm't Corp., No 14-cv-7091 (JSR) (S.D.N.Y.); Danner v. Caesars Entm't Corp., No. 14-cv-7973 (JSR) (S.D.N.Y.); and Wilmington Sav. Fund Soc., FSB v. Caesars Entm't Corp., No. 10004-VCG (Del.Ch.). Signed on 6/15/2016. (Ross, Demetrius) Signed on 6/15/2016. (Ross, Demetrius) Additional attachment(s) added on 6/15/2016 (Sims, Mildred). Modified on 6/15/2016 to attach corrected PDF (Sims, Mildred). (Entered: 06/15/2016) |
| 06/15/2016 | 275 (1 pg) | Order Scheduling (RE: 1 Complaint).Status Hearing continued on 8/17/2016 at 01:30PM at 219 South Dearborn, Room 2525, Chicago, Illinois 60604. Signed on 6/15/2016 (Ross, Demetrius) (Entered: 06/15/2016) |
| 06/15/2016 | 276 | CORRECTIVE ENTRY attach corrected PDF (RE: 274 Order on Motion for Temporary Restraining Order, Order on Motion for Preliminary Injunction). (Sims, Mildred) (Entered: 06/15/2016) |
| 06/15/2016 | 277 (5 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Triology Portfolio Company, LLC (RE: 264 Objection). (Casey, Timothy) (Entered: 06/15/2016) |
| | 278 | Certificate of Service Filed by Brian L Shaw on |

| | | |
|---|---|---|
| 06/16/2016 | (19 pgs) | behalf of Ad Hoc Committee of First Lien Bank Lenders (RE: 272 Statement). (Shaw, Brian) (Entered: 06/16/2016) |
| 07/11/2016 | 279 | Transcript regarding Hearing Held 06/08/2016. Remote electronic access to the excerpt/transcript is restricted until 10/11/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 241 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). Notice of Intent to Request Redaction Deadline Due By 7/25/2016. Redaction Request Due By 08/1/2016. Redacted Transcript Submission Due By 08/11/2016. Transcript access will be restricted through 10/11/2016. (DeFini, Jackie) (Entered: 07/11/2016) |
| 07/11/2016 | 280 | Transcript regarding Hearing Held 06/09/2016 Vol II. Remote electronic access to the excerpt/transcript is restricted until 10/11/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 146 Hearing Stricken (Other)). Notice of Intent to Request Redaction Deadline Due By 7/25/2016. Redaction Request Due By 08/1/2016. Redacted Transcript Submission Due By 08/11/2016. Transcript access will be restricted through 10/11/2016. (DeFini, Jackie) (Entered: 07/11/2016) |
| | 281 | Transcript regarding Hearing Held 06/13/2016 Vol III. Remote electronic access to the excerpt/transcript is restricted until 10/11/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 259 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 7/25/2016. Redaction Request Due By 08/1/2016. Redacted Transcript Submission Due By 08/11/2016. Transcript access will be |

| | | |
|---|---|---|
| 07/11/2016 | | restricted through 10/11/2016. (DeFini, Jackie) (Entered: 07/11/2016) |
| 07/11/2016 | 282 | Transcript regarding Hearing Held 06/15/2016. Remote electronic access to the excerpt/transcript is restricted until 10/11/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 266 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 7/25/2016. Redaction Request Due By 08/1/2016. Redacted Transcript Submission Due By 08/11/2016. Transcript access will be restricted through 10/11/2016. (DeFini, Jackie) (Entered: 07/11/2016) |
| 07/20/2016 | 283 (1 pg) | Order Setting deadline for and hearing on further motion for injunctive relief. Motion (should one be filed) is due by 8/8/2016, at noon and set for an evidentiary hearing on 8/23/16, at 9:00 a.m. . Exhibit List due by 8/19/2016. Witness List due by 8/19/2016. Objections are optional but if filed are due by 8/19/2016. Signed on 7/20/2016 (Roman, Felipe) (Entered: 07/21/2016) |
| 08/08/2016 | 284 (22 pgs; 2 docs) | Notice of Motion and Motion to Extend Time Regarding the Section 105 Injunction Enjoining Defendants from Further Prosecuting Their Guaranty Lawsuits Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al.. Hearing scheduled for 8/23/2016 at 09:00 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order) (Zott, David) (Entered: 08/08/2016) |
| 08/08/2016 | 285 (24 pgs) | Affidavit of Service of Justin J. Ra Regarding Debtors' Motion to Extend the Section 105 Injunction Enjoining Defendants from Further Prosecuting their Guaranty Lawsuits Filed by Prime Clerk (RE: 284 Motion to Extend Time). (Steele, Benjamin) (Entered: 08/08/2016) |
| | 286 (12 pgs; 2 docs) | Notice of Motion and Motion for Protective Order Filed by David J Zott on behalf of Caesars |

| | | |
|---|---|---|
| 08/12/2016 | | Entertainment Operating Company, Inc., et al.. Hearing scheduled for 8/17/2016 at 01:30 PM at 219 South Dearborn, Room 2525, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order) (Zott, David) (Entered: 08/12/2016) |
| 08/12/2016 | 287 (12 pgs; 2 docs) | Notice of Motion and Motion to Compel Ronen Stauber to Compel Deposition of Ronen Stauber Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. Hearing scheduled for 8/17/2016 at 09:30 AM at 219 South Dearborn, Courtroom 642, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order) (Hoffmann, Timothy) (Entered: 08/12/2016) |
| 08/12/2016 | 288 (48 pgs; 7 docs) | Declaration of Sidney P. Levinson in Support of Motion of Wilmington Savings Fund Society, FSB to Compel Deposition of Ronen Stauber Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (RE: 287 Motion to Compel). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Hoffmann, Timothy) (Entered: 08/12/2016) |
| 08/15/2016 | 289 (25 pgs) | Affidavit of Service of Ian Stern Regarding Notice of Debtors' Motion for a Protective Order Forbidding Wilmington Savings Fund Society, FSB from Deposing CEOC Director Ronen Stauber for the 105 Hearing Filed by Prime Clerk (RE: 286 Motion for Protective Order). (Steele, Benjamin) (Entered: 08/15/2016) |
| 08/16/2016 | 290 (7 pgs) | Objection to (related document(s): 286 Motion for Protective Order) Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (Hoffmann, Timothy) (Entered: 08/16/2016) |
| 08/16/2016 | 291 (3 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (RE: 287 Motion to Compel, 288 Declaration). (Hoffmann, Timothy) (Entered: 08/16/2016) |
| | 292 (3 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (RE: 290 Objection). (Hoffmann, |

| | | |
|---|---|---|
| 08/16/2016 | | Timothy) (Entered: 08/16/2016) |
| 08/16/2016 | 293<br>(3 pgs) | Statement / Mediator's Statement Filed by Jeffrey Zeiger on behalf of Joseph J. Farnan, Jr.. (Zeiger, Jeffrey) (Entered: 08/16/2016) |
| 08/17/2016 | 294 | (E)Hearing Continued (RE: 1 Scheduling). Status hearing scheduled for 08/23/2016 at 09:00 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 08/17/2016. (Castellano, Nancy) (Entered: 08/17/2016) |
| 08/17/2016 | 295 | (E)Order Denying for the Reasons Stated on the Record Motion For Protective Order (Related Doc # 286 ). Signed on 08/17/2016. (Castellano, Nancy) (Entered: 08/17/2016) |
| 08/17/2016 | 296<br>(26 pgs) | Affidavit of Service of Michael Callo Regarding Mediator's Statement Filed by Prime Clerk (RE: 293 Statement). (Steele, Benjamin) (Entered: 08/17/2016) |
| 08/17/2016 | 297<br>(2 pgs) | Order Granting Motion To Compel (Related Doc # 287). Signed on 8/17/2016. (Roman, Felipe) (Entered: 08/18/2016) |
| 08/19/2016 | 298<br>(33 pgs; 3 docs) | Statement of Frederick Barton Danner Concerning Debtors' Motion to Extend the Section 105 Injunction Enjoining Defendants From Further Prosecuting Their Guaranty Lawsuits Filed by Edmund Aronowitz on behalf of Frederick Barton Danner. (Attachments: # 1 Exhibit A - Settlement and Forbearance Agreement # 2 Exhibit B - Letter Agreement) (Aronowitz, Edmund) (Entered: 08/19/2016) |
| 08/19/2016 | 299<br>(5 pgs) | List of Witnesses Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Zeiger, Jeffrey) (Entered: 08/19/2016) |
| 08/19/2016 | 300<br>(7 pgs) | List of Exhibits Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Zeiger, Jeffrey) (Entered: 08/19/2016) |
| | 301 | Objection to (related document(s): 284 Motion to |

| | | |
|---|---|---|
| 08/19/2016 | (23 pgs; 2 docs) | Extend Time) Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (Attachments: # 1 Exhibit A - Amendment to Guaranty and Pledge Agreement) (Casey, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 302 (3 pgs) | List of Exhibits Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 303 (3 pgs) | List of Witnesses Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC. (Casey, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 304 (16 pgs) | Objection to (related document(s): 284 Motion to Extend Time) Filed by Mark F Hebbeln on behalf of BOKF, N.A. (Hebbeln, Mark) (Entered: 08/19/2016) |
| 08/19/2016 | 305 (137 pgs; 5 docs) | Objection to (related document(s): 284 Motion to Extend Time) Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D) (Hoffmann, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 306 (6 pgs) | Response to (related document(s): 284 Motion to Extend Time) Filed by Brian L Shaw on behalf of Ad Hoc Committee of First Lien Bank Lenders (Shaw, Brian) (Entered: 08/19/2016) |
| 08/19/2016 | 307 (4 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (RE: 301 Objection). (Casey, Timothy) (Entered: 08/19/2016) |
| | 308 (5 pgs) | Joint List of Exhibits Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) |

| 08/19/2016 | | (Entered: 08/19/2016) |
|---|---|---|
| 08/19/2016 | 309<br>(4 pgs) | List of Witnesses Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 310<br>(24 pgs) | Certificate of Service Filed by Brian L Shaw on behalf of Ad Hoc Committee of First Lien Bank Lenders (RE: 306 Response). (Shaw, Brian) (Entered: 08/19/2016) |
| 08/19/2016 | 311<br>(188 pgs) | Designation of Deposition Testimony Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 312<br>(12 pgs; 2 docs) | Certificate of Service Filed by Mark F Hebbeln on behalf of BOKF, N.A. (RE: 304 Objection). (Attachments: # 1 Exhibit A and B) (Hebbeln, Mark) (Entered: 08/19/2016) |
| 08/19/2016 | 313<br>(4 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (RE: 302 List of Exhibits). (Casey, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 314<br>(4 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (RE: 303 List of Witnesses). (Casey, Timothy) (Entered: 08/19/2016) |
| 08/19/2016 | 315<br>(4 pgs) | Statement -- Statement In Support Of Debtors' Motion To Extend the Section 105 Injunction Enjoining Defendants From Further Prosecuting Their Guaranty Lawsuits Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National Association (RE: 284 Motion to Extend Time). (Johnston-Ahlen, Julie) (Entered: 08/19/2016) |
| | 316<br>(20 pgs) | Certificate of Service Filed by Julie A. Johnston-Ahlen on behalf of Wilmington Trust, National |

| | | |
|---|---|---|
| 08/19/2016 | | Association (RE: 315 Statement). (Johnston-Ahlen, Julie) (Entered: 08/19/2016) |
| 08/19/2016 | 317 (5 pgs) | Statement /Caesars Entertainment Corporation's Statement in Support of Debtors' Motion to Extend the Section 105 Injunction Enjoining Defendants From Further Prosecuting Their Guaranty Lawsuits Filed by Angela M Allen on behalf of Caesars Entertainment Corporation (RE: 284 Motion to Extend Time). (Allen, Angela) (Entered: 08/19/2016) |
| 08/19/2016 | 318 (22 pgs) | Certificate of Service Filed by Angela M Allen on behalf of Caesars Entertainment Corporation (RE: 317 Statement). (Allen, Angela) (Entered: 08/19/2016) |
| 08/21/2016 | 319 (12 pgs; 2 docs) | Statement - First Lien Notes Committee's Statement in Support of Debtors' Motion to Extend the Section 105 Injunction Enjoining Defendants from Further Prosecuting Their Guaranty Lawsuits Filed by Mark A Berkoff on behalf of First Lien Noteholders (RE: 284 Motion to Extend Time). (Attachments: # 1 Certificate of Service) (Berkoff, Mark) (Entered: 08/21/2016) |
| 08/22/2016 | 320 (16 pgs) | Affidavit of Service Filed by Edmund Aronowitz on behalf of Frederick Barton Danner (RE: 298 Statement). (Aronowitz, Edmund) (Entered: 08/22/2016) |
| 08/22/2016 | 321 (4 pgs) | Designation of Deposition Testimony Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 08/22/2016) |
| 08/22/2016 | 322 (189 pgs) | Counter Designation of Deposition Testimony Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (RE: 311 Designation/Counter - Designation of Deposition Testimony). (Zeiger, Jeffrey) (Entered: 08/22/2016) |
| | 323 (5 pgs) | Supplemental Certificate of Service Filed by Mark A Berkoff on behalf of First Lien Noteholders (RE: 319 Statement). (Berkoff, Mark) (Entered: |

| 08/22/2016 | | 08/22/2016) |
|---|---|---|
| 08/22/2016 | 324 (5 pgs) | Stipulation. Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB. (Hoffmann, Timothy) (Entered: 08/22/2016) |
| 08/22/2016 | 325 (4 pgs) | Counter Designation of Deposition Testimony with Objection Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (RE: 322 Designation/Counter - Designation of Deposition Testimony). (Hoffmann, Timothy) (Entered: 08/22/2016) |
| 08/22/2016 | 326 (1 pg) | Appearance for Scott Lerner Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al.. (Zeiger, Jeffrey) (Entered: 08/22/2016) |
| 08/22/2016 | 327 (6 pgs) | Stipulation Stipulation Concerning 2L RSA Parties. Filed by Lars A Peterson on behalf of BOKF, N.A., Caesars Entertainment Operating Company, Inc., et al., Frederick Barton Danner, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC, Wilmington Savings Fund Society, FSB. (Peterson, Lars) (Entered: 08/22/2016) |
| 08/23/2016 | 328 (3 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB (RE: 305 Objection, 308 List of Exhibits, 309 List of Witnesses, 311 Designation/Counter - Designation of Deposition Testimony). (Hoffmann, Timothy) (Entered: 08/23/2016) |
| 08/23/2016 | 329 (5 pgs) | Counter Designation of Deposition Testimony with Objection Filed by Jeffrey Zeiger on behalf of Caesars Entertainment Operating Company, Inc., et al. (RE: 321 Designation/Counter - Designation of Deposition Testimony). (Zeiger, Jeffrey) (Entered: 08/23/2016) |
| | 330 (28 pgs) | Affidavit of Service of Michael Callo Regarding Plaintiffs' Counter-Designation of Testimony from the Deposition of Marc S. Lampkin, 30(B)(6) Designee of Brownstein Hyatt Farber Schreck, |

| | | |
|---|---|---|
| 08/23/2016 | | LLP Filed by Prime Clerk (RE: 322 Designation/Counter - Designation of Deposition Testimony). (Steele, Benjamin) (Entered: 08/23/2016) |
| 08/23/2016 | 331 (3 pgs) | Certificate of Service Filed by Timothy W Hoffmann on behalf of Wilmington Savings Fund Society, FSB (RE: 321 Designation/Counter - Designation of Deposition Testimony, 324 Stipulation, 325 Designation/Counter - Designation of Deposition Testimony). (Hoffmann, Timothy) (Entered: 08/23/2016) |
| 08/23/2016 | 332 | (E)Hearing Continued (RE: 284 Extend Time). hearing scheduled for 08/24/2016 at 10:15 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 08/23/2016. (Castellano, Nancy) (Entered: 08/23/2016) |
| 08/23/2016 | 333 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 08/24/2016 at 10:15 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 08/23/2016. (Castellano, Nancy) (Entered: 08/23/2016) |
| 08/23/2016 | 334 (4 pgs) | Response to (related document(s): 284 Motion to Extend Time) Filed by Paul V Possinger on behalf of The Statutory Unsecured Claimholders' Committee of Caesars Entertainment Operating Company, Inc., et al. (Possinger, Paul) (Entered: 08/23/2016) |
| 08/24/2016 | 335 (28 pgs) | Affidavit of Service by Michael Callo regarding Appearance for Scott Lerner [Docket No. 326] and Plaintiffs' Objections and Counter-Designation of Testimony from the Deposition of Ronen Stauber [Docket No. 329] Filed by Prime Clerk. (Steele, Benjamin) (Entered: 08/24/2016) |
| 08/24/2016 | 336 | (E)Hearing Continued (RE: 284 Extend Time). hearing scheduled for 08/25/2016 at 09:30 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 08/24/2016. (Castellano, Nancy) (Entered: 08/24/2016) |
| | 337 | (E)Hearing Continued (RE: 1 Complaint). Status |

| | | |
|---|---|---|
| 08/24/2016 | | hearing scheduled for 08/25/2016 at 09:30 AM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 08/24/2016. (Castellano, Nancy) (Entered: 08/24/2016) |
| 08/25/2016 | 338 (1 pg) | Order requiring clerk of the court to file transcript of 7th Circuit argument . Signed on 8/25/2016 (Roman, Felipe) (Entered: 08/25/2016) |
| 08/25/2016 | 339 (58 pgs) | Transcript of 7th Circuit argument (RE: 338 Order (Generic)). (Roman, Felipe) (Entered: 08/25/2016) |
| 08/25/2016 | 340 | (E)Hearing Continued (RE: 284 Extend Time). hearing scheduled for 08/26/2016 at 03:00 PM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 08/25/2016. (Castellano, Nancy) (Entered: 08/25/2016) |
| 08/25/2016 | 341 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 08/26/2016 at 03:00 PM at Courtroom 642 219 South Dearborn, Chicago, IL, 60604.. Signed on 08/25/2016. (Castellano, Nancy) (Entered: 08/25/2016) |
| 08/26/2016 | 342 (1 pg) | Order; This matter came before the court for ruling after an evidentiary hearing on the debtors' motion to extend the section 105 injunction that expires on August 29, 2016. The court having heard the evidence and having made findings of fact and conclusions of law on the record in open court, IT IS HEREBY ORDERED: The motion is denied. (Related Doc # 284). Signed on 8/26/2016. (Roman, Felipe) (Entered: 08/26/2016) |
| 08/26/2016 | 343 (1 pg) | Order For the reasons stated on the record, the debtors' oral motion for a stay pending appeal of this court's ruling on the motion to extend section 105 injunction is DENIED. (RE: 284 Motion to Extend Time). Signed on 8/26/2016 (Roman, Felipe) (Entered: 08/26/2016) |
| | 344 (70 pgs; 6 docs) | Notice of Appeal to District Court. Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al.. Fee Amount $298 (RE: 342 Order on Motion to Extend Time). Appellant Designation due by 09/9/2016. |

| | | |
|---|---|---|
| 08/26/2016 | | Transmission of Record Due no later than 09/26/2016. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E)(Zott, David) (Entered: 08/26/2016) |
| 08/26/2016 | 345 | Receipt of Notice of Appeal(15-00149) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number 32693967. Fee Amount $ 298.00 (re:Doc# 344) (U.S. Treasury) (Entered: 08/26/2016) |
| 08/29/2016 | 346 (2 pgs; 2 docs) | Certificate of Service (RE: 344 Notice of Appeal). (Attachments: # 1 Volume) (Poindexter, Haley) (Entered: 08/29/2016) |
| 08/29/2016 | 347 | Transmittal of Notice of Appeal to District Court (RE: 344 Notice of Appeal). (Poindexter, Haley) (Entered: 08/29/2016) |
| 08/29/2016 | 348 (1 pg) | Notice of Docketing Notice of Appeal, to District Court . Case Number 16cv08423 Assigned to Judge: Charles R Norgle Sr. (RE: 344 Notice of Appeal). (Poindexter, Haley) (Entered: 08/29/2016) |
| 08/29/2016 | 349 (26 pgs) | Affidavit of Service of Michael Callo Regarding Notice of Appeal to District Court Filed by Prime Clerk (RE: 344 Notice of Appeal). (Steele, Benjamin) (Entered: 08/29/2016) |
| 08/29/2016 | 350 (31 pgs) | Appellant Designation of Contents for Inclusion in Record and Statement of Issue On Appeal Filed by David J Zott on behalf of Caesars Entertainment Operating Company, Inc., et al.. (RE: 344 Notice of Appeal). Appellee designation due by 09/12/2016. (Zott, David) (Entered: 08/29/2016) |
| | 351 | Transcript regarding Hearing Held 08/23/2016 Vol I. Remote electronic access to the excerpt/transcript is restricted until 11/28/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 284 Motion to Extend Time). Notice of Intent to Request Redaction Deadline Due By 9/13/2016. Redaction Request Due By 09/20/2016. Redacted Transcript Submission Due By 09/30/2016. |

| | | |
|---|---|---|
| 08/30/2016 | | Transcript access will be restricted through 11/28/2016. (DeFini, Jackie) (Entered: 08/30/2016) |
| 08/30/2016 | [352](#) | Transcript regarding Hearing Held 08/24/2016 Vol II. Remote electronic access to the excerpt/transcript is restricted until 11/28/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 332 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 9/13/2016. Redaction Request Due By 09/20/2016. Redacted Transcript Submission Due By 09/30/2016. Transcript access will be restricted through 11/28/2016. (DeFini, Jackie) (Entered: 08/30/2016) |
| 08/30/2016 | [353](#) | Transcript regarding Hearing Held 08/25/2016 Vol III. Remote electronic access to the excerpt/transcript is restricted until 11/28/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 336 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 9/13/2016. Redaction Request Due By 09/20/2016. Redacted Transcript Submission Due By 09/30/2016. Transcript access will be restricted through 11/28/2016. (DeFini, Jackie) (Entered: 08/30/2016) |
| 08/30/2016 | [354](#) | Transcript regarding Hearing Held 08/26/2016. Remote electronic access to the excerpt/transcript is restricted until 11/28/2016. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter J Defini, Telephone number 312-987-9722. (RE: related document(s) 340 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 9/13/2016. Redaction Request Due By 09/20/2016. Redacted Transcript Submission Due By 09/30/2016. Transcript access will be restricted through 11/28/2016. (DeFini, Jackie) (Entered: 08/30/2016) |
| | | |

| | | |
|---|---|---|
| 08/30/2016 | [355](#)<br>(31 pgs) | Affidavit of Service of Ian Stern Regarding Appellants' Designation of the Contents of the Record and Statement of Issue on Appeal Filed by Prime Clerk (RE: [350](#) Appellant Designation and Statement of Issue). (Steele, Benjamin) (Entered: 08/30/2016) |
| 08/30/2016 | [356](#)<br>(5 pgs) | Affidavit of Service of Steven Gordon Regarding Emergency Motion for Administrative Relief [Case No. 16-cv-08421, Docket No. 19] Filed by Prime Clerk. (Steele, Benjamin) (Entered: 08/30/2016) |
| 08/30/2016 | [357](#)<br>(24 pgs) | Affidavit of Service of Michael Callo Regarding Attorney Appearance Form of David J. Zott, Attorney Appearance Form of Jeffrey J. Zeiger, Attorney Appearance Form of John C. O'Quinn, Attorney Appearance Form of David R. Seligman, Emergency Motion for Administrative Relief, and Emergency Motion to Maintain the Status Quo By Enjoining the Guaranty Actions Pending Appeal and to Expedite the Appeal Filed by Prime Clerk. (Steele, Benjamin) (Entered: 08/30/2016) |
| 09/07/2016 | [358](#)<br>(4 pgs) | Appellee Designation of Contents for Inclusion in Record of Appeal Filed by Timothy W Hoffmann on behalf of BOKF, N.A., Wilmington Savings Fund Society, FSB. (RE: [344](#) Notice of Appeal, [350](#) Appellant Designation and Statement of Issue). (Hoffmann, Timothy) (Entered: 09/07/2016) |
| 09/07/2016 | [359](#)<br>(2 pgs) | Appellee Designation of Contents for Inclusion in Record of Appeal Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC. (RE: [344](#) Notice of Appeal). (Casey, Timothy) (Entered: 09/07/2016) |
| 09/07/2016 | [360](#)<br>(4 pgs) | Notice of Filing Filed by Timothy R Casey on behalf of Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Trilogy Portfolio Company, LLC (RE: [359](#) Appellee Designation). (Casey, Timothy) (Entered: 09/07/2016) |

**A0058**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/09/2016 13:38:35 | | | |
| **PACER Login:** | juliaf91:4461091:3934342 | **Client Code:** | 17959-0020/46824 |
| **Description:** | Docket Report | **Search Criteria:** | 15-00149 Fil or Ent: filed To: 9/9/2016 Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

1

1          IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF DIVISION
2                  EASTERN DIVISION

3

4   CAESARS ENTERTAINMENT OPERATING )
    COMPANY, INC., ET AL.,          )
5                                   )  No. 15 A 00149
                     Plaintiff,     )
6                                   )
            vs.                     )
7                                   )
    BOKF, N.A., ET AL.,             )  Chicago, Illinois
8                                   )  August 26, 2016
                     Defendant.     )  3:00 p.m.
9   ----------------------------    )
                                    )
10  CAESARS ENTERTAINMENT OPERATING )
    COMPANY, INC., ET AL.,          )  No. 15 B 01145
11                                  )
                     Debtor.        )
12

13       TRANSCRIPT OF PROCEEDINGS BEFORE THE
            HONORABLE A. BENJAMIN GOLDGAR

14

15  APPEARANCES:

16

17  For the Plaintiff/Debtor:        Mr. David Zott;

18  For the Second Lien Noteholders:  Mr. Tim Hoffman;

19

20

21

22

23

24

25

**A0060**

2

1          This matter is before me for ruling

2    after a three-day evidentiary hearing on the motion

3    of debtors Caesars Entertainment Operating Co. (or

4    "CEOC") and its subsidiaries to extend the section

5    105 injunction I issued on June 15.  The injunction

6    expires on August 29.  The injunction halted civil

7    actions against non-debtor parent company Caesars

8    Entertainment Corp. (or "CEC") seeking to reinstate

9    and recover on CEC's guarantees of various CEOC

10   notes.  Most of those actions are pending in the U.S.

11   District Court for the Southern District of New York.

12   One is pending in the Delaware Chancery Court.  There

13   are fully-briefed cross-motions for summary judgment

14   pending in all the actions, and the district court

15   has set oral argument on the motions for August 30,

16   the day after the current injunction expires.  The

17   debtors would have me extend the injunction and

18   enjoin the guaranty plaintiffs - the defendants here

19   - from pursuing the actions until a decision on plan

20   confirmation in the underlying bankruptcy cases.

21          The findings in my opinion dated

22   July 22, 2015, the first injunction order dated

23   February 26, 2016, and my ruling on June 15, 2016,

24   addressing the second injunction request, are

25   incorporated.  Today's decision assumes familiarity

3

1  with those decisions, the identities of the many

2  parties, and the identities of the various witnesses

3  at the hearings.

4             For the reasons I will now

5  discuss, the debtors' motion to extend the existing

6  injunction will be denied.

7             The premise of all of the

8  debtors' requests for injunctive relief has been that

9  the bankruptcy estates have claims against CEC, just

10 as the guaranty plaintiffs do, and the estates'

11 claims against CEC are assets of the estates.  The

12 court of appeals described the rest of the debtors'

13 theory this way.  "If before CEOC's bankruptcy is

14 wound up," the court said, "CEC is drained of capital

15 by the lenders' suits to enforce the guaranties that

16 CEC had given them, there will be that much less

17 money for CEOC's creditors to recover in the

18 bankruptcy proceeding. . . . The less capital CEC has

19 for CEOC to recapture through prosecution or

20 settlement of its fraudulent-transfer claims, the

21 less money its creditors will receive in the

22 bankruptcy proceeding."  Caesars Entm't Operating

23 Co., Inc. v. BOKF, N.A. (In re Caesars Entm't

24 Operating Co.), 808 F.3d 1186, 1189 (7th Cir. 2015).

25 What's more, the court continued, "[o]ne can envision

A0062

4

1  a situation in which CEC, having both obligations on

2  the guaranties it issued to CEOC's lenders, and

3  obligations to CEOC arising from the latter's

4  fraudulent-transfer claims, would lack the money to

5  satisfy all its obligees."  Id.  The court of appeals

6  noted CEOC's contention "that if the guaranty

7  litigation against CEC can be frozen for a time . . .

8  , the bankruptcy examiner's report analyzing the

9  disputed transactions will provide the parties with

10 information they need to have a clear shot at

11 negotiating an overall settlement."  Id.

12                    That was in response to the

13 debtors' first motion for injunctive relief.  The

14 motion sought an injunction only until 60 days after

15 the examiner issued his initial report, or May 9,

16 2015, whichever was greater.  On remand from the

17 court of appeals, I granted the motion and issued the

18 injunction, noting that the injunction was only

19 temporary and designed to promote a resolution of

20 these cases through a consensual plan.  A month after

21 the first injunction expired, the debtors sought a

22 second one on an emergency basis.  The premise:  That

23 progress on the settlement front justified additional

24 relief, this time through a decision on confirmation.

25 After an evidentiary hearing, I granted the motion,

5

1   despite deficiencies in the evidence, because enough

2   progress was demonstrated to warrant relief.  But the

3   injunction was given an August 29 expiration date. I

4   warned that the chances of further relief were slim,

5   and the August 29 date should be treated as a

6   deadline.

7                   Despite that warning, on August 8

8   the debtors moved to extend the current injunction,

9   again asking for relief through a decision on plan

10  confirmation.  The confirmation hearing is set to

11  begin January 17, 2017.  There is, of course, no date

12  for a decision on a hearing that has yet to be held.

13                  The requirements for a section

14  105 injunction differ somewhat from the requirements

15  necessary for injunctive relief in other contexts.

16  Rather than a likelihood of success on the merits,

17  the debtor must show a likelihood of a successful

18  reorganization.  The debtor must also show that the

19  denial of relief threatens the reorganization.  Or,

20  as the court of appeals put it here, the question the

21  debtors raise is "whether the injunction sought by

22  CEOC is likely to enhance the prospects for a

23  successful resolution of the disputes attending its

24  bankruptcy.  If it is, and its denial will thus

25  endanger the success of the bankruptcy proceedings,

6

1    the grant of the injunction would, in the language of

2    section 105(a) be 'appropriate' . . . ."  BOKF, 808

3    F.3d at 1188-89.  The debtor must also show that the

4    public interest favors relief.  And, I will now

5    conclude, the debtor must show that the balance of

6    equities weighs in its favor.  There is no

7    irreparable harm requirement.

8                A section 105 injunction is

9    considered a drastic and extraordinary remedy, one

10    rarely sought and even more rarely granted.  That's

11    the case because an injunction confers one of the

12    principal benefits of bankruptcy – protection from

13    the collection efforts of creditors – on someone who

14    has not chosen to assume the burden of filing a

15    bankruptcy case of his own.  It's also the case

16    because the injunction impairs the rights creditors

17    have under state law and interferes with the work of

18    other courts – in this case the work not only of a

19    U.S. district court but the court of another

20    sovereign, the state of Delaware.  To me, that last

21    point is critical and makes a section 105 injunction

22    a remedy never to be granted lightly.  As with all

23    injunctions, a section 105 injunction is an equitable

24    remedy.  Whether an injunction should be granted is

25    thus a matter for my discretion.

**A0065**

7

1              In this case, the evidence

2    supports only one of the four elements necessary for

3    the relief the debtors want.  The other elements

4    weigh in favor of a denial.

5                   First, the evidence showed, as it

6    has shown at past hearings, that the debtors do have

7    a likelihood of reorganizing successfully.  The

8    debtors have a strong business that has done well

9    since these cases were filed.  The evidence showed

10   that the debtors have outperformed projections during

11   the first half of this year and have met projections

12   in June and July.  David Hilty, the defendants'

13   expert, agreed there is a likelihood of a successful

14   reorganization here.

15                   But I'm no longer convinced, as I

16   had been in the past, either that an injunction is

17   likely to enhance the success of a reorganization or

18   that its denial will endanger that success.

19                   First, I can't find, given the

20   history of the parties' negotiations, that an

21   injunction is likely to enhance the prospects for a

22   successful resolution of the disputes in these

23   bankruptcies.  Most of the deal-making that has

24   happened here has occurred when no injunction was in

25   effect.  This is particularly true of events in late

**A0066**

8

1  May and early June of this year. The progress on

2  settlement that I found justified a second injunction

3  this past June all took place when CEC had no

4  protection from an injunction and deadlines in the

5  guaranty litigation were looming. As for what

6  happened after the June 15 injunction the answer is:

7  Not that much. The post-June 15 progress the debtors

8  cite consists mostly of restructuring support

9  agreements (or "RSAs") previously reached being

10  executed or becoming effective. That can't be

11  dismissed entirely, but it's the reaching of an

12  agreement in principle that matters most, not its

13  execution. The RSAs with CEC, the UCC, the SGNs, and

14  the first lien notes were all reached before June 15.

15  As of June 15, negotiations with the first lien banks

16  were continuing, but an agreement was reached just 5

17  days later, suggesting one was well in the works as

18  of the injunction date.

19                Since June 22, the debtors can

20  point only to the Danner RSA and the second lien

21  notes RSA. But the significance of the Danner RSA is

22  doubtful. As for the second lien notes RSA, that RSA

23  is not effective, won't ever become effective (given

24  the cooperation agreement among the dissident

25  noteholders requiring them not to sign it), and has a

9

1  $950 million funding shortfall.  Whether that

2  shortfall will be made up – and if so, when and by

3  whom – is purely speculative.

4                    Negotiations with the guaranty

5  plaintiffs, both the second lien noteholders and the

6  unsecured noteholders, have also proceeded at a pace

7  that shows no real urgency on the part of the

8  debtors' camp.  Although there have been five

9  mediation sessions involving the second lien

10 noteholders, the first new proposal to them was not

11 made until August 2.  The noteholders countered that

12 day but never received a response.  Since August 17,

13 when I gave another thinly-veiled warning that

14 further injunctive relief was unlikely, the second

15 lien noteholders have offered to meet, but CEC

16 refused to participate in a meeting unless the

17 parties' mediator could participate.  The unsecured

18 noteholders, meanwhile, practically begged for an

19 opportunity to discuss settlement but did not gain an

20 audience until August 2.  Ultimately, they were told

21 that further settlement discussions were pointless

22 until a deal with the second lien noteholders was

23 struck.

24                    The pace of discussions does not

25 show that the current injunction is helping or that

10

1    its expiration gives the parties much cause for

2    concern.  Given this history, in fact, it appears

3    that it isn't injunctive relief that promotes

4    settlement here but rather its absence.  The

5    deadlines in the underlying guaranty litigation are

6    what prompt the parties to act.

7                    The debtors disagree, pointing to

8    the mediator's assertion in a written statement that

9    the parties have made "material progress."  Again,

10   however, the mediator didn't testify, so there was no

11   opportunity to probe that assertion.  His written

12   statement seems to assume that progress consists

13   primarily of frequent meetings and discussions, since

14   that takes up the majority of his statement.

15   Certainly, it's better for the parties to meet and

16   discuss than not, but meeting and discussing alone,

17   without more, isn't progress.  His statement fails to

18   describe the discussions themselves, the dates or

19   locations when they took place, any proposals

20   exchanged, or any distance remaining between the

21   parties.  The only actual progress, in the sense of

22   an agreement, that the mediator cites, is the second

23   lien notes RSA.  It's hard to conclude that that RSA

24   represents much progress toward a settlement here.

25                    Almost 20 months have passed

11

1   since these bankruptcy cases have been filed.  During

2   that time, the debtors and CEC have had the benefit

3   of two injunctions totaling 5 months, both issued in

4   2016.  The first extended from February 26 to May 9,

5   the second from June 15 to August 29.  During that

6   time, no consensual resolution of these cases has

7   been reached, although that was unquestionably what

8   the court of appeals had in mind.  The debtors have

9   had the "clear shot" the court mentioned.

10                    Particularly disturbing is that

11   none of the targets of the estates' claims arising

12   from the disputed transactions – targets that include

13   the ultimate owners of the Caesars enterprise, Apollo

14   and TPG – are making any financial contribution to

15   the reorganization, although the proposed plan would

16   release all the claims against them (both the

17   estate's claims and the claims in the guaranty

18   litigation).  James Millstein, the debtors'

19   restructuring advisor, was asked about this at the

20   first hearing in June 2015 and again at the second

21   hearing this past June.  At both hearings, he

22   admitted that the only party providing a contribution

23   was CEC.  Incredibly, the testimony this week was

24   that the targets of these claims were not even

25   approached about making a contribution until two

12

weeks ago.  These parties are the same ones the
examiner concluded in his report are potentially
liable to the estates for $3.6-5.1 billion.  Yet
asked at his deposition whether any of these parties
had been approached, Ronen Stauber testified: "I
don't know."  This, from a member not only of the
CEOC Board but the Board's restructuring committee.

Worse still, Brendan Hayes,
another of the debtors' restructuring advisors,
testified that when Apollo and TPG were at last
approached about funding the $950 million "hole" in
the second lien notes RSA, they refused, saying
essentially that it was "a CEC problem."  Stauber's
testimony confirms Hayes's version of events.

Stauber's only explanation of the
debtors' failure to pursue the objects of the
estate's claims is that the debtors have always
looked at the funding of the plan "holistically,"
meaning the overall amount of the funding, seemingly
unconcerned about where that funding would come from.
Ignoring these obvious and significant sources of
recovery for more than a year and a half is nothing
less than stunning and makes clear that further
injunctive relief is unwarranted.

The debtors argue, though, that

A0071

13

1   Apollo and TPG are making a contribution.  Their

2   contribution consists of the reduction in the value

3   of their ownership interest in CEC from $4 billion to

4   $2 billion under the plan.  But the evidence showed

5   that the $4 billion valuation is a fiction, that the

6   real value is actually below the value of Apollo and

7   TPG's interest in "new CEC" under a confirmed plan.

8   Apollo and TPG do currently hold a controlling

9   interest in CEC and stand to lose control if the plan

10  is confirmed.  That loss has a value of some kind.

11  But no one could quantify its value, and the debtors

12  themselves never mentioned this as a contribution.

13          The debtors took the position in

14  closing argument that their injunction request isn't

15  about settlement at all, that it's about protecting

16  the contribution to the plan from CEC.  The debtors

17  are indeed trying to protect that contribution.  But

18  the point of the injunction has always been not only

19  to protect the CEC contribution but to gain time to

20  reach a settlement.  And to be clear, a settlement

21  means a consensual plan.  It does not mean a cramdown

22  plan confirmed after a contested confirmation

23  hearing.  Gaining time to reach a settlement was the

24  goal the debtors advanced at the first injunction

25  hearing.  It was the goal the debtors advanced in the

14

1  court of appeals.  It has always been the point of

2  the debtors' requests for injunctive relief.

3                   An injunction through a decision

4  on confirmation is a non-starter in any event and

5  always has been - not because bankruptcy courts lack

6  the power to grant one, but because these sorts of

7  injunctions are, as I said, drastic remedies and so

8  almost always temporary, rarely more than a few

9  months.  A soup-to-nuts injunction - one running from

10  petition date through effective date - is, as Hilty

11  noted, tantamount to the automatic stay.  Had

12  Congress intended to permit that sort of remedy for

13  non-debtors, it would have provided it.  Except in

14  chapter 12 and 13 cases, it hasn't done so.  The two

15  decisions - only two - that the debtors cite in which

16  courts granted an injunction of that duration

17  involved plans under which the creditors enjoined

18  would be paid 100%, not the situation here.

19                   Just as the issuance of an

20  injunction isn't likely to enhance the prospects for

21  a successful resolution of the disputes in these

22  cases, I'm no longer convinced that the denial of an

23  injunction will endanger the reorganization.  As I

24  noted in my June 15 ruling, Millstein has always

25  acknowledged that a reorganization of these debtors

15

based on a CEC contribution is only one way to
reorganize them, and a reorganization can in fact be
accomplished without a contribution.  As early as the
first hearing in June 2015, he testified that it
would be perfectly possible to reorganize around the
value of the debtors themselves and to assign the
estate's claims to a litigation trust and pursue the
claims that way.  Millstein thought only that the
attendant administrative costs made that option less
desirable.  At the second hearing this past June,
Millstein went further, refusing even to say that the
denial of an injunction would rule out a
reorganization that relied on a contribution from
CEC.  He could say with certainty only that
consummation of the plan would be substantially
delayed.

Not even a CEC bankruptcy is a
foregone conclusion, Millstein admitted.  Both
Millstein and Hilty testified, both at the June 2016
hearing and in Hilty's case at the latest one, that
in the event of an adverse judgment in the guaranty
litigation there were alternatives, including the
possibility of a forbearance agreement and even a
stay pending appeal.  At most, Millstein said, a
bankruptcy would "put in jeopardy" CEC's

16

1   contribution.  The debtors' offered no additional

2   evidence on these points at the latest hearing,

3   certainly nothing to support the prediction in the

4   closing argument of a "catastrophe" if the current

5   injunction weren't extended.

6                    In my June 15 ruling, I noted all

7   of this evidence and the weaknesses in the debtors'

8   case but said that "on the whole the debtors'

9   progress on the settlement front" was enough to

10  justify further relief.  That's no longer true.

11                   The public interest doesn't favor

12  an extension of the injunction, either.  Two

13  interests have been cited here, and I mentioned both

14  in my earlier rulings.  They are the public interest

15  in successful reorganizations and the public interest

16  in settlements.

17                   The interest in successful

18  reorganizations doesn't support further relief

19  because a successful reorganization is possible here

20  even if the injunction is not extended, and a denial

21  of an extension seems unlikely to imperil the

22  debtors' efforts to reorganize.  As for settlement,

23  past experience in this case has shown that

24  settlements result when no injunction is in place.

25  The injunctions I've issued have been more of an

17

1    impediment than an aid.  The interest in settlement

2    actually counsels against extending the current

3    injunction.

4                    That brings me to the balancing

5    of the equities.  Although I've previously questioned

6    whether balancing is necessary in a section 105

7    context, I now conclude that it is.  I reach that

8    conclusion for several reasons.  First, balancing

9    isn't mentioned as a requirement in the Seventh

10   Circuit decisions – but neither do those decisions

11   prohibit balancing.  The question simply goes

12   unaddressed.  Second, as I've observed before,

13   balancing is a traditional part of the injunction

14   question.  Third, other circuits do require balancing

15   when a section 105 injunction is sought, and

16   Collier's describes balancing as "arguably the most

17   critical element of a section 105 injunction . . . ."

18   Faced squarely with the question, the Seventh Circuit

19   would likely find balancing necessary.

20                    Balancing requires a comparison

21   of the harm to the movant if relief is denied and the

22   harm to the non-movant if relief is granted.  The

23   debtors risk harm in a number of respects if the

24   injunction is not extended.  They face the

25   possibility that there will be an adverse judgment in

18

1  the guaranty litigation and the resulting loss of the

2  CEC contribution.  If that happens, they risk the

3  possibility that all the work put in on the RSAs with

4  other segments of the creditor body will go for

5  naught.  And they face the possibility that a CEC

6  bankruptcy will indeed produce one of "the great

7  messes of our time," Millstein's phrase, because of

8  the litigation that could ensue and the

9  administrative costs that litigation could entail.

10                    But how great are these risks?

11  Not so great.  Millstein acknowledged that they were

12  just possibilities.  CEC might win the guaranty

13  litigation.  Even if CEC loses, CEC might not file

14  bankruptcy.  (After all, CEC was threatening to file

15  a bankruptcy case last June and the testimony at the

16  June 2015 hearing was that it might do so even if no

17  judgment were entered.  More than a year later, no

18  bankruptcy case has been filed.)  Even if CEC files

19  bankruptcy, there might still be a reorganization

20  involving a CEC contribution.  And even if the

21  contribution disappears, there can still be a

22  successful reorganization.  Denial of further relief

23  may risk the success of the current plan of

24  reorganization; a reorganization itself is not at

25  risk.  Meanwhile, allowing the injunction to expire

19

1  now appears more likely to produce a resolution than

2  extending the injunction.

3              The defendants, meanwhile,

4  themselves face risks if the injunction is extended –

5  particularly if it's extended as long as the debtors

6  would like.  The defendants will be stymied in their

7  ability to seek restoration of the CEC guarantees and

8  enforcement of their rights under them.  As the court

9  in Saxby's Coffee Worldwide observed, creditors have

10 a substantial interest in the enforcement of

11 bargained-for rights that should not be minimized.

12 As the Saxby's court also  observed, litigants always

13 face some risk in their ability to succeed in

14 litigation because of the delay an injunction

15 produces in obtaining a prompt resolution.

16              In Saxby's, the court discounted

17 those interests because no "particularized harm" had

18 been identified, and none has been identified here.

19 No one has identified any witnesses who are in danger

20 of disappearing or dying, for example.  On the other

21 hand, Saxby's granted a 7-month injunction because it

22 was relatively early in the case, and the injunction

23 involved a "relatively modest, finite period of

24 time."  It is not early in this case – quite the

25 contrary – and the debtors have already been the

20

1   beneficiaries of 5 months of injunctions.  The

2   injunction they want is neither modest nor finite,

3   since it would run through a decision on

4   confirmation.  When that decision will be issued is

5   anyone's guess, but it won't be soon.  The hearing

6   itself could prove interminable (and the delay in a

7   decision even more so), given that 68 parties (not

8   counting the debtors) have given notice of their

9   intent to participate.  Those parties currently

10  intend to call 57 fact witnesses and 10 experts.  Far

11  from 5 months or 7 months, the injunction the debtors

12  are asking for could last a year or more.

13              The defendants here also run

14  another risk of sorts.  The claims that some of them

15  are asserting are brought under the Trust Indenture

16  Act of 1939.  The evidence showed that CEC has used

17  past injunctions to lobby Congress to amend the TIA

18  to eliminate the claims in the guaranty litigation.

19  This isn't much of a risk, since the evidence also

20  showed that no bill had even been introduced, let

21  alone voted on, and in a presidential election year

22  it seems unlikely Congress will pass an amendment to

23  the TIA – or pass much else for that matter.  But

24  it's unseemly – and so inequitable – for CEC to

25  employ an injunction in its favor to gain an

21

1   advantage in litigation over parties whose hands the

2   injunction has tied.  Injunctions should preserve the

3   status quo; the status quo was evidently not enough

4   for CEC.

5                    In closing, counsel for the

6   debtors placed the blame on CEC and also asserted

7   that CEC really had "nothing to do" with the debtors'

8   request to extend the injunction.  But CEC has

9   everything to do with that request.  The injunction

10  halts litigation against CEC, not against the

11  debtors.  (The bankruptcy cases helped the debtors,

12  after all.)  CEC therefore benefits directly from the

13  injunction.  If that weren't the case, CEC wouldn't

14  have insisted in its own RSA that the debtors

15  continue to pursue injunctive relief.  A section 105

16  injunction is also known as a "third party

17  injunction" for a reason.

18                    Although the call is a close one,

19  the balance of the equities tips in favor of the

20  defendants here.

21                    In concluding, it's helpful to

22  keep in mind what the often-cited Saxby's decision

23  says about section 105 injunctions:

24                    "The § 105 injunction should not

25  provide nondebtors with a comfortable, 'free ride' on

22

1   the coattails of the debtor.  The issuance of a § 105

2   injunction should not eliminate the keen sense of

3   urgency that insider nondebtors would otherwise have

4   to resolve, as promptly as possible, the outstanding

5   legal and monetary disputes that gave rise to the

6   bankruptcy case.  Stated another way, the nondebtors

7   should continue to feel pressure to expedite the

8   reorganization process so that the injunction may be

9   lifted as soon as possible and the ordinary legal

10  relationships among the nondebtors restored."

11          The injunctions here have provided

12  CEC, Apollo, and TPG, a comfortable, free ride on the

13  debtors coattails.  They have shown no keen sense of

14  urgency to resolve the outstanding disputes that gave

15  rise to the bankruptcy case – and frankly, neither

16  have the debtors, at least where the disputed

17  transactions are concerned.  CEC, Apollo, and TPG

18  have evidently felt no particular pressure to

19  expedite the reorganization process.  Now perhaps

20  they will.

21          Whether to grant or deny

22  injunctive relief requires a trial judge to reach a

23  decision "based on a subjective evaluation of the

24  import of the various factors and a personal

25  intuitive sense of the nature of the case."  Lawson

23

1  Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th

2  Cir. 1986).  Because in my judgment, and based on my

3  sense of these bankruptcy cases, the debtors have

4  managed to establish only one of the four elements

5  necessary to have the existing injunction extended, I

6  will exercise my discretion and deny the debtors'

7  motion.

8             MR. ZOTT:  Your Honor, can I have a

9  moment?

10            THE COURT:  It depends on what for,

11 Mr. Zott, because I'm done with this matter now.

12            MR. ZOTT:  I could not hear you, Your

13 Honor.

14            THE COURT:  I said it depends on what

15 for, Mr. Zott, because I am done.

16            MR. ZOTT:  Okay.  Well, here is our

17 issue, Your Honor.  As you know -- I understand and I

18 appreciate Your Honor taking the time and effort, as

19 I said yesterday in closings.  So now at this point,

20 with the injunction having been -- our request to

21 extend the injunction having been denied --

22            THE COURT:  Yes.

23            MR. ZOTT:  -- then the guaranty

24 summary judgments will go forward on August 30th.

25            THE COURT:  Presumably.

**A0082**

24

1          MR. ZOTT:  We intend to appeal from

2   Your Honor's order.

3          THE COURT:  Sure.

4          MR. ZOTT:  And to seek an expedited

5   appeal.  The challenge, of course, is that the

6   summary judgment ruling could come as early as

7   August 30th at 4:00 p.m.  I know Your Honor is of the

8   view that it probably wouldn't come then.

9          THE COURT:  No.

10          MR. ZOTT:  We don't have that

11   confidence, given the fact that the district court

12   has had it under advisement for a long time, set it

13   one day after the injunction has been expired, and

14   set it at 4:00 p.m.  And I think the testimony was no

15   one knows when the court will rule.  Even if it's a

16   week later, that still wouldn't be enough time to

17   actually prosecute an appeal, even an expedited

18   appeal.

19          So, we are requesting, Your Honor, and

20   moving, and we'll do it with papers, but moving

21   orally under Bankruptcy Rule 8007(a)(1) to extend the

22   injunction pending appeal.  This is not, obviously,

23   to extend it through confirmation.  This is to extend

24   it just to give us the right to have a court review

25   the substance of Your Honor's decision without

25

1  mooting it out through having the guaranty litigation

2  go forward.  And I'm prepared to address the

3  standards here, Your Honor.  We're prepared to file

4  papers today.

5           I would also note, Your Honor, that --

6  should I keeping going, Judge?

7           THE COURT:  Yes, please.

8           MR. ZOTT:  Okay.  So, with respect to

9  the stay of the injunction pending appeal, Your

10  Honor, we respectfully submit that the key issue here

11  is to allow, given the complexity and the difficulty

12  and the importance of the issues, to have -- to

13  permit an appellate court, the district court, and/or

14  the Seventh Circuit to review this decision before

15  the potential for irreparable harm can occur to the

16  debtors.

17           As Your Honor noted and has always

18  been the case, we at least believe that the judgments

19  threaten the $4 billion contribution that is the

20  linchpin of the plan.  We believe, as the evidence

21  showed, it's supported by $14 billion in capital

22  structure.  We believe that the prospect of a CEC

23  bankruptcy could be very, very harmful.  Again, that

24  in our view alone would be enough to get the

25  injunctive relief simply during the period that an

26

1  appellate court would review.  I'm not talking about

2  for the entire length, obviously, to confirmation, or

3  even for 30 days.  We also believe we'd have

4  irreparable harm just from not being able to have an

5  appellate court review the court's decision.

6            In terms of the balance of the harm,

7  Your Honor, we believe that the potential prejudice

8  to debtors and to all of the creditors who support

9  the plan far, far outweigh the harm that the

10  litigants showed, the guaranty plaintiffs, who told

11  the court their main harm would be having to reargue

12  the issue again in court, which is what they told you

13  at the closing.

14            On the public interest, Your Honor

15  knows the standards there.  We believe that there is

16  a strong public interest in a successful

17  reorganization and promoting settlement.

18            Finally, on likelihood of success,

19  Your Honor, this is a little different.  This would

20  be the likelihood of success on appeal.

21            THE COURT:  Right.

22            MR. ZOTT:  Not the likelihood of

23  reorganizing.

24            THE COURT:  Right.  I'm quite familiar

25  with the standards.

**A0085**

27

1          MR. ZOTT:  Okay.  So, you also know
2   then that it's a sliding scale, so the greater the
3   harm, the less of a showing.  We believe the Seventh
4   Circuit already has weighed in and ruled once in this
5   case.
6          THE COURT:  On a rather different
7   issue, I might say.
8          MR. ZOTT:  Well, that's really the
9   issue that the Seventh Circuit would have to decide.
10  We don't agree with that, Your Honor.
11         THE COURT:  Well, you think they've
12  already ruled on the issue that I just discussed?
13         MR. ZOTT:  I think in part they have.
14  I think they ruled on the standard to apply.
15         THE COURT:  I think I applied that
16  standard, Mr. Zott.
17         MR. ZOTT:  Okay.  And I respect that,
18  Your Honor.  And I understand that, and I'm not here
19  today to in any way --
20         THE COURT:  Well, let me cut you off.
21  There is no such thing in this court as an oral
22  motion, number one.  So, I am not in a position to
23  address a request for a stay that you're making from
24  the lectern.  There are parties who are not even in a
25  position to oppose your request because no one

28

1  contemplated that you would make such a request.

2              Number two, it seems to me that it is

3  not possible to get a stay of the denial of an

4  injunction pending appeal because that's tantamount

5  to getting the injunction.  If I were to extend the

6  injunction through an appeal, not only to the

7  district court but beyond, it would essentially be

8  granting you exactly what you wanted that I said you

9  couldn't have.

10             Also, I do not believe you have even a

11 reasonable likelihood of success on appeal.  This was

12 the very factual determination that the court of

13 appeals said that I had to make.  Findings of fact

14 are determined under a clearly erroneous standard.

15 The exercise of my discretion in granting an

16 injunction requires an abuse of discretion – in other

17 words, a showing that no reasonable person could have

18 made the decision that I made.  And that's a really

19 hard standard to meet.  And, not surprisingly, I

20 think what I did was reasonable or I wouldn't have

21 done it.  But I think you're quite unlikely to meet

22 that standard.

23             So, you know, if you want to file a

24 motion, I'll consider it as promptly as I can, but

25 I'm not prepared even to enter an order one way or

**A0087**

29

1  the other right now.

2          MR. ZOTT:  All right, Judge.  The only

3  issue is -- and I appreciate that, but the problem we

4  have, of course, is we think a ruling could come as

5  early as Tuesday.

6          THE COURT:  I think that's really

7  unlikely.  I mean, he's going to have the argument at

8  4:00 o'clock in the afternoon his time.  What's the

9  likelihood that Judge Rakoff actually issues a

10  decision that day?

11          MR. ZOTT:  I think there is a

12  substantial chance of that, I honestly do, because I

13  don't think he would set something for 4:00 p.m. on

14  all those motions.

15          THE COURT:  Well, if you want to file

16  a motion today - I mean, I hesitate to do this

17  because it's completely out of order.  I mean,

18  ordinarily you would have to have an application to

19  file an emergency motion.  You haven't even done

20  that.  And I really hope to be out of here soon, to

21  be perfectly honest.

22          MR. ZOTT:  I know.

23          THE COURT:  It's been a long week.

24          MR. ZOTT:  I know.

25          THE COURT:  But I understand what

30

1  you're doing, and I don't blame you for trying to do
2  it.  And the only question is how I can accommodate
3  you.  And I just don't want to address an oral motion
4  for a stay pending appeal.
5            MR. ZOTT:  Can I raise one other
6  point?
7            THE COURT:  Sure.
8            MR. ZOTT:  There's also another
9  procedure, Your Honor.  It's an administrative stay
10 pending briefing on the stay.  So, in other words,
11 there is authority that even before briefing the stay
12 pending appeal, the court has the ability to enter a
13 brief administrative stay that would just freeze
14 everything while the parties brief whether or not to
15 enter a stay pending appeal.
16            And that's permitted under the same
17 rule, Rule 8007(a)(1).  And we could file that brief
18 within an hour.  It then would grant the court
19 somewhat more time to consider the factors.  Now, I
20 understand -- and so that's one option, which would
21 be to have the court enter a temporary stay, just
22 administrative relief, so that you could consider the
23 stay pending appeal with something more than a day or
24 two.
25            THE COURT:  You anticipated my

31

1   decision, did you?

2          Could you point me to the rule that

3   talks about an administrative something-or-other?

4          MR. ZOTT:  The rule I'm relying on is

5   Rule 8007(a)(1).

6          THE COURT:  Yes.

7          MR. ZOTT:  And then there's under --

8   and then applying that rule, because I agree it

9   doesn't specifically refer to an administrative stay.

10  But there is a substantial body of law, and I've got

11  the cases I could cite to Your Honor, which recognize

12  the authority to give an administrative stay, the

13  purpose of which is to give the court sufficient

14  opportunity to consider the merits of a motion for a

15  stay pending appeal.

16         THE COURT:  Well, I don't think that

17  you have a chance of getting a stay, and I would

18  rather deny your motion as fast as I can so that you

19  can take it to the district court.

20         MR. ZOTT:  That's the other thing I

21  was going to raise, Your Honor.  I would then request

22  that you deny the motion, as well as the request for

23  administrative relief, and we can go right to the

24  district court.  Because, I mean, it sounds like

25  that's what you want to do, and I appreciate that,

32

1  and I respect it, and this is all about us trying to

2  do our job and you trying to do your job.

3           THE COURT:  Yes.  Mr. Zott, I don't

4  blame you for trying to do your job, and I never

5  have.  You have to understand that.  As for what I

6  want, it's not a matter of what I want.  I have no

7  desire particularly other than to go home at a

8  certain point today.

9           MR. ZOTT:  Poor phrasing, Judge.

10          THE COURT:  It's what I think is

11  appropriate given the facts and the law.

12          MR. ZOTT:  Okay.

13          THE COURT:  Can I have counsel's

14  appearance, please.

15          MR. HOFFMAN:  Your Honor, Tim Hoffman

16  on behalf of the second lien noteholders.  The people

17  from Jones Day who tried this case are, obviously,

18  not in the courtroom.

19          THE COURT:  No, they didn't anticipate

20  this.

21          MR. HOFFMAN:  The theory was -- and I

22  think we have only listen-only lines.

23          THE COURT:  Yes, we do.

24          MR. HOFFMAN:  So they cannot

25  participate.  If the debtors would like some relief

33

1  from you, I think they have to file a motion.

2                    THE COURT:  Well, what if I were to

3  dispense with whichever local rule requires a written

4  motion, and simply deny it as an oral motion right

5  now?  I mean, they're going to have to file something

6  in the district court, not to mention a notice of

7  appeal, I suspect.  And then everybody will get to

8  see that.

9                    So if I deny the motion, then (A)

10 nobody is really prejudiced by the fact that no one

11 can participate because the non-participants will

12 win; and (B) it gets the debtors to a court that may

13 be more hospitable, although I doubt it, than this

14 one.

15                    MR. HOFFMAN:  Your Honor, I think

16 there is some prejudice in the fact that we --

17                    THE COURT:  How so?

18                    MR. HOFFMAN:  -- haven't seen the

19 motion.  We don't know what the --

20                    THE COURT:  Well --

21                    MR. HOFFMAN:  -- basis is, we don't

22 know what the law is to be.  I mean, I think --

23                    THE COURT:  Well, sure, neither have

24 I.  I'm talking about the argument that Mr. Zott just

25 made.  In the district court, there isn't this

34

1  opportunity for an oral motion.  You have got to get
2  your foot in the door first.  That's going to require
3  some paper and you'll see the paper.  So in that
4  respect, I don't think you're going to be harmed.
5  The question is whether you have an objection to my
6  simply denying their oral motion for a stay now.
7                    MR. HOFFMAN:  I mean --
8                    MR. ZOTT:  Well --
9                    MR. HOFFMAN:  I think the answer is
10 yes, we do.
11                   MR. ZOTT:  Well --
12                   THE COURT:  Well, let him finish,
13 Mr. Zott.
14                   MR. HOFFMAN:  And it's based upon the
15 fact, as you just stated, Your Honor, that there are
16 no oral motions in this court.
17                   THE COURT:  There really aren't.
18                   MR. HOFFMAN:  They have papers ready.
19 I think they should have to file a motion, and they
20 should have to go through the procedural
21 requirements.  And I say that especially because of
22 the fact that our view of this hearing was the fact
23 that it was just you were going to read the decision,
24 and there was going to be no participation.  There
25 was going to no anything else.

35

1          THE COURT:  Yes.  It's not even the
2   local rules.  It's Bankruptcy Rule 9013.
3          MR. ZOTT:  Right.
4          THE COURT:  "Shall be by written
5   motion, unless made during a hearing."  But this
6   isn't a hearing.  This was just a ruling date.
7          MR. ZOTT:  Well --
8          THE COURT:  You know, believe it or
9   not, Mr. Zott, I'd like to help you with this.  I
10  understand about stays pending appeal.  And I would
11  like to send you somewhere else because I know you're
12  not going to get anything out of me.  But I don't
13  know that I can.
14         MR. ZOTT:  All right.  Well, Your
15  Honor, I mean, we're in a situation now where they're
16  obviously not going to agree to the motion I brought.
17  So, I mean, they obviously oppose it.  And Your Honor
18  is obviously going to deny it because of the
19  rationale that you gave, which I totally respect.
20         So now we -- and yet if Your Honor
21  doesn't deny it, and they obviously oppose it, then,
22  you know, it seems like it's -- I'm going to be
23  potentially denied the ability to appeal what could
24  be a $14 billion disaster against my clients.  So, I
25  mean, I think the fair thing to do is to deny it,

36

1  Judge.

2           And I also think this would be

3  construed as a hearing sufficiently enough for an

4  oral motion.  When else would you bring a motion for

5  an emergency stay other than when you lose on the

6  issue?  I don't see how else it could happen.  And

7  it's Thursday, tomorrow is Friday, and the ruling

8  comes in Tuesday.

9           So at least with respect to the

10  district court -- and you did mention that one of the

11  reasons in your ruling was respect for other courts.

12  So at least allow the district court the ability to

13  look at this issue.  All they're trying to do now is

14  a pocket veto, and that is not right.  I mean, it's

15  fine to deny it, let us go to the district court, and

16  they can make all the arguments there that they want

17  to make.

18           THE COURT:  All right.  I am

19  persuaded.  This is --

20           MR. HOFFMAN:  Your Honor --

21           THE COURT:  No.  We're done.  I'm

22  persuaded this is a hearing.  I have an oral motion

23  for a stay pending appeal.  For the reasons I've

24  described, the motion is denied.  I'll enter an

25  order.

**A0095**

37

1          MR. ZOTT:  Thank you Your Honor.  I

2 appreciate it.

3          MR. HOFFMAN:  Thank you, Your Honor.

4          (Which were all the proceedings had in

5          the above-entitled cause, August 26,

6          2016, 3:00 p.m.)

7 I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
THAT THE FOREGOING IS A TRUE AND ACCURATE
8 TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
ENTITLED CAUSE.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | | |
|---|---|---|---|
| **Honorable** | A. Benjamin Goldgar | **Hearing Date** | August 26, 2016 |
| **Bankruptcy Case** | No. 15 B 01145 | **Adversary** | No. 15 A 149 |

| | |
|---|---|
| **Brief Statement of Motion** | Caesars Entertainment Operating Co., Inc. v. BOKF, N.A. |
| | Order denying debtors' motion to extend section 105 injunction (Dkt. No. 284) |
| **Names and Addresses of moving counsel** | |
| **Representing** | |

## ORDER

This matter came before the court for ruling after an evidentiary hearing on the debtors' motion to extend the section 105 injunction that expires on August 29, 2016. The court having heard the evidence and having made findings of fact and conclusions of law on the record in open court, IT IS HEREBY ORDERED:

The motion is denied.

**A0097**

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| **Honorable** | A. Benjamin Goldgar | **Hearing Date** | August 26, 2016 |
|---|---|---|---|
| **Bankruptcy Case** | No. 15 B 01145 | **Adversary** | No. 15 A 149 |

**Brief Statement of Motion**

Caesars Entertainment Operating Co., Inc. v. BOKF, N.A.

Order denying debtors' oral motion for stay pending appeal

**Names and Addresses of moving counsel**

**Representing**

## ORDER

For the reasons stated on the record, the debtors' oral motion for a stay pending appeal of this court's ruling on the motion to extend section 105 injunction is DENIED.

### United States Bankruptcy Court, Northern District of Illinois

| | | | |
|---|---|---|---|
| Name of Assigned Judge | A. Benjamin Goldgar | **CASE NO.** | 15 B 1145 |
| **DATE** | June 15, 2016 | **ADVERSARY NO.** | 15 A 149 |
| **CASE TITLE** | Caesars Entertainment Operating Co., Inc. v. BOKF, N.A. | | |
| **TITLE OF ORDER** | Order granting plaintiffs' emergency motion for temporary restraining order and preliminary injunction | | |

**DOCKET ENTRY TEXT**

The emergency motion of debtors Caesars Entertainment Operating Co., Inc. and subsidiaries for a temporary restraining order and preliminary injunction is granted as follows. The plaintiffs in the following actions are enjoined from prosecuting the actions against Caesars Entertainment Corp. from the date of this order until the close of business on August 29, 2016: *BOKF, N.A. v. Caesars Entm't Corp.*, No. 15-cv-1561 (JSR) (S.D.N.Y.); *Trilogy Portfolio Co. v. Caesars Entm't Corp.*, No. 14-cv-7091 (JSR) (S.D.N.Y.); *Danner v. Caesars Entm't Corp.*, No. 14-cv-7973 (JSR) (S.D.N.Y.); and *Wilmington Sav. Fund Soc., FSB v. Caesars Entm't Corp.*, No. 10004-VCG (Del. Ch.).

[For further details see text below.]

---

### STATEMENT

This matter is before the court for ruling after a three-day evidentiary hearing on the emergency motion of debtors Caesars Entertainment Operating Co. (or "CEOC") and its subsidiaries for injunctive relief under section 105(a) of the Bankruptcy Code. The debtors again seek to halt temporarily six civil actions against non-debtor parent company Caesars Entertainment Corp. (or "CEC") seeking to reinstate and recover on CEC's guarantees of various CEOC notes. Five of the actions are pending in the U.S. District Court for the Southern District of New York; the sixth is pending in the Delaware Chancery Court. There are fully-briefed cross-motions for summary judgment pending in all six actions. The debtors would have the court enjoin the guaranty plaintiffs from pursuing the actions until a decision on plan

## STATEMENT

confirmation here.[1]

The findings in the earlier opinion of July 22, 2015, and earlier injunction order dated February 26, 2016, are incorporated.  For substantially the reasons described in the February 26 order (which are also incorporated, *see Withrow v. Larkin*, 421 U.S. 35 (1975) (noting that Rule 65(d) is satisfied through a reference to reasons in an earlier decision)), and for additional reasons set forth below, the debtors' motion will be granted and the guaranty plaintiffs enjoined from pursuing the actions.  But the injunction will have a much shorter duration than the movants want.  And the chances of further injunctive relief are slim.

The premise of the debtors' motions (both the current one and its predecessor) is that the bankruptcy estates have claims against CEC, just as the guaranty plaintiffs do, and the estates' claims against CEC are assets of the estates.  The court of appeals described the rest of the debtors' theory this way.  "If before CEOC's bankruptcy is wound up," the court said, "CEC is drained of capital by the lenders' suits to enforce the guaranties that CEC had given them, there will be that much less money for CEOC's creditors to recover in the bankruptcy proceeding. . . . The less capital CEC has for CEOC to recapture through prosecution or settlement of its fraudulent-transfer claims, the less money its creditors will receive in the bankruptcy proceeding." *Caesars Entm't Operating Co., Inc. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186, 1189 (7th Cir. 2015).  What is more, the court continued, "[o]ne can envision a situation in which CEC, having both obligations on the guaranties it issued to CEOC's lenders, and obligations to CEOC arising from the latter's fraudulent-transfer claims, would lack the money to satisfy all its obligees." *Id.*

The court of appeals noted CEOC's contention "that if the guaranty litigation against CEC can be frozen for a time . . . , the bankruptcy examiner's report analyzing the disputed transactions will provide the parties with information they need to have a clear shot at negotiating an overall settlement." *Id.*  The question, then, is "whether the injunction sought by CEOC is likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy.  If it is, and its denial will thus endanger the success of the bankruptcy proceedings, the grant of the injunction would, in the language of section 105(a) be 'appropriate' . . . ." *Id.* at 1188-89.

---

[1]     Technically, the debtors request relief only as to three of the New York actions. Because neither UMB, N.A. nor Wilmington Trust, N.A., plaintiffs in *UMB Bank, N.A. v. Caesars Entm't Corp.*, No. 15-cv-4634 (JSR) (S.D.N.Y.), and *Wilmington Trust, N.A. v. Caesars Entm't Corp.*, No. 15-cv-8280 (JSR) (S.D.N.Y.), is a defendant here, no injunction can be entered against either one.  But the debtors represent in their motion that both UMB and Wilmington Trust have agreed to abide by the terms of any injunction entered.

-2-

## STATEMENT

To understand why another injunction is appropriate here, the terms of the February 26 injunction and events since its entry must be considered. The February 26 injunction had a limited duration. Consistent with the debtors' request (and the process the court of appeals appeared to envision), the injunction expired 60 days after the examiner filed his initial report or on May 9, 2016, whichever came first.

On February 3, the debtors had moved to have the court appoint a mediator to assist in reaching a resolution with the many creditor constituencies. The motion was denied because the parties needed no authorization to engage a mediator, and on March 1 the debtors filed a notice that a mediator had been selected. On March 15, the examiner filed his initial report with certain portions redacted. Twenty parties signed the mediator's protocol, and on April 7 they had their first session with the mediator.

On May 4, counsel for the debtors announced at a status hearing in the adversary proceeding that the debtors were not seeking to extend the injunction set to expire in five days, that because the district judge hearing the New York actions had retired, there were no imminent trial dates and no emergency requiring relief. Morever, he said, "[t]he injunction that the court entered had its intended effect from at least the debtors' perspective. It's given us a window of opportunity to mediate. Those discussions are still ongoing." He added, however, that "depending on the result of those discussions, we may seek additional relief later from this court if we are able to get to a point where there is agreement with certain stakeholders."

On June 6, a month later, the debtors and CEC entered into a Restructuring Support and Forbearance Agreement (or "RSA") with the holders of subsidiary-guaranteed notes claims. On June 7, the next day the debtors and CEC entered into an RSA with CEC under which CEC agreed to support the latest iteration of the debtors' plan of reorganization. The debtors contend the plan entails a materially larger contribution to the reorganization from CEC. At a hearing on June 8, the day after that, counsel for the Unsecured Creditors Committee told the court that the unsecured creditors had reached an "agreement in principle" concerning the treatment of their claims.

At the hearing on the debtors' motion, James Millstein, the debtors' restructuring advisor, testified that there had been progress on other fronts, as well. He said the debtors had an agreement in principle, soon to be executed, with the first lien noteholders. That, he said, left only two major groups unreconciled to the plan: the first lien bank lenders and the second lien noteholders. But negotiations with the first lien bank lenders were continuing, and the debtors had at least "advanced [the] ball in getting closer to a consensual deal" with the second lien noteholders, even though the Second Lien Committee "will tell you the ball hasn't nearly been advanced far enough." In all, Millstein opined, there had been "enormous progress towards a plan."

-3-

## STATEMENT

Meanwhile, Millstein testified, the debtors' business has done quite well, outperforming its budget. It remains "one of the . . . strongest casino companies in the United States." The operations that CEC owns had likewise improved, so that although CEC's cash "is down, their valuation is up." The guaranty plaintiffs' expert, David Hilty, agreed that the businesses were performing well.

This evidence is enough to show that an additional injunction is "likely to enhance the prospects for a successful resolution of the disputes attending" the CEOC bankruptcy. *BOKF*, 808 F.3d at 1188. The remainder of Millstein's testimony, largely consistent with his testimony at the hearing a year ago, showed that denying relief would "thus endanger the success of the bankruptcy proceedings." *Id.* CEC could never pay a judgment in favor of the guaranty plaintiffs, he said, and CEC would likely file bankruptcy itself.

Certainly, the evidence on the prospects for a successful resolution could have been stronger. Millstein admitted that there was no executed RSA with the first lien notes or unsecured creditors, and he couldn't say whether the other RSAs were effective or even signed. No witnesses from CEC or from any creditor testified to any of these deals. There was no description of where settlement talks stood and no evidence that further talks were scheduled. The mediation effort appears to have stalled.

The same is true for the evidence on the possibility that failure to issue an injunction might endanger the success of the bankruptcy proceedings. Millstein conceded that if judgments were entered against CEC in the guaranty actions, CEC might have alternatives to bankruptcy. That was a concession he did not make at the hearing a year ago. Millstein also conceded that a CEC bankruptcy might only delay confirmation of a CEOC plan while it was determined "whether or not CEC could make substantially similar contributions." That, too, was not the view he took at last year's hearing.

On the whole, though, the debtors' progress on the settlement front is enough to show a continued likelihood of a successful reorganization – in the sense of a fully consensual plan, the debtors' goal. And the progress has been fairly rapid. Although, as the guaranty plaintiffs point out, these cases are now eighteen months old, it must be remembered that the examiner issued his initial report – the event everyone hoped would break the logjam – only three months ago. The mediator was selected only two weeks before that. In just three or three-and-a-half months, in other words, the debtors have reached agreements in principle – or better, written agreements – with a large part of their capital structure. And the prospect that a CEC bankruptcy will bring on "one of the great messes of our time," to use Millstein's phrase, remains plausible.

The public interests in successful reorganizations and in settlement continue to support a temporary injunction for the same reasons discussed at length in the February 26 order. And on the whole, so does the balance of the equities (again assuming without deciding that balancing is

-4-

## STATEMENT

required before a section 105 injunction can be granted).  The guaranty plaintiffs do raise legitimate concerns about an "imbalance" in negotiations if an injunction is entered – if, while their hands are tied, the debtors continue to litigate full bore against them in the bankruptcy cases, or if the Trust Indenture Act, the statute underlying the guaranty plaintiffs' claims, is amended retroactively to erase those claims.  But a reasonable degree of balance can be restored by limiting the duration of the injunction.

That raises the final question:  the duration of the injunction.  The duration will be short.  The purpose of granting injunctive relief here is to facilitate a negotiated resolution of the disputes in this case.  Relief will be ordered only because the debtors have made a sufficient showing that an injunction is likely to "enhance the prospects for a successful resolution" of those disputes.  *BOKF*, 808 F.3d at 1188.  The purpose is *not* to give the debtors and CEC an opportunity to avoid negotiations and then at confirmation cram a plan down on the second lien noteholders.

What will enhance the likelihood of a settlement and avoid the monumental confirmation hearing the Second Lien Committee predicts is a short injunction with a clear termination date and little chance of extension.  The debtors like to quote the statement from the February 26 order that "uncertainty produces settlements because settlements avoid risk."  That statement is true – but only up to a point.  As Hilty pointed out in his testimony at the hearing, what tends to produce settlements are *deadlines*.  Deadlines produce settlements because they force parties to compromise in order to avoid the risk that a blissful uncertainty will become a distasteful certainty.  (As Samuel Johnson reportedly said:  "Depend upon it, sir, when a man knows he is to be hanged in a fortnight, it concentrates his mind wonderfully.")  Without a deadline in this case, Hilty predicted, the debtors and CEC would have little incentive to talk.  They could sit back and take their chances at confirmation.

Indeed, recent events in these cases bear out his testimony.  Millstein admitted that the RSA with CEC was reached only in the week to ten days before the hearing on the debtors' motion.  So was the RSA with the subsidiary-guaranteed notes.  And so, for that matter, was the agreement in principle with the Unsecured Creditors Committee.  There is little doubt the deadlines in the guaranty litigation spurred all of this sudden settlement activity.  The summary judgment motions in the guaranty litigation are set for argument on June 16 (in the Delaware action) and June 22 (in the New York actions), after which the courts could rule at any time.  Had these deadlines not given CEC and other creditors a substantial incentive to negotiate, there would have been no agreements.

Because deadlines, not uncertainty alone, spur settlement, the debtors will not be granted injunctive relief through confirmation.  The injunction will instead expire on August 29, 2016 – the same 74-day injunction the debtors were granted before.  To encourage the debtors and CEC to make good use of that 74-day period, they are warned that the likelihood any further injunctive

-5-

## STATEMENT

relief will be granted is small. The August 29 expiration date should accordingly be considered a deadline to reach a resolution. On the other hand, to lessen the possibility that the guaranty plaintiffs will do nothing for the next 74 days and will simply wait for the injunction to expire, they are warned that further relief will indeed be considered if it appears that despite the overtures of the debtors and CEC the parties have not participated in extensive, good-faith negotiations.

To sum up, the emergency motion of debtors Caesars Entertainment Operating Co., Inc. and subsidiaries for a temporary restraining order and preliminary injunction is granted as follows. The plaintiffs in the following actions are enjoined from prosecuting the actions against Caesars Entertainment Corp. from the date of this order until the close of business on August 29, 2016: *BOKF, N.A. v. Caesars Entm't Corp.*, No. 15-cv-1561 (JSR) (S.D.N.Y.); *Trilogy Portfolio Co. v. Caesars Entm't Corp.*, No. 14-cv-7091 (JSR) (S.D.N.Y.); *Danner v. Caesars Entm't Corp.*, No. 14-cv-7973 (JSR) (S.D.N.Y.); and *Wilmington Sav. Fund Soc., FSB v. Caesars Entm't Corp.*, No. 10004-VCG (Del. Ch.).[2] The earlier motion that had been continued from time to time is now moot. This adversary proceeding is set for a status hearing on August 19, 2016, at 1:30 p.m. A separate scheduling order will be entered.

Dated: June 15, 2016

A. Benjamin Goldgar
United States Bankruptcy Judge

---

[2]    Because the debtors agreed to seek relief only against the plaintiffs in the actions, there is no occasion to address whether this court has the power to enjoin the New York and Delaware courts themselves – the issue raised at the outset of the evidentiary hearing. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 327-30 (1995) (Stevens, J., dissenting) (arguing that bankruptcy courts have no such power).

-6-

A0104

## United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | A. Benjamin Goldgar | **CASE NO.** | 15 B 1145 |
|---|---|---|---|
| **DATE** | February 26, 2016 | **ADVERSARY NO.** | 15 A 149 |
| **CASE TITLE** | Caesars Entertainment Operating Co., Inc., et al. v. BOKF , N.A., et al. | | |
| **TITLE OF ORDER** | Order granting in part and continuing in part debtors' motion to stay or in the alternative for injunctive relief | | |

#### DOCKET ENTRY TEXT

The motion of debtors Caesars Entertainment Operating Co., Inc. and subsidiaries to stay or in the alternative for injunctive relief is granted in part and continued in part. As to defendant BOKF, N.A., the motion is granted. BOKF, N.A. is enjoined from pursuing the action styled *BOKF, N.A. v. Caesars Entm't Corp.*, No. 15-cv-1561 (SAS) (S.D.N.Y.), until (a) 60 days after the examiner files his initial report in the bankruptcy case, or (b) May 9, 2016, whichever comes first. As to the remaining defendants, the motion is continued for further status. A separate scheduling order will be entered.

**[For further details see text below.]**

### STATEMENT

Before the court on remand from the court of appeals is the motion of the debtors – Caesars Entertainment Operating Co., Inc. ("CEOC") and more than 170 of its subsidiaries – for a preliminary injunction under section 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a). The injunction would temporarily halt proceedings in four civil actions in other courts against CEOC's non-debtor parent, Caesars Entertainment Corp. ("CEC"), in which the plaintiffs seek to enforce CEC's guarantees of notes that CEOC issued.

After a careful review of the court's first decision, the opinion of the court of appeals, the record from the June 2015 evidentiary hearing, and events in the bankruptcy case and related litigation since the hearing, the court will grant the motion in part and continue it in part for the reasons and on the terms set forth below. *See* Fed. R. Civ. P. 65(d)(1) (made applicable by Fed. R. Bankr. P. 7065).

### 1. Background

Familiarity with the court's first decision is assumed. *See Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co., Inc.)*, 533 B.R. 714 (Bankr. N.D. Ill.

**STATEMENT**

2015).  What follows is a summary to provide context.

The debtors in these chapter 11 cases are the primary operating units of the Caesars gaming enterprise, an $8 billion international business operation.  The debtor in the lead case is CEOC.  The other debtors are subsidiaries of CEOC.  The majority owner of CEOC is CEC. CEC is not a debtor.

In 2005 and 2006, CEOC issued $1.5 billion in senior unsecured notes due 2016 and 2017.  CEC guaranteed CEOC's obligations under the notes.  In 2008, CEC and its subsidiaries were acquired in a leveraged buyout.  The next year, CEOC issued $3.71 billion in second priority secured notes due 2018.  The year after that, CEOC issued another $750 million in second priority secured notes due 2018.  CEC guaranteed CEOC's obligations under the second priority notes.

For several years after the 2008 financial crisis, CEOC's revenues declined, and they continued to do so even after the economy began to recover.  CEOC found itself with insufficient cash flow to service the substantial debt remaining from the 2008 LBO, including the notes it had issued before and after.  Beginning in 2009, the Caesars enterprise therefore engaged in more than forty-five transactions designed to restructure CEOC's debt (the "disputed transactions"). One, the "B-7 Refinancing," took place in May 2014.  Another, the "Senior Unsecured Notes Transaction," took place in August 2014.  The precise nature of these transactions is irrelevant. What matters is that CEC contends these transactions released its obligations under the guarantees of the 2016, 2017, and 2018 notes.

To say these transactions angered the noteholders is an understatement.  Over the next ten months, indenture trustees and noteholders (the "guaranty creditors") brought a series of actions against CEC to reinstate the guarantees and recover damages for (among other things) breach of the indentures and notes.  Wilmington Savings Fund Society, FSB, and BOKF, N.A., indenture trustees for the two sets of 2018 notes, sued CEC separately in the Delaware Court of Chancery and the U.S. District Court for the Southern District of New York.  CEC's potential liability in the two actions together comes to $4.46 billion.  Frederick Barton Danner brought an action against CEC in the same district as representative of a plaintiff class of 2016 noteholders. MeehanCombs Global Credit Opportunities Master Fund, LP, and other holders of 2016 and 2017 notes also brought an action in that district.  CEC's combined potential liability in the MeehanCombs and Danner actions is $125 million.

In June 2014, CEOC's board formed a Special Governance Committee to investigate all of the disputed transactions (including the B-7 Refinancing and Senior Unsecured Notes Transaction) to determine whether CEOC had claims against CEC or its affiliates arising out of them.  Although the investigation is unfinished, the SGC appears to have found that CEOC indeed has claims, including claims for fraudulent transfers.

-2-

## STATEMENT

Around the same time, the debtors began negotiating with CEOC's first lien creditors and CEC over a possible restructuring. In December 2014, the debtors, CEC, and some of CEOC's first lien noteholders entered into a "Restructuring Support and Forbearance Agreement" (the "Notes RSA"). Under the Notes RSA, CEC agreed to make a significant financial contribution to a restructuring, a contribution the debtors value at more than $2.5 billion. The contribution represents a settlement of CEOC's potential claims against CEC. CEOC agreed in turn that its reorganization plan would release all claims against CEC as well as against its affiliates, shareholders, officers, directors, and others.

Less than a month later, on January 12, 2015, three second lien noteholders filed an involuntary bankruptcy petition against CEOC in the District of Delaware. Three days after that, CEOC and the other debtors filed voluntary chapter 11 petitions in this district. The Delaware bankruptcy court then transferred the involuntary case here.

In March 2015, the debtors filed an adversary complaint and motion seeking, among other things, preliminary injunctive relief under section 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a), to halt temporarily the prosecution of the Wilmington Savings, BOKF, Danner, and MeehanCombs actions against CEC. The underlying theory was that the four actions threatened the debtors' ability to reorganize. That was so, the debtors said, because the reorganization (as envisioned in the Notes RSA) depended heavily on CEC's financial contribution. CEC lacked the resources to make that contribution and also pay judgments in favor of the plaintiff noteholders. If the actions were not enjoined and the noteholders succeeded not only in reinstating CEC's guarantees of the notes but recovering on them, CEC's contribution to the reorganization would vanish. The noteholders would get the money meant to fund CEOC's plan. The debtors would get nothing.

In June 2015, the court held a two-day evidentiary hearing on the debtors' motion and in July 2015 denied it. *See Caesars*, 533 B.R. 714. The motion was denied because the court concluded it lacked the power to grant the relief the debtors sought.[1] The court acknowledged that under many decisions this would be "a textbook case" for a section 105(a) injunction, *id.* at 732, but read the two most recent Seventh Circuit decisions on the subject – *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), and *Levey v. Sys. Div., Inc. (In re Teknek, LLC)*, 563 F.3d 639 (7th

---

[1] At some point between the filing of the complaint and the hearing on the motion, the debtors narrowed the scope of the relief sought. Originally, the debtors had asked for the four actions to be enjoined "until the effective date of a restructuring plan." (Adv. Dkt. No. 4 at 15). On March 12, 2015, however, an examiner had been appointed and charged with investigating the disputed transactions. (Bankr. Dkt. No. 675). At the June 2015 hearing as well as in their post-trial brief, the debtors asked to have the actions enjoined only "until 60 days after the Examiner issues his report." (Tr. v. I at 147; Adv. Dkt. No. 151 at 25).

-3-

**STATEMENT**

Cir. 2009) – to allow the issuance of such an injunction only in exceptionally limited circumstances, *id.* at 729.  Those circumstances, the court said, had not been shown.  *Id.* at 731-32.

The debtors appealed the order.  The district court affirmed for essentially the same reasons.  *See Caesars Entm't Operating Co., et al. v. BOKF, N.A. (In re Caesars Entm't Operating Co., et al.)*, No. 15 C 6504, 2015 WL 5920882 (N.D. Ill. Oct. 6, 2015).  The debtors appealed again and this time were more successful:  the court of appeals vacated the order denying their injunction motion.  *Caesars Entm't Operating Co., Inc. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186 (7th Cir. 2015).

In its opinion, the court of appeals reasoned that section 105(a) grants bankruptcy courts "extensive equitable powers . . . to perform their statutory duties," and "nothing" in that provision (or in the *Fisher* and *Teknek* decisions, *id.* at 1189-90) "authorize[d] the limitation on the powers of a bankruptcy judge" that the bankruptcy court and district court had found.  *Id.* at 1188.  Because of their misinterpretation of the statute, the court added, neither court had reached the critical question the debtors' motion presented.  *Id.*  That question

> is whether the injunction sought by CEOC is likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy.  If it is, and its denial will thus endanger the success of the bankruptcy proceedings, the grant of the injunction would, in the language of section 105(a), be "appropriate to carry out the provisions" of the Bankruptcy Code, since successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives.

*Id.* at 1188-89 (quoting 11 U.S.C. § 105(a)).

The court of appeals then effectively endorsed the theory underlying the debtors' injunction request.  "If before CEOC's bankruptcy is wound up," the court said, "CEC is drained of capital by the lenders' suits to enforce the guaranties that CEC had given them, there will be that much less money for CEOC's creditors to recover in the bankruptcy proceeding."  *Id.* at 1189.  "The less capital CEC has for CEOC to recapture through prosecution or settlement of its fraudulent-transfer claims, the less money its creditors will receive in the bankruptcy proceeding."  *Id.*  What is more, the court continued, "[o]ne can envision a situation in which CEC, having both obligations on the guarantees it issued to CEOC's lenders, and to CEOC arising from the latter's fraudulent transfer claims, would lack the money to satisfy all its obligees . . . ."  *Id.*

The court of appeals noted CEOC's contention "that if the guaranty litigation against

-4-

**A0108**

**STATEMENT**

CEC can be frozen for a time . . . , the bankruptcy examiner's report analyzing the disputed transactions will provide the parties with information they need to have a clear shot at negotiating an overall settlement." *Id.*  If that contention is correct, the court said, "there is nothing in section 105(a) to bar the order sought by CEOC" since section 105(a) authorizes orders "'appropriate to carry out the provisions' of the Bankruptcy Code." *Id.* (quoting 11 U.S.C. § 105(a)).

Whether such an order is appropriate, though, "is a factual issue that remains to be determined." *Id.*  The matter was remanded for that determination. *Id.* at 1191.

### 2.  Findings of Fact

This court's first decision made extensive findings of fact. *See Caesars*, 533 B.R. at 720-27.  Those findings are incorporated by reference.  The court now makes additional findings based on (1) the record from the June 2015 hearing, and (2) events both before and after the hearing, all of which the court has either judicially noticed (*see* Adv. Dkt. Nos. 198, 205), or judicially notices in this order, *see* Fed. R. Evid. 201(c)(1).  Additional findings of fact also appear below in the court's conclusions of law.

### a.  The Guaranty Actions against CEC

Witnesses at the June 2015 hearing warned that the four actions might prompt holders of CEOC first lien notes – notes also subject to CEC guarantees supposedly released – to bring actions of their own.  (*See, e.g.,* Tr. v. I at 49).  Not two weeks after June 2015 hearing, UMB Bank, N.A., trustee under certain CEOC first lien indentures, sued CEC in the Southern District of New York.  (Adv. Dkt. No. 198, ¶ 6).[2]  The UMB complaint alleged that the release of CEC's guaranty of $6.345 billion in CEOC first lien notes violated the terms of the indentures as well as the Trust Indenture Act of 1939 and sought to collect from CEC the $6.345 billion due on the notes.  (*Id.*).  The UMB action was the fifth contesting the purported release of CEC from its various guaranty obligations and seeking to collect on the notes in question.[3]

The district court in New York deemed the BOKF and UMB actions related (*see UMB*

---

[2]      The guaranty creditors took the position that the debtors could have orchestrated the filing of the UMB action.  (Adv. Dkt. No. 156).  Suspicious though the timing may have seemed in July 2015, events since then have dispelled the possibility of a collusive filing.

[3]      UMB is not a party to the adversary proceeding here but has apparently agreed to be bound by a decision on the debtors' motion for preliminary injunction.  (*See* Adv. Dkt. No. 152, Ex. D).

## STATEMENT

*Bank, N.A. v. Caesars Entm't Corp.*, No. 15-cv-4634 (SAS) (S.D.N.Y.), Dkt. entry dated June 17, 2015), and set a schedule for BOKF and UMB to file motions for partial summary judgment (*id.*, Dkt. No. 19). At the end of June, BOKF and UMB both moved for partial summary judgment on their complaints against CEC. (Adv. Dkt. No. 198 ¶¶ 6-7). In August, the district court denied the motions. (*Id.*). BOKF and UMB later filed a second round of motions for partial summary judgment, and in January 2016 the district court denied those motions as well. (*Id.*). The BOKF and UMB actions are set for trial together on March 14, 2016, a little over two weeks from now. (*Id.*).

The plaintiffs in the MeehanCombs and Danner actions likewise moved for partial summary judgment on their complaints against CEC. (*Id.*, ¶ 8). In December 2015, the district court denied the motions. (*Id.*). The MeehanCombs and Danner actions are set for trial together on May 9, 2016. (*Id.*).

In contrast, no trial date has been set in the Wilmington Savings action pending in the Delaware Chancery Court. (Adv. Dkt. No. 210, Tr. dated February 22, 2016, at 4-5). Fact discovery in the action has closed, but expert discovery is continuing, and there is currently no cut-off. (*Id.*).

### b. Other Litigation Against CEC

During CEOC's bankruptcy case, CEC has been a defendant in other major litigation.

• In December 2014, Hilton Worldwide, Inc. Global Benefits Administrative Committee and others sued CEC in the Eastern District of Virginia. (Adv. Dkt. No. 198, ¶ 11). The complaint sought to enforce CEC's funding obligations under a Hilton pension plan, obligations undertaken when Hilton spun off certain gaming and other operations to Caesars in 1998. (*Id.*). Hilton alleged that $18 million of those obligations was currently due and unpaid. (*Hilton Worldwide, Inc. Global Benefits Admin. Comm., et al. v. Caesars Entm't Corp., et al.*, No. 14-cv-1766 (E.D. Va.), Dkt. No. 1).

The Hilton action was transferred to this district and referred to the bankruptcy court, where the action was docketed as an adversary proceeding. (Adv. Dkt. No. 198, ¶ 11). The plaintiffs then moved to withdraw the reference. (*Id.*). Proceedings in the district court and in the bankruptcy court have been stayed to permit settlement discussions. (*Id.*).

• On January 12, 2015, the same day the involuntary petition was filed against CEOC, the National Retirement Fund (the "NRF"), expelled five CEOC subsidiaries and affiliates from a multi-employer pension plan the NRF sponsored. *See In re Caesars Entm't Operating Co.*, 540 B.R. 637, 640 (Bankr. N.D. Ill. 2015). The NRF had given notice of the expulsion on January 12 and later sent a second notice assessing withdrawal liability under ERISA and demanding

**STATEMENT**

payment.  *Id.* at 640-41.  In March 2015, the NRF and its manager sued CEC in the Southern District of New York to collect unpaid withdrawal liability.  (Adv. Dkt. 198, ¶ 9).  The parties are currently engaged in settlement discussions.  (*Id.*).

That same month, the debtors filed an adversary proceeding in CEOC's bankruptcy case against the NRF's board of trustees and others.  The complaint alleged that the notice and payment demand violated the automatic stay and sought to have the NRF's collection efforts against CEC enjoined.  (*Id.*, ¶ 10; *see Caesars Entm't Operating Co., Inc., et al. v. Board of Trustees of the Nat'l Ret. Fund, et al.*, No. 15 A 131 (Bankr. N.D. Ill.), Dkt. Nos. 6, 8).  The debtors also filed two motions in the bankruptcy case, one asserting that the expulsion violated the stay, the other that the notice and payment demand violated the stay.  (Adv. Dkt. 198, ¶ 10).  In November 2015, both motions were denied, and two of the three counts in the adversary complaint were dismissed.  (*Id.*; *see Caesars*, 540 B.R. at 647).  The debtors have appealed the denial of the motions, but briefing in the appeal has been extended because the parties are engaged in settlement discussions.  (*Id.*).

• In October 2015, Wilmington Trust, N.A., as successor indenture for subordinated unsecured CEOC notes due 2016, sued CEC in the Southern District of New York, to enforce CEC's guaranty of more than $500 million in notes.  (*See Wilmington Trust, N.A. v. Caesars Entm't Corp.*, No. 15-cv-8280 (SAS) (S.D.N.Y.), Dkt. No. 1).  This brought to six the number of actions against CEC arising out of the purported release of the guarantees.  The debtors have not asked to have proceedings in the Wilmington Trust action enjoined.

### c.  No CEC Bankruptcy

Witnesses at the June 2015 injunction hearing testified that CEC would likely file a bankruptcy case of its own if judgments were entered in any of the four (now six) guaranty actions against it (Tr. v. I at 55, 67-68, 115-16, 208), and it might do so even before entry of a judgment in favor of BOKF (a ruling on BOKF's first motion for partial summary judgment was then expected in August 2015) (*id.* at 209-10; Tr. v. II at 59-60, 130).  CEC did not file a bankruptcy case in August 2015 and still has not filed one.  (Adv. Dkt. No. 198, ¶ 5).

### d.  The CEOC Bankruptcy Case

As of the June 2015 hearing, the only restructuring agreement the debtors had reached with creditors was the Notes RSA that four-fifths of the first lien noteholders had executed.  (Tr. v. I at 47, 193).  The Notes RSA was later amended in July 2015 and amended again in October 2015.  (Adv. Dkt. 198, ¶ 1).  The debtors had been in discussions earlier in 2015 with CEOC's first lien bank lenders over a possible restructuring agreement, but in April talks had broken off (Tr. v. II at 46).

## STATEMENT

In August 2015, CEC and CEOC succeeded in entering into a Restructuring Support and Agreement with certain of its first lien bank lenders (the "Banks RSA"). (Adv. Dkt. No. 198, ¶ 2). Meanwhile, in July 2015, CEOC and CEC announced a Restructuring Support and Forbearance Agreement with certain second lien note claimants (the "Second Lien RSA"). (*Id.*, 198, ¶ 3). The Second Lien RSA ultimately expired on September 18, 2015, when insufficient noteholders executed it for it to become effective (*id.*).

On October 7, 2015, the same day the Notes RSA was modified, the debtors filed with the court a modified chapter 11 plan. (*Id.*, ¶ 4). The modified plan was not only consistent with the Notes RSA and Banks RSA but included many terms from the Second Lien RSA despite that agreement's expiration. (*Id.*; *see* Bankr. Dkt. No. 2402). As the modified disclosure statement the debtors filed at the same time makes clear, the plan takes the same basic form as its predecessor, in that it calls for a substantial financial contribution from CEC in various forms (*see* Bankr. Dkt. No. 2403 at 59-64) and also contains a blanket release of claims against CEC and others (*id.* 69-70; *see also* Adv. Dkt. No. 205).

Later in October, the debtors received a second extension of the exclusive periods during which only they can file a plan and solicit acceptances of the plan, *see generally* 11 U.S.C. § 1121. (Bankr. Dkt. No. 2473).[4/] In February 2016, the debtors sought a third and final extension of exclusivity, allowing them until July 15 to file a plan and until September 15 to solicit acceptances – the statutory maximums, *see* 11 U.S.C. § 1121(d)(2)(A), (B). No party objected, and the motion was granted at a February 17 hearing. (Bankr. Dkt. No. 3283). But the Ad Hoc Committee of First Lien Bank Lenders commented in its response to the debtors' request that with the passage of time, the likelihood the two RSAs could form the basis of a consensual plan had "vastly diminished." (*Id.* at 3). The Committee said its patience was "wearing thin," and that without an "impending resolution" it might have to consider "alternative solutions to these cases." (*Id.*).

At the same February 17 hearing, counsel to the examiner gave the court and parties a status report. (*See* Bankr. Dkt. No. 3290). Claims of privilege and confidentiality had delayed the filing of the examiner's report, and earlier in the month the examiner had received permission to file an initial redacted version. (*Id.*, No. 3169). In his seventh interim report filed in February, the examiner had announced he hoped to file his final report by the end of the month. (*Id.*, No. 3203 at 6). On February 17, counsel clarified that the final report would not be filed by that date, but it was still the examiner's intention to file the initial redacted version by February 29. (*Id.*, No. 3290, Tr. dated Feb. 17, 2016, at 21). He has since announced that the initial report will be filed during the week of March 7 – and no later than March 14. (*Id.*, No. 3316).

---

[4/]      The debtors had sought and received an initial extension back in May. (*Id.* No. 1454).

## STATEMENT

The discussion at the February 17 hearing then turned to this adversary proceeding. Because the debtors had sought a section 105(a) injunction lasting 60 days after the examiner filed his report, the court asked whether the debtors meant the initial report expected on February 29 or the final version. (*Id.*, No. 3290, at 23-24). The debtors confirmed that "the 60 days would begin from the initial filing rather than from the . . . fully unredacted report." (*Id.* at 24).

With that, the debtors also narrowed their request for immediate injunctive relief to the UMB and BOKF trial set for March 14. (*Id.* at 25-26). Because the debtors sought an injunction lasting 60 days from the filing of the examiner's initial report, and because the examiner intended (at that time) to file the initial report on February 29, the injunction would expire before the May 9 trial date in the MeehanCombs and Danner actions. An injunction aimed at those actions consequently seemed unnecessary. And the debtors agreed, at least for now, saying they were content with "continuing the request . . . until such time as we have further visibility into when the examiner's report comes out . . . ." (*Id.* at 26).[5]

### 3. Conclusions of Law

The debtors' motion will be granted and proceedings in the BOKF action temporarily enjoined. The evidence adduced at the hearing, as well as events post-hearing, demonstrated that an injunction is likely to enhance the prospects for a successful reorganization, an injunction will serve the public interest, and the equities weigh in the debtors' favor. As to the MeehanCombs and Danner actions, the debtors have agreed for the motion to be continued. And since there is no current need to enjoin proceedings in the Wilmington Savings action, the motion will be continued as to that action as well.

To obtain an injunction under section 105(a), it is unnecessary to satisfy the traditional elements for injunctive relief. *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998). As long as the third-party litigation would "'defeat or impair'" the bankruptcy court's "'jurisdiction over the case before it,'" the debtor need show only that (1) there is a "'likelihood of success on the merits,'" *id.* (quoting *L & S*, 989 F.2d at 932), which in this context means the likelihood of a

---

[5]        The debtors agreed after having an opportunity to consider a question the court had posed earlier in the day. (*See id.* at 25 "Your Honor, while I'm here, you also asked me a question this morning regarding . . . the May trial, and given that the debtors are only seeking relief for 60 days from the initial filing of the examiner's report, do you in fact need to decide whether the 105 injunction, if any, should apply to the MeehanCombs and Danner parties . . . ."). But the question had concerned only the MeehanCombs and Danner actions, not the Wilmington Savings action in Delaware. The debtors have therefore taken no position on whether their request to enjoin proceedings in the Wilmington Savings action should also be continued. For purposes of this order, it will be assumed the debtors have not agreed to a continuance.

-9-

---

**STATEMENT**

---

successful reorganization, *In re Excel Innovations*, 502 F.3d 1086, 1095 (9th Cir. 2007); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009); and (2) the injunction would serve the public interest, *Fisher*, 155 F.3d at 882.  The debtor need not show irreparable harm or an inadequate remedy at law.  *Id.*

### a.  The Likelihood of Success

The evidence at the hearing (nearly all of which came from the debtors) showed the debtors have a reasonable likelihood of a successful reorganization.

For starters, no one contests the strength of the debtors' business.  The business is a "substantial" one (Tr. v. I at 60), operating a "very valuable gaming franchise" with "a signature property in Las Vegas" (*id.* at 35).  The debtors have more than $5 billion in annual revenue and in its most recent year (as of June 2015) generated $1 billion in EBITDA.  (*Id.* at 60).  The business has "substantial free cash flow after capital expenditures."  (*Id.*; *see also id.* at 63 (calling it "a company with substantial revenues, . . . exceeding its own budget")).  The critical question in this case, then, is not whether the company can be restructured successfully.  Rather, as the court of appeals observed, the question is whether a temporary injunction "is likely to enhance the prospects for a successful *resolution of the disputes* attending [the CEOC] bankruptcy."  *Caesars*, 808 F.3d at 1188 (emphasis added).[6/]

The evidence strongly suggested that it is.[7/]  The debtors' goal in seeking injunctive relief is to have a short spell, one during which CEC is not subject to the imminent threat of an adverse judgment, when the parties can negotiate a consensual plan along the lines of the Notes RSA.  All parties agree that the estate has "significant claims" against CEC arising out of the disputed transactions.  (Tr. v. I at 35-36; *see also id.* at 59 (describing the claims as "multi-billion dollar damage claim[s]")).  The Notes RSA, it was explained, embodies a "tentative settlement" of those claims under which CEC would make a "substantial contribution" that the debtors valued

---

[6/]      In considering the likelihood of a successful reorganization, courts typically consider not only the strength of the debtor's business but also the progress of the bankruptcy case itself.  *See, e.g., Lyondell*, 402 B.R. at 590 (finding the necessary likelihood and granting an injunction where "the Debtors have so far been successful in doing everything they've needed to do to date").  No party has questioned the progress of this case – other than, as discussed later, the length of the time it has taken and the possibility that the Banks RSA may be terminated – and the court of appeals framed the relevant question in terms of the "successful resolution of the disputes" in the bankruptcy, *Caesars*, 808 F.3d at 1188, not other matters in the case.

[7/]      And in so many words, too.  (Tr. v. I at 78 (stating that "the likelihood of [the debtors] being successfully restructured is enhanced by the entry of the stay" (Millstein)).

**STATEMENT**

at roughly $2.5 billion.  (*Id.* at 40-41, 196).  Junior creditors have questioned whether the contribution is truly "substantial" given the estate's claims, *see Caesars*, 533 B.R. at 726, but they have never contended that a plan funded by CEC would be unacceptable no matter how much CEC paid.

Since the June 2015 hearing, in fact, the debtors have been able to bring other creditors on board with their proposed plan structure.  In July, CEOC and CEC announced a Second Lien RSA with certain second lien noteholders.  In August CEC and CEOC entered into the Banks RSA with its first lien bank lenders.  Although the Second Lien RSA expired before it became effective because too few noteholders had signed it, on October 7 the debtors filed a modified plan that was consistent with the Notes RSA and Banks RSA and included many of the Second Lien RSA's terms.  The modified plan continues to rely on a substantial financial contribution from CEC.  The success of the debtors' efforts to date suggests that additional negotiations could well result in a consensual plan based on CEC's funding.

The debtors envision that the examiner's report evaluating the estate's claims against CEC, along with a "market test" the debtors have been conducting (*see* Tr. v. I at 42-43, 98-100), will supply creditors with enough information for meaningful negotiations over CEC's contribution (Tr. v. II at 190-91).  The idea is to have the examiner's report and the market test "set the table" for a consensual resolution of the disputes "through the framework that's been established in the [Notes] RSA."  (*Id.* at 190).

But the BOKF and UMB actions threaten a reorganization on that basis.  As of January, 2015, CEC had a market capitalization of $1.8 billion and an enterprise value of roughly $3 billion, *Caesars*, 533 B.R. at 722, including not quite $400 million in cash (Tr. v. I at 198).  If successful, the BOKF and UMB claims alone would result in a judgment of $7.095 billion ($750 million plus $6.345 billion), considerably more than double CEC's value.  CEC plainly lacks the ability to pay a judgment that large.  (Tr. v. I at 50, 55).  A $7.1 billion judgment would deprive CEC of the assets needed to satisfy the estate's claims and rule out any CEC contribution to the plan.  (*Id.* at 210 (stating that "these judgments would, in essence, cripple CEC and render it unable to be a participant in the RSA, or in any plan that looks like the RSA" )).  CEC would end up in a bankruptcy case of its own.  (*See id.* at 50-51, 67-68, 72, 115-16, 207-09 (predicting a bankruptcy even before the UMB action was filed)).

As the court noted in its first opinion, these facts describe a "textbook case" for a section 105(a) injunction.  *Caesars*, 533 B.R. at 732.  Bankruptcy courts have often enjoined litigation against a non-debtor, usually but not always a guarantor of the debtor's debts, who intends to contribute financially to the debtor's reorganization.  *Id.*; *see also In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997);  *Saxby's Coffee Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*, 440 B.R. 369, 378 (Bankr. E.D. Pa. 2009); *Regency Realty Assocs. v. Howard Fertilizer, Inc. (In re Regency Realty Assocs.)*, 179 B.R. 717, 719 (Bankr. M.D. Fla.

-11-

## STATEMENT

1995) (calling this the "classic scenario"); *see, e.g., Gander Partners LLC v. Harris Bank, N.A. (In re Gander Partners LLC)*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010); *Lazarus Burman Assocs. v. National Westminster Bank USA (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 899 (Bankr. E.D.N.Y. 1993); *F.T.L., Inc. v. Crestar Bank (In re F.T.L., Inc.)*, 152 B.R. 61, 64 (Bankr. E.D. Va. 1993); *In re Kham & Nate's Shoes No. 2, Inc.*, 97 B.R. 420, 428-29 (Bankr. N.D. Ill. 1989); *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986); *Rustic Mfg., Inc. v. Marine Bank (In re Rustic Mfg., Inc.)*, 55 B.R. 25, 31 (Bankr. W.D. Wis. 1985); *Lahman Mfg. Co. v. First Nat'l Bank (In re Lahman Mfg. Co.)*, 33 B.R. 681, 685 (Bankr. D.S.D. 1983); *Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.)*, 21 B.R. 777, 779 (Bankr. D.N.M. 1982). This case follows the same pattern. The only difference is one of magnitude.

In opposing injunctive relief, the guaranty creditors argue primarily that the Notes RSA cannot serve as the basis for a successful reorganization. A detailed analysis, they maintain, reveals that it demands relatively little from CEC, leaves CEC in control of the reorganized debtors, and provides CEC and others with blanket releases – releases that are invalid as a matter of law. Recent expressions of discontent from the first lien banks, the guaranty creditors add, show that the Banks RSA, if not a dead letter yet, will be one soon.

Whatever merit the guaranty creditors' criticisms of the Notes RSA may have, they do not suggest a successful reorganization is less than likely. The evidence was undisputed that the debtors consider the Notes RSA simply "a framework" for negotiations (Tr. v. I at 25, 40, 64), a "template for a plan" (*id.* at 106).[8] James Millstein, the debtors' restructuring consultant, described the Notes RSA as "a work in process" rather than a final product, one meant to force other creditors "to consider what they would compromise." (*Id.* at 65, 132). "We're here to have an honest conversation about the value of the company, the value of the claims, and try to determine an equitable allocation of that value among the creditors . . . ." (*Id.* at 69). He noted that he had been asked to consider alternatives to the RSA, other approaches. (*Id.* at 41-42). But, he remarked, "[w]e have to start somewhere." (*Id.* at 65). Objections to the specifics of the RSAs – the amount of CEC's contribution, the scope of the releases, and so on – prove that the parties have disagreements about the RSA, not that a resolution of those disagreements is out of the question.

As for the first lien banks, they did complain in a recent filing, a response to the debtors' request for a final extension of exclusivity, that "many months have passed" without progress toward a global resolution of the case. (Bankr. Dkt. No. 3223 at 2). The banks commented that "[w]ith the passage of the time, the likelihood that the RSAs will form the foundation for a

---

[8]    Randall Eisenberg, the debtors' chief restructuring officer, agreed. (Tr. v. II at 190 (calling the RSA a "framework" meant to create a "path forward" to a "consensual resolution")).

-12-

## STATEMENT

consensual plan of reorganization in these cases has vastly diminished." (*Id.*). But the banks' comment simply underscores the debtors' immediate need for relief. Their concern is "the passage of time." (*Id.*). Best, then, to grant the debtors' motion and give them breathing space as soon as possible to negotiate an overall settlement.

The guaranty creditors argue that far from interfering with a reorganization, allowing their claims to go to judgment would assist the effort. Judgments, they contend, will answer the question whether CEC is liable on the guarantees, an answer essential to an evaluation of the plan's proposed release of CEC.

Judgments will answer that question, true enough. In seeking injunctive relief, though, the debtors are pursuing a consensual resolution of their bankruptcy case, not answers to the kinds of questions parties litigate at contested confirmation hearings. The debtors want to avoid that hearing if it can be avoided. Without judgments, CEC's liability does remain uncertain. But uncertainty produces settlements because settlements avoid risk. At the June 2015 hearing, counsel for some of the guaranty creditors observed that lawyers "talk about cases settling on the courthouse steps." (Tr. v. II at 218). Cases that settle on the courthouse steps settle on the way in to the courthouse, not on the way out.

The guaranty creditors also argue that the debtors can reorganize on a basis other than the RSAs. Because a reorganization on some other basis is possible, the guaranty creditors say, the debtors do not need to have the actions enjoined.

The evidence supported the premise of the argument but not its conclusion. Millstein admitted at the hearing he was considering alternatives to the RSAs that did not involve a contribution from CEC. (Tr. v. I at 43). One "clear alternative," he said, would be to base a reorganization "solely around the values of operating assets." (*Id.* at 44). Because the business is strong, "[w]e can provide a distribution to creditors under a plan of reorganization based on the franchise itself." (*Id.* at 64).

But Millstein explained that the business was just one of the "two significant sources of value"; the other was the estate's claims against CEC arising out of the disputed transactions. (*Id.* at 43-44). A plan based on the strength of the business would still entail pursuing those claims post-confirmation, probably through a litigation trust. (*Id.*). The claims are vital estate assets, in other words, and a reorganization will either settle them (as the RSAs attempt to do) or allow them to be pursued later on for the benefit of creditors. Regardless, the claims remain a critical component of any reorganization, a component that adverse judgments in the guaranty litigation would jeopardize.

Because the debtors' reorganization depends, one way or another, on the estate's claims against CEC, because CEC does in fact "lack the money to satisfy all its obligees," *Caesars*, 808

-13-

## STATEMENT

F.3d at 1189, and because CEC will indeed be "drained of capital by the lenders' suits to enforce the guaranties" if those suits are not enjoined before adverse judgments are entered, *id.*, an injunction of the BOKF action, the action with an imminent trial date, is appropriate.

### b.  The Public Interest

A temporary injunction halting the trial in the BOKF action also serves the public interest.  Enjoining the action will promote an overall settlement as well as the debtors' reorganization.

In the bankruptcy context, the public interest is the interest in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public.  *See Gander Partners*, 432 B.R. at 789 (calling it "one of the most important public interests" (internal quotation omitted)); *Lazarus*, 161 B.R. at 901; *Monroe*, 67 B.R. at 756.  The debtors unquestionably have considerable value, not only as a going concern but because of the estate's claims against CEC.  (*See* Tr. v. I at 43-44).  Enjoining the guaranty litigation – at least, the BOKF action on the brink of trial – will maintain the value of those claims (by protecting the CEC assets that would pay them) while allowing settlement discussions out from under the immediate threat of an adverse judgment.  *See Caesars*, 808 F.3d at 1189 (stating that the interest of all creditors in receiving more rather than less in the bankruptcy case "would be furthered by a temporary injunction staying the lenders' lawsuits against CEC").

The other relevant public interest here is the interest in settlement itself.  *See United Health Care*, 210 B.R. at 234 (declining to exempt creditor from previous section 105(a) injunction based in part on "the public interest in promoting out-of-court settlements").  As the court of appeals said in its opinion, "successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives," *Caesars*, 808 F.3d at 1189, and indeed public policy favors settlements generally, *National Cas. Co. v. White Mountain Reins. Co.*, 735 F.3d 549, 556 (7th Cir. 2013).  The purpose of the injunction here is to give the parties "a clear shot at negotiating an overall settlement." *Caesars* 808 F.3d at 1189.

The guaranty creditors do not question these interests but contend with some force that their right to recover separately on CEC's guarantees of CEOC's obligations is what they bargained for.  Exercising that right unhindered by the primary obligor's bankruptcy is the point of securing a guaranty.  *See Lyondell*, 402 B.R. at 593 (noting the argument that "guaranties are an important device in commercial transactions" the purpose of which is to protect parties "from the insolvency of the primary obligor").

Of course, "guaranties should be respected and honored wherever possible, and . . . courts should be wary of placing limits on the enforcement of commercial guaranties except in cases of the most pressing need." *Id.*  But that does not mean "the enforcement of guaranties can *never* be

-14-

## STATEMENT

blocked." *Id.* at 593-94 (emphasis added). Sometimes "the needs and concerns of other creditors simply trump commercial predictability." *Id.* at 594. This is one of those times – particularly since CEC had no assets other than its equity interest in CEOC when it gave the guarantees. (Tr. v. I at 70). Only as a result of the disputed transactions that give rise to the estate's claims against CEC does CEC have "independent value" that could satisfy the guaranty creditors' claims. (*Id.* at 70-71). The guaranty creditors are competing directly with the estate for the same assets. (*Id.* at 71).

Under these circumstances, the public interests in successful reorganizations and in settlements outweigh the guaranty creditors' interest in enforcing their guarantees.

### c. The Balance of the Equities

The balance of equities also heavily favors granting the debtors' motion.[9/] Without an injunction, the debtors stand to suffer very real harm. The guaranty creditors, in contrast, will suffer no particular harm from the temporary injunction the debtors have requested.

The debtors will be harmed if injunctive relief is not granted because the BOKF and UMB actions will proceed to trial and ultimately to judgment. If the result is unfavorable and the guarantees are reinstated and enforced, these creditors stand to obtain a judgment against CEC for $7.1 billion, more than twice the company's value. No longer will CEC be able to make a financial contribution to the debtors' reorganization. CEC will instead file its own bankruptcy. (Tr. v. I at 50 (CEC "will need to avail itself of a bankruptcy proceeding to protect its assets so as to provide an equitable distribution to its creditors")). The chances of a global settlement in the CEOC bankruptcy will be slim. The chances of a settlement that CEC funds will be nil.

It gets worse. If CEC files bankruptcy, Millstein said, the debtors will be forced to protect their own rights against CEC: rather than simply file claims in the CEC bankruptcy, the debtors will have to pursue equitable remedies for the return of the assets transferred to CEC. (*Id.* at 56-59 ("We will want the assets back and bring them into our estate so as not to have the competition from the guarantee claims diluting our recoveries . . . ."). In effect, the debtors will be "litigating for the return of property from one estate in favor of another estate." (*Id.* at 59). The result will be "a very different bankruptcy case" (*id.* at 50), one with an unrivaled "litigation

---

[9/]    As the court observed in its first decision, it is unclear whether the equities must be weighed before issuing a section 105(a) injunction. *See Caesars*, 533 B.R. at 728 n.13. Typically, a plaintiff moving for a preliminary injunction must show the equities favor granting that relief, and some bankruptcy court decisions mention balancing the equities as a necessary step. *See id.* For purposes of this decision, the court assumes (without deciding) that the step is necessary.

A0119

**STATEMENT**

forum" and massive administrative expenses (*id.* at 57).  A CEC bankruptcy, Millstein predicted, would be "one of the great messes of our time."  (*Id.*).  "[A]ll creditors will regret the day that that occurs."  (*Id.*).

The guaranty creditors, on the other hand, stand to lose nothing but time if an injunction is granted – and not much time at that.  The BOKF and UMB actions set for trial on March 14 will merely be delayed for a brief period after the examiner submits his initial report.  If there has been no resolution of the bankruptcy and the injunction expires, BOKF and UMB will be free to pursue their actions.  The guaranty creditors identify no particular harm from a short delay.  *See Lazarus*, 161 B.R. at 901 (finding no harm where injunction would "merely delay the enforcement" of creditor's rights); *F.T.L.*, 152 B.R. at 64 (same); *Monroe*, 67 B.R. at 755 (same).  Certainly, any harm to them fails to compare with the potential harm to the debtors if injunctive relief is denied.  *See Lyondell*, 402 B.R. at 592 (finding the balance weighed in favor of debtors where creditors would "merely be delayed somewhat" if an injunction were granted and its denial would produce an "incalculable disaster").

The guaranty creditors, though, object to any delay at all.  They point out that CEC is a defendant in other litigation, litigation the debtors have not sought to stop, and they see no reason why their actions should be delayed when others are not.

The guaranty creditors are mistaken.  The debtors' adversary proceeding against NRF sought what was effectively a section 105(a) injunction, and they moved for that relief.  (*See Caesars Entm't Operating Co., Inc., et al. v. Board of Trustees of the Nat'l Retirement Fund, et al.*, No. 15 A 131 (Bankr. N.D. Ill.), Dkt. Nos. 6, 8 (incorrectly seeking to "extend[ ] the automatic stay")).  All litigation between the debtors and NRF in this district has since been stayed or deadlines extended by agreement to allow the parties to discuss settlement.  Litigation between Hilton and the debtors has likewise been stayed by agreement for the same purpose.  The debtors have not asked to have the UMB action enjoined, but UMB has agreed to be bound by the order addressing the BOKF action.  The debtors have not asked to have the Wilmington Trust action enjoined, but that action is in its early stages.  CEC only filed its answer at the end of November 2015 (*Wilmington Trust, N.A. v. Caesars Entm't Corp.*, No. 15-cv-8280 (SAS) (S.D.N.Y.), Dkt. No. 24), and the docket in the action shows no trial date has been set.

At the June 2015 hearing, the guaranty creditors also contended that CEC's threat to file bankruptcy was a bluff.  Given the chance, they would doubtless argue now that subsequent events have proved them right:  nine months have passed since the hearing, and CEC still has not filed bankruptcy.

No evidence at the hearing showed CEC was bluffing.  Steven Zelin, senior managing director at Blackstone Group (CEC's investment banker and financial advisor), specifically rejected the notion.  (Tr. v. II at 59-60).  Although CEC has indeed not filed bankruptcy yet, none

-16-

**A0120**

## STATEMENT

of the guaranty actions has gone to judgment.  The evidence was clear last June that with BOKF about to move for summary judgment, CEC was considering a bankruptcy filing (Tr. v. I at 116, 209), and there was a "substantial risk" CEC would file one (*id.* at 116,; *see also id.* at 55, 67-68, 208-10; Tr. v. II at 59-60, 130).  Just days after the hearing, UMB filed its action seeking more than $6 billion, and the BOKF and UMB actions are on the brink of trial.  Whatever the situation last June, CEC now risks an adverse judgment more than double the value of the company.  A judgment that size will compel a bankruptcy.

The guaranty creditors complain, finally, that an injunction will effectively grant CEC bankruptcy relief without CEC's filing a bankruptcy.  Quoting *Saxby's Coffee*, the guaranty creditors argue that "to enjoy the benefits of bankruptcy a recipient needs to suffer the burdens." *Saxby's Coffee*, 440 B.R. at 378 (internal quotation omitted); *see also In re National Staffing Servs., LLC*, 338 B.R. 35, 37 (Bankr. N.D. Ohio 2005).

The principle the guaranty creditors cite is sound enough.  What *Saxby's Coffee* actually said, though, is that the issuance of a section 105(a) injunction is "an exception" to that principle. *Id.*  Because it is, courts do stress that injunctive relief under section 105(a) is an "extraordinary and drastic remed[y]," *Regency*, 179 B.R. at 720; *National Staffing*, 338 B.R. at 37 ("a dramatic measure to be used cautiously"), one to be invoked "sparingly," *In re Third Eighty-Ninth Assocs.*, 138 B.R. 144, 146 (S.D.N.Y. 1992) (internal quotation omitted), and in "limited circumstances," *Teknek*, 563 F.3d at 648.  And it should be invoked sparingly not least because it is no small thing to "meddle with proceedings in another court . . . ."  *Caesars*, 533 B.R. at 744.

Under the circumstances here, however – where a brief delay of the BOKF action will give the parties an opportunity to negotiate an overall settlement of this "immense, and immensely complicated," bankruptcy, *Caesars*, 808 F.3d at 1187, enhancing the prospects of settlement and potentially staving off "one of the great messes of our time" (Tr. v. I at 57) – injunctive relief is clearly "'appropriate,'" *Caesars*, 808 F.3d at 1189 (quoting 11 U.S.C. § 105(a)).

### d.  The Wilmington Savings Action

With the BOKF action enjoined and the debtors' motion to enjoin the MeehanCombs and Danner actions continued, only the Wilmington Savings action remains.  Unlike the BOKF action, no trial date has been set in that action.  Fact discovery has concluded, but expert discovery is continuing without a cut-off.  Preliminary injunctions are meant to be emergency relief, granted when there is "an urgent need for speedy action to protect the movant's rights." *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 201 (Bankr. S.D.N.Y. 1992).  If there is currently no urgent need to enjoin the MeehanCombs and Danner actions with a May trial date, there is no need whatever to enjoin the Wilmington Savings action with no trial date.  The debtors' motion will be continued as to the

**STATEMENT**

Wilmington Savings action as well.

### e.  Bond

Citing Rule 65(c) of the Federal Rules of Civil Procedure, the guaranty creditors argue that at the very least the debtors should have to post a bond.  When a preliminary injunction is entered in a civil action in the district court, Rule 65(c) demands a bond.  Fed. R. Civ. P. 65(c); *see Roche Diagnostics Corp. v. Medical Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011) ("Normally, an injunction bond or equivalent security is essential.").  Bankruptcy Rule 7065, on the other hand, provides that a "preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."  Fed. R. Bankr. P. 7065; *see In re Gervin*, 300 F. App'x 293, 300 (5th Cir. 2008) (finding the bankruptcy court did not abuse its discretion in refusing to require a bond); *Lyondell*, 402 B.R. at 594-95 (noting that Rule 7065 makes "posting a bond optional" and declining to require one).

No bond will be required here.  The guaranty creditors offer no reason (apart from the inapplicable Rule 65(c) itself) for requiring one.  They have not shown, or even attempted to show, that a preliminary injunction will damage them in any way.  At most, the injunction will delay the guaranty creditors' in asserting their rights for a time, but that time will be reasonably short.  The chances that these creditors sustain any damage from that delay are consequently remote.  Because they are remote, there is no reason to "depart from the general rule" in bankruptcy cases that a bond is unnecessary when a debtor in possession is granted preliminary injunctive relief.  *Lyondell*, 402 B.R. at 595.

### 4.  Conclusion

The motion of debtors Caesars Entertainment Operating Co., Inc. and subsidiaries to stay or in the alternative for injunctive relief is granted in part and continued in part.  As to defendant BOKF, N.A., the motion is granted.  BOKF, N.A. is enjoined from pursuing the action styled *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-cv-1561 (SAS) (S.D.N.Y.), until (a) 60 days after the examiner files his initial report in the bankruptcy case, or (b) May 9, 2016, whichever comes first.  As to the remaining defendants, the motion is continued for further status.  A separate scheduling order will be entered.

Dated: February 26, 2016

A. Benjamin Goldgar
United States Bankruptcy Judge

-18-

**A0122**

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT | ) | No. 15 B 1145 |
| OPERATING CO., INC., *et al.*, | ) | (Jointly administered) |
| | ) | |
| Debtors. | ) | |
| ———————————————— | ) | |
| | ) | |
| CAESARS ENTERTAINMENT | ) | |
| OPERATING CO., INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 15 A 149 |
| | ) | |
| BOKF, N.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

## <u>MEMORANDUM OPINION</u>

This adversary proceeding is before the court for ruling after an evidentiary hearing on the

motion of the debtors – Caesars Entertainment Operating Co., Inc. ("CEOC") and more than 170

of its subsidiaries – for a preliminary injunction under section 105(a) of the Bankruptcy Code, 11

U.S.C. § 105(a), to halt four civil actions against CEOC's non-debtor parent, Caesars

Entertainment Corp. ("CEC") in other courts.

The actions arise out of nearly $4.6 billion in second lien and senior unsecured notes that

CEOC issued and CEC guaranteed. The plaintiffs in the four actions – indenture trustees and

holders of the notes[1] – brought the actions after CEC claimed that two 2014 transactions

---

[1]   The plaintiffs are (1) Wilmington Savings Fund Society, FSB ("Wilmington"); (2)
BOKF, N.A. ("BOKF"); (3) MeehanCombs Global Credit Opportunities Master Fund, LP;
Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust; SB 4 CF LLC;

involving CEC had released the guarantees.  The actions seek damages from CEC for breach of

contract (among other things) as well as declaratory judgments that the guarantees are still in

effect.  The debtors contend the actions should be enjoined because their prosecution threatens

the success of the debtors' chapter 11 cases.  The plaintiffs in the four actions – defendants here –

oppose the debtors' request.

These are the court's findings of fact and conclusions of law pursuant to Rule 52(a)(2) of

the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52(a)(2) (made applicable by Fed. R. Bankr.

P. 7052).  Because the debtors have not shown they are entitled to the injunctive relief they

request, their motion will be denied.

## 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a)

and the district court's Internal Operating Procedure 15(a).  This is a core proceeding under 28

U.S.C. § 157(b)(2)(A).  *See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville*

*Corp.)*, 801 F.2d 60, 64 (2d Cir. 1986).

Two of the four defendants here, MeehanCombs and Danner, contest jurisdiction.  They

contend a bankruptcy court lacks subject matter jurisdiction to enjoin proceedings in other courts.

They are mistaken.  The grant of bankruptcy jurisdiction appears in section 1334 of Title

28 of the U.S. Code.  Section 1334(a) confers on the district court original and exclusive

jurisdiction over all bankruptcy cases.  28 U.S.C. § 1334(a).  Section 1334(b), in turn, confers on

the district court non-exclusive jurisdiction over proceedings "arising under title 11" as well as

---

CFIP Ultra Master Fund, Ltd.; and (4) Trilogy Portfolio Co., LLC (collectively, "MeehanCombs");
and (4) Frederick Barton Danner, as representative of a plaintiff class ("Danner").

**A0124**

proceedings "arising in" or "related to" cases under title 11. 28 U.S.C. § 1334(b). Under section 157(a), district courts may refer those proceedings to the bankruptcy court. 28 U.S.C. § 157(a). In referred matters (and in this district all matters are automatically referred), the bankruptcy courts therefore exercise the jurisdiction of district court. *See generally Executive Benefits Ins. Agency v. Arkison*, ___ U.S. ___, 134 S. Ct. 2165, 2171 (2014).

The court has jurisdiction over this proceeding because it is one "arising under" Title 11.[2] A proceeding "arises under" the Code if the claim in the proceeding is "created or determined by a statutory provision of title 11." *Nelson v. Welch (In re Repository Techs., Inc.)*, 601 F.3d 710, 719 (7th Cir. 2010); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987). The claim here, a claim to enjoin civil actions in other courts, is created by section 105(a) of the Code. *See Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998); *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993); *In re Energy Coop., Inc.*, 886 F.2d 921, 929 (7th Cir. 1989). The proceeding to decide that claim is therefore one over which the bankruptcy court has jurisdiction.[3]

---

[2]    MeehanCombs argues that the court lacks subject matter jurisdiction over the claims in the actions themselves. But the debtors are not asking the court to assert jurisdiction over those claims. They are asking the court to enjoin their continued prosecution. Jurisdiction to do the one does not depend on jurisdiction to do the other. Ralph Brubaker, *Nondebtor Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten Callaway v. Benton Case*, 72 Am. Bankr. L.J. 1, 44-45 (1998) ("A temporary status quo injunction simply does not adjudicate the parties' underlying dispute. Thus, jurisdiction to temporarily stay an action is not dependent upon jurisdiction to adjudicate the parties' controversy."). In *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), the Court implicitly rejected the dissent's view that if a bankruptcy court lacks jurisdiction to decide a claim, that court cannot enjoin another court, a court plainly having jurisdiction, from deciding it. *See id.* at 323-24 (Stevens, J., dissenting).

[3]    The Court in *Celotex* concluded that the bankruptcy court had "related to" jurisdiction over a request for a section 105 injunction. *Celotex*, 514 U.S. at 309. In doing so, however, the Court left open the possibility that there might be "arising under" or "arising in" jurisdiction. The Court acknowledged that possibility in passing and remarked: "We need not and do not decide this question here. " *Id.* at 311 n.8.

-3-

**A0125**

Not only is there jurisdiction, but because the claim asserted is one "arising under" the Code, the proceeding is also a "core" proceeding. *See* 28 U.S.C. § 157(b); *Stern v. Marshall*, ___ U.S. ___, ___, 131 S. Ct. 2594, 2603 (2011) (discussing the statutory definition of "core" proceedings). Therefore, it is a proceeding in which the bankruptcy court can enter a final judgment. *Johns-Manville*, 801 F.2d at 64 (stating that a section 105 injunction claim is core); *Spiers Graff Spiers v. Menako (In re Spiers Graff Spiers)*, 190 B.R. 1001, 1008 (Bankr. N.D. Ill. 1996) (same); *Carabetta Enters., Inc. v. City of Asbury Park (In re Carabetta Enters., Inc.)*, 162 B.R. 399, 403 (Bankr. D. Conn. 1993) (same); *Gathering Rest., Inc. v. First Nat'l Bank of Valparaiso (In Gathering Rest., Inc.)*, 79 B.R. 992, 997-98 (Bankr. N.D. Ind. 1987) (same); *Rustic Mfg., Inc. v. Marine Bank (In re Rustic Mfg., Inc.)*, 55 B.R. 25, 29 (Bankr. W.D. Wis. 1985) (same); Brubaker, *supra*, 72 Am. Bankr. L.J. at 42-47.

MeehanCombs and Danner express particular concern over an Article I court enjoining proceedings in an Article III court. They argue that such an injunction would be unconstitutional, a separation of powers violation.

But they cite no decision reaching that conclusion, and there appears to be none. In *Celotex*, the Court upheld a bankruptcy court's jurisdiction to enjoin proceedings in a federal district court – an Article III court. *Celotex*, 514 U.S. at 309. The Court did so in the face of a dissent complaining that "the majority attaches insufficient weight to the fact that the challenged injunction was issued by a non-Article III judge . . . ." *Id.* at 313-14. The leading decision on section 105 injunctions in this circuit, *Fisher v. Apostolou*, likewise affirmed a bankruptcy court's injunction halting proceedings in a district court. *Fisher*, 155 F.3d at 878. The Supreme Court in *Celotex* and the Seventh Circuit in *Fisher* evidently detected no separation of powers problem. *See also In re A.H. Robins Co.*, 788 F.2d 994, 1003 (4th Cir. 1986) (declaring that

-4-

**A0126**

bankruptcy courts have jurisdiction to enjoin actions "in other courts, whether state or federal").[4/]

Because the debtors' section 105 injunction claim is one "arising under" the Code (and at the very least is "related to" these bankruptcy cases), the court has jurisdiction to decide it. 28 U.S.C. § 1334(b).

## 2.  Facts

The facts are drawn from the evidence adduced at the hearing and from the dockets in the bankruptcy cases. *See CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 738 n.5 (Bankr. N.D. Ill. 2008) ("The court can take judicial notice of its own docket entries.").

### a.  CEC and the Debtors

The debtors in these jointly-administered chapter 11 cases are the primary operating units of a larger group of companies described as "the Caesars gaming enterprise" (collectively, "Caesars"). (MC Ex. 19 at 1).[5/]  The debtor in the lead case is CEOC; the debtors in the other cases are subsidiaries of CEOC.  The majority owner of CEOC is CEC.  (Tr. v. II at 148).  CEC

---

[4/]     With one exception, MeehanCombs and Danner base their argument entirely on decisions issued before *Celotex*, such as *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969 (N.D. Ill. 1992).  The one exception is an unpublished decision, *In re Receivership Estate of Indian Motorcycle Mfg., Inc.*, No. CIV.A. 95-Z-777, 2002 WL 507543 (D. Colo. Feb. 28, 2002), that relied on *Mahurkar*. *Id.* at *1-2.  Neither *Mahurkar* nor *Indian Motorcycle* mentioned separation of powers.  And neither decision is relevant anyway.  Each concerned a bankruptcy court's power to prevent a district court from deciding the effect of the automatic stay on the action before it – not the issue here.

[5/]     The debtors' exhibits are cited "P. Ex. ___."  The defendants' joint exhibits are cited as "Def. J. Ex. ___."  The supplemental exhibits of the plaintiffs in the MeehanCombs action are cited as "MC Ex. ___."  The transcript is cited by volume and page number: "Tr. v. ___ at ___."

-5-

**A0127**

is not a debtor here.

Caesars owns, operates, or manages fifty casinos in five countries, including the United States. (MC Ex. 19 at 2). All told, Caesars has 68,000 employees and oversees 3 million square feet of gaming space as well as 39,000 hotel rooms. (*Id.* at 2-3). The debtors own, operate, or manage thirty-eight of the casinos. (*Id.* at 3-4). In its most recent fiscal year, Caesars had revenues in excess of $8 billion, of which the debtors contributed more than $5 billion. (*Id.*).

### b. The Senior Unsecured Notes

In September 2005, CEOC and CEC entered into an indenture with U.S. Bank N.A. as indenture trustee (the "2005 indenture"). (MC Ex. 19 at 27; Def. J. Ex. 88 at 9; MC Ex. 1 at 11; P. Ex. 40). Pursuant to the 2005 indenture, CEOC issued $750 million in notes due 2017 with an interest rate of 5.75 percent. (MC Ex. 19 at 21; Def. J. Ex. 88 at 9; MC Ex. 1 at 11). In June 2006, CEOC and CEC entered into a second indenture with U.S. Bank as indenture trustee (the "2006 indenture"). (MC Ex. 19 at 27; Def. J. Ex. 88 at 2; MC Ex. 1 at 11; P. Ex. 41). Pursuant to the 2006 indenture, CEOC issued another $750 million in notes, these due 2016 with a 6.50 percent interest rate. (MC Ex. 19 at 21; Def. J. Ex. 88 at 9; MC Ex. 1 at 11).

CEOC's obligations under the 2016 and 2017 notes were unsecured (MC Ex. 19 at 27), but CEC guaranteed CEOC's obligations under the indentures and the notes (Def. J. Ex. 88 at 9; MC Ex. 1 at 11; P. Ex. 40 at Art. XII; P. Ex. 41 at Art. XV). MeehanCombs holds $15,318,000 of the 2016 notes and $5,632,000 of the 2017 notes. (MC Ex. 1 at 11). Danner holds $104 million of the 2016 notes. (Def. J. Ex. 88 at 2; P. Ex. 80A; Tr. v. II at 163-64, 244-45).[6]

---

[6]    At the hearing, the amount of Danner's 2016 notes was said to total $119 million. (*See* P. Ex. 80A). That figure, it was eventually explained, includes the $15 million in 2016 notes that MeehanCombs holds. (Tr. v. II at 244-45).

-6-

**A0128**

### c. The 2008 Leveraged Buyout

In 2008, affiliates of Apollo Global Management, LLC ("Apollo") and TPG Capital LP ("TPG"), along with other investors, acquired CEC (and thus its subsidiaries) in a $30.7 billion leveraged buyout. (MC Ex. 19 at 4, 16). Apollo, TPG, and the investors paid $6.1 billion of that amount in cash; the remainder was funded through the issuance (presumably by CEOC) of roughly $24 billion in debt. (*Id.*; *see generally* Tr. v. II at 153-56 (describing the debtors' capital structure)). Of the $24 billion, $19.7 billion was secured by liens on substantially all of the debtors' assets. (MC Ex. 19 at 4).

### d. The Second Lien Notes

In 2009, CEC and CEOC entered into an indenture with U.S. Bank as indenture trustee (the "2009 indenture"). (MC Ex. 19 at 25; Def. J. Ex. 44 at 2, 18; P. Ex. 45). Pursuant to the indenture, CEOC issued $3.71 billion in notes due 2018 with an interest rate of 10 percent. (Def. J. Ex. 44 at 18). CEOC's obligations under the notes were secured by second priority liens on, among other things, substantially all of CEOC's assets. (MC Ex. 19 at 25; Def. J. Ex. 44 at 18). In addition, CEC guaranteed CEOC's obligations under the indenture and the notes. (Def. J. Ex. 44 at 18; P. Ex. 45 at Art. XII).

In 2010, CEC and CEOC entered into still another indenture with U.S. Bank as indenture trustee (the "2010 indenture"). (MC Ex. 19 at 24-25; Def. J. Ex. 41 at 19; Def. J. Ex. 44 at 18; P. Ex. 52). Pursuant to the indenture, CEOC issued $750 million in notes due 2018, these with an interest rate of 12.75 percent. (Def. J. Ex. 41 at 19; Def. J. Ex. 44 at 18). CEOC's obligations under the notes were secured in part by second priority liens on substantially all of CEOC's assets. (MC Ex. 19 at 25; Def. J. Ex. 41 at 19; Def. J. Ex. 44 at 18-19). As with the other second

-7-

lien notes, CEC guaranteed all of CEOC's obligations under the 2010 indenture and the notes.

(Def. J. Ex. 41 at 20; Def. J. Ex. 44 at 19; P. Ex. 52 at Art. XII).

Wilmington succeeded U.S. Bank as indenture trustee under the 2009 indenture.  (Def. J.

Ex. 44 at 2).  BOKF succeeded U.S. Bank as the indenture trustee under the 2010 indenture.

(Def. J. Ex. 41 at 8).[2]

### e. The Economy

Unfortunately for Caesars' new owners, they acquired the gaming enterprise at the

beginning of the 2008 financial crisis and resulting recession.  (MC Ex. 19 at 5, 28).  For several

years thereafter, casinos worldwide struggled as spending on travel and entertainment declined.

(*Id.*).  But even after the economy began to recover, CEOC's total revenues continued to decline,

a result of increased competition in the gaming industry and the industry's reduced share of

overall consumer spending on travel and entertainment.  (*Id.* at 5, 28-31).  With declining

revenues, CEOC found itself unable to generate cash flow sufficient to service the "substantial

debt load" remaining from the 2008 buyout.  (*Id.* at 5; Tr. v. I at 61).

### f. The "Disputed Transactions"

Beginning in 2009 or so, Caesars sought to "restructure and manage" CEOC's debt.  (MC

Ex. 19 at 31).  Caesars engaged in more than forty-five "capital market transactions," including

"asset sales, exchange and tender offers, debt repurchases and re-financings."  (*Id.* at 6).

_____

[2]     These are by no means the only notes that CEOC has issued and CEC has
guaranteed.  As of December 31, 2014, CEOC had outstanding $6.345 billion in first lien notes,
$5.238 billion in second lien notes, and $530 million in senior unsecured notes.  (MC Ex. 19 at
21).  CEC's total potential liability on guaranty claims related to these notes is approximately $12
billion.  (Tr. v. I at 46, 97).

According to the debtors, these transactions were designed to "extend debt maturities, meet interest obligations, monetize assets[,] and transfer debt and capital expenditure obligations at properties CEOC could not afford to invest in." (*Id.*).

Before the transactions, however, CEC was a holding company that owned 100 percent of CEOC; CEC had no other assets. (Tr. v. I at 70) ("At the time the guarantees [of the second lien and senior unsecured notes] were given [CEC] was a holding company. It had nothing in it other than the equity in CEOC."). Only as a result of the assets that CEC obtained through the various transactions did it come to have "independent value," meaning value beyond its ownership interest in CEOC. (*Id.* at 70-71; *see also id.* at 129). As of January 2015, CEC had a market capitalization of $1.8 billion (MC Ex. 19 at 16) and an enterprise value of roughly $3 billion (Tr. v. I at 50-51, 98).

As a consequence, many of CEOC's creditors take a different view of many if not all of the transactions (collectively, the "disputed transactions"). They consider them part of a carefully orchestrated plan to "strip CEOC of valuable assets," moving those assets "beyond the reach of CEOC's creditors." (Def. J. Ex. 44 at 3, 5; *see also* Def. J. Ex. 41 at 60; Def. J. Ex. 42 at 13-15; Def. J. Ex. 43 at 33-34). The plan's goal as well as its effect, these creditors suggest, was to create a "Good Caesars" (CEC and its affiliates, holding prime assets that once belonged to CEOC) and a "Bad Caesars" (CEOC, left with barely profitable or unprofitable properties and burdened with debt remaining from the 2008 leveraged buyout). (Def. J. Ex. 41 at 22-24; Def. J. Ex. 44 at 7; *see also* Def. J. Ex. 42 at 15 (describing the disputed transactions as designed to create a "Solvent Caesars" and an "Insolvent Caesars")).

Two of these transactions gave rise to the actions the debtors want enjoined.

-9-

### i. The "B-7 Refinancing"

The first was a transaction the debtors and others call the "B-7 Refinancing."  In May

2014, CEC and CEOC had CEOC amend its first lien credit agreement and obtain an additional

$1.75 billion in new term loans.  (MC Ex. 19 at 35; Def. J. Ex. 41 at 35).  The first lien credit

agreement was amended in ways beneficial to CEC (MC Ex. 19 at 36), and the loan proceeds

were used to retire certain outstanding debt (MC Ex. 19 at 36; Def. J. Ex. 41 at 35).

More important, as part of the same transaction CEC sold 68.1 shares, or five percent, of

CEOC common stock for $6.15 million to institutional investors not affiliated with CEC.  (MC

Ex. 19 at 35; Def. J. Ex. 41 at 35).  CEC then took the position that the stock sale had released its

guaranty of CEOC's obligations under its first and second lien notes (MC Ex. 19 at 36; Def. J.

Ex. 41 at 36), announcing that position publicly in a Form 8-K filed with the SEC on May 6,

2014 (Def. J. Ex. 41 at 36).  CEC took that position, apparently, because it believed the relevant

indentures terminated the guaranty if CEOC ceased to be a wholly-owned subsidiary of CEC.

(*See* Def. J. Ex. 41 at 4).  CEOC takes the same position here.  (*See* MC Ex. 19 at 7).[8/]

### ii. The "Senior Unsecured Notes Transaction"

The second transaction was one the debtors and others call the "Senior Unsecured Notes

Transaction."  On August 12, 2014, CEC and CEOC consummated a transaction with certain

holders of CEOC's outstanding senior unsecured notes.  (MC Ex. 19 at 36).  The noteholders

involved in the transaction held more than 51 percent of the senior unsecured notes.  (*Id.*).  In the

transaction, CEC and CEOC repurchased $155.4 million of the notes, with CEC and CEOC each

---

[8/]     Less than a month later, in June 2014, CEC allegedly disposed of more CEOC
common stock, transferring 6 percent of its CEOC stock to an employee benefits plan.  (Def. J.
Ex. 41 at 42-43).

paying the noteholders $77.7 million as well as accrued and unpaid interest. (*Id.* at 36-37; Def. J. Ex. 42 at 2; Def. J. Ex. 43 at 3, 22).

As part of the transaction, the indentures were amended so that the selling noteholders agreed to support any future restructuring that had the consent of at least 10 percent of holders of senior unsecured notes still outstanding. (MC Ex. 19 at 37; Def. J. Ex. 42 at 3). The participating noteholders also entered into supplemental indentures that modified the provisions restricting disposition of "substantially all" of CEOC's assets and – most important – removed CEC's guaranty of the senior unsecured notes. (MC Ex. 19 at 37; Def. J. Ex. 42 at 3; Def. J. Ex. 43 at 23).

### g. The Delaware and New York Actions

The two transactions, and especially the purported release of CEC's guarantees, did not sit well with the second lien noteholders or with the senior unsecured noteholders (at least those who had not participated in the Senior Unsecured Notes Transaction). A flurry of litigation ensued.

On August 4, 2014, Wilmington filed an action in the Delaware Court of Chancery against CEC, CEOC, and other defendants, including other CEC affiliates, directors and officers of CEC, and directors of CEOC. (MC Ex. 19 at 40; *see* Def. J. Ex. 44). Of the nine counts in Wilmington's complaint, two are relevant here. Count II is a claim for damages against CEC alleging that the B-7 Refinancing breached the 2009 indenture in various ways and also breached CEC's implied duty of good faith and fair dealing. (Def. J. Ex. 44 at 62-64). Count III is a claim against CEC seeking a declaratory judgment that CEC's guaranty of the notes subject to the 2009 indenture has not been released but remains enforceable. (*Id.* at 65-68).

-11-

A month later, on September 3, 2014, MeehanCombs brought an action against CEC and CEOC in the U.S. District Court for the Southern District of New York. (MC Ex. 19 at 41; *see* Def. J. Ex. 43). The MeehanCombs complaint has eight counts, all directed at both CEC and CEOC, and all alleging claims based on the Senior Unsecured Notes Transaction. (Def. J. Ex. 43). Counts I and II request declaratory judgments that the guarantees in the 2005 and 2006 indentures are still in effect and the supplemental indentures are void. (*Id.* at 24-29). Count III is a claim for damages under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb (the "TIA"). (*Id.* at 29-32). Counts IV through VII are claims for damages alleging that CEOC and CEC breached the indentures and guarantees. (*Id.* at 32-37). Count VIII is a damages claim for breach of the duty of good faith and fair dealing. (*Id.* at 37-41).[9]

On October 2, 2014, Danner filed a class action against CEC and CEOC in the same district. (MC Ex. 19 at 41; *see* Def. J. Ex. 42). The Danner complaint has five counts. As with the MeehanCombs complaint, all of the counts are directed at both CEC and CEOC, and all contest the Senior Unsecured Notes Transaction. (Def. J. Ex. 42). Count I requests a declaratory judgment that the original 2006 indenture is in effect and the supplemental indenture is void. (*Id.* at 18-20). Count II is a claim for damages under the TIA. (*Id.* at 20-21). Counts III and IV are damage claims alleging breaches of the 2006 indenture. (*Id.* at 21-23). Count V is a damages claim for breach of the duty of good faith and fair dealing. (*Id.* at 23-26).[10]

---

[9]    In January 2015, MeehanCombs filed an amended complaint. (MC Ex. 1). The claims remained the same; the complaint was amended only to make clear that in light of these bankruptcy cases, MeehanCombs was not seeking to pursue the action against CEOC. (*Id.* at 2).

[10]    Like the MeehanCombs complaint, the Danner complaint was later amended to make clear that because of these bankruptcy cases, the Danner claims were no longer being asserted against CEOC. (Def. J. Ex. 88 at 1-2).

In March 2015, six months after the Danner action was filed, BOKF filed an action against CEC alone in the Southern District of New York. (Def. J. Ex. 41). The complaint has seven counts. As with the Wilmington complaint, all the counts in the BOKF complaint concern the B-7 Refinancing. Counts I, III, and IV are claims for damages alleging that CEC breached the guaranty and the 2010 indenture. (*Id.* at 52-53, 57-59). Count II requests a declaratory judgment that the guaranty was not released and is still in effect. (*Id.* at 53-57). Counts V, VI, and VII are damage claims asserting, respectively, TIA violations, intentional interference with contractual relations, and breach of the duty of good faith and fair dealing. (*Id.* at 60-65).

In May 2015, the district court hearing the BOKF action (as well as the MeehanCombs and Danner actions) was notified that BOKF planned to move for partial summary judgment on Counts II and V of its complaint even though BOKF had taken no discovery and discovery would not close for some months. (*See* Def. J. Ex. 136). CEC asked the district court to defer consideration of the motion, *see* Fed. R. Civ. P. 56(b) (allowing a party to move for summary judgment at any time unless "the court orders otherwise"), but the court declined to do so and set a briefing schedule on the motion (Def. J. Ex. 136; *see also* Tr. v. I at 139-40). BOKF filed its motion on June 25, 2015. (*See BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-cv-1561 (SAS), Dkt. No. 30).[11]

### h. Insurance

CEC and CEOC notified their insurers about each of the four actions. (Tr. v. II at 179-80). CEC is the named insured under a $15 million management liability policy with National

---

[11]    The court can take judicial notice of the records of other courts in related matters. *Bank of Commerce & Trust Co. v. Strauss (In re Strauss)*, 523 B.R. 614, 623 n.7 (Bankr. N.D. Ill. 2014).

Union Fire Insurance Company of Pittsburgh. (*See* P. Ex. 65). Other insureds under the policy are CEC's subsidiaries (including CEOC), CEC's officers and directors, and officers and directors of CEC's subsidiaries. (Tr. v. II at 171).

The policy provides four forms of coverage, three of which are relevant. The policy pays the losses of directors and officers who have no indemnification from CEC or any subsidiary. (P. Ex. 65 at 2957). It pays the losses of CEC and any subsidiary for payments made on behalf of indemnified officers and directors. (*Id.*) And it pays the losses of CEC and the subsidiaries themselves – but only losses arising from a "securities claim," a defined term. (*Id.*). This third coverage the policy calls "organization coverage." (*Id.*).

Claims under the policy are paid in a specified order. All covered losses of directors and officers without indemnification are paid first, then losses of directors and officers who have been indemnified. (*Id.* at 3013; Tr. v. II at 266). Only after payment of those losses are losses of CEC, CEOC, and the other subsidiaries as covered "organizations" paid. (*Id.*). Coverage also includes payment of defense costs. (P. Ex. 65 at 2977; Tr. v. II at 178-79).

The National Union policy, which has a self-insured retention of $1.25 million, is the first layer of $280 million in management liability insurance coverage from an assortment of insurers. (Tr. v. II at 174-75, 179, 221; MC Ex. 16). Coverage under each of the policies is similar. (Tr. v. II at 179). Only the initial $155 million of coverage, however, is available to CEC and its subsidiaries for their liabilities; the $125 million excess of the initial $155 million is coverage for officers and directors. (Tr. v. II at 174-75; MC Ex. 16).

In October 2014, National Union sent CEC a letter acknowledging that the MeehanCombs action involves a securities claim as defined in the policy but reserving rights on whether the Wilmington action is a securities claim. (P. Ex. 71 at 6). National Union noted in

-14-

A0136

the letter that "breach of contract and declaratory judgment claims are generally held to be uninsurable." (*Id.* at 7). Later the same month, National Union sent CEC a second letter acknowledging that the Danner action involves a securities claim. (P. Ex. 72 at 1). The second letter referred to the first National Union letter and deemed it applicable to the Danner action. (*Id.* at 2). National Union has not taken a position on the BOKF action. (Tr. v. II at 186). The excess carriers have taken positions on coverage consistent with National Union's position. (*Id.*).

The retention under the National Union policy has been met. (*Id.* at 181). No claims have yet been paid. (*Id.*). National Union has consented to the retention of defense counsel in the Wilmington, MeehanCombs, and Danner actions (*see* P. Exs. 71 at 8, 72 at 2) and presumably has paid and will continue to pay defense costs.

### i. The Special Governance Committee

In June 2014, shortly before the Wilmington action was filed, CEOC appointed to its board two independent directors and formed a Special Governance Committee of the board consisting of the two independent directors (the "SGC"). (MC Ex. 19 at 38). The SGC was given the task of investigating the disputed transactions and determining whether the debtors or their creditors (or both) have claims against CEC or its affiliates. (*Id.* at 38-39; *see also* Tr. v. I at 83).

In August 2014, the SGC began an investigation that has taken thousands of hours and required the analysis of tens of thousands of documents. (MC Ex. 19 at 39). Although the investigation is continuing and the SGC's specific conclusions have yet to be disclosed in these bankruptcy cases, the SGC apparently found that CEOC has "substantial claims" against CEC and its affiliates arising out of the disputed transactions, including claims for avoidable

-15-

preferences and fraudulent transfers.  (*Id.*; Tr. v. I at 50; Tr. v. II at 151; *see also* Tr. v. I at 35-36,

44-45 (calling the claims "an important estate asset"), 71, 82).

### j.  The Restructuring Support Agreement

Around the same time the SGC was starting its investigation, the debtors began

negotiating with CEOC's first lien creditors and with CEC over the terms of a possible

restructuring.  (MC Ex. 19 at 42; Tr. v. II at 18).  On December 19, 2014, the debtors, CEC, and

some of CEOC's first lien noteholders reached an agreement on the terms of a restructuring that

they documented in a Restructuring Support and Forbearance Agreement and accompanying term

sheet (the "RSA").  (*Id.* at 43; Tr. v. I at 127).

The terms of the RSA are complex (*see generally* P. Ex. 20), but only two aspects are

relevant here.  First, CEC agreed to make a financial contribution to the debtors' restructuring.

(P. Ex. 20, Ex. B at 11-13).  The contribution takes several different forms that need not be

described.  (*Id.*; *see also* MC Ex. 19 at 43-44; Tr. v. II at 279-80 (noting that the contribution is

"comprised of five different elements")).  The parties disagree about the contribution's monetary

value.  The debtors call the total contribution "substantial" (MC Ex. 19 at 11; Tr. v. I at 127) and

"significant" (MC Ex. 19 at 43; Tr. v. I at 35-36, 81), valuing it in excess of $2.5 billion (Tr. v. I

at 196).  The defendants are skeptical.  (*See generally* Tr. v. II at 14-52).  The exact value is

unimportant.

Second, in exchange for CEC's contribution under the RSA, CEOC agreed that its plan of

reorganization would provide for the release of all claims the estates had against CEC, its

affiliates (including Apollo and TPG), shareholders, officers, directors, and others.  (P. Ex. 20,

Ex. B at 12; *see also* Tr. v. I at 89-93; Tr. v. II at 56-57, 220).  Among other things, then, the

-16-

**A0138**

RSA would release CEC from more than $12 billion in noteholder guaranty claims (Tr. v. I at 97)

as well as from all claims the estates might have against CEC (*see id.* at 150; *see also* P. Ex. 20,

Ex. B at 12-13) in exchange for a CEC contribution of perhaps $2.5 billion.

The debtors find that sort of comparison unhelpful. They note that the RSA represents a

settlement of contested claims. (Tr. v. I at 36, 47, 58, 133). They also do not consider the RSA

to be fixed, let alone the plan that will ultimately be proposed for confirmation. (*Id.* at 39-40).

Rather, they say, the RSA is "a work in process" (*id.* at 65) that should serve as a basis for further

negotiation (*id.* at 64; Tr. v. II at 192). According to the debtors, the RSA is simply a "useful

device to get creditors to focus on a relative recovery and an absolute recovery . . . ." (Tr. v. I at

64-65).

Many of CEOC's creditors, on the other hand, and particularly the second lien

noteholders who do not stand to be paid much under it, view the RSA not as a way to spark

negotiations but rather as a "sweetheart deal." (*Id.* at 105). To them, the true beneficiary is CEC,

since the RSA effectively leaves CEC in control of the enterprise (Tr. v. II at 20-23, 38-39),

"exonerates [CEC] from liability for billions of dollars of transfers, . . . doesn't make it pay very

much money, and gives sweeping releases to everybody who got near those transfers" (Tr. v. I at

106).

### k. The Bankruptcy Cases

On January 12, 2015, less than a month after the execution of the RSA, three second lien

noteholders filed an involuntary bankruptcy petition against CEOC in the District of Delaware.

(*In re Caesars Entm't Operating Co.*, No. 15-10047-KG (Bankr. D. Del.), Dkt. No. 1). Three

days later, on January 15, 2015, CEOC and the other debtors filed voluntary chapter 11 petitions

-17-

**A0139**

in this district.  (Bankr. Dkt. No. 1).  After initially staying the voluntary cases (*In re Caesars*

*Entm't Operating Co.*, No. 15-10047-KG (Bankr. D. Del.), Dkt. No. 47), the Delaware

bankruptcy court determined under Rule 1014(b), Fed. R. Bankr. P. 1014(b), that all of the cases

should proceed in this district (*id.* No. 220).  The court lifted the stay and transferred the

involuntary case here.  (*Id.*).  That case is pending and is set for trial in October 2015.

## I.  The Adversary Proceeding

On March 11, 2015, just over a week after BOKF filed its action against CEC, the debtors

filed an adversary complaint in the bankruptcy cases, naming as defendants BOKF, Wilmington,

MeehanCombs, and Danner.  (Adv. Dkt. No. 1).

The complaint alleges that the four actions concern "the very same assets transfers and

capital markets transactions that will be litigated in the bankruptcy cases" and asserts that the

continuation of the actions "threatens to harm the Debtors' estate[s] and imperil their ability to

reorganize."  (*Id.* at 2).  The reorganization would be imperiled, the debtors allege, because CEC

would be unable to make the financial contribution on which the reorganization depends if the

guarantees were reinstated.  (*Id.* at 10-11).  The estates would be harmed because the actions

could deplete the insurance that CEOC shares with CEC, insurance that the debtors say is

property of the bankruptcy estates.  (*Id.* at 11).  The complaint has two counts.  Count I seeks a

declaratory judgment "extending the automatic stay" under section 362(a) of the Code to "non-

debtor affiliates" of CEOC.  (*Id.* at 12-13).  Count II requests an injunction under section 105(a)

temporarily halting the continuation of the actions against the "non-debtor affiliates."  (*Id.* at 13-

15).

Along with the complaint, the debtors filed a motion for an order "staying or enjoining

-18-

A0140

the continued prosecution of the actions." (*Id.* No. 4 at 15). The motion is not keyed to either

count of the complaint, but because the request is for injunctive relief and only Count II seeks

that relief, the motion has been interpreted as a motion for a preliminary injunction on Count II.

In the course of the litigation, other matters fell away,[12] leaving a single question: whether

prosecution of the defendants' guaranty claims against CEC should be enjoined under section

105(a).

### 3. Discussion

The answer is no. In the Seventh Circuit, the section 105(a) injunction is a more limited

remedy than in other circuits. A bankruptcy court can issue an injunction halting third-party

litigation against a non-debtor in another court only when (among other things) the third party's

claims against the non-debtor arise out of the same acts as claims the bankruptcy estate has

against the non-debtor. The debtors have not demonstrated that the claims the estates have

against CEC arise out of the same acts as the guaranty claims the defendants are pursuing against

CEC in Delaware and New York. As for CEOC's insurance, the policy may be property of the

estate, but the proceeds are not. CEC has an independent right under the policy to payment of its

---

[12]      The complaint had sought relief not only because the actions allegedly threatened
CEC's contribution to the restructuring and CEOC's insurance coverage but also because (1)
some of the claims asserted in the actions were derivative claims and so were property of the
bankruptcy estates; (2) successful prosecution of the claims against CEOC's directors would give
rise to claims for indemnification against CEOC; and (3) burdensome discovery in the actions
would distract critical CEOC employees from their restructuring obligations. (Adv. Dkt. No. 1 at
10-11). But the derivative claims, including the claims against the CEOC directors, were claims
only in the Wilmington action, and Wilmington agreed those claims were stayed under section
362(a). (*See id.* Nos. 22 at 10, 129 at 4 n.3). That left as the only claims to be enjoined the
contract, TIA, good faith and fair dealing, and declaratory judgment claims against CEC, along
with Danner's claim against CEC for intentional interference with contractual relations
(collectively, "the guaranty claims"). (*Id.* No. 129 at 4 n.3). As to those claims, the debtors
elected to abandon their "distraction" theory. (*Id.* No. 114 at 2).

losses, regardless of whether any other insured is a debtor in a bankruptcy case.

### a. The Section 105(a) Injunction

Section 105(a) of the Code provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Considered the bankruptcy version of the All Writs Act, *see In re 1900 M Rest. Assocs., Inc.*, 352 B.R. 1, 7 (D.D.C. 2006) (quoting legislative history); *In re Chateaugay Corp.*, 109 B.R. 613, 621 (S.D.N.Y. 1990); *Regency Realty Assocs. v. Howard Fertilizer, Inc. (In re Regency Realty Assocs.)*, 179 B.R. 717, 719 (Bankr. M.D. Fla. 1995), the statute authorizes a bankruptcy court to take actions necessary to implement other Code provisions, *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004), and to protect the court's jurisdiction, *Levey v. Sys. Div., Inc. (In re Teknek, LLC)*, 563 F.3d 639, 648 (7th Cir. 2009); *Fisher*, 155 F.3d at 882; *Chateaugay*, 109 B.R. at 621; 2 *Collier on Bankruptcy* ¶ 105.01 at 105-6 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015).

Among other powers, section 105(a) permits a bankruptcy court to protect its jurisdiction by enjoining, at least temporarily, the prosecution of a third party's action against a non-debtor in another court. That power has long been recognized not only in the Seventh Circuit, *see, e.g., Teknek*, 563 F.3d at 648; *Fisher*, 155 F.3d at 882; *L & S*, 989 F.2d at 932; *Energy Coop.*, 886 F.2d at 929, but elsewhere, *see, e.g., Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1242 (6th Cir. 1993); *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 599 (10th Cir. 1990) (calling the remedy "hornbook law"), and is mentioned in the statute's legislative history, *see* S. Rep. No. 95-989, at 51 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5836-37; H. Rep. No. 95-595, at 342 (1978),

-20-

*reprinted in* 1978 U.S.C.C.A.N. 5963, 6298.

To obtain an injunction under section 105(a), it is unnecessary to satisfy the traditional elements for injunctive relief. *Fisher*, 155 F.3d at 882. As long as the third-party litigation would "'defeat or impair'" the bankruptcy court's "'jurisdiction over the case before it,'" *id.* (quoting *L & S*, 989 F.2d at 932), the debtor need show only (1) that there is a "'likelihood of success on the merits,'" *id.* (quoting *L & S*, 989 F.2d at 932), which in this context means the likelihood of a successful reorganization, *In re Excel Innovations*, 502 F.3d 1086, 1095 (9th Cir. 2007); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009); and (2) that the injunction would serve in the public interest, *Fisher*, 155 F.3d at 882. The debtor need not show irreparable harm or an inadequate remedy at law. *Id.*[13]

But before these elements can be considered, the case must be one in which relief under section 105(a) is possible. *Phar-Mor, Inc. v. General Elec Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*, 166 B.R. 57, 61 (W.D. Pa. 1994). In its two most recent decisions on the subject, *Fisher* and *Teknek*, the Seventh Circuit restricted the section 105(a) remedy to a particular set of "limited circumstances." *Fisher*, 155 F.3d at 882. Perhaps because the purpose of a section

---

[13]    It is unclear whether the debtor must show that the equities weigh in his favor. Typically, a plaintiff seeking a preliminary injunction must make that showing, *see, e.g., Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481 (7th Cir. 2015), *petition for cert. filed*, 83 U.S.L.W. 3747 (U.S. Mar. 18, 2015) (No. 14-1136), and some bankruptcy court decisions in this district mention balancing the equities as a necessary exercise before relief can be granted, *see, e.g., Gander Partners LLC v. Harris Bank, N.A. (In re Gander Partners LLC)*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010), *aff'd*, 442 B.R. 883 (N.D. Ill. 2011). But neither of the Seventh Circuit decisions setting out the elements of a section 105(a) injunction mentions balancing the equities as one of them. *See Fisher*, 155 F.3d at 882; *L & S*, 989 F.2d at 932. *Fisher* affirmed the entry of a section 105(a) injunction without considering (expressly, at least) how the equities balanced, *see Fisher*, 155 F.3d at 882-83, although the bankruptcy court had done so, *see id.* at 879.

-21-

105(a) injunction is to protect the bankruptcy court's jurisdiction, the Seventh Circuit defined

those circumstances in jurisdictional terms, permitting the bankruptcy court to enjoin third-party

litigation against a non-debtor only if that litigation "is sufficiently 'related to'" the case before

court. *Fisher*, 155 F.3d at 882 (quoting 28 U.S.C. § 1334(b)); *see also Teknek*, 563 F.3d at 648.

To understand when third-party claims against a non-debtor are sufficiently related to a

bankruptcy case that their prosecution can barred, it is useful to consider the claims in *Fisher* and

*Teknek*. *Fisher* was a chapter 7 case arising out of a Ponzi-like scheme run by Thomas Collins,

his corporation, and several accomplices. *Fisher*, 155 F.3d at 877-78. The corporation ended up

in bankruptcy, and the investors sued the accomplices in the district court, alleging a variety of

fraud claims. *Id.* The trustee in the bankruptcy case filed an adversary proceeding asserting

(among other things) that the estate had fraud claims of its own against the accomplices and

asking to enjoin prosecution of the investors' claims. *Id.* at 878-79. The bankruptcy court

granted the injunction, reasoning that the trustee had standing to pursue the investors' claims. *Id.*

at 879. The district court reversed, finding those claims were not property of the estate. *Id.*

On appeal, the court of appeals agreed that the investors' claims were not estate property,

*id.* at 881, but found the injunction proper nonetheless under section 105(a). Although the

investors' claims were not property of the estate, the court said, it was "difficult to imagine" how

they could be "more closely 'related to' it": "They are claims to the same limited pool of money,

in the possession of the same defendants, as a result of the same acts, performed by the same

individuals, as part of the same conspiracy." *Id.* Of these factors, the most important was that

the claims arose out of the "same acts." The critical question, the court emphasized, is "the

overlap between the claims of the debtor . . . and the claims of the creditors . . . against third

parties." *Id.* at 883. The claims must be "so closely related" that allowing the third-party claims

-22-

in another court to proceed would result in "a race to the courthouse" and "would derail the bankruptcy proceedings." *Id.*

More than ten years later in *Teknek*, the court revisited the section 105(a) injunction question and underscored that to be enjoined, the third party's claims must arise out of the same acts as the estate's claims. Another chapter 7 case, *Teknek* stemmed from a patent judgment that Systems Division, Inc. ("SDI") obtained against Teknek LLC ("Teknek") and a related corporation, Teknek Electronics ("Electronics"). *Teknek*, 563 F.3d at 642. While the patent action was pending, the shareholders of Teknek and Electronics looted the two corporations, transferring their assets to a third, Teknek Holdings ("Holdings"). *Id.* The district court hearing the patent action later added the shareholders and Holdings as defendants in the action on an alter ego theory, making them liable for the judgment. *Id.*

When Teknek (but not Electronics) filed a bankruptcy case, the trustee brought an adversary proceeding against the shareholders seeking to hold them personally liable for Teknek's obligations under the judgment. *Id.* at 642-43. The bankruptcy court issued an injunction preventing SDI from collecting its judgment against the shareholders and Holdings so that the trustee could pursue the judgment on behalf of the estate. *Id.* at 642. The district court reversed, concluding that the claims SDI wanted to pursue in enforcing its judgment were neither property of the estate nor related to the bankruptcy case. *Id.*

The court of appeals agreed and affirmed. The court acknowledged that under *Fisher*, a section 105(a) injunction is available to "block claims that are not property of the estate . . . if they are sufficiently 'related to' claims on behalf of the estate." *Id.* at 648. The court also acknowledged that, as in *Fisher*, the trustee's claims and SDI's claims were claims to "the same pool of money" in possession of "the same defendants." *Id.* at 649. But that, the court said, was

-23-

**A0145**

not enough.  Unlike the claims in *Fisher*, the claims at issue in *Teknek* were "not based on the

same acts."  *Id.*  The looting of Teknek and the looting of Electronics were "separate acts"

causing separate injuries to separate companies, "only one of which is in bankruptcy."  *Id.*; *see*

*also id.* at 650 (noting that if not for "the presence of Electronics, an independent non-debtor that

is directly liable to SDI for the patent judgment," an injunction would have been proper).

　　　　Under *Fisher* and *Teknek*, then, a bankruptcy court can employ section 105(a) to enjoin

third-party claims against a non-debtor in another court in favor of the bankruptcy estate's claims

only if the third party's claims are sufficiently related to the bankruptcy case.  That will be true

only if both sets of claims are claims to the same assets in possession of the same defendants, and

both sets of claims arise out of the same acts.  *Id.* at 649; *Fisher*, 155 F.3d at 883; *see also*

*Pinewood Enters., L.C. v. Williams (In re Living Hope Sw. Med. Servs. LLC)*, No. 4:11-CV-

04059, 2012 WL 79661, at *4 (W.D. Ark. Jan. 11, 2012) (citing *Teknek* and issuing stay pending

appeal of section 105(a) injunction in part because the trustee's claims and the enjoined claims

"do not appear to be based wholly on the same acts").

### b.  The Debtors' Arguments for Injunctive Relief

　　　　The debtors make two arguments for an injunction stopping the Delaware and New York

actions against CEC.  One is based on the potential effect of adverse judgments in the actions on

CEC's proposed financial contribution to the debtors' restructuring.  The other is based on the

potential effect of those judgments on the debtors' insurance coverage under the National Union

policy.  In neither case, however, have the debtors shown what they must:  that the bankruptcy

estates have claims arising out of the same acts as the claims in the actions the debtors want

-24-

**A0146**

enjoined.[14]

### i. The CEC Contribution Argument

The debtors' first argument goes like this. The estates in these bankruptcy cases have claims against CEC arising out of the disputed transactions, transactions that transferred to CEC most (if not all) of the assets it now owns. Those claims are one of the estates' principal assets, and in settlement of them CEC has agreed to make a large financial contribution to the debtors' reorganization. If the Delaware and New York actions against CEC are allowed to proceed and are successful, the defendants will take for themselves the assets that would otherwise fund the debtors' reorganization. CEC's contribution will disappear.

The circumstances the debtors describe do not warrant relief under *Fisher* and *Teknek*. The debtors note that the estates and the defendants have claims against the same entity (CEC), claims that if successful would be paid from the same pool of assets (CEC's assets). What the debtors have not shown is that the estate claims arise out of the "same acts" as the claims in the

---

[14]    MeehanCombs and Danner assert in their post-trial brief that the court consequently "lacks jurisdiction" to enjoin the actions. (Adv. Dkt. No. 153 at 14). The assertion is understandable, given that *Fisher* and *Teknek* both employ jurisdictional language to describe when a section 105(a) injunction is proper, even citing section 1334(b). In neither decision, however, did the court say that the bankruptcy court did (*Fisher*) or did not (*Teknek*) have jurisdiction to issue an injunction, and the better interpretation is that those decisions concern, not subject matter jurisdiction, but the scope of the section 105(a) remedy. *See American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods)*, 885 F.2d 621, 624 (9th Cir. 1989) (distinguishing between the bankruptcy court's jurisdiction to entertain an action seeking a section 105(a) injunction and its power to issue the injunction itself); *Lyondell*, 402 B.R. at 586 (same); 3 *Collier on Bankruptcy*, *supra*, ¶ 362.04 at 362-49 to -50 (noting that issuance of a section 105 injunction "appears to be . . . directed to the discretion of the court rather than to its jurisdiction"). That a claim fails on the merits does not mean the court lacked jurisdiction to hear the claim in the first place. *Bell v. Hood*, 327 U.S. 678, 682 (1946); *Bovee v. Broom*, 732 F.3d 743, 744 (7th Cir. 2013); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003).

Delaware and New York actions. The claims in those actions are based on either the B-7

Refinancing or the Senior Unsecured Notes Transaction. Not only have the debtors failed to

show the estates have the same claims arising out of those transactions (and it is hard to see how

the estates could), the debtors have failed to show the estates have *any* claims against CEC

arising out of them.[15/] Without competing estate claims based on the same acts – the breach of

the indentures and notes and the release of CEC's guarantees – the debtors have no case for a

section 105(a) injunction. *Teknek*, 563 F.3d at 649; *Fisher*, 155 F.3d at 883.

Rather than address the B-7 Refinancing and Senior Unsecured Notes Transaction, the

debtors focus on the disputed transactions as a whole. The debtors suggest that the estates'

claims and the defendants' claims all arise out of the same overarching scheme to strip CEOC of

its assets. (Adv. Dkt. Nos. 129 at 5, 151 at 9).

The debtors' suggestion misses the mark. They are right, of course, that the Delaware

and New York complaints allege a broader scheme on CEC's part to transfer away CEOC assets.

But those allegations are not essential (to take a single example) to the defendants' breach of

contract claims. A plaintiff with a claim for breach of contract typically must plead and prove

only "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance

by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod v. Wells Fargo

Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (describing the standard elements at common law

---

[15/]    The only evidence on the subject came from CEOC's chief restructuring officer,
Randall Eisenberg, who testified under questioning from the court that CEOC has claims arising
from the B-7 Refinancing and Senior Unsecured Notes Transaction. (Tr. v. II at 152-53). But
Eisenberg did not describe what those claims might be, and he admitted he took that position
only because it was his impression that all of the disputed transactions gave CEOC claims. (*Id.*
at 153). He admitted he did not know the SGC's view on which transactions gave rise to claims.
(*Id.*). James Millstein, financial advisor and investment banker to the debtors, testified that
CEOC has no such claims. (Tr. v. I at 132).

-26-

**A0148**

(internal quotation omitted)). There is no need to plead or prove that the breach was part of some

larger scheme. The defendants' allegations add flavor to their contract claims, nothing more.[16/]

The debtors cannot satisfy the "same acts" requirement of *Fisher* and *Teknek* through the general

air of conspiracy the defendants cultivate.[17/]

      The debtors contend nonetheless that this is "a textbook case" for a section 105(a)

injunction. (Adv. Dkt. No. 129 at 1). They reach that conclusion because the injunction would

stop litigation against a party who had guaranteed a debtor's debts and intended to make a

financial contribution to its reorganization. The pattern, the debtors insist, is a familiar one.

      It is. Although the facts vary slightly from case to case, courts have often issued section

105(a) injunctions to halt actions of the kind and under the circumstances the debtors describe.

*See, e.g., In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997); *Saxby's Coffee*

*Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*, 440 B.R. 369, 384 (Bankr.

E.D. Pa. 2009); *Lyondell*, 402 B.R. at 594; *In re Kham & Nate's Shoes No. 2, Inc.*, 97 B.R. 420,

428-29 (Bankr. N.D. Ill. 1989); *Rustic*, 55 B.R. at 31; *Lahman Mfg. Co. v. First Nat'l Bank (In re*

*Lahman Mgf. Co.)*, 33 B.R. 681, 685 (Bankr. D.S.D. 1983); *Otero Mills, Inc. v. Security Bank &*

---

    [16/]    It is unnecessary to go through this same analysis for the other guaranty claims: the declaratory judgment claims, TIA claims, claims for breach of the duty of good faith and fair dealing, and Danner's intentional interference with contract claim. Unless all of the defendants' guaranty claims can be enjoined, there is no point in enjoining any of them. (The declaratory judgment and good faith and fair dealings claims appear simply to be variations on the breach of contract theme in any event.)

    [17/]    At the close of the hearing, the court asked the parties in their post-trial briefs to "do the analytical part of taking each of the counts that the [debtors] want enjoined and explain to me why or why not I have the power under Fisher and Teknek, which are the two operative cases, to enjoin those counts." (Tr. v. II at 270). Rather than provide that count-by-count analysis, the debtors have chosen to paint with a far broader brush. It is fair to infer that the debtors have not explained how the estates' claims and the defendants' claims arise out of the same acts because they do not.

*Trust (In re Otero Mills, Inc.)*, 21 B.R. 777, 779 (Bankr. D.N.M. 1982). In some cases, the mere

possibility that the action could impair the non-debtor's financial support of the debtor's

reorganization was enough to warrant relief. *See Regency*, 179 B.R. at 719 (citing cases and

calling this the "classic scenario").

But the Seventh Circuit has a different textbook. *Fisher* and *Teknek* narrow the

circumstances under which bankruptcy courts in this circuit can grant section 105(a) injunctions

to shield non-debtors from third-party litigation. Unless the debtor's estate has a claim against

the non-debtor, and unless that claim is based on the same acts and would be paid from the same

assets as the third party's claim against the non-debtor, no relief is possible. *Teknek*, 563 F.3d at

649; *Fisher*, 155 F.3d at 883. *Fisher* and *Teknek* therefore rule out relief in favor of a non-debtor

guarantor based purely on the contention that without it the non-debtor will be unable to devote

time, money, or both to the debtor's reorganization.

The limits *Fisher* and *Teknek* place on the ability of bankruptcy courts to protect their

jurisdiction through a section 105(a) injunction are consistent with the idea that bankruptcy

jurisdiction itself is "limited," *In re FedPak Sys. Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996),

particularly in this circuit, *id.*; *see also ALT Hotel, LLC v. DiamondRock Allerton Owner, LLC

(In re ALT Hotel, LLC)*, 479 B.R. 781, 806 (Bankr. N.D. Ill. 2012). They are consistent, as well,

with notions of comity – a recognition that for one court to meddle with proceedings in another

court, especially the court of a different sovereign, is no small matter. *See Pearle Vision v.

Romm (In re Romm)*, Nos. 05 B 46897, 06 A 69, 2006 WL 3692416, at *5 n.3 (Bankr. N.D. Ill.

Dec. 13, 2006). Even in circuits taking a broader approach, a section 105 injunction is

considered an "extraordinary and drastic remedy," *In re Third Eighty-Ninth Assocs.*, 138 B.R.

144, 146 (S.D.N.Y. 1992), to be used only in "unusual circumstances," *Saxby's*, 440 B.R. at 379

-28-

**A0150**

(internal quotation omitted).

Those circumstances are not present here. Because the claims of the bankruptcy estates have not been shown to arise out of the same acts as the guaranty claims in the Delaware and New York actions, the debtors are not entitled to have the prosecution of those claims enjoined, whatever the effect on CEC's contribution to the reorganization.

### ii. The Insurance Argument

The debtors' second argument is based, not on the possible loss of the CEC contribution, but on the loss of coverage under the National Union insurance policy. According to the debtors, the $155 million in primary and excess coverage is an asset of their bankruptcy estates. If the Delaware and New York actions against CEC proceed to judgment, if those judgments are adverse to CEC, and if the insurers pay CEC's claims for the losses, the $155 million will disappear. To avoid this potential depletion of estate property, the debtors say, injunctive relief under section 105(a) is necessary.

The insurance argument runs up against the same obstacles as the CEC contribution argument – *Fisher* and *Teknek* – and suffers from the same flaw. The debtors have not shown that the estates' claims against CEC and the defendants' claims against CEC, claims that could theoretically be paid under the policies, arise out of the same acts. *Teknek*, 563 F.3d at 649; *Fisher*, 155 F.3d at 883. Without that showing, the defendants' claims cannot be enjoined.

Arguably, in fact, the debtors' insurance contention is weaker, and the circumstances even more remote from *Fisher* and *Teknek*, because the estates and the defendants do not appear to be competing for the same pool of assets (here, the insurance proceeds), as the trustees and creditors were in *Fisher* and *Teknek*. The policy has an "insured vs. insured" coverage exclusion

-29-

**A0151**

(here called an "entity v. insured" exclusion (P. Ex. 65 at 2961)).  Because the debtors and CEC

are insureds under the policy, the policy would appear not to pay losses resulting from the

estates' claims against CEC.  *Cf. Biltmore Assocs., LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663,

668-74 (9th Cir. 2009) (holding policy's "insured vs. insured" exclusion precluded coverage of

debtor's claims against its own directors and officers).  Nor does it appear the policy would pay

losses from most of the defendants' claims.  National Union notified CEC that breach of contract

and declaratory judgment claims are "generally held to be uninsurable," suggesting losses from

those claims would not be paid.  (P. Ex. 71 at 7).[18]

    The debtors do not attempt to fit their insurance argument under *Fisher* and *Teknek* as

such.  They contend instead that the proceeds of the policy are property of their bankruptcy

estates.  Therefore, they say, the defendants' actions (if successful) will reduce the amount of

property in the estates and should be enjoined for that reason.

    The debtors are mistaken.  Putting aside the prediction (a dubious one given the

substantial coverage problems) that the actions risk exhausting the insurance policy, the policy

proceeds are not property of the debtors' estates.[19]  An insurance policy a debtor holds on the

petition date (or more accurately the debtor's rights under the policy, *In re Forty-Eight*

_____

    [18]    National Union made this declaration in its letter to CEC only about the
MeehanCombs and Wilmington actions, but National Union's later letter about the Danner action
deemed the first letter applicable to that action.  (P. Ex. 72 at 2).  National Union did
acknowledge coverage of the MeehanCombs and Danner actions as "securities claims."  By that,
though, National Union was presumably referring to the TIA claims in those actions, since
National Union reserved rights concerning the Wilmington action, and the Wilmington complaint
has no TIA claim.

    [19]    If they were, the debtors would not need an injunction under section 105(a) to
protect them.  The automatic stay under section 362(a)(3), 11 U.S.C. § 362(a)(3), would serve
that purpose.  *See In re Petters Co.*, 419 B.R. 369, 375 (Bankr. D. Minn. 2009); *In re Arter &
Hadden, L.L.P.*, 335 B.R. 666, 671 (Bankr. N.D. Ohio 2005).

-30-

*Insulations, Inc.*, 133 B.R. 973, 977 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992))

becomes property of the debtor's bankruptcy estate, *In re Stinnett*, 465 F.3d 309, 312 (7th Cir.

2006); *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 748 (7th Cir. 1989). But that

does not mean the proceeds of the policy also become property of the estate. *Mazzolin v.*

*Lehman Bros Real Estate Fund III*, No. 11 C 953, 2012 WL 245192, at *3 (N.D. Ill. Jan. 25,

2012); 5 *Collier on Bankruptcy, supra*, ¶ 541.10[1] at 541-53.

Whether policy proceeds are estate property depends on the nature of the policy. *In re*

*Equinox Oil Co.*, 300 F.3d 614, 618 (5th Cir. 2002); *In re Gladwell*, No. 06-82063, 2009 WL

140098, at *2 (Bankr. C.D. Ill. Jan. 21, 2009). This is especially true of directors and officers

liability insurance is concerned. *See Arter & Hadden*, 335 B.R. at 671 (noting the "'discord'" in

the case law (quoting *In re Medex Reg'l Labs., LLC*, 314 B.R. 716, 720 (Bankr. E.D. Tenn.

2004)). As a rule, courts find that proceeds of a policy providing coverage only to the debtor are

property of the estate, and proceeds of a policy providing coverage only to directors and officers

are not. *Petters*, 419 B.R. at 376. After that, however, the outcome becomes less clear. *Id.*; *see*

*also In re Vitek*, 51 F.3d 530, 535 (5th Cir. 1995) (noting the problem but declining to address it).

Here, the outcome follows from the unusual breadth of the National Union policy. The

insureds under the policy include not only CEOC and its directors and officers but also CEC and

its directors and officers (not to mention CEC's other subsidiaries and their directors and

officers). The policy extends coverage not only to the directors and officers themselves and to

CEC, CEOC, and CEC's other subsidiaries (to the extent they indemnify directors and officers

for losses), but it also provides identical "organization coverage" (usually called "entity

coverage," Susan N.K. Gummow, *Bankruptcy & Ins. Law Manual* 132 (2d ed. 2007)) to CEC,

CEOC, and CEC's other subsidiaries. CEC therefore has the same "organization coverage"

-31-

**A0153**

under the policy that CEOC and the other debtors have.

Because it does, CEC has independent rights to the policy proceeds, rights that are CEC's property alone. *See Petters*, 419 B.R. at 376 (recognizing that "any individual insured has a contractually-distinct status that runs directly between itself and the insurer," so that "the right to receive payment on a covered claim [is] the property of that insured itself"); *Forty-Eight Insulations*, 133 B.R. at 977. As an additional insured, CEC is entitled to exercise its rights under the policy, notwithstanding the bankruptcy, and can do so until the policy limits are exhausted. *St. Paul v. Home Depot*, Nos. 03 50389, 03 C 50390, 2004 WL 2075129, at *2 (N.D. Ill. Sept. 14, 2004); Gummow, *supra*, at 165-66.

The debtors' rights under the National Union policy are estate property, true enough, *Forty-Eight Insulations*, 133 B.R. at 977, but that does not mean they trump CEC's rights, making the policy proceeds untouchable, *id. at* 978; *see also In re SportStuff, Inc.*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010); *In re Spaulding Composites Co.*, 207 B.R. 899, 907 (B.A.P. 9th Cir. 1997); *St. Paul*, 2004 WL 2075129, at *2. To find otherwise, allowing the debtors to hold up payments for CEC's losses in favor of the debtors' own, would give the debtors rights under the policy they did not have before these cases were filed. It is a truism that the Code does not grant debtors rights greater than they had outside of bankruptcy. *Hills Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 592 (9th Cir. 1993); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989). Given non-debtor CEC's equal and independent right to the policy proceeds, those proceeds are not property of the debtors' estates.

Because the bankruptcy estates and the defendants have not been shown to have claims arising out of the same acts, that could be paid with the proceeds of the insurance the debtors share with CEC, and because the insurance proceeds are not property of the bankruptcy estates,

-32-

**A0154**

the debtors are not entitled to have the defendants' actions in Delaware and New York enjoined.

### 4. Conclusion

The motion of debtors Caesars Entertainment Operating Co. and subsidiaries to stay, or in the alternative, for injunctive relief is denied to the extent that the motion seeks an injunction under section 105(a) of the Bankruptcy Code halting the prosecution of civil actions pending against non-debtor Caesars Entertainment Corp. in the Delaware Court of Chancery and the U.S. District Court for the Southern District of New York. The balance of the motion is denied as moot. A separate order will be entered consistent with this opinion.

Dated: July 22, 2015

_____
A. Benjamin Goldgar
United States Bankruptcy Judge

-33-

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT | ) | No. 15 B 1145 |
| OPERATING CO., INC., *et al.*, | ) | (Jointly administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| CAESARS ENTERTAINMENT | ) | |
| OPERATING CO., INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 15 A 149 |
| | ) | |
| BOKF, N.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

**ORDER DENYING IN PART AND DENYING IN
PART AS MOOT DEBTORS' MOTION TO STAY, OR
IN THE ALTERNATIVE, FOR INJUNCTIVE RELIEF**

This matter came before the court for ruling after an evidentiary hearing on the motion of

debtors Caesars Entertainment Operating Co. and subsidiaries to stay, or in the alternative, for

injunctive relief. The court having made findings of fact and conclusions of law pursuant to Rule

52(a)(2) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52(a)(2) (made applicable by

Fed. R. Bankr. P. 7052), in its memorandum opinion dated today, for the reasons set forth in the

memorandum opinion IT IS HEREBY ORDERED:

The motion is denied to the extent that it seeks an injunction under section 105(a) of the

Bankruptcy Code, 11 U.S.C. § 105(a), halting the prosecution of civil actions pending against

non-debtor Caesars Entertainment Corp. in the Delaware Court of Chancery and the U.S. District

**A0156**

Court for the Southern District of New York.  The balance of the motion is denied as moot.

Dated: July 22, 2015

A. Benjamin Goldgar
United States Bankruptcy Judge

EFiled: Aug 04 2014 09:55PM EDT
Transaction ID 55832534
Case No. 10004-

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| **WILMINGTON SAVINGS FUND SOCIETY, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second-Priority Senior Secured Notes due 2018, on behalf of itself and derivatively on behalf of CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **C.A. No. _____** |
| | ) | |
| **Plaintiff,** | )<br>) | |
| **vs.** | )<br>) | |
| **CAESARS ENTERTAINMENT CORPORATION, CAESARS GROWTH PARTNERS, LLC, CAESARS ACQUISITION COMPANY, CAESARS ENTERTAINMENT RESORT PROPERTIES, LLC, CAESARS ENTERTAINMENT OPERATING COMPANY, INC., CAESARS ENTERPRISE SERVICES, LLC, ERIC HESSION, GARY LOVEMAN, JEFFREY D. BENJAMIN, DAVID BONDERMAN, KELVIN L. DAVIS, MARC C. ROWAN, DAVID B. SAMBUR, AND ERIC PRESS,** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| **Defendants,** | )<br>) | |
| **and** | )<br>) | |
| **CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,** | )<br>)<br>) | |
| **Nominal Defendant.** | )<br>x | |

LAI-3214821v21

**A0158**

## VERIFIED COMPLAINT

Plaintiff Wilmington Savings Fund Society, FSB ("Plaintiff" or "Trustee"), solely in its capacity as successor trustee under the Indenture dated as of April 15, 2009 (as supplemented or amended, the "2009 Indenture"), under which Caesars Entertainment Operating Company, Inc. ("CEOC") issued 10% Second-Priority Senior Secured Notes due 2018 (the "Second Lien Notes"), brings this action directly and derivatively against CEOC, its controlling shareholder, Caesars Entertainment Corporation ("CEC"), CEOC's directors and others for (a) recovery of fraudulent transfers and the return to CEOC of valuable assets that were wrongly taken from CEOC by the actions of its directors and its controlling shareholder, (b) damages for breach of contract, breaches of fiduciary duties and waste of corporate assets, (c) declaratory relief as to the breaches of contract by CEOC and CEC, (d) imposition of a constructive trust or equitable lien over the transferred assets, and (e) injunctive relief enjoining the consummation of other self-dealing transactions.

## INTRODUCTION

1.     This action arises from a series of self-dealing transactions between CEOC – at all relevant times an insolvent corporation – and entities controlled by CEC, or under common control with CEC, that involved transfers made for less than adequate consideration and with intent to hinder or delay CEOC's creditors.

2

The purpose and effect of the transfers was to enrich CEC and its affiliates and shareholders at the expense of CEOC and to move CEOC's assets beyond the reach of CEOC's creditors. Certain of these transactions also breached the 2009 Indenture.

2.     In January 2008, affiliates of two private equity firms, Apollo Global Management, Inc. ("Apollo") and TPG Capital, LP ("TPG" and, together with Apollo and all of their co-investors, the "Sponsors") acquired the company then known as Harrah's Entertainment Inc. ("Harrah's") and now known as CEC in a highly leveraged $30 billion buyout. The Sponsors continue to own most of the stock in CEC and control all aspects of CEC's, and therefore CEOC's, governance and operations, even after the sale of a minority interest in CEC through a public offering.

3.     At the time of the buyout, Harrah's operated primarily through a wholly-owned subsidiary then known as Harrah's Operating Company, Inc., now known as CEOC, and it was the operating company that incurred most of the debt used to fund the buyout.[1] Harrah's owned and operated a network of casinos in regional markets throughout the country, as well as a significant number of casinos

---

[1]   For purposes of simplicity, this Complaint sometimes refers to the collective operations of CEC and its subsidiaries as "Caesars."

in destination markets – at that time, primarily Las Vegas, New Orleans and Atlantic City.

4.     Harrah's used its regional properties to build a database of customers it could then "feed" to Harrah's destination casinos.  Over time and after the arrival of Gary Loveman in 1997 and his ascension to chief executive officer in 2003, Harrah's refined this approach using a proprietary and industry-leading customer loyalty program known as Total Rewards, which pioneered the use of advanced data analytics and behavioral tracking technologies to maximize play and profitability throughout its casino network.  Total Rewards was developed by Loveman as a means to drive traffic to properties that were disadvantaged from a capital standpoint.  As a result of Loveman's innovative approach and the success of Total Rewards, Harrah's was widely regarded as one of, if not the, premier operator of casino properties in the world.

5.     Within months of the buyout, the global financial crisis and ensuing recession crippled Caesars' business.  CEOC was especially hard hit as revenues at its casinos needed to service its debt fell dramatically.  In the aftermath of the crisis, CEOC and the Sponsors initially responded to CEOC's unsustainable capital structure through distressed exchange offers and credit facility amendments, which reduced CEOC's indebtedness to some extent and extend the maturity of much of its debt.

4

6.     The Sponsors' response to CEOC's difficulties soon changed. Beginning in the summer of 2010, the Sponsors began to strip CEOC of valuable assets. The first of these transfers, in August 2010, included trademarks with a book value of $45.3 million, which were moved to CEC subsidiaries, which were not liable for CEOC's debt, for, on information and belief, little or no consideration. In 2011, CEOC transferred its interactive gaming operations to CEC, again for little or no consideration, depriving CEOC of an asset that, just two years later, was ascribed a value by CEC of as much as $779 million.

7.     By early 2012, it had become apparent that the economy was recovering. The number of total visits to Las Vegas had returned to all-time highs, and the Sponsors saw elements of special value and high growth potential in CEOC's internet gaming business, Las Vegas properties, New Orleans casino, property management revenues and intellectual property, especially the Total Rewards network. The network of regional and Atlantic City casinos have recovered more slowly and shown less growth potential. Yet, CEOC, still burdened by almost $20 billion of acquisition debt, continued to generate significant operating losses.

8.     Faced with the prospect that CEOC would be unable to repay its massive debt, in 2013, the Sponsors started to remove CEOC's most valuable assets from the reach of its creditors, and to transfer them to two affiliates not

liable for CEOC's debt. Those two affiliates are Caesars Entertainment Resort Properties, LLC ("Resort Properties"), a wholly owned subsidiary of CEC, and Caesars Growth Partners, LLC ("Growth Partners"), an entity controlled by the Sponsors and which is 58% owned by CEC.

9.     In September 2013, the Sponsors caused CEOC to transfer two of CEOC's significant Las Vegas properties to Resort Properties. One of these properties is known as Project Linq which is a newly completed shopping, dining and entertainment district that features the largest ferris wheel in the world, and the other is known as Octavius Tower which is a luxury tower, which is a part of Caesars Palace. This was closely followed by the October 2013 transfer to Growth Partners, of two additional valuable properties of CEOC (Planet Hollywood in Las Vegas and a new casino project in Baltimore), along with 50% of the management fees payable to CEOC from those properties.

10.    In March 2014, the Sponsors announced the sale to Growth Partners of four of CEOC's most important properties, including three in Las Vegas (The Cromwell, The Quad, and Bally's Las Vegas (collectively, the "Nevada Properties")) as well as Harrah's New Orleans. At the same time, Caesars also disclosed its intention to transfer control over CEOC's most valuable asset – the data and other intellectual property that comprises the Total Rewards Program – to Growth Partners and Resort Properties.

11.     The net effect of the transactions described above has been to divide Caesars into two segments – one, a "Good Caesars," consisting of Growth Partners and Resort Properties that owns the prime assets formerly belonging to CEOC, and the other, a "Bad Caesars," consisting of CEOC which remains burdened by substantial debt and whose remaining properties consist primarily of regional casinos that are unprofitable or far less profitable than those taken from CEOC by the Sponsors.  Only the "Bad Caesars" remains liable for the vast majority of the debts incurred in the 2008 buyout transaction.  Thus, the Sponsors and CEC have sought to deprive CEOC's lenders and creditors of the ability to seek recourse against CEOC's most valuable assets when CEOC inevitably defaults on its debts as they come due.

12.     At the times when these transfers were made, CEOC was insolvent, had unreasonably small capital and was unable to repay its debts.  Moreover, the transfers were made for inadequate consideration and less than reasonably equivalent value.  Moreover, it appears that no effort was undertaken to market any of the transferred assets to non-insider third parties, which would have demonstrated that the prices paid by Resort Properties and Growth Partners were grossly below fair value.

13.     Because the consideration received by CEOC was woefully inadequate and because the transfers were intended to extract valuable assets from

7

CEOC to enrich CEC and the Sponsors at the expense of CEOC and its creditors, certain of the transfers violated Section 4.06 of the 2009 Indenture, which prohibits "Asset Sales" for less than "Fair Market Value." Moreover, the transfers were unlawful and voidable. The transfers were also intended to hinder or delay CEOC's creditors, making them intentional, as well as constructive, fraudulent transfers.

14. In these circumstances, CEC and CEOC's directors and controlling shareholders owe (and at all relevant times have owed) fiduciary duties to CEOC and CEOC's creditors. The actions of CEC and CEOC's directors therefore must be reviewed under a standard of entire fairness; and it is incumbent upon the proponents of the transfers complained of herein to demonstrate their entire fairness.

15. CEC and its directors have made clear that they have no intention of preserving the value of CEOC or otherwise protecting the interest of its creditors. On May 6, 2014, CEC denied and disaffirmed its payment guaranty of CEOC's indebtedness (including the Second Lien Notes). This denial and disaffirmance is an Event of Default under Section 6.01(h) of the 2009 Indenture. In addition, on April 13, 2014, CEC's Board adopted an equity-based compensation plan, which provides for certain CEC officers, employees, consultants, advisors and others to receive compensation in the form of shares of stock in Growth Partners' parent

8

**A0165**

company, Caesars Acquisition Company ("Acquisition"). The Board justified this action as a means of providing incentives tied to the success of Growth Partners (one of the parts of "Good Caesars"). The natural consequence, however, effectively eliminated any remaining economic incentive of CEC's management team to preserve and enhance the value of CEOC, leaving "Bad Co." behind. These two recent actions, among many others, confirm that CEC and its directors and shareholders have abandoned the interests of CEOC and its creditors.

16.     All of the transfers described above should be avoided or the value of the property transferred must be returned to CEOC. The directors of CEOC are liable for damages. Plaintiffs are also entitled to declaratory relief that the Parent Guarantee remains in full force and effect and an injunction restraining further violations of law. CEOC and CEC are also liable for breaches of their contractual obligations to Plaintiff and the holders of Second Lien Notes.

### PARTIES

17.     Plaintiff Trustee is the successor trustee under the 2009 Indenture.

18.     Nominal plaintiff and defendant CEOC is a Delaware corporation that owns, operates and manages casinos and other entertainment properties in Las Vegas, on the east coast and in other locations and regions in the United States. CEOC's headquarters are located at One Caesars Palace Drive, Las Vegas, Nevada 89109.

9

19.     Defendant CEC is a Delaware corporation that, through subsidiaries, joint ventures and other arrangements, owns, operates and manages gambling casinos and properties in the United States and foreign countries. CEC's offices are located at the principal place of business of CEOC.

20.     Defendant Acquisition is a Delaware corporation that was formed in 2013 by CEC to make an equity investment in Growth Partners. Acquisition is a public company whose stock is listed and traded on NASDAQ. Upon information and belief, most of the voting stock of Acquisition is owned by affiliates of the Sponsors, who control CEC. The Sponsors also control Acquisition pursuant to a voting agreement that gives them the right to appoint Acquisition's board of directors. Acquisition's offices are located at CEOC's principal place of business in Las Vegas.

21.     Defendant Growth Partners is a Delaware limited liability company that was formed in 2013 as a joint venture between CEC and Acquisition to acquire assets from CEOC and CEC. All of the voting units of Growth Partners are owned by Acquisition. All of the non-voting units of Growth Partners are owned by CEC or its subsidiaries. Growth Partners' offices are located at CEC's principal place of business in Las Vegas.

22.     Defendant Resort Properties is a Delaware limited liability company that was formed in October 2013 as a wholly-owned subsidiary of CEC for the

purpose of acquiring, holding and operating certain Caesars properties. Resort Properties's offices are located at CEOC's principal place of business in Las Vegas.

23.     Defendant Caesars Enterprise Services, LLC ("Services LLC") is a Delaware limited liability company that was formed on April 4, 2014 as a subsidiary of CEOC for the purpose of acquiring and managing the enterprise-wide assets of CEOC for the benefit of CEC, Growth Partners and Resort Properties. Services LLC's offices are located at CEOC's principal place of business in Las Vegas.

24.     The following chart illustrates the current Caesars organizational structure following the creation of Growth Partners and Resort Properties in 2013 and the purported sale by CEC of 5% of its equity stake in May 2014:



25.     CEC, CEOC, Resort Properties, Acquisition and Growth Partners have created and do business through dozens of direct and indirect subsidiaries, affiliates, holding companies and other entities, all of which are owned or

11

controlled by these companies or by the Sponsors. CEC, CEOC, Resort Properties, Acquisition and Growth Partners frequently create new such entities, or abandon older ones, for purposes of minimizing taxes, attempting to circumvent provisions of agreements, or concealing the nature or details of transfers. Because these entities are owned, controlled and dominated by the Sponsors, CEC, CEOC, Resort Properties, Acquisition or Growth Partners, and have been used for improper purposes, their independent identities should be disregarded and they should be treated as alter egos of their ultimate owners.

26. Eric Hession was, at all relevant times, a director of CEOC, until his resignation on June 27, 2014. Hession has also served, at all relevant times, as Senior Vice President of Finance and Treasurer of CEC.

27. Gary Loveman is, and was at all relevant times, a director of CEC. Loveman also is the Chairman, Chief Executive and President of CEC. Upon information and belief, Loveman stands to benefit personally from some or all of the transactions described in this Complaint.

28. Jeffrey D. Benjamin is, and was at all relevant times, a director of CEC. Benjamin is a consultant to Apollo and, upon information and belief, stands to benefit personally from some or all of the transactions described in this Complaint.

29.     David Bonderman is, and was at all relevant times, a director of CEC and is currently a director of CEOC.  Bonderman is a founding partner of TPG and, upon information and belief, stands to benefit personally from some or all of the transactions described in this Complaint.

30.     Kelvin L. Davis is, and was at all relevant times, a director of CEC and is currently a director of CEOC.  Davis is a senior partner of TPG and, upon information and belief, stands to benefit personally from some or all of the transactions described in this Complaint.

31.     Marc C. Rowan is, and was at all relevant times, a director of CEC and is currently a director of CEOC.  Rowan is a founding partner of Apollo and, upon information and belief, stands to benefit personally from some or all of the transactions described in this Complaint.

32.     David B. Sambur is, and was at all relevant times, a director of CEC and is currently a director of CEOC.  Sambur is a partner of Apollo and, upon information and belief, stands to benefit personally from some or all of the transactions described in this Complaint.

33.     Eric L. Press is, and was at all relevant times, a director of CEC. Press is a partner of Apollo and, upon information and belief, stands to benefit personally from some or all of the transactions described in this Complaint.

13

34.     According to CEC's recent proxy statement, CEC does not consider Messrs. Loveman, Benjamin, Bonderman, Davis, Rowan or Sambur to be independent directors because of their relationships with affiliates of the Sponsors or other relationships with CEC.  Because of CEC's control and domination of CEOC, directors who are not independent of CEC also are not independent of CEOC.  Moreover, given the conflicts of interest between CEC and CEOC (due in part to CEC's 58% ownership interest of Growth Partners), any director of CEC cannot and should not be regarded as an independent director of CEOC.

## STANDING

35.     This action is brought to vindicate the rights of holders of the Second Lien Notes.  The Trustee has standing to maintain this action because the 2009 Indenture expressly authorizes the Trustee to bring and maintain legal actions on behalf of holders of the Second Lien Notes.

36.     The Trustee also has standing to bring and maintain this action because it is a creditor of CEOC, and CEOC has been insolvent at all relevant times.

## BACKGROUND

**A.     CEC.**

37.     In January 2008, the Sponsors acquired CEC in a $30 billion leveraged buyout financed primarily through the incurrence of debt at CEOC.

14

**A0171**

Today, more than six years after the buyout, Caesars has outstanding $25.3 billion of long-term debt, $19.3 billion of which was issued and is owed by CEOC.

38.    At all relevant times, the Sponsors have owned all or most of CEC's voting stock.  Moreover, pursuant to a January 28, 2008 stockholders agreement, the Sponsors have the power to appoint all or almost all of the members of CEC's board of directors.  Through this control, the Sponsors also control the management, business decisions and operations of each of CEC's subsidiaries.  As a result, all business conducted between CEC and its subsidiaries, or between or among CEC's subsidiaries, involves self-dealing and conflicts of interest.

**B.    CEOC.**

39.    From 2008 until at least 2013, CEOC was CEC's principal operating subsidiary.  Before the transfers described in this Complaint, CEOC owned and operated five of Caesars' nine highly profitable casinos in Las Vegas,[2] as well as five casinos on the east coast and 17 casinos elsewhere in the United States.  In addition, CEOC manages 20 other casinos in the United States and in other countries.

---

[2]    CEOC also owns a tenth Caesars property, named Hot Spot, in Las Vegas that offers limited gaming.  However, Hot Spot is so small (1,000 square feet containing fifteen slot machines, and no table games) that Caesars does not consider it to be a "casino".

15

40.     At all relevant times, CEOC has been completely dominated and controlled by CEC.  Until May 5, 2014, CEC owned all of CEOC's stock and it continues to own at least 95% of CEOC's stock.  CEC appoints all of CEOC's directors and, as an accounting matter, consolidates CEOC's financial results with its own.

41.     The leveraged buyout of CEC occurred approximately six months before the onset of the financial crisis in 2008.  The ensuing recession had serious adverse effects upon CEOC's business, causing a steep decline in revenues from CEOC's network of regional casinos.  Indeed, the only properties that have generated material positive operating income and operating margins have been CEOC's five casinos in Las Vegas and its casino in New Orleans.  The following chart shows, by region, CEOC's net revenues, operating income (loss) and operating margin (dollars in millions) for the year ended December 31, 2013:

| Category | Las Vegas | Atlantic Coast | Other U.S. (including New Orleans) |
|---|---|---|---|
| Net Revenue | $3,070.4 | $1,520.9 | $2,924.0 |
| Operating Income/(Loss) | $527.2 | ($2,405.3)[3] | $56.6 |
| Operating Margin | 17.2% | (158.1%) | 1.9% |

---

[3]     Even adjusting for year over year increases in impairment charges from 2012 to 2013, operating losses in the Atlantic Coast region for 2013 totaled ($410.8 million), resulting in a negative operating margin of (27.0%).

16

**A0173**

42.     The following charts illustrate, for each of the regions, the year-over-year change in revenue and operating income from 2008 through the end of 2013, showing the extent to which the regional casinos have lagged behind those located in Las Vegas:

| Net Revenue | | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Las Vegas | $3,254.2 | $2,698.0 | $2,834.8 | $3,013.1 | $3,029.9 | $3,070.4 |
| Atlantic Coast | 2,316.8 | 2,025.9 | 1,899.9 | 1,839.1 | 1,681.3 | 1,520.9 |
| Other U.S. | 3,986.8 | 3,646.7 | 3,274.0 | 3,080.6 | 3,048.8 | 2,924.0 |

| Operating Income | | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Las Vegas | ($1,936.1) | ($681.0) | $349.9 | $495.5 | $428.7 | $527.2 |
| Atlantic Coast | (396.7) | 28.3 | 83.7 | 79.6 | (394.6) | (2,405.3) |
| Other U.S. | (598.3) | 380.8 | 280.4 | 420.0 | 33.2 | 56.6 |

43.     Notably, the "Other U.S." region includes the casino in New Orleans which, on information and belief, generates operating income and accounts for a substantial portion of the positive operating income shown for the Other U.S. region.

**C.      THE SECOND LIEN NOTES AND THE INDENTURES.**

44.     On December 24, 2008, CEOC issued $214.8 million aggregate principal amount of 10.00% second-priority senior secured notes due 2015 and $847.6 million aggregate principal amount of 10.00% second-priority senior secured notes due 2018, pursuant to an Indenture, dated as of December 24, 2008, among CEOC, CEC, and U.S. Bank National Association ("U.S. Bank"), as trustee

17

(as supplemented or amended, the "2008 Indenture"). On that same day, CEOC and certain of its subsidiaries entered into a collateral agreement, dated as of December 24, 2008 (the "Second Lien Collateral Agreement") whereby CEOC and those subsidiaries granted liens on substantially all of their assets to secure the obligations under the 2008 Indenture. In addition, pursuant to the 2008 Indenture, CEC guaranteed CEOC's obligations under the 2008 Indenture and the notes issued pursuant to the 2008 Indenture.

45. On April 15, 2009, CEOC issued $3.71 billion aggregate principal amount of 10.00% second-priority senior secured notes due 2018, pursuant to the 2009 Indenture. The obligations under the 2009 Indenture are secured by liens against substantially all of CEOC's assets and certain of its subsidiaries' assets pursuant to the Second Lien Collateral Agreement. Pursuant to the 2009 Indenture, CEC guaranteed CEOC's obligations under the 2009 Indenture.

46. On April 16, 2010, CEOC issued $750 million aggregate principal amount of 12.75% second-priority senior secured notes due 2018, pursuant to an indenture, dated as of April 16, 2010, among CEOC, CEC, and U.S. Bank, as trustee and collateral agent (as supplemented or amended, the "2010 Indenture" and, collectively with the 2008 Indenture and the 2009 Indenture, the "Indentures"). The obligations under the 2010 Indenture are also secured by liens against substantially all of CEOC's and certain of its subsidiaries' assets pursuant

18

to the Second Lien Collateral Agreement. Pursuant to the 2010 Indenture, CEC guaranteed CEOC's obligations under the 2010 Indenture.

47.    The notes issued under the 2009 Indenture are referred to in this Complaint as the "Second Lien Notes." The notes issued under the 2008 Indenture and 2010 Indenture share equal second-lien priority with the Second Lien Notes.

**D.    TOTAL REWARDS AND CAESARS' BUSINESS PLAN.**

48.    Many of Caesars' local and regional casinos currently generate operating losses. However, CEC's business plan has been and is to use these largely unprofitable local and regional casinos to funnel customers to its destination casinos – primarily those located in Las Vegas. As described below, much of CEC's success in this regard is due to a customer loyalty program known as Total Rewards. According to CEC, Total Rewards "drives performance" of its properties and allows Caesars to generally operate more profitably than its competitors in many markets. In fact, CEC has represented that, because of Total Rewards, its casinos generate one-third more revenue than their competitors.

49.    Total Rewards is the brainchild of CEC's Chairman, Chief Executive and President, Gary Loveman. Loveman holds a Ph.D. in economics from MIT and taught for several years at the Harvard Business School where he studied customer loyalty programs. He was also a consultant on customer loyalty programs for such companies as Disney, McDonalds and American Airlines. In

1997, Harrah's hired Loveman as a consultant and he quickly launched Total Rewards. The program was so successful that Loveman became Harrah's Chief Operating Officer in 1998 and its Chief Executive Officer in 2003.

50.    Total Rewards is a sophisticated customer loyalty and data-gathering/marketing system designed to maximize the synergy of Caesars' network of properties. It encourages customers to make repeated visits to Caesars casinos by awarding them "credits" for staying at Caesars properties or gambling, drinking, dining or shopping there. When customers have accumulated enough credits, the program offers them a reward trip to Caesars' destination properties which are primarily in Las Vegas and New Orleans, and special treatment once they arrive. Caesars claims that approximately 45 million customers have participated in Total Rewards, although fewer are considered active.

51.    Caesars also has used Total Rewards to compile a massive database containing information about its customers' gambling and spending habits. Using advanced data analytics, behavioral tracking technologies and other techniques, Caesars targets customers with marketing promotions, direct mail, social media, and what Caesars calls "interactive slot machines." Caesars also has made Total Rewards a centerpiece of its burgeoning internet gambling operations. As CEC disclosed in a public offering last year:

> Caesars Entertainment revolutionized the approach the
> gaming industry takes with respect to marketing by

introducing the Total Rewards loyalty program in 1997. Continual improvements have been made throughout the years enabling the system to remain the most effective in the industry and enabling Caesars Entertainment to grow and sustain revenues more efficiently than its largest competitors and generate cross-market play, which is defined as play by a guest in one of Caesars Entertainment's properties outside its home market, which is where the guest signed up for Total Rewards. To support the Total Rewards loyalty program, Caesars Entertainment created the Winner's Information Network, or WINet, the industry's first sophisticated nationwide customer database. In combination, these systems supported the first technology-based customer relationship management strategy implemented in the gaming industry and have enabled Caesars Entertainment's management teams to enhance overall operating results at its properties.

Resort Properties Preliminary Offering Memorandum, dated September 24, 2013, at 2. Partly as a result of Total Rewards' success, about 47% of the "play" in Caesars' casinos in 2012 consisted of customers crossing from one Caesars property to another.

52.     Total Rewards has made Caesars' national network of largely unprofitable regional casinos, in essence, a "farm system" that identifies Caesars' best customers and feeds them to its destination casinos, particularly those located in Las Vegas. As CEC recently put it, "our collection of distinctly branded properties in Las Vegas, tied together through Total Rewards, helps us capture a greater share of wallet with customers than we would otherwise achieve."

21

53.    Total Rewards and all of the information, databases and other intellectual property comprising it are, and always have been, owned by CEOC.

**E.    CEOC'S INSOLVENCY.**

54.    CEOC's operations are unprofitable because of its number of underperforming regional casinos and CEOC's massive debts.  Precise numbers for all periods are difficult to come by because CEC consolidates CEOC's results with those of its other subsidiaries; however, CEOC accounts for most of CEC's operations and CEC's overall performance has been dismal.  According to CEC's recently-filed Form 10K for the year ended December 31, 2013, CEC had operating losses of $2.235 billion, total losses of $2.948 billion, and negative shareholders' equity of $3.122 billion.  CEC's financial condition actually is worsening:  during the prior year ended December 31, 2012, net operating losses for CEC were $319.9 million, with total losses of $1.497 billion.

55.    Notably, CEOC's losses during periods where its financial results have been reported are even larger than CEC's losses.  The chart below shows how CEOC's operating results have deteriorated dramatically since 2011.

22

| Year | Operating Income/Loss | Total Loss |
|------|----------------------|-----------|
| 2011 | $645.1 million | ($779.4 million) |
| 2012 | ($495.8 million) | ($1,705.8 million) |
| 2013 | ($1,435.4 million) | ($2,988.6 million) |

56. CEOC's operating losses come from its regional casinos. For example, in the Atlantic Coast region, where CEOC has owned and operated five of Caesars' six casinos (one of which CEOC has announced it intends to close), Caesars had a negative operating margin of (158%) and an operating loss exceeding ($2.4 billion). In other parts of the United States, where CEOC operates 17 of Caesars' 18 casinos, operating income was just $56.6 million, with an operating margin of only 1.9%, even including the strong performance of Harrah's New Orleans. Only in Las Vegas – where Caesars has nine casinos – has Caesars been able to generate positive operating results. There, Caesars had operating income of $527.2 million and an operating margin of 17.2%.

57. The transfers of valuable assets from CEOC to CEC, Acquisition and Growth Partners, as discussed in more detail below, have deepened CEOC's insolvency. Specifically, these transfers have stripped CEOC of valuable assets, making it impossible for CEOC to offset its losses at regional casinos with profits from casinos in Las Vegas and New Orleans and to outgrow its insolvent

23

**A0180**

condition. CEOC's insolvency has been further deepened by the fact that it has been liquidating assets and dissipating the proceeds of those transfers through continued loss-making operations.

58.    One reason for CEOC's losses has been the debt service obligations left over from the 2008 leveraged buyout. As noted above, CEOC is the issuer of $19.6 billion of CEC's overall debt and it has debt service obligations in 2014 of just under $2 billion. Three quarters of CEOC's debt will mature in the next five years. Over the past several years, CEOC has failed to generate sufficient EBITDA to service its obligations to pay interest on its debts, and the deficit is growing. The chart below illustrates CEOC's inability to service its interest expense from the results of its operations since 2011.

| Year | CEOC EBITDA | Interest Expense | Deficiency |
|------|-------------|------------------|------------|
| 2011 | $1,513.8 million | $2,030.9 million | ($517.1 million) |
| 2012 | $1,411.1 million | $2,001.8 million | ($590.7 million) |
| 2013 | $1,263.6 million | $2,146.3 million | ($882.7 million) |

59.    That deficiency does not even take into account the cash required for capital expenditures and other outlays not reflected in EBITDA. For example, in 2013, the actual negative cash flow was ($1,393.4 million).

60.    Not surprisingly, CEOC has substantial negative equity, and in amounts and at a rate that have ballooned:

24

**A0181**

| Year | Equity (in millions) |
|------|----------------------|
| 2010 | ($469) |
| 2011 | ($1,079) |
| 2012 | ($2,955) |
| 2013 | ($5,703) |

61.     CEC has been forced to admit that CEOC will be unable to pay its

debts as they become due.  In its recent 10K, CEC conceded:

> We do not expect that cash flow from operations will be
> sufficient to repay CEOC's indebtedness in the long-term
> and we will have to ultimately seek a restructuring,
> amendment or refinancing of our debt, or if necessary,
> pursue additional debt or equity offerings.

CEC 10-K filed on March 17, 2014, at 46.  CEC's admission is consistent with the

view of at least one national ratings agency.  As Standard & Poor's noted in the

press release for its April 8, 2014 downgrade, Caesars' "capital structure is

unsustainable" and that S&P did not believe that Caesars would have sufficient

liquidity in 2015.

## CEOC'S UNLAWFUL TRANSFERS

62.     CEC and CEOC's board, aided and abetted by CEC's directors,

undertook a series of transactions between 2010 and 2014 to strip CEOC of

valuable assets.  Controlled and dominated by CEC, CEOC's board rubber-

25

stamped the disposition of critical assets for inadequate consideration and less than reasonably equivalent value.

## A.     TRANSFER OF TRADEMARKS.

63.     In August 2010, in connection with the amendment of an existing financing facility for CEC, CEOC transferred trademarks with a book value of $45.3 million (the "Trademarks") to those CEC subsidiaries, even though CEOC already was insolvent.  Upon information and belief, CEOC received little, if any, consideration for the transfer.

## B.     TRANSFER OF CAESARS' ONLINE GAMING BUSINESS (2011).

64.     In May 2009, Caesars formed Caesars Interactive Entertainment ("CIE") as an indirect subsidiary of CEOC.  The purpose of CIE was to develop Caesars' business and brands through online gaming and develop the rights to a well-known event called the World Series of Poker.  CEC repeatedly has represented to investors and others that one of its most promising opportunities lay in the development of internet-based gaming.  For example, in a March 2, 2010 presentation, CEC told investors that online opportunities "could change the game" and was one of the "key drivers" of CEC's future value.

65.     At the time CIE was formed, it licensed various intangible assets and intellectual property rights from other entities within the Caesars structure, including the intellectual property related to the World Series of Poker, various

26

Caesars brands, and the right to participate in Total Rewards. CIE was required, in turn, to engage in certain marketing and promotional activities for CEC and CEOC and pay CEOC for customer referrals. Finally, under a shared services agreement, CEOC agreed to provide business support to CIE. Plaintiff is informed and believes that, under that shared services agreement or separately, CEOC made a substantial investment over the two years following the formation of CIE to develop the value of the intellectual property licensed by CIE.

66. Upon information and belief, at some time between April 4, 2011 and November 15, 2011, a subsidiary of CEOC transferred to CEC its interest in HIE Holdings, Inc., an entity that held 96.4% of the equity in CIE. The terms of this transfer were not publicly disclosed, but based on the absence of any information regarding the consideration in subsequent filings, Plaintiff is informed and believes that CEOC received inadequate consideration for the transfer.

67. CIE was enormously valuable at the time of the transfer. On March 30, 2012, just a few months after the transfer, CIE entered into an agreement with Rock Gaming, LLC ("Rock Gaming") pursuant to which Rock Gaming agreed to purchase 12,310 shares of CIE stock for $60.8 million in cash. Later SEC filings by CEC indicated that the shares sold to Rock Gaming constituted no more than 10.8% of CIE's stock, implying a value of over $560 million for all of CIE's common shares at the time of the deal. An Acquisition public filing in July 2013

27

disclosed that the value of CEC's ownership interest in CIE was then $525 million, subject to a further increase of up to $225 million based on potential earnings from CIE's social and mobile games in 2015 (the "CIE Potential Earnings"). As discussed below, CEC ultimately contributed its ownership interest in CIE to Growth Partners in October 2013 and, when it did so, ascribed a $779 million value to that ownership interest (equal to $554 million plus the CIE Potential Earnings).

68.     But for CEOC's transfer of its interest in CIE to CEC in late 2011, that extraordinary value would have been realized by CEOC.

## C.     RESORT PROPERTIES AND THE OCTAVIUS/LINQ TRANSFERS (2013).

69.     Although Las Vegas was badly hurt by the 2008 financial crisis and recession, CEC concluded in 2012 that the market there was in the midst of a recovery. In a meeting with CEC's lenders on February 6, 2012, CEC stated that "Las Vegas properties have shown robust growth, and are poised for future improvement as the Strip market continues to improve." A chart CEC displayed showed a consistently positive growth rate for the number of visitors to Las Vegas since being negative for nearly all of 2008 and a majority of 2009.

70.     CEC soon devised ways to divert Las Vegas assets and opportunities from CEOC to itself. In October 2013, CEC entered into a series of transactions to refinance a CMBS financing of properties owned indirectly by Resort Properties,

28

**A0185**

which included causing CEOC to transfer to a Resort Properties subsidiary two important Las Vegas properties – Octavius Tower and Project Linq.

71.     Octavius Tower was the newest of the six hotel towers that comprise the Las Vegas Caesars Palace complex.  Octavius Tower is a 23-story, high-end luxury hotel complex that features 662 guest rooms, 60 suites and six luxury villas and is intended to cater to Caesars Palace's VIP customers and ultra-high net worth guests from Asia.

72.     Project Linq is a dining, entertainment, and retail development corridor located between Caesars's Flamingo casino and The Quad Resort & Casino, on the east side of the Las Vegas Strip.  Project Linq is especially valuable to Caesars because of its "irreplaceable center-strip location" across the street from Caesars Palace and in the midst of six other Caesars properties.

73.     As a technical matter, CEC accomplished the transfer of the Octavius Tower and Project Linq by first shifting the ownership of various subsidiaries and holding companies that owned or controlled the properties from CEOC to CEC and then contributing the properties to Rio Properties, LLC, a subsidiary of Resort Properties.

74.     On information and belief, at the time of the transfers, the only consideration CEC offered for the deal – and the consideration CEOC's captive Board accepted – was to assume (through a refinancing) the $450 million in bank

debt associated with, and secured by, the two properties, to be paid without any consideration for the equity value of Octavius Tower and Project Linq. Plaintiff is informed and believes that, when this became public, one or more holders of Second Lien Notes objected to the inadequate consideration and self-dealing. CEC quickly increased the consideration by contributing notes issued by CEOC with an ascribed value of $69 million, plus $81 million in cash.

75. But, even the increased consideration of assumption of the $450 million in bank debt, $81 million in cash, and $69 million ascribed value of notes (for a total of approximately $600 million) was inadequate and nowhere close to reasonably equivalent value of the two properties. As of February 2011, when CEOC obtained the $450 million in bank debt, it already had spent at least $355 million in construction of the Octavius Tower alone and had contributed the underlying land, which, on information and belief, CEOC valued at $87 million. Upon information and belief, CEOC continued to spend money on the construction of the Octavius Tower in the following ten months. In addition, through June 30, 2013, CEOC had spent $309.6 million on construction of Project Linq, and presumably spent even more between then and October 2013 when the transfers occurred. Despite its investment of more than $750 million in Octavius Tower and Project Linq, CEOC received just over $600 million to show for that investment when the properties were transferred. To make matters worse, at the time of the

30

transfer, CEOC was obligated to pay about $50 million annually under long-term leases for space at Octavius Tower and Project Linq. The present value of that cash flow alone exceeds the consideration received for the transfer of those assets, and does not take into account the substantial value that Resort Properties will realize from the operation and lease of additional retail space at Project Linq, which by Caesars' own projections will generate anywhere from $23-28 million in additional EBITDA per year.

76.     On information and belief, neither Octavius Tower nor the Linq Project were offered to unaffiliated buyers or investors and neither was subject to any marketing process to ensure that CEOC received fair value for these assets.

**D.     THE CREATION OF ACQUISITION AND GROWTH PARTNERS.**

77.     In early 2013, the Sponsors formed two entities to which they could transfer other CEOC assets:

(a)  On February 25, 2013, CEC incorporated Acquisition and distributed subscription rights to Acquisition's common stock to CEC's existing shareholders. The Sponsors, as CEC's largest shareholders, received most of the subscription rights and, upon exercising those rights, took control of Acquisition. On October 21, 2013, the Sponsors entered into an Omnibus Voting Agreement with CEC and Acquisition that gave the Sponsors absolute control of Acquisition's board of directors.

31

**A0188**

(b)  On July 16, 2013, CEC organized Growth Partners for the main purpose of acquiring assets from CEOC.

(c)  On October 21, 2013, Acquisition acquired all of the voting units of Growth Partners.  That same day, CEC acquired all of the non-voting units of Growth Partners by contributing to Growth Partners all of the outstanding stock of CIE and certain unsecured CEOC notes held by one of CEC's subsidiaries.[4]

Thus, the Sponsors controlled Acquisition and Growth Partners and, together, the Sponsors and CEC (which itself is 64% owned by the Sponsors) owned most of the equity of Acquisition and Growth Partners.

78.  Once Acquisition and Growth Partners were organized, CEC took additional steps to transfer certain Caesars assets into one solvent, profitable group of companies with Growth Partners and Resort Properties at its core while retaining others in an insolvent, largely unprofitable group of companies focused around CEOC.  Specifically, the reorganization of Caesars into "Good Caesars"

---

[4]  Although the CEOC notes contributed by CEC have a face value of $1.1 billion, they were ascribed a value under the 2013 Transaction of only $750 million. Thus, CEC transferred the CEOC notes at a price of about 68% of par, based on the apparent premise that CEOC might be unable to repay the notes in full at maturity, which for certain of the notes was to occur as early as June 2015. Then, just six months later on May 6, 2014, CEC announced that CEOC intended to repay in full (actually, at a price in excess of par) $427 million in the unsecured CEOC notes held by Growth Partners that accrued interest at a rate of 5.625% and were not scheduled to mature until June 2015.

and a "Bad Caesars" would be accomplished by conveying, in a series of transactions, CEOC's more valuable, higher-growth properties to Growth Partners and Resort Properties (together with their subsidiaries, the "Good Caesars"), while leaving the low or no-growth (and, for the most part, money-losing) properties and massive acquisition debt at CEOC (the "Bad Caesars"). Freed from the demands of debt service, Growth Partners and Resort Properties could prosper. Meanwhile, CEOC would flounder until its creditors renegotiated their debt or CEOC simply erased its debt in a bankruptcy filing.

79. None of this could happen, of course, unless the board of CEOC went along. But because CEC had absolute control of CEOC, the CEOC board's assent was a foregone conclusion.

## E. THE OCTOBER 2013 TRANSACTION AGREEMENT AND THE MANAGEMENT SERVICES AGREEMENT.

80. On October 21, 2013, CEC, Acquisition and Growth Partners entered into an agreement (the "2013 Transaction Agreement") with CEOC and certain of CEC's subsidiaries to convey additional CEOC assets to entities controlled by CEC.

### *Transfer of Properties and Management Fees*

81. The 2013 Transaction Agreement required CEOC to transfer its interests in two valuable assets to Growth Partners – the equity of Planet Hollywood Resort & Casino ("Planet Hollywood"), a property located in

33

Las Vegas, and CEOC's interest in a casino under construction in Baltimore, Maryland. In addition, CEOC transferred to Growth Partners 50% of the stream of management fees CEOC was to earn from managing the two properties – even though CEOC would retain 100% of the responsibility for managing the properties. The stated consideration for these transfers was a cash payment of $360 million, allocated as follows: a) $210 million for Planet Hollywood; b) $70 million for the Planet Hollywood management fees; and c) $80 million for the Baltimore casino and management fees. A subsidiary of Growth Partners assumed $513.2 million of debt secured by Planet Hollywood (which was offset by roughly $40 million in restricted cash on deposit and, based on limited public disclosures, as much as an another $175 million in unrestricted cash held by the entity that owned Planet Hollywood).[5]

82.     The transactions were one-sided and unfair to CEOC and do not appear to have been negotiated at arm's-length. Plaintiff is informed and believes that none of the assets transferred was offered to any true third-party buyers or investors and none of the transfers was subject to any marketing process to ensure that CEOC could maximize the value of the transferred assets. Moreover, certain

---

[5]   The 10-Q filed by Acquisition for the quarter ending September 30, 2013, shows a cash balance of $203.1 million (excluding the $40 million in restricted cash at Planet Hollywood) that would include both Planet Hollywood and CIE. Of that amount, $28.0 million is held by a subsidiary of CIE in Israel, leaving $175 million that is attributable either to Planet Hollywood or CIE.

of the transactions involved the use of newly-created holding companies, which appears to have been a clumsy attempt to evade application of fraudulent transfer law or a breach of the 2009 Indenture.

### *The Management Services Agreement*

83.     A condition to the closing of the 2013 Transaction Agreement was that CEOC, Growth Partners and Acquisition enter into an agreement innocuously entitled the "Management Services Agreement." As CEC explained in a public filing, the purpose of the Management Services Agreement was to "allow[] [Acquisition], Growth Partners and their subsidiaries to leverage Caesars' infrastructure." CEC 8-K filed October 22, 2013, at 6. In fact, the Management Services Agreement turned CEOC into an underpaid administrative arm of Acquisition and Growth Partners and abetted CEC's step-by-step diversion of CEOC's valuable assets.

84.     The effect of the Management Services Agreement was to ensure that the current and future subsidiaries of Growth Partners and Acquisition (defined in the Management Services Agreement as "Recipients") would have access to CEOC's crown jewels, the benefits of Total Rewards and the value of the synergies generated from Total Rewards and CEOC's infrastructure, all for unfair terms and little compensation. Among the specific rights, benefits and services granted by CEOC to the Recipients were the following:

35

- Maintaining a complete accounting system for each current and future subsidiary of Growth Partners and Acquisition, including separate books and records for each Recipient. (Management Services Agreement, § 3.01).

- Preparing financing statements, annual plans and operating and capital budgets and business plans. (*Id*. §§ 3.03, 3.04).

- Establishing bank accounts and providing treasury and cash management functions. (*Id*. § 3.05).

- Preparing and filing all regulatory filings, including SEC filings and filings required by gaming control regulators. (*Id*. § 3.06).

- Granting each Recipient the rights to use the Caesars mark in their names and the Caesars mark and logo for various other purposes, including use as a domain name. (*Id*. § 3.07).

- Providing each Recipient with full access to the "Service Provider Proprietary Information and Systems," *i.e.*, Total Rewards.

- The Management Services Agreement acknowledged that the Total Rewards database and software "have been developed and/or acquired over many years through the expenditure of time, money and effort" and constitute confidential trade secrets. (*Id*. § 3.08). Effectively, these trade secrets are the crown jewels of the CEC empire and are owned entirely by CEOC.

- Offering the full array of all corporate functions to each Recipient, including information technology, website management, vendor relationship management, real estate, strategic sourcing, design and construction, regulatory compliance functions, finance and accounting, consolidated finance operations, risk management, internal audit, tax, record keeping, treasury functions, human resources, compensation, benefits, marketing and public relations, legal, payroll, accounts payable, security and surveillance, government relations, communications and data access services. (*Id.* § 3.09).

- Providing certain business advisory services, including development of business strategy and planning, handling acquisitions, and other development activities. (*Id*. § 3.10).

36

**A0193**

85.     In exchange for allowing Growth Partners and Acquisition to "leverage the Caesars infrastructure," receive the full benefit of the Total Rewards synergies and exploit the Caesars network (all of which was actually owned by CEOC), CEOC was required to work almost at cost. The "services fee" to be paid to CEOC is calculated simply as the Recipients' allocation of CEOC's personnel time and out-of-pocket costs, plus a 10% profit margin, but *minus* any discounts, rebates or similar incentives CEOC earned because of its efficiency or hard work. (*Id.* § 3.09). The service fee could be de minimis depending on how costs are allocated to the Recipients, something that must be blessed by Acquisition.

86.     Tellingly, CEOC has no control over the duration of the Management Services Agreement and, in particular, has no ability to terminate the agreement absent an Event of Default. Instead, the agreement remains in effect until Growth Partners is liquidated, which could occur as far into the future as April 21, 2022, unless the liquidation date for Growth Partners is extended further by CEC and Acquisition. Thus, the agreement assures Growth Partners and Acquisition of their ability to continue to "leverage the Caesars infrastructure," including the benefits of Total Rewards, for years to come.

87.     The Management Services Agreement is one-sided in other respects as well. The agreement imposes an open-ended commitment on CEOC, giving the Recipients complete discretion to unilaterally terminate, on 180 days' notice,

37

**A0194**

certain or all of the services CEOC provides.  In that case, the Recipients could withdraw from Total Rewards, thereby depriving CEOC's remaining properties of the value of the synergy associated with the properties CEOC was forced to transfer to Growth Partners.  Thus, the Recipients have the ability to use CEOC's property and services so long as it is convenient for them, but are free to walk away at any time; conversely, CEOC is bound to the agreement for at least eight more years.  To add insult to injury, the agreement requires CEOC to provide the Recipients with "transition assistance," including the transfer of all data and proprietary information regarding the Recipient's properties, if and when they do choose to terminate the agreement.  These terms do not resemble a transaction negotiated at arms' length.

88.     The net effect of the Management Services Agreement was to transfer, from CEOC to Growth Partners, the massive value and benefit of CEOC's Total Rewards program and management experience on profoundly unfair and uneconomic terms.  The 2013 Transaction Agreement thus left Growth Partners in control of some of CEOC's best assets, with complete untrammeled access to the immense value of CEOC's Total Rewards program for little more than CEOC's variable cost, and positioned to acquire future properties with similar access, in entities not contractually responsible for paying CEOC's creditors.

**F.      THE MARCH 2014 TRANSACTION AGREEMENT.**

89.     On March 1, 2014, CEC caused CEOC to enter into an additional Transaction Agreement (the "2014 Transaction Agreement") that required CEOC to (i) transfer a second collection of high-growth, high-value assets to Growth Partners, (ii) continue to manage those properties as before, but for half the fees it previously earned and (iii) contribute an unspecified amount of cash and much of CEOC's most valuable intellectual property – including Total Rewards – to a new joint venture.  The nominal consideration to CEOC for the 2014 Transaction Agreement is $2 billion which, as described below, is grossly inadequate.

*Transfer of Properties and Management Fees*

90.     The 2014 Transaction Agreement requires CEOC to sell four of its premier assets to Growth Partners, again apparently without any marketing process.  This time, CEOC must give up three of its four remaining Las Vegas properties – Bally's Las Vegas, The Cromwell and The Quad – and its Harrah's New Orleans casino, as well as 50% of the stream of management fees CEOC would have earned from managing the four properties.

91.     The Las Vegas and New Orleans destination properties are enormously valuable to CEOC.  According to Growth Partners, they are "irreplaceable" because of their key locations.  The New Orleans property is the largest casino in Louisiana and, as the only land-based casino in New Orleans, has

39

a 60% market share.  The Nevada Properties, in turn, are located at the center of

the Las Vegas Strip and occupy two of the four corners of a central intersection.

Growth Partners has represented that the three casinos are uniquely positioned to

take advantage of the recovering Las Vegas market and that all will enjoy

important synergies from the other, nearby Caesars properties.  Moreover, one of

the casinos (The Cromwell), has just been extensively renovated and redeveloped

and just fully opened in May 2014, and another (The Quad) is undergoing

substantial renovation.  Operating results for those two properties, only recently

depressed, are now on the verge of benefiting, in the case of The Quad, or have

already begun to benefit, in the case of The Cromwell, from the completion of

major improvements and an economic recovery in Las Vegas as shown by

improvements in gaming volumes.

92.    The nominal consideration to CEOC for the 2014 Transaction is

$2 billion.  However, this number overstates the true consideration for a number of

reasons.  First, funds required to pay the "Remaining Cromwell Costs" to reopen

the project already appear to be on deposit and will be transferred by CEOC to

Growth Partners.  Second, CEOC has agreed to indemnify Growth Partners for up

to $33.465 million in cost overruns that may occur at The Quad, along with

unquantified additional liabilities under multiemployer benefit plans based on facts

and circumstances which occurred prior to the closing date. *See,* 2014 Transaction Agreement, at §11.2(g).

93.     Third, and most importantly, the consideration paid by Growth Partners – both under the 2013 Transaction Agreement and the 2014 Transaction Agreement – fails to account for the disproportionate importance of the transferred assets to the overall value of CEOC's assets.  CEC has repeatedly disclosed that the value of its enterprise comes from its use of the broad network of regional casinos as feeders to its profitable Las Vegas and New Orleans properties.  Indeed, according to CEC's SEC filings, this is the very purpose of Total Rewards, its key competitive advantage, and the foundation of future growth.  Thus, the Las Vegas and New Orleans properties have a substantial value to CEOC that some valuation methods do not capture because, essentially, the entire Caesars casino system is operated to maximize the profits of the flagship properties.

94.     Thus, the consideration received by CEOC under the 2013 Transaction Agreement and 2014 Transaction Agreement in exchange for the transfer of five (including Planet Hollywood) of its most valuable properties in Las Vegas and New Orleans that together form the core of Total Rewards, plus the loss of the stream of management fees for each of those properties, is grossly inadequate to compensate CEOC for surrendering its most profitable and high-growth casinos.

41

*Transfer of Intellectual Property to Caesars Enterprise Services LLC*

95.     The 2014 Transaction Agreement also contemplates the transfer of additional critical elements of CEOC's intellectual property to CEC and to entities CEC controls.  Already, the Management Services Agreement (and a comparable agreement with Resort Properties' subsidiaries) entitles each Recipient of a transferred casino to a sweeping range of benefits to allow a Recipient to "leverage" CEOC's experience and intellectual property assets.  But the 2014 Transaction Agreement mandates something more – the creation of a new entity that will assume control and dominion over CEOC's most important intellectual property, which by CEC's own admission accounts for as much as a one-third premium on the stream of revenues from the properties.

96.     The 2014 Transaction Agreement previewed the creation of Services LLC, a new joint venture among CEOC, Resort Properties and Growth Partners. The formation of that entity is described in the 2014 Transaction Agreement as an essential element of the transaction.  The 2014 Transaction Agreement candidly admits that access to Total Rewards and "related Intellectual Property arrangements" are

> critical elements of the transaction such that Growth
> Partners would not have entered into this Agreement or
> the Ancillary Agreements without the fundamental
> understanding that this Agreement and the Ancillary
> Agreements, together with the Services Joint Venture

42

> Arrangements, taken as a whole, represent a single,
> integrated transaction.

2014 Transaction Agreement, at § 8.18.

97.     On information and belief, Growth Partners insisted upon the creation of Services LLC for the unlawful purpose of removing CEOC's most valuable asset – Total Rewards – from the reach of CEOC's creditors in the event of bankruptcy.  Acquisition's general counsel admitted as much when he said, at a regulatory hearing in Louisiana on April 24, 2014, that the creation of the Services LLC was requested by Acquisition's special committee based on "a fear on the Caesars Acquisition Company that parties might take away the Total Rewards Program from Caesars Acquisition Company and these CEOC lenders who – we don't know what their intentions are."  This echoed comments by Acquisition's management during a call on March 27, 2014 with potential lenders to Growth Partners, when they described the Services LLC as "bankruptcy remote" and explained that the general idea in creating Services LLC was to remove the assets of Services LLC from any bankruptcy filing by one of its owners – an obvious allusion to CEOC.  There is no other purpose.

98.     Initially, CEC and CEOC did not disclose many of the critical terms of the Services LLC.  On May 20, 2014, CEOC, Resort Properties, and Growth Partners executed the "Omnibus License and Enterprise Services Agreement" (the "Services LLC License Agreement") and the "Amended and Restated Limited

43

Liability Company Agreement of Caesars Enterprise Services, LLC" (the "Amended Services LLC LLC Agreement").  Together, these two agreements (collectively, the "Services LLC Agreements") implement CEOC's complete transfer and surrender of its dominion and control over Total Rewards and the provision of enterprise services, and remove the value of those core assets from the reach of CEOC's creditors.

99.     Among the material terms of the Services LLC Agreements are the following:

(a)  CEOC is granting the Services LLC a "non-exclusive, ***irrevocable, world-wide, royalty-free*** license" in and to all intellectual property that comprises Total Rewards – effectively giving Resort Properties and Growth Partiers the keys to the Total Rewards kingdom.

(b)  CEOC is also "transitioning" certain of its executives and employees to Services LLC, such that Services LLC (rather than CEOC) will now be the provider of corporate and other centralized enterprise-wide services ("Enterprise Services") to Caesars, thereby eliminating any existing dependence of Resort Properties and Growth Partners upon CEOC for such services.

(c)  Under the Services LLC Agreements, CEOC is ceding, to Resort Properties and Growth Partners, all of its existing control over Total

44

Rewards and the Enterprise Services. Instead, Services LLC will be equally controlled by Growth Partners, Resort Properties and CEOC. In addition, certain decisions by Services LLC may not be made without the unanimous consent of all of its members, including the following actions: extraordinary capital expenditures; any liquidation, dissolution or bankruptcy filing of Services LLC; any pledge of the assets of Services LLC; any use of Enterprise Services in a manner inconsistent with the Services LLC Agreements; any admission of new members to the Services LLC; any issuance of equity or incurrence of material indebtedness; material modifications or increases to the operating budget; any revisions to the allocation methodology for expenses; and any monetization of "Guest Data," *i.e.*, the sale of the customer data. As explained by CEOC, "any member of Services, LLC may block certain actions by Services, LLC that are in our interest," and "[i]n the event that our interests do not align with those of Growth Partners or [Resort Properties], the interest of Growth Partners or [Resort Properties] may be met before ours." CEC 8-K filed May 6, 2014, at Risk Factors.

(d) In exchange for transferring its core assets (and control over those assets), CEOC receives a 69.0% interest in Services LLC and becomes a party to the Services LLC License Agreements. That interest is, however,

essentially worthless to CEOC's creditors because it cannot be sold or assigned to third parties. For example, Section 3.4 of the Amended Services LLC Operating Agreement provides that the 69.0% ownership interest is non-transferable and cannot be sold, encumbered, or otherwise disposed of, except to "Permitted Transferees" (as defined in the Amended Services LLC Operating Agreement) which is limited to wholly-owned subsidiaries and any parent entity that owns or controls CEOC. Similarly, Section 16.4 of the Services LLC License Agreement prohibits CEOC from assigning or pledging any license to any third party without the express written consent of Resort Properties and Growth Partners. Notably, an "assignment" includes any sale or corporate reorganization. To the extent that there are carve-outs, they are limited to any "CEOC Property Owner" and do not allow any transfer to "a competitor of CEOC engaged in the gaming business," thereby excluding the most obvious purchasers of such collateral.

(e) The 69.0% interest is not only worthless to CEOC's creditors but also to CEOC. Upon any liquidation of Services LLC, any distributions on account of that interest are subordinate to repayment of the initial contributions to be made by Resort Properties (in the amount of $42.5 million) and Growth Partners (in the amount of $22.5 million), with any remaining proceeds to be distributed pro rata.

46

(f)  Although Services LLC will be equally controlled by the three entities, CEOC will bear 70.0% of the allocated costs, or about $70 million on an annual basis.  In contrast, Resort Properties will bear only 24.6% of the expenses and Growth Partners just 5.4%.  Moreover, under the Services LLC Agreements, the future allocation of expenses to Resort Properties and Growth Partners is capped at 30% and 16%, respectively.

(g)  In the event of any default by CEOC under the Services LLC Agreements, the consequences for CEOC are severe, and can include not only the loss of governance rights but also the loss of all rights to receive the Enterprise Services.  Among the "Events of Default" under the Services LLC Agreements is the filing for bankruptcy protection, the rejection of the Services LLC Agreements in bankruptcy, and the failure to make any required payments under the Services LLC Agreements.

100.   The overall effect of the Services LLC Agreements is to take CEOC's core assets and remove them from the reach of CEOC's creditors, in violation of laws that prohibit such actions.  The Services LLC Agreements will also prevent CEOC from leveraging any of the value of Total Rewards to generate much needed capital to operate the business.  Put differently, CEOC is being required to simply give away the Total Rewards system, which CEC concedes is the ultimate driver of Caesars' profitability.

47

**A0204**

101.    Moreover, CEOC will be required to assign to the Services LLC its portfolio of property management agreements.  These property management agreements are a material source of CEOC's income, yet CEOC will receive no consideration for the assignment.  However, CEOC's own properties will still be subject to such agreements, meaning that they will be required to pay property management fees to the Services LLC, which supposedly will be passed through to CEOC but only so long as the agreements remain in effect.

102.    In summary, under the 2014 Transaction Agreement, CEOC is (i) transferring four of its most valuable properties to Growth Partners, (ii) gifting control of its most valuable asset to the Services LLC, and (iii) being stripped of half of the value of its best property management contracts.  As a result, Growth Partners and Resort Properties will now effectively own most of the "hub" of the Caesars enterprise, leaving behind with CEOC the "spokes" that are located in deteriorating and less profitable (or unprofitable) markets and that exist largely to feed profitable business to Resort Properties and Growth Partners' destination properties.  CEOC's future access to the synergy associated with the transferred properties – and generated by Total Rewards – will hinge on CEOC's everlasting acquiescence to the unfavorable terms imposed upon it by the 2013 Transaction Agreement and 2014 Transaction Agreement.  Meanwhile, CEOC will be left with underperforming assets, reduced income and crushing debts, and CEOC's creditors

48

will be left without any ability to realize any of the value of Total Rewards through a sale or liquidation of CEOC's assets when the now-inevitable default under the existing indebtedness occurs.

103.     The enormous transfer of value from CEOC to Acquisition and Growth Partners pursuant to the 2014 Transaction Agreement is reflected in the dramatic increase in the price of Acquisition's publicly traded stock, and the decline in the value of the Second Lien Notes, in the days following the announcement of the 2014 Transaction Agreement.  In the five trading days following the March 3, 2014 announcement of the deal, Acquisition's stock price increased from $13.63 to $16.00, or 17.4%.  During that same period, the stock prices of comparable gaming companies did not experience similar increases.[6]  The only plausible explanation for these price movements was the market's belief that Growth Partners received substantially more value than it paid and that CEOC transferred more value than it received.

104.     The 2014 Transaction not only was made while CEOC was insolvent, but also further deepened CEOC's insolvency.  The announcement of the 2014 Transaction Agreement led to the immediate downgrade of CEOC's credit rating.

---

[6]   CEC's market capitalization also remained essentially unchanged during this period.  For CEC's shareholders, the loss of value to CEOC, which is insolvent, was offset by the increased value of CEC's 58% economic interest in Growth Partners.

49

On March 28, 2014, Moody's lowered CEOC's credit rating to Caa3 and of the

Second-Lien Notes from Caa3 to Ca. Moody's wrote:

> The proposed sale comes on the heels of the sale of
> Planet Hollywood, sale of its interest in a casino
> development in Baltimore, and the sale of Octavius
> Tower and Project Linq in Las Vegas, NV in late 2013.
> Moody's estimates that on a pro-forma basis, the
> proposed sale of the four casinos along with the previous
> sale of Planet Hollywood will reduce CEOC's annual
> EBITDA (which included Planet Hollywood for three
> quarters) in the range of $250 - $300 million,
> representing about 21% of CEOC's 2013 adjusted
> EBITDA. As a result, debt/EBITDA will rise above the
> estimated 16x at year-end 2013. Additionally, assuming
> an 8x multiple for valuation purposes, Moody's estimates
> bondholders will lose value in the range of $2.0 billion to
> $2.4 billion.

https://www.moodys.com/research/Moodys-takes-rating-actions-on-several-

entities-in-the-Caesars--PR_295963. It is Moody's view that, despite the $1.8

billion received, it is the loss of income from the properties sold that heightens the

probability of default. On April 8, 2014, Standard & Poor's followed suit,

lowering its recovery rating on CEOC's first lien debt to "3" (50% to 70%

recovery) and its issue-level rating to CCC-.

105.   As with the 2013 Transaction Agreement, Plaintiff is informed and

believes that none of the asset transfers under the 2014 Transaction Agreement or

the creation of Services LLC, was subject to any marketing process to ensure that

CEOC could maximize their value.

50

### *Award of Equity in Acquisition to Senior CEC Management*

106.   On April 13, 2014, CEC's board adopted an equity-based compensation plan, which provides for certain CEC officers, employees, consultants, advisors and others to receive compensation in the form of shares of Acquisition stock.  The Board justified this action as a means of providing incentives tied to the success of Growth Partners.  CEC disclosed that it expects that each of its executive officers will receive an award under this plan.

### G.   THE MAY 6 "COMPREHENSIVE FINANCING" AND THE PARTIAL CLOSING.

107.   Defendants' efforts to siphon value from CEOC to Growth Partners hit a snag when, at a hearing on April 24, 2014, the Louisiana Gaming Control Board ("LGCB") postponed consideration of the request of CEC and Growth Partners to transfer the Harrah's New Orleans property until May 19, 2014.

108.   Rather than wait until May 19, 2014 to find out whether the transfer of Harrah's New Orleans would be approved by the LGCB, CEC caused CEOC to agree, by an amendment to the 2014 Transaction Agreement dated May 5, 2014 (the "Amended 2014 Transaction Agreement"), to revise the 2014 Transaction Agreement to provide for two closings, one for the Nevada Properties, and the other for Harrah's New Orleans.  By doing so, CEC and Growth Partners could rush through the transfers of the Nevada Properties.  The closing of the sale of the Nevada Properties occurred on May 6, 2014.  Thereafter, on May 19, 2014, the

51

**A0208**

LGCB approved the transfer of Harrah's New Orleans to Growth Partners, and that sale closed on May 20, 2014.

109. Notably, the closing of the Nevada Properties sale excluded a portion of the real property that comprises Bally's Las Vegas, which consists of a cleaning plant Caesars uses to wash linens and other items used in Caesars' Las Vegas properties (the "Laundry Facility"). At the last minute, Growth Partners apparently became concerned that the Laundry Facility might have polluted the area around it, creating material environmental liabilities. Accordingly, Growth Partners declined to take immediate ownership of the Laundry Facility – a perfect metaphor for CEC's and Growth Partners' transfer of the most valuable assets to "Good Caesars" while leaving the (in this case, literally) toxic assets behind at "Bad Caesars." Notably, the Amended 2014 Transaction Agreement does not require Growth Partners to pay for its use of Laundry Facility that CEOC still owned as of the first closing.[7]

## H.    EVENTS OF DEFAULT UNDER THE 2009 INDENTURE.

110. Beyond the partial closing of the Nevada Properties sale on May 6, 2014, CEC and CEOC announced a number of other initiatives designed to benefit CEC and Growth Partners at the expense of CEOC and its creditors. In particular, CEC agreed to sell 5% of CEOC's common stock (the "Disposition"), to

---

[7]  CEC has not disclosed whether the sale of the Laundry Facility has since closed.

unidentified investors. The sale was clearly not a bona fide effort to raise capital, as evidenced by the fact that it reportedly generated only $6.15 million in proceeds. Rather, this equity sale was conducted in an attempt to extricate CEC from its guaranty of the Second Lien Notes under Section 12.01 of the 2009 Indenture (the "Parent Guarantee"). In the 8-K Report filed on May 6, 2014, CEC stated that "[u]pon the completion of the Disposition, Caesars Entertainment's guarantee of CEOC's outstanding secured and unsecured notes was automatically released." However, this is untrue: under the 2009 Indenture, the Disposition does not result in a release of the guarantee by CEC, and CEC's denial and/or disaffirmance of the payment guarantee itself constitutes a violation of the 2009 Indenture.

111.   CEC tried yet another route to release its obligations under the Parent Guarantee. On or about June 2, 2014, CEOC delivered a certificate, signed by its Chief Financial Officer, to the Trustee that stated that CEOC "elects to automatically release the Parent Guarantee pursuant to the last paragraph of Section 12.02(c) of the 2009 Indenture." That provision in the 2009 Indenture, however, does not give CEOC the right to release the Parent Guarantee unless CEC's guarantee of "the Credit Agreement, the Existing Notes or any Indebtedness which resulted in the obligation to guarantee the Notes has been released or discharged." Second Supplemental Indenture to the 2009 Indenture at §1. Yet, neither CEC nor CEOC had properly released CEC's guarantee of the Credit

53

Agreement, the Existing Notes, or other Indebtedness that would legitimately permit CEOC to release the Parent Guarantee of the Notes. Moreover, to the extent that such a right existed, by releasing the Parent Guarantee, CEOC disposed of an asset without obtaining any value for it, solely to benefit CEC.

112. On June 5, 2014, holders of more than a majority of the Second Lien Notes issued a Notice of Default to CEOC that identified two Events of Default under the 2009 Indenture. First, the Notice of Default asserted that a default occurred under the 2009 Indenture as a result of CEOC failure to comply with its obligations under section 4.06 of the 2009 Indenture with respect to the sales of the Nevada Properties and Harrah's New Orleans.

113. Section 4.06(a) of the 2009 Indenture provides, in part, that:

> The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Issuer or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value (as determined in good faith by the Issuer) of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents . . .

2009 Indenture at §4.06(a).

114. As stated above, the consideration received by CEOC as a result of the 2014 transfers of the Nevada Properties and Harrah's New Orleans was not at least equal to the Fair Market Value (as defined in the 2009 Indenture) of the assets

54

sold and any contrary determination by CEOC was not made in good faith.  The Default under section 6.01(c) of the 2009 Indenture became an Event of Default on August 4, 2014, if not earlier, as a result of CEOC's failure to cure.[8]

115.    In addition, the Notice of Default asserted that a Default occurred under the section 6.01(h) of the 2009 Indenture as a result of CEC's denial or disaffirmance of its obligations under the Parent Guarantee.  Section 6.01(h) provides:

> (h) the Note Guarantee of the Parent Guarantor or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Parent Guarantor denies or disaffirms its obligations under this Indenture or its Parent Guarantee and such Default continues for 10 days,

2009 Indenture at §6.01(h).

116.    As stated above, CEC denied and disaffirmed its obligations under the Parent Guarantee on May 6, 2014.  Under section 6.01(h) of the 2009 Indenture, that Default constituted an Event of Default as a result of such denial continuing for a period in excess of ten days.

---

[8]    Section 6.01(c) of the 2009 Indenture states "the failure by the Issuer or any Restricted Subsidiary to comply for 60 days after notice with its other agreements contained in the Notes or this Indenture."

## I.     THE $1.75 BILLION REFINANCING TRANSACTION.

117.   In yet another effort to benefit Growth Partners and CEC at the expense of CEOC and its creditors, on May 6, 2014, CEC announced a proposed amendment (the "$1.75 Billion Refinancing") of its existing first lien credit agreement (the "Credit Agreement"), pursuant to which CEOC sought to issue $1.75 billion in new "B-7" term loans, with first priority liens and interest at a rate of 9.8% per annum.  The proceeds were used primarily to repay outstanding debt that, for the most part, was at interest rates lower than the B-7 Loans and, in many instances, had later maturity dates than the B-7 Loans.

118.   Under the terms of the $1.75 Billion Refinancing, CEC obtained a modification to its guaranty under the Credit Agreement, so as to convert it from an unconditional guaranty of full payment into a guaranty of collection subject to a fixed dollar cap.  By obtaining this modification, CEC not only sought to limit its guaranty exposure under the Credit Agreement, for its own benefit, but also sought manufacture yet another argument to attempt to evade its guarantee obligations under the Second Lien Notes, at the expense of CEOC and its creditors.

119.   In conjunction with the $1.75 Billion Refinancing, CEOC announced on May 6, 2014 that it was launching an exchange offer to purchase existing notes that included the $427 million in unsecured 5.625% CEOC notes held by Growth Partners for a purchase price of $1,048.75 per $1,000 principal amount, a purchase

56

price well above par. Growth Partners had previously committed to use the proceeds to purchase B-7 Loans, which would have provided Growth Partners with substantial benefit at the expense of CEOC and its creditors in the form of a higher interest rate and greater security on account of its notes. Instead, on July 28, 2014, CEC announced that none of the B-7 Loans were to be allocated to Growth Partners, meaning that Growth received full cash payment on account of its CEOC notes, nearly one year prior to their scheduled maturity. That premature payment deprived CEOC of much needed cash to service its other debt and pay operating expenses, constituting yet another transfer of value from CEOC to Growth Partners.

## SELF-DEALING

120. As noted above, CEOC was at all relevant times, in fact or substance, a wholly-owned subsidiary of CEC, which either owned or was under common control of the Sponsors with Resort Properties, Acquisition and Growth Partners. Thus, all of the transactions identified in this Complaint were self-dealing transactions. As a result, the terms, conditions and consideration of each transaction are subject to the test of their entire fairness to CEOC. Moreover, the burden of establishing entire fairness is one that CEOC and the other defendants bear.

57

121.    Although it is common in self-dealing transactions for the affected parties to form special board committees to negotiate the transactions, there is no evidence that this happened here.  None of the public filings by CEC indicate that a special committee of any sort was formed from the CEOC board at the time that CEOC agreed to convey its interest in CIE to CEC.  Similarly, none of CEC's or Resort Properties' public filings suggest that there was a special committee of the board of CEOC involved in the decision to transfer Octavius Tower and Project Linq to Resort Properties in October 2013.  Nor, for that matter, does any public filing disclose that there was a special committee of the CEOC board formed in connection with the negotiation or execution of the 2013 Transaction Agreement. CEC did disclose that it obtain "certain opinions" regarding the fairness of the transactions from a financial point of view, but the disclosure made clear that the opinions were with respect to CEC, not CEOC.

122.    CEC's public filings disclose that it did appoint special board committees in connection with the 2014 Transaction Agreement, but only of the CEC and Acquisition boards, and not for CEOC.  CEC disclosed that it solicited fairness opinions, but once again only for the special committees of CEC and Acquisition.  Significantly, CEC and CEOC have thus far not publicly disclosed the fairness opinions.

58

123.   But even if CEOC has formed a special committee of its board, or now seeks to do so for the purpose of conducting a retroactive review and approval process, the actions and decisions of such a committee would not be entitled to any deference.  CEOC was, at all relevant times, in fact or substance, a wholly-owned subsidiary of CEC and every one of CEOC's directors thus has been appointed by the entity that is self-dealing.  Furthermore, there is no evidence in any filing, disclosure or other document, that any special committee of the CEOC board met, engaged experts, analyzed the proposed transactions, or received a fairness opinion.  It is revealing that CEOC, which has been insolvent for several years, did not hire a financial advisor until the week of May 12, 2014, after CEOC had already closed on the sale of the Nevada properties.  Finally, the onerous, unfair and one-sided nature of the series of transactions among CEC, Acquisition and CEOC demonstrate beyond question that the terms of these deals were unconscionable and the consideration grossly inadequate.  Any special committee of CEOC's board, if one existed at all, was clearly pretextual.

## DEMAND EXCUSED

124.   With regard to the derivative claims asserted in this Complaint, the Trustee has not made demand upon CEOC's board of directors to state such claims against the Defendants.  As discussed below, a demand would be futile and therefore is excused.

59

125.   As set forth above, self-dealing was at the heart of the transactions challenged here.  The purpose of the transactions was to transfer valuable, high-growth assets from a debt-ridden, troubled CEOC to Acquisition and Growth Partners – special vehicles controlled by the Sponsors.  Four of the six current directors of CEOC are not independent and are partners in, or are affiliated with, one of the Sponsors.  Because the Sponsors will be personally enriched by these self-dealing transactions, demand on the CEOC board would be futile.

126.   Demand also is excused because four of the six members of CEOC's board each face a substantial likelihood of non-exculpated liability for the wrongs alleged herein, and therefore cannot exercise their independent business judgment in determining whether claims should be asserted to remedy those wrongs.

127.   Finally, as set forth above, demand is excused because the grossly one-sided nature of the transactions at issue reveal the complete disregard the directors of CEOC have shown for their fiduciary duties.

## CLAIM I

### BREACH OF CONTRACT [CEOC]

### (2009 Indenture - §§ 4.06 and 6.01(c))

128.   Plaintiff repeats and realleges paragraphs 1 through 127 above.

129.   Section 4.06 of the 2009 Indenture provides that CEOC shall not, and shall not permit any of its Restricted Subsidiaries (as defined in the 2009

60

Indenture) to, cause or make an Asset Sale (as defined in the 2009 Indenture) unless, among other requirements, CEOC or any of its Restricted Subsidiaries receive consideration at the time of such Asset Sale at least equal to the Fair Market Value (as determined in good faith by CEOC) of the assets sold or otherwise disposed of.

130.    The sales by CEOC and/or its Restricted Subsidiaries under the 2014 Transaction Agreement of the Nevada Properties and Harrah's New Orleans, and 50% of the ongoing management fees and any termination fees payable under the applicable property management agreements for each of the Nevada Properties and Harrah's New Orleans, violated Section 4.06(a) of the 2009 Indenture, because, among other things, (i) the consideration received by CEOC was not at least equal to the Fair Market Value (as defined in the 2009 Indenture) of the assets sold and any determination to the contrary by CEOC was not made in good faith, and (ii) any dispositions of Equity Interests (as defined in the 2009 Indenture) or assets by Restricted Subsidiaries to purportedly Unrestricted Subsidiaries (as defined in the 2009 Indenture) neither constitute Permitted Investments (as defined in the 2009 Indenture) (as such transfers are not "investments" within the ordinary meaning of that term) nor alter the fact that such dispositions are part of a series of related transactions resulting in the sale of property, assets, and/or Equity Interests of CEOC and/or one or more of its Restricted Subsidiaries.

131.   Holders of a majority of the Second Lien Notes provided CEOC notice of this Default on June 5, 2014.  CEOC failed to cure this Default during the 60 day period provided by the 2009 Indenture.  Accordingly, an Event of Default has occurred under section 6.01(c) of the 2009 Indenture.

132.   In addition to transfers that constitute Defaults under Section 4.06(a) of the 2009 Indenture or other provisions, CEOC has breached its implied duty of good faith and fair dealing by engaging in the transfers and transactions described above that date back to 2010, which individually and collectively have deprived Plaintiff and the holders of Second Lien Notes of the right to receive the benefits to which they are entitled under the 2009 Indenture and the Second Lien Notes.

133.   By virtue of CEOC's breaches of Sections 4.06 and 6.01(c) of the 2009 Indenture and the implied duty of good faith and fair dealing, Plaintiff has incurred damages.  The Court should award money damages against CEC in an amount to be determined.

## CLAIM II

## BREACH OF CONTRACT [CEC]

### (2009 Indenture - § 6.01(h))

134.   Plaintiff repeats and realleges paragraphs 1 through 133 above.

135.   Section 6.01(h) of the 2009 Indenture provides that an Event of Default occurs with respect to the Notes if "the Note Guarantee of the Parent

Guarantor . . . ceases to be in full force and effect (except as contemplated by the terms thereof) or the Parent Guarantor denies or disaffirms its obligations under this Indenture or its Parent Guarantee and such Default continues for 10 days."

136.   In violation of Section 6.01(h) of the 2009 Indenture, on May 6, 2014, CEC denied and/or disaffirmed its obligations under the 2009 Indenture and/or the Parent Guarantee by stating, in an 8-K Report filed that same date, that upon completion of the sale of 68.1 shares of CEOC's common stock to unidentified investors, "Caesars Entertainment's guarantee of CEOC's outstanding secured and unsecured notes was automatically released."

137.   CEC has denied and/or disaffirmed its obligations under the 2009 Indenture and/or the Parent Guarantee notwithstanding the fact that under Section 12.02(c) of the 2009 Indenture, at least two of the three conditions necessary for a release of the Parent Guarantee under Section 12.02(c) of the 2009 Indenture have not yet occurred, specifically, those set forth in Section 12.02(c)(ii) and Section 12.02(c)(iii) as set forth below in paragraph 150.

138.   Under Section 6.01(h) of the 2009 Indenture, the continuation for a period of ten days of the Default on account of CEC's denial and/or disaffirmance of its obligations under its guarantee constitutes an Event of Default.  That ten-day cure period expired on May 16, 2014.

139.   In addition to the Defaults under Section 6.01(h) of the 2009 Indenture and other breaches of the 2009 Indenture, CEC has breached its implied duty of good faith and fair dealing by engaging in the transfers and transactions described above that date back to 2010, which individually and collectively have deprived Plaintiff and the holders of Second Lien Notes of the right to receive the benefits to which they are entitled under the 2009 Indenture and the Second Lien Notes.

140.   By virtue of the Event of Default under Section 6.01(h) of the 2009 Indenture and the breach of the implied duty of good faith and fair dealing, Plaintiff has incurred damages.

141.   The Court should award money damages against CEC in an amount to be determined.

142.   Section 12.01(j) of the 2009 Indenture provides that "Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Trustee or any holder in enforcing any rights under this Section 12.01." Accordingly, this Court should also award attorneys' fees and expenses incurred by the Trustee and any holder of Second Lien Notes in enforcing the Parent Guarantee.

## CLAIM III

### DECLARATORY RELIEF AGAINST CEC REGARDING ENFORCEABILITY OF PARENT GUARANTEE

(10 Del. Code §§ 6501, 6502)

143.    Plaintiff repeats and realleges Paragraphs 1 through 142 above.

144.    This request is brought pursuant to 10 Del. Code §§6501, 6502, which empowers this Court to declare the rights of parties and determine any question regarding the construction or validity of any instrument or contract.

145.    An actual controversy exists between the Plaintiff and CEC regarding the validity and enforceability of CEC's obligations under the Parent Guarantee of the Second Lien Notes under the 2009 Indenture.

146.    On May 6, 2014, CEC announced that it had "completed the sale of 5% of the equity in CEOC to institutional investors in a private transaction."  CEC 8-K filed May 6, 2014.  CEC has asserted that, "The sale of equity in CEOC resulted in the release of the Caesars Entertainment guarantee of CEOC's bonds in accordance with the terms of the bond indentures."  *Id.*

147.    Contrary to the contention of CEC, the sale of equity of CEOC did not result in the release of CEC's guarantee of the Second Lien Notes under the 2009 Indenture.

148.    Section 12.01(g) of the 2009 Indenture states:  "Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in

65

full of all the Guaranteed Obligations." The definition of "Guarantor" under the 2009 Indenture includes the "Parent Guarantor" which is CEC. To date, the Guaranteed Obligations have not been paid in full and, thus, the Parent Guarantee remains in full force and effect.

149. Section 12.01(f) of the 2009 Indenture states: "Except as ***expressly set forth*** in Sections 8.01(b), 12.02 and 12.06, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise." 2009 Indenture at §12.01(f) (Emphasis added).

150. Section 12.02(c) of the 2009 Indenture, upon which CEC appears to rely in its denial and/or disaffirmance of its Parent Guarantee, provides:

> (c) The Parent Guarantee shall terminate and be of no further force or effect and the Parent Guarantor shall be deemed to be released from all obligations under this Article XII upon:
>
> (i) the Issuer ceasing to be a Wholly Owned Subsidiary of Harrah's Entertainment;
>
> (ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary of Harrah's Entertainment in accordance with Section 5.01 and such transferee entity

66

**A0223**

assumes the Issuer's obligations under this Indenture; *and*

(iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

In addition, the Parent Guarantee will be automatically released upon the election of the Issuer and Notice to the Trustee if the guarantee by Harrah's Entertainment of the Credit Agreement, the Existing Notes or any Indebtedness which resulted in the obligation to guarantee the Notes has been released or discharged.

2009 Indenture at § 12.02(c) (as amended by the Second Supplemental Indenture)(emphasis added).

151.   Under the "express" language of Section 12.02(c), the use of the word "and" to link each of the three conditions in clauses (i), (ii) and (iii) means that each of the three conditions must be satisfied in order for termination of the release of the Parent Guarantee to occur.

152.   CEC's proposed reading of Section 12.02(c) also conflicts with Section 12.01(g), under which CEC expressly agreed that its Parent Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations.

153.   Nor is CEOC's election to release the Parent Guarantee effective as CEOC and CEC have not effectively discharged or released CEC's guarantee of

67

**A0224**

the Credit Agreement (as defined in the 2009 Indenture) or the Existing Notes (as defined in the 2009 Indenture).

154.    Accordingly, Plaintiff is entitled to a declaration that the Parent Guarantee has not been released and remains valid, binding and enforceable against CEC.

## CLAIM IV

### INTENTIONAL FRAUDULENT TRANSFER

### (6 Del. C. § 1304)

155.    Plaintiff repeats and realleges paragraphs 1 through 154 above.

156.    Plaintiff, and holders of Second Lien Notes whose interests Plaintiff represents, were and remain present creditors of CEOC as of all of the dates that transfers were made by CEOC.

157.    The transfers of the Trademarks in 2010, of CIE in 2011, of Octavius Tower and Project Linq in 2013, and the transfers under the 2013 Transaction Agreement, the 2014 Transaction Agreement and the Services LLC Agreements were made by CEOC.  In the alternative, certain of the transfers were made by newly-formed sham holding companies that are in fact alter egos of CEOC that exist for no purpose other than as a vehicle to engage in fraudulent transfers and that, under applicable law, should therefore be collapsed with CEOC such that the transfers are deemed to have been made by CEOC.

68

158.   The transfers of the Trademarks, CIE, Octavius Tower and Project Linq, and the transfers under the 2013 Transaction Agreement and 2014 Transaction Agreement, and the Services LLC Agreements were made by CEOC with actual intent to hinder, delay or defraud CEOC's creditors because the purpose and effect of the transfers is to place critical and valuable assets of CEOC beyond the reach of CEOC's creditors.

159.   Among a multitude of factors evidencing the actual intent of CEOC are the following:  (1) the transfers were to affiliates of CEOC; (2) the shareholders of CEOC retain control of the property after the transfers; (3) certain aspects of the transactions have not yet been disclosed (such as, for example, the consideration, if any, provided to CEOC on account of the transfers); (4) the value of the consideration received is not reasonably equivalent to the value of the assets transferred; (5) CEOC was insolvent on and after the date of each transfer; (6) CEOC is transferring essential assets of the business to an entity (Services LLC) that is owned by affiliates and that will license rights to affiliates; (7) CEOC has transferred and is transferring essential properties to Growth Partners and Resort Properties, which are owned and controlled by affiliates of CEOC; and (8) CEOC has transferred and is transferring assets to entities that are "bankruptcy remote" to assure that the assets will not be available in bankruptcy to satisfy the claims of CEOC's creditors.

160.    Accordingly, the transfers of the Trademarks, CIE, Octavius Tower and Project Linq, and the transfers under the 2013 Transaction Agreement and 2014 Transaction Agreement, and the Services LLC Agreements should be avoided or the value of the property transferred must be returned to CEOC.

## CLAIM V

### CONSTRUCTIVE FRAUDULENT TRANSFER

### (6 Del. C. § 1305)

161.    Plaintiff repeats and realleges paragraphs 1 through 160 above.

162.    Plaintiff, and holders of Second Lien Notes whose interests Plaintiff represents, are creditors of CEOC and were creditors of CEOC as of all of the dates that transfers were made by CEOC.

163.    The transfers of the Trademarks, CIE, Octavius Tower and Project Linq, and the transfers under the 2013 Transaction Agreement, the 2014 Transaction Agreement, and the Services LLC Agreements were made by CEOC. In the alternative, certain of the transfers were made by newly-formed sham holding companies that are in fact alter egos of CEOC that exist for no purpose other than as a vehicle to engage in fraudulent transfers and that, under applicable law, therefore should be collapsed with CEOC such that the transfers are deemed to have been made by CEOC.

70

164.   At all relevant times, from June 2010 to the present, CEOC was insolvent because the sum of its debts exceeded the sum of its assets, at a fair valuation.  In addition, either before or as a result of the transfers, CEOC's remaining assets were and remain unreasonably small in relation to its business, and CEOC is unable to pay its debts as they become due.

165.   The transfers of the Trademarks, CIE, Octavius Tower and Project Linq, and the transfers under the 2013 Transaction Agreement, the 2014 Transaction Agreement, and the Services LLC Agreements, and each of the transfers thereunder, were made by CEOC for less than reasonably equivalent value.

166.   Accordingly, the transfers of the Trademarks, CIE, Octavius Tower and Project Linq, and the transfers under the 2013 Transaction Agreement and 2014 Transaction Agreement, and the Services LLC Agreements should be avoided or the value of the property transferred must be returned to CEOC.

## CLAIM VI

### BREACH OF FIDUCIARY DUTY [CEC]

167.   Plaintiff repeats and realleges paragraphs 1 through 166 above.

168.   At all relevant times, CEC owned all of the voting stock of CEOC and controlled and dominated the business and affairs of CEOC.

169.   At all relevant times, CEOC has been insolvent.  As a result, CEC owed fiduciary duties to CEOC's creditors, including the holders of the Second Lien Notes.

170.   Because CEC controlled CEOC and was under the Sponsors' common control along with Resort Properties, Acquisition and Growth Partners, all of the transactions described in this Complaint constituted, or will constitute, self-dealing by CEC.  Accordingly, CEC's actions are not entitled to deference and the appropriateness of the transactions is governed by the standard of entire fairness. The burden is upon CEC to demonstrate that the consideration CEOC received in the transactions and the process by which the transactions were conceived, negotiated and approved was entirely fair to CEOC.

171.   In fact, the consideration received by CEOC in the transactions was and is not fair for the reasons set forth above.

172.   In addition, the process by which CEOC was compelled to enter into these transactions was unfair.  The entire purpose of the series of transactions was to transfer valuable assets from CEOC to Growth Partners so that CEC could separate CEOC's assets from its debts.  CEOC had no independent voice in the negotiations of the transactions and no serious attention was ever given to alternatives to the several transactions.

173.   CEC also violated its fiduciary duties to CEOC and its creditors by compelling CEOC to engage in a process that was unfair, by requiring CEOC to enter into one-sided agreements, and by forcing CEOC to accept inadequate consideration in exchange for CEOC's transfers and commitments.

174.   CEC's conduct is not excused or protected by its claim that it formed a special committee of the board of CEC or CEOC to negotiate the transactions or by its claim that the special committee received one or more opinions from banking firms which may or may not be disinterested persons that the transactions were fair to CEOC from a financial point of view.  Because of the complete domination and control of CEOC by CEC, the transactions and each of their elements must be subjected to the highest level of scrutiny.  Moreover, it is obvious from the sheer magnitude of the asset transfers from CEOC to Growth Partners that the consideration given to CEOC was not fair in view of the synergies that were taken from CEOC.

175.   The Court should award money damages against CEC in an amount to be determined.

176.   In addition, the Court should enjoin completion of the Services LLC Agreements.

## CLAIM VII

## BREACH OF FIDUCIARY DUTY [CEOC's Directors]

177.   Plaintiff repeats and realleges paragraphs 1 through 176 above.

178.   The board of CEOC owed CEOC an unqualified fiduciary duty of loyalty.  Among other things, this required the directors to put the interests of CEOC ahead of their own interests, to avoid self-dealing and to maximize the consideration that CEOC would receive from any transaction it entered into.

179.   Because CEOC was insolvent at all relevant times, CEOC's directors owed (and continue to owe) their fiduciary duties to CEOC's creditors, including the holders of the Second Lien Notes.

180.   CEOC's board was elected or appointed by CEC.  Because, CEC, Acquisition, Growth Partners and CEOC have at all times been under common control, all of the transactions described above have involved self-dealing. Accordingly, the directors' actions are not entitled to deference and the appropriateness of the transactions is governed by the standard of entire fairness. The burden is upon the directors to demonstrate that the consideration CEOC received in the transactions and the process by which the transactions were conceived, negotiated and approved was entirely fair to CEOC.

181.   In fact, the consideration received, or to be received, by CEOC in the transactions is not fair and was not fair for the reasons set forth above.

182.   In addition, the process by which CEOC was compelled to enter into these transactions was unfair.  The entire purpose of the series of transactions has been to transfer valuable assets from CEOC to Growth Partners so that CEC can separate CEOC's assets from its debts.  CEOC had no independent voice in the negotiation of the transactions and no serious attention was given to alternatives to the several transactions.

183.   The CEOC directors violated their fiduciary duties to CEOC by compelling CEOC to engage in a process that was unfair, by requiring CEOC to enter into one-sided agreements, and by forcing CEOC to accept inadequate consideration for CEOC's transfers and commitments.

184.   The Court should award money damages against the CEOC directors in an amount to be determined.

185.   In addition, the Court should enjoin the defendant directors from taking any steps that would lead to the completion of the Services LLC Agreements.

## CLAIM VIII

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### [CEC'S DIRECTORS]

186.   Plaintiff repeats and realleges paragraphs 1 through 185 above.

187. The board of CEOC owed CEOC unqualified fiduciary duties of loyalty, care, and good faith.

188. Because CEOC was insolvent at all relevant times, CEOC's directors owed (and continue to owe) their fiduciary duties to CEOC's creditors, including the holders of the Second Lien Notes.

189. Among other things, this required the directors to put the interests of CEOC ahead of their own interests, to avoid self-dealing and to maximize the consideration that CEOC would receive from any transaction it entered into.

190. CEOC's directors failed to exercise the necessary care, and breached their duties of good faith, care, and loyalty as set forth in this Complaint.

191. CEC's directors knew that CEOC's directors owed fiduciary duties as alleged herein.

192. CEC's directors aided and abetted the CEOC directors' breach of their fiduciary duties by, among other things, negotiating and requiring CEOC to consummate the transactions described herein.

193. CEOC has been substantially damaged as a direct and proximate result of the CEC directors' aiding and abetting the breaches of fiduciary duties set forth herein.

194. The Court should award money damages against the CEC director defendants in an amount to be determined.

## CLAIM IX

### WASTE OF CORPORATE ASSETS [CEOC's Directors]

195.   Plaintiff repeats and realleges paragraphs 1 through 194 above.

196.   The board of CEOC owed CEOC an unqualified fiduciary duty of care.  Among other things, this required the directors to exercise good business judgment, to use ordinary care and prudence in the operation of the business, and to discharge their actions in good faith and in the best interest of the corporation.

197.   As described herein, the board of CEOC on repeated occasions exchanged or released assets of CEOC for inadequate consideration.

198.   The corporate assets transferred by CEOC were transferred for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.

199.   Accordingly, the Court should award money damages against the defendant directors in an amount to be determined, or order such other form of equitable relief as may be appropriate under the circumstances.

WHEREFORE, plaintiff prays that the Court enter judgment on each of Plaintiff's claims in favor of Plaintiff, and against each of the Defendants jointly and severally, and further enter an order:

(a)  Awarding money damages to Plaintiff in an amount to be determined, plus prejudgment interest;

(b)  Avoiding the transfers of the Trademarks, CIE, Octavius Tower and Project Linq, and the transfers under the 2013 Transaction Agreement, the 2014 Transaction Agreement, and the Services LLC Agreements, and ordering that all documents, consents and actions relating to them, including without limitation the 2013 and 2014 Transaction Agreements, the Services LLC Agreements, and the Management Services Agreement, are rescinded and of no force and effect;

(c)  Enjoining CEC, Acquisition and Growth Partners to, or to cause those of their affiliates that were the ultimate recipients of the Trademarks, CIE, Octavius Tower and Project Linq, and the assets transferred under the 2013 Transaction Agreement, the 2014 Transaction Agreement, and the Services LLC Agreements to, return such assets to the original transferor, such that each of the transferred assets shall be owned and controlled by CEOC and its affiliates.

(e)  Declaring that CEC remains liable under the Parent Guarantee as provided under Section 12.01 of the 2009 Indenture;

(f)  Imposing a constructive trust and/or equitable lien on the assets comprising the Trademarks, CIE, Octavius Tower and Project Linq, and the transfers under the 2013 Transaction Agreement, the 2014 Transaction Agreement, and the Services LLC Agreements.

78

**A0235**

(g)  Awarding Plaintiff the costs of this action, including attorneys'

fees; and

(h)  Awarding Plaintiff such other relief as the Court deems just and

proper.

Dated:  August 4, 2014

*/s/ Martin S. Lessner*
Martin S. Lessner (No. 3109)
Richard J. Thomas (No. 5073)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Tel.:  (302) 571-6698
Fax:  (302) 576-3309
mlessner@ycst.com
RJThomas@ycst.com

Attorneys for WILMINGTON SAVINGS FUND
SOCIETY, FSB, solely in its capacity as successor
trustee under the 2009 Indenture

Of Counsel:

Bruce Bennett
Sidney P. Levinson
Joshua M. Mester
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071

79

**A0236**

Geoffrey Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C.  20001


-and-


James S. Carr
Eric R. Wilson
David Zalman
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY  10178

80

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### MEMORANDUM IN SUPPORT OF CHAPTER 11 PETITIONS

The Debtors in these chapter 11 cases are the primary operating units of the Caesars gaming enterprise, which was taken private in a leveraged buyout just as the 2008 recession was overtaking the world economy.  In the past several years, as economic conditions squeezed the gaming industry, the Debtors have attempted to extend their debt maturities and deleverage their balance sheets through various asset sales and capital markets transactions.  By mid-2014, however, it became clear that a wholesale restructuring was required.  Now, after more than six months of intense, arm's-length negotiations among the Debtors, their Caesars affiliates, and certain of their creditors, the parties have agreed on a comprehensive restructuring that substantially reduces the Debtors' debt, reorganizes their business into a REIT structure to maximize value and creditor recoveries, and secures significant financial and other support from the Debtors' non-Debtor affiliates that is critical to a successful restructuring.  This compromise, which is set forth in a Restructuring Support Agreement (the "RSA"), enhances recoveries for all stakeholders, and positions the Debtors to exit these chapter 11 proceedings as viable going

---

[1]    The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/CEOC.

**MeehanCombs Ex. 19**

concerns that can successfully compete in the gaming industry with appropriately-sized balance sheets.

In connection with these chapter 11 cases, the debtors are seeking important "first-day" relief to achieve uninterrupted operations across the company's network of properties and to ensure the Debtors' valued employees, guests, and stakeholders that all Caesars properties are open for business and will continue to provide guests with the amenities and experiences they expect from Caesars properties.[2]

As discussed further in Section VII.A, below, this Court has jurisdiction over these chapter 11 cases, and the Northern District of Illinois is a proper venue.  The Debtors submit this memorandum to provide the Court with an overview of the Debtors, the events leading to their chapter 11 petitions, and the complex negotiations that led to the RSA.

## Background

CEOC is the largest majority-owned operating subsidiary of Caesars Entertainment Corporation ("CEC").  The remaining Debtors are direct and indirect subsidiaries of CEOC. CEC, together with its affiliates (collectively, "Caesars"), is the world's most geographically diversified casino-entertainment company.  Since its founding in Reno, Nevada more than 75 years ago, Caesars has grown through new development, expansions, and acquisitions. Caesars now owns, operates or manages 50 casinos in five countries on three continents, with properties in the United States, Canada, the United Kingdom, South Africa, and Egypt.  Within the United States, Caesars owns, operates, or manages casinos in 14 states, primarily under the Caesars®, Harrahs® and Horseshoe® brand names.  In total, Caesars oversees approximately

---

[2]   Further support for the relief requested in the first day motions is set forth in the *Declaration of Randall S. Eisenberg, Chief Restructuring Officer of Caesars Entertainment Operating Company, Inc., in Support of First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.

3 million square feet of gaming space, 39,000 hotel rooms, 45 million customer loyalty program participants, and 68,000 employees.

In addition to the Debtors, the Caesars enterprise includes non-Debtor affiliates Caesars Entertainment Resort Properties, LLC ("CERP"); Caesars Growth Partners, LLC ("CGP"), a joint venture of CEC and independent public company Caesars Acquisition Company ("CACQ"); and a shared services venture, Caesars Enterprise Services, LLC ("CES"), as depicted in the following organization chart:



As Caesars' largest operating subsidiaries, the Debtors are an integral part of the Caesars enterprise owning, operating, or managing 38 casinos in 14 states and 5 countries. For the twelve months ending September 30, 2014, the Debtors contributed approximately $5.4 billion—

or 64 percent—of Caesars' $8.4 billion in total net revenues.  Today, the Debtors' core casino offerings are spread across the United States—including strong concentrations in Chicagoland, Nevada, and Atlantic City—as well as throughout the world.  The Debtors employ approximately 32,000 people, including approximately 3,000 in the Chicagoland area and approximately 6,500 in Las Vegas.

The Debtors' capital structure is a legacy of one of the largest leveraged buyouts in history.  On January 28, 2008, affiliates of Apollo and TPG, along with certain co-investors (together with Apollo and TPG, the "Sponsors"), acquired Caesars (then known as Harrah's Entertainment, Inc.) for approximately $30.7 billion (the "2008 LBO").  The Sponsors and other investors contributed approximately $6.1 billion in cash to fund the 2008 LBO.  The remainder was funded through the issuance of approximately $24 billion in debt, approximately $19.7 billion of which was secured by liens on substantially all of the Debtors' assets and, in most cases, subject to intercreditor agreements.

As of the date hereof (the "Petition Date"), the Debtors have outstanding funded debt obligations of approximately $18.4 billion, comprising:

- four tranches of first lien bank debt totaling approximately $5.35 billion;

- three series of outstanding first lien notes totaling approximately $6.35 billion;

- three series of outstanding second lien notes totaling approximately $5.24 billion;

- one series of subsidiary-guaranteed unsecured debt of approximately $479 million; and

- two series of senior unsecured notes totaling approximately $530 million.

The Debtors have positive cash flow before debt service, but a number of economic factors and industry trends unforeseen at the time of the 2008 LBO have left the Debtors unable to support their overleveraged capital structure and extraordinary interest expense.  The 2008

**A0241**

LBO was agreed to in December 2006, when both the economy and the casino industry were robust, and was consummated at the very beginning of the 2008 recession.  In the ensuing months and years, casinos worldwide struggled as consumer and business spending on travel and entertainment sharply declined.  As the economy rebounded, the Debtors faced new challenges. While consumers have increased discretionary spending on travel and entertainment, the gaming industry is capturing a smaller share of that spending.  Meanwhile, gaming has become increasingly competitive as new casinos have entered the market.  As a result, CEOC's total same store revenues[3] have steadily declined since the 2008 LBO:



The Debtors' substantial debt load has effectively prevented them from confronting these operational challenges.  Although the Debtors have invested in priority projects, they have been forced to raise and direct significant cash to debt service, money that could otherwise have been used for certain capital improvement projects such as hotel room remodeling, infrastructure renovations, and expansion of convention and amenities space.

---

[3]    Net Revenue includes property-level revenues only and does not include former CEOC properties.  Net Revenue (i) is presented net of promotional allowances, (ii) includes only property-level revenues (iii) excludes amounts attributable to properties not currently part of the CEOC portfolio and (iv) does not include reimbursed management costs and other corporate revenue items.

Over the past several years, Caesars has undertaken numerous initiatives to restructure the Debtors' operations and manage their debt maturities and interest expense without subjecting CEOC to a formal bankruptcy proceeding. In addition to certain operational initiatives and property closures, Caesars has engaged in over 45 capital market transactions, including a number of asset sales, exchange and tender offers, debt repurchases and re-financings, in an effort to extend debt maturities, meet interest obligations, monetize assets and transfer debt and capital expenditure obligations at properties CEOC could not afford to invest in. Certain of these transactions have been hotly contested by some of the Debtors' creditors and are the subject of pending litigation in, among other venues, the New York Supreme and Delaware Chancery Courts.[4] The primary subject transactions include the following:

- The "CIE Transactions": In May 2009, the Debtors transferred their interest in the World Series of Poker ("WSOP") intellectual property to non-Debtor affiliate Caesars Interactive Entertainment ("CIE") in exchange for an economic interest in CIE valued at $15.0 million. CEOC retained the right to use the WSOP trademark and intellectual property in certain contexts pursuant to a perpetual, royalty-free license (the "2009 Trademark License Agreement"). In September 2011, the Debtors transferred their rights to host WSOP tournaments to CIE for $20.5 million in cash. In 2013, CEC contributed its interests in CIE to CGP as part of the Growth Transaction (defined below).

- The "CERP Transaction": In fall 2013, the Debtors sold their interests in the Octavius Tower and Project Linq, a retail, dining, and entertainment development, to CERP for $80.7 million in cash, the retirement of $52.9 million of CEOC notes and avoided corporate overhead.

- The "Growth Transaction": In fall 2013, as part of a larger public capital raise transaction and the formation of a new-publicly traded company, CACQ, that would co-own CGP, the Debtors sold their interests in (i) the Planet Hollywood Resort & Casino in Las Vegas, (ii) the Horseshoe Baltimore and (iii) 50% of the management fees for those properties to CGP for $360 million in cash.

- The "Four Properties Transaction": In spring 2014, the Debtors sold their interests in (i) The Cromwell in Las Vegas, (ii) The Quad in Las Vegas, (iii) Bally's Las Vegas,

---

[4]    Copies of each of the complaints and answers will be provided to the Court.

(iv) Harrah's New Orleans, and (v) 50% of the management fees for those properties, to CGP for approximately $1.8 billion in cash.

- The "Shared Services Joint Venture":  In spring 2014, as part of the Four Properties Transaction, CEOC entered into a shared services joint venture, CES, with the companies that own and/or operate Caesars' branded properties:  CEC, CEOC, and Caesars Growth Properties Holdings, LLC ("CGPH"), an affiliate of CGP.  The joint venture partners executed an enterprise services and license agreement under which CEOC contributed to CES a worldwide license to certain intellectual property, including Total Rewards®, and received a 69% ownership stake plus 33% voting rights in CES.  CES also employs personnel who provide services to Caesars' branded properties and functions as a shared services center for the Caesars enterprise, providing most of the back office, procurement, payroll and similar services across the enterprise, with costs allocated back to each entity based on certain formulas.

- The "B-7 Refinancing":  In May and June 2014, CEOC refinanced short-term maturities with $1.75 billion of new term loans (the "B-7 Term Loan"), and amended its First Lien Credit Agreement (defined below) to extend maturities and provide covenant relief.  As part of the B-7 Refinancing, CEC sold five percent of its stock in CEOC to unaffiliated investors, which triggered a release of CEC's guarantee of certain first lien, second lien, and unsecured debt.

- The "Senior Unsecured Notes Transaction":  In August 2014, CEOC and CEC purchased approximately $155 million in CEOC Senior Unsecured Notes (defined below), CEC contributed $426.6 million of Senior Unsecured Notes to CEOC for cancellation, and CEOC amended its Senior Unsecured Notes Indentures (defined below).

Although controversial, these transactions sought to extend runway.  In addition, CEC shareholders invested more than $1.2 billion in additional capital as part of the transactions.

Since the CERP transaction the Debtors have:

- Raised more than $2 billion in liquidity;

- Paid approximately $2.2 billion of interest and $2.6 billion of principal on their debt, including approximately $1 billion of interest and $1.5 billion of principal to second lien and unsecured noteholders; and

- Extended over $10 billion of debt with pre-2016 maturity.

Notwithstanding these efforts, the Debtors remain overleveraged, with 2014 EBITDA estimated to be less than $1 billion compared with more than $18 billion in debt (including over

$12 billion of first lien senior secured debt having liens on nearly all of Debtors' assets). It became clear that a more comprehensive restructuring was necessary. Accordingly, the Debtors and CEC began negotiations with organized groups of CEOC's senior secured creditors—namely certain First Lien Lenders (as defined below), and certain First Lien Noteholders (as defined below)—regarding a comprehensive restructuring of the Debtors' balance sheet. Early in the negotiations, the first lien creditors made clear that CEC would need to provide substantial financial and continuing operational support for any proposed restructuring to, among other things, avoid the regulatory, tax, and practical complexities associated with any separation of CEOC from the Caesars enterprise. CEC was equally clear that, as a condition to providing continued support to CEOC, CEC would require releases.

Anticipating these issues, and to establish an independent decision-making process at CEOC, two independent directors were appointed to the CEOC Board of Directors in June 2014 and CEOC retained independent counsel and financial advisors. The two independent directors then formed a Special Governance Committee of the CEOC Board of Directors (the "Special Governance Committee") and were charged with, among other things, conducting an independent investigation into potential claims that the Debtors and/or their creditors may have against CEC or its affiliates, including claims that would eventually form the basis of filed creditor complaints.

The Special Governance Committee's investigation has been ongoing for approximately six months, in parallel with restructuring negotiations among CEC, CEOC and the first lien creditors. To date, advisors assisting the Special Governance Committee have reviewed approximately 35,000 documents produced by CEC, its affiliates, and the Sponsors; interviewed various Caesars officers, employees, and advisors; and worked thousands of hours on the

investigation.  Based on the investigation to date, the Special Governance Committee determined that it would require a significant contribution from CEC and its affiliates to settle and release claims.[5]

Over the same period, the Special Governance Committee has been actively monitoring the restructuring negotiations with first lien creditors and has engaged in its own negotiations with CEC to secure substantial contributions by CEC to the restructuring, and improved recoveries for all stakeholders.  These extensive, hard-fought, parallel negotiations ultimately led to the development of a restructuring framework for a chapter 11 plan with the following key features:

- Reducing the Debtors' total debt obligations by approximately $10 billion and their annual interest expense from approximately $1.7 billion to approximately $450 million;

- Reorganizing the Debtors' business as a tax-efficient real estate investment trust ("REIT") by, among other things, transferring substantially all of the Debtors' real properties to a property company ("PropCo") which would in turn lease those properties to an operating company ("OpCo") to maximize recoveries to creditors;[6]

- Securing significant, near term contributions from CEC , including:

  - cash contributions of up to $406 million plus an additional $75 million in cash if required to exit;

  - backstopping, with no associated fees, up to $969 million of equity put options to support the REIT structure and provide cash out opportunities to CEOC's creditors receiving equity in PropCo and OpCo under the proposed chapter 11 plan;

  - offering the Debtors certain rights of first refusal for owning and managing all future non-Las Vegas domestic acquisitions; and

---

[5]  The investigation remains ongoing and the releases included in the RSA, discussed below, are expressly subject to its completion.

[6]  REITs are publicly-traded tax-advantaged vehicles for holding real estate.  A REIT pays no entity-level tax to the extent earnings are distributed, and REITs trade at higher values compared to other public companies.

- importantly, providing a guarantee of OpCo's operating lease obligations, which underpins the value of PropCo and its ability to service the debt it will carry;

- Providing significant creditor recoveries of:

  - 100% to the First Lien Lenders (as defined below);

  - 92% to the First Lien Noteholders (as defined below); and

  - A baseline recovery to non-First Lien Creditors of 17.5% of PropCo equity, valued at approximately $319 million, with the opportunity, if the class votes in favor of the Plan, to receive 30.1% of PropCo equity, valued at approximately $549 million plus equity buy in rights for up to an additional 65% of PropCo equity at plan value; and

- Settles complicated litigation claims related to historical transactions that could mire the estate in protracted and costly proceedings for years, delaying creditor recoveries.[7]

The parties documented their agreement to this framework in the *Restructuring Support and Forbearance Agreement*, originally dated as of December 19, 2014, and related Plan Term Sheet the current versions of which is attached hereto as collective **Exhibit A** (the "RSA").  The RSA was initially supported by approximately 38 percent of the First Lien Noteholders (as defined below).  Since its execution, the RSA has obtained additional support, and the RSA is now endorsed by holders of over 80 percent in aggregate principal amount of the Debtors' first lien bonds and approximately 15 percent of first lien bank debt.

The Debtors believe that the restructuring contemplated by the RSA is in the best interests of their estates and the most advantageous solution for the Debtors' 32,000 employees, millions of customers, and all stakeholders.  Importantly, the RSA contains an express and unlimited "fiduciary out" permitting the Debtors to pursue a better alternative transaction if one arises.  Any such alternative framework would need to address the many complexities of these

---

[7]   The RSA expressly provides that the Debtors' release of claims against CEC and its affiliates is subject to completion of the Special Governance Committee's investigation.

**A0247**

cases, including:  the need to preserve stable operations in all geographic locations of the Debtors' heavily regulated industry, the significant tax and business implications associated with any attempt to separate the Debtors from the broader Caesars enterprise; certain creditors' demands for substantial continuing financial and operational investment by CEC to support the reorganized companies; and the complicated pending and potential litigation claims related to historical transactions.

Indeed, one of the key benefits of the RSA is that it secures substantial contributions to settle uncertain litigation claims.  To ensure adequate funding will be available for its contributions under the Plan and to enhance the value of CEC's guarantee, CEC announced on December 22, 2014, that it had entered into an agreement with CACQ to merge the two publicly traded companies, conditioned on, among other things, confirmation of a plan of reorganization in these chapter 11 cases on terms materially consistent with those in the RSA and on the timeline contemplated by the RSA.  The combined enterprise would provide additional credit support for the lease guarantee under the proposed REIT structure and otherwise secure the cash contributions supporting near-term creditor recoveries.

The Debtors, therefore, intend to promptly seek approval of the RSA and to prosecute these chapter 11 cases pursuant to the milestones contained therein.  Among other things, the milestones require the Debtors to:

- file a motion seeking to assume the RSA within 20 days of the Petition Date and obtain an order approving the Debtors' assumption of the RSA within 90 days of the filing of that motion;

- file their proposed chapter 11 plan and related disclosure statement within 45 days of the Petition Date;

- obtain entry of an interim cash collateral order within 5 days of the Petition Date and a final cash collateral order within 75 days of the Petition Date;

- obtain entry of an order approving the Debtors' disclosure statement and approving solicitation of the chapter 11 plan within 150 days of the Petition Date;

- obtain entry of an order confirming the chapter 11 plan within 120 days of the entry of the order approving the Disclosure Statement; and

- emerge from chapter 11 within 120 days of the date that the order confirming the chapter 11 plan becomes a final order.

These milestones were heavily negotiated with the Debtors' First Lien Noteholders (as defined below), whose cash collateral is being used to finance the administration of these cases, and achieve an appropriate balance between the desire for the Debtors to quickly emerge from chapter 11 and the recognition that creditors and other stakeholders need sufficient time to pressure test the compromises set forth in the RSA.

<div align="center">

**The Debtors' Businesses, Affiliates, and Capital Structure**

</div>

I.      **The Debtors' Businesses.**

      A.      **Casino operations.**

The Debtors were founded in 1937 when William F. Harrah opened a small bingo hall in Reno, Nevada.  That casino, now called Harrah's Reno, is still owned and operated by the Debtors.  Since then, the Debtors have grown their businesses across the country and around the globe.  Today, the Debtors' core casino offerings are spread across the United States—including strong concentrations in Chicagoland, Nevada, and Atlantic City—as well as throughout the world.

**CEOC's Casinos**



The Debtors' Chicagoland locations are a significant cash flow driver for their businesses. The Debtors own and operate two casinos in the Chicagoland market: Horseshoe Casino Hammond in Hammond, Indiana—their second most profitable casino behind Caesars Palace—and Harrah's Joliet in Joliet, Illinois. Together, these locations include almost 400,000 square feet of gaming space, more than 200 hotel rooms, more than 4,100 slot machines and more than 130 table games.

In Nevada, the Debtors own and operate four properties, including their flagship property Caesars Palace that is located in the heart of the Las Vegas "Strip." The Debtors' other Nevada gaming properties are Harrah's Reno, Harrah's Lake Tahoe, and Harvey's Lake Tahoe. In total, the Debtors operate approximately 270,000 square feet of gaming space and 6,400 hotel rooms in Nevada, including over 3,600 slot machines and 370 table games.

The Debtors also have significant operations in Atlantic City. The Debtors' presence in Atlantic City dates back to 1979—three years after New Jersey authorized legal gambling—

13

**A0250**

when they opened Caesars Atlantic City and Bally's Atlantic City. The Debtors also owned and operated a third casino in Atlantic City (the Showboat Atlantic City) until August 2014, when that property was closed and then later sold to a New Jersey university. The Debtors currently have more than 240,000 square feet of gaming space and approximately 2,400 hotel rooms in Atlantic City, including approximately 3,700 slot machines and 320 table games.

Finally, the Debtors own and operate or manage 15 gaming properties in other U.S. locations, including managed properties on reservations and owned river-based casinos. The majority of these properties are located throughout the Midwest and South.[8] In total, these locations include more than 1.0 million square feet of gaming space, 5,000 hotel rooms, 23,000 slot machines, and 1,000 table games.

The Debtors employ approximately 32,000 people through their various operations, including 24,000 full-time and 8,000 part-time employees. Approximately 35 percent of the Debtors' workforce is covered by collective bargaining agreements.

### B.    Highly Regulated Industry.

As owners and operators of casino entertainment facilities, the Debtors are subject to pervasive regulations in each of the jurisdictions in which they operate. In the United States, the Debtors are required to comply with the laws and regulations of 21 federal and state authorities, three tribal gaming authorities, and many local authorities to obtain and maintain licenses to own and/or operate casino properties. Certain gaming laws require Debtors engaged in gaming

---

[8]    The regional-owned locations include: Harrah's Council Bluffs, Council Bluffs, Iowa; Harrah's Gulf Coast, Biloxi, Mississippi; Harrah's Louisiana Downs, Bossier City, Louisiana; Harrah's Metropolis, Metropolis, Illinois; Harrah's North Kansas City, North Kansas City, Missouri; Horseshoe Bossier City, Bossier City, Louisiana; Horseshoe Council Bluffs, Council Bluffs, Iowa; Horseshoe Southern Indiana, Elizabeth, Indiana; Horseshoe Tunica, Tunica, Mississippi; and Tunica Roadhouse Hotel & Casino, Tunica, Mississippi. In addition to these owned locations, the Debtors manage the following domestic properties: Harrah's Ak-Chin, Phoenix, Arizona; Harrah's Cherokee, Cherokee, North Carolina; Harrah's Philadelphia, Chester, Pennsylvania; and Harrah's Rincon, San Diego, California; and Horseshoe Baltimore, Baltimore, Maryland.

operations and certain of their directors, officers, and employees to obtain licenses or findings of suitability from gaming authorities, unless some type of exemption applies or a waiver is obtained. Qualification and suitability determinations require submission of detailed entity and personal and financial information followed by a thorough investigation. In general, gaming authorities have wide discretion to deny an application for licensing.

In addition, many jurisdictions require the Debtors' stockholders or holders of debt securities to file an application, be investigated, and have their qualifications or suitability determined, unless they fall within an exception or obtain a waiver. For example, under Nevada gaming laws, each person who acquires, directly or indirectly, beneficial ownership of any voting security, or beneficial record ownership of any non-voting security or any debt security in a public corporation which is registered with the Nevada Gaming Commission may be required to be found suitable if the Commission has reason to believe that the person's ownership would be inconsistent with the declared public policy of Nevada, in the sole discretion of the Commission.

Licensing requirements make a change of control of the Debtors more complex. Licenses to own or operate casino properties generally are not transferable unless the transfer is approved by the requisite regulatory agency. Regulators must consider a number of public policy concerns when investigating and approving casino operators. As a result, the regulatory approval process may, for good reason, last several months or longer. In Illinois, for instance, the Gaming Board requires two meetings to approve any change of control: one to present an application and another, after an investigation by the Gaming Board, to approve the transfer.

## II.    **The Debtors' Corporate Structure, Parent, Affiliates, and Joint Ventures.**

The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit B**. As set forth on **Exhibit B**, CEC owns approximately 89 percent of the outstanding

shares of CEOC's common stock.  Certain institutional investors own approximately 5 percent of CEOC's common stock, and the remaining 6 percent is held by employees who received the stock pursuant to an employee benefit plan that was instituted in May 2014 for CEOC's directors, officers, and other management-level employees.  CEOC, in turn, directly or indirectly wholly- or majority-owns its Debtor subsidiaries.  All of CEOC's subsidiaries are Debtors in these chapter 11 cases other than those listed on **Exhibit C** attached hereto.

In addition to CEOC, CEC owns casino-entertainment properties indirectly through CERP and CGP.  CERP and CGP are licensed to use Total Rewards®, the industry-leading customer loyalty program to market promotions and generate customer play across the entire network of Caesars properties.

### A.    Caesars Entertainment Corporation.

The Sponsors acquired CEC in the 2008 LBO.  On February 8, 2012, CEC conducted an initial public offering of its common stock, which now actively trades on NASDAQ under the ticker symbol "CZR."  The Sponsors own or control approximately 60 percent of CEC's common stock, and thus have voting control of the company.  CEC's remaining common stock is held by institutional and retail investors not affiliated with the Sponsors.  As of the Petition Date, CEC has a market capitalization of $1.8 billion.

### B.    Caesars Entertainment Resort Properties, LLC.

After the 2008 LBO, CEC operated through two primary groups of wholly-owned subsidiaries:  (i) CEOC and (ii) a group of six subsidiaries financed by commercial mortgage-backed securities ("CMBS"):  Harrah's Atlantic City Holding, LLC; Harrah's Las Vegas, LLC; Harrah's Laughlin, LLC; Flamingo Las Vegas Holding, LLC; Paris Las Vegas Holding, LLC; and Rio Properties, LLC (the "CMBS Properties").

In September 2013, CEC announced that the CMBS Properties would enter into a series of transactions to refinance their outstanding CMBS debt and reposition them as subsidiaries of CERP, a newly created direct subsidiary of CEC.  As discussed more fully below, the Debtors sold certain properties to CERP to facilitate the refinancing.

### C.    Caesars Growth Partners, LLC.

CGP is a partnership that was formed by CACQ, a separate publicly traded company that was formed by the Sponsors and public investors in 2013 to raise capital for Caesars, and certain indirect subsidiaries of CEC.[9]  CACQ purchased approximately 42.4 percent of the economic interest and 100 percent of the voting rights in CGP for $457.8 million in cash.  CEC acquired the remaining approximate 57.6 percent economic interest (with no voting rights) in CGP in exchange for $1.1 billion in face value of Senior Unsecured Notes and all of CEC's equity in CIE.

CGP was designed to be a flexible organization that could raise capital necessary to fund Caesars' more capital-intensive growth projects, such as online gaming and certain properties in need of significant investment.  CIE, now a CGP subsidiary, operates an online gaming business providing games on social media and mobile applications.  CIE also provides certain real money games in Nevada and New Jersey, "play for fun" offerings in other jurisdictions, and owns the WSOP tournament and brand.

As discussed below, since its formation, CGP has purchased several properties and a portion of their associated management fees from CEOC.

---

[9]    CACQ was established on October 21, 2013 and initially funded with $457.8 million in cash from the Sponsors. On November 18, 2013, CACQ closed a public rights offering, which resulted in another $700 million in funding from both non-Sponsor and Sponsor investment.

### D.    Caesars Enterprise Services, LLC.

CES (often referred to as "ServicesCo") is a joint venture among the three companies which own and/or operate Caesars' properties:  CEOC, CERP and CGPH.  Historically, CEOC and its employees managed and funded centralized corporate functions for shared services among all Caesars' branded properties, such as legal, accounting, payroll, information technology and other enterprise-wide services. As the Caesars' branded properties expanded since 2008, including with the formation of CACQ and CGP, which did not exist when the initial centralized service structure was put in place,  there was a need to form a centralized "Services Company" to (i) manage centralized assets, such as certain intellectual property and the Total Rewards® loyalty program, (ii) employ personnel who provide services to Caesars' branded properties, and (iii) ensure proper governance and equitable allocation of costs around centralized services, including capital expenditures for shared services and the prioritization of projects.

CERP and CGPH contributed the initial funding needs of CES with $42.5 million and $22.5 million in cash, in exchange for which they received 20.2 percent and 10.8 percent ownership of CES, respectively.  CEOC owns the remaining 69 percent of CES.  Each of CEOC, CERP and CGPH have equal 33 percent voting control over CES.  CES's management and operations are governed by a steering committee, which consists of one member from each of CEOC, CERP, and CGPH.  The steering committee can take action by a majority vote (subject to unanimity requirements for certain material actions) or written consent of the steering committee members.

CES provides the Debtors with substantially all of their corporate, regional, and shared (with CERP, CGPH/CGP, or both) employees, as well as substantially all of their casino-level employees at the director level or above.  As of the Petition Date, the majority of the

approximately 2,000 management-level personnel responsible for running the Debtors' businesses are employed by CES, and CES is responsible for all employment-related obligations associated with these employees, including employment agreements, collective bargaining agreements, and any obligation to bargain and negotiate with a union.

Pursuant to an Omnibus License and Enterprise Services Agreement (the "Omnibus Agreement"), CEOC granted to CES a non-exclusive license to use—but otherwise retained ownership of—certain intellectual property, including Total Rewards®. In turn, CES generally grants to each entity that owns a property a license in and to the intellectual property relevant to such entity's property.

CES is a cost allocation center and not a for-profit entity; all services provided for CEOC, CERP and CGP are provided on a profit-neutral basis. The corporate overhead expenses incurred by CES in performing centralized services, employing personnel and managing intellectual property are allocated among CEOC, CERP, and CGPH, and generally reimbursed on a weekly basis, with a monthly true-up.[10] Allocation percentages are based on a complex allocation methodology that takes into account each entity's consumption of the specified service or cost.

Prior to the formation of CES, the Debtors also historically managed payroll and accounts payable functions for CEOC, CERP, CGP, and their predecessor entities, with periodic reimbursements from CERP and CGP. The formation of CES has shifted these duties from the Debtors to CES as well, with CES processing all payroll data for the Debtors and their non-Debtor affiliates, and in substantially all cases acts as a third party administrator in making payments to the Debtors' employees and remitting any appropriate deductions on account of

---

[10]    From time to time, CES has and may continue to issue capital calls to CEOC, CERP, and CGPH to ensure that CES meets its working capital requirements.

payroll taxes or other withholdings to taxing authorities and other third-party benefit providers. CES provides the same services for CERP and CGP, and each entity prefunds the required amounts to CES in advance, so there are generally no intercompany payables or claims created in connection with CEOC's direct payroll expenses.

With respect to accounts payable, CES generally manages and funds all accounts payable on behalf of the Debtors and their non-Debtor affiliates.  If and when CES makes a payment for any direct expense on behalf of CEOC, CERP or CGP, CES is reimbursed on a regular basis (usually within 24-48 hours) for those payments.

Finally, CES functions as the governor on all enterprise-wide investments, including capital expenditures.  The CES steering committee must approve all capital expenditures and cost allocations relating thereto.

## III.   **The Debtors' Capital Structure.**

As of the Petition Date, the Debtors have outstanding funded debt for borrowed money in the aggregate principal amount of approximately $18.4 billion.  These obligations are illustrated below.

**A0257**

| As of December 31, 2014 | | | |
|---|---|---|---|
| **CEOC Debt ($ in Millions)** | **Maturity** | **Int. Rate** | **Face Value** |
| Term Loan B4 | 2016 | 10.50% | $ 376.7 |
| Term Loan B5 | 2017 | 5.95% | 937.6 |
| Term Loan B6 | 2017 | 6.95% | 2,298.8 |
| Term Loan B7 | 2017 | 9.75% | 1,741.3 |
| **First Lien Bank Debt** | | | **5,354.4** |
| | | | |
| 11.25% First Lien Notes | 2017 | 11.25% | 2,095.0 |
| 8.50% First Lien Notes | 2020 | 8.50% | 1,250.0 |
| 9.00 First Lien Notes | 2020 | 9.00% | 3,000.0 |
| **First Lien Notes** | | | **6,345.0** |
| | | | |
| 12.75% Second Lien Notes | 2018 | 12.75% | 750.0 |
| 10.00% Second Lien Notes due 2018 | 2018 | 10.00% | 4,484.6 |
| 10.00% Second Lien Notes due 2015 | 2015 | 10.00% | 3.7 |
| **Second Lien Notes** | | | **5,238.3** |
| | | | |
| Senior Notes (Subsidiary Guaranteed Notes) | 2016 | 10.75% | 479.0 |
| | | | |
| 6.50% Senior Unsecured Notes | 2016 | 6.50% | 296.7 |
| 5.75% Senior Unsecured Notes | 2017 | 5.75% | 233.3 |
| **Senior Unsecured Notes** | | | **530.0** |
| | | | |
| Other Borrowings | various | various | 426.0 |
| | | | |
| **Total CEOC Funded Debt** | | | **$ 18,372.7** |

A.    **First Lien Debt.**

1.    **First Lien Bank Debt.**

The Debtors owe approximately $5.35 billion under four term loans issued pursuant to that certain Third Amended and Restated Credit Agreement, dated as of July 25, 2014 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "First Lien Credit Agreement"), by and among CEOC, CEC, Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent (the "First Lien Credit Agent"), and certain lenders from time to time party thereto (the "First Lien Lenders").    Under the First Lien Credit

**A0258**

Agreement, the Debtors have approximately $106.1 million of capacity under a revolving credit facility extended pursuant to the First Lien Credit Agreement, approximately $100.3 million of which is committed to outstanding letters of credit as of the Petition Date.[11]

### 2.    First Lien Notes.

As of the Petition Date the Debtors owe approximately $6.35 billion in principal amount outstanding to holders (the "First Lien Noteholders" and together with the First Lien Lenders the "First Lien Creditors") of three series of first lien notes (the "First Lien Notes") issued pursuant to various indentures (the "First Lien Indentures"):

- that certain Indenture, dated as of June 10, 2009 by and among CEOC, CEC, Caesars Operating Escrow LLC (f/k/a Harrah's Operating Escrow LLC )("Escrow LLC"), Caesars Escrow Corporation (f/k/a Harrah's Escrow Corporation ) ("Escrow Corporation," and together with Escrow LLC, the "Escrow Issuers"), and U.S. Bank, National Association, in its capacity as indenture trustee under the First Lien Notes Indentures, and any successors in such capacity (the "First Lien Notes Indenture Trustee," and together with the First Lien Credit Agent, the "First Lien Agents");

- that certain Second Supplemental Indenture, dated as of September 11, 2009 by and among CEOC, CEC, and the First Lien Notes Indenture Trustee;

- that certain Indenture, dated as of February 14, 2012 by and between CEOC, the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee;

- that certain Indenture, dated as of August 22, 2012 by and among the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee;

- that certain Additional Notes Supplemental Indenture, dated as of December 13, 2012 by and among the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee; and

- that certain Indenture, dated as of February 15, 2013 by and among the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee.

---

[11]    In addition, the Debtors use interest rate swap agreements to manage certain variable and fixed interest rate.  As of the Petition Date, the Debtors had eight interest rate swap agreements outstanding (collectively, the "Swap Agreements") with notional amounts totaling $5.75 billion. The Swap Agreements reset monthly or quarterly and expire in January 2015.

### 3.    First Lien Collateral and Intercreditor Agreements.

The obligations under the First Lien Credit Agreement and the First Lien Notes (collectively the "First Lien Debt") are secured by first priority liens in the "Collateral," as defined in that certain Amended and Restated Collateral Agreement (as amended, modified, waived, and/or supplemented from time to time, the "First Lien Collateral Agreement"), dated as of June 10, 2009, by and among CEOC, certain CEOC subsidiaries identified therein (the "First Lien Pledgors"), and Bank of America, N.A. in its capacity as collateral agent and any successors in such capacity as collateral agent (the "First Lien Collateral Agent").[12]

Pursuant to the First Lien Collateral Agreement, the First Lien Pledgors have pledged substantially all of their assets—including, among other things, commercial tort claims and cash—to secure the First Lien Debt.  Specifically, section 4.04(b) of the First Lien Collateral Agreement requires the First Lien Pledgors to (i) promptly notify the First Lien Collateral Agent if the Debtors at any time hold or acquire any commercial tort claim the First Lien Pledgors reasonably estimate to be in an amount greater than $15 million and (ii) grant to the First Lien Collateral Agent a security interest in such commercial tort claim and in the proceeds thereof.[13] On September 25, 2014, in compliance with their obligations under the First Lien Collateral Agreement, the Debtors granted to the First Lien Collateral Agent, for the benefit of the First Lien Creditors an interest in and lien on all of the First Lien Pledgors' rights, title, and interests in certain commercial tort claims (and proceeds thereof) (the "Commercial Tort Claims"), to the extent any such claims exist.

---

[12]    On July 25, 2014 Credit Suisse AG, Cayman Islands Branch replaced Bank of America, N.A. as administrative agent and collateral agent under the First Lien Credit Agreement.

[13]    Generally, a categorical description insufficient to grant a security interest in commercial tort claims.  See U.C.C. §§ 9-108(e)(1); 9-204(b)(2).

Under section 4.01(a) of the First Lien Collateral Agreement, the First Lien Pledgors have pledged to the First Lien Collateral Agent all right, title, and interest in or to substantially all of the First Lien Pledgors' assets, including cash. Accordingly, as part of ongoing negotiations that ultimately led to the successful adoption of the RSA—which includes the First Lien Noteholders' consent to the use of their cash collateral to finance these chapter 11 cases— on October 16, 2014, the Debtors entered into certain control agreements with the First Lien Collateral Agent to perfect the First Lien Creditors' lien on substantially all of the Debtors' unrestricted cash.

The First Lien Agents, and other parties from time to time, entered into the First Lien Intercreditor Agreement, dated as of June 10, 2009 (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement"), which was consented to by CEOC and CEC and governs, among other things: (i) payment and priority with respect to holders of claims related to the First Lien Debt; (ii) rights and remedies of the holders of First Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (iii) the relative priority of liens granted to holders of "First Lien Obligations" (as defined in the First Lien Intercreditor Agreement).

### B.       Second Lien Debt.

#### 1.       Second Lien Notes.

As of the Petition Date the Debtors owe approximately $5.24 billion in principal amount outstanding to holders (the "Second Lien Noteholders" and together with the First Lien Creditors, the "Secured Creditors") of three series of second lien notes (the "Second Lien Notes") issued pursuant to three indentures (the "Second Lien Notes Indentures"):

- that certain Indenture, dated as of April 16, 2010 by and among the Escrow Issuers, CEC, and U.S. Bank, National Association, in its capacity as indenture trustee under

the Second Lien Notes Indentures and collateral agent, and any successors in such capacity (the "Second Lien Agent");

- that certain Indenture, dated as of December 24, 2008  by and among CEOC, CEC and the Second Lien Agent; and

- that certain Indenture, dated as of April 15, 2009 by and among CEOC, CEC, and the Second Lien Agent.

### 2.    Second Lien Collateral and Intercreditor Agreements.

The Second Lien Notes are secured by second priority liens in the Collateral, as set forth in and subject to the terms of the Collateral Agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Collateral Agreement"), dated as of December 24, 2008, by and among CEOC, each subsidiary of CEOC identified therein (the "Second Lien Pledgors"), and the Second Lien Agent. [14]

Section 4.04(b) of the Second Lien Collateral Agreement requires the Second Lien Pledgors to (i) promptly notify the Second Lien Collateral Agent if the Second Lien Pledgors at any time hold or acquire any commercial tort claim they reasonably estimate to be in an amount greater than $15 million and (ii) grant to the Second Lien Collateral Agent a security interest in such commercial tort claim and in the proceeds thereof.  On November 25, 2014, in compliance with the Second Lien Collateral Agreement, the Second Lien Pledgors granted to the Second Lien Agent, in its capacity as collateral agent under the Second Lien Collateral Agreement, a security interest in and lien on all of the Second Lien Pledgors' rights, title, and interests in and to the Commercial Tort Claims (and proceeds thereof), to the extent any such claims exist.

---

[14]    Section 4.01 of the Second Lien Collateral Agreement expressly carves out cash from the Second Lien Collateral:  "Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a grant of a security interest in…cash, deposit accounts and securities accounts (to the extent that a Lien thereon must be perfected by an action other than the filing of customary financing statements)."  Because perfection of cash requires control or possession, the Second Lien Collateral Agreement cannot provide Second Lien Noteholders with a security interest in the Debtors' cash.

The First Lien Agents and the Second Lien Agent entered into the Second Lien Intercreditor Agreement, dated as of December 24, 2008 (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement"), which was acknowledged by CEOC. The Second Lien Intercreditor Agreement governs, among other things, the relative priority of the First Lien Debt and the Second Lien Notes and the rights and remedies of the holders of and Second Lien Notes with respect to debtor-in-possession financing, use of cash collateral, and adequate protection.

### C.     Subsidiary-Guaranteed Debt.

#### 1.     Subsidiary-Guaranteed Notes.

As of the Petition Date the Debtors owe approximately $479 million in principal amount outstanding to holders (the "Subsidiary-Guaranteed Noteholders") of senior unsecured subsidiary-guaranteed notes (the "Subsidiary-Guaranteed Notes") issued pursuant to that certain Indenture, dated as of February 1, 2008 (as amended, modified, waived, and/or supplemented from time to time, the "Subsidiary-Guaranteed Notes Indenture"), by and among CEOC, the Note Guarantors (as defined therein), and U.S. Bank N.A., in its capacity as indenture trustee under the Subsidiary-Guaranteed Notes Indenture.

#### 2.     Guarantor Intercreditor Agreement.

The First Lien Credit Agent, the First Lien Notes Indenture Trustee, and Citibank, N.A. (solely in its capacity as administrative agent under the Senior Unsecured Interim Loan Agreement, dated as of January 28, 2008, among CEOC, Citibank, N.A., and other parties thereto from time to time), among others, entered into the Guarantor Intercreditor Agreement, dated as of January 28, 2008 (as amended, restated, modified, and supplemented from time to time, the "Guarantor Intercreditor Agreement"). The Guarantor Intercreditor Agreement

governs, among other things, the relative priority of the Subsidiary-Guaranteed Notes and the First Lien Creditors.

**D.      Senior Unsecured Note Obligations.**

As of the Petition Date the Debtors owe approximately $530 million in principal amount outstanding to holders of senior unsecured notes (the "Senior Unsecured Notes") issued pursuant to two indentures (the "Senior Unsecured Notes Indentures"):

- that certain Indenture, dated as of June 9, 2006 by and among CEOC, CEC, and U.S. Bank National Association, in its capacity as indenture trustee (the "Senior Unsecured Notes Trustee"); and

- that certain Indenture, dated as of September 28, 2005 by and among CEOC, CEC, and the Senior Unsecured Notes Trustee.

## Events Leading to the Chapter 11 Cases

The Debtors and their non-Debtor affiliates operate one of the largest and most comprehensive portfolio of casino properties in North America.  This unique combination of gaming products has allowed the Debtors to offer patrons both local and destination options for gaming or entertainment.  Unlike competitors that offer only regional gaming properties, the Debtors have been able to obtain higher than average spending at their regional properties because their industry-leading customer loyalty program, Total Rewards®, provides customers with entertainment and gaming rewards that can be used in Las Vegas and other destinations. And unlike competitors that offer only destination properties, the Debtors' more frequent interactions with their customers at the local level allows them to fashion personally-tailored reward packages that enhance their customers' experiences and encourage trips to destinations such as Las Vegas.  This business model has resulted in higher customer traffic and spending at both regional and Las Vegas casinos.

Despite these operational successes, the Debtors have faced significant challenges due to a number of factors that ultimately required them to file for chapter 11. The 2008 LBO closed just as the recession was beginning. Business and consumer spending plummeted and unemployment increased to levels not seen since the Great Depression. Consumers were left with less discretionary income to spend on gambling and trips to casino-resorts. Although the economy has rebounded, the Debtors are now confronting changed consumer habits and increased competition from local and online outlets.

## IV.   Economic Challenges.

### A.   The 2008 Recession.

The 2008 recession had a significant impact on the Debtors, with enterprise-wide net revenues before promotional allowances falling from $12.7 billion in 2007 to $10.3 billion in 2009. In response to the 2008 recession, the Debtors eliminated hundreds of millions of dollars of corporate, marketing, and operational costs. Despite these efforts, CEC's adjusted EBITDA dropped from $2.1 billion in 2007 to $1.7 billion in 2009, and continued to decline thereafter.

### B.   Changing Consumer Spending Habits.

The challenges facing the Debtors were not limited to the 2008 recession. Even though the economy has improved, the Debtors are now facing changing consumer preferences. For example, the "Millennial" generation has shown less interest in gaming than previous generations. Thus, although Las Vegas's tourist numbers have largely rebounded to pre-recession rates, visitors, on average, are younger and less willing to gamble. According to the Las Vegas Convention and Visitors Bureau, 47 percent of Las Vegas visitors in 2012 indicated that their primary reason to visit was for vacation or pleasure instead of gambling, which is up

from 39 percent in 2008.[15]  To address this changing dynamic and capture this younger crowd, many of the newest gaming properties provide significant non-gaming entertainment options. The Debtors likewise are pursuing younger consumers, including by renovating Caesars Palace's nightclub to drive additional traffic to that property.  But nightlife, restaurants, and other entertainment options are not as profitable as gaming.

###   C.   Increased Competition.

The Debtors also face increased competition for gaming dollars.  Since 2001, nine states have legalized gambling (bringing the total to 18), which has resulted in more local casinos.[16]  In Ohio, for example, the first casino opened in 2012; now there are eleven.  Similarly, over the past five years, Pennsylvania, which had almost no gaming at the time the 2008 LBO was signed, has become the second-largest domestic gaming market outside of Nevada.[17]  These additional gaming options have added pressure to existing casinos as the total customer population has remained relatively stable.[18]

---

[15]  Las Vegas Convention & Visitors Auth., *2012 Las Vegas Visitor Profile* [Page 17] (2012), available at http://www.lvcva.com/includes/content/images/MEDIA/docs/2012-Las_Vegas_Visitor_Profile1.pdf.

[16]  Ryan McCarthy, The End of a Casino Monopoly, in Three Charts, Washington Post (Sept. 23, 2014), http://www.washingtonpost.com/news/storyline/wp/2014/09/23/the-end-of-a-casino-monopoly-in-three-charts/; Matt Villano, All In: Gambling Options Proliferate Across USA, USA Today (Jan. 26, 2013), http://www.usatoday.com/story/travel/destinations/2013/01/24/gambling-options-casinos-proliferate-across-usa/1861835/.

[17]  IBISWorld: Safe Bet: A rise in tourism and personal expenditure will boost demand for casinos, IBISWorld Industry Report 71321: Non-Casino Hotels in the US, 8 (November 2014).

[18]  Josh Barro, The Strange Case of States' Penchant for Casinos, N.Y. Times (Nov. 5, 2014), http://www.nytimes.com/2014/11/06/upshot/the-strange-case-of-states-addiction-to-casinos.html?abt=0002&abg=1 ("States have gradually expanded legal gambling over the last four decades as a way to generate revenue without unpopular tax increases. But large parts of the American market are now saturated, with revenue in decline in most major casino markets. A majority of Americans already live relatively near casinos, so opening new ones does more to shift revenue around than to generate new business. As supply has outpaced demand, some casinos are closing, and governments have missed their projections for gambling-related revenue.").

Even in Las Vegas, new developments have increased competition for existing casinos. Since 2008, three new developments have opened on the Las Vegas Strip: (i) in December 2008, Wynn Resorts Limited opened the $2.3 billion Encore Las Vegas, which includes more than 2,000 hotel rooms, approximately 76,000 square feet of gaming space, and approximately 27,000 square feet of retail and entertainment space; (ii) in December 2009, MGM Resorts International opened CityCenter, a $9.2 billion gaming and residential resort that was partially funded by the Dubai government and includes more than 6,000 hotel rooms, approximately 150,000 square feet of gaming space, and 500,000 square feet of retail and restaurant space; and (iii) in December 2010, the Cosmopolitan of Las Vegas, a $3.9 billion gaming resort, opened, adding approximately 3,000 hotel rooms, 110,000 square feet of gaming space, and 300,000 square feet of retail and restaurant space. These developments, as well as newly renovated properties by many of Las Vegas's traditional operators, have increased the supply of gaming, hotel, restaurant, and shopping opportunities available to Las Vegas visitors, leading to top-line revenue pressures for Caesars Palace.

**D.     Atlantic City Issues.**

The Debtors also face significant challenges in the Atlantic City market, where they own Caesars Atlantic City and Bally's Atlantic City. These challenges are the result of, among other things, the effects of Hurricanes Irene and Sandy on the local economy, an oversaturated local market, and increased competition from casinos on the East Coast. As the chair of the New Jersey Casino Control Commission noted in the opening to that body's 2010 annual report:

> Over the years, Atlantic City's gaming industry has gone from enjoying a monopoly in the eastern half of the United States to a fiercely competitive situation today with slot machines or full blown casinos in every neighboring state. Gamblers in the New York, Philadelphia and Baltimore metropolitan areas now have places a lot closer to home than Atlantic City is. The so-called "convenience gambler" has found more convenient places to go to gamble. Similarly, development of casino hotels in Macau and Singapore, as well as the

new properties in Las Vegas, has made it harder for Atlantic City to attract the real high-end players.[19]

As a result, Atlantic City has seen several high profile casino bankruptcies in recent years.[20] Four Atlantic City casinos closed in 2014 alone,[21] including the Debtors' Showboat Atlantic City property.  According to the Atlantic City Gaming Industry Report, prepared by the Office of Communications, State of New Jersey Casino Control Commission, gaming revenues for Atlantic City properties have declined more than 40 percent since the 2008 LBO was agreed to, from $5.2 billion in 2006 to $2.8 billion in 2013.

**V.    Out-of-Court Transactions.**

Over the past several years, Caesars has executed over 45 asset sales and capital markets transactions in an effort to restructure and manage its debt.  As set forth below, the Special Governance Committee has been investigating the controversial transactions over the last six months and certain creditor groups have filed lawsuits challenging various aspects of these transactions.

**A.    The CIE Transactions.**

Before 2009, CEOC indirectly owned the WSOP trademark.  The trade name was used to run branded, in-person poker tournaments around the United States, with the final round held at the Rio Hotel and Casino in Las Vegas.  The Rio is owned by Rio Property Holding LLC and Cinderlane Inc., non-debtor subsidiaries of CEC and CERP.

---

[19]    State of New Jersey Casino Control Comm'n, 2010 Annual Report (2010), available at http://www.state.nj.us/casinos/reports/.

[20]    See, e.g., In re Trump Entertainment Resorts, Inc., No. 14-12103 (KG) (Bankr. D. Del.); In re Revel AC, Inc., No. 14-22654 (GMB) (Bankr. D.N.J.); In re Revel AC, Inc., No. 13-16253 (JHW) (Bankr. D.N.J.).

[21]    Mark Berman, Trump Plaza Closes, Making It Official:  A Third of Atlantic City's Casinos Have Closed This Year, Wash. Post (Sept. 16, 2014), http://www.washingtonpost.com/news/post-nation/wp/2014/09/16/trump-plaza-closes-making-it-official-a-third-of-atlantic-citys-casinos-have-closed-this-year/.

In 2009, CEOC sold the WSOP trademark to CIE, a new CEC subsidiary created to pursue online gaming opportunities.[22]  In exchange, CEOC received certain preferred shares that granted it an economic interest in CIE, and a perpetual, royalty-free right to use the WSOP trademark and intellectual property.  Duff & Phelps, which was hired by the CEC Board to advise on the transaction, valued the WSOP IP and License Agreement at $15 million.  It also concluded that the transaction was fair from a financial point of view to CEOC, and the terms were no less favorable to CEOC than those that would have been obtained in an arm's-length non-affiliate transaction.

In 2011, CEOC sold the right to host the WSOP-branded poker tournaments (which it owned as part of the 2009 Trademark License Agreement) to CIE for $20.5 million in cash.[23]  Following this transaction, CEC (through its majority ownership of CIE) controlled all aspects of the WSOP, including the trademark, the property where the WSOP tournament finals were held, and the right to host the tournament.  The transaction was approved by CEC's Board.  The CEC Board's financial advisor, Valuation Research Corporation, provided a fairness opinion concluding, among other things, that the principal economic terms of the transaction were fair from a financial point of view to CEOC and the transaction was on terms that were no less favorable to CEOC than it could obtain in a comparable arm's-length non-affiliate transaction.

**B.     The CERP Transaction.**

In fall 2013, CEC decided to refinance the debt associated with the six CMBS properties. Without a refinancing, CEC faced an eventual default on the CMBS debt, which was set to mature in early 2015.  As discussed above, in October 2013, CEC combined the six CMBS

---

[22]   CEOC's rights with respect to hosting the WSOP Tournament were *not* transferred at this time.

[23]   CEOC retained certain rights granted to it under the 2009 Trademark License Agreement: the right to maintain WSOP-branded poker rooms on its properties and to sell WSOP-branded merchandise.

properties to form CERP as part of this refinancing.  CEC also contributed $200 million in cash to CERP.  CEOC sold to CERP the equity of Octavius Linq Intermediate Hold Co., which owned the Octavius Tower and Project Linq.  In exchange, CEOC received approximately $80 million in cash and $53 million in CEOC notes for retirement, and CERP assumed $450 million of debt associated with these properties and continued to fund its then-30% share of corporate costs. These transactions closed on October 11, 2013.

CEOC's Board retained Perella Weinberg Partners ("Perella") as an independent financial advisor to advise it on the CERP transaction.  Following due diligence, Perella opined that the value of the consideration CEOC received was reasonably equivalent to the value of the assets CEOC transferred.

### C.    The Growth Transaction.

As a part of the series of transactions resulting in the formation of CGP in fall 2013, CGP used a portion of the capital invested through CACQ (the minority owner of CGP) to purchase from CEOC Planet Hollywood Resort & Casino in Las Vegas, CEOC's interest in the Horseshoe Baltimore project, and 50 percent of the management fees associated with these two properties from CEOC for $360 million in cash and CGP's assumption of $513 million in debt associated with these properties.

The Growth Transaction was negotiated over several months between representatives of the Sponsors and an independent Valuation Committee of CEC's Board, which was formed to estimate the fair market value of the assets and equity exchanged in the Growth Transaction. The CEC Valuation Committee engaged Morrison & Foerster LLP as counsel and Evercore Partners L.L.C. as its financial advisor.  Evercore opined, among other things, that the consideration CEOC received in exchange for these assets was not less than the fair market value of such assets.  The CEC Valuation Committee likewise concluded that the consideration paid

for the assets represented fair market value.  The Growth Transaction closed on October 21, 2013.

### D.      The Four Properties Transaction.

In March 2014, CEOC announced that it would sell to CGP four casino properties (The Quad, Bally's Las Vegas, The Cromwell, and Harrah's New Orleans) and 50 percent of the management fees payable by each casino in exchange for approximately $2.0 billion.  The final purchase price consisted of approximately $1.8 billion of cash and CGP's assumption of a $185 million credit facility used to renovate The Cromwell.

The Four Properties Transaction was negotiated and unanimously recommended by special committees consisting of independent members of CEC and CACQ's Boards of Directors.  The CEC Special Committee engaged Centerview Partners and Duff & Phelps as financial advisors, and Reed Smith LLP as legal advisor.  Centerview Partners opined that (1) the purchase price was fair to CEOC from a financial point of view, and (2) the purchase price was reasonably equivalent to the value of the transferred casinos plus 50% of their management fee streams.  Duff & Phelps opined that the transaction was on terms that were no less favorable to CEOC than would be obtained in a comparable arm's-length transaction with a non-affiliate. The sale of the Las Vegas properties in the Four Properties Transaction closed on May 5, 2014. The sale of Harrah's New Orleans closed on May 20, 2014.

### E.      The Shared Services Joint Venture.

On May 20, 2014, CES was formed as a joint venture among CEOC, CERP and CGPH to provide centralized property management services and common management of enterprise-wide intellectual property.  CEOC has a 69% ownership stake, and 33% of the voting rights, in CES. CERP and CGPH have a 20.2 percent and 10.8 percent ownership of CES, respectively, with

each partner having a 33% vote.  CEOC's primary contribution to CES was a license to certain intellectual property, including Total Rewards®.

Pursuant to CES's limited liability company agreement, CEOC and CERP both transferred, or caused their respective subsidiaries to transfer, the employment of certain individuals to CES, and agreed to assign to CES all employment-related obligations associated with these employees.  In addition, the Omnibus Agreement assigned to CES certain duties that CEOC and its subsidiaries historically had performed, such as duties to manage, on a reimbursable basis, the payroll and accounts payable for CEOC, CERP, and CGP and their predecessor entities.  Finally, CEOC granted to CES a license to certain intellectual property, including Total Rewards®, which CES then licenses to other entities in the Caesars enterprise.

The CEC Special Committee, established for the Four Properties Transaction, approved the term sheet for the Shared Services Joint Venture.  The Duff & Phelps opinion for the Four Properties Transaction also covered the Shared Services Joint Venture term sheet.  A CEC ad hoc committee ultimately recommended that the CEC Board approve the CES Amended and Restated Limited Liability Company Agreement, as well as the Omnibus Agreement.  The CEC and CEOC Boards approved the agreements by unanimous written consents.

### F.     The B-7 Refinancing.

On May 6, 2014, CEC and CEOC announced a financing plan designed to extend CEOC's near-term maturities and provide it with covenant relief and the stability to execute its business plan.  Among other things, the plan included the following terms:

- Certain of the First Lien Lenders provided an additional $1.75 billion to CEOC under the First Lien Credit Agreement via the B-7 Term Loan;

- CEC sold 5 percent (68.1 shares) of CEOC's outstanding common shares to institutional investors unaffiliated with CEC for $6.15 million, indicating a $123 million total equity valuation for CEOC; and

- the First Lien Credit Agreement was amended to: (i) relax certain financial covenants; (ii) make CEC's guarantee of the First Lien Credit Agreement obligations a guarantee of collection rather than of payment; and (iii) limit that guarantee to debt held by consenting First Lien Lenders and approximately $2.9 billion of additional indebtedness.

On July 25, 2014, the B-7 Term Loan was assumed by CEOC after regulatory approvals were obtained and the First Lien Credit Agreement amendments became effective. CEOC used the proceeds of the B-7 Term Loan to retire virtually all existing debt maturing before 2016. Specifically, CEOC retired (i) 98 percent of the $214.8 million in aggregate principal amount of 10.00% Second Priority Senior Secured Notes due 2015, (ii) 99.1 percent[24] of the $792 million in aggregate principal amount of 5.625% Senior Notes due 2015, and (iii) 100 percent of the $29 million aggregate principal amount in term loans due 2015.

CEC's sale of CEOC stock to unaffiliated entities resulted in the automatic release of CEC's guarantee of the Debtors' obligations under the First Lien Credit Facilities, First Lien Notes, and Second Lien Notes. As noted above, the B-7 Refinancing also modified CEC's guarantee of the obligations under the First Lien Credit Agreement from a guarantee of payment to a capped guarantee of collection.

G.    The Senior Unsecured Notes Transaction.

On August 22, 2014, CEC and CEOC consummated the Senior Unsecured Notes Transaction with certain holders of CEOC's outstanding Senior Unsecured Notes, who represented $237.8 million in aggregate principal amount of the Senior Unsecured Notes and greater than 51 percent of each series of the Senior Unsecured Notes that were then held by non-affiliates of CEC and CEOC (the "August Noteholders"). As part of the Senior Unsecured Notes Transaction, the August Noteholders sold to CEC and CEOC an aggregate principal amount of

---

[24]    The remaining 0.9% was subsequently retired by the Debtors.

approximately $89.4 million of the 6.5% Senior Unsecured Notes due 2016 and an aggregate principal amount of approximately $66 million of the 5.75% Senior Unsecured Notes due 2017. In return, CEC and CEOC each paid the August Noteholders $77.7 million in cash, and CEOC also paid the August Noteholders accrued and unpaid interest in cash.  CEC also contributed Senior Unsecured Notes in the aggregate principal amount of approximately $426.6 million to CEOC for cancellation.  Through the Senior Unsecured Notes Transaction, CEOC reduced its outstanding indebtedness by approximately $582 million.

As part of the Senior Unsecured Notes Transaction, and with the consent of the August Noteholders, CEOC and the Senior Unsecured Notes Trustee entered into supplemental Senior Unsecured Notes Indentures to remove provisions relating to CEC's guarantee of the Senior Unsecured Notes and to modify the covenant restricting disposition of "substantially all" of CEOC's assets so that future asset sales would be measured against CEOC's assets as of the date of the supplemental indentures (the "August 2014 Indenture Amendments").  In addition, with the consent of the August Noteholders, CEOC and the Senior Unsecured Notes Trustee amended the Senior Unsecured Notes Indentures to modify a ratable amount of the approximately $82.4 million face amount of the 6.5% Senior Unsecured Notes and 5.75% Senior Unsecured Notes held by the August Noteholders (the "Amended Senior Unsecured Notes") to include provisions that holders of those two series of the Amended Senior Unsecured Notes will be deemed to consent to any restructuring of the Senior Unsecured Notes (including the Amended Senior Unsecured Notes) that has been consented to by holders of at least 10 percent of the outstanding 6.5% Senior Unsecured Notes and 5.75% Senior Unsecured Notes, as applicable.  The August 2014 Indenture Amendments and the Amended Senior Unsecured Notes

were effective as of August 22, 2014, the closing date of the Senior Unsecured Notes Transaction.

**H.        Recent and Impending Property Closures.**

The Debtors have considered other options to reduce overhead and improve cash flows. In particular, the Debtors conducted a comprehensive review of their property portfolio to identify their weakest performing casino properties, especially those in markets that are oversupplied with gaming options.  As a result of this review, the Debtors have closed two U.S. properties in 2014:  Harrah's Tunica, which was closed on June 2, 2014 and Showboat Atlantic City, which was closed on August 31, 2014.  Subsequently, the Debtors sold the Showboat Atlantic City property to a New Jersey public university in a transaction that closed on December 12, 2014.  In addition, the Debtors are ceasing their greyhound racing activities at the Horseshoe Council Bluffs casino in Council Bluffs, Iowa, effective December 31, 2015.

**VI.      Independent Investigation, Disputes with Creditors, and Negotiation of the RSA.**

**A.        Special Governance Committee Investigation.**

On June 27, 2014, the Debtors appointed Steve Winograd, Managing Director of BMO Capital Markets, and Ronen Stauber, Managing Director of Jenro Capital, LLC, as independent directors of CEOC.  Winograd and Stauber are each disinterested directors who are not beholden to CEC, its affiliates other than CEOC, or the Sponsors.  They have no current material ties to CEC, its affiliates other than CEOC, or the Sponsors that would compromise their impartiality, and their compensation as directors of CEOC is not contingent upon taking or approving any particular action.

The CEOC Board of Directors formed the Special Governance Committee, comprising Winograd and Stauber.  The Special Governance Committee was tasked with conducting an independent investigation into potential claims the Debtors and/or their creditors may have

**A0275**

against CEC or its affiliates, including the claims asserted in certain of the then recently filed complaints.

The Special Governance Committee asked Kirkland & Ellis LLP ("K&E") and Mesirow Financial Consulting, LLC ("Mesirow," and together with K&E, the "Advisors") to advise on legal and financial issues, respectively, in connection with its independent investigation.

Beginning in August 2014, the Special Governance Committee issued written requests for documents to CEC, its affiliates, and the Sponsors. The Advisors have reviewed and analyzed approximately 35,000 documents in the course of the independent investigation. In addition, the Advisors have interviewed employees and officers of CEC and its affiliates, as well as CEC's legal and financial advisors. To date, Mesirow alone has worked **over** 7,500 hours on the investigation.

The members of the Special Governance Committee also have reviewed and considered the allegations made by certain creditors in pending litigation related to certain of these transactions (discussed below), documents relating to those transactions, and materials prepared by the Advisors. The Special Governance Committee has consulted frequently with the Advisors concerning the independent investigation.

Based on the investigation to date, the Special Governance Committee determined that it would require a significant contribution from CEC and its affiliates to settle and release certain claims, including an avoidable insider preference, but that prosecuting and collecting on such claims would be subject to significant challenges, including disagreements over the size of the claims. As a result, the Debtors secured significant contributions under the RSA that the Special Governance Committee believes, subject to completion of its investigation, will be sufficient to address such claims.

### B.    Litigation Regarding Transactions.

The transactions set forth above are the subject of serious and complicated disputes between CEOC, CEC, and various noteholders.  Generally speaking, the noteholders claim that the transactions were unlawful and/or violate certain covenants under the applicable indentures.  More specifically, the noteholders allege that the transactions were done at below-market prices as part of a scheme by CEC and the Sponsors to transfer valuable assets from CEOC to CEC and its affiliates to remove them from the reach of CEOC's creditors.  The noteholders further allege that CEOC's directors and officers are unavoidably conflicted due to their extensive business and commercial ties to CEC and the Sponsors, and that they violated their fiduciary duties by approving the transactions.

On August 4, 2014, the Second Lien Notes Trustee commenced an action in the Court of Chancery of the State of Delaware against, among others, CEC, CEOC, CGP, CERP, CEC's directors, and certain of CEOC's directors in a case captioned *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corporation*, C.A. No. 10004-VCG (the "Delaware Chancery Court Action").  In the Delaware Chancery Court Action, the Second Lien Notes Trustee has alleged claims for, among other things, intentional and constructive fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, corporate waste, and breach of contract.  The claims in the Delaware Chancery Court Action are focused on the CIE, CERP, Growth, and Four Properties Transactions, as well as the Shared Services Joint Venture.

On August 5, 2014, CEC and CEOC commenced a lawsuit in the Supreme Court of New York, County of New York, against certain institutional First and Second Lien Noteholders, which is captioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et al.*, Index No. 652392/2014 (the "New York State Action").  The members of the Special Governance Committee abstained from

the decision to file the New York State Action.  In the New York State Action, CEC and CEOC assert that the defendants have tortiously interfered with CEC's and CEOC's businesses in an attempt to improve defendants' credit default swap and other securities positions.  CEC and CEOC also seek declarations that no defaults have occurred under CEOC's First and Second Lien Notes Indentures and that there have been no breaches of fiduciary duty or fraudulent transfers.

On November 25, 2014, the First Lien Notes Trustee commenced an action in the Court of Chancery of the State of Delaware against CEC, CEOC, CGP, CERP, CEC's directors, and all of CEOC's directors in a case captioned *UMB Bank v. Caesars Entertainment Corporation*, C.A. No. 10393-VCG (the "Receiver Action").  In the Receiver Action, the First Lien Notes Trustee alleges that Caesars has engaged in a fraudulent scheme to strip assets from CEOC, and seeks, among other things, to have the Delaware Chancery Court appoint a receiver to manage CEOC's affairs for the benefit of its noteholders.  Pursuant to the RSA, the Receiver Action will be consensually stayed as to all defendants upon the filing of these chapter 11 petitions.

Finally, certain Unsecured Noteholders have commenced two actions against CEC and CEOC in the United States District Court for the Southern District of New York, which are captioned *Meehancombs Global Credit Opportunities Master Fund, LP v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, Case No. 14-cv-07091-SAS, and *Danner v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, Case No. 14-cv-07093-SAS (the "SDNY Actions").  Through the SDNY Actions, the Unsecured Noteholders have asserted that the Unsecured Notes Transaction breached the Unsecured Notes Indentures and violated the Trust Indenture Act of 1939.

Motions to dismiss are pending in each of the Delaware Chancery Court Action, the New York State Action, and the SDNY Actions.  A motion to transfer the Receiver Action to New York is also pending.

### C.    Restructuring Negotiations and Restructuring Support Agreement.

Given their substantial debt obligations, the Debtors engaged their stakeholders, including the First Lien Lenders, the First Lien Noteholders and CEC in extensive, multilateral, arm's-length negotiations regarding the terms of a potential restructuring beginning in summer 2014.

These negotiations were complicated by a number of factors.  First, certain of the First Lien Lenders and First Lien Noteholders also held credit default swap positions, which could have significant value if the Debtors defaulted on their debts.  Second, CEC, the Debtors, and certain creditors also were engaged in ongoing, contentious litigation set forth above.  Third, it was critical that CEC support any potential restructuring given gaming regulatory requirements and the fact that the Caesars' businesses are interrelated through shared services and employees as well as the Total Rewards program.  Similarly, the Debtors could trigger significant tax obligations—including for the Debtors—by separating from CEC.

The Debtors and their stakeholders examined structures that would maximize the value of their estates and creditor recoveries.  After significant diligence and hard fought negotiations, the parties agreed to reorganize the Debtors' businesses as a REIT, which would enhance the value of the Debtors' real estate and allow the Debtors to provide their creditors with improved recoveries, including a 100 percent recovery for the First Lien Lenders.  The Debtors also focused on maximizing non-First Lien Noteholder recoveries, and successfully negotiated for improved recoveries for such classes from the initial proposals while also maintaining recoveries for the First Lien Creditors.

Despite this substantial progress, certain of the First Lien Noteholders and each of the First Lien Lenders involved in the negotiations withdrew their support on December 11, 2014. The Debtors, CEC, and certain of the First Lien Noteholders, however, continued negotiating and ultimately reached agreement on the terms of a comprehensive restructuring. This proposed restructuring is documented in the RSA and Term Sheet, which were initially executed on December 19, 2014 by the Debtors, CEC, certain Apollo-affiliated funds, and 38 percent of the First Lien Noteholders. As of the Petition Date, holders of over 80 percent in aggregate principal amount of the Debtors' first lien bonds, and approximately 15 percent of first lien bank debt, have signed the RSA.

The RSA and Term Sheet form the basis of a comprehensive chapter 11 plan that will permit the Debtors to reorganize and effectively compete in the changing casino environment without the burden of their significant debt load. Among other things, the Term Sheet provides that the Debtors will shed approximately $10 billion in debt, reducing their yearly interest payment from approximately $1.7 billion to approximately $450 million. As part of the restructuring, the Debtors will reorganize as a REIT and transfer all of the Debtors' casino properties to PropCo. CEOC will lease these properties as OpCo. Both PropCo and OpCo will issue take-back paper as part of creditor recoveries. Caesars Palace will be owned by a subsidiary of PropCo that will issue its own debt. OpCo will enter into a master lease with Caesars Palace and PropCo. The leases will include a full guarantee from CEC of all monetary obligations. This REIT structure will allow the Debtors to unlock the value of their properties for the benefit of all stakeholders.

Moreover, CEC is making significant contributions that are critical to funding anticipated payments under the Debtors' chapter 11 plan. Specifically, CEC will contribute up to

**A0280**

$1.45 billion in cash in support of the restructuring: $700 million to offer to purchase up to 100 percent of the equity in OpCo from creditors; $269 million to offer to purchase up to 15 percent of the equity in PropCo; $406 million to fund liquidity, cash recoveries to creditors, and a forbearance fee related to the RSA; and a guarantee of up to an additional $75 million of cash, which can be drawn by CEOC under certain circumstances.  CEC also will guarantee OpCo's monetary obligations under the master leases (up to $635 million per year), which will help facilitate the creation of the valuable REIT structure.  Further, the releases encompassed in the RSA—which are an important inducement for CEC's contributions—remain subject to the Special Governance Committee's ongoing investigation.

The transactions proposed by the RSA generally provide for the following treatments to holders of claims against and interests in the Debtors:

- First Lien Lenders will receive approximately a 100 percent recovery through a mix of cash, first and second lien OpCo debt, first lien PropCo debt, and either additional cash or mezzanine Caesars Palace Las Vegas ("CPLV") debt (depending on whether the CPLV debt is financed for cash);

- First Lien Noteholders will (i) receive approximately a 92 percent recovery through a mix of cash, first and second lien OpCo debt, first and second lien PropCo debt, either additional cash or mezzanine CPLV debt (depending on whether the CPLV debt is financed for cash), PropCo equity, and OpCo equity, (ii) have the right to "put" to CEC and First Lien Noteholders who elect to backstop (in exchange for cash at "plan" value) up to 14.8 percent of their PropCo equity and 100 percent of their OpCo equity, and (iii) have the right to purchase at least 50 percent of preferred PropCo equity;

- Non-First Lien Noteholders will receive either (i) if the class or classes of non-First Lien Noteholders votes to accept the plan, 30.1 percent of the PropCo equity, plus the right to purchase for cash at "plan" value up to an additional 65% of the PropCo equity or (ii) if the class or classes of non-First Lien Noteholders reject the plan, 17.5 percent of the PropCo equity; and

- Critical trade vendors will be paid in full, and the treatment of other general unsecured creditors will be agreed-to by the parties.

**A0281**

The restructuring contemplated by the RSA and Term Sheet is in the best interests of the Debtors' estates, maximizes stakeholder recoveries, secures a viable pathway to future growth, and ensures that the Debtors continue to operate on an ongoing basis for the benefit of their customers, vendors, and approximately 32,000 employees. The Debtors are in the process of drafting and negotiating the terms of the chapter 11 plan and preparing a related disclosure statement. They will seek to move promptly to assume the RSA and to confirm their plan in accordance with the milestones set forth in the RSA, which, as described above, provide a fair and reasonable amount of time for various stakeholders to analyze the terms of the agreements set forth therein.

## VII.    Chapter 11 Cases.

### A.    Jurisdiction and Venue.

The United States Bankruptcy Court for the Northern District of Illinois has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408.

On January 12, 2015, certain holders of Second Lien Notes filed an involuntary bankruptcy petition against CEOC, but no other Debtor, in the United States Bankruptcy Court for the District of Delaware. Pursuant to recent amendments to Bankruptcy Rule 1014(b), the pendency of that involuntary petition does not automatically stay these cases, which may appropriately proceed in this Court.[25]

The RSA is the result of over six months of negotiation among the Debtors and stakeholders, and is supported by creditors representing $6.45 billion of the Debtors' capital

---

[25]    Rule 1014(b) provides that if two or more petitions are filed regarding the same debtor, "the court in the district in which the first-filed petition is pending may determine, in the interests of justice and for the convenience of the parties, the district or districts in which any of the cases should proceed. The court may so determine on motion and after a hearing…. The court *may* order the parties to the later-filed cases not to proceed further until it makes the determination." (emphasis added)

structure.  These chapter 11 filings involve more than 170 Debtors, and the Debtor's intent to file bankruptcy petitions has long been a matter of public knowledge.  The involuntary bankruptcy petition filed in Delaware against a single Debtor is a transparent tactic by three out-of-the-money creditors holding one series of second lien notes to derail this entire process.  Now that the Debtors have filed their voluntary petitions, the predicate for an involuntary petition—supervision by a bankruptcy court—has been achieved.  Accordingly, CEOC will seek to dismiss the involuntary petition within its time to answer or otherwise plead in response to that petition.

**B.      Use of Cash Collateral.**

The Debtors have significant cash on hand that constitutes the Secured Creditors' cash collateral and seek to fund their operations and the administration of these cases with such cash.  Recognizing the importance of the Debtors' access to cash collateral, the Debtors have provided the Secured Creditors with the following adequate protection package in consideration for the use of cash collateral:

- replacement liens for the Secured Creditors;

- superpriority administrative expense claims for the First Lien Creditors;

- payment of the First Lien Group's professional fees and expenses;

- adequate protection payments to the First Lien Creditors at an annual rate of 1.5% and payment of available cash upon the effective date of a plan of reorganization;

- agreement to operate in the ordinary course consistent with a cash forecast; and

- disclosure and access to certain financial information.

The Debtors' proposed cash collateral package also contains several customary events of default and restructuring-related milestones.  The Debtors have also provided various stipulations customary for adequate protection packages in large complex chapter 11 cases.  Pursuant to the Second Lien Intercreditor Agreement, the Second Lien Noteholders are prohibited from

objecting to, or seeking additional, adequate protection, so long as they are granted similar adequate protection liens on a junior priority basis, which the Debtors have provided.

**C.    Governance Protocols.**

To ensure the efficient and independent management of these cases for the benefit of CEOC's estates, the Debtors have also put in place certain governance protocols. Specifically, the Debtors have:

- appointed Randall S. Eisenberg, a managing director at AlixPartners as Chief Restructuring Officer of CEOC (the "CRO") to oversee the chapter 11 cases and implementation of the restructuring transactions at the operational level;

- established a Special Restructuring Committee of the CEOC Board of Directors, comprising the two independent directors and one Apollo director, to oversee day-to-day decision making regarding restructuring related issues; and

- established decision making mandates that require the CRO to report to the Special Restructuring Committee with respect to all restructuring-related decisions requiring Board approval other than decisions involving related parties, which remain reserved exclusively for the Special Governance Committee.

<u>**Conclusion**</u>

The reorganization of Debtors' businesses will require difficult compromises in a challenging environment. The Debtors are a key part of an $8.5 billion, heavily regulated, worldwide gaming enterprise with a complex capital structure. Shedding the Debtors' unsustainable burden of more than $18 billion in funded debt will necessitate concessions from sophisticated financial institutions with disparate motivations. Moreover, the disputed asset sales and capital markets transactions undertaken in the past several years are complicated, and must be resolved in a manner that fairly compensates these estates. Cognizant of their responsibility as fiduciaries, the Debtors have taken a lead role in driving solutions to these and other problems facing their businesses. The proposed RSA reflects the significant compromises the Debtors have already achieved to create the architecture for a plan of reorganization that maximizes recoveries

for all stakeholders.  The Debtors are in the best, most informed, position to garner broader consensus around the proposed RSA framework and intend to shepherd these cases to a successful conclusion.

Dated:  January 15, 2015          /s/ David R. Seligman, P.C.
Chicago, Illinois                 James H.M. Sprayregen, P.C.
                                  David R. Seligman, P.C.
                                  **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  300 North LaSalle
                                  Chicago, Illinois 60654
                                  Telephone:    (312) 862-2000
                                  Facsimile:    (312) 862-2200

                                      - and -

                                  Paul M. Basta, P.C.
                                  Nicole L. Greenblatt
                                  **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  601 Lexington Avenue
                                  New York, New York 10022-4611
                                  Telephone:    (212) 446-4800
                                  Facsimile:    (212) 446-4900

                                  *Proposed Counsel to the Debtors*
                                  *and Debtors in Possession*

**A0285**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 292 of 539 PageID #:1251

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 2 of 183

<div style="border:1px solid black;padding:10px;">

**THIS AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, A SOLICITATION FOR CONSENTS TO ANY PLAN PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR A SOLICITATION TO TENDER OR EXCHANGE OF ANY OF THE NOTES OR BONDS ISSUED PURSUANT TO THE FIRST LIEN INDENTURES. EACH CONSENTING CREDITOR'S VOTE ON THE PLAN SHALL NOT BE SOLICITED UNTIL THE CONSENTING CREDITORS HAVE RECEIVED THE DISCLOSURE STATEMENT AND RELATED BALLOT(S), AS APPROVED BY THE BANKRUPTCY COURT**

</div>

## THIRD AMENDED & RESTATED RESTRUCTURING SUPPORT AND FORBEARANCE AGREEMENT

This Third Amended & Restated Restructuring Support and Forbearance Agreement dated as of January 13, 2015 amends, restates and replaces the Second Amended & Restated Restructuring Support and Forbearance Agreement dated as of January 9, 2014 (as amended, supplemented, or otherwise modified from time to time, this "Agreement"), among: (i) Caesars Entertainment Operating Company, Inc. ("CEOC"), on behalf of itself and each of the Subsidiary Loan Parties (as defined in the Credit Agreement (as defined below)) identified on Exhibit A hereto (collectively, the "Company"), (ii) Caesars Entertainment Corporation ("CEC," and together with the Company, the "Caesars Parties"), (iii) LeverageSource III (H Holdings), L.P. ("LS3"), (iv) LeverageSource V, L.P. ("LS5"), and (v) each of the undersigned noteholders, each of which is the holder of, or the investment advisor or the investment manager to a holder or holders of First Lien Bond Claims (as defined below) (and in such capacity having the power to bind such holder with respect to any First Lien Bond Claims identified on its signature page hereto) (including any permitted assignees under this Agreement, collectively, the "Consenting Creditors," and together with the Caesars Parties, LS3, and LS5, each referred to as a "Party" and collectively referred to as the "Parties"). All capitalized terms not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

## RECITALS:

**WHEREAS**, before the date hereof, the Parties and their representatives have engaged in arm's-length, good-faith negotiations regarding a potential restructuring of the Company's indebtedness and other obligations pursuant to the terms and conditions of this Agreement and the terms and conditions set forth on the term sheet annexed hereto as Exhibit B (the "Restructuring") (which term sheet, including any schedules, annexes, and exhibits attached thereto, amends, restates, and replaces any prior restructuring term sheet, and is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 14 hereof, the "Restructuring Term Sheet"));

**WHEREAS**, if effected, the Restructuring will resolve all claims between the Consenting Creditors (including EMC (as defined below)) and the Caesars Parties, including any litigation-related claims against the Company and CEC and those at issue in the Caesars-Commenced Litigation (as defined below);

1

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 293 of 539 PageID #:1252

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 3 of 183

WHEREAS, the Company will be implementing the Restructuring through a prenegotiated joint chapter 11 plan of reorganization;

WHEREAS, the Parties have agreed that the Company may use Cash Collateral (as defined below) during the Chapter 11 Cases (as defined below) on the terms and subject to the conditions set forth in the Restructuring Term Sheet and as otherwise satisfactory to the Parties; and

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which each of the Parties hereby acknowledges, each Party, intending to be legally bound hereby, agrees as follows:

1.    **Definitions; Rules of Construction**.

(a)    Definitions.  The following terms shall have the following definitions:

"Additional Bank Consideration" means any consideration provided by the Caesars Parties or their Affiliates in connection with the Restructuring or entry into this Agreement to any holder of First Lien Bank Debt, in its capacity as such, that exceeds or is superior to that contemplated under the Restructuring, including, without limitation, additional consideration, the granting of any guaranty, and/or the allocation of any rights or opportunities (whether investment, commercial, management, advisory or otherwise) related to the Company or the Restructuring.

"Additional Bond Consideration" means any consideration provided by the Caesars Parties or their Affiliates in connection with the Restructuring or entry into this Agreement to any holder of First Lien Bond Debt, in its capacity as such, that exceeds or is superior to that contemplated under the Restructuring, including, without limitation, additional consideration, the granting of any guaranty, and/or allocation of any rights or opportunities (whether investment, commercial, management, advisory or otherwise) related to the Company or the Restructuring.

"Affiliate" means, with respect to any Person, any other Person (whether now or hereinafter in existence) which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"Agreement" has the meaning set forth in the preamble hereof.

"Alternative Proposal" means any plan of reorganization or liquidation, proposal, offer, transaction, dissolution, winding up, liquidation, reorganization, merger, consolidation,

2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 294 of 539 PageID #:1253

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 4 of 183

business combination, joint venture, partnership, sale of material assets or equity interests or restructuring (other than the Restructuring) involving the Company and its controlled subsidiaries.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§101 *et seq*.

"Bankruptcy Court" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced, as determined by the Company in consultation with CEC and previously disclosed to the Consenting Creditors.

"Business Day" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Caesars-Commenced Litigation" means the case captioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et. al.*, Index No. 652392/2014 (N.Y. Sup. Ct., N.Y. Cty.).

"Caesars Cases" means the cases captioned (a) *Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second-Priority Senior Secured Notes due 2018, on behalf of itself and derivatively on behalf of Caesars Entertainment Operating Company, Inc. v. Caesars Entertainment Corporation, et. al.*, Case No. 10004-VCG (Del. Ch.), (b) *MeehanCombs Global Credit Opportunities Master Fund, LP, et. al. v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc.*, No. 14-cv-7097 (S.D.N.Y.), and (c) *Frederick Barton Danner v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc.*, No. 14-cv-7973 (S.D.N.Y.), and (d) all claims in, and causes of action relating to, the Caesars Cases otherwise described in clauses (a)–(c) above.

"Caesars Parties" has the meaning set forth in the preamble hereof.

"Cash Collateral" means the Company's cash to the extent that such cash is "Collateral" and subject to a perfected "Lien," both as defined under the Credit Agreement and/or First Lien Indentures, as the case may be, and in each case that has not been avoided.

"Cash Collateral Stipulation" means a stipulation governing the use of Cash Collateral that shall be consistent with the Restructuring Term Sheet and otherwise reasonably acceptable in form and substance to the Company, CEC, and the Requisite Consenting Creditors.

"CEC" has the meaning set forth in the preamble hereof.

"CEC Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with (a) the Amended and Restated Credit Agreement, dated as of November 14, 2012, among CEOC, as borrower, and CEC, as lenders, and (b) the Global Intercompany Note, dated as of January 28, 2008, among CEC and certain Affiliates.

"CEOC" has the meaning set forth in the preamble hereof.

3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 295 of 539 PageID #:1254

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 5 of 183

"CES" means Caesars Enterprise Services, LLC and its subsidiaries (whether now or hereinafter in existence).

"Chapter 11 Cases" means the voluntary chapter 11 cases that the Company will commence to effectuate the Restructuring.

"Claim" means any claim identified on a Party's signature block hereto on account of indebtedness issued by CEOC pursuant to the Credit Agreement, the First Lien Indentures, or the Non-First Lien Indentures, or any other claim (as that term is defined by section 101(5) of the Bankruptcy Code), in each case, other than any claim for which the holder (x) does not have the right to control voting or (y) is not permitted by a preexisting contractual obligation or operation of law to vote in favor of the Restructuring.  For the avoidance of doubt (i) "Claim" shall not include any claim in respect of derivatives related to or referencing indebtedness, (ii) without limiting Section 12 hereof, if the holder of a claim ceases to have the right to control voting with respect to such claim, such claim shall no longer be deemed a "Claim" for purposes of this Agreement, unless and until such holder subsequently acquires the right to control voting with respect to such claim, and (iii) the definition set forth herein shall not limit nor be deemed to limit the scope of any release provided under the Restructuring Term Sheet.

"Claim Holder" refers to (i) each Consenting Creditor, (ii) LS3, (iii) LS5, and (iv) each Caesars Party, to the extent such Caesars Party, as of the date of execution of this Agreement, either (a) is a beneficial owner of Claims or (b) has investment or voting discretion with respect to Claims and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement.

"Collateral Agent" has the meaning ascribed to it in the Credit Agreement and First Lien Indentures.

"Company" has the meaning set forth in the preamble hereof.

"Company Termination Event" has the meaning set forth in Section 10 hereof.

"Confidential Claims Information" has the meaning set forth in Section 5(a)(iii) hereof.

"Confirmation Order" has the meaning set forth on Exhibit D hereto.

"Consenting Creditors" has the meaning set forth in the preamble hereof.

"Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of July 25, 2014, among CEC, CEOC, as borrower, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent.

"Creditor Termination Event" has the meaning set forth in Section 8 hereof.

"Creditor Termination Right" has the meaning set forth in Section 8 hereof.

4

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 296 of 539 PageID #:1255

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 6 of 183

"Definitive Documentation" means the RSA Assumption Motion, Plan, Disclosure Statement, Cash Collateral Stipulation, any court filings in the Chapter 11 Cases that could be reasonably expected to affect the interests of holders of First Lien Bond Claims (but not, for the avoidance of doubt, any professional retention motions or applications), in their capacities as such, and any other documents or exhibits related to or contemplated in the foregoing.

"Deposit Accounts" means (i) account number 153910104436 held at U.S. Bank National Association and (ii) account number 4159556448 held at Wells Fargo Bank, National Association, or such other account(s) as may be designated in the event that applicable control agreements are breached or if a notice of exclusive control is delivered with respect to such account(s).

"Disclosure Statement" means the Company's disclosure statement, including any exhibits, appendices, related documents, ballots, and procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, in respect of the Plan and that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure, and other applicable law, each of which shall be substantially consistent with this Agreement and shall otherwise be reasonably acceptable to the Requisite Consenting Creditors and the Company.

"Effective Date" means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and on which the Restructuring and the other transactions to occur on the Effective Date pursuant to the Plan become effective or are consummated.

"EMC" means certain entities or accounts managed or controlled by Elliott Management Corporation who are named as defendants in the Caesars-Commenced Litigation.

"Event of Default" has the meaning ascribed to it in the First Lien Indentures.

"Executory Contracts and Unexpired Leases" means any contracts or unexpired leases to which the Company is a party that are subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"Fiduciary Out" has the meaning set forth in Section 10(c) hereof.

"First Lien Bank Claim" means a Claim in respect of First Lien Bank Debt.

"First Lien Bank Debt" means indebtedness incurred by the Company pursuant to the Credit Agreement.

"First Lien Bank Documents" means the "Loan Documents" as defined in the Credit Agreement.

"First Lien Bond Claim" means a Claim in respect of First Lien Bond Debt.

5

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 297 of 539 PageID #:1256

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 7 of 183

"First Lien Bond Debt" means indebtedness incurred by the Company pursuant to the First Lien Indentures.

"First Lien Fees and Expenses" means (i) all reasonable and documented out-of-pocket expenses (other than professional fees) incurred by any Initial Consenting Creditor in connection with the negotiation and implementation of the Restructuring plus (ii) First Lien Professional Fees.

"First Lien Indentures" means (i) the Indenture dated as of June 10, 2009, as it may have been amended and supplemented from time to time, governing CEOC's 11.25% Senior Secured Notes due 2017, (ii) the Indenture dated as of February 14, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 8.5% Senior Secured Notes due 2020, (iii) the Indenture dated as of August 22, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020 and (iv) the Indenture dated as of February 15, 2013, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020.

"First Lien Professional Fees" means all reasonable and documented fees and expenses of the First Lien Professionals incurred in their representation of holders of First Lien Bond Debt in connection with the Company, from the date of the First Lien Professionals' respective retentions by such holders of First Lien Bond Debt through and including the later of either (i) the termination of this Agreement pursuant to Sections 8, 9, or 10 of this Agreement or (ii) the Effective Date; provided that documentation of such First Lien Professional Fees shall be summary in nature and shall not include billing detail that may be subject to the attorney-client privilege or other similar protective doctrines.

"First Lien Professionals" means Kramer Levin Naftalis & Frankel LLP, Miller Buckfire & Co., Breazeale, Sachse & Wilson, L.L.P., Ballard Spahr LLP, one (1) special REIT counsel, and one (1) local counsel engaged by the Consenting Creditors in connection with the Chapter 11 Cases, and such other legal, consulting, financial, and/or other professional advisors as may be retained or may have been retained from time to time by any of the Initial Consenting Creditors with the prior written consent of the Company, which consent shall not be unreasonably withheld.

"Forbearance Defaults" means defaults or Events of Default alleged in or in connection with (a) the May 2014 Transactions, (b) the Services Transactions, (c) the CEC Transactions, (d) the Incurrence Transactions, (e) the Restricted Transactions, (f) the Caesars Cases, (g) the Caesars-Commenced Litigation, and (h) any actions taken pursuant to and in compliance with the terms of this Agreement.

"Forbearance Fee First Lien Bond Claims" means the First Lien Bond Claims held by any Forbearance Fee Party as of 11:59 pm, New York City time, on January 15, 2015.

"Forbearance Fee Parties" means those holders of First Lien Bond Claims who sign this Agreement and become Consenting Creditors on or prior to 5 p.m. EST on January 12, 2015, and shall include the transferees and assignees of such holders with respect to any transfers or assignments of Forbearance Fee First Lien Bond Claims permitted under this Agreement,

6

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 298 of 539 PageID #:1257

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 8 of 183

unless a Notice of Retention of RSA Forbearance Fee substantially in the form attached hereto as <u>Exhibit F</u> is delivered to CEC, in which case the transferor/assignor shall remain the Forbearance Fee Party with respect to such Forbearance Fee First Lien Bond Claims.

"<u>Forbearance Termination Event</u>" has the meaning set forth in <u>Section 3(a)</u> hereto.

"<u>Incurrence Transactions</u>" means the transactions consummated pursuant to, in contemplation of, or in connection with the Incremental Facility Amendment and Term B-7 Agreement, dated as of June 11, 2014, among CEC, Caesars Operating Escrow LLC, the Incremental Lenders party thereto, Bank of America, N.A., Credit Suisse AG, Cayman Islands Branch, and upon the assumption of the Term B-7 Loans, CEOC.

"<u>Initial Consenting Creditor</u>" means the Consenting Creditors who are the following signatories hereto:  (i) Brigade Capital Management, LP; (ii) DDJ Capital Management, LLC; (iii) Elliott International, L.P.; (iv) Elliott Associates, L.P.; (v) The Liverpool Limited Partnership; (vi) J.P. Morgan Investment Management Inc.; (vii) JPMorgan Chase Bank, N.A.; and (viii) Pacific Investment Management Company LLC.

"<u>LS3</u>" has the meaning set forth in the preamble hereof.

"<u>LS5</u>" has the meaning set forth in the preamble hereof.

"<u>May 2014 Transactions</u>" means the transactions consummated pursuant to, in contemplation of, or in connection with the Transaction Agreement dated as of March 1, 2014, as amended, by and among CEC, CEOC, Caesars License Company, LLC, Harrah's New Orleans Management Company, Corner Investment Company, LLC, 3535 LV Corp., Parball Corporation, JCC Holding Company II, LLC, Caesars Acquisition Company, and Caesars Growth Partners, LLC.

"<u>Milestones</u>" means those milestones set forth on <u>Exhibit D</u> hereto.

"<u>MLSA</u>" means that certain Management and Lease Support Agreement, as described in the Restructuring Term Sheet.

"<u>Non-First Lien Indentures</u>" means the indentures governing CEOC's (a) 10.00% second-priority senior secured notes due 2015, (b) 10.00% second-priority senior secured notes due 2018, (c) 12.75% second-priority senior secured notes due 2018, (d) 10.75% senior notes due 2016, (e) 10.75%/11.5% senior toggle notes due 2018, (f) 6.5% senior notes due 2016, and (g) 5.75% senior notes due 2017.

"<u>Note Purchase and Support Agreement</u>" means that certain agreement entered into by CEC, CEOC, and certain holders of the 6.50% Senior Notes due 2016 and 5.7% Notes due 2017, dated August 12, 2014.

"<u>Outside Date</u>" has the meaning set forth on <u>Exhibit D</u> hereto.

"<u>Parties</u>" has the meaning set forth in the preamble hereof.

<div align="center">7</div>

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 299 of 539 PageID #:1258

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 9 of 183

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Petition Date" means the date on which the Company commences the Chapter 11 Cases.

"Plan" means the joint prenegotiated chapter 11 plan of reorganization of the Company through which the Restructuring will be effected (as amended, supplemented, or otherwise modified from time to time), and which Plan must be materially consistent with this Agreement and the Restructuring Term Sheet and shall otherwise be reasonably acceptable to the Requisite Consenting Creditors and the Company.

"Qualified Marketmaker" means an entity that holds itself out to the public or applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company, in its capacity as a dealer or market maker in claims against the Company.

"Requisite Consenting Creditors" means, as of any time of determination, the Consenting Creditors holding greater than two-thirds of the aggregate amount of all First Lien Bond Claims held at such time by all of the Consenting Creditors; provided that any First Lien Bond Claims held by any of the Caesars Parties and/or their respective Affiliates shall not be included in the foregoing calculation.

"Restricted Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Note Purchase and Support Agreement.

"Restructuring" has the meaning set forth in the recitals hereof.

"Restructuring Support Party" means each of (i) the Caesars Parties (other than the Company), (ii) the Consenting Creditors, (iii) LS3, and (iv) LS5, together with the respective Affiliates, subsidiaries, managed funds, representatives, officers, directors, agents, and employees of each of the foregoing, in each case to the extent controlled by such Restructuring Support Party.

"Restructuring Support Period" means the date commencing on the date this Agreement becomes effective in accordance with Section 15 hereof and ending on the earlier of (i) the date on which this Agreement is terminated with respect to all Parties, and (ii) the Effective Date.

"Restructuring Term Sheet" has the meaning set forth in the recitals hereof.

"RSA Assumption Motion" has the meaning set forth on Exhibit D hereto.

"RSA Forbearance Fees" has the meaning set forth in the Restructuring Term Sheet.

"Securities Act" has the meaning set forth in Section 7(c) hereof.

8

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 300 of 539 PageID #:1259

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 10 of 183

"Services Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Omnibus License and Enterprise Services Agreement, dated May 20, 2014, by and among CES, CEOC, CERP, Caesars Growth Properties Holdings, LLC, Caesars License Company, LLC, and Caesars World, Inc.

"Termination Events" has the meaning set forth in Section 10 hereto.

"Transfer" has the meaning set forth in Section 12 hereto.

"Transferee" has the meaning set forth on Exhibit E hereto.

"Trustee" has the meaning ascribed to it in the First Lien Indentures.

"Trustee Litigation" means the case captioned *UMB Bank v. Caesars Entertainment Corporation,* et al., C.A. No. 10393-VCG (Del. Ch.).

(b)    Rules of Construction.  Other than as contained within Section 28, each reference in this Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import shall mean and be a reference to this Agreement, the Restructuring Term Sheet, and the Cash Collateral Stipulation taken as a whole.

## 2.    **Commitment of Restructuring Support Parties**.

(a)    Affirmative Covenants.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each Restructuring Support Party shall:

(i)    negotiate in good faith the Definitive Documentation, in form and substance consistent in all material respects with this Agreement (including the Restructuring Term Sheet and all exhibits thereto, which, for the avoidance of doubt, shall be binding on all the Parties upon the effectiveness of this Agreement), and as otherwise reasonably acceptable to the Requisite Consenting Creditors, the Company, and CEC (in respect of CEC, to the extent such Definitive Documents could be reasonably expected to affect the interests of CEC);

(ii)    consent to those actions contemplated by this Agreement or otherwise required to be taken to effectuate the Restructuring, including entering into all documents and agreements necessary to consummate the Restructuring, in each case, to which such Restructuring Support Party is to be a party;

(iii)    support the Restructuring and vote in favor of the Plan, when properly solicited to do so under the Bankruptcy Code, all Claims now or hereafter beneficially owned by such Restructuring Support Party or for which it now or hereafter serves as the nominee, investment manager, or advisor for beneficial holders of Claims (and not withdraw or revoke its tender, consent, or vote with respect to the Plan); provided that the foregoing may be waived by the Company in its sole discretion; provided, further, that (x) such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by any of the Consenting Creditors at any time following the termination of this Agreement with respect to such Consenting Creditor, but only to the extent this Agreement has terminated on account of a breach by a Party other than such Consenting Creditor, it being understood and agreed that no Restructuring

9

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 301 of 539 PageID #:1260

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 11 of 183

Support Party shall enter into any arrangement whereby it transfers voting rights for the purpose of avoiding any obligations under this Agreement, and (y) if this Agreement (including the Restructuring Term Sheet) is amended in a manner that would adversely affect a Consenting Creditor's First Lien Bank Claim(s), such Consenting Creditor (1) shall no longer be obligated to vote hereunder in respect of any First Lien Bank Claim(s) and (2), to the extent such Consenting Creditor has voted any First Lien Bank Claim(s) hereunder, shall be permitted to revoke its vote in respect of such First Lien Bank Claim(s) (and upon such revocation, such vote shall be deemed void *ab initio*).

(iv)    upon its execution of this Agreement, exercise its Put Option with respect to OpCo New Common Stock as provided by the Restructuring Term Sheet, which election shall be binding on such Restructuring Support Party and any Transferee thereof; and

(v)    support the mutual release and exculpation provisions to be provided in the Plan.

(b)    <u>Negative Covenants</u>.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each Restructuring Support Party shall not:

(i)    seek, solicit, support, vote its Claims for, or consent to, an Alternative Proposal; or

(ii)    take any action materially inconsistent with the transactions expressly contemplated by this Agreement, or that would materially delay or obstruct the consummation of the Restructuring, including, without limitation, commencing, or joining with any Person in commencing, any litigation or involuntary case for relief under the Bankruptcy Code against the Company or CEC.

Subject in all respects as may otherwise be provided for under the applicable documents governing the intercreditor relationships among the parties thereto, nothing in this Agreement shall prohibit any Restructuring Support Party from (x) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Restructuring, and do not hinder, delay, or prevent consummation of the Restructuring, (y) taking or directing any action relating to maintenance, protection, or preservation of any collateral, to the extent such actions are not inconsistent with this Agreement, and (z) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documentation entered into in connection with the Restructuring; <u>provided that</u>, in each case, any such action is not materially inconsistent with such Restructuring Support Party's obligations hereunder.

**3.    <u>Consenting Creditors' Forbearance</u>.**

(a)    Until the earlier to occur of (i) the termination of this Agreement and (ii) the occurrence of any Event of Default (other than any Forbearance Default) that continues for five (5) consecutive Business Days after notice thereof from the Trustee to the Company (each of clause (i) and clause (ii), a "<u>Forbearance Termination Event</u>"), each Consenting Creditor agrees to forbear from exercising its default-related rights and remedies (as well as any setoff

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 302 of 539 PageID #:1261

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 12 of 183

rights and remedies) under the First Lien Indentures or applicable law, against the Company and CEC and, with respect to each, their property and interests in property.

(b)    Upon the occurrence of a Forbearance Termination Event, the agreement of the Consenting Creditors hereunder to forbear from exercising rights and remedies in respect of the Forbearance Defaults, shall immediately terminate without requirement of any demand, presentment, protest, or notice of any kind, all of which the Company hereby waives (to the extent permitted by applicable law).

(c)    The Company agrees that, upon the occurrence of, and at any time after the occurrence of, a Forbearance Termination Event, the Consenting Creditors or the Collateral Agent or the Trustee, as applicable, may proceed, subject to the terms of the First Lien Bank Documents, the First Lien Indentures, and applicable law, to exercise any or all rights and remedies under the First Lien Bank Documents, the First Lien Indentures, applicable law, and/or in equity, including, without limitation, the rights and remedies on account of the Forbearance Defaults, all of which rights and remedies are fully reserved.

(d)    The Caesars Parties agree that, prior to the termination of this Agreement with respect to any particular Consenting Creditor, the Caesars Parties shall not commence any litigation or interpose any claim arising from or in any way related to the First Lien Bond Debt against any such Consenting Creditor.  The Consenting Creditors agree that, prior to the termination of this Agreement with respect to any particular Caesars Party, the Consenting Creditors shall not commence any litigation or interpose or join in any claim arising from or in any way relating to the First Lien Bond Debt against any such Caesars Party, including, without limitation, in connection with any of the Caesars Cases or the Trustee Litigation.

(e)    For the avoidance of doubt, and notwithstanding anything herein, the forbearance set forth in this Section 3 shall not constitute a waiver with respect to any defaults or any events of defaults under the First Lien Indentures and shall not bar any Consenting Creditor from filing a proof of claim or taking action to establish the amount of such Claim.

(f)    Anything in this Agreement or otherwise notwithstanding, (i) the Trustee Litigation may proceed unaffected by this Agreement, including, without limitation, all Parties to this Agreement may take any and all actions, make any and all omissions, give any and all directions and/or instructions, file any and all papers and documents, provide any and all evidence, raise and/or prosecute any and all claims and defenses, and otherwise act (or omit to act) in connection with or in reference to the Trustee Litigation as they may elect in their sole and absolute discretion, and all Parties to this Agreement hereby reserve all of their respective rights, powers, and remedies in connection with or in reference to the Trustee Litigation; and (ii) each of the Parties to this Agreement hereby agrees not to allege, assert directly or indirectly, plead, raise by claim or defense, challenge, or otherwise contend that the rights, powers, or remedies of any Party or trustee in connection with or in reference to the Trustee Action are in any manner restricted, limited, or otherwise prejudiced due to the existence of this Agreement or anything contained in this Agreement, and nothing contained in this Agreement shall be admissible for any such purpose. Notwithstanding the foregoing, the Consenting Creditors agree that if and only if the Petition Date occurs, then upon the occurrence of such Petition Date, they (x) shall not seek to modify or otherwise oppose the imposition of the automatic stay under

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 303 of 539 PageID #:1262

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 13 of 183

Section 362 of the Bankruptcy Code until the earlier of (i) the termination of this Agreement and (ii) the Effective Date and (y) to the extent a Consenting Creditor has directed the Trustee in connection with the Trustee Litigation, such Consenting Creditor shall direct the Trustee to agree to a consensual stay of the Trustee Litigation commencing upon the Petition Date and expiring upon the termination of this Agreement.

### 4. **Withdrawal of Litigation and Tolling**.

(a)    Subject to Section 4(e) hereof, prior to the Petition Date, (i) the Company and CEC will dismiss without prejudice, or otherwise stay, the claims asserted against EMC in the Caesars-Commenced Litigation (and, for the avoidance of doubt, shall not attempt to or otherwise cause the retraction revocation or termination of the dismissal during the term of this Agreement) (provided, however, that the Company and CEC may pursue all claims in the Caesars-Commenced Litigation against any entity that is not an affiliate of EMC, directly or indirectly controlled or managed by Elliott Management Corporation or its Affiliates, or a Consenting Creditor), and (ii) within two (2) business days of such dismissal, EMC will withdraw, without prejudice, its pending motion to dismiss (and, for the avoidance of doubt, shall not attempt to or otherwise cause the retraction revocation or termination of the withdrawal during the term of this Agreement).  No Caesars Party shall, during the term of this Agreement, prosecute or pursue against EMC any of the claims asserted against EMC in the Caesars-Commenced Litigation or any similar or related claims.

(b)    Subject to Section 4(e) hereof, upon the termination of this Agreement with respect to the Company, CEC, and EMC, the agreements between the Company, CEC, and EMC in respect of the Caesars-Commenced Litigation as set forth above shall immediately terminate.

(c)    [Reserved.]

(d)    The Caesars Parties acknowledge and agree that the time from the date hereof through and including the date that is five (5) Business Days after the date that this Agreement has been terminated with respect to all Parties shall not be counted for purposes of determining whether any litigation commenced or claim interposed by any of the Consenting Creditors, the Trustee, or the Collateral Agent against any Caesars Party, which litigation or claim relates in any way to the Company or its Affiliates (including, but not limited to, any claims relating to any transaction by or among, or approved by, the Caesars Parties), was commenced or interposed within the applicable statute of limitations or in compliance with any other rule or doctrine of timeliness.  If any Caesars Party commences any litigation or asserts any claim against any particular Consenting Creditor, which litigation or claim relates to or arises from the First Lien Indentures or any matters at issue in the Caesars-Commenced Litigation (including but not limited to the assertion of claims by the Company or CEC against EMC in the Caesars-Commenced Litigation), the time between the date hereof through and including the date that is five (5) Business Days after the date that this Agreement has been terminated with respect to such Consenting Creditor shall not be counted for purposes of determining whether any such litigation was commenced or claim interposed within the applicable statute of limitations or in compliance with any similar rule or doctrine of timeliness.

12

**A0298**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 304 of 539 PageID #:1263

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 14 of 183

(e)    Notwithstanding anything in this <u>Section 4</u> to the contrary, in the event that EMC does not become Party to this Agreement by the date that is two (2) Business Days after the date hereof, <u>Section 4(a)</u> and <u>4(b)</u> shall be of no effect and <u>Section 4(c)</u> shall be deemed amended such that it shall not apply with respect to claims held by Caesars against EMC.

**5.    <u>Covenants of Caesars Parties</u>.**

(a)    <u>Affirmative Covenants of the Caesars Parties</u>.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each of the Caesars Parties shall:

(i)    (A) support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet and this Agreement, in accordance with the Milestones, (B) negotiate in good faith the Definitive Documentation necessary to effectuate the Restructuring, on the terms and subject to the conditions set forth in this Agreement, (C) use its commercially reasonable efforts to obtain any and all required governmental, regulatory, licensing, or other approvals (including, without limitation, any necessary third-party consents) necessary to the implementation or consummation of the Restructuring; (D) use its commercially reasonable efforts to lift or otherwise reverse the effect of any injunction or other order or ruling of a court or regulatory body that would impede the consummation of a material aspect of the Restructuring, and (E) operate the Company in the ordinary course consistent with industry practice and the operations contemplated pursuant to the Company's business plan, taking into account the Restructuring and the commencement of the Chapter 11 Cases;

(ii)    promptly notify or update the Consenting Creditors upon becoming aware of any of the following occurrences:  (A) an additional person becomes a Consenting Creditor after the date of this Agreement; (B) a Termination Event has occurred; (C) any person has challenged the validity or priority of, or has sought to avoid, any lien securing the First Lien Bond Debt pursuant to a pleading filed with the Bankruptcy Court or another forum of competent jurisdiction; (D) material developments, negotiations, or proposals relating to the Caesars-Commenced Litigation, the Caesars Cases, the Forbearance Defaults, and any other case or controversy that may be commenced against such Caesars Party in a court of competent jurisdiction or brought before a state or federal regulatory, licensing, or similar board, authority, or tribunal that would reasonably be expected to materially impede or prevent consummation of the Restructuring; and

(iii)    unless the Caesars Party obtains the prior written consent of a Consenting Creditor: (x) use the information regarding any Claims owned at any time by such Consenting Creditor (the "<u>Confidential Claims Information</u>") solely in connection with this Agreement (including any disputes relating thereto); and (y) except as required by law, rule, or regulation or by order of a court or as requested or required by the Securities and Exchange Commission or by any other federal or state regulatory, judicial, governmental, or supervisory authority or body, keep the Confidential Claims Information strictly confidential and not disclose the Confidential Claims Information to any other Person; <u>provided</u>, <u>however</u>, that the Caesars Parties may combine the Confidential Claims Information provided to the Caesars Parties by a Consenting Creditor with the corresponding data provided to the Company by the Consenting

13

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 305 of 539 PageID #:1264

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 15 of 183

Creditors and freely disclose such combined data on an aggregate basis. In the event that any of the Caesars Parties is required (by law, rule, regulation, deposition, interrogatories, requests for information or documents in legal or administrative proceedings, subpoena, civil investigative demand or other similar process, or by any governmental, judicial, regulatory, or supervisory body) to disclose the Confidential Claims Information or the contents thereof, the Caesars Parties shall, to the extent legally permissible, provide affected Consenting Creditors with prompt notice of any such request or requirement so that such Consenting Creditors may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this section. If, in the absence of a protective order or other remedy or the receipt of a waiver from a Consenting Creditor, a Caesars Party believes that it is nonetheless, following consultation with counsel, required to disclose the Confidential Claims Information, such Caesars Party may disclose only that portion of the Confidential Claims Information that it believes, following consultation with counsel, it is required to disclose, provided that it exercises reasonable efforts to preserve the confidentiality of the Confidential Claims Information, including, without limitation, by marking the Confidential Claims Information "Confidential – Attorneys' Eyes Only" and by reasonably cooperating with the affected Consenting Creditor to obtain an appropriate protective order or other reliable assurance that confidential and attorneys' eyes only treatment will be accorded the Confidential Claims Information. In no event shall this Agreement be construed to impose on a Consenting Creditor an obligation to disclose the price for which it acquired or disposed of any Claim. The Caesars Parties' obligations under this <u>Section 5(a)(iii)</u> shall survive termination of this Agreement.

     (b)   <u>Negative Covenants of the Caesars Parties</u>. Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each of the Caesars Parties (except with the prior written consent of the Requisite Consenting Creditors) shall not, directly or indirectly:

     (i)   take any action to solicit, initiate, encourage, or assist the submission of an Alternative Proposal; <u>provided that</u> this <u>Section 5(b)(i)</u> shall not apply to the Company after the Petition Date. If any Caesars Party receives a proposal or expression of interest in undertaking an Alternative Proposal, so long as the Consenting Creditors have agreed to comply with any applicable confidentiality restrictions related thereto (it being understood that CEC will not require any confidentiality restrictions that are in addition to the confidentiality restrictions set forth in any non-disclosure agreement between (1) any Consenting Creditor and the Company, or (2) the First Lien Professionals and the Company, that is in effect on the date hereof), the Caesars Party shall promptly notify the First Lien Professionals of the receipt of such proposal or expression of interest, with such notice to include the identity of the Person or group of Persons involved as well as the terms of such Alternative Proposal; it being acknowledged and agreed that, without limiting the restrictions imposed on the Company pursuant to this <u>Section 5(b)(i)</u>, the Company may pursue such Alternative Proposal (including by facilitating diligence in connection with such Alternative Proposal) in accordance with the Company's fiduciary duties as set forth by <u>Section 20</u> hereof;

     (ii)   (A) publicly announce its intention not to pursue the Restructuring; (B) suspend or revoke the Restructuring; or (C) execute any agreements, instruments, or other documents (including any modifications or amendments to any material Definitive Documentation necessary to effectuate the Restructuring) that, in whole or in part, are

<div align="center">14</div>

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 306 of 539 PageID #:1265

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 16 of 183

not substantially consistent with this Agreement, or are not otherwise reasonably acceptable to the Requisite Consenting Creditors and the Company; or

(iii)    take any action or omit to take any action, or incur, enter into, or suffer any transaction, arrangement, condition, matter, or circumstance, that (in any such case) materially impairs, or would reasonably be expected to materially impair, the ability of CEC to perform its obligations under the MLSA relative to its ability to perform its obligations under the MLSA as of the date of this Agreement (after giving effect to the consummation of the Restructuring as if the Restructuring had been consummated on the date of this Agreement).

In the event the Company receives and determines to pursue an Alternative Proposal in an exercise of its fiduciary duties as set forth by Section 20 hereof, the Company shall promptly notify the Consenting Creditors of the existence and material terms of such Alternative Proposal; provided that the Company may withhold the material terms of such Alternative Proposal from any Consenting Creditor(s) who do not agree to applicable reasonable and customary confidentiality restrictions with respect thereto and/or who are in breach of this Agreement. After receipt of the material terms of such Alternative Proposal, the Requisite Consenting Creditors shall have three (3) Business Days after notice by the Company to propose changes to the terms of this Agreement, including the Restructuring Term Sheet and any exhibits thereto. The Company shall keep the Consenting Creditors informed of any amendments, modifications or developments with respect to such Alternative Proposal and any material information related to such Alternative Proposal, and, to the extent an Alternative Proposal is amended in any material respect, the Requisite Consenting Creditors shall have three (3) Business Days from any such amendment to propose changes to the terms of this Agreement.

For the avoidance of doubt, the covenants set forth in this Section 5 are in addition to, and not in lieu of, any covenants, obligations, or agreements of CEC contained in the Guaranty and Pledge Agreement, all of which covenants, obligations and agreements of CEC contained in the Guaranty and Pledge Agreement are hereby ratified and confirmed in all respects and shall survive and continue in full force and effect.

(c)    Additional Covenants in Respect of CES.  The Company and CEC shall use commercially reasonable efforts to cause, subject to the terms and conditions hereof and for the duration of the Restructuring Support Period, CES (except with the prior written consent of the Requisite Consenting Creditors) (i) to operate its business in the ordinary course, and (ii) to preserve and maintain intact all material assets, properties, and other interests (including, without limitation, intellectual property interests and intangible assets, such as reward programs and customer lists) that are currently owned, licensed, used, or enjoyed by the Company.

(d)    Additional Affirmative Covenants of the Company.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, the Company shall:

(i)    to the extent permitted by the Bankruptcy Court and applicable law, cause the signature pages attached to this Agreement to be redacted to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases, posted on the Company's website, or otherwise made publicly available;

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 307 of 539 PageID #:1266

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 17 of 183

(ii)    to the extent not otherwise paid in connection with the Chapter 11 Cases (including pursuant to any debtor-in-possession financing or the Cash Collateral Stipulation), promptly pay in cash (A) upon the execution of this Agreement by the Company, all accrued First Lien Fees and Expenses for which invoices or receipts are furnished by the First Lien Professionals and/or Consenting Creditors, (B) following the execution of this Agreement by the Company and prior to the Petition Date, all First Lien Fees and Expenses for which invoices or receipts are furnished by the First Lien Professionals and/or Consenting Creditors, and (C) after the Petition Date, subject to the Bankruptcy Court's approval of the Company's use of Cash Collateral, all unpaid First Lien Fees and Expenses incurred after the date of this Agreement from time to time, in any event within ten (10) Business Days of delivery to the Company of any applicable invoice or receipt, which shall be in compliance with any order of the Bankruptcy Court and payment of which shall be authorized pursuant to the Cash Collateral Stipulation.  For the avoidance of doubt, invoices on account of First Lien Professional Fees shall contain summary detail of services performed to enable the Company to determine the reasonableness of such First Lien Professional Fees.  The Company's obligations to pay the First Lien Professional Fees shall not be affected or reduced by the payment of any First Lien Professional Fees by any holder of First Lien Bond Debt, irrespective of whether such holder remains a holder of First Lien Bond Debt as of the date of this Agreement or is a Consenting Creditor; and

(iii)    within five (5) Business Days after satisfaction of the conditions to effectiveness of this Agreement set forth in Section 15 hereof, the Company shall enter into amended account control agreements with respect to the Deposit Accounts preventing the withdrawal of funds outside of the ordinary course of business from such Deposit Accounts, and the Company agrees that during such five (5) Business Day period, it shall not remove any funds from the Deposit Accounts outside of the ordinary course of business; provided that such account control agreements shall automatically revert back to the form of account control agreements in existence immediately prior to the execution of this Agreement upon the termination of this Agreement on account of the breach of this Agreement by one or more Consenting Creditors holding in the aggregate more than 5.0% of the First Lien Bond Claims held by all Consenting Creditors at the time of such breach (other than a breach by any Caesars Party or any of their Affiliates); provided further that such control agreements shall still automatically revert on account of a breach of this Agreement by one or more Consenting Creditors holding in the aggregate less than 5.0% of First Lien Bond Claims held by all non-breaching Consenting Creditors at the time of such breach (other than a breach by any Caesars Party or any of its Affiliates) if aggregate First Lien Bond Claims held by Consenting Creditors with power to vote in favor of the Plan is less than 2/3 plus one dollar of all First Lien Bond Debt (measured by notional value) or such breach otherwise would have a material adverse effect on the Restructuring.

(e)    Additional Negative Covenants of the Company.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, the Company (except with the prior written consent of the Requisite Consenting Creditors) shall not, directly or indirectly:

(i)    take any action in connection with the Restructuring that violates this Agreement;

16

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 308 of 539 PageID #:1267

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 18 of 183

(ii)    (A) redeem, purchase or acquire, or offer to acquire any shares of, or any options, warrants, conversion privileges, or rights of any kind to acquire any shares of, any of its capital stock or other equity interests, or (B) issue, sell, pledge, dispose of, or grant or incur any encumbrance on, any shares of, or any options, warrants, conversion privileges, or rights of any kind to acquire any shares of, any of its capital stock or other equity interests (other than issuances of equity interests upon the exercise, exchange, or conversion of options, warrants, or other conversion privileges that are outstanding as of the date hereof and only in accordance with the terms of such options, warrants, or other conversion privileges as in effect on the date hereof);

(iii)    to the extent it would materially impair the rights of the Consenting Creditors and the Company's ability to consummate the Restructuring, and other than as required by the Plan, amend or propose to amend its respective certificate or articles of incorporation, bylaws, or comparable organizational documents;

(iv)    to the extent it would materially impair the rights of the Consenting Creditors, (A) split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or (B) declare, set aside or pay any dividend or other distribution payable in cash, stock, property, a combination thereof, or otherwise with respect to any of its capital stock or other equity interests or any capital stock or other equity interests of any other Person;

(v)    pay or make any payment, transfer, or other distribution (whether in cash, securities, or other property) of or in respect of principal of or interest on any funded indebtedness of the Company that either (A) is expressly subordinate in right of payment to the First Lien Bond Debt or (B) secured by an interest in collateral, which interest is subordinate in priority to that securing any of the First Lien Bond Debt, or any payment or other distribution (whether in cash, securities, or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, or termination in respect of any such funded indebtedness that is not contemplated by the Restructuring Term Sheet; or

(vi)    enter into any proposed settlement (other than as contemplated by this Agreement and the Restructuring or as previously disclosed to the First Lien Professionals prior to the date hereof) of any claim, litigation, dispute, controversy, cause of action, proceeding, appeal, determination, investigation, matter, or otherwise that will materially impair the Company's ability to consummate the Restructuring.

(f)    The Company acknowledges that it has reviewed this Agreement and has decided to enter into this Agreement on the terms and conditions set forth herein and in the Restructuring Term Sheet in the exercise of its fiduciary duties.

6.    **Mutual Representations, Warranties and Covenants**.

(a)    Each of the Parties, severally and not jointly, represents and warrants to each other Party that the following statements are true, correct, and complete as of the date hereof (or the date that a Transferee becomes a Party):

17

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 309 of 539 PageID #:1268

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 19 of 183

(i)    it is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(ii)    except as expressly provided in this Agreement or in the Bankruptcy Code (if applicable) or as may be required for disclosure by the Securities and Exchange Commission, no material consent or approval of, or any registration or filing with, any other Person is required for it to carry out the Restructuring contemplated by, and perform its obligations under, this Agreement;

(iii)    except as expressly provided in this Agreement or the Bankruptcy Code (if applicable), it has all requisite organizational power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its obligations under, this Agreement;

(iv)    the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary organizational action on its part;

(v)    it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement; and

(vi)    the execution, delivery, and performance by such Party of this Agreement does not and will not (1) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, (2) conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material debt for borrowed money to which it or any of its subsidiaries is a party, or (3) violate any order, writ, injunction, decree, statute, rule, or regulation; provided that, (x) the foregoing shall not apply with respect to the Company on account of any defaults arising from the commencement of the Chapter 11 Cases or the pendency of the Restructuring and (y) for the avoidance of doubt, but without limiting the Company's obligations pursuant to Section 5(b)(i) hereof, nothing in this Section 6(a)(vi) shall, or shall be deemed to, waive, limit, or otherwise impair the Company's ability to exercise its fiduciary duties as set forth by Section 20 hereof, but subject, in all events, to Section 20(b) hereof prior to the Petition Date.

(b)    The Caesars Parties represent and warrant to the Restructuring Support Parties that there are no pending agreements (oral or written), understandings, negotiations, or discussions with respect to any Alternative Proposal.

(c)    Each Caesars Party, severally and not jointly, on behalf of itself and its Affiliates, represents, warrants and covenants that it has not offered, and will not offer any Additional Bank Consideration or Additional Bond Consideration to any holder of First Lien Bank Debt or First Lien Bond Debt, respectively, without making such Additional Bank

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 310 of 539 PageID #:1269

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 20 of 183

Consideration or Additional Bond Consideration available to Consenting Creditors on a *pro rata* basis in the manner contemplated in <u>Section 34</u> in this Agreement.

7.     **Ownership of Claims**.  Each Claim Holder, severally and not jointly, represents and warrants as follows:

(a)     as of the date of this Agreement, it (i) is either (A) the sole beneficial owner of the principal amount of Claims set forth below its signature hereto, or (B) has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claims and dispose of, exchange, assign, and transfer such Claims, and (iii) holds no Claims (other than potential causes of action or litigation claims, contingent, unmatured or unliquidated claims, or claims for interest or fees arising under or in connection with any indenture, credit agreement, or other credit document) that are not identified below its signature hereto; in each case except as this provision may be specifically waived, in writing by the Company;

(b)     other than pursuant to this Agreement, such Claims that are subject to <u>Section 7(a)</u> hereof are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c)     (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), (C) a non-U.S. person under Regulation S under the Securities Act, or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of any Caesars Party acquired by the applicable Claim Holder in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

8.     **Termination by Consenting Creditors**.  (i) The Requisite Consenting Creditors may terminate this Agreement and (ii) CEC, other than with respect to <u>Sections 8(i)</u> and <u>8(k)</u>, may terminate this Agreement (each, a "<u>Creditor Termination Right</u>"), in each case, upon delivery of written notice to the Company in accordance with <u>Section 26</u> hereof at any time after the occurrence of, and during the continuation of, any of the following events (each, a "<u>Creditor Termination Event</u>"):

(a)     the breach by any of the Caesars Parties, LS3, or LS5 of any of their obligations, representations, warranties, or covenants set forth in this Agreement in any material respect, which breach remains uncured for a period of five (5) consecutive Business Days after the receipt by such breaching Party and the Company of written notice of such breach from the Requisite Consenting Creditors or CEC, as the case may be; <u>provided</u> <u>that</u> for the avoidance of doubt, CEC may not exercise a Creditor Termination Right arising from its own breach, or that

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 311 of 539 PageID #:1270

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 21 of 183

of LS3 or LS5, of any obligation, representation, warranty, or covenant set forth in this Agreement;

(b)      the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction, of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring (including with respect to the regulatory approvals or tax treatment contemplated by the Restructuring), which action remains uncured for a period of five (5) consecutive Business Days after the receipt by the Company and the Consenting Creditors of written notice of such event;

(c)      a trustee under section 1104 of the Bankruptcy code or an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall have been appointed in the Chapter 11 Cases;

(d)      the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code or the Chapter 11 Cases shall have been dismissed, in each case, by order of the Bankruptcy Court, which order has not otherwise been stayed;

(e)      if any of the Definitive Documentation necessary to effectuate the Restructuring (including any amendment or modification thereof) filed with the Bankruptcy Court or otherwise finalized, or has become effective, shall contain terms and conditions that are not materially consistent with this Agreement or shall otherwise not be on terms reasonably acceptable to the Requisite Consenting Creditors, the Company, and CEC, and such material inconsistency remains uncured for a period of five (5) consecutive Business Days after the receipt by the Company and the Consenting Creditors of written notice of such material inconsistency;

(f)      a Caesars Party, LS3, LS5, or any of their respective Affiliates files any motion or pleading with the Bankruptcy Court that is not substantially consistent with this Agreement and such motion or pleading has not been withdrawn within two (2) Business Days of each of the Company's and the applicable filing Party's receiving written notice from the Requisite Consenting Creditors that such motion or pleading is materially inconsistent with this Agreement, unless such motion or pleading does not seek, and could not result in, relief that would have any adverse impact on the interest of holders of First Lien Bond Claims in connection with the Restructuring; provided that CEC may only terminate this Agreement pursuant to this Section 8(f) if CEC is materially and adversely affected by such motion or pleading;

(g)      the Company executes a letter of intent (or similar document) stating its intention to pursue an Alternative Proposal;

(h)      other than pursuant to any relief sought by the Company that is not materially inconsistent with its obligations hereunder, the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the

20

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 312 of 539 PageID #:1271

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 22 of 183

Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $5,000,000 without the written consent of the Requisite Consenting Creditors;

(i)    the Company fails to satisfy or comply with any Milestone;

(j)    the occurrence of the Outside Date if all of the material transactions contemplated hereby have not been consummated; or

(k)    any Caesars Party commences an action to challenge the validity or priority of, or to avoid, the liens on any asset or assets comprising any material portion of the collateral securing the First Lien Bond Debt.

**9.    Mutual Termination**.  This Agreement may be terminated by mutual agreement among (a) the Caesars Parties, and (b) the Requisite Consenting Creditors.

**10.    Company Termination Events**.  This Agreement may be terminated by delivery to the other Parties of a written notice, delivered in accordance with Section 26 of this Agreement, by (i) the Company upon the occurrence of any of the following events (each a "Company Termination Event," and together with the Creditor Termination Events, the "Termination Events") and (ii) CEC upon the occurrence of a Company Termination Event listed in Section 10(e):

(a)    the breach by any Restructuring Support Party of any of the obligations, representations, warranties, or covenants of such Restructuring Support Party set forth in this Agreement in any respect that materially and adversely affects the Company's interests in connection with the Restructuring, which breach remains uncured for a period of five (5) consecutive Business Days after the receipt by such breaching Restructuring Support Party from the Company of written notice of such breach; provided that, with respect to a breach by one or more Consenting Creditors, the foregoing shall apply only if (x) such breaching Consenting Creditor(s) hold(s) in excess of 5.0% of First Lien Bond Claims held by all Consenting Creditors, (y) non-breaching Consenting Creditors with power to vote in favor of the Plan do not then hold at least 2/3 plus one dollar of First Lien Bond Debt (measured by notional value), or (z) such breach would otherwise have a material adverse effect on the Restructuring;

(b)    the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction, of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring (including with respect to the regulatory approvals or tax treatment contemplated by the Restructuring), which action remains uncured for a period of five (5) consecutive Business Days after the receipt by the Company and the Consenting Creditors of written notice of such event; provided that the Caesars Parties have otherwise complied with their obligations under Section 5(a)(i)(D) of this Agreement;

(c)    the exercise by the Company of its fiduciary duties as set forth by Section 20 hereof (the "Fiduciary Out"), but without limiting the Company's obligations pursuant to Section 5(b)(i) hereof;

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 313 of 539 PageID #:1272

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 23 of 183

(d)      any Party other than the Company and its Affiliates files any motion or pleading with the Bankruptcy Court that is not substantially consistent with this Agreement and such motion or pleading has not been withdrawn or corrected within seven (7) Business Days of such Party receiving written notice from the Company that such motion or pleading is materially inconsistent with this Agreement, or CEC and/or any of its Affiliates (other than the Company) obtains relief with respect to any motion or pleading with the Bankruptcy Court that is not substantially consistent with this Agreement;

(e)      if at least 2/3 of First Lien Bond Debt (measured by notional value) plus one dollar is not beneficially owned or controlled, with power to vote in favor of the Plan, by Consenting Creditors as of the Petition Date;

(f)      if any of the Definitive Documentation (including any amendment or modification thereof) is filed with the Bankruptcy Court or otherwise finalized, or has become effective, shall contain terms and conditions that are not substantially consistent with this Agreement or shall otherwise not be on terms reasonably acceptable to the Company, and such material inconsistency remains uncured for a period of five (5) consecutive Business Days after the receipt by the Restructuring Support Parties of written notice of such material inconsistency; or

(g)      the Effective Date has not occurred by the Outside Date.

**11.**    **Termination**.

(a)      No Party may exercise any of its respective termination rights as set forth in Section 8 or Section 10 hereof, as applicable, if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Termination Event specified herein.

(b)      Upon the termination of this Agreement pursuant to Section 8, Section 9, or Section 10 hereof, all Parties shall be released from their commitments, undertakings, and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.  Upon the termination of this Agreement pursuant to Section 34 hereof, the terminating Consenting Creditor shall be released from its commitments, undertakings, and agreements under or relating to this Agreement, and there shall be no liability or obligation on the part of such Consenting Creditor.  Notwithstanding anything herein to the contrary, the termination of this Agreement by a Consenting Creditor under Section 34 hereof shall not be deemed a termination of this Agreement for purposes of the Backstop Commitment Agreement.

(c)      Notwithstanding Section 11(b) hereof, in no event shall any termination of this Agreement relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the termination date, including but not limited to CEC's and the Company's obligations to pay the First Lien Professional Fees, and (ii) obligations under this Agreement which by their terms expressly survive a termination date; provided, however, that, notwithstanding anything to the contrary contained herein, any Termination Event (including any

22

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 314 of 539 PageID #:1273

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 24 of 183

automatic termination) may be waived in accordance with the procedures established by Section 14 hereof, in which case such Termination Event so waived shall be deemed not to have occurred, this Agreement consequently shall be deemed to continue in full force and effect, and the rights and obligations of the Parties shall be restored, subject to any modification set forth in such waiver.   Upon a Termination Event that releases a Consenting Creditor from its commitments, undertakings, and agreements under or related to this Agreement (as set forth in Section 11(b)), unless otherwise agreed to in writing by such Consenting Creditor, any and all votes, approvals, or consents delivered by such Consenting Creditor and, as applicable, its Affiliates, subsidiaries, managed funds, representatives, agents, and employees in connection with the Restructuring prior to such termination date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.

     **12.**    **Transfer of Claims**.  The Restructuring Support Parties agree, with the exception of the permitted transfers and purchases enumerated in (a) and (b) below, that no Restructuring Support Party will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or contract to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (collectively, "Transfer"), all or any portion of its First Lien Bond Claims or First Lien Bank Claims now or hereafter owned, and no such Transfer will be effective, unless the transferee executes and provides to the Company and counsel to the Consenting Creditors a transfer agreement in the form attached hereto as Exhibit E within two (2) Business Days of the execution of an agreement (or trade confirmation) in respect of such Transfer.  For the avoidance of doubt, the Caesars Parties agree that any such transfer agreement shall be included in the definition of "Confidential Claims Information" in Section 5(a)(iii) hereof.  In addition to the foregoing Transfer, the following Transfers shall be permitted:

     (a)    any Transfer by one Consenting Creditor to an Affiliate of such Consenting Creditor or one or more of its affiliated funds or an affiliated entity or entities with a common investment advisor or investment manager (in each case, other than portfolio companies); provided that, for the avoidance of doubt, any transferee under this Section 12(a) shall be deemed a Consenting Creditor for purposes of this Agreement, effective as of the date of the Transfer, and any transferor under this Section 12(a) shall remain liable in all respects for any breach of this Agreement by such transferee; and

     (b)    any Transfer by one Consenting Creditor to another Consenting Creditor.

Any Transfer of any Restructuring Support Party's First Lien Bond Claims or First Lien Bank Claims that does not comply with the foregoing shall be deemed void *ab initio*; provided, however, for the avoidance of doubt, that upon any purchase, acquisition, or assumption by any Restructuring Support Party of any Claims (including but not limited to First Lien Bond Claims and First Lien Bank Claims), such Claims shall automatically be deemed to be subject to all the terms of this Agreement.  The restrictions in this Agreement are in addition to any Transfer restrictions in the Credit Agreement, the First Lien Indentures, and Non-First Lien Indentures, and in the event of a conflict the Transfer restrictions contained in this Agreement shall control; provided, however, that nothing herein shall restrict, waive, or suspend any consent right the Company may have with respect to any Transfer.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 315 of 539 PageID #:1274

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 25 of 183

Notwithstanding the foregoing, a Qualified Marketmaker, acting solely in its capacity as such, that acquires any First Lien Bond Claim or First Lien Bank Claim subject to this Agreement shall not be required to execute a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth herein if, and only if, such Qualified Marketmaker sells or assigns such First Lien Bond Claim or First Lien Bank Claim within ten (10) Business Days of its acquisition and the purchaser or assignee of such First Lien Bond Claim or First Lien Bank Claim is a Consenting Creditor or an entity that executes and provides a Transfer Agreement in accordance with the terms set forth herein; provided that if a Qualified Marketmaker, acting solely in its capacity as such, acquires First Lien Bond Debt or First Lien Bank Debt from an entity who is not a Consenting Creditor with respect to such debt (collectively, "Qualified Unrestricted Claims"), such Qualified Marketmaker may Transfer any right, title or interest in such Qualified Unrestricted Claims without the requirement that the transferee execute a Transfer Agreement; provided further that any such Qualified Marketmaker that is a Party to this Agreement shall otherwise be subject to the terms and conditions of this Agreement (including Section 2(a)(iii) hereof) with respect to Qualified Unrestricted Claims pending the completion of any such Transfer.

Notwithstanding anything herein to the contrary: (a) to the extent that a Restructuring Support Party effects the Transfer of all of its Claims in accordance with this Agreement, such Restructuring Support Party shall cease to be a Party to this Agreement in all respects and shall have no further obligations hereunder; provided, however, that if such Restructuring Support Party acquires a Claim at any point thereafter, it shall be deemed to be a Party to this Agreement on the same terms as if it had not effected a Transfer of all of its Claims; and (b) subject to Section 2(a)(iii) hereof, to the extent that a Restructuring Support Party effects the Transfer of a Claim that it holds as a participant (and not grantor) pursuant to a participation agreement with voting provisions substantially similar to those set forth in the form of participation agreement produced by the Loan Syndications & Trading Association, the transferee thereof shall not be required to execute a Transfer Agreement.

13. **Cooperation**. Before the filing of and during the Chapter 11 Cases, (i) the Company shall use commercially reasonable efforts to provide to counsel for the Consenting Creditors (a) drafts of all material motions, applications (other than applications seeking to retain professional advisors), and other documents the Company intends to file with the Bankruptcy Court, no less than three (3) Business Days before the date when the Company intends to file any such document unless such advance notice is impossible or impracticable under the circumstances, in which case the Company shall notify telephonically or by electronic mail counsel to the Consenting Creditors to advise it of the documents to be filed and the facts that make the provision of advance copies no less than three (3) Business Days before submission impossible or impracticable, and shall provide such copies as soon as reasonably possible thereafter, and (b) copies of all material documents actually filed by the Company with the Bankruptcy Court promptly but not later than one (1) day after such filing.

14. **Amendments**. No amendment, modification, waiver, or other supplement of the terms of this Agreement (including the Restructuring Term Sheet) shall be valid unless such amendment, modification, waiver, or other supplement is in writing and has been signed by the Caesars Parties, the Requisite Consenting Creditors, LS3, and LS5; provided, however, that:

24

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 316 of 539 PageID #:1275

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 26 of 183

(a)    no such consents shall be required from any Consenting Creditor with respect to any modification or amendment or any other agreement, document or other instrument implementing the Restructuring, regarding the treatment of Claims other than with respect to First Lien Bond Claims, so long as it would not, reasonably construed, have an adverse impact on the interests of holders of First Lien Bond Claims (including with respect to the form or value of recoveries to be provided on account of such Claims pursuant to the Restructuring), in their capacities as such, in connection with the Restructuring;

(b)    any amendment to this Agreement to (i) the defined terms "Consenting Creditors" or "Requisite Consenting Creditors" or (ii) Section 12 hereof shall require the written consent of the Company, CEC and each Consenting Creditor;

(c)    any amendment that would materially and adversely affect any Consenting Creditor that is a holder of First Lien Bond Claims, solely in its capacity as such, in a manner that is disproportionate to any other holder of First Lien Bond Claims, solely in its capacity as such, shall require the prior written consent of the adversely affected Consenting Creditor;

(d)    for the avoidance of doubt, any waiver of the conditions to the effectiveness of this Agreement set forth by Section 15 hereof may be waived only upon the express written consent of each of the Caesars Parties;

(e)    the Company may waive application of the representations and warranties set forth by Section 7(a)(ii) and Section 7(a)(iii) hereof in all or in part with respect to any Consenting Creditor in its sole discretion, but in consultation with CEC;

(f)    any amendment to this Agreement to the defined term "Initial Consenting Creditor" shall require the written consent of the Company, CEC, and each Initial Consenting Creditor; and

(g)    any amendment, modification, supplement or other change with respect to the amount, form, timing, economics or value or any party's entitlement to the RSA Forbearance Fees as set forth herein and in the Restructuring Term Sheet shall require the written consent of the Company, CEC and such party.

**15.    Conditions to Effectiveness**.  For the avoidance of doubt, this Agreement (and the obligations of all Parties hereunder) shall not become effective or enforceable against or by any of the Parties until the first date that this Agreement shall have been executed by (i) the Caesars Parties, (ii) LS3, (iii) LS5, and (iv) Consenting Creditors beneficially owning or controlling with the power to vote in favor of the Plan at least 60.0% of the outstanding amount of the Company's obligations under the First Lien Indentures as of such date; provided, further, that such Consenting Creditors shall have also exercised their Put Options with respect to OpCo New Common Stock as provided by the Restructuring Term Sheet; provided further still that if the conditions to effectiveness set forth by this Section 15 are not satisfied or waived by the Company as provided herein on or before January 5, 2015, this Agreement shall be null and void *ab initio* and of no force or effect.

**16.    Entire Agreement**.  This Agreement, including the Restructuring Term Sheet and the Cash Collateral Stipulation, constitutes the entire agreement of the Parties with respect to the

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 317 of 539 PageID #:1276

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 27 of 183

subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided, however, that any confidentiality agreement executed by any Restructuring Support Party shall survive this Agreement and shall continue to be in full force and effect in accordance with its terms.

17.    **Survival of Agreement**.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Company and in contemplation of possible filings by the Company under Chapter 11 of the Bankruptcy Code, and (a) the exercise of the rights granted in this Agreement (including giving of notice of termination) shall not be a violation of the automatic stay provisions of section 362 of the Bankruptcy Code and (b) the Company hereby waives its right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing.

18.    **No Waiver of Participation and Preservation of Rights**.  If the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement with respect to all Parties, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.

19.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

20.    **Company Fiduciary Duties**.

(a)    Subject to Section 5(b)(i) and Section 20(b) hereof, nothing in this Agreement shall otherwise require the Company or any directors, officers, or members of the Company, each in its capacity as a director, officer, or member of the Company, to take any action, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary obligations under applicable law (as reasonably determined by them in good faith after consultation with legal counsel).

(b)    Notwithstanding anything to the contrary in this Agreement, prior to the Petition Date, and without limiting the Company's obligations pursuant to Section 5(b)(i) hereof, the Company may only act in a manner inconsistent with the other terms of this Agreement to the extent required to pursue an Alternative Proposal that it reasonably determines in its good faith business judgment constitutes a binding proposal that is reasonably likely to be more favorable to the Company, its creditors (including holders of First Lien Bond Claims) and other parties to whom the Company owes fiduciary duties, than the Restructuring.

(c)    All Consenting Creditors reserve all rights they may have, including the right (if any) to challenge any exercise by the Company of its fiduciary duties.

21.    **Headings**.  The headings of the Sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 318 of 539 PageID #:1277

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 28 of 183

22.    **Relationship Among Parties**.  Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint.  No Restructuring Support Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Restructuring Support Parties.  It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Creditor may trade in the Claims or other debt or equity securities of the Company without the consent of the Company or any other Consenting Creditor, subject to applicable securities laws, the terms of this Agreement, and the terms of the First Lien Bank Documents and the First Lien Indentures; provided, however, that no Consenting Creditor shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditors shall in any way affect or negate this understanding and agreement.

23.    **Specific Performance; Remedies Cumulative**.  It is understood and agreed by the Parties that, without limiting any other remedies available at law or equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, without the necessity of proving the inadequacy of money damages as a remedy.  Each of the Parties hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

24.    **No Commitment**.  No Restructuring Support Party shall be obligated to fund or otherwise be committed to provide funding in connection with the Restructuring, except pursuant to a separate commitment letter or definitive documentation relating specifically to such funding, if any, that has been (i) executed by such Restructuring Support Party and (ii) approved by the Bankruptcy Court, as necessary, along with the satisfaction of any conditions precedent to such funding requirements.

25.    **Governing Law and Dispute Resolution**.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  Each of the Parties hereby agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Agreement; provided that if and when the Chapter 11 Cases are filed, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

26.    **Notices**.  All notices, requests, documents delivered, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by facsimile transmission, mailed (first class postage prepaid) or by electronic mail ("e-mail") to the Parties at the following addresses, facsimile numbers, or e-mail addresses:

KE 34649400

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 319 of 539 PageID #:1278

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 29 of 183

If to the Company:

Caesars Entertainment Operating Company, Inc.
One Caesars Palace Drive
Las Vegas, NV 89109
Attn: General Counsel

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
Attn:    Paul M. Basta, P.C.
         Nicole L. Greenblatt
Facsimile:  (212) 446 4900
E-mail Address:    paul.basta@kirkland.com
                   ngreenblatt@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:    David R. Seligman, P.C.
         Ryan Preston Dahl
E-mail Address:    dseligman@kirkland.com
                   rdahl@kirkland.com
Facsimile: (312) 862-2200

If to CEC:

Caesars Entertainment Corp.
One Caesars Palace Drive
Las Vegas, NV 89109
Attn: General Counsel

With a copy to (which shall not constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:    Jeffrey D. Saferstein
         Samuel E. Lovett
Telephone: (212) 373-3000
Facsimile  (212) 373-2053
E-mail Address:    jsaferstein@paulweiss.com
                   slovett@paulweiss.com

**A0314**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 320 of 539 PageID #:1279

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 30 of 183

If to a Consenting Creditor, to the address set forth beneath such lender's signature block,

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:   Kenneth H. Eckstein
         Daniel M. Eggermann
Telephone: (212) 715-9100
Facsimile: (212) 715-8229
E-mail Address:      keckstein@kramerlevin.com
                     deggermann@kramerlevin.com

27.    **Third-Party Beneficiaries**.  Unless expressly stated herein, the terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

28.    **Conflicts Between the Restructuring Term Sheet and this Agreement.**  In the event of any conflict among the terms and provisions in the Restructuring Term Sheet and this Agreement, the terms and provisions of the Restructuring Term Sheet shall control.  Nothing contained in this Section 28 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet as set forth in Section 14 herein.

29.    **Settlement Discussions**.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

30.    **Good-Faith Cooperation; Further Assurances**.  The Parties shall cooperate with each other in good faith in respect of matters concerning the implementation and consummation of the Restructuring.

31.    **Access**.  The Company will promptly provide the First Lien Professionals reasonable access, upon reasonable notice, during normal business hours to relevant properties, books, contracts (including any Executory Contracts and Unexpired Leases), commitments, records, management and executive personnel, and advisors of the Company (other than with respect to materials subject to attorney-client privilege or where granting such access is prohibited by law); provided, however, that the Company's obligations hereunder shall be conditioned upon such Party being party to an appropriate confidentiality agreement or undertaking; provided, further, however, that any existing confidentiality agreements entered into between the Company and a Party shall be deemed to be appropriate.

29

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 321 of 539 PageID #:1280

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 31 of 183

32.   **Qualification on Consenting Creditor Representations**.   The Parties acknowledge that all representations, warranties, covenants, and other agreements made by any Consenting Creditor that is a separately managed account of an investment manager are being made only with respect to the Claims managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Consenting Creditor that are not held through accounts managed by such investment manager.

33.   **Publicity**.   The Company shall use its commercially reasonable efforts to submit drafts to the First Lien Professionals of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) Business Days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.

34.   **Additional Consideration.**   To the extent that a holder of First Lien Bank Debt, in its capacity as such, receives Additional Bank Consideration in connection with the Restructuring, such Additional Bank Consideration shall be made available to all Consenting Creditors that are holders of First Lien Bank Claims, in their capacities as such, on the same terms and on a *pro rata* basis in accordance with their respective First Lien Bank Claims holdings.   Any Consenting Creditor that is a holder of First Lien Bank Claims who is not accorded such Additional Bank Consideration shall have the right to terminate this Agreement upon three (3) Business Days' written notice to the Parties in accordance with Section 26 hereof; provided that such termination shall only be with respect to the terminating Consenting Creditor, and not with respect to any non-terminating Parties.

To the extent that a holder of First Lien Bond Debt, in its capacity as such, receives Additional Bond Consideration in connection with the Restructuring, such Additional Bond Consideration shall be made available to all Consenting Creditors that are holders of First Lien Bond Claims, in their capacities as such, on the same terms and on a *pro rata* basis in accordance with their respective First Lien Bond Claims holdings.   Any Consenting Creditor that is a holder of First Lien Bond Claims who is not accorded such Additional Bond Consideration shall have the right to terminate this Agreement upon three (3) Business Days' written notice to the Parties in accordance with Section 26 hereof; provided that such termination shall only be with respect to the terminating Consenting Creditor, and not with respect to any non-terminating Parties.

**[Signature Pages Follow]**

30

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 322 of 539 PageID #:1281

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 32 of 183

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., on behalf of itself and each of the Subsidiary Loan Parties

By: _____
Name: Mary E. Higgins
Title: CFO

CAESARS ENTERTAINMENT CORPORATION

By: _____
Name:
Title:

21

**A0317**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,** on behalf of itself and each of the Subsidiary Loan Parties

By: _____
   Name:
   Title:

**CAESARS ENTERTAINMENT CORPORATION**

By: _____
Name: *Eric Hession*
Title: *SVP Finance & Treasurer*

31

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 324 of 539 PageID #:1283

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 34 of 183

**Exhibit A**

**Subsidiary Loan Parties**

| Subsidiary Pledgor | State of Formation |
|---|---|
| California Clearing Corporation | California |
| Harrah South Shore Corporation | California |
| AJP Holdings, LLC | Delaware |
| AJP Parent, LLC | Delaware |
| Bally's Midwest Casino, Inc. | Delaware |
| Biloxi Hammond, LLC | Delaware |
| Biloxi Village Walk Development, LLC | Delaware |
| Caesars Palace Corporation | Delaware |
| Caesars Trex, Inc. | Delaware |
| Chester Facility Holding Company, LLC | Delaware |
| CZL Development Company, LLC | Delaware |
| Harrah's Chester Downs Investment Company, LLC | Delaware |
| Harrah's International Holding Company, Inc. | Delaware |
| Harrah's Iowa Arena Management, LLC | Delaware |
| Harrah's MH Project, LLC | Delaware |
| Harrah's Operating Company Memphis, LLC | Delaware |
| Harrah's Shreveport/Bossier City Holding Company, LLC | Delaware |
| Harrah's Shreveport/Bossier City Investment Company, LLC | Delaware |
| Harrah's West Warwick Gaming Company, LLC | Delaware |
| Horseshoe Gaming Holding, LLC | Delaware |
| Koval Holdings Company, LLC | Delaware |
| Reno Crossroads LLC | Delaware |
| Showboat Atlantic City Mezz 1, LLC | Delaware |
| Showboat Atlantic City Mezz 2, LLC | Delaware |
| Showboat Atlantic City Mezz 3, LLC | Delaware |
| Showboat Atlantic City Mezz 4, LLC | Delaware |
| Showboat Atlantic City Mezz 5, LLC | Delaware |
| Showboat Atlantic City Mezz 6, LLC | Delaware |
| Showboat Atlantic City Mezz 7, LLC | Delaware |
| Showboat Atlantic City Mezz 8, LLC | Delaware |
| Showboat Atlantic City Mezz 9, LLC | Delaware |
| Showboat Atlantic City Propco, LLC | Delaware |
| Tahoe Garage Propco, LLC | Delaware |

34

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 325 of 539 PageID #:1284

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 38 of 183

**<u>Exhibit B</u>**

**Restructuring Term Sheet**

**A0323**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 326 of 539 PageID #:1285

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 39 of 183

**This document and any related communications shall not be
used for any purpose in any litigation or proceeding.**

**This Term Sheet is highly confidential and this Term Sheet, its contents and its existence may not
be distributed, disclosed or discussed to or with any party other than in accordance with the
express terms of confidentiality agreements/arrangements
among the respective parties and the Company.**

SUMMARY TERM SHEET FOR PROPOSED RESTRUCTURING[12]

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
*and certain of its direct or indirect subsidiaries*
("***CEOC***" and together with certain of its direct or indirect subsidiaries, the "***Company***")

---

[1] Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization; any such solicitation shall be in compliance with the relevant provisions of securities laws, the Bankruptcy Code and other applicable statutes and rules.

[2] This Term Sheet is an exhibit to, and part of, the Restructuring Support and Forbearance Agreement (the "***RSA***"), which contains additional descriptive language and legal terms in respect of the Company's restructuring.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 327 of 539 PageID #:1286

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 40 of 183

I.     <u>**Summary of Proposed Treatment**</u>[3]

| | |
|---|---|
| Holders of the obligations (the "***First Lien Bank Obligations***") under the First Lien Bank Documents[4] ($5,359 million plus interest thereon accrued through the Petition Date) and swaps entered into pursuant to First Lien Bank Documents ($42 million) (collectively, the "***First Lien Bank Lenders***") | Each First Lien Bank Lender shall receive its pro rata share of (a) $705 million in cash, (b) $883 million in New First Lien OpCo Debt, (c) $406 million of New Second Lien OpCo Debt, (d) $1,961 million in New First Lien PropCo Debt, and (e) $1,450 million in additional cash if the full amount of the CPLV Market Debt is financed for cash and, if not fully financed, Mezzanine CPLV Debt for the portion not so financed subject to the limitations set forth herein[5]. Each First Lien Bank Lender waives any entitlement to post-petition interest to the extent First Lien Noteholders do not receive post-petition interest. |
| Secured claims of Holders of the obligations (the "***First Lien Note Obligations***") under the First Lien Indentures ($6,345 million plus interest thereon accrued through the Petition Date) (the "***First Lien Noteholders***") | Each First Lien Noteholder shall receive in respect of its secured claim, its pro rata share of (a) $207 million in cash, (b) $306 million in New First Lien OpCo Debt, (c) $141 million of New Second Lien OpCo Debt, (d) $431 million in New First Lien PropCo Debt, (e) $1,425 million in New Second Lien PropCo Debt, (f) $1,150 million in additional cash if the CPLV Market Debt is financed for cash and, if not fully financed, Mezzanine CPLV Debt for the portion not so financed subject to the limitations set forth herein, (g) 69.9% directly or indirectly of PropCo[6] on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any), (or cash to the extent of any Equity Rights exercised and/ or such Holder exercises its Put Option, as further described below) and (h) 100% of the OpCo New Common Stock (or, at its option, cash in the event such Holder exercises its Put Option, as further described below).

As more fully described under Put Options, Equity Rights and Purchase Option (and subject to the limitations set forth therein), each First Lien Noteholder (a) will have the opportunity to be a Put Participant and sell the |

---

[3] Administrative, priority and critical trade claims shall be paid in full in cash as soon as practicable following consummation of the Restructuring or as otherwise provided for in definitive documentation. The plan may provide for separate classification for general unsecured claims on terms and with treatment that is reasonably acceptable to the Requisite Consenting Creditors (as defined in the RSA).

[4] Capitalized terms not defined herein have the meanings set forth in the RSA.

[5] The First Lien Bank Lenders may choose to have up to $100 million of Mezzanine CPLV Debt they are to receive converted to a corresponding amount of New First Lien OpCo Debt, New Second Lien OpCo Debt, New First Lien PropCo Debt, New Second Lien PropCo Debt or equity in PropCo

[6] Pending regulatory and REIT requirements, the First Lien Noteholders will receive their interest in PropCo indirectly through REIT New Common Stock (as opposed to directly through PropCo New LP Interests as Caesars Entertainment Company or its designee ("***CEC***") and CEOC will).

2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 328 of 539 PageID #:1287

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 41 of 183

| | |
|---|---|
| | right to receive under the Plan some or all of its equity to the Backstop Parties for cash, (b) will have the opportunity to purchase PropCo Preferred Equity and/or (c) may receive cash from the Non-First Lien Noteholders for the right to receive some or all of their equity in connection with the exercise of the Equity Rights.<br><br>If the First Lien Noteholders fully exercise the Put Options, the First Lien Noteholders, on an aggregate basis, will receive an additional $969 million in cash and a corresponding decrease in their equity recoveries, as more fully described in Section II below under "Put Options Price." |
| Deficiency Claims of First Lien Noteholders and all claims of non-critical trade creditors and Holders of the obligations (collectively the "***Non-First Lien Obligations***") under (a) the Second Lien Indentures ($5,238 million plus interest thereon accrued through the Petition Date) (the "***Second Lien Noteholders***"), (b) the guaranteed unsecured indentures ($479 million plus interest thereon accrued through the Petition Date) (the "***Unsecured Guaranteed Noteholders***"), and (c) the unsecured note indentures ($530 million plus interest thereon accrued through the Petition Date) (the "***Unsecured Noteholders***," collectively with the Second Lien Noteholders and Unsecured Guaranteed Noteholders, the "***Non-First Lien Noteholders***") | If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, vote as a class to accept the Plan, then the First Lien Noteholders will waive or assign at CEOC's direction distributions in respect of their deficiency claims and distributions under the turnover provisions in all intercreditor agreements, and each Non-First Lien Noteholder shall receive its pro rata share of an amount of 30.1% of the equity, directly or indirectly, in PropCo on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any), which shall be deemed to include consideration for the value of any unencumbered assets.  And, as more fully described under the Equity Right, if the Non-First Lien Noteholders vote as a class to accept the Plan, each Non-First Lien Noteholder shall also have the option to be a Rights Participant.<br><br>If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then each Non-First Lien Noteholder shall receive its pro rata share of 17.5% of the equity, directly or indirectly, in PropCo on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any), which shall be deemed to include consideration for the value of any unencumbered assets.  The First Lien Noteholders will waive or assign at CEOC's direction distributions in respect of their deficiency claims and distributions under the turnover provisions in all intercreditor agreements on account of the 17.5% of equity to the Non-First Lien Noteholders.  If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then the remaining 12.6% of PropCo equity shall be allocated to the equity holders of PropCo, excluding the Non-First Lien Noteholders, based on their pro rata ownership in PropCo (after giving effect to the exercise of the Put Options).<br><br>The Plan may provide for the separate classification of Non-First Lien Noteholders in separate classes or subclasses in a manner not inconsistent with this Term Sheet. |

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 329 of 539 PageID #:1288

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 42 of 183

## II.    Put Options, Equity Rights and Purchase Option[7]

| Put Options | Each First Lien Noteholder shall have the option to put some or all of its right under the Plan to receive (i) the OpCo New Common Stock it would otherwise receive pursuant to the Plan (the "***OpCo New Common Stock Put Options***"); and/ or (ii) the direct or indirect interests in PropCo it would otherwise receive pursuant to the Plan (provided that no more than 14.8% (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any) of such interests are put in the aggregate) (the "***REIT New Common Stock Put Options***" and, together with OpCo New Common Stock Put Options, the "***Put Options***"), and to instead receive cash as described below under "Put Options Price," in which case CEC and any other Backstop Parties will purchase such equity interests as further described below, subject in the case of PropCo equity interests to the exercise of the Equity Rights described below, provided however that, in the event the UPREIT Structure is used (as defined herein), the First Lien Noteholders shall be required to put at least 5% of their PropCo equity to CEC (after taking into account any conversion of CPLV Mezzanine Debt acquired pursuant to the Equity Rights).  The Put Options must be selected in connection with plan solicitation provided that with respect to First Lien Noteholders that are parties to the RSA, elections to exercise the OpCo New Common Stock Put Options must be made at the time of execution of the RSA.

Each First Lien Noteholder that exercises any of its Put Options in whole or in part shall be referred to herein as a "***Put Participant***." |
|---|---|
| Put Options Allocation Between the Backstop Parties | As detailed in Annex I, CEC shall purchase the right to receive all the OpCo New Common Stock subject to the OpCo New Common Stock Put Options and REIT New Common Stock (or PropCo New LP Interests if applicable) subject to the REIT New Common Stock Put Options exercised by the Put Participants.[8]

The First Lien Noteholders may elect to become backstop parties (together with CEC, the "***Backstop Parties***") (which election shall be made in connection with plan solicitation) and purchase a portion of the REIT New |

---

[7] For tax efficiency or other purposes, the cash consideration to be paid to First Lien Noteholders through the exercise of either the Put Options or the Equity Rights may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan as direct payments of cash, rather than be paid in respect of the receipt of stock or CPLV Mezzanine Debt or be paid directly by the Backstop Parties and/or the Right Participants. The Company and CEC shall consult with the First Lien Professionals in respect of the preceding and, if the decision could reasonably be expected to adversely affect the recovery of the First Lien Noteholders (in form, value, or otherwise as determined by the Requisite Consenting Creditors), it shall be subject to the reasonable consent of the Requisite Consenting Creditors.

[8] For regulatory purposes, it is assumed that the First Lien Noteholders executing the RSA will elect to put at least 50.1% of the OpCo New Common Stock to CEC.

4

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 330 of 539 PageID #:1289

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 43 of 183

| | |
|---|---|
| | Common Stock (or PropCo New LP Interests if applicable) subject to the REIT New Common Put Options. First Lien Noteholders who wish to become Backstop Parties must make any required investor representations required for federal and state securities law purposes.<br><br>The Backstop Parties shall receive no fee for purchasing or agreeing to purchase the equity subject to the Put Participants' Put Options. |
| Put Options Price | The Put Options shall be at a price per share implying a total value of $700 million for 100% of the OpCo New Common Stock and $269 million for 14.8% of PropCo (directly or indirectly) on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any). |
| Equity Rights | If the Non-First Lien Noteholders vote as a class to accept the Plan, the "***Equity Rights***" as detailed below shall occur and each Non-First Lien Noteholder shall have the non-transferable right to be a "***Right Participant***."  If the Non-First Lien Noteholders do not vote as a class to accept the Plan, there shall be no Equity Rights.<br><br>Each Right Participant may elect to purchase (with the purchase immediately occurring after the closing of the Put Option) the right to receive up to all of the direct or indirect interest in PropCo to be received by the First Lien Noteholders and the Backstop Parties (but for the avoidance of doubt, not including the 5% of PropCo equity retained by OpCo) (the "***Equity Rights***"), subject to being cut back on a pro rata basis based on the amount of Equity Rights exercised.  Any Non-First Lien Noteholder exercising an Equity Right must (a) make any required investor representations required for federal and state securities law purposes and (b) execute the RSA.  Each Non-First Lien Noteholder shall have 60 days following of the filing of the Company's chapter 11 cases to execute the RSA and elect whether to exercise its Equity Rights, which Exercise Rights shall be subject to the Non-First Lien Noteholders accepting the Plan as a class.<br><br>For every $1 of direct or indirect interest in PropCo purchased pursuant to the Equity Rights, the Right Participant shall also purchase $0.25 of CPLV Mezzanine Debt to be received by the First Lien Noteholders with such CPLV Mezzanine Debt then being converted into direct or indirect interest in PropCo at the same price per share as the Put Option (the "Equitized CPLV Mezzanine Debt").<br><br>The Right Participants must make their purchases first from the First Lien Noteholders who elect to sell to the Right Participants (pro rata among such First Lien Noteholders) with such election to be made in connection with plan solicitation, second from CEC, third from the First Lien Noteholders who do not elect to sell to the Right Participants (pro rata among such First Lien Noteholders), fourth from the non-CEC Backstop Parties (pro rata among the non-CEC Backstop Parties). |

5

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 331 of 539 PageID #:1290

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 44 of 183

|  | For the avoidance of doubt, the First Lien Noteholders and the Backstop Parties, as applicable, must sell their respective right to receive equity, pursuant to the terms of the Equity Rights, to the Right Participants.  The Right Participants shall receive no fee for acting as Right Participants.

The procedures implementing the Equity Rights and exercise thereof shall be subject to the reasonable consent of the Requisite Consenting Creditors. |
|---|---|
| Equity Rights Price | The Equity Rights shall be at the same price per share as the Put Option. |
| Purchase Option | Each First Lien Noteholder shall have the non-transferable option to purchase their pro rata share (based on their holdings of the First Lien Note Obligations) of 50% of the Preferred PropCo Equity, with such purchases proportionally diluting the Preferred PropCo Equity purchased by the Preferred Backstop Investors (as defined in the Backstop Commitment Agreement to be attached hereto). |
| Purchase Option Price | The Purchase Option shall be at a price per share implying a total value of $250 million for 100% of the Preferred PropCo Equity. |
| Regulatory Requirements | All parties shall abide by, and use their commercially reasonable efforts to obtain, any regulatory and licensing requirements or approvals to consummate the Restructuring as promptly as practicable including, but not limited to requirements or approvals that may arise as a result of such party's equity holdings in the REIT, PropCo or OpCo, as the case may be. Such parties receiving equity shall use commercially reasonable efforts to cooperate with, and timely obtain and submit, all applicable licensing materials and information to, applicable gaming authorities throughout any regulatory or licensing process, including without limitation with respect to any applicable license, permit, or finding of suitability, and shall cause any individual subject to regulatory, licensing, or suitability approval to similarly cooperate and provide all such relevant materials and information. To facilitate regulatory approvals and prompt consummation of the Restructuring, any party signing the RSA must irrevocably elect upon execution of the RSA the amount of Put Options with respect to OpCo New Common Stock.

The Company and its affiliates will assist with required regulatory approvals and structuring issues, including common stock voting structures to ensure compliance with regulatory requirements.

To the extent any required regulatory approvals are not obtained by the Closing of the Restructuring, the parties agree to work together to facilitate consummation of the Restructuring as promptly as practicable.  Actions to be taken may include entering into transactions to permit the Closing to occur while such regulatory approvals are pending (alternate temporary structures), temporary escrowing of equity and/or selling down equity below regulatory threshold levels.  Any actions proposed to be taken in connection with obtaining regulatory approvals that adversely affect any |

6

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 332 of 539 PageID #:1291

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 45 of 183

| | |
|---|---|
| | First Lien Noteholder, in an economic or other material respect, must be reasonably acceptable to the Requisite Consenting Creditors, and will be binding on all First Lien Noteholders. |
| REIT Requirements | To the extent any party would otherwise receive more than 9.8% of the outstanding REIT New Common Stock, such party shall instead receive direct PropCo New LP Interests equal to the value of such REIT New Common Stock above 9.8%.  All PropCo Preferred Equity will be issued directly by PropCo, unless counsel to the Company concludes, after consultation with the First Lien Professionals, that issuance of such PropCo Preferred Equity by the REIT (as opposed to PropCo) would not adversely affect its ability to deliver the REIT opinion referenced below in IX under the heading "Tax Opinions/Private Letter Rulings." |
| Closing | The Put Options and Equity Rights will close immediately following distribution of the equity securities under the Plan (it being understood that the exercise date for the Put Options and Equity Rights will be set forth in the solicitation materials and shall occur on a date determined by the Company prior to the projected effective date of the Plan).[9] |
| Put Options Conditions Precedent | The exercise of the Put Options and Equity Rights will be subject to customary conditions precedent including: <br><br> • the Bankruptcy Court shall have entered orders (a) approving the disclosure statement in respect of the Plan and (b) confirming the Plan; <br><br> • the effective date of the Plan shall have occurred; <br><br> • all regulatory approvals, or waiting periods, shall have been received or expired; and <br><br> • other customary conditions precedent in form and substance reasonably satisfactory to the Company, the Backstop Parties, and the Requisite Consenting Creditors. |

---

[9] For tax efficiency or other purposes, the cash consideration to be paid to First Lien Noteholders through the exercise of either the Put Options or the Equity Rights may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan as direct payments of cash, rather than be paid in respect of the receipt of stock or CPLV Mezzanine Debt or be paid directly by the Backstop Parties and/or the Right Participants. The Company and CEC shall consult with the First Lien Professionals in respect of the preceding and, if the decision could reasonably be expected to adversely affect the recovery of the First Lien Noteholders (in form, value, or otherwise as determined by the Requisite Consenting Creditors), it shall be subject to the reasonable consent of the Requisite Consenting Creditors.

KL2 2879507.2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 333 of 539 PageID #:1292

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 46 of 183

### III.   The REIT and Equity Securities

| REIT | The Company shall restructure itself upon consummation of the Restructuring as a separate operating company ("**OpCo**"), and property company ("**PropCo**").  Pursuant to the Restructuring a real estate investment trust (the "**REIT**") will be formed to own and control the general partner of PropCo ("**PropCo GP**") and to hold PropCo New LP Interests. |
|---|---|
| | The separation of the Company into OpCo, PropCo and the REIT (the "**Separation Structure**") will be accomplished through either (a) the tax free contribution of PropCo assets to the REIT in a tax-free reorganization qualifying under Section 368(a)(1)(G) of the Internal Revenue Code (the "**Code**") (such structure, the "Spin"), provided however, that in lieu of the Spin, the separation will be accomplished by (b) a tax-free contribution of PropCo assets to the PropCo partnership in a transaction qualifying under section 721 of the Code (the "**UPREIT Structure**") if (i) the Company is unable to receive a favorable private letter ruling from the IRS (the "Spin Ruling") or a "should" level opinion of counsel (the "Spin Opinion"), concluding, in either case, based on facts, customary representations (and certain customary assumptions, in the case of a Spin Opinion) set forth or described in the Spin Ruling or Spin Opinion, that the Spin qualifies under Section 368(a)(1)(G) of the Code, (ii) at the election of the Requisite Consenting Creditors if the Estimated REIT E&P (as defined below) exceeds $1.3 billion  or (iii) at the election of the Company and CEC, with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld.  In either event, (x) the distribution of the new equity and debt will be made in a manner that will not generate taxable income to the Company other than cancellation of indebtedness income, and (y) the Company and CEC shall regularly consult and coordinate with the First Lien Professionals on the Separation Structure and all decisions that may materially affect the tax consequences thereof to the First Lien Noteholders. |
| | No later than 50 days prior to the deadline for voting on the Plan, the Company will deliver to the Consenting Creditors its reasonable estimate of the earnings and profits of the REIT (i) as of, and assuming an effective date of the Plan on, December 31, 2015, (ii) calculated using the implied equity values in this term sheet and valuing all new debt at par, and (iii) computed as if all of the PropCo New LP Interests other than the PropCo Preferred Equity are held through the REIT (the "**Estimated REIT E&P**"), together with supporting work papers.  The Consenting Creditors shall have 20 days to review the Company's calculation of the Estimated REIT E&P and provide any proposed revisions to the Company, and the Company and the Consenting Creditors agree to negotiate in good faith such proposed revisions and to attempt to resolve any differences between the parties within 10 days of the receipt of such proposed revisions. In the event the parties reach agreement as to the amount of the Estimated REIT E&P such Estimated REIT E&P shall be final and binding as among the Company and |

8

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 334 of 539 PageID #:1293

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 47 of 183

| | |
|---|---|
| | the Consenting Creditors for purposes of the preceding paragraph. In the event the parties do not reach agreement on the amount of the Estimated REIT E&P, then the determination of the Estimated REIT E&P shall be made by an independent accounting firm mutually acceptable to the Company and the Consenting Creditors. |
| Equity Securities | The common equity securities to be issued will consist of new shares of common stock (a) of the REIT (such stock, the "***REIT New Common Stock***") and (b) of OpCo (such stock, the "***OpCo New Common Stock***"). Such securities will be freely transferable to the extent provided under Section 1145 of the Bankruptcy Code.<br><br>The Boards of Directors of CEOC, OpCo and the REIT shall each use its reasonable best efforts to have the OpCo New Common Stock, if more than 30% of the OpCo New Common Stock is owned by the First Lien Noteholders and Non-First Lien Noteholders (the "***Non-CEC Holders***"), and the REIT New Common Stock, respectively, (a) registered under US securities laws and (b) listed on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the effective date of the Plan. A registration statement covering the REIT Common Stock (and if applicable, a registration statement covering the OpCo New Common Stock) shall be filed as soon as practicable following the effective date of the Plan and in any event within 75 days thereafter. The Board of Directors of CEOC shall consult with First Lien Professionals on the form and substance of the registration statement(s). The parties shall enter into a customary registration rights agreement providing for among other things a re-sale registration statement for any First Lien Noteholder that cannot freely transfer its equity pursuant to Section 1145 of the Bankruptcy Code and keeping any registration statements that do not automatically incorporate SEC filings by reference up to date.<br><br>In order to meet the requirement that a REIT have at least 100 shareholders, the REIT will have the right to issue, for cash, up to $125,000 of non-voting preferred stock (125 shares, $1,000 liquidation preference and approximately 12% dividend). |
| Contribution by CEOC of Properties to PropCo | If the UPREIT Structure is used, at least 5% of the PropCo New LP Interests purchased by CEC under the Put Options (on a fully diluted basis) shall be deemed as CEOC's on account of its contribution of real estate into PropCo. In such case, CEOC shall have the option to participate in future issuances, or purchase additional equity from PropCo at FMV if participation is not feasible, to maintain its percentage ownership interest in PropCo at 5% if it would otherwise decrease below that threshold. |
| Services JV | Each of the Company and CEC (including through Caesars Entertainment Resort Properties LLC and Caesars Growth Properties Holdings, LLC) shall agree to take those steps that may be necessary or advisable with respect to Caesars Enterprise Services, LLC and its subsidiaries (collectively "***CES***") to ensure that the chapter 11 cases or a restructuring consummated thereby |

9

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 335 of 539 PageID #:1294

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement    Page 48 of 183

shall not impair, modify, or affect in any adverse way under the applicable agreements (i) the Company's rights with respect to governance or administration of CES (including by amending Sections 5.5(b) with respect to any payment defaults arising from commencement of the chapter 11 cases, 5.6 and 7.12 of that certain Amended Limited Liability Company Agreement of Caesars Enterprise Services, LLC dated as of May 20, 2014 (as the same may have been amended from time to time), (ii) the Company's rights with respect to that certain Omnibus License and Enterprise Services Agreement dated as of May 20, 2014 (as the same may have been amended from time to time) (including by amending Section 16.4 thereof), (iii) the Company's rights with respect to any or all intellectual property or other business arrangements by and among the Company and CES, whether pursuant to section 365(c) of the Bankruptcy Code, any change of control provisions set forth in those agreements, or other terms of such agreements and (iv) PropCo's and OpCo's right to use and access intellectual property and other rights in the same manner that such rights are currently used and accessed across the enterprise to the extent currently provided under the Omnibus License and Enterprise Services Agreement.

In addition, such agreements shall be modified as necessary or appropriate to reflect the OpCo/PropCo structure including (i) to provide that Total Rewards and other enterprise-wide and property specific resources are allocated, and services provided, in a way that does not discriminate against PropCo, (ii) for so long as CEC or its affiliates manages the properties, CES shall ensure that, in the event CEC or its subsidiaries cease to provide the resources and services provided under such agreements to PropCo, CES shall provide such resources and services directly to PropCo on equivalent terms to or via an alternative arrangement reasonably acceptable to PropCo; provided that if CEC or its affiliates are terminated as manager under the applicable agreements other than by or with the consent of PropCo, CES shall provide such resources and services pursuant to a management agreement on substantially the same terms and conditions, notwithstanding such termination, if so elected by PropCo.  In the event PropCo terminates or consents to the termination of the management relationship with CEC or its affiliates, for so long as the transition period under the applicable management agreement(s) continues, PropCo shall continue to have access to such resources and services on no less favorable terms.  The modified documents shall be in form and substance reasonably satisfactory to the Requisite Consenting Creditors.

Furthermore, CES shall at the request of the REIT Board of Directors have meetings or conference calls once a quarter with a designee of the REIT Board of Directors to discuss, and consult on, the strategic and financial business plans, budgeting, including proposed capital expenditures and other topics as reasonably requested by the REIT Board of Directors.  The REIT shall also have audit and information rights.

10

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 336 of 539 PageID #:1295

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 49 of 183

## IV.    CEC

| | |
|---|---|
| CEC Cash Contribution | CEC will contribute $406 million (the "**CEC Cash Contribution**") to be used to pay the RSA Forbearance Fees (on the terms described below), for general corporate purposes and to fund sources and uses (and capital structure described herein) required on the effective date of the Plan ("**Exit**").<br><br>In connection with the RSA, CEC shall pay the following cash fees (the "**RSA Forbearance Fees**") in United States dollars to the Forbearance Fee Parties (as defined in the RSA) in respect of such Forbearance Fee Parties forbearing from exercising their default-related rights and remedies solely to the extent required by, and as set forth in, the RSA in an amount equal to (a) 1.625% of the Forbearance Fee First Lien Bond Claims (as defined in the RSA) held by such Forbearance Fee Parties paid at the earlier of the date when (i) holders of 66.66% of the First Lien Note Obligations and the First Lien Bank Obligations sign the RSA (or in respect of the First Lien Bank Obligations a similar restructuring support and forbearance agreement agreeable to CEOC and CEC) and (ii) the Bankruptcy Court enters an order approving the Disclosure Statement and (b) 1.625% of the Forbearance Fee First Lien Bond Claims held by such Forbearance Fee Parties paid at Exit. For the avoidance of doubt and without limitation, each Forbearance Fee Party shall be an express third party beneficiary with respect to this provision. |
| CEC Standby Commitment | $75 million, which shall only be funded if there are insufficient sources and uses (after giving effect to any Available Cash) to fund the capital structure described herein at Exit. For the purpose of determining whether CEC is required to fund the CEC Standby Commitment, the amount of Available Cash shall be deemed to exclude an amount equal to $206 million less the amount of the RSA Forbearance Fees paid by CEC. |
| CEC Put Options Purchases | CEC or an affiliated entity shall, pursuant to the Put Options, purchase up to (a) $269 million of PropCo New LP Interests or REIT New Common Stock at a price implying a total value of $269 million for 14.8% of the PropCo on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any) and (b) $700 million of OpCo New Common Stock at a price per share implying a total value of $700 million for 100% of the OpCo New Common Stock. |
| Domestic Acquisitions and New Building Opportunities | CEC and its non-debtor subsidiaries shall give PropCo a right of first refusal to own the real estate, and have CEC or OpCo lease, all non-Las Vegas domestic (U.S.) real estate acquisitions and new building opportunities with CEC retaining management rights with respect to such opportunities.<br><br>PropCo shall give CEC a right of first refusal to operate and manage all non-Las Vegas properties that PropCo acquires. |

11

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 337 of 539 PageID #:1296

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 50 of 183

| | |
|---|---|
| | The material terms of these rights of first refusal to be mutually agreed among the Company, CEC and the Initial Consenting Creditors. |
| CEC Lease Guaranty | CEC, OpCo and PropCo will enter into a Management and Lease Support Agreement (the "**MLSA**") pursuant to which (i) CEC, or a wholly-owned subsidiary, will manage the properties on behalf of OpCo and (ii) CEC will provide a guaranty in respect of the OpCo's operating lease obligations, in each case while such lease (including any extensions, renewals or replacements) remains in effect.  Certain of the material terms of the MLSA are set forth on <u>Annex II</u>.  The remaining terms of the MLSA to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto.<br><br>Certain of the material terms of the operating leases are set forth on <u>Annex II</u>.  The remaining terms of the operating leases to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
| Releases | The Plan shall provide (subject to completion of the investigation by CEOC's governance committee) that CEC's participation in the Plan through its entry into the RSA and performance of the terms thereunder in facilitating the transactions contemplated by the Restructuring shall be a full and complete settlement under Bankruptcy Rule 9019 of any claims or causes of action, known or unknown, that the Company, its estates and third parties have or could have against CEC, CAC and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees,  managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacity as such) relating to the Company, other than (a) claims under the RSA and (b) claims arising from past, existing, and future commercial relationships between any subsidiary of CEC (other than CEOC and its subsidiaries) and CEOC or any of its subsidiaries.<br><br>As part of the settlement embodied in the Plan and the RSA (subject to completion of the investigation by CEOC's governance committee), effective on the date the Restructuring is consummated, as consideration for the Cash Contribution, the CEC Put Options Purchases, the Domestic Acquisitions and New Building Opportunities, entry into the MLSA and other valuable consideration, the Company, its estate and all of the Company's creditors shall be deemed to have released CEC, CAC and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacities as such, the "**CEC Released Parties**") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the |

<div align="center">12</div>

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 338 of 539 PageID #:1297

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 51 of 183

| | Restructuring (other than (a) claims under the RSA and (b) claims arising from past, existing, and future commercial relationships between any subsidiary of CEC (other than CEOC and its subsidiaries) and CEOC or any of its subsidiaries), including a release and waiver of any obligations arising under the Guaranty and Pledge Agreement of CEC dated as of July 25, 2014.  The Plan shall also include standard injunction and exculpation provisions in respect of the CEC Released Parties.

As part of the settlement embodied in the Plan and the RSA, effective on the date the Restructuring is consummated, as consideration for their entry into the RSA and other valuable consideration, the Company and the CEC Released Parties shall be deemed to have released the Consenting Creditors and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacity as such) from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the Restructuring. |
|---|---|

## V.    Caesars Palace Las Vegas ("CPLV")

| Transfer to Unrestricted Subsidiary | CPLV shall be transferred to a newly formed wholly owned unrestricted subsidiary of PropCo ("***CPLV Sub***") and its property shall be leased to OpCo.

Certain of the material terms of the operating lease are set forth on <u>Annex II</u>.  The remaining terms of the operating lease to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
|---|---|
| Issuance of CPLV Market Debt | CPLV Sub shall use its commercially reasonable efforts to finance $2,600 million of CPLV Debt with third party investors for cash proceeds (the "***CPLV Market Debt***") on or before consummation of the Restructuring (with 100% of the net proceeds being used to increase the cash payments to the First Lien Bank Lenders and the First Lien Noteholders).  At least $2,000 million of CPLV Market Debt must be issued.

If $2,000 million or more but less than $2,600 million of CPLV Market Debt is issued, the remainder will be issued to the First Lien Bank Lenders and the First Lien Noteholders in the form of CPLV Mezzanine Debt.  The principal amount of CPLV Market Debt and CPLV Mezzanine Debt shall collectively total $2,600 million.

Notwithstanding the above, to the extent PropCo Preferred Equity is issued, the proceeds thereof shall <u>first</u> reduce the principal amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders, <u>second</u> |

KL2 2879507.2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 339 of 539 PageID #:1298

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 52 of 183

| | |
|---|---|
| | to reduce the principal amount of CPLV Market Debt, and third to reduce the principal amount of New Second Lien PropCo Debt.<br><br>The weighted average yield on the CPLV Market Debt and CPLV Mezzanine Debt will be capped such that the annual debt service shall not exceed $130 million, with the cap increased by $2 million for every $100 million of Equitized CPLV Mezzanine Debt. |
| CPLV Mezzanine Debt | If CPLV Market Debt is issued in an amount greater than $2,000 million, but less than $2,600 million (less the proceeds from the PropCo Preferred Equity applied to reduce the amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders and CPLV Market Debt), then CPLV Holding shall issue secured non-guaranteed debt (the "**CPLV Mezzanine Debt**") in an amount equal to the difference to the First Lien Bank Lenders and the First Lien Noteholders. Such CPLV Mezzanine Debt shall have a 6 year term and shall bear interest at 8% (if $600 million of CPLV Mezzanine Debt is issued) increasing by 0.25% for every $25 million reduction in the principal amount of CPLV Mezzanine Debt issued below $600 million (up to a maximum of 13%).  Additional terms of the CPLV Market Debt and CPLV Mezzanine Date to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto.<br><br>"**CPLV Holding**" will be a newly formed holding company that owns 100% of CPLV Sub. |
| Receipt of CPLV Mezzanine Debt | If CPLV Mezzanine Debt is issued, then it shall be distributed as follows:<br><br>• The first $300 million of CPLV Mezzanine Debt shall be distributed 1/3 to the First Lien Bank Lenders and 2/3 to the First Lien Noteholders; and<br><br>• Any CPLV Mezzanine Debt over $300 million shall be distributed 1/2 to the First Lien Bank Lenders and 1/2 to the First Lien Noteholders.<br><br>The $2,600 million aggregate total amount of cash proceeds from the CPLV Market Debt and the principal amount of CPLV Mezzanine Debt (and the proceeds from the PropCo Preferred Equity applied to reduce the amount of CPLV Mezzanine Debt and CPLV Market Debt) will be allocated as follows:<br><br>• $1,450 for First Lien Bank Holders and<br><br>• $1,150 for First Lien Bondholders,<br><br>with the amount of CPLV Mezzanine Debt to be issued to each in accordance with the above. |

14

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 340 of 539 PageID #:1299

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 53 of 183

## VI.    New Capital Structure[10]

| | |
|---|---|
| New First Lien OpCo Debt | Up to $1,188 million in principal amount of first lien debt.  6 year term. Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively.  Interest at LIBOR plus 4.00%, with a 1% LIBOR floor. Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto.<br><br>$883 million distributed to First Lien Bank Lenders and $306 million distributed to First Lien Noteholders, subject to adjustment as set forth herein.<br><br>OpCo will use its commercially reasonable efforts to syndicate the New First Lien OpCo Debt to the market and, to the extent so syndicated, the cash proceeds will be used to increase the cash payments to the First Lien Bank Lenders and First Lien Noteholders, ratably based on the amount of New First Lien OpCo Debt otherwise to be issued to them.  The New First Lien OpCo Debt will be marketed at an interest rate less than or equal to the rates contemplated above.<br><br>The First Lien OpCo Debt distributable to First Lien Bank Lenders and First Lien Noteholders must be in the form of bank debt and bond debt, respectively. |
| New Second Lien OpCo Debt | Up to $547 million in principal amount of second lien debt.  7 year term. Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively.  Interest at 8.5%.  Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto.<br><br>$406 million distributed to First Lien Bank Lenders and $141 million distributed to First Lien Noteholders. |
| New First Lien PropCo Debt | $2,392 million in principal amount of first lien debt.  5 year term.  Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively.  Interest at LIBOR plus 3.5% with a 1% LIBOR floor. Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto.<br><br>$1,961 million distributed to the First Lien Bank Lenders and $431 million |

---

[10] All amounts subject to the ability of the First Lien Bank Lenders to convert $100 million of CPLV Mezzanine Debt to New First Lien OpCo Debt, New Second Lien OpCo Debt, New First Lien PropCo Debt, New Second Lien PropCo Debt or equity in PropCo.

KL2 2879507.2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 341 of 539 PageID #:1300

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 54 of 183

| | |
|---|---|
| | distributed to First Lien Noteholders, subject to adjustment as set forth herein. |
| | The First Lien PropCo Debt distributable to First Lien Bank Lenders and First Lien Noteholders must be in the form of bank debt and bond debt, respectively. |
| New Second Lien PropCo Debt | $1,425 million in principal amount of second lien debt.  6 year term. Customary NC3, with step-downs thereafter.  Interest 8.0%.  Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
| | Distributed to First Lien Noteholders, subject to adjustment as set forth herein. |
| | Notwithstanding the above, to the extent PropCo Preferred Equity is issued, the proceeds thereof, after first reducing the principal amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders and then reducing the principal amount of CPLV Market Debt, shall be used to reduce the principal amount of New Second Lien PropCo Debt. |
| PropCo Preferred Equity | $300 million in principal amount of PropCo Preferred Equity.   PIK interest 5%.  Additional terms annexed hereto as Annex III. |
| | Subject to the Purchase Option, all of the PropCo Preferred Equity shall be purchased by the Preferred Backstop Investors as set forth in the Backstop Commitment Agreement which shall be substantially in form and substance as that annexed hereto as Annex IV, subject to company's ongoing review and approval (other than with respect to the economic terms of such agreement), such approval not to be unreasonably withheld and such approval shall be provided on or prior to noon on December 24, 2014.  50% of the PropCo Preferred Equity purchased by the Preferred Backstop Investors will be made available to First Lien Noteholders pursuant to the Purchase Option.  Any PropCo Preferred Equity purchased pursuant to the Purchase Option shall dilute the Backstop Investors' purchases pro rata. |
| | Proceeds of the issue of the PropCo Preferred Equity shall be used first to reduce the principal amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders, second to reduce the principal amount of CPLV Market Debt, and third to reduce the principal amount of New Second Lien PropCo Debt. |

16

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 342 of 539 PageID #:1301

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 55 of 183

## VII.    Charter Documents and By-Laws of the Equity Issuers

| | |
|---|---|
| Corporate Governance | CEOC, a Delaware corporation will become OpCo and will have charter documents and by-laws that are acceptable to CEC and the Requisite Consenting Creditors.<br><br>PropCo will be a limited partnership organized under the laws of Delaware and will have a limited partnership agreement that is customary for an UPREIT structure and reasonably acceptable to CEOC, CEC and the Requisite Consenting Creditors.<br><br>PropCo GP will be a limited liability company organized under the laws of Delaware and will have an operating agreement that is reasonably acceptable to CEOC, CEC and the Requisite Consenting Creditors.<br><br>The REIT will be a corporation organized under the laws of Maryland and will have charter documents and by-laws that are reasonably acceptable to CEOC, CEC and the Requisite Consenting Creditors. |
| OpCo Board of Directors | If CEC owns 90% or more of the OpCo New Common Stock, then the board of directors of OpCo shall consist of 3 voting members to be designated by CEC, each to be identified in a plan supplement and one of which shall be independent and reasonably acceptable to the Requisite Consenting Creditors.  The independent director shall be a member of all committees of the board.<br><br>If CEC owns less than 90% of the OpCo New Common Stock, then the board of directors of OpCo shall consist of 3 voting members, 2 designated by CEC and 1 designed by the Requisite Consenting Creditors (which shall be a member of all committees of the board), each to be identified in a plan supplement.<br><br>Regardless of CEC's percentage ownership, there shall be one non-voting observer, reasonably acceptable to OpCo, to be designated by the Requisite Consenting Creditors and identified in a plan supplement.  The observer shall be given notice of and an opportunity to attend the portion of all meetings concerning business and strategy sessions matters and other matters that would have an adverse material economic impact on PropCo (and receive all materials given to board members in connection with such matters), subject to appropriate limitations in respect of privilege issues. |
| REIT Board of Directors | If CEC owns less than 10% of PropCo (directly or indirectly), then the board of directors of the REIT shall consist of 7 voting members to be designated by the Requisite Consenting Creditors, each to be identified in a Plan Supplement.<br><br>If CEC owns 10% or more of PropCo (directly or indirectly), then the board of directors of the REIT shall consist of 7 voting members, 6 to be designated by the Requisite Consenting Creditors and 1 designated by CEC, |

17

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 343 of 539 PageID #:1302

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 56 of 183

|  | each to be identified in a Plan Supplement.<br><br>At least 3 voting members must be licensed by the required regulatory authorities by closing.  If there are not at closing at least 3 voting members licensed, then to assist with closing up to 2 of the independent members of CEOC shall be designated to the REIT board so that there will be 3 voting members at closing, with such members being removed as the non-voting members are licensed.  Until such time as the CEOC independents and members designated by CEC are a minority of the board, the REIT shall be prohibited from taking major transactions without shareholder approval.  To the extent any of members are not so licensed by closing, they shall be non-voting members until so licensed. |
|---|---|
| PropCo | PropCo will be controlled by its PropCo GP, whose sole shareholder will be the REIT. |

## VIII.   Implementation

| In-Court Restructuring:  Use of Cash Collateral | In the chapter 11 cases filed by the Company to effectuate the Restructuring, the First Lien Noteholders will support entry of a cash collateral order that will allow the Company to use cash collateral for working capital and general corporate purposes and to pay costs associated with the Company's Restructuring.  The cash collateral arrangements shall allow such use of cash, subject to (i) the milestones set forth in the RSA (plus forty-five (45) days following the breach of any milestone) and (ii) a budget acceptable to the Requisite Consenting Creditors and the Company, including capital expenditures in an amount to be agreed for the earlier of 18 months and an event of default under such cash collateral order on the terms set forth in the Cash Collateral Stipulation.[11]<br><br>As more fully set forth in the Cash Collateral Stipulation, in exchange for the Company's use of cash collateral, the First Lien Noteholders and the First Lien Bank Lenders and/or their respective legal and financial advisors shall receive, among other things, the following:<br><br>- adequate protection liens |
|---|---|

---

[11] Events of Default to include, among other things, (a) entry of an order modifying the automatic stay with respect to material assets, (b) the Company seeks to create any additional post-petition liens, (c) the Company commences, joins or assists in a proceeding against the First Lien Noteholders or First Lien Bank Lenders, (d) any modification to the Cash Collateral Order without the bank agent's or the Requisite Consenting Creditors' consent, (e) entry of a final order terminating or requiring repayment of the Adequate Protection Payments, (f) dismissal or conversion of the Company's chapter 11 cases, (g) failure to make an Adequate Protection Payment (5 business day grace period), and (h) failure to perform any other material term of the Cash Collateral Order (5 business day cure period).

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 344 of 539 PageID #:1303

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 57 of 183

|  |  |
|---|---|
|  | • liens on proceeds of avoidance actions<br><br>• payment of First Lien Professional Fees to the extent not otherwise paid in accordance with the RSA<br><br>• Adequate Protection Payments at a rate equal to 1.5%[12]<br><br>• Adequate Protection Payment of remaining Available Cash at Exit, as contemplated below<br><br>• receipt of quarterly budgets, a monthly variance report, an annual business plan and projections, and such other reports and information to the extent required by the Cash Collateral Stipulation.<br><br>The cash collateral Stipulation will contain a "pipeline plus" carveout for all fees and expenses of estate professionals (i.e., the "pipeline" benefiting from the carve shall not be subject to a budget or a cap) plus post-notice fee and expense reserves in an amount to be reasonably agreed between CEOC and the First Lien Professionals. |
| Available Cash | The Available Cash shall be applied at closing <u>first</u> to fund, together with the CEC Cash Contribution (less the RSA Forbearance Fees), the sources and uses (and capital structure described herein) at Exit and <u>second</u>, to the extent of any remaining Available Cash, to fund adequate protection payments, as applicable.<br><br>"Available Cash" means (i) the pro forma amount of CEOC balance sheet cash available after giving effect to the Exit, the consummation of the Plan, all debt reductions and repayments, the payment of all fees, expenses and related uses of cash on Exit in accordance with the plan over (ii) $400 million of minimum required CEOC liquidity, which shall be reduced by $0.50 for every dollar raised in revolving credit, provided that such reduction shall in no instance be greater than $100 million (the minimum cash requirement amount includes the $100 million of CEC's cash contribution, and does not include (a) cash held by Chester Downs and Marina, LLC and Chester Downs Finance Corp., (b) cash held by the international entities owned by CEOC (e.g. the London Clubs), and (c) customer cash held in custody by CEOC (i.e. "front money")). |

## IX.   Other

---

[12] Such payments shall be in settlement of any claims for adequate protection that the First Lien Bank Lenders and First Lien Noteholders may assert throughout the chapter 11 cases.

KL2 2879507.2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 345 of 539 PageID #:1304

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 58 of 183

| | |
|---|---|
| PropCo Call Rights | Subject to the terms of the CERP debt documents and in no event in a manner that is dilutive of covenant compliance (provided that CEC and CERP shall use commercially reasonable efforts to obtain waivers or amendments to permit the transaction if necessary), PropCo shall have the right, for up to 180 days following the date the Restructuring is consummated, to enter into a binding agreement to purchase the real property (and lease it back to CERP) and all improvements associated with Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties, and on other customary terms and conditions, with the closing of such purchase(s) to occur following regulatory approvals, provided that such 180 day period shall be extended for up to 12 months if the call rights are not exercisable during the initial 180 day period due to CERP covenant issues. <br><br> The parties shall discuss in good faith whether additional properties should be subject to the PropCo call rights and other terms applicable to the call rights. |
| Definitive Agreements | Subject to the terms of the RSA, as soon as reasonably practicable, the parties will execute Definitive Documentation implementing the Restructuring in form and substance consistent in all material respects with this Term Sheet and reasonably acceptable to the Requisite Consenting Creditors, the Company and CEC. |
| Non Transfer | As set forth in the RSA and subject to its terms and certain exceptions contained therein, each Restructuring Support Party will agree, on behalf of itself and its affiliates, not to transfer any First Lien Bank Obligations or First Lien Note Obligations held by such party and its affiliates from the date of execution of the RSA through the consummation of the Restructuring (including without limitation closing all Put Options and Equity Rights) unless the transferee(s) agree(s) to be bound by all of the terms and conditions of the RSA and this Term Sheet. |
| Intercreditor Agreements | Plan distributions shall be made in compliance with and shall, except as explicitly provided for herein, enforce all applicable intercreditor and subordination agreements. |

20

| | |
|---|---|
| Tax Opinions/Private Letter Rulings | As a condition to effectiveness of the Plan, Counsel to the Company shall deliver an opinion on which the First Lien Noteholders may rely, or the REIT shall receive a private letter ruling from the IRS, concluding, based on facts, customary representations and assumptions set forth or described in such opinion and/or private letter ruling, that the REIT's method of operation since its formation and its proposed method of operation up to and including the end of the date of the opinion or ruling has enabled and will enable the REIT to meet the requirements for qualification and taxation as a real estate investment trust under the Code.<br><br>Counsel to the Company shall deliver to the Company an opinion, or the Company shall receive a private letter ruling from the IRS, concluding, based on facts, customary representations and assumptions set forth or described in such opinion and/or private letter ruling, that the transfer of assets to PropCo and to the REIT, and the transfer of consideration to creditors of the Company should not result in a material amount of U.S. federal income tax to the Company, determined as if the Company and its subsidiaries were a stand-alone consolidated group.  The Company shall make any such opinion and/or private letter ruling available to the First Lien Professionals. |

21

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 347 of 539 PageID #:1306

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 60 of 183

**Annex I**
**Backstop Parties**

| Party | PropCo New LP Interests / REIT New Common Stock | OpCo New Common Stock | Total Amount |
|-------|------------------------------------------------|-----------------------|--------------|
| CEC | $269 million[13] | $700 million | $969 million[14] |
| | | | |
| | | | |

---

[13] Subject to dilution if other First Lien Noteholders elect to become Backstop Parties.

[14] Subject to dilution if other First Lien Noteholders elect to become Backstop Parties.

22

**A0345**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 348 of 539 PageID #:1307

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 61 of 183

**Annex II**
**Lease & MLSA Term Sheet Summary**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 349 of 539 PageID #:1308

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 62 of 183

## Annex A: Lease Term Sheet Summary

**The OpCo – PropCo leases and CEC guarantee are key elements of the proposed restructuring.**

**Lease Term and Rent**

▶ Under the proposed restructuring, there will be two separate leases: one for Caesars Palace ("CPLV") and a second for the other PropCo properties ("Non-CPLV"):

- CPLV Lease

  — Term: 15 year initial term with four 5-year renewals

  — Initial Lease Amount: $160 million rent for first 5 years (subject to the escalator described below)

  — Resets: Rent resets in years 6 and 11 with 80% fixed / 20% variable (variable portion adjusted based on 13.0% of change in revenue)

  — Escalator:  Fixed rent will be subject to an annual escalator equal to the greater of CPI and 2.0%

- Non – CPLV Lease:

  — Term: 15 year initial term with four 5-year renewals

  — Initial Lease Amount: $475 million rent for first 3 years

  — Resets: Rent resets in years 4 and 6 with 70% fixed / 30 % variable (variable portion adjusted based on 19.5% of change in revenue), and in year 11 with 80% fixed / 20% variable (variable portion adjusted based on 13.0% of change in revenue)

  — Escalator: Fixed rent will be subject to an annual escalator,  beginning in the 7th year, equal to the greater of CPI and 2.0%

1

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 350 of 539 PageID #:1309

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 63 of 183

## Annex A: Lease Term Sheet Summary (cont.)

**Triple Net Lease & CapEx Adjustment**

▶ The OpCo – PropCo leases will be structured as triple net leases with an adjustment for CapEx

▶ OpCo will be responsible for the CapEx of the leased properties with a minimum spend of $175 million per year

▶ Each year, PropCo will reimburse OpCo for the lesser of (i) $78 million or (ii) 37.5% of the annual CapEx spend

▶ PropCo's reimbursement each year will be reduced by 50 cents for every dollar of OpCo free cash flow above $10 million

▶ PropCo will also be granted an observer who will participate in OpCo board or applicable committee meetings regarding CapEx, budgeting, planning and construction for new and existing projects

**CEC's Full Guarantee of OpCo's Rent**

▶ CEC has agreed to provide a full guarantee of all payments and performance of OpCo's monetary obligations under each of the CPLV and Non – CPLV leases

▶ CEC's guarantee obligation may only be terminated in the event PropCo chooses to terminate the manager without cause

▶ In the event the manager is terminated without the consent of PropCo, then PropCo shall have the right to create a parallel structure and reinstate CEC's guarantee obligations

**Detailed lease term sheet will be mutually agreed to by the parties by noon (eastern) on December 24th.**

2

A0348

## LEASE TERM SHEET

Note: It is currently anticipated that the real estate assets of the subsidiaries of a newly-formed Delaware limited partnership ("Propco") will be leased to subsidiaries of "Opco" (defined below) pursuant to two separate leases. One lease (the "Lease")[1] will include all "Facilities" (defined below) other than Caesars Palace Las Vegas ("CPLV"). The other lease (the "CPLV Lease") will only include CPLV. To the extent that a term below does not differentiate between the Lease and the CPLV Lease, such term shall be included in both leases.

| Landlord | With respect to the Lease, all of the subsidiaries of Propco that own the fee or ground leasehold (as applicable) interests in the real property comprising the "Non-CPLV Facilities" (as defined below). |
| | With respect to the CPLV Lease, a subsidiary of Propco that owns the fee interest in the real property comprising the CPLV Facility. |
| Tenant | With respect to the Lease, the subsidiaries of Caesars Entertainment Operating Company ("CEOC" or "Opco") necessary for the operation of all of the Non-CPLV Facilities, including all license holders with respect thereto, as reasonably demonstrated to Propco. |
| | With respect to the CPLV Lease, subsidiaries of CEOC necessary for the operation of the CPLV Facility, including all license holders with respect thereto, as reasonably demonstrated to Propco. |
| Guaranty / MLSA | Caesars Entertainment Corporation ("CEC"), a wholly-owned subsidiary of CEC ("Manager"), Opco and Propco will enter into a Management and Lease Support Agreement with respect to each of the Lease and the CPLV Lease (each, an "MLSA"), pursuant to which (i) Manager will manage the Facilities (as defined below) on behalf of Opco and (ii) CEC will provide a full guarantee of all payments and performance of Opco's monetary obligations under each of the CPLV Lease and the Lease.[2] The terms of the MLSA are more particularly set forth in that certain Summary of Terms with respect to the MLSA. |
| Leased Property | With respect to the Lease, all of the real property interest in the facilities (the "Non-CPLV Facilities") described on Exhibit A attached hereto, including all buildings and structures located thereon, and all rights appurtenant thereto. The Non-CPLV Facilities also may include any material non-U.S. real estate assets (if any) directly or indirectly wholly-owned by Opco, subject to compliance with all legal, regulatory, tax/REIT and contractual |

---

[1] Lease may be structured as two individual cross-defaulted leases, to accommodate the JV interest for the Joliet asset.

[2] NTD: Management Agreement and Guaranty will be integrated as one document, subject to terms of MLSA Term Sheet.

1

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 352 of 539 PageID #:1311

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 65 of 183

| | |
|---|---|
| | restrictions and requirements applicable to such assets; provided, however, that no such non-U.S. real estate asset shall be included in the Non-CPLV Facilities if, despite the reasonable best efforts of Opco and/or CEOC, it would be unduly onerous or costly, in consideration of the value of such real estate asset, to include such real estate asset in the Non-CPLV Facilities.  If any such non-U.S. assets are included in the Non-CPLV Facilities as described above, the parties will reasonably agree on an ownership and operational structure with respect to such non-U.S. assets, which structure may include separate leases.<br><br>With respect to the CPLV Lease, all of the real property interest in CPLV (the "CPLV Facility", together with the Non-CPLV Facilities, the "Facilities"), as described on <u>Exhibit B</u> attached hereto, including all buildings and structures located thereon, and all rights appurtenant thereto. |
| Term | 15 year initial term (the "Initial Term").<br><br>Four 5-year renewal terms (each, a "Renewal Term") to be exercised at Tenant's option by notifying Landlord (i) no earlier than 18 months prior to the then-current expiration and (ii) no later than 12 months prior to the then-current expiration.<br><br>The Term with respect to any Leased Property shall not exceed 80% of the useful life of such Leased Property.  Any Leased Property not meeting such requirement shall be subject to a shorter Term than the other Leased Property that satisfies such requirements.[3]<br><br>The "Rent Reduction Adjustment" with respect to a Facility shall mean (i) with respect to the Base Rent, a proportionate reduction of the Base Rent based on the EBITDAR of such Facility versus the EBITDAR of all the Facilities and (ii) with respect to Percentage Rent, a reduction of the then current dollar amount based on excluding the Net Revenue of the applicable Facility from the Percentage Rent formula on a pro forma basis. |
| Rent | "Rent" means the sum of Base Rent and Percentage Rent.  Rent shall be paid monthly in advance.<br><br>Rent under the Lease and the CPLV Lease shall be as follows for the Initial Term and each Renewal Term:[4]<br><br>**Lease**:<br><br>(a) For the first 3 Lease years, Base Rent of $475,000,000 per Lease year.<br><br>(b) For the 4th Lease year through the 10th Lease year, (i) Base Rent equal to $332,500,000, subject to the annual Escalator (as hereinafter defined) |

---

[3]  The parties understand that none of the Facilities will run afoul of the 80% test during the Initial Term, and that the provision will apply (if at all) only in respect of Renewal Terms.
[4]  For tax purposes, portions of each Non-CPLV Facility (e.g., barges and boats) may be subject to a specific Rent allocation to be set forth in the definitive documents.

KL3 2999942.3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 353 of 539 PageID #:1312

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 66 of 183

commencing in the 7th Lease year as described below, plus (ii) Percentage Rent equal to the Non-CPLV Initial Percentage Rent (as hereinafter defined), as adjusted at the commencement of the 6th Lease year as described below.

(c) From and after the commencement of the 11th Lease year, (i) Base Rent equal to 80% of the Rent for the 10th Lease year, subject to the annual Escalator as described below, plus (ii) Percentage Rent equal to Non-CPLV Secondary Percentage Rent (as hereinafter defined).

For the 4th and 5th Lease year, Percentage Rent, in each such Lease year, shall be equal to a fixed annual amount equal to $142,500,000, adjusted as follows: (i) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 3rd Lease year has increased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such increase, the "Year 4 Non-CPLV Increase"), such $142,500,000 shall increase by the product of (a) the Non-CPLV Factor (as defined below) and (b) the Year 4 Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 3rd Lease year has decreased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such decrease, the "Year 4 Non-CPLV Decrease"), such $142,500,000 shall decrease by the product of (a) the Non-CPLV Factor and (b) the Year 4 Non-CPLV Decrease (such resulting amount being referred to herein as the "Non-CPLV Initial Percentage Rent").

For the 6th Lease year through the 10th Lease year, Percentage Rent, in each such Lease year, shall be equal to a fixed annual amount equal to the Non-CPLV Initial Percentage Rent, adjusted as follows: (i) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 5th Lease year has increased versus the Net Revenue for the 3rd Lease year (such increase, the "Year 6 Non-CPLV Increase"), Percentage Rent shall increase by the product of (a) the Non-CPLV Factor and (b) the Year 6 Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 5th Lease year has decreased versus the Net Revenue for the 3rd Lease year (such decrease, the "Year 6 Non-CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the Non-CPLV Factor and (b) the Year 6 Non-CPLV Decrease.

For the 11th Lease year through the 15th Lease year, Percentage Rent shall be equal to a fixed annual amount equal to 20% of the Rent for the 10th Lease year, adjusted as follows: (i) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 10th Lease year has increased versus the Net Revenue for the 5th Lease year (such increase, the "Year 11 Non-CPLV Increase"), Percentage Rent shall increase by the product of (a) the Non-CPLV Factor and (b) the Year 11 Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 10th Lease year has decreased versus the Net Revenue for the 5th Lease year (such decrease, the "Year 11 Non-CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the Non-CPLV Factor and (b) the Year 11 Non-CPLV Decrease (such resulting amount being referred to herein as "Non-CPLV Secondary Percentage Rent").

3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 354 of 539 PageID #:1313

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 67 of 183

At the commencement of each Renewal Term, (i) the Base Rent under the Lease for the first year of such Renewal Term shall be adjusted to fair market value rent (provided that (A) in no event will the Base Rent be decreased and (B) no such adjustment shall cause Base Rent to be increased by more than 10% of the prior year's Base Rent), subject thereafter to the annual Escalator, and (ii) the Percentage Rent for such Renewal Term will be equal to the Percentage Rent in effect for the Lease year immediately preceding the first year of such Renewal Term, adjusted as follows:  (1) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the Lease year immediately preceding the applicable Renewal Term has increased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) for each subsequent Renewal Term, the Lease year prior to the first Lease year of the immediately preceding Renewal Term (such increase, the "Renewal Term Non-CPLV Increase"), Percentage Rent shall increase by the product of (a) the Non-CPLV Factor and (b) the Renewal Term Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the Lease year immediately preceding the applicable Renewal Term has decreased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) in respect of each subsequent Renewal Term, the Lease year prior to the first Lease year of the immediately preceding Renewal Term (such decrease, the "Renewal Term Non-CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the Non-CPLV Factor and (b) the Renewal Term Non-CPLV Decrease.  The Lease shall contain a customary mechanism by which Landlord and Tenant shall determine the fair market value adjustment to Base Rent at least 12 months prior to the commencement of the applicable Renewal Term.  The fair market valuation shall be as of the date of commencement of the applicable Renewal Term.

The "Non-CPLV Factor" shall be equal to: (i) for the 4th Lease year through the 10th Lease year, 19.5%; and (ii) from and after the 11th Lease year, 13%.

From and after the commencement of the 7th Lease year, Base Rent for the Lease will be subject to an annual escalator (the "Escalator") equal to the higher of 2% and the Consumer Price Index ("CPI") increase with respect to such year, above the previous lease year's Base Rent.

**CPLV Lease:**

(a) For the first 5 Lease years, Base Rent of $160,000,000 per Lease year, subject to the annual Escalator.

(b) From and after the commencement of the 6th Lease year, (i) Base Rent equal to 80% of the Rent for the 5th Lease year, subject to the annual Escalator, plus (ii) Percentage Rent equal to the CPLV Initial Percentage Rent (as hereinafter defined), as adjusted in the 11th Lease year as described below.

For the 6th Lease year through the 10th Lease year, Percentage Rent shall be equal to a fixed annual amount equal to 20% of the Rent for the 5th Lease year, adjusted as follows: (i) in the event that the Net Revenue with respect

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 355 of 539 PageID #:1314

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 68 of 183

to the CPLV Facility for the 5th Lease year has increased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such increase, the "Year 6 CPLV Increase"), Percentage Rent shall increase by the product of (a) 13% (the "CPLV Factor") and (b) the Year 6 CPLV Increase; and (ii) in the event that the Net Revenue with respect to the CPLV Facility for the 5th Lease year has decreased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such decrease, the "Year 6 CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the CPLV Factor and (b) the Year 6 CPLV Decrease (such resulting amount being referred to herein as "CPLV Initial Percentage Rent").

From and after the commencement of the 11th Lease year, Percentage Rent shall be equal to a fixed annual amount equal to the CPLV Initial Percentage Rent, adjusted as follows: (i) in the event that the Net Revenue with respect to the CPLV Facility for the 10th Lease year has increased versus the Net Revenue for the 5th Lease year (such increase, the "Year 11 CPLV Increase"), Percentage Rent shall increase by the product of (a) the CPLV Factor and (b) the Year 11 CPLV Increase and (ii) in the event that the Net Revenue with respect to the CPLV Facility for the 10th Lease year has decreased versus the Net Revenue for the 5th Lease year (such decrease, the "Year 11 CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the CPLV Factor and (b) the Year 11 CPLV Decrease.

At the commencement of each Renewal Term, (i) the Base Rent under the CPLV Lease for the first year of such Renewal Term shall be adjusted to fair market value rent (provided that (A) in no event will the Base Rent be decreased and (B) no such adjustment shall cause Base Rent to be increased by more than 10% of the prior year's Base Rent), subject thereafter to the annual Escalator, and (ii) the Percentage Rent for such Renewal Term will be equal to the Percentage Rent in effect for the Lease year immediately preceding the first year of such Renewal Term, adjusted as follows: (1) in the event that the Net Revenue with respect to the CPLV Facility for the Lease year immediately preceding the applicable Renewal Term has increased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) for each subsequent Renewal Term, the Lease year prior to the first Lease year of the immediately preceding Renewal Term (such increase, the "Renewal Term CPLV Increase"), Percentage Rent shall increase by the product of (a) the CPLV Factor and (b) the Renewal Term CPLV Increase; and (ii) in the event that the Net Revenue with respect to the CPLV Facility for the Lease year immediately preceding the applicable Renewal Term has decreased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) in respect of each subsequent Renewal Term, the Lease year prior to the first Lease year of the immediately preceding Renewal Term (such decrease, the "Renewal Term CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the CPLV Factor and (b) the Renewal Term CPLV Decrease. The CPLV Lease shall contain a customary mechanism by which Landlord and Tenant shall determine the fair market value adjustment to Base Rent at least 12 months prior to the commencement of the applicable Renewal Term. The fair market valuation shall be as of the date of commencement of the applicable Renewal Term.

5

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 356 of 539 PageID #:1315

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 69 of 183

| | |
|---|---|
| | "Net Revenue" shall be defined in the definitive documents. |
| Rent Allocation | Rent will be allocated under section 467 of the Code and regulations thereunder on a declining basis within the 115/85 safe harbor, adjusted as necessary such that the REIT's pro rata share of Landlord's anticipated free cash flow from operations, after payment by Landlord (and its subsidiaries) of all required debt service and operating expenses, is no less than 100% of the REIT's anticipated taxable income (assuming annual Cap Ex Reimbursements of $78.0 million). |
| Triple Net Lease | Subject to the provision below regarding Landlord's reimbursement to Tenant of capital expenditures (the "Capex Reimbursement"), the Leases will be absolute, traditional triple net leases.  Tenant shall pay all Rent absolutely net to Landlord, without abatement, and unaffected by any circumstance (except as expressly provided below in the cases of casualty and condemnation and the Capex Reimbursement).  Subject to the Capex Reimbursement, Tenant will assume complete responsibility for the condition, operation, repair, alteration and improvement of the Facilities, for compliance with all legal requirements (whether now or hereafter in effect) including, without limitation, all environmental requirements (whether arising before or after the effective date of the Lease), and for payment of all costs and liabilities of any nature associated with the Facilities, including, without limitation, all impositions, taxes, insurance and utilities, and all costs and expenses relating to the use, operation, maintenance, repair, alteration and management thereof. Opco and Tenant will, jointly and severally, provide a customary environmental indemnity to Landlord. |
| Expenses, Maintenance, Repairs and Maintenance Capital Expenditures, Minor Alterations | Tenant shall be responsible for the maintenance and repair of the Leased Properties (including capital expenditures with respect thereto); provided, however, that, under the Leases, Landlord shall reimburse to Tenant an annual amount in respect of capital expenditures incurred by Tenant with respect to the Leased Properties under the Lease and CPLV Lease in the amount equal to the lesser of (1) $78.0 million per Lease year in the aggregate (decreasing proportionally upon any Facility ceasing to be Leased Properties pursuant to the terms of the Lease or CPLV Lease in proportion with the Rent Reduction Adjustment), and (2) 37.5% of all capital expenditures incurred by Opco in such year (such lesser amount, the "CapEx Reimbursement Amount").  The CapEx Reimbursement Amount shall be applied 75% to the Lease and 25% to the CPLV Lease, subject to adjustment as agreed upon by Propco to the extent required by (or to improve the terms of) any CPLV financing.  Such CapEx Reimbursement Amount shall be decreased each Lease year, for such Lease year only, by an amount equal to 50% of excess cash flow (to be defined in a manner consistent with Tenant's financing documentation) in excess of $10 million generated by Tenant from the Facilities during the prior year. Such decrease will be structured in a manner to comply with REIT requirements.

Within 30 days after the end of each month, Tenant shall provide to Landlord a report setting forth all revenues and capital expenditures for the preceding |

6

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 357 of 539 PageID #:1316

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 70 of 183

month for the Non-CPLV Facilities (in the aggregate), on the one hand, and the CPLV Facility, on the other hand, and include Tenant's request identifying the portion of the CapEx Reimbursement Amount it is requesting to be paid. Within 15 days after Landlord's receipt of such report, Landlord shall pay Tenant an amount equal to the lesser of (i) an estimated one-twelfth portion of the applicable CapEx Reimbursement Amount payable (as reasonably estimated in accordance with the applicable budget preparation process) in respect of each Lease year, or (ii) the actual amount of capital expenditures incurred by Tenant during such month, multiplied by a fraction, the numerator of which is the estimated CapEx Reimbursement Amount for that year, and the denominator of which is the Minimum CapEx Amount. Payment of the CapEx Reimbursement Amount shall be reconciled on a quarterly and year-end cumulative basis such that, (i) within the later of (x) 15 days after Tenant's delivery of the required quarterly reporting or (y) 45 days after the end of each quarter and (ii) within 30 days after the delivery of audited year-end financial statements (as applicable), quarterly and at year end Landlord will have paid to Tenant an amount equal to the ratio of the CapEx Reimbursement Amount to the Minimum CapEx Amount (in each case, as the same may be adjusted as provided herein), multiplied by the actual amount of capital expenditures paid by Tenant for such period, provided, in no event will Landlord pay to Tenant more than its applicable CapEx Reimbursement Amount for such year. In the event that Landlord does not reimburse Tenant for such costs within the time periods set forth above and after Tenant's 15-day (or 30-day, as applicable) written request therefor, Tenant shall have the right to deduct such sums from subsequent installments of Rent payable under the Lease or CPLV Lease, as applicable. In the event that Tenant fails to pay Rent as and when due under the Lease or CPLV Lease beyond all applicable notice and cure periods, Landlord shall have the right to deduct such unpaid Rent amounts from subsequent installments of the CapEx Reimbursement Amount payable under the Lease or CPLV Lease, as applicable.

Tenant must expend sums for capital expenditures relating to the Facilities in an annual amount at least equal to $175,000,000 (such amount being a gross amount toward which the CapEx Reimbursement Amount may be applied), which amount shall be increased or decreased with the inclusion or removal of Leased Properties from the Leases, in proportion with the EBITDAR of any new or sold Leased Property versus the EBITDAR of all the Leased Properties (such amount, as adjusted, the "Minimum CapEx Amount"). If Tenant does not spend the full amount of the Minimum CapEx Amount as required under the Leases, Landlord shall have the right to seek the remedy of specific performance to require Tenant to spend any such unspent amount.

Propco shall have the right to designate an observer on the Opco Board in accordance with the Summary Term Sheet for Proposed Restructuring, which observer shall have the opportunity to participate in all discussions and meetings of the Board and applicable committee regarding capital expenditures, budgeting, planning and construction of capital improvements for the (existing and new) Facilities and to receive all materials given to committee members in connection with such matters.

7

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 358 of 539 PageID #:1317

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 71 of 183

| | |
|---|---|
| | Tenant shall be permitted to make any alterations and improvements (including Material Alterations (defined below)) to the Facilities in its reasonable discretion; provided, however, that (i) all alterations must be of equal or better quality than the applicable existing Facility, as applicable, (ii) any such alterations do not have an adverse effect on the structural integrity of any portion of the Leased Properties, and (iii) any such alterations would not otherwise result in a diminution of value to any Leased Properties. If any alteration does not meet the standards of (i), (ii) and (iii) above, then such alteration shall be subject to Landlord's approval. "Material Alteration" shall mean Tenant elects to (i) materially alter a Facility, (ii) expand a Facility, or (iii) develop the undeveloped land leased pursuant to the Lease, and, in each case, the cost of such activity exceeds $50,000,000. The Minimum CapEx Amount shall not include the cost of Material Alterations. |
| Material Alterations; Growth Capex; Development of Undeveloped Land | In the event Tenant is going to perform any Material Alteration, Tenant shall notify Landlord of such Material Alteration. Within 30 days of receipt of a notification of a Material Alteration, Landlord shall notify Tenant as to whether it will fund all or a portion of such proposed Material Alteration and, if so, the terms and conditions upon which it would do so. Tenant shall have 10 days to accept or reject Landlord's funding proposal. If Landlord declines to fund a proposed Material Alteration, Tenant shall be permitted to secure outside financing or utilize then existing available financing for a 9-month period, after which 9-month period, if Tenant has not secured outside or then-existing available financing, Tenant shall again be required to first seek funding from Landlord.

If Landlord agrees to fund the Material Alteration and Tenant rejects the terms thereof, Tenant shall be permitted to either use then existing available financing or seek outside financing for a 9-month period for such Material Alteration, in each case on terms that are economically more advantageous to Tenant than offered under Landlord's funding proposal, and if Tenant elects to utilize economically more advantageous financing it shall provide Landlord with reasonable evidence of the terms of such financing. Prior to any advance of funds (if applicable), Tenant and Landlord shall enter into the agreements necessary to effectuate the applicable terms of Landlord financing (including, without limitation, an amendment to the Lease if financing is structured as a Rent increase).

If Tenant constructs a Material Alteration with its then existing available financing or outside financing, (i) during the Term, such Material Alteration shall be deemed part of the Leased Property solely for the purpose of calculating Percentage Rent and shall for all other purposes be Tenant's property and (ii) following expiration or termination of the Term, such Material Alteration shall be Tenant's property but Landlord shall have the option to purchase such property for fair market value. If Landlord does not elect to purchase such Material Alteration, Tenant shall, at its option, either remove the Material Alteration from the Leased Property and restore the Leased Property to the condition existing prior to such Material Alteration being constructed, at its sole cost and expense and prior to expiration or earlier termination of the Term, or leave the Material Alteration at the Leased Property at the expiration or earlier termination of the Term, at no |

8

| | |
|---|---|
| | cost to Landlord.  If Landlord elects to purchase the Material Alteration, any amount due to Tenant for the purchase shall be credited against any amounts owed by Tenant to Landlord under the applicable Lease (including damages, if any, in connection with the termination of such Lease).  If Landlord agrees to fund a proposed Material Alteration and Tenant accepts the terms thereof, such Material Alteration shall be deemed part of the Leased Property for all purposes. |
| Right of First Refusal | <u>Tenant's Right of First Refusal</u>: <br><br> Prior to consummating a transaction whereby Landlord or any of its affiliates (provided, however, that this provision will not apply if the MLSA has been terminated by Landlord or CEC (or an affiliate thereof) is otherwise no longer responsible for management of the Facilities with the written consent of Landlord ) will own, operate or develop a domestic (U.S.) gaming facility outside of Las Vegas, Nevada (either existing prior to such date or to be developed) that is not then subject to a pre-existing lease or management agreement in favor a third-party operator that was not entered into in contemplation of such acquisition or development, Landlord shall notify Tenant and CEC of the subject opportunity.  CEC (or its designee) shall have the right to lease (and Manager manage) such facility, and if such right is exercised Landlord and CEC (or its designee) will structure such transaction in a manner that allows the subject property to be owned by Landlord and leased to CEC (or its designee).  In such event, CEC (or its designee) shall enter into a lease with respect to the additional property whereby (i) rent thereunder shall be established based on formulas consistent with the EBITDAR coverage ratio with respect to the Lease then in effect (the "Allocated Rent Amount") and (ii) such other terms that CEC (or its designee) and Landlord agree upon shall be incorporated.  In the event that the foregoing right is not exercised by CEC (or its designee), Landlord (or an affiliate thereof) shall have the right to consummate the subject transaction without Tenant's and/or CEC's involvement, provided the same is on terms no more favorable to the counterparty than those presented to Tenant for consummating such transaction. <br><br> The mechanics and timing of applicable notices in respect of, and the exercise of, Tenant's ROFR will be more particularly set forth in the Lease. <br><br> <u>Landlord's Right of First Refusal</u>: <br><br> Prior to consummating a transaction whereby Tenant or any of its affiliates (including CEC or any of its affiliates) (provided, however, that this provision will not apply if the MLSA has been terminated by Propco or, with Propco's consent, CEC (or an affiliate thereof) is otherwise no longer managing the Facilities) will own, operate or develop a domestic (U.S.) gaming facility outside of Las Vegas, Nevada (either existing prior to such date or to be developed) that is not subject to a lease or management agreement in favor a third-party operator that was not entered into in contemplation of such acquisition or development, Tenant shall notify Landlord of the subject opportunity.  Landlord shall have the right to own |

9

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 360 of 539 PageID #:1319

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 73 of 183

|  | such facility and lease it to Tenant, and if Landlord exercises such right then Tenant and Landlord will structure such transaction in a manner that allows the subject property to be owned by Landlord and leased to Tenant (and be managed by Manager).  In such event, Tenant and Landlord shall amend the Lease by (i) adding the additional property as Leased Property, (ii) increasing Rent by the Allocated Rent Amount with respect to such property and (iii) incorporating such other terms that Tenant and Landlord have agreed to.  In the event that Landlord declines its right to own the facility, Tenant (or an affiliate thereof) shall have the right to consummate the subject transaction without Landlord's involvement, provided the same is on terms no more favorable to the counterparty than those presented to Landlord for consummating such transaction. Further, in the event Landlord declines its right to own such facility, the Lease shall provide for similar terms as those provided in the Penn Gaming lease with respect to any such facilities which are located outside of Las Vegas, Nevada and within the restricted area (as defined in the Penn Gaming lease but reduced to 30 miles) of any existing Non-CPLV Facilities. |
|---|---|
|  | The mechanics and timing of applicable notices in respect of,  and the exercise of, Landlord's ROFR will be more particularly set forth in the Lease. |
| Permitted Use | Tenant shall use the Leased Property for hotel, gaming, entertainment, conference, retail and other uses consistent with its current use, or with prevailing industry use. |
| Landlord Sale of Properties | Landlord may sell, without Tenant consent in each instance, any or all of the Facilities, upon the following terms: (i) the purchaser shall enter into a severance lease with Tenant for the sold Facility(ies) on substantially the same terms as contained in the applicable Lease, with an appropriate rent adjustment; (ii) the applicable Lease shall be modified as necessary to reflect the removal of the applicable Facility(ies), including, without limitation, an adjustment to the Rent thereunder so as to preserve the same economics following the entry into such severance lease; and (iii) CEC and Manager shall enter into a new MLSA with respect to the severance lease on terms substantially similar to CEC's obligations with respect to the MLSA with respect to the Leases.  The Leases shall not be cross-defaulted with any such severance lease. |
|  | Each Lease shall survive any such assignment or transfer by Landlord and the successor Landlord shall become a party thereto. |
|  | If the partnership (as opposed to the spin-off) structure is used, Landlord's right to sell the Facilities as described above shall be subject to compliance with a customary Tax Protection Agreement protecting CEOC from adverse tax consequences resulting from asset sales or repayment of debt below certain thresholds. |
| Assignment by Tenant | Tenant will not have the right to directly assign portions of the Lease, however, the following assignments will be permitted, as well as others of a |

10

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 361 of 539 PageID #:1320

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 74 of 183

similar nature:

1) An assignment to a permitted lender (described in further detail below) for collateral purposes, any assignment to such permitted lender or any other purchaser upon a foreclosure or transaction in lieu of foreclosure, and any assignment to any subsequent purchaser thereafter each shall be permitted; provided, however, that in all such transfers, the foreclosing lender or any purchaser or successor purchaser must keep the MLSA in place unless Landlord has consented (in its sole discretion) to the termination of the MLSA, as more particularly provided in the MLSA term sheet, and if Landlord has so consented to an MLSA termination, the foreclosing lender or any purchaser or successor purchaser shall engage an "acceptable operator" (satisfying parameters to be set forth in the Leases with respect to, among other things, gaming and other appropriate operational experience and qualification) to operate the Facilities.

2) An assignment to an affiliate of Tenant, to CEC or an affiliate of CEC.

3) Any sublease of any portion of the premises, pursuant to a bona-fide third party transaction, so long as Tenant is not released from its obligations under the Lease, and (x) provided all covenants with respect to CEC management continue to be satisfied, and (y) subject to restrictions against transactions designed to avoid payment of Percentage Rent or otherwise to negate requirements or provisions in the CPLV Lease or the Lease; provided, however, the following shall be permitted: (A) any subleases existing as of the effective date of the Lease or CPLV Lease, as applicable, consistent with currently existing arrangements and (B) any affiliate subleases necessary or appropriate for the operation of the Facilities in connection with licensing requirements (e.g., gaming, liquor, etc.).

Additionally, the following transfers of direct and indirect interests in Tenant will be permitted:

1) Transfers of stock in Tenant or its parent(s) on a nationally-recognized exchange; provided, however, in order to be a permitted transfer, in the event of a change of control of CEC, the quality of management must be generally consistent or superior to that which existed immediately prior to the transfer.

2) Reconfiguration of the Board of Directors of Tenant's parent(s) that does not result from a change of control.

3) Transfers of interests in Tenant that do not cause a change in control of Tenant.

In all events, except as expressly provided in the MLSA term sheet, neither Tenant nor the Guarantor under the Guaranty will be released in connection with any such transfer, assignment, sublet or other disposition, whether permitted or restricted.

Notwithstanding anything to the contrary, there shall be no restrictions on direct or indirect transfers in CEC; provided, however, in order to be a

11

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 362 of 539 PageID #:1321

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 75 of 183

| | |
|---|---|
| | permitted transfer, in the event of a change of control of CEC, the quality of management must be generally consistent or superior to that which existed immediately prior to the transfer.<br><br>For purposes hereof, the term "change of control" shall be defined in a manner consistent with Opco debt financing documents. |
| Landlord Financing | Landlord may finance or refinance its interest in any of the Non-CPLV Facilities and CPLV Facility, as applicable ("Landlord Financing"), in its discretion.  Tenant will reasonably cooperate in all Landlord Financings. Tenant will operate (or cause to be operated) the Facilities in compliance with the customary terms of the Landlord Financing documents (including all covenants pertaining to the maintenance of the Facilities, as applicable, funding and maintaining lender required reserves, complying with all cash management requirements of the lender, procuring insurance and providing reporting), pertaining to the Facilities, as applicable, as existing as of the effective date of the Leases and any new or additional terms of any new or modified Landlord Financing made following the effective date of the Leases, in each case provided that such terms are customary and do not (x) materially increase Tenant's obligations under the Leases, or (y) materially diminish Tenant's rights under the Leases (it being acknowledged that Tenant's obligation to fund and maintain customary and reasonable reserves as required by Landlord's lender does not materially increase Tenant's obligations or materially diminish Tenant's rights under the Leases).  The Leases shall be subordinate to all Landlord Financing, provided Landlord shall obtain non-disturbance agreements from its lenders in a form to be reasonably agreed to by the parties. |
| Tenant Financing | Tenant shall be permitted to obtain the financing contemplated by the Restructuring Support Agreement, and any refinancing/replacements thereof, subject to parameters on any financing/refinancing (such as lender qualifications for entitlement to leasehold mortgagee protections) to be set forth in the Leases. The lender (with appropriate qualifications) under such Tenant financing (i) shall be given notice of a default under the Lease, (ii) shall be afforded a right to cure any applicable Tenant default, (iii) shall, upon an early termination or rejection of the Lease, be given the opportunity to enter into a replacement lease (on terms consistent with the Lease) and (iv) shall be afforded other customary leasehold mortgagee protections.<br><br>Such mortgagee protections shall provide that the leases shall survive any debt default by Tenant under such financing and any foreclosure by such lender on Tenant's leasehold interest (provided all curable defaults have been, or upon foreclosure will be, cured), and neither Landlord nor Tenant nor its lenders or assignees shall have termination rights under the Leases in respect thereof (absent an Event of Default under the applicable Lease).<br><br>Upon foreclosure, the foreclosing lender must keep the MLSA in place unless Landlord has consented (in its sole discretion) to the termination of the MLSA, as more particularly provided in the MLSA term sheet, and if Landlord has so consented to an MLSA termination, the foreclosing lender |

KL3 2999942.3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 363 of 539 PageID #:1322

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 76 of 183

| | |
|---|---|
| | shall engage an "acceptable operator" (satisfying parameters to be set forth in the Leases with respect to, among other things, gaming and other appropriate operational experience and qualification) to operate the Facilities. |
| Financial Statements of Tenant | Tenant shall provide to Landlord quarterly and audited annual financial statements (prepared in accordance with applicable securities law requirements, including as to format and timing, and shall consent to the inclusion of such financial statements in all public or private disclosure and offering documents of Propco and the REIT required by applicable law).  In addition, the Tenant under the CPLV Lease shall provide to Landlord such additional customary and reasonable financial information related to CPLV as may be required for the Landlord Financing pertaining to CPLV.<br><br>In addition, Tenant shall provide revenue and capital expenditure reports to Landlord to the extent set forth in the section above titled "Expenses, Maintenance, Repairs and Maintenance Capital Expenditures, Minor Alterations". |
| Casualty | In the event of  any casualty with respect to a Facility, Tenant is obligated to rebuild/restore, and has no right to terminate the Lease, except that, (i) for the CPLV Lease, during the final two years of the Term, in connection with a casualty which costs in excess of 25% of total property fair market value as determined by mutually acceptable architect or contractor, either Landlord or Tenant may terminate the Lease,  (ii) for the Lease, during final two years of the Term, in connection with a casualty for any individual Facility which costs in excess of 25% of total fair market value for such individual Facility as determined by mutually acceptable architect or contractor, either Landlord or Tenant may terminate the Lease as to such individual Facility (in which event the Rent obligations under the Lease in respect of the remaining Facilities shall be proportionately adjusted, based on a mechanic to be set forth in the Leases), and (iii) Tenant shall not have an obligation to rebuild/restore solely to the extent the casualty was uninsured under the insurance policies Tenant is required to keep in place under the Lease or CPLV lease, as applicable. |
| Condemnation | If substantially all of the CPLV Facility is taken, then the CPLV Lease will terminate.  If substantially all of any individual Non-CPLV Facility under the Lease is taken, then the Lease will terminate as to such individual Non-CPLV Facility, and the Rent shall be reduced by the Rent Reduction Amount with respect to the applicable Non-CPLV Facility.  In any such case (when the Lease or CPLV Lease (as applicable) is terminated in whole or in part), the applicable award will be distributed, first to Landlord in payment of the fair market value of Landlord's interest in the applicable Facilities, then to Tenant in payment of the fair market value of the Tenant's property which was so taken, and the balance of the award if any, to Landlord.  In the case of a partial condemnation, the applicable Lease will continue unabated except that Base Rent shall be adjusted in proportion to the portion of the Facility which was taken (based on a mechanic to be set forth in the Leases). |

13

**A0361**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 364 of 539 PageID #:1323

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 77 of 183

| | |
|---|---|
| Events of Default | Standard events of default including failure to pay monetary sums and failure to comply with the covenants set forth in the Lease.  With respect to monetary defaults, Tenant shall be entitled to notice and a 10 day cure period.  With respect to non-monetary defaults, Tenant shall be entitled to notice and, so long as Tenant (i) commences to cure within 30 days after receipt of notice and (ii) continues to diligently cure the applicable default, the applicable non-monetary default shall not become an Event of Default. Landlord will refrain from exercising remedies under the Lease in respect of an Event of Default for the duration of the cure periods furnished to CEC as specifically provided in the MLSA term sheet.

A default under the Lease shall not be a default under the CPLV Lease. With respect to the Lease, (a) during the term of the initial Landlord financing with respect to the Non-CPLV Facilities, a default under the CPLV Lease shall be a default under the Lease, and (b) from and after the replacement of the initial Landlord financing with respect to the Non-CPLV Facilities with replacement financing, a default under the CPLV Lease shall not be a default under the Lease.

Any default by Tenant with respect to a Tenant Financing or Landlord with respect to a Landlord Financing shall not be considered a default under the leases. |
| Remedies upon Event of Default | If Landlord elects to terminate the Lease or CPLV Lease upon an Event of Default by Tenant during the Term (including any Renewal Terms for which Tenant has exercised its renewal option), then Landlord shall be entitled to seek damages with respect to an acceleration of future rents in accordance with applicable law, but in no event shall such damages exceed the difference between (i) the net present value of the Rent for the applicable Leased Properties for the balance of the Initial Term and/or such Renewal Term if exercised (as applicable), minus (ii) the net present value of the fair market rental for the applicable Leased Properties for the balance of the Initial Term and/or such Renewal Term if exercised (as applicable). |
| Alternative Dispute Resolution | The parties will reasonably consider an alternative dispute resolution process as part of the negotiation of the definitive documentation. |
| Effect of Lease Termination: | If the Lease or CPLV Lease is terminated for any reason, at Landlord's option (1) Tenant will cooperate (and shall cause Manager to cooperate) to transfer to a designated successor at fair market value all tangible personal property located at each Facility (as applicable) and used exclusively at such Facility (as applicable); and/or (2) Tenant shall stay in possession and continue to operate the business in the same manner as prior practice (for a period not to exceed 2-years) while the identity of a successor tenant is determined. Any amount due to Tenant hereunder for the purchase of the personal property shall be credited by Landlord against any amounts owed by Tenant to Landlord under the applicable Lease (including damages, if any, in connection with the termination of such Lease).

The foregoing is subject to the express terms of the MLSA in the event of a Non-Consented Lease Termination (as defined in the MLSA term sheet) of |

KL3 2999942.3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 365 of 539 PageID #:1324

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 78 of 183

| | the Lease or CPLV Lease. |
|---|---|
| REIT Provisions | Each lease shall contain certain provisions required to satisfy REIT-related requirements applicable to Landlord, including:<br><br>-Tenant shall not sublet, assign or enter into any management arrangements pursuant to which subtenant rent would be based on net income or profits of the subtenant.<br><br>-Landlord shall have the right to assign the leases to another person (e.g., a taxable REIT subsidiary) in order to maintain landlord's REIT status.<br><br>-Tenant shall be obligated to provide information to Landlord necessary to verify REIT compliance. |
| Regulatory | Landlord and Tenant shall comply with all applicable regulatory requirements.  The Non-CPLV Facilities intended to be demised under the Lease shall be severable into separate leases with respect to any Facility in the event necessary to comply with any applicable licensing or regulatory requirements, pursuant to a mechanism to be set forth in the Lease as agreed between Landlord and Tenant. The resulting severed leases shall be cross-defaulted. If a Facility is so severed, Rent under the initial Lease shall be reduced by the Rent Reduction Adjustment with respect to such Facility, and the Rent under a lease for any such severed Facility shall be equal to such deducted amount. |
| Governing Law | New York, except that the provisions relating to the creation of the leasehold estate and remedies concerning recovery of possession of the leased property shall be governed by the law of the state where the Facility is located. |

15

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 366 of 539 PageID #:1325

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 79 of 183

**EXHIBIT A**

<u>Non-CPLV Facilities</u>

| | | |
|---|---|---|
| **1. Horseshoe Council Bluffs** | Council Bluffs | IA |
| | | |
| **2. Harrah's Council Bluffs** | Council Bluffs | IA |
| | | |
| **3. Harrah's Metropolis** | Metropolis | IL |
| | | |
| **4. Horseshoe Southern Indiana - Vessel** | New Albany and Elizabeth | IN |
| | | |
| **5. Horseshoe Hammond** | Hammond | IN |
| | | |
| **6. Horseshoe Bossier City** | Bossier City | LA |
| | | |
| **7. Harrah's Bossier City (Louisiana Downs)** | Bossier City | LA |
| | | |
| **8. Harrah's North Kansas City** | North Kansas City and Randolph | MO |
| | | |

16

**A0364**

| | | |
|---|---|---|
| **9. Grand Biloxi Casino Hotel (f/k/a Harrah's Gulf Coast) and Biloxi Land Assemblage** | Biloxi | MS |
| **10. Horseshoe Tunica** | Robinsonville | MS |
| **11. Tunica Roadhouse** | Robinsonville | MS |
| **12. Caesars Atlantic City** | Atlantic City and Pleasantville | NJ |
| **13. Bally's Atlantic City and Schiff Parcel** | Atlantic City | NJ |
| **14. Harrah's Lake Tahoe** | Stateline | NV |
| **15. Harvey's Lake Tahoe** | Stateline | NV |
| **16. Harrah's Reno** | Reno | NV |
| **17. Harrah's Joliet (subject to the rights of Des Plaines Development Corporation/ John Q. Hammons)** | Joliet | IL |

17

**A0365**

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 81 of 183

| | | |
|---|---|---|
| **Golf Courses** | | |
| **18. Rio Secco Golf Course** | Henderson | NV |
| | | |
| **19. Cascata Golf Course** | Boulder City | NV |
| | | |
| **20. Grand Bear Golf Course** | Saucier | MS |
| **Racetracks** | | |
| **21. Bluegrass Downs** | Paducah | KY |
| **Miscellaneous** | | |
| **22. Las Vegas Land Assemblage** | Las Vegas | NV |
| | | |
| **23. Harrah's Airplane Hangar** | Las Vegas | NV |

18

**A0366**

**EXHIBIT B**

<u>CPLV Facilities</u>

| 1. **Caesars Palace** | Las Vegas | NV |
|---|---|---|

KL3 2999942.3

AWP/ACP
12/28/14 Draft

## SUMMARY OF TERMS

### Management and Lease Support Agreement ("MLSA")[1]

### between CEC, Manager, Landlord and Tenant
### in connection with the Leases
### (all as hereinafter defined)

| | |
|---|---|
| **CEC:** | Caesars Entertainment Corporation, a Delaware corporation |
| **Manager:** | A wholly-owned subsidiary of CEC, as manager of the Facilities under the MLSA[2] |
| **Landlord:** | [Propco] collectively together with its subsidiaries that own the Facilities (as defined in the Leases), as landlord under the Leases, as more particularly described in the "Lease Term Sheet" |
| **Tenant:** | [Opco/CEOC] collectively together with certain of its subsidiaries, as tenant under the Leases, as more particularly described in the "Lease Term Sheet" |
| **Leases:** | (1) A certain lease of various facilities (other than Caesars Palace Las Vegas) between Landlord and Tenant and (2) a certain lease of Caesars Palace Las Vegas between Landlord and Tenant, as |

---

[1] MLSA to consist of the two separate agreements on same terms to correspond to the two separate leases. Agreements to have same terms other than as specified herein. In connection with the incorporation of the CEC guaranty into the MLSA rather than its being a stand-alone instrument, the definitive deal documentation will provide that a termination of the MLSA by Tenant or Manager (including in the case of a rejection in bankruptcy) will not, subject to the 3rd and 4th Bullet Points of "CEC Guaranty" and subject to footnote 5 below, result in termination of CEC's guaranty obligations under the MLSA.

[2] Notwithstanding anything set forth in this MLSA Term Sheet or in the RSA Term Sheet, the Lease Term Sheet or the Debt Term Sheets, it is understood and agreed that all assets (other than the real property transferred to Propco upon the formation of the REIT structure) required to operate the properties consistent with current practice (the "Facility Management Assets"), shall be transferred to an entity (the "Facility Management Assets Owner") so as to be made continuously available to Manager through a mutually agreeable bankruptcy remote structure that shall remove the risk of lack of access in all events (it being understood that the structures to be considered include the Facility Management Assets Owner being owned by Manager and/or Landlord).

| | |
|---|---|
| | more particularly described in the "Lease Term Sheet" |
| **Term:** | The MLSA commences on the date the Leases commence. The MLSA automatically terminates, but may be replaced in accordance with the provisions described below, with respect to any Facility if such Facility is no longer demised under a Lease. The Term of the MLSA expires with respect to each Lease upon the earlier to occur of (1) the date that none of the Facilities are demised under such Lease, (2) Tenant and Landlord terminate the MLSA with respect to such Lease, (3) termination in connection with a Tenant Foreclosure (pursuant to option 1 in the following section) and (4) the termination of such Lease (pursuant to the third Bullet Point in "CEC Guaranty" below).<br><br>Notwithstanding any such termination of the MLSA, in the event of a Non-Consented Lease Termination (as defined below), the following shall occur (unless expressly elected not to occur by Landlord in accordance with the 4th Bullet Point of "CEC Guaranty"): (i) the Lease and the MLSA shall be replaced on the same terms as previously existed and (ii) the management rights and obligations of Manager shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty" and the guaranty obligations of CEC shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty."[3] |
| **Tenant Foreclosure:** | If Tenant's lender (or any lender, if more than one) has a valid lien on the leasehold estate under the Leases or on the direct or indirect equity in the Tenant, whether by mortgage, equity pledge or otherwise, and duly forecloses on such lien following an Event of Default under Tenant's financing (and/or in connection with any pursuit of remedies in a bankruptcy proceeding), such lender (the "*OpCo Lenders*") shall, in connection with and as a condition to effectuating such Tenant Foreclosure (and/or pursuit of remedies in any proceeding), |

[3] Notwithstanding anything contained in the section titled "Term" or otherwise in this MLSA Term Sheet, unless the Landlord shall have terminated the Lease or the MLSA expressly in writing (or expressly consented in writing to such termination), the CEC guaranty obligations shall, subject to the 3rd and 4th Bullet Points of "CEC Guaranty" and subject to footnote 5 below, continue in effect. Each of the Lease and the MLSA shall contain a provision stating that each document is being entered into as part of an overall integrated transaction and that the parties would not be entering into one document without the other. Further, the parties will acknowledge that in a chapter 11 case, they would not reject one agreement without rejecting the other as if they were one agreement and not separable.

2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 372 of 539 PageID #:1331

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 85 of 183

| | |
|---|---|
| | irrevocably elect one of the following: (1) with the consent of Landlord (in its sole and absolute discretion) and Manager, to terminate the MLSA and, in connection with such termination, directly operate the Facilities pursuant to the terms of the Leases, or obtain a replacement operator to operate the Facilities or (2) to retain Manager as operator of the Facilities pursuant to the terms of the MLSA and keep the MLSA in full force and effect in accordance with its terms.  The Opco Lenders will enter into an agreement (the "**_Consent Agreement_**") with Landlord, CEC and Manager to effect the consent rights hereunder (with it being understood that any rejection of a Lease in bankruptcy will be treated as a Non-Consented Lease Termination unless in connection therewith (x) Landlord terminates the Manager under the MLSA or (y) Landlord consents to the termination of the MLSA (in its sole and absolute discretion)). <br><br> In the event of a Non-Consented Lease Termination, the following shall occur (unless expressly elected not to occur by Landlord in accordance with the 4th Bullet Point of "CEC Guaranty"): (i) the Lease and the MLSA shall be replaced on the same terms as previously existed and (ii) the management rights and obligations of Manager shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty" and the guaranty obligations of CEC shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty". |
| **REIT Management:** | The terms of the MLSA shall be reasonably acceptable to the parties thereto and shall include, inter alia, the following terms: <br><br> • Operations management provisions pursuant to which Manager will manage the Facilities in its business judgment on reasonable and customary terms to be more fully set forth in the MLSA and, in any event, on terms no less favorable to Tenant than current practice. <br> • All direct expenses for operating the Facilities will be reimbursed by Tenant (including, without limitation, fees and expenses allocated to Manager and/or Tenant for the Facilities under arrangements with Caesars Enterprise Services, LLC ("CES")).  Manager will enter into separate shared services arrangements with CES (and, if necessary, any other applicable affiliates) for access to all of its services (including without limitation use of the Total Rewards® program) for the benefit of the Facilities so that the Facilities can be run consistent with past practice and in the future consistent with all other CEC (or CEC affiliates') directly or indirectly owned or |

| | |
|---|---|
| | managed facilities, without discrimination against the Facilities.[4] <br><br> • All expenses associated with owning and maintaining the Facility Management Assets will be reimbursed by Tenant. <br><br> • Manager may delegate duties under the MLSA to one or more affiliates on customary terms so long as neither Landlord nor Tenant is prejudiced thereby. |
| **CEC Guaranty:** | Pursuant to the MLSA, CEC will guaranty the payment and performance of all monetary obligations of Tenant under the Leases, subject to the following terms: <br><br> • CEC will have no liability with respect to the Leases unless an "Event of Default" is continuing under the Leases. <br><br> • If an "Event of Default" under either of the Leases occurs, CEC shall have no liability with respect to the Leases, unless CEC was given notice of the applicable default of Tenant under the Lease or CPLV Lease, as applicable, and (A) with respect to a monetary default, CEC failed to cure such default on or prior to five (5) business days after Tenant's deadline under the applicable Lease (or, if later, after CEC's receipt of such notice from Landlord) and (B) with respect to a non-monetary default, CEC failed to cure such default on or prior to Tenant's deadline to cure such default under the applicable Lease (or, if later, after CEC's receipt of such notice from Landlord). <br><br> • CEC's and Manager's obligations with respect to each MLSA (including, without limitation, CEC's guaranty obligations with respect to the Lease and the CPLV Lease, as applicable) shall terminate in the event the Lease or CPLV Lease (as applicable) is terminated by Landlord expressly in writing (or with Landlord's express written consent), except to the extent of any accrued and unpaid guaranty obligations through the date of such termination (which shall be immediately due and payable upon demand) and such damages to which Landlord is entitled due to such termination pursuant to the Lease or CPLV Lease, as applicable. In addition, CEC's obligations with respect to each MLSA |

---

[4] In connection with the implementation of definitive transaction documentation, Landlord must understand and approve any fee and expense structure to the extent it impacts Landlord or any of the Facilities.

4

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 374 of 539 PageID #:1333

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 87 of 183

|  | (including, without limitation, CEC's guaranty obligations with respect to the Lease and the CPLV Lease, as applicable) shall terminate in the event that Manager is terminated by Landlord expressly in writing (or by Tenant's lender with Landlord's express written consent, in its sole and absolute discretion) as manager of the Facilities or the CPLV Facility (as applicable)[5]; provided, however, (i) CEC's guaranty obligation shall continue to the extent of any accrued and unpaid guaranty obligations through the date of such termination (which shall be immediately due and payable upon demand) and such damages to which Landlord is entitled due to such termination pursuant to the Lease or the CPLV Lease, as applicable, and (ii) CEC's guaranty obligations shall continue to cover any post-termination management transition period during which Manager continues to act as manager. Except as provided in this Bullet Point, CEC's guaranty obligations under the MLSA shall not terminate for any reason. |
|  | • In the event a Lease is terminated without the express written consent of Landlord including, without limitation, |

---

[5] Each Lease shall provide that Manager may only be terminated as manager of the Facilities or the CPLV Facility by Landlord (or by Tenant's lender with Landlord's express written consent in its sole and absolute discretion) and, in the event of any such termination or otherwise (including in the case of a rejection in bankruptcy), Landlord shall have the sole right to elect to appoint a replacement Manager (and if so elected by Landlord, Tenant (and its successor and assigns, including under the Consent Agreement) shall be deemed to have accepted such appointment and no other right or approval shall be necessary for such appointment to be effective). If Landlord does not elect to appoint Manager (or another CEC affiliate, to be made available by CEC, under the same terms as the MLSA as provided herein) as replacement Manager (unless prevented from making such election by order of a court or other governmental entity, automatic stay or other legal prohibition), Landlord shall be deemed to have terminated Manager with its express written consent. If Landlord is prevented from making such election by order of a court or other governmental entity, automatic stay or other legal prohibition, then Landlord and Tenant (and its successor and assigns, including under the Consent Agreement) shall be deemed to have consented to Manager's continued management of the Facilities notwithstanding the termination of the MLSA until Landlord is no longer prevented from making such election. Each Lease shall further provide that if Manager is terminated as manager of the Facilities or the CPLV Facility other than by Landlord (or by Tenant's lender with Landlord's express written consent in its sole and absolute discretion), then such Lease shall automatically terminate (and such termination shall constitute a Non-Consented Lease Termination).

5

by a rejection in bankruptcy (a "***Non-Consented Lease Termination***"), then the following shall occur (unless Landlord expressly elects in writing that the following shall not occur and expressly consents in writing to the Lease termination) without expense or loss of economic benefit to Landlord: (i) Tenant (or its successors and assigns, including under the Consent Agreement) shall transfer all of its assets (including, without limitation, rights under licenses and with respect to intellectual property) to a replacement entity directly or indirectly owned by CEC or Tenant (or its successors and assigns, including under the Consent Agreement) that will assume the rights and obligations of Tenant under the Lease (the "***Replacement Tenant***"), (ii) a new lease (the "***Replacement Lease***") on terms identical to the Lease so terminated shall be entered into by Landlord with the Replacement Tenant and (iii) to the extent not transferred pursuant to clause (i) above or otherwise provided by Manager, CEC and CES shall replicate all prior arrangements with respect to management, sub-management, licensing, intellectual property and otherwise as necessary to provide for the continued management and operation of the Facilities as existed prior to such termination, and, upon such occurrence (x) CEC, Manager, Replacement Tenant and Landlord shall enter into a new management and lease support agreement on terms identical to the MLSA (and CEC, Manager and its applicable affiliates shall enter into any necessary associated sub-management, licensing and other applicable arrangements) and (y) the management rights and obligations of Manager and guaranty obligations of CEC shall continue with respect to such Replacement Lease as set forth in the MLSA.   The Consent Agreement will provide that Tenant and the OpCo Lenders will act in support of this right. If (1) Landlord has not elected in writing that the foregoing shall not occur and (2) clauses (i), (ii) and (iii) do not occur other than as a direct and proximate result of Landlord's acts or failure to act in accordance with this Bullet Point, then CEC's guaranty shall not terminate. If Landlord elects in writing that the foregoing shall not occur and/or clauses (i), (ii) or (iii) do not occur as a direct and proximate result of Landlord's acts or failure to act in accordance with this Bullet Point, then Landlord shall have been deemed to expressly consent to the termination of the Lease in writing (and CEC's guaranty

6

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 376 of 539 PageID #:1335

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 89 of 183

| | |
|---|---|
| | shall terminate).  Landlord shall have the right of specific performance to compel CEC and/or its affiliates to comply with the foregoing.  In addition, CEC, Manager and Landlord shall have the right of specific performance to compel Tenant (or its successors and assigns, including under the Consent Agreement (which shall contain such remedy)) to comply with the foregoing.  If Tenant (or its successors and assigns, including under the Consent Agreement) do not cooperate with the foregoing, CEC and Manager shall have the right to replicate the structure, including determining the ownership and identity of the Replacement Tenant, without regard to the interests of Tenant or its successors (including the OpCo Lenders). |
| **CEC Covenants:** | The MLSA shall contain customary terms and waivers of all suretyship and other defenses by CEC and will include a covenant by CEC requiring that (a) the sale of assets by CEC be for fair market value consideration, on arm's-length terms and, in the event of sales to affiliates, be subject to (i) confirmation of fair market value by the approval of an independent group of CEC's board of directors and by a fairness opinion from an investment bank reasonably acceptable to Landlord (with an approved list of investment banks to be agreed in the MLSA) and (ii) a right of first refusal in favor of Landlord or its designee and (b) non-cash dividends by CEC be permitted only to the extent such dividends would not reasonably be expected to result in CEC's inability to perform its guaranty obligations under the MLSA. |
| **Integrated Agreement:** | For the avoidance of doubt, each of the provisions constituting the MLSA, including the management obligations of Manager and the guaranty obligations of CEC, are and are intended to be part of a single integrated agreement and shall not be deemed to be separate or severable agreements. |

7

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 377 of 539 PageID #:1336

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A - Restructuring Support Agreement   Page 90 of 183

**Annex III**
**Terms of the Preferred PropCo Equity**

22

**A0375**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 378 of 539 PageID #:1337

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 91 of 183

### Terms of Series A Convertible Preferred Stock

*Description:* Series A Convertible Preferred Stock (the " Series A Preferred Stock").

*Issuer:* CEOC PropCo, a newly created holding company ("PropCo").

*Purchase Price:* $250 million.

*Use of Proceeds:* The proceeds from the Series A Preferred Stock will (i) first be used to reduce the Caesars Palace Las Vegas ("CPLV") secured non-guaranteed financing (the "CPLV Financing") in respect of the portion received by the first lien bondholders, if any, (ii) second, be used to reduce the CPLV financing placed with third party investors, if required, and (iii) third, if the CPLV Financing is sold to the market in full, the proceeds will be used to reduce the second lien debt of PropCo, as outlined in the Plan.

*Issue Amount:* $300 million aggregate initial liquidation preference.

*Initial Liquidation Preference*: $[   ] per share of Series A Preferred Stock.

*Rank:* The Series A Preferred Stock shall rank (i) senior to PropCo's common stock and any other class of preferred stock of PropCo (including with respect to dividend rights and rights upon liquidation), unless otherwise approved in accordance with the voting rights section below and (ii) subordinate to any existing or future indebtedness of PropCo.

*Dividends:* PIK dividend payable quarterly at the rate equal to the Yield (as defined below) as of any record date set for the payment of dividends to the holders of the common stock, provided that the dividend rate for the Series A Preferred Stock shall not be less than 5% per annum. Dividends are payable quarterly or, if more frequent than quarterly, when common stock dividends are paid, and are cumulative and compound based on the original purchase price and previously accumulated dividends.

All accrued and accumulated dividends are prior in preference to any dividend on the common stock and any securities junior to the Series A Preferred Stock, and shall be fully declared and paid before any dividends are declared and paid, or any other distributions or redemptions are made, on the common stock or on any securities junior to the Series A Preferred Stock (other than dividends payable in shares of common stock or repurchases pursuant to binding contractual commitments of common stock held by employees, directors or consultants upon termination of their employment or services).

"Yield" means the quotient resulting from (i) the aggregate amount of dividends declared payable to the holders of the common stock as of the record date for the common stock, if such date is concurrent with the record date for the Series A Preferred Stock, or the most recent record date if any, following the most recent record date for the Series A Preferred Stock if such record date is not concurrent, divided by (ii) the value of the common stock established and disclosed in connection with the Plan of Reorganization.

MKUAN\269894.11 - 12/19/14

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 379 of 539 PageID #:1338

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 92 of 183

*Liquidation Preference:*  Upon the commencement of any liquidation, dissolution or winding up of the affairs of PropCo or bankruptcy reorganization or any other similar event or proceeding, whether voluntary or involuntary, with respect to PropCo (each a "Liquidation Event") or Deemed Liquidation Event (as defined below), each share of Series A Preferred Stock shall be entitled to receive in preference to any distribution to the holders of any common stock or securities junior to the Series A Preferred Stock the sum of (x) the Initial Liquidation Preference per share of Series A Preferred Stock (as adjusted for stock splits, recapitalizations and similar events) plus (y) accrued and unpaid dividends (collectively the "Liquidation Preference"), provided, however, in lieu of receiving the Liquidation Preference, the holders of Series A Preferred Stock may elect to convert their shares of Series A Preferred Stock into common stock immediately prior to (and subject to the consummation of) such Liquidation Event or Deemed Liquidation Event and share in the proceeds and other consideration of the Liquidation Event or Deemed Liquidation Event as common stockholders.

If upon any Liquidation Event or Deemed Liquidation Event, the remaining assets of PropCo are insufficient to pay the Liquidation Preference to which holders of the Series A Preferred Stock are entitled, the holders of the Series A Preferred Stock shall share ratably in any distribution of the remaining assets and funds of PropCo in proportion to the respective Liquidation Preference which would otherwise be payable in respect of the Series A Preferred Stock in the aggregate upon such Liquidation Event or Deemed Liquidation Event if all amounts payable on or with respect to such shares were paid in full, and PropCo shall not make any payments to the holders of common stock or any securities junior to the Series A Preferred Stock.

A "Deemed Liquidation Event" means any of the following (i) the lease of all or substantially all of the assets of PropCo to a party other than OpCo or the sale of all or substantially all of PropCo's assets (in each case whether in one transaction or a series of transactions); (ii) upon an acquisition of PropCo by another person or entity by means of any transaction or series of transactions (including any reorganization, merger, consolidation or share transfer) where the shareholders of the common stock and Series A Preferred Stock of PropCo immediately preceding such transaction own, following such transaction, less than 50% of the voting securities of PropCo; (iii) if any person (including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended and the rules of the SEC thereunder) is or becomes the "beneficial owner" (as determined in accordance with Rule 13d-3 of the Securities Exchange Act of 1934, as amended, except that a person will be deemed to own any securities that such person has a right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 50% or more of the total voting power of all classes of voting stock; (iv) on the first day on which a majority of the members of the board of directors of PropCo does not consist of Continuing Directors (as defined below); and (v) on approval of a plan of liquidation or dissolution.

"Continuing Directors" means (i) individuals who on the date of the original issuance of the Series A Preferred Stock constituted the Board of Directors or (ii) any new directors whose election or nomination was approved by at least a majority of the directors then

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 380 of 539 PageID #:1339

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 93 of 183

still in office who were either directors on the date of the original issuance of the Series A Preferred Stock or whose election or nomination was previously so approved by the shareholders of common stock and Series A Preferred Stock.

*Optional Conversion:*  At any time and from time to time following the issuance date of the Series A Preferred Stock, the holders of Series A Preferred Stock shall have the right to convert all or any portion of the Series A Preferred Stock at such holder's option to a number of shares of common stock equal to (A) the sum of (x) the Initial Liquidation Preference per share of Series A Preferred Stock (as adjusted for stock splits, recapitalizations and similar events) plus (y) any accrued and unpaid dividends (including any amounts paid in shares of common stock), divided by (B) the Conversion Price (as defined below). The Series A Preferred Stock will initially be convertible into [14.2]% of the common stock of PropCo on a fully-diluted basis.

*Conversion Price:*  The Conversion Price shall initially be the price per share of the equity of PropCo as determined in the Plan, subject to adjustment as described below under "Anti-Dilution Protection."

*Optional Redemption at the Option of Holder:*  Commencing on the date that is ten (10) years following the closing date, Holders of the Series A Preferred Stock shall have the right to require PropCo to redeem all or a portion of the Series A Preferred Stock at a per share price equal to the Liquidation Preference.  Holders of the Series A Preferred Stock shall also have the ability to require PropCo to redeem all or a portion of the Series A Preferred Stock at any time at a per share price equal to the Liquidation Preference upon (a) the occurrence of a "Breach" (as defined below) or (b) the effective date of a confirmed plan in a chapter 11 bankruptcy case for PropCo or any similar bankruptcy or insolvency proceeding.  PropCo shall not have any right to require mandatory redemption.

Any:

1. Failure to pay dividends when due;
2. Failure to make any redemption payment or liquidation payment when due;
3. Breaches of any other covenants set forth herein; or
4. Assignment for the benefit of creditors or bankruptcy

shall constitute a "Breach," and the holders of the Series A Preferred Stock shall be entitled to a dividend rate increase by an increment of 2% per annum for all periods of time during which a Breach is continuing.

In the event that at any time and from time to time, a Breach pursuant to clauses 1, 2 or 3 above is not cured within three months of its occurrence, then the majority of the holders of the Series A Preferred Stock shall have the right to designate a party (which party may be a holder of the Series A Preferred Stock) to observe all matters submitted to or considered by the board of directors of PropCo until such time as the event is cured.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 381 of 539 PageID #:1340

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 94 of 183

*Voting and consent rights:*  The holders of the Series A Preferred Stock shall be entitled to vote on an as-converted basis with the holders of PropCo's common stock on all matters submitted to a vote of the holders of common stock.

To the extent that the shares of common stock and/or Series A Preferred Stock held by any holder of Series A Preferred Stock and/or common stock would, on the record date for a vote on matters submitted to the common stock, enable such holder to vote an interest equal to 5% or more of the common stock, such holder shall be entitled to vote an interest equal to 4.99% of the common stock.  Any interests held by such party in excess of 4.99% shall be deemed cast in favor of the vote of the majority.  The foregoing shall not apply to any holder who, on the record date for a vote on matters submitted to the common stock, holds less than 5% of the vote in respect of such matter, and shall only apply to matters submitted to the vote of the common stock, and not matters that the Series A Preferred Stock may vote on as a separate class.

In addition, the following matters require the consent of the majority of the holders of the Series A Preferred Stock, voting as a separate class, and excluding such shares owned by PropCo, OpCo or any subsidiary or other entity controlled by or controlling any such party:

    1.  changes to PropCo's certificate of incorporation or bylaws adversely affecting preferences, rights, privileges or powers of any holder of the Series A Preferred Stock;

    2.  alterations of the rights, preferences or privileges of the Series A Preferred Stock;

    3.  increasing the number of authorized shares of Series A Preferred Stock; or

    4.  creating any new class or series of stock, or any other equity securities, or any other securities convertible into equity securities of PropCo, in each such case having a preference over, or being on a parity with, the Series A Preferred Stock with respect to dividends, liquidation, voting or redemption.

*Anti-Dilution Protection:*  The Series A Preferred Stock will have customary anti-dilution provisions, including in connection with (a) a subdivision or combination of outstanding common stock, reclassification, recapitalization, stock split, dividend or other distribution payable in any form, (b) any Deemed Liquidation Event under clauses (i) through (iv) of such definition, and (c) any consideration in respect of a tender offer or exchange offer for common stock of PropCo or securities junior to the Series A Preferred Stock made by PropCo or any of its subsidiaries.  The Series A Preferred Stock shall be adjusted on a weighted average basis for issuances of common stock (or common stock equivalents, equity securities, or securities/debt convertible into equity securities).

In the event that a shareholder rights plan is in effect, the Series A Preferred Stock will receive upon conversion of such shares, in addition to the common stock of PropCo, rights under the shareholder rights agreement.

MKUAN\269894.11 - 12/19/14

**Annex IV**
**Backstop Commitment Agreement**

Doc#: US1:9650429v62

## BACKSTOP COMMITMENT AGREEMENT

**BACKSTOP COMMITMENT AGREEMENT** (this "Agreement"), dated as of [____], is by and among Caesars Entertainment Operating Company, Inc., a Delaware corporation ("CEOC"), and the investors identified on Schedule I hereto to the extent such parties are not Terminating Preferred Backstop Investors (each, a "Preferred Backstop Investor" and, collectively, the "Preferred Backstop Investors").

## RECITALS

WHEREAS, on [___] (the "Petition Date"), CEOC and certain debtor affiliates (collectively, the "Debtor") anticipate commencing jointly administered proceedings (the "Chapter 11 Proceedings") for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the Bankruptcy Court (as defined in the Restructuring Support Agreement) (and such case, the "Bankruptcy Case");

WHEREAS, in connection with the Chapter 11 Proceedings, the Debtor has engaged in good faith negotiations with certain parties in interest regarding the terms of the Bankruptcy Plan of Reorganization of the Debtor (the "Plan"), which Plan shall be consistent in all material respects with the Restructuring Term Sheet setting forth the principal terms to be included in the Plan and attached as Exhibit A to the Restructuring Support Agreement;

WHEREAS, pursuant to the Plan, CEOC has agreed to cause the formation of Propco (the "Company"), and the Company has agreed to, in each case on the terms and conditions set forth therein, commence a rights offering (the "Rights Offering") whereby holders[1] (each a "Holder" and collectively, the "Holders") of the Senior Secured Notes (as defined below) shall be granted non-transferable rights ("Rights") to purchase up to [___] shares of Preferred Stock (as defined below) issued by the Company in the aggregate at a purchase price of $[__] per share ("Per Share Purchase Price") payable in cash for aggregate proceeds to the Company of $250.0 million pursuant to the Offering Conditions;

WHEREAS, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein and in consideration of the payment of the Commitment Payment (as defined below), the Company is willing to sell, and the Preferred Backstop Investors are willing to purchase, on the Effective Date, the total number of Preferred Stock not purchased by Holders in the Rights Offering (the "Unsubscribed Shares").

---

[1] NTD. To extent Preferred Stock is not 1145 eligible, holders who purchase in the Rights Offering will be required to rep to being one of a QIB, IAI, or a non-U.S. person under Regulation S as the Rights Offering will be a private placement. Subscription forms should include such an investor qualification. Rights to be distributed pro rata among eligible holders.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 384 of 539 PageID #:1343

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 97 of 183

**NOW, THEREFORE,** in consideration of the premises and of the mutual agreements contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

Section 1.    **DEFINITIONS**.

(a)As used in this Agreement, the following terms shall have the following meanings:

"8.5% Notes" means the 8-½% Senior Secured Notes due 2020 in the aggregate principal amount of $1,250,000,000 issued pursuant to that certain Indenture dated as of February 14, 2012 (as modified, supplemented and/or amended and in effect on the date hereof) among Caesars Operating Escrow LLC, Caesars Escrow Corporation, Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

"11.25% Notes" means the 11-¼% Senior Secured Notes due 2017 in the aggregate principal amount of $2,095,000,000 issued pursuant to that certain Indenture dated as of June 10, 2009 (as modified, supplemented and/or amended and in effect on the date hereof, among Harrah's Operating Escrow LLC, Harrah's Escrow Corporation, Harrah's Entertainment, Inc. n/k/a Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

"Addendum" has the meaning assigned to it in Section 10.9.

"Additional 9% Notes" means the 9% Senior Secured Notes due 2020 in the aggregate principal amount of $1,500,000,000 issued pursuant to that certain Indenture dated as of February 15, 2013 (as modified, supplemented and/or amended and in effect on the date hereof) among Caesars Operating Escrow LLC, Caesars Escrow Corporation, Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agreement" has the meaning assigned to it in the preamble hereto.

"Approval Motion" has the meaning assigned to it in Section 5.1.

"Approval Order" has the meaning assigned to it in Section 5.1.

"Assumption Agreement" has the meaning assigned to it in Section 10.9.

"Backstop Commitment" means the commitment of each Preferred Backstop Investor to acquire the number of Preferred Stock equal to the product of (i) each such Preferred Backstop Investor's Backstop Percentage and (ii) the Unsubscribed Shares.

2

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 385 of 539 PageID #:1344

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 98 of 183

"Backstop Percentage" means the percentage set forth opposite the name of such Preferred Backstop Investor under the heading "Backstop Percentage" on Schedule I hereto (as such Schedule I may be updated pursuant to Section 10.9 hereof and/or to reflect the increase or deduction of Backstop Commitments or Default Shares acquired or disposed of pursuant to the last paragraph of Section 8(a) and Section 8(b)(i) and/or to reflect the removal of a potential Preferred Backstop Investor pursuant to the definition of Preferred Backstop Investor).

"Backstop Purchase Price" means, with respect to any Preferred Backstop Investor, such Preferred Backstop Investor's Backstop Percentage of the product of the (i) Per Share Purchase Price and (ii) the Unsubscribed Shares.

"Backstop Shares" has the meaning assigned to it in Section 2.2(a).

"Bankruptcy Case" has the meaning assigned to it in the recitals hereto.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time.

"Bankruptcy Court" has the meaning assigned to it in the recitals hereto.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

"Closing" has the meaning assigned to it in Section 2.2(b).

"Commitment Payment" means for each Preferred Backstop Investor a fee equal to the Commitment Percentage of the product of (i) such Preferred Backstop Investor's Backstop Percentage and (ii) $300 million.

"Commitment Percentage" means 5%, provided such percentage shall increase by an additional 4% for each 240 day period after the Petition Date until the Subscription Commencement Date begins.

"Company" has the meaning assigned to it in the preamble hereto.

"Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider the confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"Confirmation Order" means the Order of the Bankruptcy Court confirming the Plan.

"Contracts" means any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith.

3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 386 of 539 PageID #:1345

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 99 of 183

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs, policies or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract, credit arrangement or otherwise.

"Debtor" has the meaning assigned to it in the recitals hereto.

"Defaulting Preferred Backstop Investor" has the meaning assigned to it in Section 8(b)(i).

"Default Purchase Right" has the meaning assigned to it in Section 8(b)(i).

"Default Shares" has the meaning assigned to it in Section 8(b)(i).

"Effective Date" has the meaning assigned to it in the Plan.

"Encumbrance" means any security interest, pledge, mortgage, lien, claim, option, charge or encumbrance.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder, or any successor statute.

"Exculpated Claims" has the meaning assigned to it in Section 9(b).

"Exculpated Parties" has the meaning assigned to it in Section 9(b).

"Governmental Authority" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court, tribunal, judicial or arbitral body, or any Self-Regulatory Organization.

"Holder" has the meaning assigned to it in the recitals hereto.

"Indemnitees" has the meaning assigned to it in Section 9(a).

"Initial 9% Notes" means the 9% Senior Secured Notes due 2020 in the initial aggregate principal amount of $1,500,000,000 issued pursuant to that certain Indenture dated as of August 22, 2012 (as modified, supplemented and/or amended and in effect on the date hereof) among Caesars Operating Escrow LLC, Caesars Escrow Corporation, Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

"KKWC" has the meaning assigned to it in Section 10.9.

A0384

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 387 of 539 PageID #:1346

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 100 of 183

"Law" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Authority.

"Losses" has the meaning assigned to it in Section 9(a) hereof.

"Milestone" has the meaning assigned to it in Section 5.6.

"Milestone Dates" has the meaning assigned to it in Section 5.6.

"Material Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects, (a) has had or would reasonably be expected to have or result in a material adverse effect or change in the results of operations, properties, assets, liabilities or condition (financial or otherwise) of the applicable Company Party taken as a whole or (b) has or would reasonably be expected to prevent, materially delay or materially impair the ability of the applicable Company Party to consummate the Rights Offering or the applicable Company Party to consummate any of the transactions contemplated hereby.

"Non-Defaulting Preferred Backstop Investors" has the meaning assigned to it in Section 8(b)(i).

"Non-Terminating Preferred Backstop Investors" means any Preferred Backstop Investor that is not a Terminating Preferred Backstop Investor.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final.

"Offering Conditions" means those terms and conditions set forth on Exhibit C.

"Payment Date" has the meaning assigned to it in Section 2.3(a).

"Per Share Purchase Price" has the meaning assigned to it in the recitals hereto.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, joint venture, trust, Governmental Authority, first nation, aboriginal or native group or band, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Exchange Act.

"Plan" has the meaning assigned to it in the recitals hereto.

"Plan Solicitation Order" means an Order entered by the Bankruptcy Court, in form and substance materially consistent with this Agreement and the Restructuring Support Agreement

5

and otherwise reasonably satisfactory to the Preferred Backstop Investors and CEOC, which shall, among other things, approve the disclosure statement relating to the Plan, including the Rights Offering Documents, and set procedures for the solicitation of votes to accept or reject the Plan.

"Preferred Backstop Investor Default" has the meaning assigned to it in Section 8(b)(i).

"Preferred Backstop Investor Material Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects, has or would reasonably be expected to prevent, materially delay or materially impair the ability of the applicable Preferred Backstop Investor to consummate the transactions contemplated hereby.

"Preferred Backstop Investors" means (i) the parties listed on Schedule I hereto who have executed the Restructuring Support Agreement on or prior to December 29, 2014 or their managed funds and accounts[2] and (ii) the parties who have executed the Restructuring Support Agreement on or prior to December 29, 2014, or their managed funds and accounts, who have submitted written notice indicating that they elect to be Preferred Backstop Investors before January 5, 2015, to CEOC with a simultaneous copy to the Preferred Backstop Investors who are currently listed on Schedule I hereto (such parties electing pursuant to clause (ii), the "New Preferred Backstop Investors"). In the case of New Preferred Backstop Investors, the Schedule I of the Backstop Agreement shall be updated to reflect such parties on January 5, 2015. Notwithstanding the foregoing, Schedule I shall be updated pursuant to Section 10.9 hereof, and shall exclude any Terminating Preferred Backstop Investor. For the avoidance of doubt, to the extent that a party no longer has a Backstop Percentage, such party shall no longer be a "Preferred Backstop Investor."

"Preferred Stock" means the Series A Convertible Preferred Stock of the Company, par value $[__] per share, on terms and conditions set forth on the term sheet attached as Exhibit D hereto, as may be supplemented as appropriate, and subject to definitive documentation acceptable to the Required Preferred Backstop Investors, as determined by such Required Preferred Backstop Investors in their reasonable discretion, to be agreed to on or before the Petition Date; provided, however, that any terms affecting the economics of the Preferred Stock, directly or indirectly, as determined by the Required Preferred Backstop Investors, shall be subject to the Required Preferred Backstop Investors' sole discretion.

"Required Preferred Backstop Investors" means, as of any date of determination, the Non-Defaulting Preferred Backstop Investors and Non-Terminating Preferred Backstop Investors holding more than 66-2/3% of the total Backstop Commitment, calculated without regard to the Backstop Commitments held by Defaulting Preferred Backstop Investors and Terminating Preferred Backstop Investors.

---

[2] NTD: parties have the ability to elect on December 29, 2014 to be Preferred Backstop Parties, but are not required to do so.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 389 of 539 PageID #:1348

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 102 of 183

"Restructuring Support Agreement" means that certain Restructuring Plan Support Agreement, made and entered into as of December 19, 2014, by and among the Debtor, Caesars Entertainment Corporation, LeverageSource III (H Holdings), L.P., LeverageSource V, L.P., and the Consenting Creditors (as defined therein).

"Rights" has the meaning assigned to it in the recitals hereto.

"Rights Offering" has the meaning assigned to it in the recitals hereto.

"[Rights Offering Documents]" has the meaning assigned to it in the Plan and shall be approved by the Bankruptcy Court pursuant to the Plan Solicitation Order in form and substance materially consistent with this Agreement and the Restructuring Support Agreement and otherwise reasonably satisfactory to the Preferred Backstop Investors and CEOC.

"Senior Secured Notes" means the (i) 11.25% Notes, (ii) 8.5% Notes, (iii) Initial 9% Notes and (iv) Additional 9% Notes.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder, or any successor statute.

"Self-Regulatory Organization" means any securities exchange, futures exchange, contract market, any other exchange or corporation or similar self-regulatory body or organization applicable to a party to this Agreement.

"Subscription Commencement Date" means the date the Plan Solicitation Package is mailed or distribution is otherwise commenced in accordance with the Plan Solicitation Order.

"Subscription Expiration Date" means _____ [Insert date that is ten days prior to the Voting Deadline and not less than 20 days after the Subscription Commencement Date] or such later date as the Required Preferred Backstop Investors shall agree.

"Subsidiaries" of any Person means any corporation, partnership, joint venture, limited liability company, trust, estate or other Person of which (or in which), directly or indirectly, more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or other Person or (c) the beneficial interest in such trust or estate is at the time owned by such first Person, or by such first Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"Terminating Preferred Backstop Investors" has the meaning assigned in Section 8(a).

"Unsubscribed Shares" has the meaning assigned to it in the recitals hereto.

7

"Voting Deadline" means the date set by the Bankruptcy Court as the deadline for voting to accept or reject the Plan.

Section 2.    **RIGHTS OFFERING; BACKSTOP; COMMITMENT PAYMENT**.

2.1    Rights Offering.

(a) The Company shall make the Rights Offering pursuant to the Plan, which shall be subject to the Offering Conditions and such other terms and conditions set forth in the Rights Offering Documents.

(b)    Ten Business Days prior to the date of the Confirmation Hearing, the Company shall notify the Preferred Backstop Investors of the Rights Offering and the Preferred Backstop Investors shall have the right, but not obligation, upon written notice to the Company to elect to purchase up to 50% of the Preferred Stock issued in the Rights Offering (in addition to each of their rights as a Holder pursuant to the Rights Offering Documents) on the same terms and conditions as the other Holders under the Rights Offering Documents; provided, however, that the Preferred Backstop Investors shall not be required to post funds until the Effective Date. Each Preferred Backstop Investor shall have the right to purchase its pro rata share of such amount, based on its Backstop Percentage and to the extent any Preferred Backstop Investor elects to not purchase its pro rata share, such share(s) shall be made available to the Preferred Backstop Investors that are purchasing their pro rata share.

(c) The Company hereby agrees and undertakes to give, or to cause to be given, to the Preferred Backstop Investors as soon as reasonably practicable, but in no event later than two (2) Business Days, after the entry of the Confirmation Order, by overnight mail, e-mail or by electronic facsimile transmission, (i) written notification setting forth (A) the total number of shares of Preferred Stock purchased by Holders (inclusive of any shares of Preferred Stock purchased pursuant to Section 2.1(b)) in the Rights Offering pursuant to the exercise of Rights and the aggregate cash proceeds received by the Company therefor, (B) the number of Unsubscribed Shares, (C) the Backstop Purchase Price for each Preferred Backstop Investor and (D) the targeted Effective Date and (ii) a subscription form to be completed by each Preferred Backstop Investor to facilitate such Preferred Backstop Investor's subscription for the Preferred Stock purchased pursuant to this Agreement. In addition, on the first Business Day of each calendar week during the period beginning on the Subscription Commencement Date and ending on the Subscription Expiration Date, the Company shall give, or cause to be given, to the Preferred Backstop Investors by overnight mail, e-mail or by electronic facsimile transmission a written notification setting forth the then most current information as to the total amount of Preferred Stock then subscribed for in the Rights Offering, the number of then unsubscribed Preferred Stock, the Backstop Purchase Price for each Preferred Backstop Investor (as if the Rights Offering were to be concluded with the then current amount of subscribed for Preferred Stock) and the targeted Effective Date.

8

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 391 of 539 PageID #:1350

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 104 of 183

2.2     Backstop.

(a) On the terms and subject to the conditions contained herein, and in reliance on the representations and warranties set forth in this Agreement, each of the Preferred Backstop Investors hereby agrees, severally and not jointly, to purchase on the Effective Date, and the Company hereby agrees to sell and issue to each such Preferred Backstop Investor, at the Backstop Purchase Price therefor, its Backstop Percentage of the Unsubscribed Shares, subject to the Offering Conditions. The Preferred Stock which each of the Preferred Backstop Investors purchases pursuant to this Agreement are referred to herein as such Preferred Backstop Investor's "Backstop Shares." For the avoidance of doubt, any shares of Preferred Stock acquired in the Rights Offering pursuant to Section 2.1(b) shall not be deemed Backstop Shares.

(b)     The closing of the purchase and sale of the Backstop Shares hereunder (the "Closing") will occur on the Effective Date contemporaneously with substantial consummation of the Plan. At the Closing, payment for the Backstop Shares that each Preferred Backstop Investor has agreed to purchase shall be effected by each such Preferred Backstop Investor delivering to the Company in immediately available funds its respective Backstop Purchase Price (ii) against delivery by the Company of the Backstop Shares to which such Preferred Backstop Investor is entitled to and delivery to each Preferred Backstop Investor such certificates, documents or instruments required to be delivered by it to such Preferred Backstop Investor pursuant to this Agreement. The agreements, instruments, certificates and other documents to be delivered on the Effective Date by or on behalf of the Company shall be delivered to each applicable Preferred Backstop Investor in accordance with Section 10.3 hereof.

2.3     Commitment Payment.

(a) The Commitment Payment shall be earned upon the entry of the Approval Order and shall be payable, with respect to a Preferred Backstop Investor, upon the earlier of (x) the Effective Date of the Plan and (y) two Business Days after the termination of this Agreement by or with respect to such Preferred Backstop Investor, provided that the Commitment Payment, with respect to a Preferred Backstop Investor, shall not be required to be paid to a particular Preferred Backstop Investor to the extent that such termination of this Agreement with respect to such Preferred Backstop Investor has occurred due to a breach of this Agreement by such Preferred Backstop Investor, to the extent such breach has been determined as solely caused by the Preferred Backstop Investor by a final, non-appealable order entered by a court of competent jurisdiction (such date, the "Payment Date").

(b)     On the Payment Date, CEOC shall pay to each Preferred Backstop Investor, by wire transfer in immediately available funds to an account specified by such Preferred Backstop Investor to CEOC not less than one (1) day prior to the Payment Date, such Preferred Backstop Investor's pro rata portion of the Commitment Payment based on

9

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 392 of 539 PageID #:1351

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 105 of 183

such Preferred Backstop Investor's Backstop Percentage (which percentage, for the avoidance of doubt, shall be adjusted pursuant to the definition of Backstop Percentage).

(c)    The provisions for the payment of the Commitment Payment and the other provisions provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Preferred Backstop Investors would not have entered into this Agreement, and the Commitment Payment shall, pursuant to the Approval Order, constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code.

Section 3.    **REPRESENTATIONS AND WARRANTIES OF THE COMPANY and CEOC**.  Each of the Company and CEOC (the "Company Parties") hereby represents and warrants, severally and not jointly, to each of the Preferred Backstop Investors as of the date hereof and as of the Effective Date (except for representations and warranties that are made as of a specific date, which are made only as of such date), on behalf of itself and not any other party, as follows:

3.1    Organization and Qualification; Subsidiaries.    Each Company Party and its Subsidiaries has been duly organized and is validly existing and is in good standing under the laws of their respective jurisdictions of organization, with the requisite power and authority to own its properties and conduct its business as currently conducted.

3.2    Authorization; Enforcement; Validity.    Subject only to Bankruptcy Court approval, each Company Party has all necessary corporate power and authority to enter into this Agreement and to carry out its obligations hereunder (including, without limitation (a) the issuance of the Backstop Shares and (b) the payment of the Commitment Payment) in accordance with the terms hereof.  The execution and delivery by each Company Party of this Agreement, the performance by each of the Company and CEOC of its obligations hereunder (including, without limitation, (x) the issuance of the Backstop Shares and (y) the payment of the Commitment Payment), have been duly authorized by all requisite action on the part of such Company Party, and no other action on the part of the Company Party is necessary to authorize the execution and delivery by the Company Party of this Agreement or the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by the Company Party, and assuming due authorization, execution and delivery by the other parties hereto and subject to Bankruptcy Court approval, this Agreement constitutes the legal, valid and binding obligation of the Company Party, enforceable against the Company Party in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

3.3    No Conflicts.    Assuming that all consents, approvals, authorizations and other actions described in Section 3.4 have been obtained, and except as may result from any facts or circumstances relating solely to any of the Preferred Backstop Investors, the execution, delivery and performance by the Company Party of this Agreement and the consummation of the transactions contemplated hereby (including, without limitation, (x) the issuance of the Backstop

10

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 393 of 539 PageID #:1352

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 106 of 183

Shares and (y) the payment of the Commitment Payment) do not and will not: (a) violate, conflict with or result in the breach of the certificate of incorporation, articles of incorporation, bylaws, certificate of formation, operating agreement, limited liability company agreement or similar formation or organizational documents of the Company Party or any of its Subsidiaries; (b) conflict with or violate any Law or Order applicable to the Company or any of its respective assets or properties; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Company Party or its Subsidiaries is a party or to which any of their respective assets or properties are subject, or result in the creation of any Encumbrance on any of their respective assets or properties, except, in the case of clauses (b) and (c), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.4    <u>Consents and Approvals</u>.    The execution, delivery and performance by the Company Party of this Agreement do not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law or Order applicable to the Company Party or any of its Subsidiaries or by which any of their respective assets or properties may be bound, any Contract to which the Company Party or any of its Subsidiaries is a party or by which the Company Party or any of its Subsidiaries may be bound, except the entry of the Approval Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the fourteen (14) day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable.

Section 4.    **REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP INVESTORS**.    Each Preferred Backstop Investor represents and warrants, severally and not jointly, to the Company Parties as of the date hereof and as of the Effective Date (except for representations and warranties that are made as of a specific date, which are made only as of such date), as follows:

4.1    <u>Authorization; Enforcement; Validity</u>.    Such Preferred Backstop Investor has all necessary corporate, limited liability company or equivalent power and authority to enter into this Agreement and to carry out, or cause to be carried out, its obligations hereunder in accordance with the terms hereof. The execution and delivery by such Preferred Backstop Investor of this Agreement and the performance by such Preferred Backstop Investor of its obligations hereunder have been duly authorized by all requisite action on the part of such Preferred Backstop Investor, and no other action on the part of such Preferred Backstop Investor is necessary to authorize the execution and delivery by such Preferred Backstop Investor of this Agreement or the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by such Preferred Backstop Investor, and assuming due authorization, execution and delivery by the other parties hereto, this Agreement

11

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 394 of 539 PageID #:1353

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 107 of 183

constitutes the legal, valid and binding obligation of such Preferred Backstop Investor, enforceable against such Preferred Backstop Investor in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

4.2    No Conflicts.    The execution, delivery, and performance by such Preferred Backstop Investor of this Agreement do not and will not (a) violate any provision of the organizational documents of such Preferred Backstop Investor; (b) conflict with or violate any Law or Order applicable to such Preferred Backstop Investor or any of its respective assets or properties; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which such Preferred Backstop Investor is a party or to which any of its assets or properties are subject, or result in the creation of any Encumbrance on any of its assets or properties, except, in the case of clauses (b) and (c), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Preferred Backstop Investor Material Adverse Effect on such Preferred Backstop Investor.

4.3    Consents and Approvals.    No consent, approval, order, authorization, registration or qualification of or with any court or Governmental Authority or body having jurisdiction over such Preferred Backstop Investor is required in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for any consent, approval, order or authorization required under the Bankruptcy Code.

4.4    Investor Representation.    (i) It is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) an institutional accredited investor as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act, (C) a non-U.S. person under Regulation S under the Securities Act, or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of the Company acquired by the applicable Preferred Backstop Investor in connection with this Agreement will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

Section 5.    **ADDITIONAL COVENANTS**.

5.1    Approval Motion and Approval Order.    CEOC agrees to file a motion and supporting papers (the "Approval Motion") (including an order in form and substance materially consistent with this Agreement and otherwise reasonably satisfactory to CEOC and the Required Preferred Backstop Investors) seeking an order of the Bankruptcy Court (the "Approval Order") approving this Agreement.

5.2    Commercially Reasonable Efforts.    CEOC agrees to use its commercially reasonable efforts to timely satisfy (if applicable) each of the conditions under Sections 6 and 7 of this Agreement.

12

**A0392**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 395 of 539 PageID #:1354

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 108 of 183

5.3    <u>Further Assurances</u>.    Each party hereto, without expanding such party's obligations under the Restructuring Support Agreement other than as specifically contemplated hereby, shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party hereto may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby, in each case at the cost of CEOC.

5.4    <u>Use of Proceeds</u>. The Company shall use the net proceeds from the sale of Preferred Stock issued pursuant to the Rights Offering solely as provided in the Plan.

5.5    <u>Milestones</u>.  CEOC shall use its reasonable best efforts to cause the following actions (each, individually a "<u>Milestone</u>" and collectively, the "<u>Milestones</u>") to occur on or before the dates specified below (such corresponding date, the "<u>Milestone Date</u>");

(a)    The motion for the Approval Order shall have been filed no later than 45 days from the Petition Date and the Approval Order shall have been entered by the Bankruptcy Court by no later than 150 days from the date of the filing of such motion;

(b)    the Plan Solicitation Order shall have been entered by the Bankruptcy Court by no later than 150 days from the Petition Date;

(c)    the Confirmation Order shall have been entered by the Bankruptcy Court by no later than 120 days from the date of entry of the Plan Solicitation Order;

(d)    the Company shall file a registration statement under the Securities Exchange Act of 1933, as amended, (the "Registration Statement") registering the Preferred Stock as soon as practicable following the effective date of the Plan and in any event within 75 days thereafter, and shall cause the Registration Statement to be effective as soon as practicable thereafter;

(e) the Subscription Expiration Date shall have occurred by no later than [240 days after the Petition Date]; and

(f) the Effective Date shall have occurred by no later than [180 days from the date the Confirmation Order becomes a final order].

Section 6.    **CONDITIONS    TO    THE    BACKSTOP    INVESTORS' OBLIGATIONS**.  The obligations of each of the Preferred Backstop Investors to purchase the Backstop Shares pursuant to this Agreement on the Effective Date shall be subject to the satisfaction at or prior to the Effective Date of each of the following conditions, any one or more of which may be waived in writing by the Required Preferred Backstop Investors:

6.1    <u>Representations and Warranties</u>.    (a) All of the representations and warranties made by the Company Parties in this Agreement shall be true and correct in all material respects

13

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 396 of 539 PageID #:1355

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 109 of 183

as of the Effective Date as though made at and as of the Effective Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); (b) the Company Parties shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by the Company Parties on or prior to the Effective Date or such earlier date as may be applicable; and (c) with respect to clauses (a) and (b), at the Closing there shall be delivered to the Preferred Backstop Investors a certificate signed by a duly authorized representative of the Company to the foregoing effect.

6.2    <u>Approval Order</u>.  The Approval Order shall have been entered by the Bankruptcy Court.

6.3    <u>Confirmation Order</u>.  The Confirmation Order shall have been entered by the Bankruptcy Court, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacatur, in whole or in part, of the Confirmation Order.

6.4    <u>Plan and Rights Offering Documents</u>.  (i) Each of the Plan (and the exhibits thereto) and the Confirmation Order, with respect to provisions that could affect the economic interests of the Preferred Backstop Investors or that could be adverse to any of the Preferred Backstop Investors, shall not be inconsistent with this Agreement and the Restructuring Support Agreement, and shall be in form and substance reasonably acceptable to the Required Preferred Backstop Investors, and (ii) the Rights Offering Documents, which shall include the Offering Conditions, shall be in form and substance materially consistent with this Agreement and the Restructuring Support Agreement and otherwise reasonably acceptable to the Required Preferred Backstop Investors and CEOC.

6.5    <u>Conditions to Confirmation</u>.  Each of the conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date shall have been satisfied or waived in accordance with the Plan.

6.6    <u>Rights Offering</u>.  The Subscription Expiration Date shall have occurred.

6.7    <u>Payment of Amounts</u>.  The Company shall have paid each Preferred Backstop Investor such Preferred Backstop Investor's pro rata portion of the Commitment Payment in accordance with the terms of this Agreement.

Section 7.    **CONDITIONS TO THE COMPANY'S OBLIGATIONS**.    The obligations of the Company to issue and sell the Backstop Shares to each of the Preferred Backstop Investors pursuant to this Agreement shall be subject to the satisfaction at or prior to the Effective Date of each of the following conditions, any one or more of which may be waived in writing by CEOC or the Company:

7.1    <u>Representations and Warranties</u>.  (a) All of the representations and warranties made by each Preferred Backstop Investor in this Agreement shall be true and correct in all

14

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 397 of 539 PageID #:1356

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 110 of 183

material respects as of the date hereof and as of the Effective Date as though made at and as of the Effective Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date), except to the extent that the breach of any such representation or warranty would not reasonably be expected to have a Preferred Backstop Investor Material Adverse Effect on such Preferred Backstop Investor and (b) each Preferred Backstop Investor shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by such Preferred Backstop Investor on or prior to the Effective Date.

7.2   Approval Order.  The Approval Order shall have been entered by the Bankruptcy Court.

7.3   Confirmation Order.  The Confirmation Order shall have been entered by the Bankruptcy Court, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacatur, in whole or in part, of the Confirmation Order.

7.4   Conditions to Confirmation.  Each of the conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date shall have been satisfied in accordance with the Plan.

7.5   Rights Offering.  The Subscription Expiration Date shall have occurred

7.6   Backstop Subscription Forms.  CEOC and the Company shall have received a duly executed subscription form from each Preferred Backstop Investor in accordance with Section 2.1(b).

Section 8.   **TERMINATION**.

(a)   Termination by the Preferred Backstop Investors.  This Agreement may be terminated at any time by any Preferred Backstop Investor with respect to itself (and not with respect to any other Preferred Backstop Investor):

(i)   upon the failure of any of the conditions set forth in Section 6 hereof to be satisfied, which failure cannot be cured or is not cured within [10] days of written notice to the Company and CEOC by such Preferred Backstop Investor;

(ii)   if any of the Company Parties alters, amends or modifies any term of this Agreement without the consent of the Required Preferred Backstop Investor, or if any alteration, amendment or modification is adverse to any Preferred Backstop Investor, without the consent of each Preferred Backstop Investor;

(iii)   if any of the Company Parties breaches any representation or warranty or breaches any covenant applicable to it in any material respect under this Agreement

15

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 398 of 539 PageID #:1357

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 111 of 183

and if such breach is curable, it is not cured within [10] days of written notice to the applicable Company Party by such Preferred Backstop Investor;

(iv)      if any of the Milestones shall not have occurred on or prior to the applicable Milestone Date; or

(v)      upon the occurrence of any matters set forth in any of [clauses (a) through (k) of Section 8] of the Restructuring Support Agreement and/or a Company Termination Event (as defined in the Restructuring Support Agreement) and/or a termination of the Restructuring Support Agreement;

provided that, in the event any Preferred Backstop Investor elects to terminate this Agreement (each, a "Terminating Preferred Backstop Investor"), the Backstop Commitments allocated to such Terminating Preferred Backstop Investor shall be allocated to all Non-Defaulting Preferred Backstop Investors who elect to acquire such Backstop Commitments on a pro rata basis (based on the Backstop Percentages of such electing Non-Defaulting Preferred Backstop Investors), and provided further that in the event no Non-Defaulting Preferred Backstop Investor elects to acquire the Backstop Commitments of the Terminating Preferred Backstop Investors, this Agreement shall terminate.

(b)      Termination by the Company.

(i)      (A) upon termination of the Restructuring Support Agreement, the Company may terminate this Agreement by written notice to the Preferred Backstop Investors or (B) if any Preferred Backstop Investor breaches this Agreement in a manner that causes a Preferred Backstop Investor Material Adverse Effect with respect to such Preferred Backstop Investor, and if such breach is curable, is not cured within five (5) Business Days after receipt of written notice from the Company to such Preferred Backstop Investor (each, a "Preferred Backstop Investor Default" and any such defaulting Preferred Backstop Investor, a "Defaulting Preferred Backstop Investor"), then following the expiration of the five (5) Business Day notice period, the Company shall follow the procedures set forth in clause (ii) below and each of the other Preferred Backstop Investors (the "Non-Defaulting Preferred Backstop Investors") shall have the right (the "Default Purchase Right") but not the obligation, to purchase on the Effective Date all or a portion of the Backstop Shares that were to be purchased by the Defaulting Preferred Backstop Investor (the "Default Shares") at a price per share equal to the Per Share Purchase Price.  To the extent that the Non-Defaulting Preferred Backstop Investors (in the aggregate) desire to purchase more than the total number of Default Shares, such Default Shares shall be allocated between the Non-Defaulting Preferred Backstop Investors pro rata, based on their respective Backstop Percentages.

(ii)      As soon as practicable after a Preferred Backstop Investor Default, but in no event later than three (3) Business Days following the Company or CEOC becoming aware of such Preferred Backstop Investor Default, the Company or CEOC shall send a written notice (in accordance with the notice provisions set forth in Section 10.3) to each Non-Defaulting Preferred Backstop Investor, specifying the number of Default Shares.  The

16

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 399 of 539 PageID #:1358

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 112 of 183

Non-Defaulting Preferred Backstop Investors shall have five (5) Business Days from receipt of such notice to elect to exercise the Default Purchase Right by notifying the Company and CEOC in writing of its or their election to purchase all or a portion of the Default Shares then available as a result of the Preferred Backstop Investor Default or find a third-party reasonably satisfactory to the Non-Defaulting Preferred Backstop Investors to replace the commitment of the Defaulting Preferred Backstop Investor.  If at the conclusion of such five (5) Business Day period, the Non-Defaulting Preferred Backstop Investors have not elected to exercise the Default Purchase Right in its entirety or have not found a third-party to replace the commitment of the Defaulting Backstop Purchaser, then the Company or CEOC may terminate this Agreement.

(iii)      Notwithstanding anything to the contrary in this Section 8(b), in addition to any liability to the Company or CEOC, the parties agree that any Defaulting Preferred Backstop Investor will be liable to the Non-Defaulting Preferred Backstop Investors for the consequences to the Non-Defaulting Preferred Backstop Investors of its breach and that the Non-Defaulting Backstop Purchasers can enforce rights of damages and/or specific performance pursuant to Section 10.18 immediately upon the expiration of the original five (5) Business Day notice period set forth Section 8(b)(i).

(c)Mutual Termination.  This Agreement may be terminated by the mutual written consent of CEOC and the Preferred Backstop Investors representing more than 75% of the aggregate Backstop Percentage.

(d)      Effect of Termination.  If this Agreement is terminated pursuant to this Section 8, subject to the last paragraph of Section 8(a), the obligations of such parties contained in Sections 2.3, 9, 10.2 through 10.19 and this Section 8 shall survive any such termination.

Section 9.      **PROTECTION OF COMMITMENT PAYMENT**.

Both of the Company and CEOC shall jointly and severally indemnify, save and hold harmless each Preferred Backstop Investor, and each of their respective directors, officers, stockholders, employees, partners, members, managers, representatives, attorneys, other professional advisors and agents and all of their respective heirs, successors, legal administrators, permitted assigns and designees, and each Person who (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) controls any of the Preferred Backstop Investors and the officers, directors, agents and employees of any such controlling Person (collectively, the "Covered Persons") from and against all losses, claims, damages, liabilities, costs (including, without limitation, the costs of investigation and reasonable attorneys' fees) and expenses, as incurred by any or all of the Covered Persons in connection with any direct claim or claim against them by a third party for avoidance of or otherwise in connection with or arising from the payment of the Commitment Payment; provided that neither the Company nor CEOC shall have any obligation to indemnify or save and hold harmless any Covered Person (i) for any claim or expense that is judicially determined (the determination having become final and no longer subject to appeal) to have arisen solely and directly from such Covered Persons' gross negligence, willful misconduct, or breach of this Agreement that has caused a Preferred

17

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 400 of 539 PageID #:1359

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 113 of 183

Backstop Investor Material Adverse Effect and that would result in the loss of such Preferred Backstop Investor's entitlement under the terms of this Agreement to payment of the Commitment Payment or (ii) for any claim or expense that is settled prior to a judicial determination as to the exclusion set forth in clause (i) above, but determined by the Bankruptcy Court, after notice and a hearing, to be a claim or expense for which such Covered Person should not receive indemnity under the terms of this Section 9; provided that, without otherwise limiting CEOC's or the Company's obligation under this Section 9, CEOC and the Company shall have no obligation to indemnify any Covered Person pending such judicial determination where CEOC or the Company has in good faith  and in a reasonable manner, asserted an uncured breach of this Agreement that has caused a Preferred Backstop Investor Material Adverse Effect that would result in the loss of such Preferred Backstop Investor's entitlement under the terms of this Agreement to payment of the Commitment Payment.  This provision will be in addition to the rights of each and all of the Covered Persons to bring an action against the Company for breach of any term of this Agreement.  The Company acknowledges and agrees that each and all of the Covered Persons shall be treated as third-party beneficiaries with rights to bring an action against the Company under this Section 9.

Section 10.   **MISCELLANEOUS**.

10.1   Payments.  All payments made by or on behalf of CEOC and/or the Company or any of their affiliates to a Preferred Backstop Investor or its assigns, successors or designees pursuant to this Agreement shall be without withholding, set-off, counterclaim or deduction of any kind.

10.2   Survival.  The representations and warranties made in this Agreement will survive the execution and delivery of this Agreement and the Closing for the length of the applicable statute of limitations with respect thereto.

10.3   No Waiver of Rights.  All waivers hereunder must be made in writing, and the failure of any party at any time to require another party's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation. Any waiver of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision or a waiver or modification of any other provision.

10.4   Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for any party as shall be specified by such party in a notice given in accordance with this Section 10.3)

(a)   If to the Company, to:

18

**A0398**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 401 of 539 PageID #:1360

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 114 of 183

[PROPCO]
[__]
[__]
Attention: [__]
Facsimile: [__]

with a copy (which shall not constitute notice to the Company) to

[__]
[__]
[__]
Facsimile:  [__]
Attention: [__]

(b)    If to CEOC, to:

Caesars Entertainment Operating Company, Inc.
One Caesars Palace Drive
Las Vegas, NV 89109
Attn: General Counsel

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
Attn:   Paul M. Basta, P.C.
        Nicole L. Greenblatt
Facsimile:  (212) 446 4900
E-mail Address:   paul.basta@kirkland.com
                  ngreenblatt@kirkland.com

    -and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:   David R. Seligman, P.C.
        Ryan Preston Dahl
E-mail Address:   dseligman@kirkland.com
                  rdahl@kirkland.com
Facsimile: (312) 862-2200

19

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 402 of 539 PageID #:1361

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 115 of 183

(c)    If to a Preferred Backstop Investor, to the mailing address or facsimile number set forth on Schedule I hereto.

with a copy (which shall not constitute notice to such Preferred Backstop Investor) to:

Kleinberg, Kaplan, Wolff & Cohen, P.C.
551 Fifth Avenue, 18th Floor
New York, NY 10176
Telephone: (212) 986-6000
Facsimile: (212) 986-8866
Attention: Mary Kuan, Esq.

Any of the foregoing addresses or facsimile numbers may be changed by giving notice of such change in the foregoing manner, except that notices for changes of address or facsimile number shall be effective only upon receipt.

10.5    Headings.  The section and subsection headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

10.6    Construction.  The parties hereto and their respective legal counsel participated in the preparation of this Agreement, and therefore, this Agreement shall be construed neither against nor in favor of any of the parties hereto, but rather in accordance with the fair meaning thereof.

10.7    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

10.8    Entire Agreement.  This Agreement (including the Schedules and Exhibits hereto) and the agreements and documents referenced herein constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the parties hereto with respect to the subject matter hereof.

10.9    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Except as set forth below, neither this Agreement nor any of the rights, interests or obligations under this

20

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 403 of 539 PageID #:1362

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 116 of 183

Agreement will be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other parties. Notwithstanding the foregoing, (i) a Preferred Backstop Investor may enter into arrangements with other parties regarding its rights and/or obligations under this Agreement, provided that it shall remain liable for its obligations with respect to the Backstop Commitment, and (ii) the rights, obligations and interests hereunder may be assigned, delegated or transferred, in whole or in part, by any Preferred Backstop Investors (A) either alone or in connection with a corresponding Transfer (as such term is defined in the Restructuring Support Agreement) of Claims (as such term is defined in the Restructuring Support Agreement) to a transferee with the consent of CEOC, such consent not to be unreasonably withheld, delayed or denied and (B) to affiliates and to other Preferred Backstop Investors; provided, however, that such transferee, as a condition precedent to such Transfer, becomes a party to this Agreement and assumes the obligations of the transferring Preferred Backstop Investor under this Agreement by executing an addendum substantially in the form set forth in Exhibit A (the "Addendum") and an assumption in substantially the form set forth in Exhibit B hereto (the "Assumption Agreement") and deliver the same to Kleinberg, Kaplan, Wolff & Cohen, P.C. ("KKWC") and a copy to CEOC. Any Transfer that is made in violation of the immediately preceding sentence shall be null and void ab initio, and CEOC and each Preferred Backstop Investor, as applicable, shall have the right to enforce the voiding of such transfer. Following any assignment of a Preferred Backstop Investor's rights and obligations in this Agreement described in Section 10.9(ii) above, Schedule I hereto shall be updated by KKWC (in consultation with the assigning Preferred Backstop Investor and the Transferee) and delivered to CEOC solely to reflect the name and address of the applicable transferee and the Backstop Percentage that shall apply to such transferee, and any changes to the Backstop Percentage applicable to the assigning Preferred Backstop Investor. Any update to Schedule I hereto described in the immediately preceding sentence shall not be deemed an amendment or modification of this Agreement. In performing this Agreement, CEOC may rely solely on the most current Schedule I delivered by KKWC.

     10.10   No Third Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and, except as expressly set forth in Section 9, nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever.

     10.11   Amendment. This Agreement may not be altered, amended, or modified except by a written instrument executed by or on behalf of CEOC and the Required Preferred Backstop Investors, provided that if any alteration, amendment or modification could be adverse to any of the Preferred Backstop Investors, such Preferred Backstop Investors' written consent shall be required. This Agreement shall become binding only after the same is signed and delivered by or on behalf of each of the parties hereto.

     10.12   Governing Law. This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 404 of 539 PageID #:1363

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 117 of 183

10.13    Consent to Jurisdiction.    Each of the parties hereto (a) irrevocably and unconditionally agrees that any actions, suits or proceedings, at Law or equity, arising out of or relating to this Agreement or any agreements or transactions contemplated hereby shall be heard and determined in the Bankruptcy Court; (b) irrevocably submits to the jurisdiction of such court in any such action, suit or proceeding; (c) consents that any such action, suit or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action, suit or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 10.3 to such party at its address as provided in Section 10.3 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

10.14    Waiver of Jury Trial.    EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS.    EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.13.

10.15    Currency.    Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

10.16    Approvals.    Notwithstanding anything to the contrary herein, unless notified in writing to the contrary, for purposes of seeking approvals of the Preferred Backstop Investors hereunder, such as in accordance with Section 6.4, the Company Parties may rely on the written approval (including email) of KKWC.

10.17    Counterparts.    This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

10.18    Specific Performance.    Each party hereto acknowledges that, in view of the uniqueness of the securities referenced herein and the transactions contemplated by this Agreement, the other parties hereto would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that such other parties shall be entitled to specific enforcement of the terms

22

hereof in addition to any other remedy to which it may be entitled, at law or in equity, without otherwise limiting the parties' remedies hereunder.

10.19    Rules of Construction.    Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.    Section, subsection, clause, schedule, annex and exhibit references are to this Agreement unless otherwise specified.    Any reference to this Agreement shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, and supplements thereto and thereof, as applicable.    Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.

10.20    Covenants and Representations.    Notwithstanding anything to the contrary in this Agreement or otherwise, (i) CEOC, on behalf of itself and the Debtors, shall cause the Company to perform each obligations, covenant, undertaking and agreement in this Agreement, and to cause the Company's representations and warranties in this Agreement to be true, complete and correct as of the times given and shall be liable for all obligations not satisfied or performed by the Company, (ii) all obligations, covenants, undertakings and agreements of the Preferred Backstop Investors to the Company shall apply only after the Company has been properly incorporated and formed in accordance with the Plan and (iii) the Company shall be deemed to give the representations and warranties with respect to itself and contained in Section 3 only on the Effective Date and on the date that it has been properly incorporated and formed in accordance with the Plan.

*[No further text appears; signature pages follow]*

23

**A0403**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.

By: _____
Name:
Title:

[BACKSTOP INVESTOR]

By: _____
Name:
Title:

24

## Schedule I

## SCHEDULE OF BACKSTOP INVESTORS

| Name and Address of Preferred Backstop Investors and Wire Instructions | Backstop Percentage[3] |
|---|---|
| Certain funds or entities or accounts managed by Brigade Capital Management | % |
| Certain funds or accounts managed by DDJ Capital Management, LLC | |
| Certain funds or entities or accounts managed by Elliott Management Corporation | |
| PIMCO and/or certain funds or entities or accounts managed by PIMCO | |
| Certain funds or entities or accounts managed by JPMorgan Asset Management | |
| **Total:** | 100% |

[Need email/contact info for notices, subscription status reports etc.]

---

[3] NTD: The initial percentage for each Preferred Backstop Investor will be equal to the product of (i) the quotient resulting from (x) the amount designated by such Preferred Backstop Investor, provided such amount shall not exceed the principal amount of the first lien bonds held by such Preferred Backstop Investor divided by (y) the aggregate amount designated by all Preferred Backstop Investors pursuant to clause (x) and (ii) 100.

A0405

## Exhibit A

### ADDENDUM

Reference is made to that certain Backstop Commitment Agreement (as amended, modified or supplemented from time to time, the "Agreement") by and among Caesars Entertainment Operating Company, Inc., a Delaware corporation ( "CEOC"), and each of the Preferred Backstop Investors party thereto from time to time.  Each capitalized term used but not defined herein shall have the meaning given to it in the Agreement.

Upon execution and delivery of this Addendum by the undersigned, as provided in Section 10.9 of the Agreement, the undersigned hereby becomes a Preferred Backstop Investor, as applicable thereunder and bound thereby effective as of the date of the Agreement.

By executing and delivering this Addendum, the undersigned represents and warrants, for itself and for the benefit of each party to the Agreement, that:

(a)     as of the date of this Addendum, the undersigned has executed and delivered an Assumption and Joinder Agreement therefor (a copy of which is attached to this Addendum);

(b)     as of the date of this Addendum, with respect to each transferee that (i) is an individual, such Transferee has all requisite authority to enter into this Addendum and to carry out the transactions contemplated by, and perform its respective obligation under, the Agreement and (ii) is not an individual, such transferee is duly organized, validly existing, and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Addendum and to carry out the transactions contemplated by, and perform its respective obligations under, the Agreement;

(c)     assuming the due execution and delivery of the Agreement by the Company the Addendum and the Agreement are legally valid and binding obligations of it, enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws, or by equitable principles relating to or limiting creditors' rights generally; and

(d)     as of the date of this Addendum, it is not aware of any event that, due to any fiduciary or other duty to any other person, would prevent it from taking any action required of it under the Agreement and this Addendum.

By executing and delivering this Addendum to CEOC, the undersigned agrees to be bound by all the terms of the Agreement.

26

The undersigned acknowledges and agrees that once delivered to CEOC, it may not revoke, withdraw, amend, change or modify this Addendum unless the Agreement has been terminated.

THIS ADDENDUM SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

This Addendum may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

[Signature on Following Page]

27

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be duly executed and delivered by their proper and duly authorized officers as of this [__] day of [____].

TRANSFEREE WHO BECOMES A BACKSTOP INVESTOR

[NAME]

_____

as a Preferred Backstop Investor
Name:

28

**A0408**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 411 of 539 PageID #:1370

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 124 of 183

## Exhibit B

### ASSUMPTION AND JOINDER AGREEMENT

Reference is made to (i) that certain Backstop Commitment Agreement (as amended, modified or supplemented from time to time, the "Agreement"), dated as of [__], 2014, by and among Caesars Entertainment Operating Company, Inc., a Delaware corporation ( "CEOC") and each of the Preferred Backstop Investors party thereto from time to time, and (ii) that certain Addendum, dated as of [__], [__] (the "Transferor Addendum") submitted by _____, as transferor (the "Transferor"). Each capitalized term used but not defined herein shall have the meaning given to it in the Agreement.

As a condition precedent to becoming a Preferred Backstop Investor, the undersigned (the "Transferee") hereby agrees to become bound by all the terms, conditions and obligations set forth in the Agreement and the Transferor Addendum copies of which are attached hereto as Annex I. This Assumption and Joinder Agreement shall take effect and shall become an integral part of the Agreement and the Transferor Addendum immediately upon its execution, and the Transferee shall be deemed to be bound by all of the terms, conditions and obligations of the Agreement and the Transferor Addendum as of the date thereof. The Transferee shall hereafter be deemed to be a "Preferred Backstop Investor" and a "party" for all purposes under the Agreement.

[Signatures on Following Page]

A0409

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 412 of 539 PageID #:1371

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 125 of 183

IN WITNESS WHEREOF, this Assumption and Joinder Agreement has been duly executed by each of the undersigned as of the date specified below.

Date: [    ]

| | |
|---|---|
| _____ | _____ |
| Name of Transferor | Name of Transferee |
| _____ | _____ |
| Authorized Signatory of Transferor | Authorized Signatory of Transferee |
| _____ | _____ |
| (Type or Print Name and Title of Authorized Signatory) | (Type or Print Name and Title of Authorized Signatory) |

Address of Transferee:

_____

_____

_____

Attn:

_____

Tel:

_____

Fax:

_____

E-mail:

_____

30

**A0410**

## Exhibit C

## OFFERING CONDITIONS

1. Holders shall receive an Election Form and ballot in the Solicitation Package, which shall be approved by the Bankruptcy Court.

2. The Election Form must be submitted by the Subscription Expiration Date.

3. Returned Election Form for Holders other than the Preferred Backstop Investors must provide evidence of financial wherewithal to purchase the shares of Preferred Stock pursuant to the Rights Offering.  CEOC shall determine in its discretion whether such Holders are satisfactory to CEOC (such approved Holders, the "Satisfactory Holders").

4. CEOC shall notify the Preferred Backstop Investors of the Satisfactory Holders and the Preferred Stock such Satisfactory Holders have elected to purchase pursuant to the Rights Offering no later than three days before the deadline set by the Bankruptcy Court for the filing of objections to confirmation of the Plan (the "Objection Deadline").

5. On or before the Objection Deadline, all Holders designated as Satisfactory Holders (which, for the avoidance of doubt, shall exclude the Preferred Backstop Investors) shall post cash in the amount of the maximum aggregate Per Share Purchase Price for all Preferred Stock such Holder elected to purchase (the "Purchase Amount Obligation") with a third party escrow agent designated by CEOC and reasonably satisfactory to the Required Preferred Backstop Investors.

6. To the extent that the cash timely posted by the Satisfactory Holders is less than the Purchase Amount Obligation, the Preferred Backstop Investors shall have the right, but not the obligation, to satisfy their respective Backstop Commitments with respect to any shortfall in the Purchase Amount Obligation, provided that any Backstop Commitment declined by any Preferred Backstop Investor shall be allocated pro rata (based on the Backstop Commitment of the Preferred Backstop Investors electing to participate) to the Preferred Backstop Investors electing to participate.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 414 of 539 PageID #:1373

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 127 of 183

**Annex**
**Debt Term Sheets**

New First Lien OpCo Debt
$[_____] Term Facility
Summary of Principal Terms[1]

| | |
|---|---|
| **Borrower:** | [Caesars Entertainment Operating Company, Inc.] [2] (the "**Borrower**"). |
| **Agent/Collateral Agent:** | [      ] will act as sole administrative agent for the Senior Facilities (in such capacity and together with its permitted successors and assigns, the "**Agent**"), and will perform the duties customarily associated with such role. |
| | [      ] will act as collateral agent for the Senior Facilities (in such capacity, the "**Collateral Agent**") and will perform the duties customarily associated with such role. |
| | The Agent and Collateral Agent shall each be acceptable to the First Lien Bank Lenders and the First Lien Noteholders. |
| **Facilities:** | (A) a senior secured term loan facility in an aggregate principal amount set forth in the Restructuring Term Sheet (the "**First Lien Term Facility**" and loans thereunder, the "**Term Loans**"), which will be issued to each First Lien Bank Lender, in accordance with the Restructuring Term Sheet (in such capacity, collectively the "**Lenders**"). |
| | (B) at the Borrower's option, a senior secured revolving credit facility in an aggregate principal amount not to exceed $200 million (the "**Revolving Facility**" and, together with the First Lien Term Facility, the "**Senior Facilities**"), to be provided by the First Lien Bank Lenders or such other financial institutions to become Lenders under the Senior Facilities, a portion of which will be available through a subfacility in the form of letters of credit. |
| | In accordance with the Restructuring Term Sheet, the Borrower shall use its commercially reasonable efforts to syndicate the First Lien Term Facility to the market at or below the interest rates set forth herein and, to the extent so syndicated, the cash proceeds will be used to increase the cash payments to the First Lien Bank Lenders pursuant to the terms of the Restructuring Term Sheet. |

---

[1] All capitalized terms used but not defined herein shall have the meaning assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the "**Restructuring Term Sheet**").

[2] [NTD:  Assumes CEOC is the operating company in the new REIT structure.

Doc#: US1:9680911v26

| | |
|---|---|
| Definitive Documentation: | The definitive documentation for the Senior Facilities (the "*Senior Facilities Documentation*") shall, except as otherwise set forth herein, be based on financing and security documentation typical and customary for exit financings, taking into consideration (i) the First Lien Credit Agreement, dated as of October 11, 2013, among Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Las Vegas, LLC, Harrah's Atlantic City Holding, Inc., Rio Properties, LLC, Flamingo Las Vegas Holding, LLC, Harrah's Laughlin, LLC and Paris Las Vegas Holding, LLC, as borrowers, the lenders party thereto and Citicorp North America, Inc., as administrative agent (the "*CERP Credit Agreement*") and (ii) the operating lease structure of the Borrower and its subsidiaries, and otherwise be reasonably satisfactory to the Borrower and the Requisite Consenting Creditors (the "*Documentation Precedent*"); provided that, in the case of provisions setting forth the debt and lien capacity, such Senior Facilities Documentation shall be based on and consistent with the CERP Credit Agreement, as modified to reflect the terms set forth herein. |
| Incremental Facilities: | The Borrower will be permitted after the Closing Date to add additional revolving or term loan credit facilities (the "*Incremental Facilities*") in an aggregate principal amount not to exceed the greater of (x) $150 million and (y) an aggregate principal amount of indebtedness that would not cause (1) in the case of debt incurred under the Incremental Facilities that is secured by pari passu liens on the Collateral, the pro forma First Lien Net Leverage Ratio (to be defined as the ratio of total funded debt outstanding that consists of the Term Loans and other funded debt that is secured by first-priority liens on the Collateral that are pari passu with the Term Loans (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA) ("*First Lien Net Leverage Ratio*") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date[3] and (2) in the case of debt incurred under the Incremental Facilities that is secured by junior liens on the Collateral, the pro forma Total Secured Net Leverage Ratio (to be defined as the ratio of total funded debt |

---

[3] For the avoidance of doubt, (i) the calculation of the ratios in the OpCo debt documents shall exclude Chester Downs (from both debt and EBITDA) and (ii) any Revolving Facility loans outstanding at the time of incurrence of any debt shall be included in the calculation of any Leverage Ratio at the time of such incurrence.

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 417 of 539 PageID #:1376

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 130 of 183

outstanding that is secured by liens on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA ("***Total Secured Net Leverage Ratio***") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Total Secured Net Leverage Ratio in effect on the Closing Date; *provided*, that:

(i)     the loans under such additional credit facilities shall be secured senior obligations and shall rank pari passu or junior in right of security with, and shall have the same guarantees as, the Senior Facilities; *provided*, that, if such additional credit facilities rank junior in right of security to the Senior Facilities, (x) such additional credit facilities will be established as a separate facility from the Senior Facilities and pursuant to separate documentation, (y) such Incremental Facilities shall be subject to the Intercreditor Agreements (as defined below) or other intercreditor agreements that are not materially less favorable to the Lenders and the First Lien Noteholders than the Intercreditor Agreements and (z) for the avoidance of doubt, will not be subject to clause (iv) below;

(ii)    the loans under the additional term loan facilities will mature no earlier than, and will have a weighted average life to maturity no shorter than, that of the First Lien Term Facility and all other terms of any such additional term loan facility (other than pricing, amortization or maturity) shall be substantially identical to the First Lien Term Facility or otherwise reasonably acceptable to the Agent;

(iii)   all fees and expenses owing in respect of such increase to the Agent, Collateral Agent and the Lenders shall have been paid; and

(iv)    each incremental term facility shall be subject to a "most favored nation" pricing provision that ensures that the initial "yield" on the incremental facility does not exceed the "yield" at such time on the First Lien Term Facility by more than 50 basis points (with "yield" being determined by the Agent taking into account the applicable margin, upfront fees, any original issue discount and any LIBOR or ABR floors, but excluding any structuring, commitment and

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 418 of 539 PageID #:1377

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 131 of 183

arranger or similar fees).

Purpose:

On the Closing Date, the Term Loan will be issued to each First Lien Bank Lender in accordance with the Restructuring Term Sheet.

Availability:

The full amount of the First Lien Term Facility will be issued on the Closing Date. Amounts under the First Lien Term Facility that are repaid or prepaid may not be reborrowed.

Interest Rates:

LIBOR + 4.0% per annum, with a 1.0% LIBOR floor.

Default Rate:

With respect to overdue principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand.

Final Maturity and Amortization:

The First Lien Term Facility will mature on the date that is six (6) years after the Closing Date, and, commencing with the second full fiscal quarter ended after the Closing Date, will amortize in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of the First Lien Term Facility with the balance payable on the maturity date of the First Lien Term Facility.

Guarantees:

All obligations of the Borrower under the Senior Facilities and, at the option of the Borrower, under any interest rate protection or other hedging arrangements entered into with the Agent, an entity that is a Lender or agent at the time of such transaction (or on the Closing Date, if applicable), or any affiliate of any of the foregoing ("*Hedging Arrangements*"), or any cash management arrangements with any such person ("*Cash Management Arrangements*"), will be unconditionally guaranteed (the "*Guarantees*") by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Borrower (the "*Subsidiary Guarantors*"), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon. The Guarantees will be guarantees of payment and performance and not of collection.

Security:

Subject to exceptions described below and other exceptions to be agreed upon, the Senior Facilities, the Guarantees, any Hedging Arrangements and any Cash Management Arrangements will be secured on a first-priority basis by

4

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 419 of 539 PageID #:1378

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 132 of 183

substantially all the owned material assets of the Borrower and each Subsidiary Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the "*Collateral*"), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Borrower or any Subsidiary Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary), (b) a lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Borrower and each Subsidiary Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Borrower, Agent and Collateral Agent shall reasonably determine that the costs or other consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract the counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received), and (z) other exceptions consistent with the Documentation Precedent. There shall be neither lockbox arrangements nor any control agreements relating to the Borrower's and its subsidiaries' bank accounts or securities accounts.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation consistent with the Documentation Precedent.

The Senior Facilities Documentation will provide that none of the Collateral Agent, Lenders or Administrative Agent will be permitted to terminate Caesars Entertainment Corporation or any of its subsidiaries or affiliates as manager of any of the PropCo facilities without the prior written consent of PropCo.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in a customary intercreditor agreement between the

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 420 of 539 PageID #:1379

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 133 of 183

administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, except that such intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder (the "*First Lien Intercreditor Agreement*").

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in a customary intercreditor agreement, consistent with the Documentation Precedent, as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand (the "*First Lien/Second Lien Intercreditor Agreement*" and, together with the First Lien Intercreditor Agreement, the "*Intercreditor Agreements*").

<u>Mandatory Prepayments</u>:    Unless (in the case of clause (a)) the net cash proceeds are reinvested (or committed to be reinvested) in the business within 12 months after (and, if so committed to be reinvested, are actually reinvested within three months after the end of such initial 12-month period), a non-ordinary course asset sale or other non-ordinary disposition of property (other than sale of receivables in connection with a permitted receivable financing) of the Borrower or any of the subsidiaries (including insurance and condemnation proceeds), (a) the Lenders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the Term Loans to the sum of the total funded debt outstanding that consists of the Term Loans and the First Lien Notes) of 100% of the net cash proceeds in excess of an amount to be agreed upon from such non-ordinary course asset sales or other non-ordinary dispositions of property, and (b) the Lenders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the Term Loans to the sum of the total funded debt outstanding that consists of the Term Loans and the First Lien Notes) of 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Borrower and its subsidiaries (other than debt permitted to be incurred under the Senior Facilities Documentation unless otherwise provided as a condition to the incurrence thereof), shall be applied to prepay the Term Loans under the First Lien Term Facility, in each case subject to customary and other exceptions to be agreed upon, including those consistent with

6

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 421 of 539 PageID #:1380

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 134 of 183

the Documentation Precedent.

In addition, beginning with the first full fiscal year of the Borrower after the Closing Date, 50% of Excess Cash Flow (to be defined in a manner consistent with the Documentation Precedent and to take into account application of Excess Cash Flow under the Lease and otherwise in a manner satisfactory to the Requisite Consenting Creditors and subject to a minimum threshold to be agreed) of the Borrower and its restricted subsidiaries (stepping down to 25% if the First Lien Net Leverage Ratio is less than or equal to 2.75 to 1.00 and stepping down to 0% if the First Lien Net Leverage Ratio is less than or equal to 2.25 to 1.00) shall be used to prepay the Term Loans under the First Lien Term Facility and the First Lien Notes, on a ratable basis; *provided* that any voluntary prepayment of Term Loans made during any fiscal year (including Loans under the Revolving Facility to the extent commitments thereunder are permanently reduced by the amount of such prepayments at the time of such prepayment) and voluntary repayment of the First Lien Notes shall be credited against excess cash flow prepayment obligations for such fiscal year (or, at the Borrower's option, any future year) on a Dollar-for-Dollar basis.

All mandatory prepayments shall be made pro rata among the Lenders.

Notwithstanding the foregoing, each Lender under the First Lien Term Facility shall have the right to reject its pro rata share of any mandatory prepayments described above, in which case the amounts so rejected may be retained by the Borrower on terms consistent with the Documentation Precedent.

The above-described mandatory prepayments shall be applied to the First Lien Term Facility in direct order of maturity.

Prepayments from subsidiaries' Excess Cash Flow and asset sale proceeds will be limited under the Senior Facilities Documentation to the extent (x) the repatriation of funds to fund such prepayments is prohibited, restricted or delayed by applicable local laws, (y) applied to repay indebtedness of a foreign subsidiary of the Borrower or (z) the repatriation of funds to fund such prepayments would result in material adverse tax consequences.

<u>Voluntary Prepayments and</u>    Voluntary reductions of the unutilized portion of the

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 422 of 539 PageID #:1381

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 135 of 183

| | |
|---|---|
| <u>Reductions in Commitments:</u> | commitments under the Senior Facilities and prepayments of borrowings thereunder will be permitted at any time in minimum principal amounts to be agreed upon, without premium or penalty, subject to the following paragraph and subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period.  All voluntary prepayments of the First Lien Term Facility will be applied pro rata to the Term Loan (and pro rata among the Lenders) and to the remaining amortization payments under the First Lien Term Facility in such order as the Borrower may direct. |

Voluntary Prepayments of the Term Loans made prior to the four year anniversary of the Closing Date will be subject to a prepayment premium, as follows:

- First year following Closing Date:  customary "make-whole" premium (T+50)
- Second year following Closing Date:  3%
- Third year following Closing Date:  2%
- Fourth year following Closing Date:  1%
- Fourth year anniversary and thereafter:  par

| | |
|---|---|
| <u>Representations and Warranties:</u> | The following representations and warranties, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries, subject to customary and other exceptions and qualifications to be agreed upon, consistent with the Documentation Precedent): organization, existence, and power; qualification; authorization and enforceability; no conflict; governmental consents; subsidiaries; accuracy of financial statements and other information in all material respects; projections; no material adverse change since the Closing Date; absence of litigation; compliance with laws (including PATRIOT Act, OFAC, FCPA, ERISA, margin regulations, environmental laws and laws with respect to sanctioned persons); payment of taxes; ownership of properties; governmental regulation; inapplicability of the Investment Company Act; Closing Date solvency on a consolidated basis; labor matters; validity, priority and perfection of security interests in the Collateral; intellectual property; treatment as designated senior debt under subordinated debt documents (if any); use of proceeds; and insurance. |

8

| | |
|---|---|
| <u>Affirmative Covenants</u>: | The following affirmative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary (consistent with the Documentation Precedent) and other baskets, exceptions and qualifications to be agreed upon:  maintenance of corporate existence and rights; performance and payment of obligations; delivery of annual and quarterly consolidated financial statements (accompanied by customary management discussion and analysis and (annually) by an audit opinion from nationally recognized auditors that is not subject to any qualification as to scope of such audit or going concern) (with extended time periods to be agreed for delivery of the first annual and certain quarterly financial statements to be delivered after the Closing Date) and an annual budget; delivery of notices of default and material adverse litigation, ERISA events and material adverse change; maintenance of properties in good working order; maintenance of books and records; maintenance of customary insurance; commercially reasonable efforts to maintain ratings (but not a specific rating); compliance with laws; inspection of books and properties; environmental; additional guarantors and additional collateral (subject to limitations set forth under the captions "***Guarantees***" and "***Security***"); further assurances in respect of collateral matters; use of proceeds; and payment of taxes. |

The Senior Facilities Documentation will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

| | |
|---|---|
| <u>Negative Covenants</u>: | The following negative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary exceptions and qualifications (consistent with the Documentation Precedent) and others to be agreed upon: |

1.   Limitation on dispositions of assets.

2.   Limitation on mergers and acquisitions.

3.   Limitation on dividends and stock repurchases and optional redemptions (and optional prepayments) of

9

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 424 of 539 PageID #:1383

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 137 of 183

subordinated debt, it being understood that such limitations will be more restrictive until the Total Net Leverage Ratio is less than 3.00 to 1.00.

4. Limitation on indebtedness (including guarantees and other contingent obligations) and preferred stock, it being understood that additional unsecured indebtedness may be incurred in an aggregate principal amount that would not cause the pro forma Total Net Leverage Ratio (to be defined as the ratio of total funded debt outstanding (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA) ("***Total Net Leverage Ratio***") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Total Net Leverage Ratio in effect on the Closing Date.

5. Limitation on loans and investments.

6. Limitation on liens and further negative pledges.

7. Limitation on transactions with affiliates.

8. Limitation on sale/leaseback transactions.

9. Limitation on changes in the business of the Borrower and its subsidiaries.

10. Limitation on restrictions on ability of subsidiaries to pay dividends or make distributions.

11. Limitation on changes to fiscal year.

12. Limitation on modifications to subordinated debt documents.

13. Limitation on material modifications to the MLSA, lease and other arrangements entered into in connection with the lease structure.

EBITDA shall be defined in a manner consistent with the Documentation Precedent.

All ratios and calculations shall be measured on a Pro Forma Basis (to be defined in a manner consistent with the Documentation Precedent, and including the annualized effect

Doc#: US1:9680911v26

**A0422**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 425 of 539 PageID #:1384

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 138 of 183

of addbacks in the definition of EBITDA).

With respect to basket amounts, covenant thresholds and similar levels in the Senior Facilities Documentation provisions with respect to debt and lien capacity that are tied to dollar amounts, such amounts, thresholds and levels will be based on the corresponding dollar amounts that are set forth in the CERP Credit Agreement, in each case as adjusted pursuant to the agreement of the parties, including to reflect the pro forma capital structure of the Borrower and the relative size and EBITDA of the Borrower (such amounts as adjusted, the "***Basket Adjustments***").

Financial Covenant:    First Lien Term Facility:  None.

Events of Default:    The following (subject to customary and other thresholds and grace periods to be agreed upon, consistent with the Documentation Precedent, and applicable to the Borrower and its restricted subsidiaries), among others, if any, to be negotiated in the Senior Facilities Documentation: nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross event of default and cross acceleration to material indebtedness; bankruptcy and similar events; material judgments; ERISA events; invalidity of the Guarantees or any security document, in each case, representing a material portion of the Guarantees or the Collateral; and Change of Control (to be defined in a manner consistent with the Documentation Precedent).

Unrestricted Subsidiaries:    The Senior Facilities Documentation will contain provisions pursuant to which, subject to limitations consistent with the Documentation Precedent, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will not be subject to the affirmative or negative covenant or event of default provisions of the Senior Facilities Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating the financial ratios contained in the Senior Facilities Documentation on terms consistent with the Documentation Precedent.

Voting:    Usual for facilities and transactions of this type and consistent with the Documentation Precedent; provided that the

**A0423**

Borrower and its affiliates, including the Sponsors, shall not have voting rights with respect to loans and commitments held by them.

Cost and Yield Protection: Usual for facilities and transactions of this type, consistent with the Documentation Precedent.

Assignments and Participations:

The Lenders will be permitted to assign loans and commitments under the Senior Facilities with the consent of the Borrower (not to be unreasonably withheld or delayed, but which consent under the First Lien Term Facility shall be deemed granted if the Borrower fails to respond to a request for consent by a Lender within ten business days of such request being made); *provided*, that such consent of the Borrower shall not be required (i) if such assignment is made, in the case of the First Lien Term Facility, to another Lender under the First Lien Term Facility or an affiliate or approved fund of a Lender under the First Lien Term Facility or (ii) after the occurrence and during the continuance of an event of default relating to payment default or bankruptcy. All assignments will also require the consent of the Agent (subject to exceptions consistent with the Documentation Precedent) not to be unreasonably withheld or delayed. Each assignment, in the case of the First Lien Term Facility, will be in an amount of an integral multiple of $1,000,000. The Agent will receive a processing and recordation fee of $3,500, payable by the assignor and/or the assignee, with each assignment. Assignments will be by novation and will not be required to be pro rata between the Senior Facilities.

The Lenders will be permitted to sell participations in loans subject to the restrictions set forth herein and consistent with the Documentation Precedent. Voting rights of participants shall (i) be limited to matters in respect of (a) increases in commitments of such participant, (b) reductions of principal, interest or fees payable to such participant, (c) extensions of final maturity or scheduled amortization of the loans or commitments in which such participant participates and (d) releases of all or substantially all of the value of the Guarantees, or all or substantially all of the Collateral and (ii) for clarification purposes, not include the right to vote on waivers of defaults or events of default.

Notwithstanding the foregoing, assignments (and, to the extent such list is made available to all Lenders, participations) shall not be permitted to ineligible institutions identified to the Agent on or prior to the Closing Date, and,

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 427 of 539 PageID #:1386

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 140 of 183

with the consent of the Agent, thereafter; provided that the Agent shall not be held liable or responsible for any monitoring or enforcing of the foregoing.

Assignments shall not be deemed non-pro rata payments. Non-pro rata prepayments will be permitted to the extent required to permit "extension" transactions and "replacement" facility transactions (with existing and/or new Lenders), subject to customary restrictions consistent with the Documentation Precedent.

Assignments to the Sponsors and their respective affiliates (other than the Borrower and its subsidiaries) (each, an "*Affiliated Lender*") shall be permitted subject to customary restrictions consistent with the Documentation Precedent.

| | |
|---|---|
| <u>Non-Pro Rata Repurchases</u>: | The Borrower and its subsidiaries may purchase from any Lender (other than the Borrower or any of its affiliates, including the Sponsors), at individually negotiated prices, outstanding principal amounts or commitments under the First Lien Term Facility in a non-pro rata manner; *provided* that (i) the purchaser shall make a representation to the seller at the time of assignment that it does not possess material non-public information with respect to the Borrower and its subsidiaries that has not been disclosed to the seller or Lenders generally (other than the Lenders that have elected not to receive material non-public information), (ii) any commitments or loans so repurchased shall be immediately cancelled and (iii) no default or event of default exists or would result therefrom. |
| <u>Expenses and Indemnification</u>: | Consistent with the Documentation Precedent. |
| <u>Regulatory Matters</u>: | Customary for facilities of this type and consistent with the Documentation Precedent. |
| <u>Governing Law and Forum</u>: | New York. |
| <u>Counsel to Agent/Collateral Agent</u>: | [        ]. |

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 428 of 539 PageID #:1387

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 141 of 183

New First Lien OpCo Debt
$[_____] First Lien Notes
Summary of Principal Terms[1]

Issuer:                    [Caesars Entertainment Operating Company, Inc.][2], in its
                           capacity as the issuer of the First Lien Notes (the "**Issuer**").

Issue:                     The First Lien Notes in an amount set forth in the Restructuring
                           Term Sheet will be issued under and have the benefit of an
                           indenture and security documentation typical and customary in
                           the case of first lien senior secured notes issued pursuant to an
                           exit financing, taking into consideration (i) the indenture for the
                           first-priority senior secured notes issued on October 11, 2013 by
                           Caesars Entertainment Resort Properties, LLC, Caesars
                           Entertainment Resort Properties Finance, Inc., Harrah's Atlantic
                           City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's
                           Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las
                           Vegas Holding, LLC, Rio Properties, LLC (the "**CERP First
                           Lien Indenture**") and (ii) the operating lease structure of the
                           Issuer and its subsidiaries, and otherwise be reasonably
                           satisfactory to the Issuer and the Requisite Consenting Creditors
                           (the "**Documentation Precedent**"); provided that, in the case of
                           provisions setting forth the debt and lien capacity, the indenture
                           shall be based on and consistent with the CERP First Lien
                           Indenture, as modified to reflect the terms set forth herein.

                           In accordance with the Restructuring Term Sheet, the Issuer
                           shall use its commercially reasonable efforts to syndicate the
                           First Lien Notes to the market at or below the interest rates set
                           forth herein and, to the extent so syndicated, the cash proceeds
                           will be used to increase the cash payments to the First Lien
                           Noteholders pursuant to the terms of the Restructuring Term
                           Sheet.

Purpose:                   On the Closing Date, the First Lien Notes will be issued to each
                           First Lien Noteholder in accordance with the Restructuring Term
                           Sheet.

Maturity:                  The First Lien Notes will mature on the date that is six (6) years
                           after the Closing Date.

Interest Rate:             LIBOR + 4.0% per annum, with a 1.0% LIBOR floor.

---

[1] All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring
   Term Sheet to which this Term Sheet is attached (the "**Restructuring Term Sheet**"), or in the New First Lien
   OpCo Debt Term Sheet attached thereto.
[2] NTD:  Assumes CEOC is the operating company in the new REIT structure.

Doc#: US1:9680911v26

**A0426**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 429 of 539 PageID #:1388

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 142 of 183

| | |
|---|---|
| <u>Default Rate</u>: | With respect to overdue principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand. |
| <u>Ranking</u>: | The First Lien Notes will constitute senior first-priority secured indebtedness of the Issuer, and will rank pari passu in all respects, including in right of payment with all obligations under the Senior Facilities (the "***Credit Agreement***") and all other first lien senior indebtedness of the Issuer. |
| <u>Guarantees</u>: | The First Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer (the "***Note Guarantors***"), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon, on a senior first-priority secured basis (the "***Note Guarantees***"). The Note Guarantees will rank pari passu in all respects, including in right of payment, with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors. The Note Guarantees will be guarantees of payment and performance and not of collection. |
| <u>Security</u>: | Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the First Lien Notes and the Note Guarantees will be secured by a first-priority security interest in substantially all the owned material assets of the Issuer and each Note Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the "***Collateral***"), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Issuer or any Note Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary) (b) a lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Issuer and each Note Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Issuer and Collateral Agent shall reasonably determine that the costs or other |

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 430 of 539 PageID #:1389

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 143 of 183

consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract the counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received), and (z) other exceptions consistent with the Documentation Precedent; and provided that the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions.  There shall be neither lockbox arrangements nor any control agreements relating to the Issuer's and its subsidiaries' bank accounts or securities accounts.

All of the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, consistent with the Documentation Precedent.

The indenture for the First Lien Notes will provide that none of the Collateral Agent, First Lien Noteholders or Trustee will be permitted to terminate Caesars Entertainment Corporation or any of its subsidiaries or affiliates as manager of any of the PropCo facilities without the prior written consent of PropCo.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in the First Lien Intercreditor Agreement, as between the administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, which intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder.

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement, as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand.

<u>Mandatory Redemption</u>:     None.

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 431 of 539 PageID #:1390

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 144 of 183

| | |
|---|---|
| <u>Optional Redemption:</u> | Prior to the first anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the first anniversary of the Closing Date plus 50 basis points. |
| | Prior to the first anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes. |
| | After the first anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to 3.00%, which premium shall decline to 2.00% on the second anniversary of the Closing Date, to 1.00% on the first anniversary of the Closing Date and to zero on the fourth anniversary of the Closing Date. |
| | All redemptions shall be made on a pro rata basis among the First Lien Notes. |
| <u>Offer to Repurchase with Proceeds of Debt Issuance:</u> | The Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt outstanding that consists of the First Lien Notes and the First Lien Term Facility) of 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Issuer and its subsidiaries (other than debt permitted to be incurred under the indenture governing the First Lien Notes unless otherwise provided as a condition to the incurrence thereof). |
| <u>Offer to Purchase from Asset Sale Proceeds:</u> | The Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt outstanding that consists of the First Lien Notes and the First Lien Term Facility) of 100% of the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent. |
| <u>Offer to Repurchase Upon a Change of Control:</u> | The Issuer will be required to make an offer to repurchase the First Lien Notes following the occurrence of a "***change of control***" (to be defined in a manner consistent with the |

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 432 of 539 PageID #:1391

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 145 of 183

|  | Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase. |
|---|---|
| <u>Offer to Repurchase from Excess Cash Flow</u>: | Beginning with the first full fiscal year of the Issuer after the Closing Date, the Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt that consists of the First Lien Notes and First Lien Term Facility) of 50% of Excess Cash Flow (to be defined in a manner consistent with the definition in the Credit Agreement and subject to the same minimum threshold therein) of the Issuer and its restricted subsidiaries (stepping down to 25% if the First Lien Net Leverage Ratio is less than or equal to 2.75 to 1.00 and stepping down to 0% if the First Lien Net Leverage Ratio is less than or equal to 2.25 to 1.00); *provided* that any voluntary prepayment of Term Loans made during any fiscal year (including Loans under the Revolving Facility to the extent commitments thereunder are permanently reduced by the amount of such prepayments at the time of such prepayment) and voluntary repayment of the First Lien Notes shall be credited against excess cash flow prepayment obligations for such fiscal year (or, at the Borrower's option, any future year) on a Dollar-for-Dollar basis.<br><br>Prepayments from subsidiaries' Excess Cash Flow and asset sale proceeds will be limited under the First Lien Notes Documentation to the extent (x) the repatriation of funds to fund such prepayments is prohibited, restricted or delayed by applicable local laws, (y) applied to repay indebtedness of a foreign subsidiary of the Borrower or (z) the repatriation of funds to fund such prepayments would result in material adverse tax consequences. |
| <u>Defeasance and Discharge Provisions</u>: | Customary for high yield debt securities consistent with the Documentation Precedent. |
| <u>Modification</u>: | Customary for high yield debt securities consistent with the Documentation Precedent.  Notes held by the Issuer and its affiliates, including the Sponsors, shall not have voting rights. |
| <u>Registration Rights</u>: | Customary registration rights. |
| <u>Covenants</u>: | Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such covenants; *provided* that such baskets and carveouts shall |

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 433 of 539 PageID #:1392

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 146 of 183

conform to the corresponding amounts in the Credit Agreement). For the avoidance of doubt, there shall be no financial maintenance covenants.

1.      The provisions limiting indebtedness shall, in addition to carve-outs consistent with the Documentation Precedent, provide that the amount of indebtedness incurred under the "bank basket" will not exceed an amount equal to the sum of (i) the aggregate principal amount of the Credit Agreement (including the accordion provisions thereunder), plus (ii) such additional amount of indebtedness that may be incurred that would not cause the ratio of funded debt (including the debt referred to in clause (i) of this sentence) outstanding that is (A) secured by a first priority lien on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the "***Net First Lien Leverage Ratio***") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date, (B) secured by junior liens on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the "***Net Total Secured Leverage Ratio***") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Net Total Secured Leverage Ratio in effect on the Closing Date and (C) unsecured (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the "***Net Total Leverage Ratio***") to exceed a ratio to be set on the Closing Date that is equal to 0.25x greater than the pro forma Net Total Leverage Ratio in effect on the Closing Date;[3]

2.      The provisions limiting liens shall provide for customary permitted liens consistent with the Documentation Precedent and include (i) the ability to incur first-priority liens on indebtedness to the extent that the pro forma Net First Lien Leverage Ratio is not greater than a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date; (ii) the ability to incur liens junior to the liens securing the First Lien Notes, provided that the indebtedness secured by such junior liens is permitted under the indenture, and (iii) the ability to incur liens on assets of non-Note Guarantor subsidiaries so

---

[3] For the avoidance of doubt, (i) the calculation of the ratios in the OpCo debt document shall exclude Chester Downs (from both debt and EBITDA) and (ii) any Revolving Facility loans outstanding at the time of incurrence of any debt shall be included in the calculation of any Leverage Ratio at the time of such incurrence.

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 434 of 539 PageID #:1393

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 147 of 183

long as such liens secure obligations of non-Note Guarantor subsidiaries that are otherwise permitted.

3.      With respect to basket amounts, covenant thresholds and similar levels in the indenture governing the First Lien Notes provisions with respect to debt and lien capacity that are tied to dollar amounts, such amounts, thresholds and levels will be based on the corresponding dollar amounts that are set forth in the CERP First Lien Indenture, in each case as adjusted pursuant to the agreement of the parties, including to reflect the pro forma capital structure of the Issuer and the relative size and EBITDA of the Issuer (such amounts as adjusted, the "***Basket Adjustments***").

4.      The provisions limiting dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt will be more restrictive until the Net Total Leverage Ratio is less than 3.00 to 1.00.

5.      The indenture for the First Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

| | |
|---|---|
| <u>Events of Default</u>: | Customary for high yield debt securities and consistent with the Documentation Precedent. |
| <u>Governing Law</u>: | New York. |
| <u>Regulatory Matters</u>: | Consistent with the Documentation Precedent. |
| <u>Counsel to the Notes Lead Arranger</u>: | [          ]. |

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 435 of 539 PageID #:1394

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 148 of 183

New Second Lien OpCo Debt
$[_____] Second Lien Notes
Summary of Principal Terms[1]

| | |
|---|---|
| Issuer: | [Caesars Entertainment Operating Company, Inc.][2], in its capacity as the issuer of the Second Lien Notes (the "**Issuer**"). |
| Issue: | The Second Lien Notes in an a amount set forth in the Restructuring Term Sheet will be issued under and have the benefit of an indenture and security documentation typical and customary in the case of second lien senior secured notes issued pursuant to an exit financing, taking into consideration (i) the indenture for the second-priority senior secured notes issued on October 11, 2013 by Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Atlantic City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las Vegas Holding, LLC, Rio Properties, LLC (the "**CERP Second Lien Indenture**") and (ii) the operating lease structure of the Issuer and its subsidiaries, and otherwise be reasonably satisfactory to the Issuer and the Requisite Consenting Creditors (the "**Documentation Precedent**"); provided that, in the case of provisions setting forth the debt and lien capacity, the indenture shall be based on and consistent with the CERP Second Lien Indenture, as modified to reflect the terms set forth herein. |
| Purpose: | On the Closing Date, the Second Lien Notes will be issued to each First Lien Bank Lender and First Lien Noteholder in accordance with the Restructuring Term Sheet. |
| Maturity: | The Second Lien Notes will mature on the date that is seven (7) years after the Closing Date. |
| Interest Rate: | A fixed rate equal to 8.5%. |
| Ranking: | The Second Lien Notes will constitute senior second-priority secured indebtedness of the Issuer, and will rank pari passu in right of payment with all obligations under the Senior Facilities (the "**Credit Agreement**") and all other senior indebtedness |

---

[1] All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the "**Restructuring Term Sheet**"), or in the New First Lien OpCo Debt Term Sheet attached thereto.

[2] NTD:  Assumes CEOC is the operating company in the new REIT structure.

(including the First Lien Notes) of the Issuer.

Guarantees:

The Second Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer that guarantees the Credit Agreement or the First Lien Notes (the "***Note Guarantors***"), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon, on a senior second-priority secured basis (the "***Note Guarantees***"). The Note Guarantees will rank pari passu in right of payment with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors. The Note Guarantees will be automatically released upon release of the corresponding guarantees of the Credit Agreement and the First Lien Notes; *provided* that such released guarantees shall be reinstated if such released guarantors thereof are required to subsequently guarantee the Credit Agreement or the First Lien Notes. The Note Guarantees will be guarantees of payment and performance and not of collection.

Security:

Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the Second Lien Notes and the Note Guarantees will be secured by a second-priority security interest in those assets of the Issuer and the Note Guarantors that secure the First Lien Notes (the "***Collateral***"), *provided* that (i) assets securing the Second Lien Notes shall not include property excluded from the Collateral securing the First Lien Notes and (ii) the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions.

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand.

The indenture for the Second Lien Notes will provide that none of the Collateral Agent, note holders or Trustee will be permitted to terminate Caesars Entertainment Corporation or any of its subsidiaries or affiliates as manager of any of the PropCo facilities without the prior written consent of PropCo.

Doc#: US1:9680911v26

| | |
|---|---|
| <u>Mandatory Redemption</u>: | None. |
| <u>Optional Redemption</u>: | Prior to the first anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the first anniversary of the Closing Date plus 50 basis points. |
| | Prior to the first anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes. |
| | After the first anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to 3.00%, which premium shall decline to 2.00% on the second anniversary of the Closing Date, to 1.00% on the first anniversary of the Closing Date and to zero on the fourth anniversary of the Closing Date. |
| | All redemptions shall be made on a pro rata basis among the Notes. |
| <u>Offer to Purchase from Asset Sale Proceeds</u>: | The Issuer will be required to make an offer to repurchase the Second Lien Notes at par with the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent. |
| <u>Offer to Repurchase Upon a Change of Control</u>: | The Issuer will be required to make an offer to repurchase the Second Lien Notes following the occurrence of a "***change of control***" (to be defined in a manner consistent with the Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase. |
| <u>Defeasance and Discharge Provisions</u>: | Customary for high yield debt securities consistent with the Documentation Precedent. |
| <u>Modification</u>: | Customary for high yield debt securities consistent with the Documentation Precedent.  Notes held by the Issuer and its affiliates, including the Sponsors, shall not have voting rights. |
| <u>Registration Rights</u>: | Customary registration rights. |
| <u>Covenants</u>: | Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such |

3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 438 of 539 PageID #:1397

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 151 of 183

covenants); *provided*, that such covenants shall in no event be more restrictive than the corresponding covenant in the First Lien Notes.  For the avoidance of doubt, there shall be no financial maintenance covenants.

1.      The provisions limiting indebtedness shall, in addition to carve-outs consistent with the Documentation Precedent, provide that the amount of indebtedness incurred under the "bank basket" will not exceed an amount equal to the sum of (i) the aggregate principal amount of the Credit Agreement (including the accordion provisions thereunder), plus (ii) such additional amount of indebtedness that may be incurred that would not cause the ratio of funded debt outstanding that is (A) secured by a first priority lien on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the "*Net First Lien Leverage Ratio*") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date, (B) secured by junior liens on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the "*Net Total Secured Leverage Ratio*") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Net Total Secured Leverage Ratio in effect on the Closing Date and (C) unsecured (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the "*Net Total Leverage Ratio*") to exceed a ratio to be set on the Closing Date that is equal to 0.25x greater than the pro forma Net Total Leverage Ratio in effect on the Closing Date.[3]

2.      The provisions limiting liens shall provide for customary permitted liens consistent with the Documentation Precedent and include (i) the ability to incur (x) first-priority liens on indebtedness to the extent that the pro forma Net First Lien Leverage Ratio is not greater than a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Net First Lien Leverage Ratio in effect on the Closing Date and (y) pari passu liens on indebtedness so long as such liens are subject to the First Lien/Second Intercreditor Agreement or another intercreditor agreement that is not materially less favorable to the holders than the First

---

[3] For the avoidance of doubt, (i) the calculation of the ratios in the OpCo debt document shall exclude Chester Downs (from both debt and EBITDA) and (ii) any Revolving Facility loans outstanding at the time of incurrence of any debt shall be included in the calculation of any Leverage Ratio at the time of such incurrence.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 439 of 539 PageID #:1398

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 152 of 183

Lien/Second Lien Intercreditor Agreement and such indebtedness is permitted under the indenture; (ii) the ability to incur liens junior to the liens securing the Second Lien Notes, provided that the indebtedness secured by such junior liens is permitted under the indenture and (iii) the ability to incur liens on assets of non-Note Guarantor subsidiaries so long as such liens secure obligations of non-Note Guarantor subsidiaries that are otherwise permitted.

3.    With respect to basket amounts, covenant thresholds and similar levels in the indenture governing the Second Lien Notes provisions with respect to debt and lien capacity that are tied to dollar amounts, such amounts, thresholds and levels will be based on the corresponding dollar amounts that are set forth in the CERP Second Lien Indenture, in each case as adjusted pursuant to the agreement of the parties, including to reflect the pro forma capital structure of the Issuer and the relative size and EBITDA of the Issuer (such amounts as adjusted, the "***Basket Adjustments***")

4.    The provisions limiting dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt will be more restrictive until the Net Total Leverage Ratio is less than 3.00 to 1.00.

5.    The indenture for the Second Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

| | |
|---|---|
| <u>Events of Default</u>: | Customary for high yield debt securities and consistent with the Documentation Precedent. |
| <u>Governing Law</u>: | New York. |
| <u>Regulatory Matters</u>: | Consistent with the Documentation Precedent. |
| <u>Counsel to the Notes Lead Arranger</u>: | [          ]. |

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 440 of 539 PageID #:1399

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 153 of 183

<u>New First Lien PropCo Debt</u>
<u>$[_____] Term Facility</u>
<u>Summary of Principal Terms</u>[1]

<u>Borrower</u>:

[REIT PropCo] (the "***Borrower***").

<u>Agent/Collateral Agent</u>:

[     ] will act as sole administrative agent for the Senior Facilities (in such capacity and together with its permitted successors and assigns, the "***Agent***"), and will perform the duties customarily associated with such role.

[     ] will act as collateral agent for the Senior Facilities (in such capacity, the "***Collateral Agent***") and will perform the duties customarily associated with such role.

The Agent and Collateral Agent shall each be acceptable to the First Lien Bank Lenders and First Lien Noteholders.

<u>Facilities</u>:

(A)    a senior secured term loan facility in an aggregate principal amount set forth in the Restructuring Term Sheet (the "***First Lien Term Facility***" and loans thereunder, the "***Term Loans***"), which will be issued to each First Lien Bank Lender in accordance with the Restructuring Term Sheet (in such capacity, the "***Lenders***").

(B)    at the Borrower's option, a senior secured revolving credit facility in an aggregate principal amount not to exceed an amount to be agreed (and acceptable to the Requisite Consenting Creditors) (the "***Revolving Facility***" and, together with the First Lien Term Facility, the "***Senior Facilities***"), to be provided by the First Lien Bank Lenders or such other financial institutions to become Lenders under the Senior Facilities, a portion of which will be available through a subfacility in the form of letters of credit.

<u>Definitive Documentation</u>:

The definitive documentation for the Senior Facilities (the "***Senior Facilities Documentation***") shall, except as otherwise set forth herein, be based on financing and security documentation typical and customary for exit financings, taking into consideration (i) the First Lien Credit Agreement, dated as of October 11, 2013, among Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort

---

[1] All capitalized terms used but not defined herein shall have the meaning assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the "***Restructuring Term Sheet***").

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 441 of 539 PageID #:1400

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 154 of 183

Properties Finance, Inc., Harrah's Las Vegas, LLC, Harrah's Atlantic City Holding, Inc., Rio Properties, LLC, Flamingo Las Vegas Holding, LLC, Harrah's Laughlin, LLC and Paris Las Vegas Holding, LLC, as borrowers, the lenders party thereto and Citicorp North America, Inc., as administrative agent, and (ii) the operating lease structure and the REIT structure of the Borrower and its subsidiaries, and otherwise be reasonably satisfactory to the Borrower and the Requisite Consenting Creditors (the "***Documentation Precedent***").

Incremental Facilities:

The Borrower will be permitted after the Closing Date to add additional revolving or term loan credit facilities (the "***Incremental Facilities***") on terms consistent with Documentation Precedent.

Purpose:

On the Closing Date, the Term Loan will be issued to each First Lien Bank Lender in accordance with the Restructuring Term Sheet.

Availability:

The full amount of the First Lien Term Facility will be issued on the Closing Date.  Amounts under the First Lien Term Facility that are repaid or prepaid may not be reborrowed.

Interest Rates:

LIBOR + 3.5% per annum, with a 1.0% LIBOR floor.

Default Rate:

With respect to principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand.

Final Maturity and Amortization:

The First Lien Term Facility will mature on the date that is five (5) years after the Closing Date, and, commencing with the second full fiscal quarter ended after the Closing Date, will amortize in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of the First Lien Term Facility with the balance payable on the maturity date of the First Lien Term Facility.

Guarantees:

All obligations of the Borrower under the Senior Facilities and, at the option of the Borrower, under any interest rate protection or other hedging arrangements entered into with the Agent, an entity that is a Lender or agent at the time of such transaction (or on the Closing Date, if applicable), or any affiliate of any of the foregoing ("***Hedging Arrangements***"), or any cash management arrangements with any such person

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 442 of 539 PageID #:1401

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 155 of 183

("**Cash Management Arrangements**"), will be unconditionally guaranteed (the "**Guarantees**") by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Borrower (the "**Subsidiary Guarantors**"), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon. The Guarantees will be guarantees of payment and performance and not of collection.

Security:

Subject to exceptions described below and other exceptions to be agreed upon, the Senior Facilities, the Guarantees, any Hedging Arrangements and any Cash Management Arrangements will be secured on a first-priority basis by substantially all the owned material assets of the Borrower and each Subsidiary Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the "**Collateral**"), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Borrower or any Subsidiary Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary), (b) a perfected first priority lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Borrower and each Subsidiary Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property (including assignment of rents)) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Borrower, Agent and Collateral Agent shall reasonably determine that the costs or other consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract such counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received) and (z) other exceptions consistent with the Documentation Precedent. For the avoidance of doubt, lockbox arrangements and control agreements relating to the Borrower's and its subsidiaries' bank accounts and securities accounts will be

3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 443 of 539 PageID #:1402

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 156 of 183

required to be delivered at closing. The operating lease with [Caesars Entertainment Operating Company, Inc.] shall be subject to a customary subordination and non-disturbance agreement as provided in the Lease Term Sheet attached to the Restructuring Support Agreement.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation consistent with the Documentation Precedent.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in a customary intercreditor agreement between the administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, except that such intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder (the "*First Lien Intercreditor Agreement*").

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in a customary intercreditor agreement between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand (the "*First Lien/Second Lien Intercreditor Agreement*").

| | |
|---|---|
| <u>Mandatory Prepayments:</u> | Customary asset sale mandatory prepayments and Excess Cash Flow mandatory prepayments (commencing the first full fiscal year of the Borrower after the Closing Date, and subject to a minimum threshold to be agreed), on terms and definitions consistent with Documentation Precedent, with Excess Cash Flow to be calculated for these purposes after any Mandatory REIT Distributions. Excess Cash Flow payments will be made ratably between the Term Loans and the First Lien Notes (and ratably among the Lenders and holders of the First Lien Notes). |
| <u>Voluntary Prepayments and Reductions in Commitments:</u> | Voluntary reductions of the unutilized portion of the commitments under the Senior Facilities and prepayments of borrowings thereunder will be permitted at any time, in minimum principal amounts to be agreed upon, without premium or penalty, subject to the following paragraph and subject to reimbursement of the Lenders' redeployment costs |

4

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 444 of 539 PageID #:1403

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 157 of 183

in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period.  All voluntary prepayments of the First Lien Term Facility will be applied pro rata to the Term Loan (and pro rata among the Lenders) and to the remaining amortization payments under the First Lien Term Facility in such order as the Borrower may direct.

Voluntary Prepayments of the Term Loans made prior to the four year anniversary of the Closing Date will be subject to a prepayment premium, as follows:
- First year following Closing Date:  customary "make-whole" premium (T+50)
- Second year following Closing Date:  3%
- Third year following Closing Date:  2%
- Fourth year following Closing Date:  1%
- Fourth year anniversary and thereafter:  par

|  |  |
|---|---|
| Representations and Warranties: | The following representations and warranties, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries, subject to customary and other exceptions and qualifications to be agreed upon, consistent with the Documentation Precedent): organization, existence, and power; qualification; authorization and enforceability; no conflict; governmental consents; subsidiaries; accuracy of financial statements and other information in all material respects; projections; no material adverse change since the Closing Date; absence of litigation; compliance with laws (including PATRIOT Act, OFAC, FCPA, ERISA, margin regulations, environmental laws and laws with respect to sanctioned persons); payment of taxes; ownership of properties; governmental regulation; inapplicability of the Investment Company Act; Closing Date solvency on a consolidated basis; labor matters; validity, priority and perfection of security interests in the Collateral; intellectual property; treatment as designated senior debt under subordinated debt documents (if any); use of proceeds; and insurance. |
| Affirmative Covenants: | The following affirmative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary (consistent with the Documentation Precedent) and other baskets, exceptions and qualifications to be agreed upon:  maintenance of corporate |

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 445 of 539 PageID #:1404

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 158 of 183

existence and rights; performance and payment of obligations; delivery of annual and quarterly consolidated financial statements (accompanied by customary management discussion and analysis and (annually) by an audit opinion from nationally recognized auditors that is not subject to any qualification as to scope of such audit or going concern) (other than solely with respect to, or resulting solely from an upcoming maturity date under any series of indebtedness occurring within one year from the time such opinion is delivered) (with extended time periods to be agreed for delivery of the first annual and certain quarterly financial statements to be delivered after the Closing Date) and an annual budget (it being understood that the public REIT reporting that includes the Borrower shall satisfy the Borrower's reporting obligations so long as it includes a consolidating income statement and balance sheet for the Borrower); delivery of notices of default and material adverse litigation, ERISA events and material adverse change; maintenance of properties in good working order; maintenance of books and records; maintenance of customary insurance; commercially reasonable efforts to maintain ratings (but not a specific rating); compliance with laws; inspection of books and properties; environmental; additional guarantors and additional collateral (subject to limitations set forth under the captions "***Guarantees***" and "***Security***"); further assurances in respect of collateral matters; use of proceeds; and payment of taxes.

<u>Negative Covenants</u>:

The following negative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary exceptions and qualifications (consistent with the Documentation Precedent) and others to be agreed upon:

1.    Limitation on dispositions of assets.

2.    Limitation on mergers and acquisitions.

3.    Limitations on dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt; provided, that, any distributions required to be made to distribute 100% of REIT taxable income or satisfy any REIT-related requirements shall be permitted (such distributions, the "***Mandatory REIT Distributions***").

6

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 446 of 539 PageID #:1405

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 159 of 183

4.      Limitation on indebtedness (including guarantees and other contingent obligations) and preferred stock.

5.      Limitation on loans and investments.

6.      Limitation on liens and further negative pledges.

7.      Limitation on transactions with affiliates.

8.      Limitation on sale/leaseback transactions.

9.      Limitation on changes in the business of the Borrower and its subsidiaries.

10.     Limitation on restrictions on ability of subsidiaries to pay dividends or make distributions.

11.     Limitation on changes to fiscal year.

12.     Limitation on modifications to subordinated debt documents.

13.     Limitation on material modifications to the MLSA, lease and other arrangements entered into in connection with the lease structure.

EBITDA shall be defined in a manner consistent with the Documentation Precedent.

All ratios and calculations shall be measured on a Pro Forma Basis (to be defined in a manner consistent with the Documentation Precedent, and including the annualized effect of addbacks in the definition of EBITDA).

The Senior Facilities Documentation will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

<u>Financial Covenant</u>:      First Lien Term Facility:  None.

<u>Events of Default</u>:      The following (subject to customary and other thresholds and grace periods to be agreed upon, consistent with the Documentation Precedent, and applicable to the Borrower and its restricted subsidiaries), among others, if any, to be negotiated in the Senior Facilities Documentation:

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 447 of 539 PageID #:1406

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 160 of 183

nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross event of default and cross acceleration to material indebtedness; bankruptcy and similar events; material judgments; ERISA events; invalidity of the Guarantees or any security document, in each case, representing a material portion of the Guarantees or the Collateral; and Change of Control (to be defined in a manner consistent with the Documentation Precedent).

<u>Unrestricted Subsidiaries:</u>    The Senior Facilities Documentation will contain provisions pursuant to which, subject to limitations consistent with the Documentation Precedent, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary.  Unrestricted subsidiaries will not be subject to the affirmative or negative covenant or event of default provisions of the Senior Facilities Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating the financial ratios contained in the Senior Facilities Documentation on terms consistent with the Documentation Precedent.  In addition, [CPLV Sub] shall constitute an unrestricted subsidiary of the Borrower on the Closing Date.

<u>Voting:</u>    Usual for facilities and transactions of this type and consistent with the Documentation Precedent; provided that the Borrower and its affiliates, including the Sponsors, shall not have voting rights with respect to loans and commitments held by them.

<u>Cost and Yield Protection:</u>    Usual for facilities and transactions of this type, consistent with the Documentation Precedent.

<u>Assignments and Participations:</u>    Customary assignment provisions consistent with the Documentation Precedent.

<u>Non-Pro Rata Repurchases:</u>    The Borrower and its subsidiaries may purchase from any Lender (other than the Borrower or any of its affiliates, including the Sponsors), at individually negotiated prices, outstanding principal amounts or commitments under the First Lien Term Facility in a non-pro rata manner; *provided* that (i) the purchaser shall make a representation to the seller at the time of assignment that it does not possess material non-public information with respect to the Borrower and its

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 448 of 539 PageID #:1407

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 161 of 183

subsidiaries that has not been disclosed to the seller or Lenders generally (other than the Lenders that have elected not to receive material non-public information), (ii) any commitments or loans so repurchased shall be immediately cancelled and (iii) no default or event of default exists or would result therefrom.

**Expenses and Indemnification:**   Consistent with the Documentation Precedent.

**Regulatory Matters:**   Customary for facilities of this type and consistent with the Documentation Precedent.

**Governing Law and Forum:**   New York.

**Counsel to Agent/Collateral Agent:**   [          ].

9

A0446

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 449 of 539 PageID #:1408

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 162 of 183

<u>New First Lien PropCo Debt</u>
<u>$[          ] First Lien Notes</u>
<u>Summary of Principal Terms</u>[1]

| | |
|---|---|
| <u>Issuer:</u> | [REIT PropCo], in its capacity as the issuer of the First Lien Notes (the "***Issuer***"). |
| <u>Issue:</u> | The First Lien Notes in an amount set forth in the Restructuring Term Sheet will be issued under and have the benefit of an indenture and security documentation typical and customary in the case of first lien senior secured notes issued pursuant to an exit financing, taking into consideration (i) the indenture for the first-priority senior secured notes issued on October 11, 2013 by Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Atlantic City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las Vegas Holding, LLC, Rio Properties, LLC and (ii) the operating lease structure and the REIT structure of the Issuer and its subsidiaries, and otherwise be reasonably satisfactory to the Issuer and the Requisite Consenting Creditors (the "***Documentation Precedent***"). |
| <u>Purpose:</u> | On the Closing Date, the First Lien Notes will be issued to each First Lien Noteholder in accordance with the Restructuring Term Sheet. |
| <u>Maturity:</u> | The First Lien Notes will mature on the date that is five (5) years after the Closing Date. |
| <u>Interest Rate:</u> | LIBOR + 3.5% per annum, with a 1.0% LIBOR floor. |
| <u>Default Rate:</u> | With respect to principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand. |
| <u>Ranking:</u> | The First Lien Notes will constitute senior first-priority secured indebtedness of the Issuer, and will rank pari passu in all respects, including in right of payment, with all obligations under the Senior Facilities (the "***Credit Agreement***") and all |

---

[1] All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the "***Restructuring Term Sheet***"), or in the New First Lien PropCo Debt Term Sheet attached thereto.

other first lien senior indebtedness of the Issuer.

| | |
|---|---|
| <u>Guarantees:</u> | The First Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer (the "***Note Guarantors***"), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon, on a senior first-priority secured basis (the "***Note Guarantees***"). The Note Guarantees will rank pari passu in all respects, including in right of payment, with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors. The Note Guarantees will be guarantees of payment and performance and not of collection. |
| <u>Security:</u> | Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the First Lien Notes and the Note Guarantees will be secured by a first-priority security interest in substantially all the owned material assets of the Issuer and each Note Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the "***Collateral***"), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Issuer or any Note Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary) (b) a perfected first priority lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Issuer and each Note Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property (including an assignment of rents)) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Issuer and Collateral Agent shall reasonably determine that the costs or other consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract the counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received), and (z) other exceptions |

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 451 of 539 PageID #:1410

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 164 of 183

consistent with the Documentation Precedent; and provided that the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions. For avoidance of doubt, lockbox arrangements and control agreements relating to the Issuer's and its subsidiaries' bank accounts and securities accounts will be required to be delivered at closing. The operating lease with [Caesars Entertainment Operating Company, Inc.] shall be subject to a customary subordination and non-disturbance agreement as provided in the Lease Term Sheet attached to the Restructuring Support Agreement.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, consistent with the Documentation Precedent.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in the First Lien Intercreditor Agreement, as between the administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, which intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder.

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement, as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand.

| | |
|---|---|
| <u>Mandatory Redemption</u>: | None. |
| <u>Optional Redemption</u>: | Prior to the first anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the first anniversary of the Closing Date plus 50 basis points. |

Prior to the first anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes.

After the first anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to

3

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 452 of 539 PageID #:1411

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 165 of 183

3.0%, which premium shall decline to 2.0% on the second anniversary of the Closing Date, to 1.0% on the third anniversary of the Closing Date and to zero on the fourth anniversary of the Closing Date.

All redemptions shall be made on a pro rata basis among the Notes.

| | |
|---|---|
| <u>Offer to Purchase from Asset Sale Proceeds</u>: | The Issuer will be required to make an offer to repurchase the First Lien Notes at par with the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent. |
| <u>Offer to Repurchase with Proceeds of Debt Issuance</u>: | The Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt that consists of the First Lien Notes and First Lien Term Facility) of 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Issuer and its subsidiaries (other than debt permitted to be incurred under the indenture governing the First Lien Notes unless otherwise provided as a condition to the incurrence thereof). |
| <u>Offer to Repurchase Upon a Change of Control</u>: | The Issuer will be required to make an offer to repurchase the First Lien Notes following the occurrence of a "***change of control***" (to be defined in a manner consistent with the Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase. |
| <u>Offer to Purchase from Excess Cash Flow</u>: | Beginning with the first full fiscal year of the Issuer after the Closing Date, the Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt that consists of the First Lien Notes and First Lien Term Facility) of Excess Cash Flow (to be defined in a manner consistent with the Credit Agreement and subject to the same minimum threshold therein) of the Issuer and its restricted subsidiaries. |
| <u>Defeasance and Discharge</u> | Customary for high yield debt securities consistent with the |

| | |
|---|---|
| <u>Provisions</u>: | Documentation Precedent. |
| <u>Modification</u>: | Customary for high yield debt securities consistent with the Documentation Precedent.  Notes held by the Issuer and its affiliates, including the Sponsors, shall not have voting rights. |
| <u>Registration Rights</u>: | Customary registration rights. |
| <u>Covenants</u>: | Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such covenants; *provided*, that such baskets and covenants shall conform to the corresponding amounts in the Credit Agreement (including with respect to the Mandatory REIT Distributions)).  For the avoidance of doubt, there shall be no financial maintenance covenants. |

[CPLV Sub] shall constitute an unrestricted subsidiary of the Issuer on the Closing Date.

The provisions limiting dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt shall be subject to only those very limited carveouts that shall be agreed to by the Issuer and the Requisite Consenting Creditors, but shall in any event permit the Mandatory REIT Distributions.

The indenture for the First Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

| | |
|---|---|
| <u>Events of Default</u>: | Customary for high yield debt securities and consistent with the Documentation Precedent. |
| <u>Governing Law</u>: | New York. |
| <u>Regulatory Matters</u>: | Consistent with the Documentation Precedent. |
| <u>Counsel to the Notes Lead Arranger</u>: | [     ]. |

5

**A0451**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 454 of 539 PageID #:1413

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A - Restructuring Support Agreement   Page 167 of 183

New Second Lien PropCo Debt
$[_____] Second Lien Notes
Summary of Principal Terms[1]

| | |
|---|---|
| Issuer: | [REIT PropCo], in its capacity as the issuer of the Second Lien Notes (the "***Issuer***"). |
| Issue: | The Second Lien Notes in an amount set forth in the Restructuring Term Sheet will be issued under and have the benefit of an indenture and security documentation typical and customary in the case of second lien senior secured notes issued pursuant to an exit financing, taking into consideration (i) the indenture for the second-priority senior secured notes issued on October 11, 2013 by Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Atlantic City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las Vegas Holding, LLC, Rio Properties, LLC and (ii) the operating lease structure and the REIT structure of the Issuer and its subsidiaries, and otherwise be reasonably satisfactory to the Issuer and the Requisite Consenting Creditors (the "***Documentation Precedent***"). |
| Purpose: | On the Closing Date, the Second Lien Notes will be issued to each First Lien Noteholder in accordance with the Restructuring Term Sheet. |
| Maturity: | The Second Lien Notes will mature on the date that is six (6) years after the Closing Date. |
| Interest Rate: | A fixed rate equal to 8.0%. |
| Ranking: | The Second Lien Notes will constitute senior second-priority secured indebtedness of the Issuer, and will rank pari passu in right of payment with all obligations under the Senior Facilities (the "***Credit Agreement***") and all other senior indebtedness of the Issuer. |
| Guarantees: | The Second Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer that guarantees the Credit Agreement or the First Lien Notes (the "***Note Guarantors***"), subject to exceptions consistent with the Documentation |

---

[1] All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the "***Restructuring Term Sheet***"), or in the New First Lien PropCo Debt Term Sheet attached thereto.

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 455 of 539 PageID #:1414

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 168 of 183

|  |  |
|---|---|
|  | Precedent and others, if any, to be agreed upon, on a senior second-priority secured basis (the "***Note Guarantees***").   The Note Guarantees will rank pari passu in right of payment with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors.  The Note Guarantees will be automatically released upon release of the corresponding guarantees of the Credit Agreement and First Lien Notes; *provided* that such released guarantees shall be reinstated if such released guarantors thereof are required to subsequently guarantee the Credit Agreement or First Lien Notes. The Note Guarantees will be guarantees of payment and performance and not of collection. |
| <u>Security:</u> | Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the Second Lien Notes and the Note Guarantees will be secured by a second-priority security interest in those assets of the Issuer and the Note Guarantors that secure the First Lien Notes (the "***Collateral***"), *provided* that (i) assets securing the Second Lien Notes shall not include property excluded from the Collateral securing the First Lien Notes and (ii) the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions. |
|  | The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand. |
| <u>Mandatory Redemption:</u> | None. |
| <u>Optional Redemption:</u> | Prior to the third anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the third anniversary of the Closing Date plus 50 basis points. |
|  | Prior to the third anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes. |
|  | After the third anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to one-half of the coupon on such Notes, which premium shall decline |

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 456 of 539 PageID #:1415

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 169 of 183

ratably on each anniversary of the Closing Date thereafter to zero on the date that is two years prior to the maturity date.

All redemptions shall be made on a pro rata basis among the Notes.

<u>Offer to Purchase from Asset Sale Proceeds</u>:

The Issuer will be required to make an offer to repurchase the Second Lien Notes at par with the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent.

<u>Offer to Repurchase Upon a Change of Control</u>:

The Issuer will be required to make an offer to repurchase the Second Lien Notes following the occurrence of a "***change of control***" (to be defined in a manner consistent with the Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase.

<u>Defeasance and Discharge Provisions</u>:

Customary for high yield debt securities consistent with the Documentation Precedent.

<u>Modification</u>:

Customary for high yield debt securities consistent with the Documentation Precedent.  Notes held by the Issuer or its affiliates, including the Sponsors, shall not have voting rights.

<u>Registration Rights</u>:

Customary registration rights.

<u>Covenants</u>:

Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such covenants); *provided*, that such covenants shall in no event be more restrictive than the corresponding covenant in the First Lien Notes (including, without limitation, with respect to the Mandatory REIT Distributions).  For the avoidance of doubt, there shall be no financial maintenance covenants.

[CPLV Sub] shall constitute an unrestricted subsidiary of the Issuer on the Closing Date.

The indenture for the Second Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

Events of Default:        Customary for high yield debt securities and consistent with the Documentation Precedent.

Governing Law:        New York.

Regulatory Matters:        Consistent with the Documentation Precedent.

Counsel to the Notes Lead Arranger:        [      ].

4

**A0455**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 458 of 539 PageID #:1417

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 171 of 183

<div align="center">

CPLV Mezz Debt
$[_____] Term Facility
Summary of Principal Terms[1]

</div>

|  |  |
|---|---|
| Borrower: | [CPLV Holdings] (the "***Borrower***"), a newly-formed holding company that owns 100% of the outstanding stock of the subsidiary (or subsidiaries) of PropCo that own CPLV and have issued the CPLV Market Debt (as defined below) (collectively, the "***CPLV Sub***"). |
| Agent: | [    ] will act as sole administrative agent and collateral agent for the Term Facility (in such capacity and together with its permitted successors and assigns, the "***Agent***"), and will perform the duties customarily associated with such roles. |
| Facilities: | A secured non-guaranteed term loan facility in an aggregate principal amount equal to the difference in the amount of CPLV Market Debt (as defined below) issued in accordance with the Restructuring Term Sheet and $2,600 million (the "***CPLV Mezz Facility***" and loans thereunder, the "***CPLV Mezz Loans***"), which will be issued to each First Lien Bank Lender and First Lien Noteholder in accordance with the Restructuring Term Sheet (in such capacity, the "***Lenders***").[2] In accordance with the Restructuring Term Sheet, at least $2,000 million of real estate financing shall be issued to third party investors for cash proceeds on or before consummation of the Restructuring, which shall be senior to the CPLV Mezz Debt (with 100% of the net proceeds being used to repay the holders of the CPLV Term Loans) (the "***CPLV Market Debt***"). |
| Definitive Documentation: | The definitive documentation for the CPLV Mezz Facility (the "***Mezz Facility Documentation***") shall be based on customary documentation for commercial real estate mezzanine financings, as modified to reflect (i) agency and operational matters acceptable to the Borrower and Agent and (ii) the operating lease structure and the REIT structure of the Borrower (the "***Documentation Precedent***"). |
| Purpose: | On the Closing Date, the CPLV Mezz Loans will be issued to each First Lien Bank Lender and First Lien Noteholder in |

---

[1] All capitalized terms used but not defined herein shall have the meaning assigned thereto in the
    Restructuring Term Sheet to which this Term Sheet is attached (the "***Restructuring Term Sheet***").
[2] For the avoidance of doubt, the Lenders will be issued notes backed by the CPLV Mezz Loans through a
    customary securitization structure.

Doc#: US1:9680911v26

<div align="center">

**A0456**

</div>

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 459 of 539 PageID #:1418

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 172 of 183

accordance with the Restructuring Term Sheet.

|  |  |
|---|---|
| Availability: | The full amount of the CPLV Mezz Facility will be issued on the Closing Date. Amounts under the CPLV Mezz Facility that are repaid or prepaid may not be reborrowed. |
| Interest Rates: | A rate equal to 8.00% if the principal amount of the CPLV Mezz Facility is equal to $600 million, increasing by 0.25% for every $25 million reduction in the principal amount of the CPLV Mezz Facility below $600 million on the Closing Date (up to a maximum interest rate of 13.0%). |
| Default Rate: | With respect to principal, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand. |
| Final Maturity and Amortization: | The CPLV Mezz Facility will mature on the date that is six (6) years after the Closing Date. |
| Guarantees: | None. |
| Security: | Subject to customary exceptions, the CPLV Mezz Facility will be secured on a first-priority basis by a pledge of the equity interests in CPLV Sub. There shall be neither lockbox arrangements nor any control agreements relating to the Borrower's and its subsidiaries' bank accounts or securities accounts. The operating lease with [Caesars Entertainment Operating Company, Inc.] shall be subject to a customary subordination and non-disturbance agreement as provided in the Lease Term Sheet attached to the Restructuring Support Agreement. |

The relative rights and priorities in the Collateral for the CPLV Mezz Facility and the CPLV Market Debt will be set forth in a customary intercreditor agreement, as between the collateral agent for the CPLV Mezz Facility, on the one hand, and the collateral agent for the CPLV Market Debt, on the other hand.

|  |  |
|---|---|
| Mandatory Prepayments: | Customary for commercial real estate mezzanine financings. |
| Voluntary Prepayments and Reductions in Commitments: | Voluntary reductions of the unutilized portion of the commitments under the CPLV Mezz Facility and prepayments of borrowings thereunder will be permitted at any time, in minimum principal amounts to be agreed upon, without premium or penalty, pro rata among the Lenders |

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 460 of 539 PageID #:1419

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 173 of 183

|                                 | subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period. All voluntary prepayments of the Term Facility will be applied to the remaining amortization payments under the CPLV Mezz Facility in such order as the Borrower may direct. |

Representations and
Warranties:

The following representations and warranties will apply (to be applicable to the Borrower and its restricted subsidiaries, subject to customary and other exceptions and qualifications to be agreed upon, consistent with the Documentation Precedent): organization, existence, and power; qualification; authorization and enforceability; no conflict; governmental consents; subsidiaries; accuracy of financial statements and other information in all material respects; projections; no material adverse change since the Closing Date; absence of litigation; compliance with laws (including PATRIOT Act, OFAC, FCPA, ERISA, margin regulations, environmental laws and laws with respect to sanctioned persons); payment of taxes; ownership of properties; governmental regulation; inapplicability of the Investment Company Act; Closing Date solvency on a consolidated basis; labor matters; validity, priority and perfection of security interests in the Collateral; intellectual property; treatment as designated senior debt under subordinated debt documents (if any); use of proceeds; and insurance.

Affirmative Covenants:

The following affirmative covenants will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary (consistent with the Documentation Precedent) and other baskets, exceptions and qualifications to be agreed upon: maintenance of corporate existence and rights; performance and payment of obligations; delivery of annual and quarterly consolidated financial statements (accompanied by customary management discussion and analysis and (annually) by an audit opinion from nationally recognized auditors that is not subject to any qualification as to scope of such audit or going concern) (other than solely with respect to, or resulting solely from an upcoming maturity date under any series of indebtedness occurring within one year from the time such opinion is delivered) (with extended time periods for delivery of the first annual and certain quarterly financial statements to be delivered after the Closing Date) and an annual budget (it being understood that the public REIT reporting that includes the Borrower shall satisfy the Borrower's reporting obligations so long as it includes a consolidating income statement and balance sheet for the

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 461 of 539 PageID #:1420

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 174 of 183

Borrower); delivery of notices of default and material adverse litigation, ERISA events and material adverse change; maintenance of properties in good working order; maintenance of books and records; maintenance of customary insurance; commercially reasonable efforts to maintain ratings (but not a specific rating); compliance with laws; inspection of books and properties; environmental; additional guarantors and additional collateral (subject to limitations set forth under the captions "***Guarantees***" and "***Security***"); further assurances in respect of collateral matters; use of proceeds; and payment of taxes.

Negative Covenants:

The following negative covenants, among others, if any, to be negotiated in the Mezz Facility Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary exceptions and qualifications (consistent with the Documentation Precedent) and others to be agreed upon:

1.   Limitation on dispositions of assets.

2.   Limitation on mergers and acquisitions.

3.   Limitation on dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt; provided that, any distributions required to be made to distribute 100% of REIT taxable income or satisfy any REIT-related requirements shall be permitted (such distributions, the "***Mandatory REIT Distributions***").

4.   Limitation on indebtedness (including guarantees and other contingent obligations) and preferred stock.

5.   Limitation on loans and investments.

6.   Limitation on liens and further negative pledges.

7.   Limitation on transactions with affiliates.

8.   Limitation on sale/leaseback transactions.

9.   Limitation on changes in the business of the Borrower and its subsidiaries.

10.   Limitation on restrictions on ability of subsidiaries to pay dividends or make distributions.

Doc#: US1:9680911v26

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 462 of 539 PageID #:1421

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 175 of 183

11.    Limitation on changes to fiscal year.

12.    Limitation on modifications to subordinated debt documents.

13.    Limitation on material modifications to the MLSA, lease and other arrangements entered into in connection with the lease structure.

EBITDA shall be defined in a manner consistent with the Documentation Precedent.

All ratios and calculations shall be measured on a Pro Forma Basis (to be defined in a manner consistent with the Documentation Precedent, and including the annualized effect of addbacks in the definition of EBITDA).

The Mezz Facility Documentation will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

**Financial Covenant:**    CPLV Mezz Facility:  None.

**Events of Default:**    The following (subject to customary and other thresholds and grace periods to be agreed upon, consistent with the Documentation Precedent, and applicable to the Borrower and its restricted subsidiaries): nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross event of default and cross acceleration to material indebtedness (including CLV Market Debt); bankruptcy and similar events; material judgments; ERISA events; invalidity of the Guarantees or any security document, in each case, representing a material portion of the Guarantees or the Collateral; and Change of Control (to be defined in a manner consistent with the Documentation Precedent).

**Voting:**    Usual for facilities and transactions of this type and consistent with the Documentation Precedent; provided that the Borrower and its affiliates, including the Sponsors, shall not have voting rights with respect to loans and commitments held by them. .

**Cost and Yield Protection:**    Usual for facilities and transactions of this type, consistent

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 463 of 539 PageID #:1422

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 176 of 183

|   | with the Documentation Precedent. |
|---|---|
| <u>Assignments and Participations:</u> | The Lenders will be permitted to assign loans and commitments under the CPLV Mezz Facility with the consent of the Borrower (not to be unreasonably withheld or delayed, but which consent under the CPLV Mezz Facility shall be deemed granted if the Borrower fails to respond to a request for consent by a Lender within ten business days of such request being made); *provided*, that such consent of the Borrower shall not be required (i) if such assignment is made, in the case of the CPLV Mezz Facility, to another Lender under the CPLV Mezz Facility or an affiliate or approved fund of a Lender under the Term Facility or (ii) after the occurrence and during the continuance of an event of default relating to payment default or bankruptcy.  All assignments will also require the consent of the Agent (subject to exceptions consistent with the Documentation Precedent) not to be unreasonably withheld or delayed.  Each assignment, in the case of the CPLV Mezz Facility, will be in an amount of an integral multiple of $1,000,000.  The Agent will receive a processing and recordation fee of $3,500, payable by the assignor and/or the assignee, with each assignment.  Assignments will be by novation. |

The Lenders will be permitted to sell participations in loans subject to the restrictions set forth herein and consistent with the Documentation Precedent.  Voting rights of participants shall (i) be limited to matters in respect of (a) increases in commitments of such participant, (b) reductions of principal, interest or fees payable to such participant, (c) extensions of final maturity or scheduled amortization of the loans or commitments in which such participant participates and (d) releases of all or substantially all of the value of the Guarantees, or all or substantially all of the Collateral and (ii) for clarification purposes, not include the right to vote on waivers of defaults or events of default.

Notwithstanding the foregoing, assignments (and, to the extent such list is made available to all Lenders, participations) shall not be permitted to ineligible institutions identified to the Agent on or prior to the Closing Date and, with the consent of the Agent, thereafter; provided that the Agent shall not be held liable or responsible for any monitoring or enforcing of the foregoing.

Assignments shall not be deemed non-pro rata payments.  Non-pro rata prepayments will be permitted to the extent

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 464 of 539 PageID #:1423

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 177 of 183

required to permit "extension" transactions and "replacement" facility transactions (with existing and/or new Lenders), subject to customary restrictions consistent with the Documentation Precedent.

Assignments to the Sponsors and their respective affiliates (other than the Borrower and its subsidiaries) (each, an "*Affiliated Lender*") shall be permitted subject to customary restrictions consistent with the Documentation Precedent.

Non-Pro Rata Repurchases:    The Borrower and its subsidiaries may purchase from any Lender (other than the Borrower and its affiliates, including the Sponsors), at individually negotiated prices, outstanding principal amounts or commitments under the CPLV Mezz Facility in a non-pro rata manner; *provided* that (i) the purchaser shall make a representation to the seller at the time of assignment that it does not possess material non-public information with respect to the Borrower and its subsidiaries that has not been disclosed to the seller or Lenders generally (other than the Lenders that have elected not to receive material non-public information), (ii) any commitments or loans so repurchased shall be immediately cancelled and (iii) no default or event of default exists or would result therefrom.

Expenses and Indemnification:    Consistent with the Documentation Precedent.

Regulatory Matters:    Customary for facilities of this type and consistent with the Documentation Precedent.

Governing Law and Forum:    New York.

Counsel to Agent:    [       ].

Doc#: US1:9680911v26

### Exhibit C

[INTENTIONALLY OMITTED]

KE 34369171.11

**A0463**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 466 of 539 PageID #:1425

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 179 of 183

**Exhibit D**

**Milestones**

The failure to comply with any of the following Milestones will result in a Creditor Termination Event under <u>Section 8</u> of this Agreement:

1.  The Company shall commence the Chapter 11 Cases in the Bankruptcy Court on or after January 15, 2015, but no later than January 20, 2015.

2.  Within 5 Business Days after the Petition Date, an order approving the interim use of cash collateral, on the terms and conditions substantially consistent with those set forth in the Cash Collateral Stipulation, shall have been entered by the Bankruptcy Court;

3.  Within 20 days after the Petition Date, the Company shall have filed a motion with the Bankruptcy Court seeking authorization to assume this Agreement (the "<u>RSA Assumption Motion</u>") in form, scope and substance materially consistent with this Agreement and otherwise reasonably acceptable to the Company, CEC, and the Requisite Consenting Creditors.

4.  Within 45 days after the Petition Date, the Company shall have filed the Plan and Disclosure Statement, in each case in form, scope and substance reasonably satisfactory to the Requisite Consenting Creditors and the Company; for the avoidance of doubt, any supplement to the Plan must be in form, scope and substance materially consistent with the Restructuring Term Sheet and otherwise reasonably satisfactory to the Requisite Consenting Creditors and the Company.

5.  Within 75 days after the Petition Date, the Company shall have obtained entry by the Bankruptcy Court of an order approving the use of cash collateral on a final basis on terms and conditions substantially consistent with those set forth in the Cash Collateral Stipulation.

6.  Within 90 days after filing the RSA Assumption Motion, the Company shall have obtained entry by the Bankruptcy Court of an order approving the assumption of this Agreement in form, scope and substance materially consistent with this Agreement and otherwise reasonably acceptable to the Company, CEC, and the Requisite Consenting Creditors.

7.  Within 150 days after the Petition Date, the Company shall have obtained entry by the Bankruptcy Court of (a) an order approving the Disclosure Statement, and (b) an order approving solicitation procedures in relation to the Plan and Disclosure Statement; in each case materially consistent with the Restructuring Term Sheet and otherwise in in form, scope and substance reasonably satisfactory to the Requisite Consenting Creditors and the Company.

8.  Within 120 days after the Bankruptcy Court's approval of the Disclosure Statement, the Company shall have obtained entry by the Bankruptcy Court of an order confirming the Plan that is materially consistent with the Restructuring Term Sheet and otherwise reasonably satisfactory to the Requisite Consenting Creditors and the Company (the "<u>Confirmation Order</u>").

KE 34369171.11

**A0464**

9.    Within 120 days after the Confirmation Order has become a final order (the "Outside Date"), the Effective Date shall have occurred.  In the event the Company has failed to obtain required regulatory approvals for certain of its assets as of the Outside Date, the Company shall close and proceed to effectiveness with respect to those assets for which it does have regulatory approval, unless the Company determines in good faith, after consultation with the Requisite Consenting Creditors, that to do so would have a materially adverse effect on the Company, in which case the Company shall have an additional sixty (60) days in which to obtain the additional required regulatory approvals and close on those assets.  Any further extensions of the Outside Date shall require the consent of the Requisite Consenting Creditors.

<p style="text-align:center">*      *      *      *      *</p>

KE 34369171.11

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 468 of 539 PageID #:1427

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A
- Restructuring Support Agreement   Page 181 of 183

**Exhibit E**

**Transfer Agreement**

**PROVISION FOR TRANSFER AGREEMENT**

        The undersigned ("Transferee") (a) hereby acknowledges that it has read and understands the Restructuring Support and Forbearance Agreement, dated as of _____ (the "Agreement"),[1] by and among the Caesars Parties and each of the Consenting Creditors party thereto, (b) desires to acquire the Claims described below (the "Transferred Claims") from one of the Restructuring Support Parties (the "Transferor") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound with respect to the Transferred Claims, and shall be deemed a Consenting Creditor for all purposes under the Agreement, including with respect to any election made such Transferor with respect to any Put Option applicable to the OpCo New Common Stock that has been exercised by such Transferor.  To the extent the Transferred Claims are Forbearance Fee First Lien Bond Claims, Transferee shall be considered a Forbearance Fee Party for all purposes under the Agreement, unless a Notice of Retention of RSA Forbearance Fee substantially in the form of Exhibit F to the Agreement is delivered to CEC.

        The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the **[First Lien Indentures / Credit Agreement]** and the Agreement, to the same extent applicable to the Transferred Claims, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Transferred Claims, except as otherwise provided in the Agreement and (iii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor with respect to the Transferred Claims.

Date Executed:  _____,

_____

**Print name of Transferee**

_____

**Name:**
**Title:**

**Address:**    _____

_____

_____

**Attention:**   _____

**Telephone:** _____

**Facsimile:**  _____

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 469 of 539 PageID #:1428

Case 15-01145   Doc 4-1   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit A - Restructuring Support Agreement   Page 182 of 183

| Principal Amount Held | |
|---|---|
| **Claim**[2] | **Amount** |
| | |
| | |
| | |
| | |
| | |
| | |

---

[2] Specify type and indicate whether Claims are Forbearance Fee First Lien Bond Claims.

43

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 470 of 539 PageID #:1429

Case 15-01145    Doc 4-1    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit A
- Restructuring Support Agreement    Page 183 of 183

## **Exhibit F**

## **Notice of Retention of RSA Forbearance Fee**

The RSA Forbearance Fees payable in respect of $[_____] of First Lien Bond Claims (such amount, the "Retained RSA Forbearance Fee") shall be payable by CEC to the Transferor in accordance with the Restructuring Term Sheet, notwithstanding the transfer of such First Lien Bond Claims to the undersigned Transferee.

For the avoidance of doubt, upon delivery of this notice to CEC by either the Transferor or the Transferee, CEC shall pay the Retained RSA Forbearance Fee in accordance with the terms of the Restructuring Term Sheet to the Transferor and shall not be required to pay such amounts to the Transferee, notwithstanding the transfer of the First Lien Bond Claims to the undersigned Transferee.

Date Executed: _____,

_____
**Print name of Transferor**

_____
**Name:**
**Title:**

**Address:**    _____

_____

**Attention:**    _____
**Telephone:**    _____
**Facsimile:**    _____


_____
**Print name of Transferee**

_____
**Name:**
**Title:**

**Address:**    _____

_____

**Attention:**    _____
**Telephone:**    _____
**Facsimile:**    _____

44

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 471 of 539 PageID #:1430

Case 15-01145   Doc 4-2   Filed 01/15/15   Entered 01/15/15 01:35:13   Desc Exhibit B - Corporate Organizational Chart   Page 1 of 11

**<u>EXHIBIT B</u>**

**Corporate Organizational Chart**

KE 34666702

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 472 of 539 PageID #:1431

Case 15-01145    Doc 4-2    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit B
- Corporate Organizational Chart    Page 2 of 11

# ORGANIZATIONAL CHART 1



# ORGANIZATIONAL CHART 2
# CEOC SUBSIDIARIES (PART I)



**A0471**

# ORGANIZATIONAL CHART 3
## CEOC SUBSIDIARIES (PART II)





**A0472**

# ORGANIZATIONAL CHART 4
# CEOC SUBSIDIARIES (PART III)



# ORGANIZATIONAL CHART 5
## CEOC SUBSIDIARIES (PART IV)





**A0474**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 477 of 539 PageID #:1436

Case 15-01145    Doc 4-2    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit B
- Corporate Organizational Chart    Page 7 of 11

**ORGANIZATIONAL CHART 6**
**CEOC SUBSIDIARIES (PART V)**



# ORGANIZATIONAL CHART 7
# CEOC SUBSIDIARIES (PART VI)



**A0476**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 479 of 539 PageID #:1438

Case 15-01145    Doc 4-2    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit B
- Corporate Organizational Chart    Page 9 of 11

# ORGANIZATIONAL CHART 8
# CEOC SUBSIDIARIES (PART VII)



Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 480 of 539 PageID #:1439

Case 15-01145    Doc 4-2    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit B - Corporate Organizational Chart    Page 10 of 11

# ORGANIZATIONAL CHART 9
# CEOC SUBSIDIARIES (PART VIII)



A0478

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 481 of 539 PageID #:1440

Case 15-01145    Doc 4-2    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit B
- Corporate Organizational Chart    Page 11 of 11

# ORGANIZATIONAL CHART 10
# CEOC SUBSIDIARIES (PART VIII-continued)

London Clubs Holdings Limited

London Clubs Trustee Limited

Cutembourg Metropole Casino (Pty) Limited

London Clubs Management Limited

LCI plc

London Clubs (Overseas) Limited

LCI (Overseas) Investments Pty Ltd.

Non-Affiliates

London Clubs LSQ Limited

London Clubs Leeds Limited

London Clubs Poker Room Limited

Playboy Club (London) Limited

Burlington Street Services Limited

London Clubs Limited

London Clubs (Europe) Limited

Inter Casino Management (Egypt) Limited

70%      30%

Emerald Safari Resort (Pty) Limited

London Clubs Nottingham Limited

London Clubs Southend Limited

London Clubs Manchester Limited

Corby Leisure Retail Development Limited

Brussels Casino SA

R Club (London) Limited

London Clubs Glasgow Limited

The Sportsman Club Limited

London Clubs Brighton Limited

Casanova Club Limited

R Casino Limited



**Legend**

**Debtor**

**Non-Debtor**

**Non-Affiliate**

**A0479**

Case: 1:16-cv-08423 Document #: 63 Filed: 09/09/16 Page 482 of 539 PageID #:1441

Case 15-01145    Doc 4-3    Filed 01/15/15    Entered 01/15/15 01:35:13    Desc Exhibit C
- List of Non-Debtor Subsidiaries    Page 1 of 4

# EXHIBIT C

**List of Non-Debtor Subsidiaries**

KE 34666718

| List of Non-Debtors |
|---|
| Baluma Holdings S.A. |
| Caesars Bahamas Investment Corporation |
| Caesars Bahamas Management Corporation |
| Harrah's (Barbados) SRL |
| Creator Capital Limited |
| Baluma Ltda. |
| CA Hospitality Holding Company, Ltd. |
| Caesars Canada Marketing Services Corporation |
| Windsor Casino Limited |
| Caesars Global Living (Zhuhai) Limited |
| Woodbury Manager, LLC |
| Burlington Street Services Limited |
| Caesars Spain Holdings Limited |
| Casanova Club Limited |
| Corby Leisure Retail Development Limited |
| Dagger Holdings Limited |
| Golden Nugget Club Limited |
| Harrah's Activity Limited |
| Harrah's Entertainment Limited |
| LCI plc |
| London Clubs (Europe) Limited |
| London Clubs (Overseas) Limited |
| London Clubs Brighton Limited |
| London Clubs Holdings Limited |
| London Clubs International Limited |
| London Clubs Leeds Limited |
| London Clubs Limited |
| London Clubs LSQ Limited |
| London Clubs Management Limited |
| London Clubs Manchester Limited |
| London Clubs Nottingham Limited |
| London Clubs Poker Room Limited |
| London Clubs Southend Limited |
| London Clubs Trustee Limited |
| Playboy Club (London) Limited |
| R Casino Limited |
| R Club (London) Limited |
| The Sportsman Club Limited |
| Caesars Asia Limited |
| Caesars World International Far East Limited |
| CH Management Company, Ltd. |
| Inter Casino Management (Egypt) Limited |
| LAD Hotel Partners, LLC |
| Shanghai Golf Club, Ltd. |

| List of Non-Debtors |
|---|
| Shanghai Real Estate, Ltd. |
| Sterling Suffolk Racecourse, LLC |
| El Palacio Del Cesar en Mexico, S.A. de C.V. |
| Atlantic City Express Service, LLC |
| Harrah's Nova Scotia ULC |
| Park Place Finance, ULC |
| Showboat Nova Scotia ULC |
| 2115-2121 Ontario Building, LLC |
| 250 Huron LLC |
| Chester Downs and Marina LLC |
| London Clubs Glasgow Limited |
| Caesars World International Corporation PTE, Ltd. |
| Conrad International Hotels Corporation-SA (Proprietary) Limited |
| Culembourg Metropole Casino (Pty) Limited |
| Emerald Safari Resort (Pty) Limited |
| Johnnic Casino Holdings Limited |
| LCI (Overseas) Investments Pty Ltd. |
| Caesars Casino Castilla La Mancha S.A. |
| Caesars Hotel Castilla La Mancha, S.L. |
| Harrah's International C.V. |
| HEI Holding C.V. |
| HET International 1 B.V. |
| HET International 2 B.V. |
| Brussels Casino SA |
| Caesars Entertainment (U.K.) Ltd. |
| Baluma Cambio, S.A. |
| Baluma S.A. |
| Caesars Enterprise Services, LLC |
| Chester Downs Finance Corp. |
| ROC Finance 1 Corp. |
| ROC Finance, LLC |
| Rock Gaming Cleveland Scranton Peninsula, LLC |
| Rock Ohio Caesars Chase, LLC |
| Rock Ohio Caesars Cincinnati, LLC |
| Rock Ohio Caesars Cleveland, LLC |
| Rock Ohio Caesars Gateway, LLC |
| Rock Ohio Caesars Hotel, LLC |
| Rock Ohio Caesars, LLC |
| Rock Parent, LLC |
| Thistledown Racetrack, LLC |
| Turfway Park, LLC |
| NAL Ohio Holdings, LLC |
| RGFD, LLC |
| Harrah's Kansas Casino Corporation |

3

**A0482**

| **List of Non-Debtors** |
| --- |
| Harrah's Vicksburg Corporation |
| Caesars Ohio Acquisition, LLC |
| Caesars Ohio Investment, LLC |
| Horseshoe Cincinnati Management, LLC |
| Horseshoe Cleveland Management, LLC |
| Horseshoe Ohio Development, LLC |
| Thistledown Management, LLC |

4

**A0483**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD.,** and **TRILOGY PORTFOLIO COMPANY, LLC,** | **CIVIL ACTION NO. 14-7091-SAS** |

: **CIVIL ACTION NO. 14-7091-SAS**

:

: **AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

:

: **JURY TRIAL DEMANDED**

Plaintiffs,

v.

**CAESARS ENTERTAINMENT CORPORATION** and **CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,**[1]

Defendants.

Plaintiffs MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-

Long/Short Debt Portfolio, a Series of Underlying Funds Trust, SB 4 CF LLC, CFIP Ultra

Master Fund, Ltd. and Trilogy Portfolio Company, LLC (collectively, "Plaintiffs"), by and

through their attorneys Drinker Biddle & Reath LLP, submit the following Amended Complaint

and in support thereof respectfully allege upon personal knowledge as to themselves and their

own acts, and upon information and belief as to all other matters, as follows:

---

[1]  While the caption of this matter remains the same as in the original Complaint, as set forth in this Court's Order dated January 15, 2015 (ECF No. 28), Plaintiffs' claims as against Defendant Caesars Entertainment Operating Corporation ("CEOC") are stayed pursuant to Section 362(a) of the Bankruptcy Code based on Chapter 11 petitions filed with respect to CEOC in both the United States Bankruptcy Courts for the District of Delaware and for the Northern District of Illinois.  For the avoidance of doubt, and notwithstanding anything else stated herein, Plaintiffs' amendment of their Complaint with the filing of this Amended Complaint *is not and should not be deemed an attempt to commence or continue an action against CEOC, to collect a debt against CEOC or take any other action in violation of the automatic stay imposed by section 362 of Title 11 of the United States Code.*

**Debtors
Exhibit-002**

**A0484**

## AMENDMENT AND AUTOMATIC STAY

1.      **At the time of the filing of this Amended Complaint, Defendant Caesars Entertainment Operating Company, Inc. is a Debtor under the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.  This Amended Complaint is filed pursuant to this Court's Opinion and Order dated January 15, 2015 (Doc. No. 21), which contemplates the continuance of this action only as against Caesars Entertainment Corporation. Notwithstanding anything else stated herein, this Amended Complaint is not and should not be deemed an attempt to commence or continue an action against Caesars Entertainment Operating Company, Inc., to collect a debt against Caesars Entertainment Operating Company, Inc., or to take any action in violation of the automatic stay.**

## SUMMARY OF THE ACTION

2.      This is an action for declaratory judgment, violations of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa to 77bbbb. (the "TIA"), and breaches of (i) two series of notes, (ii) two guarantees, and (iii) two indentures qualified under the TIA under which the notes and guarantees were issued.  Plaintiffs are beneficial holders of certain notes issued by Caesars Entertainment Operating Company, Inc. ("CEOC") and guaranteed by Caesars Entertainment Corporation ("CEC," and together with CEOC, "Caesars")[2] that were sold pursuant to registered public offerings in 2005 and 2006, and are governed by the TIA.

3.      CEOC and CEC engaged in a "backroom deal" with a specific group of noteholders (the "Favored Noteholders") to provide them with special treatment and compensation in exchange for the Favored Noteholders' assistance in impairing the fundamental rights of all other noteholders.  To be clear, CEOC and CEC did not make any offers or solicit

---

[2]  Upon information and belief, CEOC and CEC were named, respectively, Harrah's Operating Company, Inc. and Harrah's Entertainment, Inc. until 2010.

Confidential

CEOC_105_Adversary_001425

the consent of all noteholders.  Rather, CEOC and CEC rejected the fair and inclusive path where an issuer makes an offer available to all noteholders, in favor of cutting its separate deal with the select few Favored Noteholders, who as a result of such deal exited all or substantially all of their economic stake in the Notes (defined below).  This conduct took place against the backdrop of an ongoing restructuring of CEOC.  Gary Loveman, chief executive officer and president of CEC, admitted the same in an August 12, 2014 <u>Financial Times</u> article:  "We have indicated that the company requires deleveraging and that a restructuring is appropriate.  A bankruptcy is a different thing.  It is one option."  Through this purported transaction, CEOC and CEC seek to impair the basic fundamental rights of all other noteholders, without their consent, including the stripping of the guarantee of CEC which provides critical credit support for the Notes.  Consistent with Mr. Loveman's statement, CEOC filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois on January 15, 2015, after certain of its second-lien bondholders filed an involuntary bankruptcy petition as to CEOC in the United States Bankruptcy Court for the District of Delaware on January 12, 2015.  Accordingly, Plaintiffs have filed the following Amended Complaint.

## NATURE OF THE ACTION

4.    Plaintiffs are collectively the beneficial holders of approximately $15,318,000 of 6.50% Senior Notes due 2016 ("<u>2016 Notes</u>") and $5,632,000 of 5.75% Senior Notes due 2017 ("<u>2017 Notes</u>" and, together with the 2016 Notes, the "<u>Notes,</u>" each evidenced by a global note) issued by CEOC and unconditionally guaranteed by CEC (for the 2017 Notes, the "<u>2017 Guarantee</u>"; for the 2016 Notes, the "<u>2016 Guarantee</u>"; and together, the "<u>Guarantees</u>").

5.    While Plaintiffs are sophisticated investors, upon information and belief, the vast majority of the other holders (whose holdings collectively equal approximately $137 million) are

3

**A0486**

individual investors whose Notes have also been stripped of all value as a result of the Agreement (defined below).  Upon information and belief, the individual holders have few avenues through which to band together to challenge the Agreement.

6.      Plaintiffs bring this action against Caesars because of its course of self-dealing and collusion related to the Notes, designed to deprive Plaintiffs and other holders of the Notes, including individual investor noteholders (collectively, the "Disenfranchised Noteholders"), of their guaranteed protections under federal law, the Indentures (defined below) governing the Notes, and the Guarantees, in order to favorably position the Favored Noteholders and certain of Caesars's creditors and other stakeholders, including CEC, in a bankruptcy that will deprive the Disenfranchised Noteholders of their rights to receive principal and interest under the Notes and Guarantees, and the benefit of their bargain under the Indentures.

7.      Specifically, on August 12, 2014, Caesars entered into a Note Purchase and Support Agreement (the "Agreement"), in which it contracted to pay a vast premium over market to purchase over $155 million of Notes from only certain noteholders—the Favored Noteholders—in exchange for votes that would strip the remaining Notes of certain fundamental provisions, while excluding Plaintiffs and other Disenfranchised Noteholders from the transaction entirely.  The transaction was negotiated and executed in secret, and was not publicly announced by Caesars until the filing of a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") on August 12, 2014.  See CEOC Form 8-K, filed Aug. 12, 2014, attached hereto as Exhibit "A."  That Form 8-K omitted the identities of the Favored Noteholders and other material information.  As of the date of this pleading, CEC still has not disclosed the identities of the Favored Noteholders, the number of Notes from each series purchased, and other relevant information about the transaction.

4

8.      The form of the Agreement itself was not made public until August 14, 2014, when CEOC filed its Quarterly Report on Form 10-Q.  Even that disclosure omitted material information, including schedules, and the form of supplemental indentures purportedly consented to, as well as the Favored Noteholders' identities (once again).  *See* Note Purchase and Support Agreement, Schedule A, attached to the CEOC Form 10-Q, filed Aug. 14, 2014, and attached hereto as Exhibit "B."  It was not until August 25, 2014 that CEOC and CEC filed an amendment to their Form 8-K announcing the consummation of the Agreement and attaching as exhibits certain amended indentures which purported to govern the Notes (the "Supplemental Indentures") as of that date.  *See* CEOC Form 8-K and exhibits, filed Aug. 25, 2014, attached hereto as Exhibit "C."

9.      The Agreement required the Favored Noteholders to consent to certain amendments that stripped two critical provisions:  (1) the Guarantees by CEC for payment of principal and interest, and (2) a covenant in the governing Indentures that would prevent Caesars from transferring all or substantially all of CEOC's assets (the "Amendments").  The Agreement also required the Favored Noteholders to agree in advance to support any future restructuring proposed by Caesars, subject to certain conditions.

10.     The Supplemental Indentures are invalid because, pursuant to the terms of the Agreement, the purported consents to the Supplemental Indentures were given by CEOC and CEC and/or holders that were directly or indirectly controlled by CEOC and CEC.  As a result, both the voting of those Notes in favor of the Amendments and directing the Trustee to execute the Supplemental Indentures based on that vote violated Section 316(a) of the TIA and the Indentures' provisions prohibiting affiliate voting and requiring a majority of non-affiliated noteholders to consent to certain amendments.

5

11.    Without the benefit of the Guarantees by CEC, the Notes are effectively worthless.  The removal of the Guarantees constitutes an *ipso facto* impairment of the Disenfranchised Noteholders' right to receive principal and interest, and as such was, *inter alia*, a violation of the TIA and the Indentures themselves, as set forth fully below.

12.    The Agreement not only violated the TIA and the Indentures, but also violated both public policy and the reasonable expectations of the bond market.  To be clear, an issuer can offer to buy its bonds back, and can seek the bondholders' consent to amendments to the indenture in connection with that offer, so long as the offer is made publicly and is offered to all bondholders.  Here, Caesars executed the disputed transaction in secret and indisputably failed to offer all of its bondholders the opportunity to participate in the transaction.

13.    The Agreement also amounted to a constructive partial redemption in violation of the Indentures.  Caesars did not negotiate a market price for the purchased Notes, or even a reasonable and customary premium to market.  Rather, by offering to pay par plus accrued interest for $155.4 million of Notes (nearly 40% over the total amount of Notes outstanding), Caesars made an offer that was economically impracticable for the Favored Noteholders to refuse, and thus tantamount to unilateral action.

14.    As detailed below, the Amendments forced through by the Agreement—which purport to bind the Disenfranchised Noteholders—were merely part of Caesars's larger strategy to restructure CEOC's debt by transferring out valuable assets and abandoning CEC's Guarantees on the debt, and to leave the Disenfranchised Noteholders out in the cold in favor of other creditors and stakeholders.

15.    As soon as the Agreement became public following the August 12, 2014 8-K, it was recognized by the marketplace as yet another bit of chicanery in advance of Caesars's

6

imminent restructuring. For example, an August 22, 2014 article in Bloomberg News described the deal as "one of the most egregious things [Caesars has] done so far" in the course of effectuating its strategy for dealing with Caesars's and its consolidated subsidiaries' approximately $24.4 billion in debt since two private equity firms took the company private for $30.7 billion six years ago. The article stated that "[i]n agreeing last week to pay some holders of its most junior bonds $155.4 million in return for them giving up certain protections, Las Vegas-based Caesars gets their support in a restructuring… [and] [t]hat might make it easier for the company to force all classes of creditors to accept whatever agreement it reaches with senior bondholders."

16. On December 19, 2014, Caesars announced that it had signed a restructuring agreement, subsequently amended on December 31, 2014 and January 13, 2015, with its most senior bondholders to restructure CEOC's indebtedness (the "RSA"). *See* Third Amended & Restated Restructuring Support and Forbearance Agreement, dated Jan. 13, 2015, attached hereto as Exhibit "D."

17. On January 12, 2015, three holders of Second Lien Notes issued by CEOC filed an involuntary bankruptcy petition against CEOC in the United States Bankruptcy Court for the District of Delaware, Case No. 15-10047 (KG), pursuant to Section 303 of the Bankruptcy Code (the "Delaware Bankruptcy").

18. Plaintiffs notified this Court of the Delaware Bankruptcy, and the resulting stay of the present action against CEOC, in a letter to the Court dated January 13, 2015 (Doc. No. 26).

19. On January 15, 2015, CEOC and its affiliates filed voluntary Chapter 11 cases in the United States Bankruptcy Court for the Northern District of Illinois, captioned *In re Caesars*

7

*Entertainment Operating Company, Inc., et al.*, Case No. 15-01145 (ABG) (the "Chicago Bankruptcy").

20.    The filing of the Chicago Bankruptcy constituted an immediate event of default under the Indentures, as a result of which all principal and interest is immediately due and owing. However, CEC continues to disclaim its Guarantee of the Notes, and has not paid what it owes to Plaintiffs.

21.    As set forth fully hereinafter, Caesars's course of conduct violates and will continue to violate the TIA, Plaintiffs' contractual rights under the Notes, Indentures, and the Guarantees, and its implied duty of good faith and fair dealing, and entitles Plaintiffs to the declaratory relief and money damages for which Plaintiffs respectfully pray below.

## THE PARTIES

22.    Plaintiff MeehanCombs Global Credit Opportunities Master Fund, LP is a Cayman Islands limited partnership with its principal place of business at c/o MeehanCombs, LP, its Investment Manager, 40 Signal Road in Stamford, Connecticut.  MeehanCombs Global Credit Opportunities Master Fund, LP is the beneficial owner of $5,862,000 of the 2016 Notes.

23.    Plaintiff Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust is a Delaware statutory trust with its principal place of business at c/o MeehanCombs, LP, its Sub-Advisor, 40 Signal Road in Stamford, Connecticut.  Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust is the beneficial owner of $4,432,000 of the 2016 Notes.

24.    Plaintiff SB 4 CF LLC is a Delaware limited liability company with its principal place of business at c/o Chicago Fundamental Investment Partners, LLC, its Investment

8

CEOC_105_Adversary_001431

Manager, 71 South Wacker Drive in Chicago, Illinois.  SB 4 CF LLC is the beneficial owner of $2,361,000 of the 2017 Notes.

25.     Plaintiff CFIP Ultra Master Fund, Ltd. is a Cayman Islands exempted company with its principal place of business at c/o Chicago Fundamental Investment Partners, LLC, its Investment Manager, 71 South Wacker Drive in Chicago, Illinois.  CFIP Ultra Master Fund, Ltd. is the beneficial owner of $3,271,000 of the 2017 Notes.

26.     Plaintiff Trilogy Portfolio Company, LLC is a Delaware limited liability company with its principal place of business at c/o Trilogy Capital Management, LLC, its Investment Manager, 33 Benedict Place in Greenwich, Connecticut.  Trilogy Portfolio Company, LLC is the beneficial owner of $5,024,000 of the 2016 Notes.

27.     Defendant Caesars Entertainment Corporation, formerly known as Harrah's Entertainment, Inc., is a Delaware corporation with its principal place of business at One Caesars Palace Drive in Las Vegas, Nevada.  Through its various affiliates, CEC owns, manages, or operates dozens of casinos throughout the United States.  CEC is controlled by its large and sophisticated private equity Sponsors, Apollo and TPG (both defined below).

28.     Defendant Caesars Entertainment Operating Company, Inc., formerly known as Harrah's Operating Company, Inc., is a Delaware corporation with its principal place of business One Caesars Palace Drive in Las Vegas, Nevada.  CEOC is a direct operating subsidiary of CEC.  On January 12, 2015, certain second-lien bondholders of CEOC filed an involuntary bankruptcy petition as to CEOC in the bankruptcy court for the District of Delaware.  On January 15, 2015, CEOC filed a voluntary bankruptcy petition in the bankruptcy court for the Northern District of Illinois.  Pursuant to 11 U.S.C. § 362, this action is subject to an automatic stay as to CEOC, but not CEC.  For the avoidance of doubt, as previously stated, and notwithstanding anything else

9

stated herein, this Amended Complaint *is not and should not be deemed an attempt to commence or continue an action against CEOC, to collect any debt against CEOC or take any other action in violation of the automatic stay*.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1331, 1367, and 2201.  This controversy arises under federal law, involves claims herein so related to Plaintiffs' federal claims that they form part of the same case or controversy, and Plaintiffs seek a declaration of their rights and other legal relations, whether or not further relief is or could be sought.

30.     This Court has personal jurisdiction over Caesars under New York's long arm jurisdiction statute, N.Y.C.P.L.R. § 302(a), because those entities have, at least, minimum contacts with the State of New York.  Among other things, Caesars transacts business within the State, regularly does or solicits business or engages in other persistent courses of conduct in the State, expects or should reasonably expect its acts to have consequences in the State, and/or derives substantial revenue from interstate or international commerce.

31.     Venue is proper in this District pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b) and (c).  Among other things, Caesars is found or transacts business in this District, the offer or sale of debt at issue took place at least in part in this District, and/or a substantial part of the events giving rise to the violations of law complained of herein occurred at least in part in this District.

10

## FACTUAL BACKGROUND

**The 2016 and 2017 Notes**

32.     On September 28, 2005, CEOC issued $750 million in 2017 Notes pursuant to an Indenture, dated as of September 28, 2005, among CEOC, CEC as guarantor, and U.S. Bank National Association ("U.S. Bank") as Trustee (as supplemented or amended, the "2017 Notes Indenture").  The 2017 Notes Indenture is attached hereto as Exhibit "E."

33.     On June 9, 2006, CEOC issued $750 million in 2016 Notes pursuant to an Indenture, dated as of June 9, 2006, among CEOC, CEC as guarantor, and U.S. Bank as Trustee (as supplemented or amended, the "2016 Notes Indenture," and together with the 2017 Notes Indenture, the "Indentures").  The 2016 Notes Indenture is attached hereto as Exhibit "F." Pursuant to the 2016 Notes Indenture, the terms of the 2016 Notes were set forth via an Officer Certificate delivered to the Trustee on June 9, 2006.

34.     U.S. Bank resigned as indenture trustee with respect to the Notes (as well as six other CEOC debt issuances) on July 31, 2014.  Caesars appointed The Law Debenture Trust Company of New York ("Law Debenture") as successor indenture trustee, which became effective on August 11, 2014.

35.     Collectively, Plaintiffs are holders of the Notes.  Specifically, Plaintiff MeehanCombs Global Credit Opportunities Master Fund, LP is the beneficial owner of $5,862,000 of the 2016 Notes, Plaintiff Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust is the beneficial owner of $4,432,000 of the 2016 Notes, Plaintiff SB 4 CF LLC is the beneficial owner of $2,361,000 of the 2017 Notes, Plaintiff CFIP Ultra Master Fund, Ltd. is the beneficial owner of $3,271,000 of the 2017 Notes and Plaintiff Trilogy Portfolio Company, LLC is the beneficial owner of $5,024,000 of the 2016 Notes.

11

36.     As holders of the 2017 Notes, Plaintiffs SB 4 CF LLC and CFIP Ultra Master Fund, Ltd. are entitled to receive interest payments on April 1 and October 1 annually.  The entire outstanding principal of the 2017 Notes was scheduled to mature on October 1, 2017, but has now become immediately due and owing pursuant to the event of default triggered by the Chicago Bankruptcy.

37.     As holders of the 2016 Notes, Plaintiffs MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust and Trilogy Portfolio Company, LLC are entitled to receive interest payments on June 1 and December 1 annually.  The entire outstanding principal of the 2016 Notes was scheduled to mature on June 1, 2016, but has now become immediately due and owing pursuant to the event of default triggered by the Chicago Bankruptcy.

38.     While Plaintiffs are sophisticated investors, upon information and belief, the vast majority of Notes (approximately $137 million) are held by individual investors whose notes have also been stripped of value as a result of the Agreement.  On information and belief, these individual investors may not even know that Caesars has disclaimed the CEC guarantee and does not intend to honor its contractual obligations.  These individuals have no practical means of contacting each other.

**Critical Indenture and Guarantee Provisions**

39.     The Notes, the Indentures, and the Guarantees and each provide certain essential protections for Plaintiffs and other noteholders.

40.     One such provision—mandated by Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b)—is the unconditional right of noteholders to receive principal and interest.  This provision is found in Section 6.8 of the 2017 Notes Indenture:

12

> Unconditional Right of Holders to Receive Principal and Interest
>
> Notwithstanding any other provision in this Indenture, the Holder of any Notes shall have **the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any,** on the Notes on the Stated Maturity (or, in the case of redemption, on the Redemption Date) **and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder**.

Ex. E, 2017 Notes Indenture, § 6.8 (emphasis added).  This provision is also located in Section 508 of the 2016 Notes Indenture:

> Unconditional Right of Holders to Receive Principal, Premium and Interest
>
> Notwithstanding any other provision in this Indenture, the Holder of any Security shall have **the right, which is absolute and unconditional, to receive payment of the principal of and any premium and (subject to Section 307) interest** on such Security on the respective Stated Maturities expressed in such Security (or, in the case of redemption, on the Redemption Date) **and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder**.

Ex. F, 2016 Notes Indenture, § 508 (emphasis added).  Collectively, Section 6.8 of the 2017 Notes Indenture and Section 508 of the 2016 Notes Indenture constitute an unconditional right to receive principal and interest on the Notes from both CEC and CEOC, which right shall not be impaired without the holders' consent.

41.     Other provisions concerning CEC's irrevocable and unconditional guarantee of the Notes are found at Article XII of to the 2017 Notes Indenture and the Notation of Guarantee, the form of which is Exhibit B to the 2017 Notes Indenture, and Article XV of the 2016 Notes Indenture and the Notation of Guarantee, the form of which is Exhibit A to the 2016 Notes Indenture.  Section 12.1.1 of the 2017 Notes Indenture states:

> [T]he Guarantor hereby **irrevocably and unconditionally guarantees** (such guarantee being the "Guarantee") to each Holder

13

> of a Note authenticated and delivered by the Trustee and to the
> Trustee and its successors and assigns, irrespective of the validity
> and enforceability of this Indenture and the Notes hereunder, that:
> **(i) the principal of, premium, if any, and interest on the Notes**
> **promptly will be paid in full when due, whether at Maturity,**
> **by acceleration, call for redemption or otherwise, and interest**
> **on the overdue principal, premium, if any, and interest, if any,**
> **of the Notes**, if lawful, and all other obligations of the Company to
> the Holders and the Trustee hereunder or thereunder will be
> promptly paid in full or performed, all in accordance with the
> terms hereof and thereof . . . . Failing payment when due by the
> Company of any amount so guaranteed for whatever reason, the
> Guarantor shall be obligated to pay the same immediately.  The
> Guarantor hereby agrees that its obligations hereunder shall be
> **unconditional, irrespective of** the validity, regularity or
> enforceability of the Notes or this Indenture, the absence of any
> action to enforce the same, **any waiver or consent by any Holder**
> **of the Notes with respect to any provisions hereof or thereof**,
> the recovery of any judgment against the Company, any action to
> enforce the same or any other circumstance which might otherwise
> constitute a legal or equitable discharge or defense of a guarantor.

Ex. E, 2017 Notes Indenture, § 12.1.1 (emphasis added).  The text of Section 1501(1) of the

2016 Notes Indenture is substantially the same.  *See* Ex. F, 2016 Notes Indenture, § 1501(1).

42.     In consenting to the Guarantee, CEC specifically agreed that its obligations were

not subject to any pre-conditions, including any demand for payment by the noteholders:

> The Guarantor hereby waives diligence, presentment, demand of
> payment, filing of claims with a court in the event of insolvency or
> bankruptcy of the Company, any right to require a proceeding first
> against the Company, protest, notice and all demands whatsoever
> and covenants that this Guarantee shall not be discharged except
> by complete performance of the obligations contained in the Notes
> and this Indenture.

Ex. E, 2017 Notes Indenture, § 12.1.1.  The text of the 2016 Notes Indenture is substantially the

same.  *See* Ex. F, 2016 Notes Indenture, § 1501.

43.     Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes

Indenture (hereinafter, the "Covenants Against Fundamental Changes") provide that CEOC shall

14

**A0497**

not consolidate or merge with another company, or transfer "all or substantially all of its assets" to another company, and may not permit another company to transfer all or substantially all its assets to CEOC, "whether in a single transaction or a series of related transactions," unless (i) the entity resulting from that transaction (if it does not continue to be CEOC) expressly assumes all obligations of CEOC under the Indentures, (ii) no default or event of default would occur, and (iii) CEOC delivers an appropriate officers certificate and opinion of counsel. *See* Ex. E, 2017 Notes Indenture, § 5.1; Ex. F, 2016 Notes Indenture, § 801.  The Covenants Against Fundamental Changes are intended to ensure that any legal entity that succeeds to the business and assets of CEOC shall remain liable for the obligations of CEOC under the Notes and Indentures, and that mergers, consolidations and asset sales do not obviate the rights of holders thereunder.

44.     Another provision of the Indentures protecting noteholders' rights pertains to the consent required for CEOC and the Trustee to enter into a supplemental indenture.  Section 9.2 of the 2017 Notes Indenture includes a fundamental term requiring the consent of at least a majority of the outstanding Notes to amend or eliminate any provisions of the Indenture or to modify the rights of the holders:

> ### With Consent of Holders
>
> The Company and the Trustee may enter into a supplemental indenture with the written consent of the Holders of at least a majority in principal amount of the outstanding Notes affected by such supplemental indenture (including consents obtained in connection with a tender offer or exchange offer for the Notes), for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights of the Noteholders.

Ex. E, 2017 Notes Indenture, § 9.2.

15

45.     Both Indentures specify that consents obtained in connection with a tender offer or exchange offer shall be included in determining whether holders of a majority in principal amount of the Notes have approved a supplemental indenture.  Importantly, the consents obtained through the Agreement were not obtained in connection with a tender offer or exchange offer for the Notes, because the offer was made in secret and was not made available to any holders other than the Favored Noteholders.

46.     Under both Indentures, Notes owned by CEOC or an Affiliate cannot be counted for determining whether the required majority consented to an amendment or supplemental indenture.  Section 2.9 of the 2017 Notes Indenture provides:

> In determining whether the Holders of the required principal amount of Notes have concurred in any request, demand, authorization, direction, notice, consent or waiver Notes owned by the Company or an Affiliate shall be disregarded . . . .

Ex. E, 2017 Notes Indenture, § 2.9.  Correspondingly, the definition of "Outstanding" under the 2016 Notes Indenture states:

> [I]n determining whether the Holders of the requisite principal amount of the Outstanding Securities have given, made or taken any request, demand, authorization, direction, notice, consent, waiver or action hereunder as of any date, . . . (D) Securities owned by the Corporation or any other obligor upon the Securities or any Affiliate of the Corporation or of any such other obligor, whether of record or beneficially, shall be disregarded and deemed not to be Outstanding . . . ."

Ex. F, 2016 Notes Indenture, § 101.

47.     The term "Affiliate" is broadly defined under both Indentures.  Under the 2017 Notes Indenture, "Affiliate" is defined as follows:

> "Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" (including, with correlative meanings, the

16

CEOC_105_Adversary_001439

> terms "controlled by" and "under common control with"), as used
> with respect to any Person, shall mean the possession, directly or
> indirectly, of the power to direct or cause the direction of the
> management or policies of such Person, whether through the
> ownership of voting securities or by agreement or otherwise.

Ex. E, 2017 Notes Indenture, § 1.1.  Almost identically, "Affiliate" is defined by the 2016 Notes

Indenture as:

> "Affiliate" of any specified Person means any other Person directly
> or indirectly controlling or controlled by or under direct or indirect
> common control with such specified Person.  For the purposes of
> this definition, "control" (including, with correlative meanings, the
> terms "controlled by" and "under common control with"), as used
> with respect to any specified Person means the power to direct the
> management and policies of such Person, directly or indirectly,
> whether through the ownership of voting securities, by contract or
> otherwise.

Ex. F, 2016 Notes Indenture, § 101.

48.     Other sections of the Indentures mandate specific procedures to ensure holders are

treated fairly and equally.

49.     By way of example, the processes for redeeming less than all of the outstanding

Notes prioritize fair treatment of all holders.  Section 3.3 of the 2017 Notes Indenture states:

> Selection of Notes to be Redeemed.
>
> If less than all the Notes are to be redeemed, the Trustee shall
> select the Notes to be redeemed in any manner that the Trustee
> deems **fair and appropriate**.  The Trustee shall make the selection
> from Notes outstanding not previously called for redemption.

Ex. E, 2017 Notes Indenture, § 3.3 (emphasis added).  The corresponding section of the 2016

Notes Indenture, Section 1103, states:

> Selection by Trustee of Securities to Be Redeemed
>
> If less than all the Securities of any series are to be redeemed
> (unless all the Securities of such series and of a specific tenor are
> to be redeemed or unless such redemption affects only a single

17

CEOC_105_Adversary_001440

**A0500**

> Security), the particular Securities to be redeemed shall be selected not more than 60 days prior to the Redemption Date by the Trustee, from the Outstanding Securities of such series not previously called for redemption, by such method as the Trustee shall deem **fair and appropriate** and which may provide for the selection for redemption of a portion of the principal amount of any Security of such series . . . .

Ex. F, 2016 Notes Indenture, § 1103 (emphasis added).

50.   In addition, Section 512 of the 2016 Notes Indenture prohibits a majority from directing the Trustee to take any action that is "unduly prejudicial to the rights of other Holders of Securities of that series not joining in that action." Ex. F, 2016 Notes Indenture, § 512.

51.   Similarly, the Indentures emphasize the importance of equal treatment of holders:

> [I]t being understood and intended that no one or more of such Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all such Holders.

Ex. E, 2017 Notes Indenture, § 6.7; Ex. F, 2016 Notes Indenture, § 507.

52.   The Notation of Guarantee of Caesars Entertainment Inc. states that CEC "has unconditionally guaranteed, to the extent set forth in the Indenture" the obligations under the Notes. Ex. E, 2017 Notes Indenture at Ex. B (Notation of Guarantee); Ex. F, 2016 Notes Indenture at Ex. A (Notation of Guarantee).

53.   Further, the Indentures state that voluntary or involuntary bankruptcy proceedings constitute an event of default, upon which CEOC and CEC's obligations under the Notes become immediately due. Section 6.1(e) of the 2017 Notes Indenture states:

> "Event of Default," wherever used herein with respect to the Notes, means any one of the following events:  . . .

Confidential

CEOC_105_Adversary_001441

> (e)     the Company or any of its Significant Subsidiaries pursuant to or within the meaning of any Bankruptcy Law:
>
> > (i)     commences a voluntary case, . . . .

Ex. E, 2017 Notes Indenture, § 6.1(e).  The text of Section 501(5)(a) of the 2016 Notes Indenture is substantially the same.  *See* Ex. F, 2016 Notes Indenture, § 501(5)(a).

54.     Additionally, Section 6.2 of the 2017 Notes Indenture states in relevant part:

> If an Event of Default specified in Section 6.1(e) or (f) shall occur, the principal amount (or specified amount) of and accrued and unpaid interest, if any, on all outstanding Notes shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

Ex. E, 2017 Notes Indenture, § 6.2.  The text of Section 502 of the 2016 Notes Indenture is substantially the same.  Ex. F, 2017 Notes Indenture, § 502).

55.     Unfortunately, in violation of the bondholder protections provided by the Indenture provisions above, the Guarantee provisions above, and the TIA, as well as Caesars's duty of good faith and fair dealing to its noteholders (including Plaintiffs), Caesars has engaged in a series of transactions to circumvent its obligations under the Notes, Indentures and Guarantees and to effectively eviscerate Plaintiffs' unconditional right to receive principal and interest.

**Caesars's Scheme to Remove Assets from CEOC Prior to its Bankruptcy**

56.     The Agreement was not an isolated incident of self-dealing by Caesars and its affiliates, but rather represents a capstone on a long history of collusive transactions.

57.     When they were issued in 2005 and 2006, the 2016 Notes and 2017 Notes were investment grade and each was issued in the principal face amount of $750 million.  At that time, as an investment grade issuer, Caesars had access to broad distribution of its debt securities including distribution to individual investors.

19

58.     In January 2008, investment funds managed by affiliates of two private equity firms, Apollo Global Management, Inc. ("Apollo") and TPG Capital, LP ("TPG"), along with co-investors, acquired Caesars in a highly-leveraged $30 billion buyout.  Apollo and TPG continue to own most of CEC's stock and control all aspects of CEC's (and thus CEOC's) governance and operations.

59.     Upon information and belief, Apollo, TPG and certain co-investors paid only $6 billion of the purchase price in cash.  The rest of the consideration was funded by new indebtedness issued by Caesars.  Prior to the buyout, Caesars had a total of $12.4 billion of debt outstanding, including $750 million of 2017 Notes and $750 million of 2016 Notes.  After the Apollo buyout, Caesars had a total of $23.2 billion of debt outstanding.  CEOC incurred most of the debt used to fund the buyout.

60.     At the time of the buyout, the Notes were senior unsecured obligations of CEOC, which were absolutely and unconditionally guaranteed by CEC, and the Indentures for the Notes provided for negative pledge covenants (with certain exceptions) and the Covenants Against Fundamental Changes.  Accordingly, while the Notes had few express covenants (consistent with market practice for unsecured investment grade notes), a holder of Notes could reasonably expect that the business and assets of Caesars would be available for the payment of principal and interest on the Notes as they came due.

61.     Soon after the buyout, Caesars suffered devastating effects from the global financial crisis and ensuing recession, particularly with respect to revenues at the casinos upon which CEOC relied to service its debt.

62.     In response, in the summer of 2010, Apollo and TPG began to implement a "solution" to CEOC's debt crisis by engaging in a series of self-dealing and collusive

20

CEOC_105_Adversary_001443

**A0503**

transactions which stripped CEOC of valuable assets and moved them to other CEC subsidiaries that would not be liable for CEOC's debt.

63.     First, in August 2010, trademarks with a book value of $45.3 million were moved from CEOC to CEC subsidiaries for, upon information and belief, little or no consideration.

64.     Next, in 2011, CEOC transferred its interactive gaming operations to CEC for, upon information and belief, little or no consideration.  Just two years later, CEC ascribed a value of $779 million to these assets.

65.     On February 8, 2012, CEC conducted a public offering of its stock, which currently trades on NASDAQ with an indicated market capitalization in excess of $1.9 billion.

66.     In 2013, CEC and CEOC embarked on a further series of related-party asset sales with other entities owned or controlled by CEC and/or its affiliates.

67.     In September 2013, CEOC transferred significant Las Vegas properties, (1) Project Linq, a new completely shopping, dining and entertainment district and (2) Octavius Tower, a luxury tower that is a part of CEOC's current last remaining Las Vegas property, Caesars Palace, to Caesars Entertainment Resort Properties, LLC ("CERP"), a wholly owned subsidiary of CEC for $150.2 million.

68.     A month later, CEOC transferred Planet Hollywood in Las Vegas and a new casino project in Baltimore, along with 50% of the management fees payable to CEOC from those properties, to Caesars Growth Partners, LLC ("CGP") an entity controlled by Apollo and TPG which is 5% owned by CEC for $360 million.

69.     In March 2014, CEOC sold four of its most important properties to CGP, including three in Las Vegas (The Cromwell, The Quad and Bally's Las Vegas) and Harrah's New Orleans for $2 billion minus assumed debt and other customary closing adjustments.

21

Caesars also announced its intention to transfer ownership of CEOC's Total Rewards Program—an industry-leading customer loyalty program—to a separate entity jointly owned by CEOC, CGP and CERP.

70.    These self-dealing transactions effectively divided Caesars into two segments:  (i) a "Healthy Caesars," consisting of CGP and CERP, which own the prime assets formerly belonging to CEOC, and (ii) an "Insolvent Caesars," consisting of CEOC, still burdened by substantial debt, but, on information and belief, holding only assets (primarily regional casinos) that are unprofitable or far less profitable than those taken from CEOC.  These changes affect the nature of the businesses owned and operated by CEOC in a manner that fundamentally changes the benefit of the bargain between CEOC and its noteholders—changes that could not have been anticipated by a reasonable noteholder.

71.    The foregoing transactions took place as CEOC plunged further into insolvency. In its Form 10-K filed on March 17, 2014, CEC (which consolidates CEOC's results with those of its other subsidiaries) admitted:

> We do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings.

CEC Form 10-K, filed March 17, 2014, at 46.

72.    Further, far from their investment grade at issuance, Standard & Poor's lowered the Notes' credit ratings to C in April 2014 and, as quoted in an August 12, 2014 Financial Times article, analysts have stated, "[t]he capital structure is unsustainable and a restructuring of some form is increasingly likely over the near term.  The company will continue to burn cash to fund capital expenditures and interest payments, and we expect Caesars will need additional liquidity in 2015."

22

CEOC_105_Adversary_001445

73.    CEOC's decline culminated in the Delaware Bankruptcy and Chicago Bankruptcy actions, initiated on January 12, 2015 and January 15, 2015, respectively.

74.    Caesars knew or should have known that the self-dealing transactions to restructure Caesars would seriously weaken the business and financial condition of CEOC, leave CEOC with insufficient operating cash flow to pay or refinance its substantial remaining indebtedness as it became due, and impair the fundamental rights of all holders of the 2016 Notes and 2017 Notes.

75.    The Chicago Bankruptcy constitutes an Event of Default under both the 2016 Notes Indenture and the 2017 Notes Indenture.  *See* 2017 Notes Indenture, § 6.1(e); 2016 Notes Indenture, § 501(5)(a).

76.    As a result of the Event of Default caused by CEOC's voluntary bankruptcy filing, the principal amount of, and accrued and unpaid interest on the 2017 Notes and 2016 Notes became immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.  *See* 2017 Notes Indenture, § 6.2; 2016 Notes Indenture, § 502.

77.    The 2016 Notes and 2017 Notes are effectively junior to $17.3 billion of debt secured by liens at CEOC, representing sixteen times CEOC's proforma adjusted earnings before interest, taxes, depreciation, and amortization (EBITDA).  Thus, in the current restructuring, the Notes will be unable to look to CEOC for recovery due to the abundance of debt secured by the assets.  Furthermore, the RSA provides that the Noteholders will not receive any recovery on the 2016 or 2017 Notes from CEOC, and further provides that CEOC will seek the extraordinary remedy of asking the bankruptcy court to release claims the Noteholders have against CEC.

78.    The transactions in which Caesars created Healthy Caesars and Insolvent Caesars are the subject of a complaint filed on August 4, 2014 by the trustee of 10% Second-Priority

23

CEOC_105_Adversary_001446

**A0506**

Senior Secured Notes due 2018 against CEC and CEOC in Delaware Chancery Court, captioned *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corporation*, No. 10004 (Del. Ch.).

79.     Caesars responded to the *Wilmington Savings* suit with a countersuit in New York State Supreme Court, captioned *Caesars Entertainment Operating Company, Inc. v. Appaloosa Investment Limited Partnership I*, No. 652392-2014 (N.Y. Sup. Ct.), alleging that several funds have sought to undermine and impede CEC and CEOC's efforts to de-lever CEOC and to drive CEOC into default.

80.     In its August 5, 2014 complaint—filed before the Agreement was executed— Caesars conceded at that time that the risk of bankruptcy for CEOC prior to the scheduled principal repayment date of the Notes was material:  "[w]ith approximately \$2 billion of cash, no near-term maturities, and minimal risk of covenant default, the way was clear for CEOC to continue to operate and service its debt through 2014, 2015, **and potentially into 2016.**" (*See* Complaint, Index No. 652392/2014, dated Aug. 5, 2014 in *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et al.*, at ¶ 91.) (emphasis added.)

81.     Caesars's complaint also alleges that the second lien noteholders have already issued notices of default against CEOC that stated they "'intend to exercise all of [their] rights and remedies that are available under applicable law.'" (*Id.* at ¶ 141.)  Some of these second lien noteholders subsequently filed the Delaware Bankruptcy.

82.     Also in August, Caesars announced that it executed a waiver agreement on August 12 with its first lien noteholders requiring, among other things, that CEOC would only have ten days to cure any notices of default on or after September 19, 2014.

24

83.     Further, CEOC's August 12, 2014 Form 8-K announcing the Agreement with the Favored Noteholders contemplated the future out-of-court RSA, as it states the Favored Noteholders will "consent or approve a restructuring of the Notes" until the earlier of "the 181st day after the closing date" or the "occurrence of a 'credit event'" including bankruptcy or failure to pay CEOC's indebtedness. *See* Ex. A.

84.     Gary Loveman, chief executive officer and president of CEC, admitted that CEOC was undergoing an out-of-court restructuring in an August 12, 2014 <u>Financial Times</u> article: "We have indicated that the company requires deleveraging and that a restructuring is appropriate. A bankruptcy is a different thing. It is one option."

85.     In sum, the foregoing course of conduct, including the Agreement at issue in this Complaint, constituted an aggregate plan or scheme by CEC and CEOC to restructure CEOC's $19.8 billion debt out of court to stack the deck against certain creditors, such as Plaintiffs and the Disenfranchised Noteholders, in advance of CEOC's recently-filed bankruptcy that will favor CEC and other stakeholders and insiders and allow CEC to evade its irrevocable guarantee of the Notes.

86.     Upon further information and belief, Sullivan & Cromwell represented the Favored Noteholders in negotiations with Caesars, during which the Favored Noteholders, through counsel, expressed the view that the Guarantees remain in place.

**Caesars's Preferential Treatment of Certain Holders**
**<u>and Attempt to Eviscerate Protections for Remaining Holders</u>**

87.     In a Form 8-K filed with the SEC on August 12, 2014, CEC and CEOC announced the Agreement with the Favored Noteholders to purchase approximately $89.4 million of the 2016 Notes and approximately $66 million of the 2017 Notes at par, representing 36% of the 2016 Notes and 45% of the 2017 Notes. *See* Ex. A.

25

88.    The par purchase price for Favored Noteholders' Notes represented more than a 100% premium over market.  By way of reference, prior to the Agreement, the 2016 Notes were trading at approximately 48 cents on the dollar.

89.    The 100 cents on the dollar paid to Favored Noteholders represented substantially all of their economic interests.  Upon information and belief, a holder sold 2016 Notes to one or more Favored Noteholder(s) at 69.866% of par just before the closing of the Agreement.  The Favored Noteholder(s) simultaneously sold 68.7% of the Notes to CEOC/CEC at 100% of par.  The remaining Notes held by the Favored Noteholders (the "Amended Notes"), the terms of which have been amended through the Agreement and now are, in substance if not in form, a new series of Notes, represent less than 2% of the purchase price paid to the holder.

90.    In addition, Schedule A to the Agreement, attached to CEOC's August 14, 2014 Form 10-Q, stated that, as a condition to selling their Notes at such a premium, the Favored Noteholders were required to consent to the Amendments to the terms of the Indentures that would impair the rights of the Disenfranchised Noteholders, including (1) "the removal and acknowledgement of the termination of the CEC guarantee of the Securities" and (2) "modif[ication of] the covenant restricting disposition of 'substantially all' of CEOC's assets to measure future asset sales based on CEOC's assets as of the date of the amendment."  Ex. B.

91.    Unlike standard issue tender offers and exchange offers for outstanding debt securities, the negotiation and execution of the Agreement itself was non-public.  Caesars did not offer to purchase Plaintiffs' or other Disenfranchised Noteholders' (including what Plaintiffs understand to be the extensive number of individual investors noteholders') Notes, excluding Plaintiffs and the other Disenfranchised Noteholders from participation in the Agreement.

Confidential

CEOC_105_Adversary_001449

92.    Caesars has not disclosed how or why it selected the Favored Noteholders to the exclusion of others.  However, on information and belief, the Favored Noteholders were involved in other deals in which Caesars's controlling stockholders, Apollo and TPG, were involved, and likely held other positions within the Caesars capital structure.  According to a report published on August 19, 2013, Apollo Global Management and TPG Capital were among "the lead owners in a giant consortium of almost 20 creditors seeking to agree to a consensual debt-for-equity conversion" of a €1.3 billion loan syndicate for IVG Immobilien AG (once Germany's biggest property company) that would "enable IVG to avoid a court-supervised restructuring."  James Wallace, "Private equity funds to vote imminently on IVG's debt-for-equity swap," Aug. 19, 2013, CoStar Group Finance Blog, available online at http://costarfinance.com/2013/08/19/private-equity-funds-to-vote-imminently-on-ivgs-debt-for-equity-swap/, attached hereto as Exhibit "G."  Other members of the consortium included Aurelius Capital Management LLP and BlackRock.  *See id.*  The report noted that "Aurelius and BlackRock were previously opposed to the debt-for-equity swap, but are understood now to have come round to the restructuring proposal."  *Id.*  On information and belief, Aurelius and/or BlackRock are among the Favored Noteholders benefited by the Agreement.

93.    Caesars did not solicit Plaintiffs' or the Disenfranchised Noteholders' consent to the Amendments.  Nor did Caesars provide Plaintiffs or the other Disenfranchised Noteholders with any notice regarding the Agreement.

94.    Indeed, Plaintiffs first learned of the Agreement and the Amendments from the August 12, 2014 CEOC Form 8-K, filed with the SEC only ten days prior to when the transaction closed (and without all material information and exhibits).

27

95.     On August 22, 2014, CEOC, CEC and the Favored Noteholders purported to consummate the transaction contemplated by the Agreement and filed a Form 8-K to that effect. *See* CEOC Form 8-K, filed Aug. 22, 2014, attached hereto as Exhibit "H."

96.     On August 25, 2014, CEOC and CEC filed an amendment to their Form 8-K announcing the consummation of the transaction, attaching as exhibits the Supplemental Indentures; *i.e.*, certain amended Indentures which purported to govern the Notes as of that date. *See* Ex. C.

97.     The August 25 Form 8-K announced that pursuant to Section 9.2 of the 2017 Notes Indenture and Section 902 of the 2016 Notes Indenture, the Trustee's execution of the Supplemental Indentures—an exercise of its powers under the Indentures—occurred pursuant to the consents that the Favored Noteholders agreed to deliver to Caesars in the Agreement. *See* Ex. B, Agreement, §§ 2,2(c), (e); Ex. C, CEOC Form 8-K dated Aug. 25, 2014 at 6, 10-11, 15-16, 20, 29, 33 and 42.

98.     Based on the sequence of the transactions set forth in the Agreement, the consents that were purportedly given by a majority of non-affiliated holders were in actuality given by Caesars, because the Purchased Notes were no longer owned by the Favored Noteholders at the time the consents became effective.

99.     The Agreement set forth the terms and conditions on which the Favored Noteholders agreed to sell the Purchased Notes to Caesars.  The Agreement also set forth the terms and conditions on which the Favored Noteholders agreed to provide the Proposed Consents (as defined in the Agreement), which were the consents required for Caesars to direct the Trustee to enter into the Supplemental Indenture.

28

**A0511**

CEOC_105_Adversary_001451

100.    "Closing" is defined under the Agreement as "[t]he closing of the purchase and sale of the Notes and the Proposed Consent contemplated by this Agreement . . . ."  *See* Ex. B, Agreement, § 2.1.

101.    Section 2.2 of the Agreement set forth in detail the events required to occur at the Closing.  These are:

(a)    the transfer of the Purchased Notes to CEOC or CEC as applicable, *see id.* at § 2.2(a)(i);

(b)    the delivery of certain documentation, including documentation needed to affect the transfer and assignment of the Purchased Notes and to give effect to the Proposed Consent, *see id.* at §§ 2.2(a)(ii) and (iii);

(c)    payment of $155.4 million by CEOC and CEC to the Favored Noteholders, representing 100% of the principal amount of the Purchased Notes, plus accrued and unpaid interest on the aggregate principal amount of all the Subject Notes (as defined in the Agreement), including both the Purchased Notes and the Amended CEOC Notes (as defined in the Agreement), *see id.* at § 2.2(b);

(d)    the execution and delivery of the Supplemental Indentures by CEOC to the applicable trustees under the Indentures, *see id.* at § 2.2(c);

(e)    the allocation of the Amended CEOC Notes by the Favored Noteholders among themselves, for no additional consideration, *see id.* at § 2.2(d);

(f)    the transfer of the Purchased Notes and Affiliate Notes (as defined in the Agreement) to the respective trustees, with instructions to cancel the same "upon the Closing."  *Id.* at § 2.2(e).

29

CEOC_105_Adversary_001452

102.     On information and belief, the parties were careful to lay out the order of events that occurred under the Agreement.  One event is conspicuously missing from the list of things to occur at the Closing:  the effectiveness of the Proposed Consents.

103.     In fact, under Section 5.1 of the Agreement, the Proposed Consents did not "become effective until the consummation of the Closing."  *Id.* at § 5.1.

104.     By definition—and contrary to general practice in the bond market—at the time the consents became effective, Caesars's purchase of the Notes from the Favored Noteholders had already "closed," and thus Caesars owned the Purchased Notes at the time of the relevant vote directing the Trustee to execute the Supplemental Indentures.

105.     Moreover, even if the consents had become effective prior to the purchase of the Purchased Notes by Caesars (and they did not), Caesars was still the "beneficial owner" of the Purchased Notes under the terms of the Agreement because it had the power to vote or dispose of the securities.  *See* Rule 13d-3 under the Securities Exchange Act of 1934, 17 C.F.R. § 240.13d-3.

106.     In addition, even if Caesars did not "own" the Notes at the time the consents became effective, they at the very least had "control" over the Favored Noteholders because, upon information and belief, the Favored Noteholders were paid prior to the consents becoming effective and, thus, the Favored Noteholders were contractually bound to deliver consents drafted by Caesars.

107.     When they signed the Agreement, the Favored Noteholders bound themselves to provide consents to the Amendments.  *See* Ex. B, Agreement, § 2.2(a) and Schedule A.

108.     The Favored Noteholders agreed in Section 5.1 of the Agreement "not [to] transfer[] any interest in the Notes (including any right to exercise voting power with respect

30

thereto or delivering any proxy with respect to such Notes or entering into any voting agreement relating to the Notes) from the date hereof to the earlier of (i) the effective time of the Proposed Consents and (ii) the valid termination of this Agreement . . . ." *Id.* at § 5.1

109.    Additionally, the Favored Noteholders agreed in Section 5.4 of the Agreement "(i) to consent to any Qualified Solicitation . . . and (ii) not to sell, transfer or assign any beneficial ownership of the Amended CEOC Notes except to a transferee that agrees in writing to be bound by the same covenant." *Id.* at § 5.4.

110.    Further, under Section 2.2(e) of the Agreement, the purchased Notes were cancelled immediately upon receipt by CEOC. *See id.* at § 2.2(e). Accordingly, as soon as the closing was consummated, the Purchased Notes were cancelled and could no longer be considered in connection with any direction to the Trustee.

111.    Thus, regardless of Caesars's beneficial ownership and/or control of the Purchased Notes, the Purchased Notes should not have been counted in the vote directing the Trustee to execute the Supplemental Indentures because they were no longer "outstanding" when the consents became effective.

112.    This sequencing of the transactions set forth in the Agreement was in stark contrast to a proper consent solicitation and exchange offer, where (a) the offer is made to all bondholders (even if the issuer intends to consummate the offer with less than all holders, each holder has the same opportunity to be selected for participation); (b) the selling bondholders provide their consents to the trustee, who then enters into a supplemental indenture which will only be effective after the company has accepted all the tendered bonds for payment and has agreed to make payment; and (c) payment to bondholders is made *after* the consents—and, hence, the supplemental indentures—become effective.

31

113.    Further, on information and belief, and as discussed above at Paragraph 92, Caesars selected the Favored Noteholders, in whole or in part, on the basis of other financial relationships between the private equity sponsors of Caesars and such noteholders.  Such a *quid pro quo* whereby the terms of the Agreement were given to the Favored Noteholders in exchange for beneficial treatment of Caesars, Apollo and/or TPG in other transactions was not a good faith, arm's length transaction between Caesars and unaffiliated, independent third parties.

### COUNT ONE

**(Declaratory Judgment That Guarantees and Covenants
Against Fundamental Changes Are in Full Force and Effect)**

114.    Plaintiffs incorporate by reference Paragraphs 1 through 113 of the Complaint as if set forth fully herein.

115.    The Guarantees and the Covenants Against Fundamental Changes cannot be removed from the Indentures as reflected in the Supplemental Indentures because:

(a)    CEC's obligations under the Guarantees and the provisions of the Indenture governing them are "unconditional, irrespective of . . . any waiver or consent by any Holder" and Plaintiffs' right, which is absolute and unconditional, to receive payment of the principal of and any premium and interest from CEC shall not be impaired without Plaintiffs' consent. (see Indentures and Notations of Guarantee provisions cited at Paragraphs 40 and 41 above);

(b)    CEOC still constitutes a wholly owned subsidiary of CEC under Rule 1-02(z) of the Regulation S-X promulgated by that SEC, the Guarantees, and the Indentures; thus Caesars's attempts to disclaim the guarantee under

32

**A0515**

CEOC_105_Adversary_001455

Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the Notations of Guarantee is without force and effect;

(c)     Even if CEOC would not constitute a wholly owned subsidiary of CEC under Rule 1-02(z) and the Indentures based solely on CEC's equity ownership of CEOC, the transactions by which CEC transferred equity in CEOC to others was part of a scheme to circumvent the rights of the holders of the Notes in violation of the TIA, the Indentures, the Guarantees, and the covenant of good faith and fair dealing;

(d)     at the times the purported consents were granted, CEOC and CEC controlled or shared control over the power to vote the Favored Noteholders' Notes pursuant to the Agreement, and also controlled or shared control over the power to sell the Notes subject to the Agreement and, as a result, pursuant to the Indentures' provisions cited at Paragraphs 44 through 47 above and the provisions of the Agreement cited at Paragraphs 98 to 112 above, CEOC and CEC had beneficial ownership of the Notes at the times the purported consents were granted, thus, the voting of those Notes constituted "Affiliate" voting and their votes should not have been counted pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture, as well as Section 316(a) of the TIA;

(e)     the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the

33

2016 Notes Indenture, as well as Section 316(a) of the TIA, for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures;

(f)     the removal and acknowledgement of termination of the Guarantee and modification of the Covenants Against Fundamental Changes, and subsequent "approval" of the Supplemental Indentures, were effectuated without Plaintiffs' and the other Disenfranchised Noteholders' (including the extensive number of individual investors who are noteholders) consent in violation of the Indentures, Guarantees, and the TIA, 15 U.S.C. §§ 77aaa, *et seq.*, and pursuant to a course of dealing by Caesars that constituted bad faith.

116.    There is a substantial and continuing controversy between Caesars and Plaintiffs, and a declaration of rights under the Notes, Indentures, and Guarantees is both necessary and appropriate to establish that Plaintiffs are not bound by the removal of the Guarantees and/or the Covenants Against Fundamental Changes from the Notes, or any other invalidation of the same, and that such Guarantees and Covenants Against Fundamental Changes remain in full force and effect as between CEOC, CEC and Plaintiffs and the remaining Disenfranchised Noteholders.

117.    But for Caesars's violation of the Indentures, Guarantees, and the TIA, and their collusive conduct and bad faith, Plaintiffs' and the Disenfranchised Noteholders' rights under the Guarantees and Covenants Against Fundamental Changes would not have been stripped by the Amendments.  Plaintiffs are being injured by the elimination of both provisions without their consent, depriving them of the guarantee of payment of principal and interest by CEC (the only mechanism by which, given Caesars's scheme to deplete CEOC of valuable assets and watch it

34

slip into bankruptcy, Plaintiffs can reasonably expect to be paid under the Notes), as well as the value of and benefit of the Indentures' protections for noteholders, generally.

118.    Plaintiffs' injury can be redressed by the requested relief:  a declaratory judgment that the Guarantees are in full force and effect as between CEOC, CEC and Plaintiffs (and the other Disenfranchised Noteholders, including individual investor holders).  If the Amendments are effectuated against Plaintiffs, Plaintiffs will be monetarily damaged, because the Notes will become worthless and Plaintiffs will lose any ability to collect principal and interest against CEC in the event of a default by CEOC, an event seen as likely in the eyes of CEOC and CEC as evidenced by their own statements.

119.    Accordingly, Plaintiffs are entitled to a declaration that the Guarantees and Covenants Against Fundamental Changes in the Indentures are still in full force and effect.

## COUNT TWO
### (Declaratory Judgment That the Supplemental Indentures are Invalid and Void *Ab Initio*)

120.    Plaintiffs incorporate by reference Paragraphs 1 through 119 of the Complaint as if set forth fully herein.

121.    Because the Favored Noteholders' purported "vote" to consent to the Supplemental Indentures was invalid as to Plaintiffs and the Disenfranchised Noteholders (including, as Plaintiffs understand, the numerous individual investors holders), the Supplemental Indentures are invalid and void *ab initio* as to Plaintiffs and the Disenfranchised Noteholders.  The Supplemental Indentures are invalid because the execution of the Supplemental Indentures violated Section 316(a) of the TIA, Sections 902, 904, 905 of the 2016 Notes Indenture and Sections 9.2, 9.3, 9.4 and 9.5 of the 2017 Notes Indenture.  Specifically, at the times the purported consents were granted, CEOC and CEC controlled or shared control over

35

CEOC_105_Adversary_001458

**A0518**

the power to vote the Favored Noteholders' Notes pursuant to the Agreement, and also controlled or shared control over the power to sell the Notes subject to the Agreement.  As a result, pursuant to the Indentures' provisions cited at Paragraphs 44 through 47 above and the provisions of the Agreement cited at Paragraphs 98 to 112 above, CEOC and CEC had beneficial ownership of the Notes at the times the purported consents were granted, thus, the voting of those Notes constituted "Affiliate" voting.  Thus, Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture, as well as the TIA, such consents may not be counted in determining whether the Supplemental Indentures were approved by a majority of the Notes outstanding.

122.    In addition, the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures.

123.    Both the TIA and the express terms of the Indentures prohibit CEOC, CEC and their affiliates from voting any Notes beneficially owned by them in connection with any proposed amendment to the Indentures.  This prohibition reflects the direct conflict of interest between the obligors under the Notes and the holders.  To permit CEOC and CEC to do indirectly what they could not do directly, through what amounts to a straw man transaction, would be contrary to public policy and would clear a dangerous path for future abuses of the rights of noteholders, particularly individual investors in broadly distributed bond deals who have no practical means of engaging in separate discussions or transactions on a one-off basis, for the benefit of large and highly sophisticated bond issuers such as Caesars.

124.    The Agreement violates public policy by effectively disenfranchising the Plaintiffs and other Disenfranchised Noteholders (including individual investor noteholders),

36

who were not given an opportunity to evaluate or even consider the terms of the offers made privately to the Favored Noteholders.

125.    Accordingly, the Supplemental Indentures are invalid because Caesars did not truly obtain a majority vote consenting to the Amendments and Supplemental Indentures, and because their course of conduct violated the TIA, the Indenture, and public policy.  As a result, Plaintiffs' rights were and continue to be violated.

126.    There is a substantial and continuing controversy between Caesars and Plaintiffs, and a declaration of rights is both necessary and appropriate to establish that Plaintiffs are not bound by the Supplemental Indentures, which were procured by vote-buying, "empty votes" and collusive tactics that violate the TIA, the terms of the Indentures, and public policy, and constitute bad faith by Caesars.

127.    But for Caesars's conduct in, *inter alia*, obtaining the Supplemental Indentures through vote-buying and empty votes from those Favored Noteholders, who then exited all or substantially all of their economic stake in the Notes, Plaintiffs' and the Disenfranchised Noteholders' rights under former Indentures would not be impaired.  Plaintiffs are being injured by the deprivation of the protections of the Indentures, including Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, the Notations of Guarantee, and the Covenants Against Fundamental Changes, depriving them of the guarantee of payment of principal and interest by CEC and the protection against Caesars's course of conduct stripping CEOC of its valuable assets to Plaintiffs' detriment.

128.    Plaintiffs' injury can be redressed by the requested relief:  a declaratory judgment that the Supplemental Indentures are invalid and void *ab initio*.  If Plaintiffs are bound by the

37

Supplemental Indentures, Plaintiffs will be monetarily damaged, as they will no longer have the right or ability to collect principal and interest against CEC, rendering their Notes worthless.

129.    Accordingly, Plaintiffs are entitled to a declaration that the vote in favor of the Amendments was invalid, and that the Supplemental Indentures void *ab initio*.

## COUNT THREE
### (Violations of the Trust Indenture Act,
### 15 U.S.C. §§ 77aaa, *et seq.*)

130.    Plaintiffs incorporate by reference Paragraphs 1 through 129 of the Complaint as if set forth fully herein.

131.    The TIA governs corporate debt securities offered for sale and which have been qualified by the SEC, including the 2016 and 2017 Notes.  In order to qualify under the TIA, the relevant indenture must contain specific provisions designed to protect the bondholder.  *See* 15 U.S.C. § 77ggg.

### Section 316(a) of the TIA

132.    Section 316(a) of the TIA provides that holders of a majority of the principal amount of any series of notes governed by the statute may "direct the time, method, and place of . . . exercising any trust or power conferred upon such trustee" under the indenture, provided that notes controlled by any obligor—directly or indirectly—not be counted towards the requisite majority.  *See* 15 U.S.C. § 77ppp(a) ("[I]n determining whether the holders of the required principal amount of indenture securities have concurred in any such direction or consent, indenture securities owned by any obligor upon the indenture securities, or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any such obligor, shall be disregarded . . . .").

38

133.    The Agreement triggered the application of TIA Section 316(a) because the consents that were contemplated in the Agreement were used to direct the Trustee to execute the Supplemental Indentures, which constituted an exercise of the Trustee's powers under the Indentures.  *See* Ex. B, Agreement, §§ 2,2(c), (e); Ex. C, CEOC Form 8-K dated Aug. 25, 2014 at 6, 10-11, 15-16, 20, 29, 33 and 42.

134.    Caesars violated Section 316(a) of the TIA by causing the Trustee to execute the Supplemental Indentures based on the consents of the Favored Noteholders because, at the time the purported consents to the Amendments were given, CEOC and CEC beneficially owned and/or directly or indirectly controlled the Favored Noteholders' Notes pursuant to the Agreement.  As a result, the Favored Noteholders' consents should have been disregarded pursuant to Section 316(a) of the TIA.

### Section 316(b) of the TIA

135.    Section 316(b) of the TIA requires that Plaintiffs and the Disenfranchised Noteholders have an absolute right to receive payment of the principal of and interest under the Indentures, on or after the respective due dates expressed in those Indentures, and further provides that Plaintiff and the Disenfranchised Noteholders' right to institute suit for the enforcement of any such payment shall not be impaired or affected without their consent.  *See* 15 U.S.C. § 77ppp(b).

136.    Caesars has impaired the rights of Plaintiffs and the Disenfranchised Noteholders to payment, as well as their right to institute suit for payment of such rights, without securing their consent, in violation of the TIA.

137.    The elimination of the Guarantees and the modifications to the Covenants Against Fundamental Changes impair the rights of the Plaintiffs and Disenfranchised Noteholders to

39

receive payment of principal and interest, as well as their ability to file suit for enforcement of those rights.

138.    Because Caesars negotiated the Agreement with only the Favored Noteholders (who then also exited all or substantially all of their economic stake in the Notes), any assertion that the changes bind Plaintiffs and the Disenfranchised holders is a violation of the TIA.

139.    Further, the collusive and self-dealing transactions detailed above constituted an aggregate course of conduct of which the Agreement and Amendments were a part, and, upon information and belief, (1) the removal of CEC's guarantees of CEOC's debt, governed by Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the Notations of Guarantee, and (2) the modification of the Covenants Against Fundamental Changes, prohibiting CEOC from transferring "all or substantially all of its assets," located in Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes Indenture, effectuated through the Amendments were part of a larger scheme by Caesars to remove any remaining limitations on Caesars's strategy to restructure CEOC's debt at the expense of CEOC's noteholders, and highlight the damage Plaintiffs will continue to suffer as a result of Caesars's transfer of valuable assets out of CEOC prior to its bankruptcy and restructuring.

140.    Accordingly, Plaintiffs are entitled to a declaration that their rights under Section 316(a) and (b) of the TIA have been violated, and to the declaratory relief pled in Counts One and Two.

141.    As a result of Caesars's violations of the TIA, Plaintiffs have also suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on their Notes.

40

## COUNT FOUR
### (Breach of Contract, 2017 Notes
### Indenture § 6.8, 2016 Notes Indenture § 508)

142.    Plaintiffs incorporate by reference Paragraphs 1 through 141 of the Complaint as if set forth fully herein.

143.    The terms of the Notes and Indentures were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

144.    Under Section 6.8 of the 2017 Notes Indenture and Section 508 of the 2016 Notes Indenture (both of which are provisions mandated by Section 316(b) of the TIA), Plaintiffs and the other Disenfranchised Noteholders (including the extensive number of individual investor holders) are entitled to the unconditional right to receive principal and interest payments from Caesars and such rights shall not be impaired without the consent of each individual holder.

145.    Caesars has impaired the rights of Plaintiffs and the Disenfranchised Noteholders to payment under the Notes and to institute suit for the enforcement of any such payment on or after June 1, 2016 and October 1, 2017, without securing their consent.

146.    Specifically, the Agreement involves only the Favored Noteholders of the 2016 and 2017 Notes, but, through an empty vote of the Favored Noteholders, who then exited all or substantially all of their economic stake in the Notes, purports to bind Plaintiffs and the remaining holders including the extensive number of individual investor noteholders to the Amendments, including: (1) consent to the removal and acknowledgement of the termination of the CEC guarantee within the Indentures governing the Notes, and (2) consent to a modification of the Covenants Against Fundamental Changes. By purportedly effectuating these Amendments without Plaintiffs' consent, Caesars breached Section 6.8 of the 2017 Notes Indenture and Section 508 of the 2016 Notes Indenture.

41

Confidential

CEOC_105_Adversary_001464

147.    Due to Caesars's buying the votes of the Favored Noteholders, without making the same compensation equally and ratably available to all holders, including the numerous individual investor noteholders who possess no practical means of engaging in separate discussions or transactions on a one-off basis, Caesars had direct or indirect control of the Favored Noteholders, rendering them "Affiliates" of Caesars, and the Favored Noteholders' votes in favor of the Agreement and Amendments invalid pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture.

148.    In addition, the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures.

149.    Further, the collusive and self-dealing transactions detailed above constituted an aggregate course of conduct of which the Agreement and Amendments were a part, and, upon information and belief, (1) the removal of CEC's guarantees of CEOC's debt, governed by Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the Notations of Guarantee, and (2) the modification of the Covenants Against Fundamental Changes, located in Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes Indenture, effectuated through the Amendments were part of a larger scheme by Caesars to remove any remaining limitations on Caesars's strategy to restructure CEOC's debt at the expense of CEOC's noteholders, and highlight the damage Plaintiffs will continue to suffer as a result of Caesars's transfer of valuable assets out of CEOC prior to its bankruptcy and restructuring.

150.    Accordingly, Plaintiffs are entitled to the declaratory relief pled in Counts One and Two, above.

42

151.    In addition, as a result of Caesars's breach, Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on their Notes.

## COUNT FIVE
### (Breach of Contract, 2017 Notes Indenture
### Article III, 2016 Notes Indenture Article IX)

152.    Plaintiffs incorporate by reference Paragraphs 1 through 151 of the Complaint as if set forth fully herein.

153.    The terms of the Notes and Indentures were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

154.    Article III of the 2017 Notes Indenture and Article IX of the 2016 Notes Indenture describe the processes which must be followed for Caesars to redeem some, but not all, of the outstanding Notes.  Of critical importance, Section 3.3 of the 2017 Notes Indenture states:  "If less than all the Notes are to be redeemed, the Trustee shall select the Notes to be redeemed in any manner that the Trustee deems fair and appropriate."  Ex. E, 2017 Notes Indenture, § 3.3 (emphasis added.)  Section 1103 of the 2016 Notes Indenture contains substantially the same language.  *See* Ex. F, 2016 Notes Indenture, § 1103.

155.    By offering the Favored Noteholders payment at more than a 100% premium over market to purchase a majority of the outstanding Notes via the Agreement—a premium so substantial that it constituted a self-effecting offer—Caesars was able to effectuate a constructive redemption, the value of which is apparent by the exorbitant price paid.  However, Caesars did not follow the proper redemption processes when seeking to purchase the Favored Noteholders' interest pursuant to the Agreement, which further constitutes a breach of Caesars's obligations

43

under the Notes, Indentures and Guarantees.  In particular, the Notes selected for redemption were not determined by a "fair and appropriate" process.

156.    Accordingly, Plaintiffs are entitled to the declaratory relief pled in Counts One and Two, above.

157.    As a result of Caesars's breach, Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on their Notes.

<u>COUNT SIX</u>
**(Breach of Contract, Guarantees)**

158.    Plaintiffs incorporate by reference Paragraphs 1 through 157 of the Complaint as if set forth fully herein.

159.    The Guarantees were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

160.    Pursuant to the terms of the Guarantees, CEC agreed to provide an unconditional guarantee of principal, interest and other amounts due and owing under the Notes.  *See* Ex. E, 2017 Notes Indenture, Article XII and Ex. B (Notation of Guarantee); Ex. F, 2016 Notes Indenture, Article XV and Ex. A (Notation of Guarantee).

161.    There are no provisions in the Guarantees that provide for the release of the Guarantees pursuant to consent of a limited number of holders.  Rather, the Guarantees provide, *inter alia*, that Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of any waiver or consent by any Holder of such Securities with respect to any provisions hereof or thereof.

44

**A0527**

CEOC_105_Adversary_001467

162.    Therefore, the purported release of the Guarantee pursuant to the purported "vote" and consent of the Favored Noteholders is a breach of the terms of the Guarantees.

163.    As a result of Caesars's breach, Plaintiffs are entitled to the declaratory relief pled at Count One.

164.    Additionally, Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on their Notes.

## COUNT SEVEN
### (Breach of Contract, 2017 Notes Indenture § 6.7 and 2016 Notes Indenture § 507)

165.    Plaintiffs incorporate by reference Paragraphs 1 through 164 of the Complaint as if set forth fully herein.

166.    The terms of the Notes and Indentures were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

167.    At the times the purported consents to the Amendments were granted, CEOC and CEC effectively controlled or shared control over the power to vote the Favored Noteholders' Notes pursuant to the Agreement, and also effectively controlled or shared control over the power to sell the Notes subject to the Agreement at the time the consents were delivered.  As a result, pursuant to the Indentures' provisions cited at Paragraphs 44 through 47 above and the provisions of the Agreement cited at Paragraphs 98 to 112 above, CEOC and CEC had beneficial ownership of the Notes at the times the purported consents were granted.

168.    In addition, the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures.

45

169.    Section 6.7 of the 2017 Notes Indenture and Section 507 of the 2016 Notes Indenture mandate that no one or more bondholder shall affect, disturb or prejudice the rights of any other bondholder, nor obtain a priority or preference over any other bondholder.  *See* Ex. E, 2017 Notes Indenture, § 6.7; Ex. F, 2016 Notes Indenture, § 507.

170.    Caesars violated these provisions both in its role as a noteholder, constructive noteholder and as obligor by giving preferential treatment to the Favored Noteholders via the Agreement in exchange for the Favored Noteholders' consent to the Amendments, which constitutes a breach of Caesars's obligations under the Notes and Indentures.

171.    Caesars itself has made clear that even informal efforts to obtain preferential treatment will violate this equal treatment requirement—having filed its own action in New York State Court on that very ground.  (*See* Complaint, Index No. 652392/2014, dated Aug. 5, 2014 in *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et al.*, at ¶¶ 116-118, 150-153.)

172.    As a result of Caesars's breach, Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on their Notes.

### COUNT EIGHT
**(Breach of Duty of Good Faith and Fair Dealing)**

173.    Plaintiffs incorporate by reference Paragraphs 1 through 172 of the Complaint as if set forth fully herein.

174.    The terms of the Notes, Indentures and Guarantees were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

46

175.    New York law implies in every contract a covenant requiring each party to deal fairly and in good faith with the other and to refrain from taking any actions that would deprive the other party of the benefit of their respective bargain.

176.    Caesars breached the covenant of good faith and fair dealing by engaging in a course of conduct outside of performance of the contract, including entry into the Agreement and Amendments that sought to accomplish certain outcomes Caesars would never have been able to achieve had it followed the terms of the Notes, Indentures, and Guarantees, as well as the provisions of the TIA.

177.    Specifically, Caesars violated the implied covenant of good faith and fair dealing by the following:

(a)    By entering into a non-public offering (the Agreement) with certain Favored Noteholders to purchase their Notes at an exorbitant premium, on the condition that they vote their Notes to approve the Amendments prior to exiting all or substantially all of their economic stake in the Notes, thus impermissibly binding and disenfranchising the remaining noteholders without making the same compensation equally and ratably available to all holders, including as Plaintiffs understand the numerous individual investor noteholders who possess no practical means of engaging in separate discussions or transactions on a one-off basis;

(b)    By attempting to disclaim its guarantee under Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the Notations of Guarantee, despite the fact that CEOC still constitutes a wholly owned subsidiary under Rule 1-02(z) and the Indentures and, even

47

CEOC_105_Adversary_001470

if CEOC would not constitute a wholly owned subsidiary of CEC under Rule 1-02(z) of the Regulation S-X promulgated by the SEC and the Indentures based solely on CEC's equity ownership of CEOC, the transactions by which CEC transferred equity in CEOC to others was part of a scheme to circumvent the rights of the holders of the Notes in violation of the TIA, the Notes, the Indentures, the Guarantees, and the covenant of good faith and fair dealing;

(c)     By seeking to avoid the Covenants Against Fundamental Changes located in Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes Indenture by purchasing the Favored Noteholders' consents to the Amendments so that it could continue with its strategy of moving valuable assets from CEOC to other Caesars entities and their affiliates, in order to insulate Healthy Caesars (CEC and other of its affiliates) from the debt of Insolvent Caesars (CEOC);

(d)     By thwarting the redemption provisions in the Indentures requiring the Trustee to select shares for redemption using a "fair and appropriate" process, under which Caesars would not have been able to vote such shares, once redeemed, to enact the Amendments; and

(e)     By thwarting the provisions that mandate that no one or more bondholder shall affect, disturb or prejudice the rights of any other bondholder, nor obtain a priority or preference over any other bondholder.

178.    Caesars course of conduct violated the implied covenant of good faith and fair dealing and public policy because:

48

**A0531**

CEOC_105_Adversary_001471

(a)     Caesars completely disregarded Section 9.2 of the 2017 Notes Indenture and Section 902 of the 2016 Notes Indenture, which permit amendment to the Indentures with a simple majority, but implies that all holders must have the opportunity to vote on the proposed amendment.  Instead of presenting the Amendments to all holders of the Notes, including Plaintiffs, Caesars circumvented the Indentures and purchased a simple majority of votes from the Favored Noteholders, without making the same compensation equally and ratably available to all holders, including the numerous individual investor noteholders who possess no practical means of engaging in separate discussions or transactions on a one-off basis;

(b)     The "vote" on the Amendments was mere empty voting, because the Favored Noteholders voted Notes for which they no longer had an economic interest because they sold such Notes at par plus interest, and had no interest in protecting the rights of the Disenfranchised Noteholders;

(c)     Caesars directed the voting of the Favored Noteholders' Notes, even though they had a direct conflict of interest with the noteholders, and would have been unable to vote the Notes directly under the Indentures; and

(d)     Plaintiffs were disenfranchised because Caesars simply "bought" the consent of the Favored Noteholders without public engagement or Plaintiffs' involvement, rendering Plaintiffs' voting rights under the Indentures illusory.

49

179.     Caesars's foregoing aggregate course of dealing outside of the provisions and protections of the Indentures, and actions to strip Plaintiffs and the Disenfranchised Noteholders of such protections through a course of conduct constituting bad faith, deprived Plaintiffs of the benefit of their bargain under the Indentures.

180.     Further, at the time of the original issuance of the Notes—each in the aggregate principal face amount of $750 million—no reasonable person would have anticipated Caesars's current and past course of conduct at the time of contracting, nor that 51% of holders could approve amendments to the Indentures without broad solicitation.

181.     Accordingly, Plaintiffs are entitled to the declaratory relief claimed in Counts One and Two, above.

182.     Additionally, Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued and unpaid interest on their Notes.

**COUNT NINE**
**(Breach of Contract (2017 Notes Indenture §§ 6.1(c), 6.2 and 2016 Notes Indenture §§ 501(5)(a) and 502) and Breach of Guarantees as to CEC)**

183.     Plaintiffs incorporate by reference Paragraphs 1 through 182 of the Complaint as if set forth fully herein.

184.     The terms of the Notes, Indentures and Guarantees were at all times herein valid and enforceable contract obligations of CEC.

185.     CEOC's commencement of a voluntary bankruptcy case constituted an Event of Default under Section 6.1(c) of the 2017 Notes Indenture and Section 501(5)(a) of the 2016 Notes Indenture.

50

186.    As a result of this Event of Default, all amounts due under the Notes, Guarantees and Indentures have become immediately due and payable, including all outstanding principal and accrued, unpaid and capitalized interest. *See* Ex. E, 2017 Notes Indenture, Article XII and Ex. B (Notation of Guarantee); Ex. F, 2016 Notes Indenture, Article XV and Ex. A (Notation of Guarantee).

187.    Pursuant to the Notes, Indentures and Guarantees, CEC unconditionally guaranteed CEOC's obligations under the Notes and is now liable to Plaintiffs for all amounts due thereunder, including all outstanding principal and accrued, unpaid, and capitalized interest.

188.    CEC has breached its obligations to Plaintiffs under the terms of the Notes, Indentures and Guarantees by failing to pay Plaintiffs all amounts due thereunder, including all outstanding principal and accrued, unpaid, and capitalized interest due on their Notes.

189.    As a result of CEC's breach, Plaintiffs have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued, unpaid and capitalized interest on their Notes.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants CEC and CEOC[3] and enter an order:

(a)    Declaring that the Guarantees and Covenants Against Fundamental Changes are in full force and effect;

(b)    Declaring that the Supplemental Indentures are invalid and void *ab initio*;

---

[3] As set forth in this Court's Order dated January 15, 2015 (ECF No. 28), Plaintiffs' claims as against Defendant CEOC are stayed pursuant to Section 362(a) of the Bankruptcy Code based on Chapter 11 petitions filed with respect to CEOC in both the United States Bankruptcy Courts for the District of Delaware and for the Northern District of Illinois.  For the avoidance of doubt and notwithstanding anything else stated herein, Plaintiffs' amendment of their complaint with the filing of this Amended Complaint *is not and should not be deemed an attempt to commence or continue an action against CEOC, to collect a debt against CEOC or take any other action in violation of the automatic stay imposed by section 362 of Title 11 of the United States Code.*

51

(c)     Awarding Plaintiffs damages in an amount to be determined at trial, but

not less than an amount equal to the principal of and accrued, unpaid and

capitalized interest on their Notes;

(d)     Pre- and post-judgment interest calculated pursuant to the terms of the

Notes, Indentures, and Guarantees;

(e)     Awarding Plaintiffs their attorneys' fees, costs and expenses incurred in

bringing this action; and

(f)     Awarding such other and further relief as the Court may deem proper.

Plaintiffs hereby demand a trial by jury.


Dated: January 29, 2015                         Respectfully submitted,


                                                DRINKER BIDDLE & REATH LLP


                                                By: /s/ James H. Millar
                                                    James H. Millar
                                                    Kristin K. Going
                                                    Clay J. Pierce
                                                    Tracy S. Combs

                                                1177 Avenue of the Americas
                                                41st Floor
                                                New York, New York 10036
                                                Telephone:  (212) 248-3140
                                                Fax:        (212) 248-3141

                                                james.millar@dbr.com
                                                kristin.going@dbr.com
                                                clay.pierce@dbr.com
                                                tracy.combs@dbr.com

                                                *Attorneys for Plaintiffs*


52


Confidential                                              CEOC_105_Adversary_001475

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD.,** and **TRILOGY PORTFOLIO COMPANY, LLC,** | **CIVIL ACTION NO. 14-7091-SAS** |
| Plaintiffs, | |
| v. | |
| **CAESARS ENTERTAINMENT CORPORATION** and **CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,** | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, James H. Millar, hereby certify that on this day a true and correct copy of the foregoing

Amended Complaint for Declaratory Relief and Damages was filed electronically with the Case

Management/Electronic Case Filing System ("CM/ECF") for the Federal Judiciary.  Notice of

this filing will be sent to all parties by operation of the Notice of Electronic Filing System, and

the parties to this action may access this filing from CM/ECF.


/s/ James H. Millar
James H. Millar

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2016, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all CM/ECF participants, resulting in service upon all counsel of record.

<u>s/ John C. O'Quinn</u>
John C. O'Quinn