CASE NO. 1:16-cv-08423

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

*In re* CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL., *Debtors.*

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL., *Appellants*,
*v.*
BOKF, N.A., ET AL., *Appellees*.

*Appeal from the United States Bankruptcy Court for the*
*Northern District of Illinois, Case No. 15-01145, Adv. Pro. No. 15-00149*

## JOINT OPENING BRIEF OF APPELLEES

JONES DAY
Morgan R. Hirst
77 West Wacker Drive
Chicago, IL 60601
(312) 782-3939

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
(213) 489-3939

KELLEY DRYE & WARREN LLP
Eric R. Wilson
David I. Zalman
101 Park Avenue
New York, NY 10178
(212) 808-7800

*Counsel for Appellee Wilmington*
*Savings Fund Society, FSB*

FOLEY & LARDNER LLP
Mark F. Hebbeln
Lars A. Peterson
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
(312) 832-4500

ARENT FOX LLP
Andrew I. Silfen
Mark B. Joachim
Mark A. Angelov
Beth M. Brownstein
1675 Broadway
New York, NY 10019
(212) 484-3900

Jackson D. Toof
1717 K Street, NW
Washington, DC 20006
(202) 857-6000

*Counsel for Appellee BOKF, N.A.*

DRINKER BIDDLE & REATH LLP
Timothy R. Casey
191 North Wacker Drive, Suite 3700
Chicago, IL 60606
(312) 569-1000

James H. Millar
Kristin K. Going
Frank F. Velocci
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
(212) 248-3140

*Counsel for Appellees Relative Value-*
*Long/Short Debt Portfolio, a Series of*
*Underlying Funds Trust, and Trilogy*
*Portfolio Company, LLC*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, the Appellees make the following disclosures:

1.      Appellee Wilmington Saving Fund Society, FSB ("WSFS"), states that its corporate parent is WSFS Financial Corporation, a publicly-held corporation.

2.      Appellee BOKF, N.A. ("BOKF" and, with WSFS, the "Trustees"), states that its corporate parent is BOK Financial Corporation, a publicly-held corporation.

3.      Appellee Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust ("Relative Value"), states that it has no corporate parent and no publicly held corporation owns 10% or more of its stock.

4.      Appellee Trilogy Portfolio Company, LLC (with Relative Value, "Trilogy"), states that it has no corporate parent and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

I.     **PRELIMINARY STATEMENT** ..................................................1

II.    **STATEMENT OF THE ISSUE** ..............................................7

III.   **STANDARD OF REVIEW** ....................................................7

IV.   **STATEMENT OF THE CASE** ...............................................8

     **A.**     **The Debtors Seek A "Temporary Stay" To Promote Settlement** ...........................................9

     **B.**     **The Debtors Argue On Appeal For A "Temporary" Injunction To "Foster" Settlement** ........................10

     **C.**     **The Bankruptcy Court Twice Grants Temporary Relief For The Reasons Advanced By The Debtors** ..................................12

     **D.**     **The Debtors Ignore The Bankruptcy Court's Warning And Seek A Permanent Injunction Intended To Eliminate The Guarantee Claims Through A Cramdown Plan** ....................17

     **E.**     **The Debtors Focus Their Case On Settlement Negotiations** .........19

     **F.**     **The Bankruptcy Court Denies The Debtors' Request For A Third Injunction** ...................................................20

V.     **SUMMARY OF ARGUMENT** ..............................................25

VI.   **ARGUMENT** ....................................................................28

     **A.**     **The Requested Injunction Requires An Extraordinary Exercise Of Discretion** ...........................30

     **B.**     **The Bankruptcy Court Applied The Proper Legal Standard** ......32

         1.     The Bankruptcy Court Did Not Hold That Injunctive Relief Is Available Only To Facilitate A Fully Consensual Plan ........32

         2.     Section 105 Injunctions Are Almost Always Brief And Almost Never Through Plan Confirmation ..............................35

**Page**

   C.     **The Bankruptcy Court Properly Exercised Its Discretion In Denying The Debtors' Third Request To Extend The Injunction** ...................................................40

       1.    The Evidence Supports The Bankruptcy Court's Finding That The Guarantee Actions Do Not Threaten The Estate Or The Debtors' Ability To Reorganize ...................................41

       2.    The Evidence Supports The Bankruptcy Court's Finding That The Equities Do Not Favor Further Injunctive Relief ......48

       3.    The Evidence Supports The Bankruptcy Court's Finding That An Injunction Is Not In The Public Interest ....................53

VII.   **CONCLUSION** ...........................................................................56

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Adams v. City of Chicago,* 135 F.3d 1150 (7th Cir. 1998) .......................................7

*In re Airadigm Communications, Inc.*, 519 F.3d 640 (7th Cir. 2008) ....................38

*American Hosp. Supply Corp. v. Hospital Prods. Ltd.*,
  780 F.2d 589 (7th Cir. 1986) ...................................................................6

*Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564 (U.S. 1985) .......................8

*Bedrossian, M.D. v. Northwestern Mem'l Hosp.*,
  409 F.3d 840 (7th Cir. 2005) ...................................................................7

*In re Caesars Entm't Operating Co.*, 533 B.R. 714 (Bankr. N.D. Ill. 2015) ..........10

*In re Caesars Entm't Operating Co.*, No. 15-cv- 6504,
  2015 WL 5920882 (N.D. Ill. Oct. 6, 2015) ..............................................8, 11, 31

*In re Caesars Entm't Operating Co.*,
  808 F.3d 1186 (7th Cir. 2015) ........................................................2, 4, 12, 33, 36

*Dore & Associates Contracting, Inc. v. American Druggists' Ins. Co.,*
  54 B.R. 353 (W.D. Wis. 1985) ...............................................................55

*In re Fabtech*, No. 10-18401,
  2010 WL 6452908 (BAP 9th Cir. July 19, 2010).................................38, 39, 45

*Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998)...............................30, 31, 36, 38

*In re GAC Storage El Monte, LLC*, 489 B.R. 747 (Bankr. N.D. Ill. 2013).............45

*In re Gander Partners LLC*, 432 B.R. 781 (Bankr. N.D. Ill. 2010)............31, 36, 51

*Goodman, D.C. v. Illinois Dep't of Fin. & Prof'l Regulation*,
  430 F.3d 432 (7th Cir. 2005) ...................................................................7

*In re G.S.F. Corp.*, 938 F.2d 1467 (1st Cir. 1991) ...................................................31

*In re IFC Credit Corp.,* 422 B.R. 659 (Bankr. N.D. Ill. 2010)................................36

**Page**

*In re Juneau Bldg. Ctr.*, 57 B.R. 254 (Bankr. M.D. La. 1986)................................39

*In re Lowenschuss*, 67 F.3d 1394 (9th Cir.1995)......................................................38

*In re Lyondell Chem. Co.*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009)........31, 37, 51, 55

*In re Monroe Well Serv., Inc.* 67 B.R. 746 (Bankr. E.D. Pa. 1986) .................37, 51

*In re Otero Mills, Inc.* 21 B.R. 777 (Bankr. D.N.M. 1982)...............................38, 39

*Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210 (7th Cir. 1997).... 7-8

*In re Paul R. Glenn Architects*, No 12-1266,
    2013 WL 441602 (Bankr. N.D. Ill. Feb. 5, 2013) .......................................36, 51

*In re Phar-Mor, Inc. Secs. Litig.*, 166 B.R. 57  (W.D. Pa. 1994)..................... 46-47

*In re PTI Holdings Corp.*, 346 B.R. 820 (Bankr. D. Nev. 2006) ...........................51

*In re Saleh*, 427 B.R. 415 (Bankr. N.D. Ohio 2010) ...............................................30

*In re Saxby's Coffee Worldwide, LLC*,
    440 B.R. 369 (Bankr. E.D. Pa. 2009) ................................................31, 36, 40, 42

*Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423 (7th Cir. 1985) .............8, 40

*In re Teknek, LLC*, 563 F.3d 639 (7th Cir. 2009) ....................................................31

*In re Third Eighty-Ninth Assocs.*, 138 B.R. 144 (S.D.N.Y. 1992) .........................31

*In re Western Real Estate Fund*, 922 F.2d 592 (10th Cir. 1990).....................38, 39

## Statutes and Other Authority

11 U.S.C. § 105(a) .....................................................................................................30

11 U.S.C. § 1121(d)(2).............................................................................................53

2 COLLIER ON BANKRUPTCY ¶ 105.03[1][c] (16th ed. rev. 2016)...........................49

## I.    PRELIMINARY STATEMENT[1]

Following three days of evidentiary hearings, and based on the full record of two prior trials and a twenty-month bankruptcy case, the Bankruptcy Court declined to extend the short injunction it had issued to temporarily stay enforcement of contractual guarantees executed by the Debtors' non-debtor parent, Caesars Entertainment Company ("CEC").  This decision respecting a "drastic and extraordinary remedy" is unimpeachable and anything but an abuse of discretion.

Recognizing this, the Debtors construct a strawman.  They claim that the Bankruptcy Court made an error of law in "holding" that an injunction is not available unless it "would enhance the prospects for a fully consensual reorganization," which they deem "an inappropriately rigid and narrow interpretation" and "an artificial limitation on the purpose or duration" of the equitable powers afforded by section 105(a) of the Bankruptcy Code.  Br. at 1, 3, 26.  The Debtors assert this constitutes reversible error because "[t]he bankruptcy court's decision hinges entirely on a fundamental misreading of the Seventh Circuit's decision" in their prior appeal.  *Id.* at 28.

The Bankruptcy Court made no such holding, and it did not "misread" the Seventh Circuit's opinion.  The Seventh Circuit remanded so that the Bankruptcy Court could consider whether to grant "the temporary injunction sought by

---

[1]    The Debtors' Appendix is cited as "A"; the Appellees' Supplemental Appendix is cited as "SA"; and the Debtors' Opening Brief is cited as "Br."

CEOC," something it described as "a factual issue that remains to be determined." 808 F.3d 1186, 1188 (7th Cir. 2015). The Seventh Circuit explained that "[w]e don't say that the stay sought by CEOC must be granted – that's an issue for the bankruptcy judge to resolve in the first instance." *Id.* at 1191.

The Bankruptcy Court did not misunderstand the scope of its power. On remand in February, the Court observed that "I have the power to grant the injunction, should I find the facts warrant it." SA25. The Court then exercised that power, twice enjoining the Appellees' pursuit of their guarantee claims against CEC. In the most recent trial, when the Debtors sought yet another injunction and argued that the availability of relief "cannot rise or fall with whether we reach a consensual deal," the Court again reiterated that "I have the power" to enjoin the Appellees. The question was whether "that's a sensible exercise of it." SA175.

Based on the evidence, the Bankruptcy Court concluded it was not. The Court found that a further extension of the injunction would not aid in the Debtors' reorganization and that "a reorganization itself is not at risk." A77. It decided that, to the contrary, the prior injunctions had impaired reorganization efforts because, among other things, they sheltered CEC while the Debtors took no steps to recover anything from dozens of affiliates and insiders whom the independent Examiner identified as potentially liable to the bankruptcy estate for billions of dollars. "Ignoring these obvious and significant sources of recovery for more than

a year is nothing less than stunning and makes clear that further injunctive relief is not warranted." A71.

The Bankruptcy Court also found that the equities warranted denial of further injunctive relief. Among other things, it concluded that CEC's efforts "to employ an injunction in its favor to gain an advantage in litigation over parties whose hands the injunction has tied" were "unseemly" and "inequitable." A79-80. "Injunctions should preserve the status quo; the status quo was evidently not enough for CEC." A80. The Court deemed the Debtors' assertion that "*CEC's* behavior . . . cannot be held against" them, Br. at 68 (emphasis in original), to be incredible given that CEC owns and controls the Debtors. "CEC has everything to do with [it]. The injunction halts litigation against CEC, not against the Debtors." A80; *see* SA176 ("I don't see how you can say it isn't [about CEC]. . . . [I]t's CEC that is the immediate beneficiary of the injunction. The judgment will be against CEC. Otherwise, CEC wouldn't care. And apparently it does somewhat.").

The Debtors' criticism of the Bankruptcy Court for considering whether injunctive relief would promote a consensual reorganization is disingenuous. Until it became clear that they could not prove their case, all of the Debtors' requests for relief were premised on the idea that an injunction was needed to promote settlement. The Debtors repeatedly assured the Bankruptcy Court, this Court, and the Seventh Circuit that, absent a settlement, the Appellees would be free to pursue

their claims against CEC. They promised the Seventh Circuit that "[n]o one is talking about extinguishing [the Appellees'] claims for all time." SA22.

The Seventh Circuit took the Debtors at their word and held that a "*temporary*" freeze might be appropriate to "provide the parties with information they need to have a clear shot at negotiating an overall settlement of what amounts to a three-cornered battle among CEC, its direct creditors via CEC's guaranties to them, and CEOC's creditors." 808 F.3d at 1189. Then, on remand in June and August, the Debtors put on witnesses to describe their alleged "progress" toward an "overall settlement." The "constant parade of witnesses disclosing settlement communications," Br. at 3, was the Debtors' own pageant.

No wonder, then, that the Bankruptcy Court considered the impact of injunctive relief on the prospect of settlement. But it did not do so "myopically" to the exclusion of the evidence presented or in the belief that settlement was the only basis for an injunction, as the Debtors now charge. To the contrary, the Court applied the legal standard established by the Seventh Circuit to the evidence and found the Debtors' case to be lacking. It concluded that an injunction would not enhance the prospects for a successful resolution of the disputes attending the bankruptcy and that its denial would not endanger the success of the bankruptcy proceeding. It also found that an injunction would not be in the public interest. And, as noted, it concluded that the equities weighed against an injunction as well,

- 4 -

rejecting the Debtors' assertion that the equities are irrelevant. The Court explained what it should not have needed to say: "A Section 105 injunction is an equitable remedy. To receive equity, . . . one must do equity." SA43.

Finally, the Debtors' argument that the Bankruptcy Court abused its discretion by reaching "opposite conclusions" on the "same evidence" and "exactly the same facts" as those found in the prior trials, Br. at 2, 29, is demonstrably false. The "same facts" led the Bankruptcy Court to issue a second short injunction with a termination date of August 29, 2016, accompanied by a "warn[ing]" that "the likelihood any further injunctive relief will be granted is small." A103-04. The "same evidence" that only warranted a seventy-four day stay in June did not justify, much less compel, an extension of the injunction beyond its firm expiration date, let alone an injunction through plan confirmation.

Moreover, the Debtors ignore the wealth of new facts developed at the most recent trial, which included the "stunning" revelation that, until two weeks before trial, the Debtors had not sought any contribution from any of the seventy-three insider defendants (other than CEC itself) identified by the Examiner. A70-71. "Worse still," when finally approached, CEC's "sponsors" (Apollo and TPG, two of the largest private equity funds in the world) effectively told the Debtors to pound sand, proclaiming this a "CEC problem." *Id.*

New evidence also revealed that, rather than paying for releases under the Debtors' proposed Plan, the CEC sponsors would profit if the Plan were confirmed, with the value of their equity in CEC increasing by hundreds of millions of dollars. The Bankruptcy Court labeled the Debtors' valuation testimony to the contrary a "fiction." A72. Other new evidence established that, when it was sheltered by the injunction, CEC lobbied dozens of members of Congress in an effort to change the Trust Indenture Act to extinguish retroactively the Appellees' guarantee claims against it. A79-80.

Finally, just as importantly, the Bankruptcy Court noted the lack of evidence that otherwise might justify an injunction – "certainly nothing to support the prediction in the closing argument of a 'catastrophe' if the current injunction weren't extended." A74-75. Among other things, the Court found the evidence to contradict the Debtors' assertions that a settlement with CEC was the only way they could reorganize, that an injunction was necessary to preserve a settlement with CEC, and that CEC would file for bankruptcy absent an injunction. A73-74.

The Bankruptcy Court followed the Seventh Circuit's mandate. It considered the record and properly exercised its discretion to deny the Debtors' request for another injunction. This Court should affirm.

## II.   STATEMENT OF THE ISSUE

Did the Bankruptcy Court abuse its discretion when it found that the evidence did not support an extension of the "drastic and extraordinary" temporary stay preventing the Appellees from enforcing contractual rights against the Debtors' non-debtor parent, CEC?

## III.   STANDARD OF REVIEW

"[D]enial of a preliminary injunction is reviewed for abuse of discretion." *Goodman, D.C. v. Illinois Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005).  "Under this standard, we reverse only where no reasonable person could take the view adopted by the [trial] court." *Bedrossian, M.D. v. Northwestern Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005) (quotation omitted). "[I]t is not enough that we think we would have acted differently in the [trial] judge's shoes; we must have a strong conviction that he exceeded the permissible bounds of judgment." *American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589, 595 (7th Cir. 1986).

"When reviewing a denial of a preliminary injunction, [appellate courts] review the [trial] court's findings of facts for clear error . . . ." *Adams v. City of Chicago,* 135 F.3d 1150, 1154 (7th Cir. 1998) (quotation omitted).  "A finding of fact is clearly erroneous only if based on the entire evidence the [appellate] court is left with the definite and firm conviction that a mistake has been committed." *Rust*

*Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir. 1997) (quotations omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (U.S. 1985)).

## IV.  STATEMENT OF THE CASE

As the Court may recall from briefing on the prior appeal of this matter,[2] the Trustees are indenture trustees for a total of $4.46 billion in second lien notes issued by the Debtors, and Trilogy is the holder of $14 million in unsecured notes issued by the Debtors.  CEC unconditionally guaranteed all of that debt but later denied and disaffirmed its guarantees.  This led to litigation against CEC (the "Guarantee Actions") filed in Delaware Chancery Court and United States District Court for the Southern District of New York.[3]

---

[2]  The Appellees incorporate by reference their Statement of the Case from the prior appeal.  *See* No. 15-cv-6504, ECF 34.

[3]  The Debtors try again to portray the Guarantee Actions as "intertwined with the Debtors' potential claims against CEC."  Br. at 19.  This Court already has rejected that assertion.  No. 15-cv- 6504, 2015 WL 5920882, at *5-*6 (N.D. Ill. Oct. 6, 2015) ("In the instant case, defendants' claims against CEC do not in any way depend on CEC's misconduct with respect to CEOC. . . .  [The Debtors'] argument that defendants' claims against CEC 'arise from the same

**A.    The Debtors Seek A "Temporary Stay" To Promote Settlement.**

The Debtors filed for bankruptcy in January 2015 and have since proposed a plan of reorganization (the "<u>Plan</u>") that would permanently release all of the Appellees' claims against non-debtor CEC.  SA334-37.[4]  In March 2015, the Debtors filed a complaint against the Appellees seeking to enjoin prosecution of the Guarantee Actions against CEC.  A644.  Although the Debtors initially requested an injunction through the effective date of their proposed Plan, they quickly pared back their request.

In their May 2015 pre-trial brief, the Debtors made clear they were seeking only "a temporary stay of the guarantee litigation until 60 days after the Examiner issues his final report."  SA181.[5]  The Debtors asserted that the purpose of the injunction was to "give all parties time to digest the Examiner's report . . . and, in light of its findings, attempt to reach a consensual or otherwise confirmable plan of reorganization. . . .  Although temporary, the stay will provide the Debtors with a critically important window to pursue their efforts to reorganize and build

---

capital market transactions involving debtors and their debt,' is simply wrong.").

[4]    The Debtors purported to include a copy of the Plan in their Appendix, starting at page A2240.  The Appendix, however, omits the document.  The Appellees have included the section cited above in the Supplemental Appendix.

[5]    The Bankruptcy Court appointed the Examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate potential claims available to the bankruptcy estate with respect to pre-bankruptcy transactions engineered by CEC and other insiders in order to strip the Debtors of their most valuable assets.

consensus around a value-maximizing plan." *Id.*; *see* SA187, 192 (same); SA198-99 (same).

The Debtors also argued that the Appellees "will suffer no harm from a temporary stay. The threat of their guaranty claims will provide them with powerful leverage to negotiate a favorable consensual deal. If they can achieve a deal, they are better off. If not, the stay will lapse 60 days after the Examiner issues his report, and they will be no worse off." SA199.

Following a two-day trial, the Bankruptcy Court denied an injunction, concluding that, as a matter of law, it lacked authority to grant the requested relief. 533 B.R. 714 (Bankr. N.D. Ill. 2015) [A123].

## B. The Debtors Argue On Appeal For A "Temporary" Injunction To "Foster" Settlement.

On appeal to this Court, the Debtors again asserted that a temporary injunction should be entered to permit parties to explore settlement. At oral argument, their counsel acknowledged that "the whole purpose of having a temporary injunction to span 60 days beyond the time of the examiner's report is to try to foster" settlement. SA18; *see* SA20 ("The examiner's report . . . may very well give rise to the kind of consensus that the bankruptcy process is intended to foster that would lead to resolution. That's the reason for the . . . request for the temporary injunction.").

The Debtors again assured the Court that they "only seek a temporary – not permanent – injunction. [The Appellees] will still have their claims – and those claims will provide [the Appellees] with significant leverage in negotiating a consensual reorganization. And if no deal is reached, [the Appellees] will be able to pursue their claims." SA206.

After briefing and argument, this Court affirmed. Among other things, the Court observed that, even if the Bankruptcy Court had the requisite authority, "[n]o other factors compel, or even support the issuance of an injunction." 2015 WL 5920882, at *6.

On appeal to the Seventh Circuit, the Debtors again said that they "merely seek temporary relief until 60 days after the examiner issues his report, so that, through the bankruptcy process, all of the relevant stakeholders can evaluate and respond to the examiner's assessment of the disputed transactions and perhaps achieve consensus on restructuring." SA216; see SA219 ("The Debtors only seek a temporary – not permanent – injunction. Appellees will still have their claims, and those claims will provide Appellees with significant leverage in negotiating a consensual reorganization."). At argument before the Seventh Circuit, in the face of panel skepticism, counsel for the Debtors promised that "[n]o one is talking about extinguishing [the Appellees'] claims for all time. The point of this is . . . a temporary stay of the ongoing litigation." SA22.

- 11 -

The Seventh Circuit reversed the Bankruptcy Court's holding that it lacked the power to issue an injunction. 808 F.3d at 1191. It held that "there is nothing in section 105(a) to bar the order sought by [the Debtors]" *if* the Debtors were correct that a short stay would facilitate "an overall settlement." *Id.* at 1189. The Seventh Circuit concluded that the question for the Bankruptcy Court was "whether the injunction sought by [the Debtors] is likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy. If it is, and its denial will thus endanger the success of the bankruptcy proceedings, the grant of the injunction would in the language of section 105(a), be appropriate." *Id.* at 1188-89 (quotation omitted).

The Seventh Circuit did not direct that an injunction be entered. Instead, it remanded so that the Bankruptcy Court could consider "[w]hether the temporary injunction sought by CEOC is such an 'appropriate' order," which it described as "a factual issue that remains to be determined." *Id.* at 1189; *see also id.* at 1191 ("We don't say that the stay sought by CEOC must be granted – that's an issue for the bankruptcy judge to resolve in the first instance.").

## C. The Bankruptcy Court Twice Grants Temporary Relief For The Reasons Advanced By The Debtors.

On remand to the Bankruptcy Court, the Debtors renewed their motion, again seeking an injunction through sixty days after issuance of the Examiner's report in order to promote settlement. SA230 ("the injunction would provide a

brief – yet critical – 60-day window following the issuance of the Examiner's Report for the Debtors and other parties in interest to try to reach a consensual, value-maximizing plan that contains significant funding contributions and credit support from CEC").

The Bankruptcy Court recognized that, as a result of the Seventh Circuit's ruling, "I have the power to grant the injunction, should I find the facts warrant it." SA25. It did just that on February 26, 2016, issuing a temporary injunction through sixty days after issuance of the Examiner's report. A105. The Court noted that "[t]he critical question in this case, then, is not whether the company can be restructured successfully. Rather, as the court of appeals observed, the question is whether a temporary injunction 'is likely to enhance the prospects for a successful *resolution of the disputes* attending [the CEOC] bankruptcy.'" A114 (quoting the Seventh Circuit opinion) (emphasis in original). It found that "[t]he evidence strongly suggested that it is." *Id.*

In particular, the Bankruptcy Court credited the Debtors' assertion that the Examiner's report would lead to global peace: "The debtors envision that the examiner's report evaluating the estate's claims against CEC, along with a 'market test' the debtors have been conducting, will supply creditors with enough information for meaningful negotiations over CEC's contribution. The idea is to have the examiner's report and the market test 'set the table' for a consensual

- 13 -

resolution of the disputes . . . ." A115 (transcript citations omitted). Quoting the Seventh Circuit's opinion, the Court stated that "[t]he purpose of the injunction here is to give the parties 'a clear shot at negotiating an overall settlement.'" A118. And, taking the Debtors at their word that the goal was not to extinguish the guarantee claims, the Court stated that "[i]f there has been no resolution of the bankruptcy and the injunction expires, [the Appellees] will be free to pursue their actions. The guaranty creditors identify no particular harm from a short delay." A120.

In March 2016, the Examiner issued his report, concluding that CEC and its insiders (including Apollo and TPG) had orchestrated fraudulent transfers to loot the Debtors of valuable assets and deprive them of the ability to pay their debts, including the Appellees' notes. The Examiner found that CEC and those insiders potentially were liable to the bankruptcy estate for damages ranging from $3.6 to $5.1 billion just on causes of action the Examiner believed to have a likely prospect of success. SA301. That range does not include massive additional amounts likely to be recovered on account of damages the Examiner did not have the time or information to quantify. Moreover, the Examiner identified billions of dollars of other colorable causes of action that, although more difficult to prove, he believed to have a prospect of success.

After the injunction expired, the Debtors sought to reinstate it in June 2016, on an "emergency" basis, in the face of upcoming summary judgment arguments in the Guarantee Actions. The Debtors agreed that the purpose of the prior injunction was "to allow the Debtors and their stakeholders a window of opportunity to try to reach a global settlement following the issuance of the Examiner report," SA253, and again argued that "the question for this Court is whether the injunctive relief sought by the Debtors is likely to enhance the prospects for a successful resolution of disputes attending their bankruptcy proceedings." SA255; *see* SA262 (same).

This time, however, the Debtors sought an injunction all the way through confirmation. They argued that this "would allow more time for settlement discussions among the Debtors, CEC, and the Guaranty Creditors without the threat of imminent multi-billion dollar judgments and a CEC bankruptcy filing." SA265. The Debtors proclaimed that the prior injunction had "provided the parties with a critical window in which to advance Plan negotiations toward a consensual Plan," and they cited "progress" with various creditor constituencies. SA253, 260, 264. During the ensuing three-day trial, the Debtors' financial advisor (James Millstein) testified at length on direct examination about settlement negotiations and alleged "progress" toward a consensual resolution. A101-02 (describing testimony); SA28-34 (testimony regarding "substantial progress" toward a "fully consensual plan," including negotiations with CEC, the official committee of

- 15 -

unsecured creditors, first lien noteholders, first lien banks and second lien noteholders).

On June 15, 2016, the Bankruptcy Court issued a second temporary injunction, but not the full relief the Debtors had requested. Based on the evidence before it, the Court found that only a seventy-four day injunction, through August 29, 2016, was warranted. A99.

The Bankruptcy Court noted that, contrary to his testimony at the June 2015 evidentiary hearing, Millstein had admitted that CEC had alternatives to bankruptcy even if judgments were entered against it in the Guarantee Actions. A102. "That was a concession he did not make at the hearing a year ago." *Id.* The Court also observed that, contrary to his prior testimony, Millstein also conceded that even a CEC bankruptcy "might only delay confirmation" of a plan of reorganization that included a contribution from CEC. *Id.* "That, too, was not the view he took at last year's hearing." *Id.* Nevertheless, the Court concluded that, although "the evidence on the prospects for a successful resolution could have been stronger," it was persuaded that "the debtors' progress on the settlement front is enough to show a continued likelihood of a successful reorganization – in the sense of a fully consensual plan, the debtors' goal." *Id.*

Again taking the Debtors at their word, the Bankruptcy Court stated that "[t]he purpose of granting injunctive relief here is to facilitate a negotiated

- 16 -

resolution of the disputes in this case." A103. It made clear that "[t]he purpose is *not* to give the [D]ebtors and CEC an opportunity to avoid negotiations and then at confirmation cram a plan down on the second lien noteholders." *Id*. (emphasis in original). Thus, "[b]ecause deadlines, not uncertainty alone, spur settlement, the debtors will not be granted injunctive relief through confirmation." *Id*. Rather, the Court "warned" the Debtors that "the likelihood any further injunctive relief will be granted is small" and that "[t]he August 29 expiration date should accordingly be considered a deadline to reach a resolution." A103-04; *see* A100 ("[T]he injunction will have a much shorter duration than the movants want. And the chances of further injunctive relief are slim.").

**D. The Debtors Ignore The Bankruptcy Court's Warning And Seek A Permanent Injunction Intended To Eliminate The Guarantee Claims Through A Cramdown Plan.**

Instead of considering August 29 a firm deadline, the Debtors promised CEC that they would request yet another extension – on terms dictated by CEC – through a decision on confirmation of the Plan (not scheduled to be heard until January 2017), regardless of consensus and heedless of the Bankruptcy Court's warning. A2550. On August 8, the Debtors did just that, filing a motion for another extension of the injunction through confirmation. SA275.

In that motion, the Debtors largely dropped the pretense of seeking more time to negotiate a fair settlement with the Appellees. They claimed that a temporary

stay with a firm expiration date somehow vested the Appellees "with undue negotiating leverage" and that an indefinite injunction was needed to pressure the Appellees with "the risk of a contested confirmation hearing." SA283.

The Debtors recognized that, following the Seventh Circuit's directive, the Bankruptcy Court had enjoined the Appellees specifically "to 'facilitate a negotiated resolution of the disputes in this case.'" SA282, 287 (quoting the Bankruptcy Court opinion). But they argued that an injunction through confirmation would meet the Seventh Circuit's standard because "[d]isputes, after all, can be resolved through settlements or the courts." SA283.

The Debtors nevertheless devoted the lion's share of their motion to a recitation of alleged "progress" in their "negotiations" with creditors, including a summary of the ongoing mediation, and pleas for the Bankruptcy Court to "rebalance[e] the parties' negotiating leverage" and "reallocat[e] some of the risk back to the" Appellees. SA278-81, 283, 285-86, 288, 291-92. Before trial, the Debtors even filed a statement from the mediator purporting to describe "progress in the mediation." SA326.[6]

---

[6] Consistent with a prior ruling on the admissibility of a statement from the mediator, the parties stipulated that only part of the document would be admitted into evidence. SA106-16. The trial exhibit as admitted therefore was redacted. The Debtors improperly included the entire unredacted version in their Appendix. The Appellees have included the admitted, redacted statement in their Supplemental Appendix. SA326.

**E.    The Debtors Focus Their Case On Settlement Negotiations.**

The Bankruptcy Court held another three-day trial on the Debtors' motion in August 2016.  At trial, it heard live testimony from the Debtors' financial advisor (Brendan Hayes, who works for Millstein), the Trustees' advisor (David Hilty), and Trilogy's Director of Research (Barry Kupferberg), along with deposition testimony from a member of the Debtors' purportedly "independent" special governance committee (Ronan Stauber) and a lobbyist hired by CEC to advance legislation aimed at amending the Trust Indenture Act to impair the Appellees' claims in the Guarantee Actions.

Consistent with their motion, the Debtors focused Hayes' testimony on the alleged "progress" in settlement discussions.  Among other things, Hayes testified at length (seventy-nine transcript pages of direct testimony) about mediation and the "current status" and nature of the Debtors' negotiations with first lien bank creditors, first lien bond creditors, second lien noteholders, the official committee of second lien noteholders, the official committee of unsecured creditors, subordinated guaranteed noteholders, unsecured noteholders, CEC, CEC affiliates, and CEC shareholders.  SA46-108, 117-32; A2768.  The Debtors even elicited testimony about the "delta" between their mediation offers and requests made by second lien noteholders, with Hayes proclaiming on direct examination that "we're a few points apart based on my participation in the negotiations."  SA87.

However, recognizing that they had not shown any real progress toward settlement, the Debtors ultimately argued that the availability of an injunction "cannot rise or fall with whether we reach a consensual deal." SA175. The Bankruptcy Court agreed. *Id.* ("I'm not disputing that I have the power.").

## F. The Bankruptcy Court Denies The Debtors' Request For A Third Injunction.

At the conclusion of trial, the Bankruptcy Court offered to delay ruling to enable the parties to talk settlement. SA178. The Debtors declined and urged the Court to "rule as soon as possible," *id.*, which it did the following day. In detailed findings of fact and conclusions of law recited on the record, the Court applied the standards established by the Seventh Circuit and exercised its discretion to deny further injunctive relief.

The Bankruptcy Court found that the Debtors had established only the first of four required elements necessary for injunctive relief under section 105 of the Bankruptcy Code – the likelihood of a successful reorganization. A66. This was not disputed by the Appellees.

As to the second element, the Bankruptcy Court found "I'm no longer convinced, as I had been in the past, either that an injunction is likely to enhance the success of a reorganization or that its denial will endanger that success." *Id.* The Court found that "most of the deal-making that has happened here has occurred when no injunction was in effect." *Id.* Noting the Debtors' lack of

urgency during the most recent injunction period, the Court concluded that "[t]he pace of discussions does not show that the current injunction is helping or that its expiration gives the parties much cause for concern." A68-69. Consequently, "it appears that it isn't injunctive relief that promotes settlement here, but rather its absence." A69.

The Bankruptcy Court found it "particularly disturbing" that:

> [N]one of the targets of the estates' claims arising from the disputed transactions – targets that include the ultimate owners of the Caesars enterprise, Apollo and TPG – are making any financial contribution to the reorganization, although the proposed plan would release all the claims against them (both the estate's claims and the claims in the guaranty litigation). . . . Incredibly, the testimony this week was that the targets of these claims were not even approached about making a contribution until two weeks ago. These parties are the same ones the examiner concluded in his report are potentially liable to the estates for $3.6-5.1 billion. . . .
>
> Worse still, . . . when Apollo and TPG were at last approached about funding the $950 million "hole" in the second lien notes RSA, they refused, saying essentially that it was "a CEC problem." . . . .
>
> Ignoring these obvious and significant sources of recovery for more than a year and a half is nothing less than stunning and makes clear that further injunctive relief is unwarranted.

A70-71. The Court rejected as "a fiction" the testimony of the Debtors' financial advisor (Hayes) that Apollo and TPG somehow were contributing to the reorganization simply by consenting to the proposed Plan and found, to the

contrary, that the Plan actually *increased* the value of their ownership interests in CEC. A71-72; *see* SA145-61.

Regarding the Second Lien RSA – the single agreement with creditors that the Debtors claimed as material progress during the injunction period – the Bankruptcy Court found that "[i]t's hard to conclude that that RSA represents much progress toward a settlement here." A69. Among other things, "that RSA is not effective, won't ever become effective (given the cooperation agreement among the dissident noteholders requiring them not to sign it), and has a $950 million funding shortfall. Whether that shortfall will be made up – and if so, when and by whom – is purely speculative." A67-68.[7]

The Bankruptcy Court found the Debtors' request for an injunction through confirmation was "a non-starter in any event and always has been." A73. Notably, however, the Court rejected the holding the Debtors now attribute to it. An injunction through confirmation was a non-starter "*not because bankruptcy courts lack power to grant one*, but because these sorts of injunctions are, as I said, drastic remedies and so almost always temporary." *Id.* (emphasis added).

The Bankruptcy Court also found that, "[j]ust as the issuance of an injunction isn't likely to enhance the prospects for a successful resolution of the

---

[7]    Moreover, the creditors who signed the Second Lien RSA all held equity in CEC and/or its affiliate Caesars Acquisition Corporation and were not incentivized to maximize recoveries on their second lien notes. SA337; SA162-72.

disputes in these cases, I'm no longer convinced that a denial of an injunction will endanger the reorganization." *Id.* To the contrary, the Debtors' financial advisors testified that a voluntary "contribution" from CEC was just one path to reorganization and that "a reorganization can in fact be accomplished without a contribution." A74. Millstein testified "that it would be perfectly possible to reorganize around the value of the debtors themselves and to assign the estate's claims [against CEC] to a litigation trust and pursue the claims that way," and "refus[ed] even to say that the denial of an injunction would rule out a reorganization that relied on a contribution from CEC." *Id.* The Court also observed that, despite repeated threats to do so, CEC had not filed for bankruptcy even though it had not been sheltered by an injunction until late February 2016. A77.

Thus, the Bankruptcy Court concluded, the Guarantee Actions would not endanger the reorganization because, as the Debtors' own paid experts had conceded, (a) CEC might win the Guarantee Actions; (b) even if CEC lost, it might not file for bankruptcy; (c) even if CEC filed for bankruptcy, there still could be a reorganization involving a CEC contribution; and (d) "even if the contribution disappears, there can still be a successful reorganization." *Id.* At the end of the day, while denial of an injunction "may risk the success of the current plan of reorganization; a reorganization itself is not at risk." *Id.* The Court found that the

evidence overall did not "support the prediction in the closing argument of a 'catastrophe' if the current injunction weren't extended." A75.

The Bankruptcy Court next found that an injunction would not further the public interest in successful reorganizations and settlements. It concluded that "the interest in settlement actually counsels against extending the current injunction" as "past experience in this case has shown that settlements result when no injunction is in place. The injunctions I've issued have been more of an impediment than an aid." A75-76.

Finally, the Bankruptcy Court found that the equities weighed against the Debtors. It first rejected the Debtors' assertion that the equities were irrelevant to the equitable relief they sought. A76. It then turned a jaundiced eye toward CEC's efforts to take advantage of the injunction to lobby Congress to amend the Trust Indenture Act in order to impair the Appellees' claims against it.[8] It was "unseemly – and so inequitable – for CEC to employ an injunction in its favor to gain an advantage in litigation over parties whose hands the injunction has tied.

---

[8]  CEC's lobbyist testified that, off the top of his head, he recalled meeting or speaking with "almost every republican member of the House Financial Services Committee, senior members of the House Financial Services Appropriations, folks in the speaker['s office], [and] . . . Boehner, Ryan, McCarthy, Scalise; then a significant number similar in the senate and some folk on the transportation committees, both the [appropriations] and . . . the commerce committee . . . , Senator McConnell . . . ; and talked to, ironic for me, Senator Reid's office a significant number of times." SA146. He also testified that Marc Rowan of Apollo personally met with Representatives Waters and McCarthy for a half hour each. SA142-43.

Injunctions should preserve the status quo; the status quo was evidently not enough for CEC." A79-80.

The Court therefore exercised its discretion to deny injunctive relief.

## V.    SUMMARY OF ARGUMENT

An injunction shielding a non-debtor insider like CEC is a "drastic remedy." It requires "an extraordinary exercise of discretion."  In denying such relief to the Debtors, the Bankruptcy Court did not abuse the considerable discretion afforded it by the Bankruptcy Code.

1.    The Debtors' portrayal of the Bankruptcy Court's decision as an error of law rather than an exercise of discretion is unfounded.  The Court did not hold that an injunction is available only where relief would lead to a fully consensual plan.  It recognized that it had the power to issue an injunction – just as it had on two prior occasions – but declined in its discretion to do so based on the evidence presented to it.

In assessing the relevant factors, the Bankruptcy Court properly considered evidence regarding the prospects for settlement.  The Seventh Circuit specifically held that the Court should determine "whether the injunction sought by [the Debtors] is likely to enhance the prospects for a successful resolution of the disputes attending the bankruptcy."  Moreover, the Court was responding to the issues the Debtors presented.  "Gaining time to reach a settlement was the goal the

debtors advanced at the first injunction hearing. It was the goal the debtors advanced in the court of appeals. It has always been the point of the debtors' request for injunctive relief." To that end, the Debtors called witnesses to testify extensively on direct examination about the progress of settlement negotiations and mediation.

Similarly, the Bankruptcy Court did not hold that it lacked the power to issue an injunction through confirmation. It simply declined to exercise it because, among other things, "these sorts of injunctions are . . . drastic remedies and so almost always temporary, rarely more than a few months." In fact, no court has ever granted an injunction through confirmation in circumstances where the debtor sought to discharge a third-party's claim against a sheltered insider like CEC. The Court did not abuse its discretion in concluding that the evidence did not warrant such unprecedented relief.

2. The evidence supports the Bankruptcy Court's "intensely fact driven" finding that the Debtors had not established entitlement to further injunctive relief. The Debtors did not prove that another injunction would enhance the prospects of a successful reorganization or that the denial of relief would endanger that success. Rather, the prior injunctions had given Apollo, TPG and other insider wrongdoers "a comfortable, free ride" on the Debtors' "coattails" while the Debtors pursued a Plan that would release the insiders from billions of dollars of claims without any

settlement payment. At the same time, the Debtors' witnesses conceded that the Debtors could reorganize without settling with CEC and that, even absent an injunction, a settlement with CEC was possible. There was, in short, no evidence "to support the prediction in the closing argument of a 'catastrophe' if the current injunction weren't extended."

The Bankruptcy Court did not reach "opposite conclusions" on the "same facts" that had warranted short injunctions earlier in the year. The facts and evidence that led the Court to conclude in June that a brief stay with a firm termination date of August 29, 2016, did not justify, much less compel, an extension of the injunction beyond August and through confirmation.

Moreover, the recent trial produced substantial new evidence that impacted the Bankruptcy Court's views on whether to issue another injunction, including evidence that none of the insider wrongdoers other than CEC would make any settlement payment and none had even been asked to do so in the first eighteen months of the bankruptcy case. The Court also learned that Apollo and TPG stood to profit if the Plan were confirmed and that CEC tried to upset the status quo by lobbying Congress to impair the Appellees' guarantee claims while it was protected by the injunction.

That evidence also supports the Bankruptcy Court's finding that the equities do not favor further injunctive relief. Before trial, the Court advised the Debtors

- 27 -

that they "might well want to show – if it can be shown – what is equitable about stopping guaranty plaintiffs from enforcing their contractual rights in order to let the debtors confirm a plan under which alleged wrongdoers are released for free." The Debtors made no such showing. Rather, the Court concluded that it would be inequitable to enjoin the Appellees while Debtors attempted to confirm a Plan that would pay them pennies on the dollar while releasing the various insider wrongdoers for free.

Finally, the evidence supports the Bankruptcy Court's finding that another injunction would not serve the public interest. Because an injunction is not necessary for a successful reorganization, the policy favoring reorganizations is not served by the requested relief, and the Court found that its prior injunctions did nothing to promote settlements in this case.

The Bankruptcy Court thus did not abuse its discretion in denying injunctive relief, and the Order should be affirmed.

## VI. ARGUMENT

The Bankruptcy Court thoroughly reviewed the evidence before it (adduced over the course of three separate trials) and the record of twenty months of the bankruptcy case in concluding that a further injunction of the Guarantee Actions against non-debtor CEC was not warranted. This decision is entitled to an extremely deferential review, as best evidenced by the Debtors' failure to cite a

single case where a court has done what it asks this Court to do here: reverse a bankruptcy court's denial of an injunction for abuse of discretion.

Apparently recognizing this, the Debtors employ a combination of selective quotation of the Bankruptcy Court's order and mischaracterization of governing precedent to argue that the Bankruptcy Court employed the wrong legal standard. The Debtors' efforts at misdirection are as transparent as they are flawed.

The Bankruptcy Court performed precisely the fact-intensive balancing required by the Seventh Circuit. It employed the exact same legal framework it used, at the urging and with the full endorsement of the Debtors, when it twice issued "extraordinary and drastic" temporary stays of the Guarantee Actions. Weighing the evidence, the Court found that those injunctions had not "enhance[d] the prospects of the successful resolution of the disputes attending [the] bankruptcy." To the contrary, they had the opposite effect, allowing the ultimate corporate masters of the Debtors to sit safely on the sidelines, insulated from the Guarantee Actions, without making any payment in exchange for total immunity and discharge of billions of dollars of liability.

In light of these facts, and evidence showing that the Guarantee Actions posed no threat to the Debtors' reorganization, the Bankruptcy Court exercised its discretion to decline further injunctive relief. For all the reasons set forth below, that ruling is unimpeachable.

**A.    The Requested Injunction Requires An Extraordinary Exercise Of Discretion.**

The Debtors' Brief is permeated with an attitude of entitlement to injunctive relief, with repeated declarations that the Bankruptcy Court acted in an "unprecedented" manner in declining to issue an injunction in this "textbook case," an "untenable result" that section 105 "is supposed to prevent."  Br. at 2, 4, 26, 31, 53.  The Debtors' premise attempts to turn the law upside down.

Under section 105(a) of the Bankruptcy Code, "[t]he court *may* issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a) (emphasis added).   Contrary to the Debtors' claims, section 105 is not a statutory mandate "to prevent the harm to the bankruptcy estate."  Br. at 1.  It is a mechanism enabling courts to issue orders "necessary or appropriate to carry out the provisions" of the Bankruptcy Code. The Debtors misquote the statute in attempting to argue otherwise.  Br. at 3-4 (adding the words "to protect the bankruptcy estate" after "necessary or appropriate" in their recitation of the statutory language).[9]

---

[9]    The Debtors go so far as to cite *Fisher* for the proposition that the Bankruptcy Court had "*responsibility*" to enjoin the Guarantee Actions.  Br. at 34 (emphasis in original).  *Fisher* does not so hold.  In *Fisher*, the Seventh Circuit concluded that the bankruptcy court's temporary stay "was not an abuse of discretion" where the enjoined creditor could "proceed with this action against the nondebtor defendants" when the stay was lifted.  *Fisher v. Apostolou*, 155 F.3d 876, 882-83 (7th Cir. 1998).

A section 105 injunction is considered an "extraordinary and drastic remedy" to be used only in "unusual circumstances." *In re Third Eighty-Ninth Assocs.*, 138 B.R. 144, 146 (S.D.N.Y. 1992); *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369, 379 (Bankr. E.D. Pa. 2009); *see In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir. 1991) ("it is an extraordinary exercise of discretion to use that power to stay a third party action not involving the debtor"); *In re Saleh*, 427 B.R. 415, 420-21 (Bankr. N.D. Ohio 2010) (injunction of a third-party action "is a radical measure" and "an extreme remedy").

In the context of an injunction that would shield a non-debtor from its own creditors, like the one the Debtors seek here, courts tread particularly carefully. Thus, as this Court observed in the prior appeal, "a third party action against a debtor's guarantor is typically not stayed." 2015 WL 5920882, at *6; *see also In re Teknek, LLC*, 563 F.3d 639, 649 (7th Cir. 2009) (noting the "more common case" in which a claimant may sue the debtor's guarantor); *see, e.g.*, *Fisher*, 155 F.3d at 882-83 (same); *In re Gander Partners LLC*, 432 B.R. 781, 784 (Bankr. N.D. Ill. 2010) (same); *In re Lyondell Chem. Co.*, 402 B.R. 571, 593 (Bankr. S.D.N.Y. 2009) ("courts should be wary of placing limits on the enforcement of commercial guaranties except in cases of the most pressing need").

**B.**     **The Bankruptcy Court Applied The Proper Legal Standard.**

Faced with the impossibility of impeaching the inherently factual findings
that led the Bankruptcy Court to decline the extraordinary relief they requested, the
Debtors try on appeal to reduce the Bankruptcy Court's decision to an error of law.
The decision they ascribe to the Bankruptcy Court, however, does not resemble the
one actually issued.

**1.**     **The Bankruptcy Court Did Not Hold That Injunctive Relief Is
Available Only To Facilitate A Fully Consensual Plan.**

The Debtors claim that the Bankruptcy Court held, as a matter of law, that
an injunction under section 105 is available only where such relief would enhance
the prospects for a fully consensual plan.  Br. at 1, 7, 26, 28, 31, 33.  The Debtors
recite this mantra again and again in the apparent hope that, repeated enough, it
somehow will be true.

It is not.  The Bankruptcy Court never held that an injunction only could
issue in support of a fully consensual plan of reorganization.  The Court
specifically rebuffed this argument when the Debtors made it at trial:

> MR. ZOTT:  So I agree with Your Honor that a part of
> the goal of this injunction has always been and remains,
> to reach a consensual deal, absolutely.  On the other hand,
> it cannot rise or fall with whether we reach a consensual
> deal.  Because if it were to rise and fall with that, then
> you would basically give one creditor group the ability to
> deprive us of the injunction simply by refusing to
> negotiate or to negotiate to a deal.  And that's –
>
> THE COURT:  *I'm not disputing that I have the power*.

- 32 -

>    MR. ZOTT:  Right.
>
>    THE COURT:  I'm disputing that that's a sensible exercise of it.
>
>    MR. ZOTT:  That's fair.

SA175 (emphasis added).  The Bankruptcy Court said that it had authority to issue an injunction in aid of a non-consensual reorganization.  Based on the evidence, the Court exercised its discretion to not deploy that power.  A82.

That said, there is no doubt that the Bankruptcy Court considered whether injunctive relief would aid a fully consensual reorganization.  This was entirely proper for at least two reasons.  First, it is exactly what the Seventh Circuit said the Bankruptcy Court should do.  808 F.3d at 1188-89 (the question for the Bankruptcy Court is "whether the injunction sought by [the Debtors] is likely to enhance the prospects for a successful resolution of the disputes attending the bankruptcy").  As the Bankruptcy Court noted, "[t]he issues for the hearing have not changed.  The issues for the hearing are the same issues that are described in the court of appeals' opinion."  SA36.

Second, the Bankruptcy Court followed this mandate in direct response to the issues presented by the Debtors.  While the Debtors now disclaim the Court's statement that "the point of the injunction has always been . . . to gain time to reach a settlement," Br. at 46, the Court simply was describing the theory of the case that the Debtors had recited time and time again:  "Gaining time to reach a settlement

- 33 -

was the goal the debtors advanced at the first injunction hearing. It was the goal the debtors advanced in the court of appeals. It has always been the point of the debtors' request for injunctive relief." A72-73; *see* SA41 ("the debtors always have proceeded under the theory that the denial of an injunction would, as the court of appeals put it, 'endanger the success of the bankruptcy proceedings'").

Similarly, it was the Debtors, not the Appellees or the Bankruptcy Court, that put "sensitive settlement negotiations" at issue. Br. at 40. Beginning as far back as the first trial in June 2015, the Debtors called witnesses to testify on direct examination as to the progress of settlement. SA3-14. The trials in June and August 2016 were consumed by the Debtors' witnesses describing mediation and settlement negotiations in their direct testimony. *See, supra*, Sections IV.C-IV.E. The "constant parade of witnesses disclosing settlement communications," Br. at 3, was one of the Debtors own making.[10]

---

[10]  The Debtors improperly cite the mediator's letter of resignation, which they filed in the main bankruptcy case after trial and while this appeal was pending. Br. at 41-42. Contrary to the Debtors' assertions, that letter is no criticism of the Bankruptcy Court. (Resignation "is not to fault or criticize those involved with the case"). If anything, the mediator's discomfort with trial testimony about mediation reflects unhappiness with the Debtors' strategy of putting the mediation on trial, not with the Bankruptcy Court that was forced to hear the testimony adduced by the Debtors. In any event, as the Bankruptcy Court later noted, the mediator was very confused about what had happened at trial. *See* accompanying Motion to Dismiss, Ex. 1, at 7-10 (mediator's letter "displayed two major areas of misunderstanding").

In criticizing the Bankruptcy Court after the fact, the Debtors attempt a bait and switch. The Debtors consistently trumpeted their "progress" toward a consensual plan of reorganization as a basis for enjoining the Guarantee Actions. They cannot now be heard to complain when, after testing those assertions, the Bankruptcy Court determined they were false.

## 2. Section 105 Injunctions Are Almost Always Brief And Almost Never Through Plan Confirmation.

Contrary to their prior positions before this Court and the Seventh Circuit, the Debtors sought what amounts to a permanent injunction of the Guarantee Actions, through a decision on confirmation of their Plan that proposes to release and discharge CEC from all liability to the Appellees for no consideration whatsoever. No court has ever granted a permanent injunction in similar circumstances, and the Bankruptcy Court certainly did not abuse its discretion in concluding that the evidence did not warrant such radical relief.

Once again, the Debtors attempt to portray the Bankruptcy Court's denial of permanent injunctive relief as legal error instead of an exercise of discretion after consideration of the extensive factual record. The Debtors claim that the Bankruptcy Court's "insistence that an injunction through confirmation 'always has been' off the table is thus another instance of the court fundamentally misunderstanding its authority and responsibility under § 105." Br. at 51.

Like so much of the Debtors' Brief, this is nothing more than selective misquotation of the Bankruptcy Court's ruling combined with outright misleading statements of the law. First, as demonstrated by the very next line of the ruling (which the Debtors conveniently omit), the Bankruptcy Court did not view this as an issue of "power" to grant the injunction requested by the Debtors. A73 ("An injunction through a decision on confirmation is a non-starter in any event and always has been – *not because bankruptcy courts lack the power to grant one*, but because these sorts of injunctions are, as I said, drastic remedies and so almost always temporary, rarely more than a few months") (emphasis added).

Second, the Bankruptcy Court is exactly right; injunctions of third-party actions are almost always "temporary" with a very short duration. *See*, *e.g.*, 808 F.3d at 1189 (discussing authority to issue the "temporary injunction" sought by the Debtors); *Fisher,* 155 F.3d at 882 ("in limited circumstances, the trustee may temporarily block adjudication of claims that are not property of the estate by petitioning the bankruptcy court to enjoin other litigation"); *In re Paul R. Glenn Architects*, No 12-1266, 2013 WL 441602, *4 (Bankr. N.D. Ill. Feb. 5, 2013) (120-day injunction); *Saxby's*, 440 B.R. at 387 (two-month injunction); *Gander*, 432 B.R. at 789 ("due to the scope of the extraordinary relief being provided herein, the court limits the duration of the preliminary injunction to 120 days"); *In re IFC Credit Corp.,* 422 B.R. 659, 664-65 (Bankr. N.D. Ill. 2010) (ninety-day

injunction); *Lyondell*, 402 B.R. at 576 (sixty-day injunction); *In re Monroe Well Serv., Inc.* 67 B.R. 746, 757 (Bankr. E.D. Pa. 1986) (thirty-day injunction).

Indeed, in their prior appeals to this Court and the Seventh Circuit, the Debtors specifically represented they were seeking nothing more than a "temporary" injunction. In oral argument before the Seventh Circuit, counsel for the Debtors asserted that "[n]o one is talking about extinguishing [the Appellees'] claims for all time. The point of this is a temporary injunction of – or a temporary stay of the ongoing litigation." SA22. But contrary to that promise, the Debtors then sought an injunction through confirmation with the express goal of *permanently* extinguishing the Appellees' claims through the cramdown Plan. SA282-83.

Third, the Debtors baldly pronounce that "[c]ourts across the country have likewise enjoined third-party actions through plan confirmation" and imply that the Bankruptcy Court's refusal to do so somehow made it an outlier. Br. at 51-52. Not so. None of the cases the Debtors cite remotely supports the request for a permanent injunction through confirmation with the ultimate objective effect of extinguishing the Appellees' claims.

In *Fisher*, for example, the Seventh Circuit said nothing about extending an injunction through plan confirmation. To the contrary, it made clear that after the injunction was lifted "it will be possible for the district court to proceed with this

- 37 -

action against the nondebtor defendants for whatever individualized damages may be proper." *Fisher*, 155 F.3d at 883; *see also In re Kham & Nate's Shoes No. 2, Inc.*, 97 B.R. 420, 429 (Bankr. N.D. Ill. 1989) (injunction issued *after* confirmation upon finding that guarantees likely would be released due to bank's fraud, willful and wanton misconduct and bad faith).

The Debtors' citation to cases from the Ninth and Tenth Circuits is misleading. Br. at 52 (citing *In re Fabtech*, No. 10-18401, 2010 WL 6452908 (BAP 9th Cir. July 19, 2010); *In re Western Real Estate* Fund, 922 F.2d 592 (10th Cir. 1990); *In re Otero Mills, Inc.* 21 B.R. 777 (Bankr. D.N.M. 1982)). The law in those Circuits is different from the law of the Seventh Circuit in a critical way. In the Ninth and Tenth Circuits, the bankruptcy court has no power to discharge the liabilities of a bankrupt's guarantor. *See In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.1995); *Western Real Estate*, 922 F.2d at 600. Thus, an injunction through confirmation poses no threat of permanent harm to the enjoined creditor, who will always retain its rights against non-debtors.

In contrast, the Seventh Circuit permits third-party releases in a very limited set of circumstances. *In re Airadigm Communications, Inc.*, 519 F.3d 640, 656 (7th Cir. 2008). And here, the Debtors' proposed Plan seeks the permanent release of the Appellees' guarantee claims against non-debtor CEC. SA334-37. None of the cases cited by the Debtors permit an injunction through confirmation for the

purpose of eliminating an enjoined creditor's claims. In fact, they hold otherwise. *See Western Real Estate,* 922 F.2d at 601-02 ("while a temporary stay prohibiting a creditor's suit against a nondebtor . . . may be permissible . . . the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor").[11]

The Debtors complain that "[t]he bankruptcy court's approach . . . effectively eliminates cramdowns for creditors holding claims against a third party vital to a successful reorganization." Br. at 38-39. The Debtors have it backwards. Creditors are entitled to enforce their rights against non-debtors – who, by definition, have chosen not to subject themselves to judicial oversight and the strictures of the Bankruptcy Code – absent extraordinary and drastic circumstances. The Bankruptcy Court found that this case presented no such extreme facts and thus exercised its discretion to deny an injunction intended to protect CEC. Nothing in the Bankruptcy Code or caselaw suggests this was unwise, much less unlawful.

---

[11] Similarly, as the Bankruptcy Court noted, *Fabtech* and *Otero Mills* involved situations where the enjoined creditors would be paid in full under the proposed plan and the injunction would terminate if that did not happen. The Bankruptcy Court archly observed that that is "not the situation here." A73; *see Fabtech*, 2010 WL 6452908, at *2 nn.4-5; *Otero Mills*, 21 B.R. at 779-80; *see also In re Juneau Bldg. Ctr.,* 57 B.R. 254, 257 (Bankr. M.D. La. 1986) (calling *Otero* a "quintessential example" of a case where "collection against the third party should be stayed because the principal obligor (the debtor) will pay the obligation through the plan").

**C.   The Bankruptcy Court Properly Exercised Its Discretion In Denying The Debtors' Third Request To Extend The Injunction.**

The "determination of whether to grant or deny a § 105 injunction is intensely fact driven." *Saxby's*, 440 B.R. at 380.  The availability of injunctive relief is "driven by the debtors' ability or inability to marshal facts demonstrating that the pending nonbankruptcy proceedings against the nondebtors pose a serious risk to its reorganization and the court's assessment of the relative harms each side may suffer from the grant or denial of the injunction request." *Id.*

The Bankruptcy Court found that the Debtors had not marshalled such facts. To achieve reversal, the Debtors must show that the Bankruptcy Court's factual findings were clearly erroneous and that the Court abused its discretion in denying the requested relief.  This, of course, is an exceedingly difficult standard to meet. "The [trial] court's authority to decide factual issues is just that – authority. . . . The [trial] judge is manager of the entire swirl of facts, and the clearly erroneous rule is based in substantial measure on a belief that because appellate courts never are in a better position than the district court, and often are in a worse one, a substitution of judgment would increase the randomness of the process without increasing accuracy over the run of cases." *Scandia*, 772 F.2d at 1428.

The Debtors have not come close to making the requisite showing.  After hearing three days of evidence, and considering the testimony and record of two prior evidentiary hearings on the same issues, the Bankruptcy Court found that the

Debtors had not proven that another injunction was likely to enhance the success of a reorganization or that its denial would endanger that success, that the equities supported an injunction, or that further relief would be in the public interest. The extensive factual record confirms the Bankruptcy Court's findings and demonstrates that the Court did not abuse its discretion in any way.

> **1.  The Evidence Supports The Bankruptcy Court's Finding That The Guarantee Actions Do Not Threaten <u>The Estate Or The Debtors' Ability To Reorganize</u>.**

The Bankruptcy Court found that "I'm no longer convinced, as I have been in the past, either that an injunction is likely to enhance the success of a reorganization or that its denial will endanger that success." A66.

Regarding the former, the Bankruptcy Court noted two troubling, and undeniable, facts: (1) the settlements the Debtors had negotiated tended to occur when an injunction had not been in place, A66-69; and (2) neither Apollo nor TPG nor any of the dozens of other insiders the Examiner had found likely to be liable for billions of dollars were paying anything in exchange for the release and discharge of all claims against them, something the Court found "particularly disturbing." A70-72. In fact, the Debtors had not even *requested* any settlement payments from anybody other than CEC until two weeks before trial, and then

were promptly rebuffed by Apollo and TPG, their corporate masters.  A71

("nothing less than stunning.").[12]

From this, the Court concluded that "[t]he injunctions here have provided

CEC, Apollo, and TPG, a comfortable, free ride on the debtors['] coattails.  They

have shown no keen sense of urgency to resolve the outstanding disputes that gave

rise to the bankruptcy case – and frankly, neither have the debtors, at least where

the disputed transactions are concerned.  CEC, Apollo, and TPG have evidently

felt no particular pressure to expedite the reorganization process.  Now perhaps

they will."  A81-82; *see Saxby's*, 440 B.R. at 386.

In finding that the Guarantee Actions did not endanger the Debtors' ability

to reorganize, the Bankruptcy Court pointed to evidence (much of it supplied by

Millstein and Hayes, the Debtors' own financial advisors) that:  (1) a CEC

contribution was only one way for the Debtors to reorganize, and a reorganization

could be accomplished without CEC's contribution; (2) allowing the Guarantee

Actions to proceed would not preclude a reorganization centered around a CEC

contribution; (3) a judgment of liability against CEC would not necessarily require

CEC to file for bankruptcy; and (4) even if CEC filed for bankruptcy, there still

could be a reorganization involving a CEC contribution.  A73-74.

---

[12]   The Court also found it remarkable that the supposedly independent member of
the Debtors' board charged with leading negotiations against CEC and other
insiders (Stauber) did not even know whether anybody other than CEC had ever
been approached at all.  A71.

The Debtors engineer their attack on those factual findings by claiming that the Bankruptcy Court:

> reached opposite conclusions from those it reached in February and June *based on exactly the same facts*, and candidly acknowledged the only difference was the parties progress on the settlement front. These internally inconsistent factual findings are the definition of an abuse of discretion.

Br. at 29 (emphasis in original); *id.* at 1, 2, 32, 48. This is demonstrably false.

First, those "same facts" led the Bankruptcy Court to issue, on June 15, a short injunction with a termination date of August 29, accompanied by a "warn[ing]" that "the likelihood any further injunctive relief will be granted is small." A103-04. The "same evidence" that warranted only a seventy-four day injunction in June did not justify, much less compel, an extension of the injunction beyond its firm expiration date until confirmation.

Indeed, when it issued its second injunction in June 2016, the Bankruptcy Court cautioned that the evidence supporting the injunction "could have been stronger." A102. In particular, the Court noted numerous concessions by the Debtors' expert (Millstein) concerning the lack of harm that might result without an injunction. *Id.* Even adopting the ridiculous premise that the evidence presented at the June and August hearings was the "same" (as shown below, it was not), the Court already had made clear that the factual record from the June hearing did not warrant an injunction beyond August 29. *See also* SA36 ("What has

changed is the amount of time that has passed. With the passage of time, the

burden that the movant has in this situation increases.").

Second, the August trial produced substantial new evidence that impacted

the Bankruptcy Court's views on whether injunctive relief was warranted,

including that:

- Seventy-two of seventy-three insiders the Examiner identified as liable to the bankruptcy estate for billions of dollars (including Apollo and TPG) were contributing nothing in exchange for the Debtors' proposed releases of them under the Plan, SA161.1-2;

- The Debtors had filed a complaint against those insiders, making allegations that confirmed the Examiner's findings of wrongdoing and culpability, SA302;

- The Debtors had not approached any of those insiders for a settlement payment until two weeks before trial, SA137.1-3;

- Not only were Apollo and TPG to be released under the Plan without making any settlement payment whatsoever, they would see their equity in CEC increase in value if the Plan became effective, SA143-56;

- The Second Lien RSA – the alleged cornerstone of the Debtors' "progress" during the injunction period – was not effective, could never become effective, and was unfunded by nearly a billion dollars, SA137.4, SA162-63;

- CEC and Apollo lobbied Congress extensively to amend the Trust Indenture Act in an effort to impair the Appellees' guarantee claims against CEC, SA140-43; and

- CEC had negotiated for the sale of a subsidiary, Caesars Interactive Entertainment, for approximately $4.4 billion cash but declined to use any proceeds to pay the Appellees, SA101.

Third, the new evidence and the passage of time had revealed the falsity of prior assertions previously credited by the Court. CEC had not carried out its threats to file for bankruptcy even when not sheltered by an injunction. The Debtors' experts agreed that a reorganization was possible without a settlement with CEC and that a settlement could be achieved even without an injunction. There was, in short, no evidence "to support the prediction in the closing argument of a 'catastrophe' if the current injunction weren't extended." A74-75.

The Debtors nevertheless claim that the Guarantee Actions "will undermine – if not render completely unworkable – the Debtors' widely supported proposed plan of reorganization." Br. at 26. The alleged jeopardy of the Plan is irrelevant.[13] The salient question is whether the Guarantee Actions impact the Debtors' ability to reorganize, not their ability to confirm any particular plan they have chosen to propose. *See Fabtech*, 2010 WL 6542908, at *4 (the "applicable standard for enjoining an action against a non-debtor is the ability to demonstrate a reasonable likelihood of *reorganization*, not . . . a reasonable likelihood of being able to *confirm* its Plan") (emphasis in original) (quotations and citations omitted). The Bankruptcy Court found that the Guarantee Actions pose no threat to the Debtors' reorganization generally. *See*, *supra*, Section IV.F.; *see also In re GAC Storage El Monte, LLC*, 489 B.R. 747, 770 (Bankr. N.D. Ill. 2013) (injunction denied where

---

[13] And the evidence is to the contrary. *See*, *supra*, Section IV.F.

"there has been no showing of danger of imminent, irreparable harm to the Debtor's ability to reorganize").

The Debtors once again recycle their argument that the Guarantee Actions represent a "race to the courthouse" by a group of "hold-out creditors" seeking "preferential treatment outside the bankruptcy process." Br. at 3, 37, 64. The Debtors are wrong. The Appellees are not seeking to "jump to the front of the line," Br. at 17, by seeking recovery directly from non-debtor CEC. The Appellees bargained for independent rights against CEC, and their claims are not subordinated or junior to other CEC creditors. The Appellees are not moving ahead of anybody by enforcing their contractual rights against CEC, a non-debtor. In these circumstances, the Debtors' feared "race to the courthouse" is a misplaced metaphor, as courts have recognized:

> The Debtors' concern that the continued prosecution of the Creditor Actions could result in a "race to the courthouse" is of no moment to the instant issue. The Code is designed to eliminate a "race to the courthouse" by creditors seeking to file claims against a *debtor*. Here, any "race" that may occur would be for the purpose of lodging claims against a non-debtor, which is not a bankruptcy concern. Moreover, the fact that the Creditor Actions may result in disproportionate recoveries by certain creditors is also irrelevant. The Code is concerned only with a disproportionate *distribution* of the debtor's estate. The fact that a creditor may gain additional relief from sources other than the property of the estate does not contravene the Code's provisions or policies.

*In re Phar-Mor, Inc. Secs. Litig.*, 166 B.R. 57, 62 (W.D. Pa. 1994) (emphasis in original).

Similarly, the Debtors are wrong in repeatedly proclaiming that the bankruptcy estate's claims and the Appellees' claims "seek to recover from the same limited pool of assets from the same entity (CEC)." Br. at 16, *id.* at 4, 11, 18, 55, 66. CEC has assets other than those which the Debtors fraudulently transferred to it. More importantly, the Debtors neglect that the seventy-two insider targets from whom they chose not even to ask for a settlement payment – a failure the Bankruptcy Court found to be "stunning" and "disturbing" – likely have billions of dollars of resources at their disposal.[14] Recovery on the bankruptcy estate claims and the Appellees' guarantee claims need not be a zero sum game. This is why the Court was so shocked that the Debtors had not attempted to maximize value by seeking recoveries from *all* potentially liable wrongdoers.

The Bankruptcy Court made precisely this point to the Debtors before trial:

> [W]hy should the successful reorganization depend on a contribution from CEC alone? [S]everal other entities stand behind CEC. Not only that, but the estates here have claims – large ones the examiner found – against some of these entities, entities that include Apollo and TPG, as well as a host of other companies and individuals.

---

[14] The Debtors do not know what those targets can pay because they never investigated. Amazingly, they "haven't done any due diligence on [the targets'] financial position." SA136.

The plan the debtors want to confirm would release those claims. Yet as far as I know, none of those companies and individuals, all of whom would benefit from the proposed release, has contributed so much as a dime under the plan. . . .

The debtors in these cases are asking the guaranty plaintiffs, all of them creditors of the debtors, to take considerably less than they are owed. The guaranty plaintiffs are miffed at being asked to do that when parties potentially liable to the estates would see the claims against them released under the plan – and would pay nothing for that benefit. They're especially miffed when some of the released parties are the ultimate owners of the Caesars enterprise, the very entities that engineered the leveraged buyout that led to these cases. The guaranty plaintiffs don't see the proposed reorganization here as involving shared pain. I don't blame them.

SA41-43.

The Debtors had no answer, and the Bankruptcy Court's factual findings that the Guarantee Actions do not threaten the Debtors' ability to reorganize therefore were perfectly logical and fully supported by the evidence. The Court properly relied on those findings in exercising its discretion to deny injunctive relief.[15]

### 2. The Evidence Supports The Bankruptcy Court's Finding That The Equities Do Not Favor Further Injunctive Relief.

The Bankruptcy Court also correctly found that the equities weighed against further injunctive relief. Recognizing that the equities disfavor them, the Debtors

---

[15] Trilogy argued below that CEC could pay a $14 million judgment in Trilogy's favor and still make the contemplated contribution to the Debtors' restructuring. Trilogy does not waive that argument on appeal.

- 48 -

flee from the inquiry, arguing that equity is "not part of the § 105 analysis." Br. at

65. Nonsense. As the Bankruptcy Court noted, while the Seventh Circuit has

never specifically identified balancing the equities as an element of relief under

section 105(a), it certainly has never prohibited it. "The question simply goes

unaddressed" in the governing caselaw. A76. The Court observed that "balancing

is a traditional part of the injunction question" and "other circuits do require

balancing." *Id.* Indeed, the leading bankruptcy treatise explains that the "balance

of the harms element is arguably the most critical element in a section 105

injunction." *See* 2 COLLIER ON BANKRUPTCY ¶ 105.03[1][c] (16th ed. rev. 2016)

(quotation omitted). In short, "[a] Section 105 injunction is an equitable remedy.

To receive equity, . . . one must do equity." SA43.

The Bankruptcy Court crystallized the issue before trial, remarking that "the

debtors might well want to show – if it can be shown – what is equitable about

stopping guaranty plaintiffs from enforcing their contractual rights in order to let

the debtors confirm a plan under which alleged wrongdoers are released for free."

*Id*. The Debtors made no such showing.

To the contrary, the evidence was that the Guarantee Actions posed no threat

to the Debtors' ability to reorganize. *See*, *supra*, Sections IV.F. and VI.C.1.

Moreover, and "particularly disturbing," seventy-two of the seventy-three insiders

identified by the Examiner as potentially liable for billions of dollars are not

paying anything for full releases under the Plan. A70-71. Worse was evidence demonstrating that the Debtors had not approached any of those wrongdoers about paying anything until two weeks before the trial began on August 23, more than *eighteen months* into the bankruptcy proceeding. *See Id*.

The evidence also showed that CEC, the party most directly benefited by the injunction, used the injunction period to lobby intensively for an amendment of the Trust Indenture Act in order to impair the Appellees' guarantee claims against it. The Bankruptcy Court found that both "unseemly" and "inequitable." A79-80.[16]

Conversely, while the Debtors cavalierly state that the Appellees face "no real risk" from another injunction preventing them from exercising their contractual rights, Br, at 68, they threatened to cram down a Plan that extinguishes those rights. At the same time, real harm results every day the Appellees remain unable to enforce their rights. The Appellees possess over $4.5 billion in claims on contractual guarantees on which CEC has defaulted. Since February 2016, the Appellees effectively have been prevented from prosecuting those claims, with one jury trial and two sets of summary judgment hearings enjoined at the eleventh

---

[16] The Bankruptcy Court's consideration of CEC's lobbying does not "raises serious constitutional concerns." Br. at 67. CEC is free to lobby Congress as much as it wants, and the Court said nothing to the contrary. What the Court found was that CEC's attempt to impair the guarantee claims while the Appellees were enjoined from prosecuting them was inequitable and therefore relevant in the context of determining whether another injunction should be issued.

hour.  This is cognizable harm.  Courts have repeatedly recognized that "guaranties are an important device in commercial transactions, and . . . as a matter of public policy their enforcement should not be limited."  *Lyondell*, 402 B.R. at 593; *see also In re PTI Holdings Corp.*, 346 B.R. 820, 831 (Bankr. D. Nev. 2006) (creditor "has an important interest that would be adversely affected by an injunction: the enforcement of bargained-for rights" against non-debtors).

The Debtors would have the Appellees once again enjoined from pursuing billions of dollars in claims while:  (1) they race toward a confirmation trial (set to begin in January 2017) on a reorganization plan that wipes out the claims for no compensation; and (2) CEC pursues legislative action to impair the claims extrajudicially.  If the Debtors and CEC get what they want, the Appellees will *never* have the ability to litigate their Guarantee Claims and will not be compensated for them.

That is not equitable.  As the Bankruptcy Court found, "[t]he injunction [the Debtors] want is neither modest nor finite."  A79.  The requested relief is far different than in cases involving short, temporary injunctions where courts found little to no harm to the enjoined creditors.  *E.g.*, *Monroe Well Serv.*, 67 B.R. at 755 ("the injunction will result in no material difference in [the creditors'] ability to . . . collect their claims"); *Gander*, 432 B.R.at 788 ("The reorganization objective is to pay [creditor] in full by refinancing its loans."); *Paul R. Glenn*, 2013 WL 441602,

at *4 (limited harm to creditor "by delaying, not terminating," the creditor's litigation).

The Debtors note, no less than five times, that the Bankruptcy Court previously remarked that a threat to CEC presented "the 'textbook' scenario for injunctive relief." Br. at 54, *id.* at 4, 21, 22, 34. They fail to disclose the Court's important caveat:

> [I]n another important respect, this isn't a textbook case. In the textbook case, the third party that the injunction would protect is a person – an actual human being – rather than a corporation. [F]or example, a partner in a debtor partnership or an officer or shareholder in a debtor corporation. In the textbook case, no one stands behind the third party and its contribution. A judgment against a third party consequently spells doom for the reorganization. . . .

> It isn't true here. CEC is majority-owned by four LLCs. Two of those LLCs are owned, in turn, by TPG Capital, LP, a large private equity fund. The other two LLCs are owned by Apollo Global Management, LLC, also a large private equity fund. With those entities standing behind CEC, it's hard to argue this is truly the textbook case.

SA40-41.

Given the record before it, the Bankruptcy Court was more than justified in determining that the equities weighed against any further injunctive relief.

### 3. The Evidence Supports The Bankruptcy Court's Finding That An Injunction Is Not In The Public Interest.

Finally, public policy disfavors an injunction. The Bankruptcy Court examined the two public policy considerations cited by the Debtors – the policy in support of successful reorganizations and the policy favoring settlements – and found that another injunction would serve neither. A75.

First, "a successful reorganization is possible here even if the injunction is not extended, and a denial of an extension seems unlikely to imperil the debtors' efforts to reorganize." *Id.* The Debtors denigrate this finding as "hypothetical[]," Br. at 64, but ignore that it was based on the testimony of their own financial advisors. *See*, *supra*, Section IV.F.

The Debtors' repeated assertions that "no one has proposed a viable alternative plan without a significant recovery from CEC" are disingenuous. Br. at 12, 54, 64. The Debtors asked for, and received, an extension of their "exclusive period" for filing a plan of reorganization for the maximum twenty-months permitted by the Bankruptcy Code. 11 U.S.C. § 1121(d)(2). That period did not expire until the middle of September 2016, *after* the ruling now on appeal. Accordingly, no one could have proposed an alternative plan.

More pertinently, the Noteholder Committee (of which the Trustees are members) always has asserted that the best way for the Debtors to reorganize was through a plan that maximizes the value of the estate's claims against *all* seventy-

three wrongdoers identified by the Examiner, either through settlements or litigation. To that end, the Noteholder Committee requested that the Bankruptcy Court authorize it to pursue claims against those wrongdoers on behalf of the estate. B. Ct. Main Case ECF 3694. The Debtors filed their own complaint in order to fend off the Noteholder Committee's request. SA302. The Debtors' assertion that a reorganization is possible only with a contribution from CEC, to the exclusion of a reorganization funded by all wrongdoers who would benefit from the releases the Debtors propose to dole out, is patently false.[17]

The Bankruptcy Court also found that the policy favoring settlement would not be furthered by another injunction because "past experience in this case has shown that settlements result when no injunction is in place. The injunctions I've issued have been more of an impediment than an aid. The interest in settlement actually counsels against extending the current injunction." A75-76.

The Debtors brush past that unimpeachable finding and argue that the Bankruptcy Court "completely overlooked the public interest in preserving the Debtors' existing settlements with the holders of approximately $14 billion in debt, all of which are at risk if the guaranty actions move forward." Br. at 65. This is nonsense. The Court did not "overlook" those settlements. They are the very agreements that "result[ed] when no injunction is in place." A75; *see* A66-68.

---

[17] Indeed, a plan funded by all parties to receive a release is much more likely to satisfy plan confirmation standards than the Plan proposed by the Debtors.

In addition, there are no "existing settlements with the holders of approximately $14 billion in debt."  More than $2 billion of that figure is attributable to the conflicted CEC shareholders who signed the Second Lien RSA, which "is not effective, won't ever become effective . . . , and has a $950 million funding shortfall."  A67-68; *see* A2768.  Moreover, another $11 billion of that figure relates to "settlements" in which the Debtors agreed to pay first lien creditors between 109% and 116% of their claims.  A2768.  Those creditors naturally agreed to "compromise" in exchange for such a good deal, and those "settlements" are irrelevant to the public interest in facilitating arms' length settlements with impaired creditors like the Appellees, to whom the Debtors have proposed to pay as little as 22% of their claims.  A2523.  And the only reason the agreements are "at risk" at all is because the Debtors permitted CEC to insert provisions that would enable it to walk away any time an injunction of the Guarantee Actions is not in place, effectively hanging the sword of Damocles over the bankruptcy case.  A2108-09; A2199-2201; A2229-31; A2554-55; A2608-09; A2704.

Finally, while not discussed in the Bankruptcy Court's ruling, multiple courts have found a public interest in protecting the integrity of guarantees. *Lyondell*, 402 B.R. at 593; *PTI Holdings*, 346 B.R. at 831; *Dore & Associates Contracting, Inc. v. American Druggists' Ins. Co.,* 54 B.R. 353, 362 (W.D. Wis.

1985) (lifting injunction where debtor's surety had "failed to demonstrate that the public interest in a successful reorganization of the debtors continues to outweigh the public interest in protecting the integrity of construction performance bonds").

## VII.  CONCLUSION

For all of these reasons, the Bankruptcy Court did not abuse its discretion in denying the injunctive relief requested by the Debtors, and its Order should be affirmed in all respects.[18]

*[signatures on following pages]*

---

[18] Should the Court conclude that the Bankruptcy Court erred, it should not "reverse and order entry of [the] injunction immediately," as the Debtors claim. Br. at 70.  As the Appellees demonstrated previously, any reversal should be accompanied by a remand to the trier of fact for consideration not only the merits but also an appropriate bond and restrictions on CEC during the period it benefits from an injunction.  *See* No. 15-6504, ECF 34 at 42-45.

Respectfully submitted,

JONES DAY

By:  /s/ Morgan R. Hirst
Morgan R. Hirst
77 West Wacker Drive
Chicago, IL 60601
(312) 782-3939

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
(213) 489-3939

KELLEY DRYE & WARREN LLP
Eric R. Wilson
David I. Zalman
101 Park Avenue
New York, NY 10178
(212) 808-7800

*Counsel for Appellee Wilmington Savings Fund Society, FSB*

September 23, 2016

FOLEY & LARDNER LLP

By:  /s/ Mark F. Hebbeln
Mark F. Hebbeln
Lars A. Peterson
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
(312) 832-4500

ARENT FOX LLP
Andrew I. Silfen
Mark B. Joachim
Mark A. Angelov
Beth M. Brownstein
1675 Broadway
New York, NY 10019
(212) 484-3900

Jackson D. Toof
1717 K Street, NW
Washington, DC 20006
(202) 857-6000

*Counsel for Appellee BOKF, N.A.*

By: /s/ Timothy R. Casey
DRINKER BIDDLE & REATH LLP
Timothy R. Casey
191 North Wacker Drive, Suite 3700
Chicago, IL 60606
(312) 569-1000

James H. Millar
Kristin K. Going
Frank F. Velocci
1177 Avenue of the Americas
New York, NY 10036-2714
(212) 248-3140

*Counsel for Appellees Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust, and Trilogy Portfolio Company, LLC*

## <u>TYPE-VOLUME CERTIFICATION</u>

Pursuant to Rule 8015(a)(7)(C) of the Federal Rules of Bankruptcy Procedure, this brief complies with the type-volume limitations of Rule 8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure, as follows:

(1)     Exclusive of the portions exempted by Rule 8015(a)(7)(B)(iii) of the Federal Rules of Bankruptcy Procedure, the brief contains 13,574 words, according to the count of Microsoft Word.

(2)     The brief was prepared using Microsoft Word in 14-point Times New Roman, a proportionally-spaced font.

September 23, 2016                          /s/ Morgan R. Hirst
                                    Morgan R. Hirst
                                    *Appellee Wilmington Savings Fund*
                                    *Society, FSB*