# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

---

*In re* CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL., *Debtors*.

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL., *Appellants*,
*v.*
BOKF, N.A., ET AL., *Appellees*.

---

*Appeal from the United States Bankruptcy Court for the*
*Northern District of Illinois, Case No. 15-01145, Adv. Pro. No. 15-00149*

---

## APPELLEES' SUPPLEMENTAL APPENDIX

JONES DAY
Morgan R. Hirst
77 West Wacker Drive
Chicago, IL 60601
(312) 782-3939

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
(213) 489-3939

KELLEY DRYE & WARREN LLP
Eric R. Wilson
David I. Zalman
101 Park Avenue
New York, NY 10178
(212) 808-7800

*Counsel for Appellee Wilmington*
*Savings Fund Society, FSB*

FOLEY & LARDNER LLP
Mark F. Hebbeln
Lars A. Peterson
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
(312) 832-4500

ARENT FOX LLP
Andrew I. Silfen
Mark B. Joachim
Mark A. Angelov
Beth M. Brownstein
1675 Broadway
New York, NY 10019
(212) 484-3900

Jackson D. Toof
1717 K Street, NW
Washington, DC 20006
(202) 857-6000

*Counsel for Appellee BOKF, N.A.*

DRINKER BIDDLE & REATH LLP
Timothy R. Casey
191 North Wacker Drive, Suite 3700
Chicago, IL 60606
(312) 569-1000

James H. Millar
Kristin K. Going
Frank F. Velocci
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
(212) 248-3140

*Counsel for Appellees Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust, and Trilogy Portfolio Company, LLC*

# TABLE OF CONTENTS

Excerpted Bankruptcy Court Hearing Transcript
(June 3, 2015)......................................................................SA001

Excerpted September 2015 District Court Oral Arguments Transcript
(September 29, 2015) [No. 15-cv-06504, ECF 41]. ....................SA015

Excerpted Seventh Circuit Oral Arguments Transcript
(December 10, 2015)...............................................................SA021

Excerpted Bankruptcy Court Hearing Transcript
(February 3, 2016)..................................................................SA024

Excerpted June 2016 Hearing Transcript, Day 2
(June 8, 2016).......................................................................SA026

Excerpted Bankruptcy Court Hearing Transcript
(August 17, 2016) ..................................................................SA035

Excerpted August 2016 Hearing Transcript, Day 1
(August 23, 2016) ..................................................................SA044

Excerpted August 2016 Hearing Transcript, Day 2
(August 24, 2016) ..................................................................SA138

Excerpted August 2016 Hearing Transcript, Day 3
(August 25, 2016) ..................................................................SA173

Debtors' Pretrial Brief in Support of Their Motion to Stay, or in the Alternative for
Injunctive Relief Enjoining Prosecution of Certain Litigation Against Caesar
Entertainment Corporation
(May 29, 2015) [No. 15-00149, ECF 129] ................................SA179

Excerpted Debtors' Post Trial Brief in Support of Their Motion to Stay, or in the
Alternative for Injunctive Relief Enjoining Prosecution of Certain Litigation
Against Caesars Entertainment Corporation
(June 26, 2015) [No. 15-00149, ECF 151] ................................SA195

Excerpted Appellants' Opening Brief, *In re Caesars Entm't Operating Co., Inc.*,
Nos. 15-01145, 15-00149 (N.D. Ill. July 27, 2015)
(August 7, 2015) [ECF 28] ......................................................SA200

Excerpted Appellants' Opening Brief, *Caesars Entm't Operating Co., Inc. v. BOKF, N.A.*, No. 15-3259 (7th Cir. Oct. 9, 2015) (October 19, 2015) [ECF 6] ............................................................................SA208

Excerpted Debtors' Notice of Opinion from the United States Court of Appeals for the Seventh Circuit and Motion for Emergency Request for Ruling (December 28, 2015) [No. 15-00149, ECF 189-2].........................................SA222

Excerpted Motion of Noteholder Committee for Order Granting Standing to Commence, Prosecute, and Settle Claims on Behalf of the Debtors' Estates (May 13, 2016) [No. 15-01145, ECF 3694] ....................................................SA234

Notice of Debtors' Emergency Motion and Motion for Temporary Restraining Order and Preliminary Injunction Enjoining Defendants from Further Prosecuting their Guaranty Lawsuits (June 6, 2016) [No. 15-00149, ECF 241] ........................................................SA250

Notice of Debtors' Motion and Motion to Extend the Section 105 Injunction Enjoining Defendants from Further Prosecuting their Guaranty Lawsuits (August 8, 2016) [No. 15-00149, ECF 284]...................................................SA275

Excerpted Final Report of Examiner, Richard J. Davis (May 15, 2016) [No. 15-01145, ECF 3401] ....................................................SA297

Excerpted Adversary Complaint, *Caesars Entm't Operating Co., Inc. v. Caesars Entm't Corp.*, No. 16-00522 (Bankr. N.D. Ill) (August 9, 2016) [DX12] ................................................................................SA302

Mediator's Statement (Redacted) (August 16, 2016) [PX16].................................................................................SA326

Excerpted Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (July 11, 2016) ..............................................................................................SA329

Excerpted Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (July 11, 2016) ..............................................................................................SA333

Stipulation between Wilmington Savings Fund Society, FSB, BOKF, N.A., Trilogy Portfolio Company, LLC, Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust, Frederick Barton Danner, and the Debtors Concerning 2L RSA Parties (August 22, 2016) [No. 15-00149, ECF 327] ................................................SA338

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF DIVISION
EASTERN DIVISION

| | |
|---|---|
| CAESARS ENTERTAINMENT OPERATING )<br>COMPANY, INC., et al., )<br> ) No. 15 A 00149<br>  Plaintiff, )<br> )<br>  vs. )<br> )<br>BOKF, N.A., et al., )  Chicago, Illinois<br> )  June 3, 2015<br>  Defendants. )  10:30 a.m.<br> )   1:15 p.m.<br>—————————————————— )<br> )<br>CAESARS ENTERTAINMENT OPERATING )<br>COMPANY, INC., et al., )  No. 15 B 01145<br> )<br>  Debtors. ) | |

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE A. BENJAMIN GOLDGAR

APPEARANCES:

For the Plaintiff:              Mr. David Zott;
                                Mr. Jeffrey Zeiger;
                                Mr. Judson Brown;

For Wilmington Savings
Fund:                           Mr. James Johnston;
                                Mr. Geoffrey Stewart;
                                Mr. Joshua Mester;

For BOKF:                       Mr. Michael Cryan;

For Frederick Barton Danner:    Mr. Gordon Novod;

For MeehanCombs:                Mr. Frank Velocci;

# **I N D E X**

| Witness: | DX | CX | REDX | RECX |
|---|---|---|---|---|
| James Millstein | 23 | 74 | 135 | 157 |
| | | 118 | 142 | 158 |
| | | 121 | 143 | |
| | | 122 | 151 | |
| | | | 152 | |
| Steven Zelin | 160 | | | |

1    A    Yeah.  I mean, I think in my 30-odd years

2    of doing this, I think I've been involved in a

3    handful of real cram-down cases.  Most of the -- most

4    cases ultimately become consensual.  But the question

5    is how long does it take.  And the advantage of a

6    restructuring support agreement or, you know, some

7    kind of a prepetition agreement among the debtor and

8    its creditors, is that it helps to shorten and focus

9    the disputes that need to be resolved in the case.

10    Q    And what are the advantages of shortening

11    and focusing disputes in bankruptcy?

12    A    It has the salutary effect of minimizing

13    the administrative expenses and of avoiding

14    unnecessarily burdening the court, frankly, with

15    disputes that can be resolved consensually.

16    Q    Now, is it your expectation that the debtor

17    will seek to confirm the RSA in its current form?

18    A    I'm not sure I understand your question.

19    Q    Well, do you believe that the RSA, as it

20    stands today, is the final version that this debtor

21    is ultimately going to go and try to submit for

22    confirmation down the line?

23    A    No.  I mean, based on my own direct

24    experience in the last two-plus months that we've

25    been involved in the case, it is serving the purpose

1  of a framework for negotiations, but negotiations are

2  ongoing.  And I expect that there will be changes to

3  the RSA over the course of the next few months.

4      Q    And I think you testified earlier that that

5  process and negotiations are occurring even in this

6  time frame?

7      A    Yes.

8      Q    And are you involved in that?

9      A    I am.

10      Q    And you also testified earlier, I believe,

11  that the RSA does provide for a substantial

12  contribution from CEC on account of the debtors'

13  claims?

14      A    Yes.

15      Q    Have you actually had the opportunity, you

16  and your team, to independently value that

17  contribution?

18      A    The governance committee, the board, has

19  asked us to do that, and that is something that we

20  are ongoing -- an ongoing project of ours.  It's in

21  part a little bit of a moving target because some of

22  the contributions are still -- the form of those

23  contributions is still the subject of some

24  negotiation.

25      Q    Is there any doubt that even in its correct

1 form, CEC's contribution is a substantial one?

2      A     Yes.

3      Q     I said is there any doubt?

4      A     No, there is no doubt.  I mean, their

5 contribution, is -- as currently structured, there

6 are three primary contributions that CEC is making.

7 It is providing the estate with $406 million worth of

8 cash.  It is providing a backstop to the value of the

9 equity that's being proposed to be distributed under

10 the plan in two different entities.  And it is

11 providing credit support for a REIT structure through

12 the form of a lease guarantee.

13           So those -- and that credit support

14 should enable the entire capital structure to trade

15 at a higher valuation than it might otherwise trade

16 on a post-confirmation basis.

17           So those three buckets, cash, lease

18 guarantee, and a backstop on the valuation of the

19 equity of the PropCo and OpCo incorporated into this

20 REIT structure are substantial contributions by the

21 parent in -- made in anticipated settlement of the

22 claims against it.

23      Q     And are you also exploring -- is the

24 debtor -- are the debtors exploring any other

25 alternatives to the RSA in order to reorganize?

1    A    Well, as I said, there are ongoing

2  negotiations with both -- with parties who are not a

3  party to the RSA, creditor groups who are not parties

4  to the RSA, to attempt to induce them to become

5  parties to the RSA.

6             But, in addition, we have been asked

7  as a matter of prudence planning to consider possible

8  alternatives to the RSA, if it proves to be a

9  structure that at the end of the day does not enlist

10 broad creditor support.  So we've started to think

11 about other approaches.

12            And I would say that sort of

13 incidental or related to the plan contemplated by the

14 RSA, we have also undertaken to begin the process of

15 potentially doing a market test of the values

16 provided to creditors under the RSA.

17            Just to take a little digression here,

18 one of the three forms of support being provided by

19 the parent company to the debtors' reorganization

20 under the RSA is a backstop on the equity values,

21 which is to say that creditors are being -- the

22 creditors who receive equity under the plan are being

23 afforded the right to put that equity to the parent

24 at a price.

25            And so the question raised is is that

1  recoveries.

2       Q    Okay.  And have you also negotiated with

3  the creditors, including with the first lien notes in

4  this case?

5       A    Yes.

6       Q    Okay.  And you mentioned that the --

7  currently the first lien notes have agreed to the

8  RSA?

9       A    Yes.

10      Q    And you also mentioned that the first lien

11 notes have a -- they at least had a guarantee that

12 would guarantee 6.345 billion of their debt?

13      A    That's correct.

14      Q    And they're not currently pursuing that in

15 the guarantee litigation?

16      A    They are not.

17      Q    From a pure question of economic incentive,

18 are there any reasons that you're aware of as to why

19 the first lien noteholders would be incentivized to

20 join the litigation if it proceeds?

21      A    So this is the fundamental problem that the

22 estate faces and the creditors face in treating --

23 with a possibility of a plan of reorganization:  Do

24 they seek to pursue their separate claims against CEC

25 or do they allow the estate to bring the value -- the

1 value obtainable from CEC into the equation, and to

2 provide for that value and distribute it under a CEC

3 plan of reorganization?

4               To date, the first lien noteholders

5 have, obviously, by signing the RSA, determined to do

6 it through the estate.  But if the -- if there's

7 going to be a separate effort to collect value from

8 CEC through the guarantee litigation, they have every

9 economic incentive to join it, because under the RSA,

10 they are not unimpaired.  They remain impaired.

11 They're not getting a full recovery on their claims.

12 And so if the guarantee litigation is permitted to be

13 pursued, then I expect that the first lien notes will

14 join that party so as to prevent them from being

15 jumped by a set of junior creditors with respect to a

16 valuable estate asset.

17      Q    And if the first lien noteholders join that

18 party, in your words, what effect would that have on

19 the debtors' ability to achieve a consensual

20 restructuring in this bankruptcy?

21      A    Well, I think the -- I think we'll be in

22 the -- we'll be in a much different situation,

23 because I think if the litigations are pursued and

24 they ripen into a judgment, you will have -- in other

25 words, if the guarantees are reinstated, then the --

1          So the franchise is valuable.  We can

2     provide a distribution to creditors under a plan of

3     reorganization based on the franchise itself.  And

4     whether it's done pursuant to the structure

5     contemplated by the RSA or through another structure

6     that may be negotiated consensually with the

7     creditors, I'm confident that the creditors will find

8     a way, despite their various differences with one

9     another and with CEC, they'll find a way to make sure

10    they don't dissipate the value of the franchise.

11          THE COURT:  Why doesn't an agreement

12    like the RSA cause problems?  Why doesn't it result

13    in parties who feel they aren't getting enough under

14    an agreement like that, and I dare say that there are

15    some parties like that in this case, why doesn't that

16    harden their positions and cause them to be

17    especially aggressive?

18          THE WITNESS:  In my experience in

19    negotiating in a complicated case like this, parties

20    often have, you know, unformed views and uninformed

21    views as to what's available and what can be

22    obtained.  And so the value of an RSA is actually in

23    crystallizing a framework for a negotiation.  So the

24    creditors look at absolute recovery and relative

25    recovery.  And an RSA is a very useful device to get

1  creditors to focus on a relative recovery and

2  absolute recovery both.

3          And it -- I think particularly in this

4  case, one has to view it as a work in process.  It's

5  a way of saying this group of creditors is prepared

6  to agree to compromise on this basis, and it forces

7  other creditors to consider what they would

8  compromise.

9          And as I said earlier in my testimony,

10  it's having exactly that effect.  We have other

11  creditor constituencies who are now looking at the

12  RSA and saying well, that doesn't work for me.  I

13  need this.  And so it's an iterative process.  We

14  have to start somewhere.

15          THE COURT:  So in your view then it's

16  not so much the fact that some creditor groups do

17  better under the RSA than others, but, rather, the

18  ones who are doing better for now have compromised;

19  they've accepted less and that sends a message, is

20  that what you're saying?

21          THE WITNESS:  Well, no.  I mean, at

22  the end of the day, the relative priority under the

23  Bankruptcy Code of different creditor claims will --

24  that's the framework that ultimately needs to be

25  respected.  If you've designed a plan of

1   member of the capital structure compromises under an

2   RSA, does that in and of itself have any salutary

3   effect on trying to, you know, achieve a broader

4   consensus with the more junior members?

5        A    Yes.  I mean, the one way to look at the

6   RSA is that the connotative treatment of the first

7   lien secured creditors that leaves them impaired,

8   together with the contributions being made by CEC

9   itself, are trying to create value for junior

10  creditors that will induce them to compromise, and

11  support the plan.

12            I think what all of this represents is

13  that there -- a pretty clear position of junior

14  creditors that it's not enough.  But that's what

15  bankruptcy is for.  I mean, that's what we're here to

16  do.  We're here to have an honest conversation about

17  the value of the company, the value of the claims,

18  and try to determine an equitable allocation of that

19  value among the creditors based on their relative

20  priorities, based on the contractual relationships

21  they established with the debtor, and between

22  themselves prior to the commencement of the case.

23  That's what we're doing here.

24       Q    And why do you believe continuation of the

25  guarantee litigation would disrupt that process?

1     A    Well, because the allegedly guaranteed

2  parties are trying to jump the line.  They're trying

3  to -- they're trying to alter the priorities that

4  would otherwise prevail in the bankruptcy, and to

5  compete with the debtors' claims against CEC arising

6  out of many of the same transactions of which they're

7  a litigant.

8          THE COURT:  Isn't that what guarantees

9  are for?  This is why people get them.

10         THE WITNESS:  Yeah, that's right.

11         THE COURT:  So...

12         THE WITNESS:  That's right.  But

13  the -- there is a more -- there is a more complicated

14  conversation about that.  At the time these

15  guarantees were given, there was nothing in CEC.  The

16  value that sits in CEC really resided in CEOC.  The

17  value that could be obtained today came from the

18  debtors.

19         And so if we recovered our fraudulent

20  transfers, if there are fraudulent -- if there are --

21  if they really were fraudulent transfers, the

22  guarantees would be of absolutely no value to these

23  parties because at the time the guarantees were given

24  it was a holding company.  It had nothing in it other

25  than the equity in CEOC.  And it's only through a

1  series of transactions, which the estate is asserting

2  or could assert that CEC has independent value to

3  those guarantee claims.

4              So what these creditors are trying to

5  do is compete with fraudulent conveyance claims that

6  the estate has, and be a beneficiary of those

7  fraudulent conveyance claims by seeking a separate

8  recovery on their guarantees.  And in that sense,

9  they're jumping the line.  If they're successful,

10 they're jumping the line and getting ahead of the

11 estate, and, therefore, really interfering with the

12 priorities it would otherwise obtain in the

13 bankruptcy.

14 BY MR. ZOTT:

15 Q    There were arguments made in some of the

16 briefs, Mr. Millstein, saying that if you allow the

17 litigation to continue, you actually encourage the

18 parties to try to come to a consensual deal,

19 otherwise CEC will be able to, quote, luxuriate in a

20 pressure-free environment.

21              Do you agree with that perspective?

22 A    My experience of CEC today in this

23 environment is that they are not luxuriating.  They

24 are under enormous pressure from all of the creditor

25 constituencies and from the debtors from the pendency

1  of the proceeding.  It's a life or death struggle for

2  them at this point to resolve these cases

3  consensually.

4          And I think that's -- that is obvious

5  from the -- just a comparison of the potential

6  contingent claims against them through the guarantees

7  and on the fraudulent conveyance litigation compared

8  to the value of their assets as reflected in the

9  market value of their equity.  And there's no way

10  they can satisfy all of these claims.  And so

11  they need -- and in the absence of their ability to

12  come to a consensual resolution of these claims

13  through this proceeding, they are going to be a

14  debtor in this courtroom.

15      Q    You mentioned -- when we first met and

16  started preparing, you mentioned a John Lennon song.

17  Do you remember the song?

18      A    Which one?  Give Peace a Chance?

19          THE COURT:  Imagine all the people

20  living life --

21          (Laughter.)

22  BY MR. ZOTT:

23      Q    I think he got it right.

24          What was the song?

25      A    Give Peace a Chance.

<pre>
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                           EASTERN DIVISION

3
    CAESARS ENTERTAINMENT OPERATING    )
4   COMPANY, INC., et al.,             )
                                       )
5            Plaintiffs-Appellants,    )
                                       )
6        vs.                           )  No. 15 C 6504
                                       )
7   BOKF, N.A., et al.,                )  Chicago, Illinois
                                       )  September 29, 2015
8            Defendants-Appellees.     )  10:00 a.m.

9
                 TRANSCRIPT OF PROCEEDINGS - HEARING
10
            BEFORE THE HONORABLE ROBERT W. GETTLEMAN
11

12  APPEARANCES:

13  For the Plaintiffs-       KIRKLAND & ELLIS LLP
    Appellants:               BY:  MR. DAVID R. SELIGMAN
14                            300 North LaSalle Street
                              Chicago, Illinois 60654
15                            (312) 862-2000

16                            KIRKLAND & ELLIS LLP
                              BY:  MR. JOHN C. O'QUINN
17                                 MR. JASON M. WILCOX
                              655 15th Street, N.W.
18                            Washington, D.C. 20005
                              (202) 879-5000
19

20

21

22

23  Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                              219 South Dearborn Street, Room 1706
24                            Chicago, Illinois 60604
                              (312) 435-7626
25                            nancy_bistany@ilnd.uscourts.gov
</pre>

```
 1    APPEARANCES:   (Continued)

 2

 3    For Defendant-              JONES DAY
      Appellee Wilmington         BY:   MR. JAMES O. JOHNSTON
      Savings Fund:                     MR. BRUCE BENNETT
 4                                555 South Flower Street, 50th Floor
                                  Los Angeles, California 90017
 5                                (213) 489-3939

 6                                JONES DAY
                                  BY:   MR. MORGAN R. HIRST
 7                                77 West Wacker Drive, Suite 3500
                                  Chicago, Illinois 60601-1692
 8                                (312) 782-3939

 9

10    For Defendant-              DRINKER BIDDLE & REATH LLP
      Appellees MeehanCombs       BY:   MS. KRISTIN K. GOING
      and Trilogy:                1177 Avenue of the Americas
11                                41st Floor
                                  New York, New York 10036-2714
12                                (212) 248-3140

13

14    For Defendant-              GRANT & EISENHOFER P.A.
      Appellee Danner:            BY:   MR. GORDON Z. NOVOD
15                                485 Lexington Avenue, 29th Floor
                                  New York, New York 10017
16                                (646) 722-8500

17

18

19

20

21

22

23

24

25
```

1          The reasons to do it here are twofold.  Number one,

2     because time is of the essence.  We do have a race to judgment.

3     And while this other action is pending, yeah, that's a cloud

4     that looms over the bankruptcy proceeding.  And the whole

5     point, again, of having the injunction is to hopefully try to

6     build consensus to provide a cooling-off period in which people

7     can see the information from the examiner, assess it for

8     themselves, and then see whether or not there's a plan to be

9     agreed to.

10          But second, when you get past the issue of authority,

11     respectfully, I don't think there are any fact issues that are

12     really left to be adjudicated, because the test that's been

13     identified by the Third -- by the Seventh Circuit essentially

14     has three parts to it.

15          Number one, does it affect the integrity of the

16     bankruptcy estate?  And it assuredly does for the reasons that

17     I've just been talking about.

18          Number two, is there a likelihood of a successful

19     reorganization?  I don't even think that that issue is being

20     disputed here.  Part of the arguments that the appellees have

21     made is you could potentially have a successful reorganization

22     even without the contribution from CEC.  So they can't have it

23     both ways and then say, well, we're going to argue that there's

24     no likelihood of a successful reorganization here.

25          And on the facts, when their expert was asked at the

1    trial, you know, did he agree with certain things about --

2    about the debtors' ongoing business and whether or not, you

3    know, they had good brand recognition, good EBITDA, et cetera,

4    he agreed.  So there weren't any disputes about that.

5         And that was the only witness that they had at trial.

6    They didn't call any fact witnesses.  There are no credibility

7    determinations to be made here on remand.

8         The last factor that leaves is the public interest

9    factor.  And with respect to the public interests, cases like

10   *In re Gander Associates*, *Paul Glenn* recognize that a successful

11   reorganization is always in the public interest, number one.

12        Number two, certainly fostering settlement is in the

13   public interest.  And, again, the whole purpose of having a

14   temporary injunction to span 60 days beyond the time of the

15   examiner's report is to try to foster just that.

16        And then three -- and I mentioned this before -- they

17   don't identify any harm to them that would raise public

18   interest concerns about why their actions should be allowed to

19   proceed other than to say, well, perhaps our claims would

20   potentially be eliminated if a plan is confirmed.  But, again,

21   that's not a reason to not grant an injunction.  That's a

22   reason to litigate in the bankruptcy proceeding about what the

23   plan of confirmation -- the plan proposed for confirmation

24   should look like.

25        THE COURT:  And just explain to me again, how would

**SA018**

1   bankruptcy is supposed to be the main event where those types
2   of issues are being adjudicated, not third-party litigation.
3           The second thing, though, that would happen is, you
4   know, there was certainly -- certainly testimony that -- at
5   trial that that creates a situation where CEC itself might
6   enter into bankruptcy and might make it impossible, therefore,
7   to be able to have a reorganization here, certainly not one
8   that involved a contribution from -- from CEC.  And you can
9   find this at the record at A1021 and A1073 to 1074.  Mr. Zelin,
10  the financial advisor to CEC, said that bankruptcy would be a
11  real option.
12          And, again, I think it's undisputed that the claims
13  against CEC are one of two primary assets that the estate --
14          THE COURT:  But you're only seeking a temporary stay,
15  so that could happen anyway.  So if that possibility is there
16  that might force CEC into bankruptcy, maybe that's the best
17  thing, to put these all in one big bankruptcy proceeding and
18  make all these decisions at one time.
19          MR. O'QUINN:  Well --
20          THE COURT:  But I don't see a temporary stay as
21  avoiding that decision by CEC or its advisor, or whatever, as
22  to whether or not they've got so many claims against it, they
23  might as well just file a Chapter 11 or worse.
24          MR. O'QUINN:  So, Judge Gettleman, what you have at
25  the moment is a proposal in which there would be a settlement

1    of claims against CEC.  That's been valued by the debtors at

2    approximately 2 -- being worth approximately $2 billion.  One

3    of the virtues of having the injunction that's being sought, in

4    order to allow the examiner to make an assessment of what those

5    claims are worth, is so that all of the parties here that are

6    stakeholders can have an independent assessment of what those

7    are.

8         I mean, the guaranty-plaintiffs have asserted that

9    that's essentially a sweetheart deal between the debtors and

10   CEC.  The examiner's report may very well put the lie to that.

11   And if it does, that may very well give rise to the kind of

12   consensus that the bankruptcy process is intended to foster

13   that would lead to resolution.  That's the reason for the

14   temporary -- the request for the temporary injunction.

15        And as for the scenario where CEC itself ends in

16   bankruptcy, then you end up with what Mr. Millstein testified

17   as one of the great messes of our time, where you have the

18   debtors with claims against another debtor, and then you have a

19   fight about who gets priority and where those things go.  And

20   you could have a very long, messy, protracted bankruptcy, which

21   is not in the interest of anybody, including the

22   guaranty-plaintiffs.

23        THE COURT:  Okay.

24        MR. O'QUINN:  I'm happy to answer other questions

25   that the Court may have, whether it relates to the cases

UNITED STATES COURT OF APPEALS SEVENTH CIRCUIT


IN RE:   CEASARS ENTERTAINMENT
OPERATING COMPANY, INC., et al.,

                  Debtors.
_____
CEASARS ENTERTAINMENT OPERATING
COMPANY, INC., et al.,

        Plaintiffs-Appellants,

   vs.                              No. 15-3259

BOKF, N.A., et al.,

        Defendants-Appellees.




        Transcription of digitally recorded
proceedings in the above-captioned matter,
transcribed by LAURA M. O'BRIEN, Certified
Shorthand Reporter of the State of Illinois.



Judge Daniel A. Manion
Judge Richard A. Posner
Judge Diane S. Sykes


REPORTED BY:  Laura M. O'Brien, CSR, RPR, CRR
LICENSE NO.:  084-004259
JOB NO.: 7186

1    JUDGE POSNER:  Well, why would it be better

2  to have the -- to have the decisions by the

3  State Courts and maybe the Federal Court in

4  New York before an effort is made to wind up the

5  bankruptcy?

6    MR. O'QUINN:  Well, Judge Posner, the

7  testimony at trial and the representations made

8  by CEC in its public filings is that if it's

9  adjudicated to be liable for the guaranty

10  claims, it's going to enter into bankruptcy.

11  And if it does, it's not then in a position to

12  be able to make a contribution to the debtors'

13  estates in settlement of the debtors' claims.

14  And the type of consensual reorganization that

15  is hoped for here simply won't be able to be

16  achieved.

17        And so that's -- that is why it

18  threatens the integrity of the bankruptcy

19  estate.  No one is talking about extinguishing

20  their claims for all time.  The point of this is

21  a temporary injunction of -- or a temporary stay

22  of the ongoing litigation.  But it's to prevent

23  the harm to the debtors, namely that one of the

24  principal assets around which they are hoping to

1   reorganize will essentially not be available to

2   them, because CEC itself would be in bankruptcy.

3      JUDGE MANION: Well, CEC, is it because it's

4   not a party and somehow or other, I don't know

5   how, it extracted the -- we call them the good

6   Ceasars?

7      MR. O'QUINN: Well, that's the way that I

8   think the plaintiffs have --

9      JUDGE MANION: It seems to be the big issue

10   is CEC took out the good Ceasars, as you -- I

11   think somebody calls them, and then left the

12   other ones that aren't very good, and that's

13   where the problem with the -- all parties is

14   they're not -- they're worried about getting

15   those back into the mix, I presume.

16      MR. O'QUINN: That -- I think that's right,

17   Judge Manion. And here's the key point. If the

18   assets that the debtors allege were fraudulently

19   transferred from them to CEC, if they were with

20   the debtors, then the guaranty plaintiffs would

21   be second and lower tier creditors to try to

22   recover in a bankruptcy. But instead, they're

23   doing an end run around the bankruptcy process,

24   essentially trying to jump the line, because

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF DIVISION
EASTERN DIVISION

| | | |
|---|---|---|
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | ) ) | |
| Plaintiff, | ) ) | No. 15 A 00149 |
| vs. | ) ) | |
| BOKF, N.A., ET AL., | ) ) | Chicago, Illinois February 3, 2016 |
| Defendant. | ) | 11:00 a.m. |
| ------------------------------ | ) ) | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | ) ) | No. 15 B 01145 |
| Debtor. | ) ) ) | |

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE A. BENJAMIN GOLDGAR

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Mr. David Zott; |
| For the U.S. Trustee: | Ms. Denise DeLaurent; |
| For BOKF: | Mr. Mark Hebbeln; |
| For Relative Value and Trilogy: | Ms. Kristin Going; |
| For the Second-Priority Noteholders: | Mr. Geoffrey Stewart; |

| | |
|---|---|
| Court Reporter: | Amy Doolin, CSR, RPR U.S. Courthouse 219 South Dearborn Room 661 Chicago, IL 60604. |

1           THE COURT:  They are here.

2           MR. TOOF:  Good morning, Your Honor.

3  Jackson Toof, Arent Fox, on behalf of BOKF.

4  Mr. Hebbeln is in the courtroom.

5           THE COURT:  Yes.  Good morning.  Okay.

6  I think that's it.

7           The mandate, as I was saying, issued

8  yesterday.  So this is back in my lap.  So I guess my

9  only question really is timing.

10          Obviously, the Court of Appeals had a

11 different view of its case law than I did, and so

12 apparently I have the power to grant the injunction,

13 should I find that the facts warrant it.  And they

14 said that it was up to me, not surprisingly, to make

15 the factual determination.

16          It was a little hard for me to

17 decipher the docket in the New York cases, but I had

18 the impression there was a trial date -- the earliest

19 trial date was either March 9 or March 14.

20          MR. ZOTT:  Yes, Your Honor.  The first

21 trial -- this is David Zott on behalf of the debtors.

22 The first trial is set for March 14th.

23          THE COURT:  Okay.

24          MR. ZOTT:  And that would be a trial

25 of UMB and BOKF, who have collective claims of $7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF DIVISION
EASTERN DIVISION


CAESARS ENTERTAINMENT OPERATING )
COMPANY, INC., )
 ) No. 15 A 00149
            Plaintiff, )
 )
        vs. )
 )
BOKF, N.A., ET AL., ) Chicago, Illinois
 ) June 8, 2016
            Defendants. ) 10:30 a.m.
 )  2:00 p.m.
----------------------------- )
 )
CAESARS ENTERTAINMENT OPERATING )
COMPANY, INC., ) No. 15 B 01145
 )
            Debtor. )


VOLUME I (Pages 1–184)

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE A. BENJAMIN GOLDGAR


APPEARANCES:

For the Plaintiff:          Mr. David Zott;
                            Mr. Jeffrey Zeiger;
                            Mr. David Seligman;

For WSFS:                   Mr. Bruce Bennett;
                            Mr. James Johnston;


For BOKF, N.A.:             Mr. Jackson Toof;

For Trilogy:                Mr. Frank Velocci;
                            Ms. Kristin Going;
                            Mr. James Millar

For the Danner Defendants:  Mr. Edmund Aronowitz;

**SA026**

# **I N D E X**

| Witness: | DX | CX | REDX | RECX |
|---|---|---|---|---|
| James Millstein | 24 | 57 | | |
| David Seligman | 111 | 118 | 127 | 132 |
| | | 126 | 134 | 137 |
| Steven Pesner | 139 | | | |
| Barry Kupferberg | 148 | 156 | | |

BY MR. ZOTT:

     Q     Are you aware that the court has entered
an injunction, just to get you focused, that
temporarily stayed the guaranty litigation, a portion
of that?

     A     Yes.

     Q     And I would like you, sir, to describe for
the court the progress, if any, that the debtors have
made with respect to a plan since that injunction was
entered.

     A     Well, as I think the court is aware after
yesterday's hearing, substantial progress has been
made towards a -- not quite yet fully consensual
plan, but substantially consensual plan.

               As described in the disclosure
statement, and I think as affirmed by the parties at
yesterday's hearing, the debtors have entered into a
restructuring support agreement with their parent
company, CEC, that describes and governs the nature
of the contributions they would make to this case to
settle claims against them.

               We have an agreement in principle with
the official unsecured creditors committee with
regard to the treatment of unsecured creditors under
the plan.

1        We have, if not an executed RSA, soon

2   to be, I hope, executed RSA, but certainly an

3   agreement in principle with the first lien

4   noteholders.  And then an agreement with one of the

5   subgroups of unsecured creditors called the

6   subsidiary guaranty notes.

7        That leaves out among the major

8   creditor groups, the first lien banks, with whom -- I

9   guess the best way to say it is they have -- under

10  the revised plan, the recovery that they would

11  receive under the revised plan is greater than that

12  which they had previously agreed to, but they are

13  continuing to negotiate with the debtors for improved

14  recoveries.

15       And the 2L, or the second lien

16  noteholders, I guess who are the plaintiffs in many

17  of the, you know, proceedings here that have been

18  sought to be enjoined or restrained temporarily.

19  Q   Okay.  Well, let me talk about the second

20  lien noteholders then.  The plaintiffs, as you

21  mentioned, in many of the injunction proceedings --

22  or many of the guaranty actions.

23       First, during the injunction period,

24  has you and your team -- have you and your team had

25  any meetings or discussions with representatives of

1   the noteholders?

2       A    Yes, both with representatives of the

3   noteholders and with individual noteholders, members

4   of the committee and other noteholders who are not on

5   the committee.

6       Q    And did that include substantive

7   discussions about efforts to try to resolve the case

8   and their claims?

9       A    Yes.

10      Q    Now, did you see the mediator statement

11  that was submitted to the judge yesterday about the

12  actual mediation process in terms of meetings between

13  CEC and the noteholders?

14      A    Yes.

15      Q    Okay.  And let me ask you, is it unusual,

16  in your experience, for progress in a bankruptcy to

17  vary among the various creditor groups?

18      A    Yeah.  I mean, in a case as complicated as

19  this where you have, you know, first lien banks and

20  noteholders separately organized, and then an

21  official unsecured creditors committee that

22  represents a variety of different kinds of unsecured

23  creditors, noteholders to trade creditors, and where

24  the second lien noteholder group are plaintiffs in

25  other causes of action outside the case, as well as

1  non-plaintiffs, as well as a very sophisticated group

2  of individual noteholders who are not shy about

3  representing their own position regardless of what

4  the 2L committee may assert from time to time, there

5  are -- there's a different pace of negotiation with

6  each group.

7          And the interesting and obvious

8  dynamic of this case also needs to be taken note of,

9  which is that while CEC, the parent company, has from

10  time to time inserted itself directly into plan

11  negotiations with individual creditor groups, the

12  debtors are the debtors, and we have also a duty to

13  try to move these cases forward, and have been

14  negotiating both with CEC for the terms of their

15  contribution, as well as with each of the individual

16  creditor groups.

17          So the mediator -- what I'm saying,

18  the mediator statement was really referencing only

19  conversations, direct conversations between CEC and

20  the 2Ls.  There have been a host of conversations

21  between the debtors and individual 2L noteholders,

22  and the 2L representatives of 2L committee ongoing

23  during this period.

24          And we think, frankly, that we have --

25  we have advanced the ball in getting closer to a

1  consensual deal between at least the debtors and the

2  2L committee.

3      Q    Okay.

4      A    But by no means -- I'm sure that the

5  representatives of the 2L committee will tell you the

6  ball hasn't nearly been advanced enough.  But it has

7  moved down the field quite considerably.

8           And one needs to take notice that the

9  first plan that was filed had a recovery level that

10  is at half the level, 50 percent of the level that

11  the new plan provides for the 2Ls.  So while the 2Ls

12  want more, without question, and remain unsatisfied,

13  they have through this plan negotiation process

14  already doubled their potential recoveries.

15      Q    And is it fair to say more work needs to be

16  done?

17      A    Oh, yeah.

18      Q    And are the debtors, are they giving up or

19  are they committed to continuing to negotiate?

20      A    No.  We're -- we are continuing to have

21  conversations with members of the committee and

22  non-members of the committee.

23      Q    And you mentioned that there are here

24  either deals in principle, signed RSAs, or very close

25  with some of the other creditor groups.  So what does

1  that allow the debtor to do in terms of actually

2  focusing its attention with respect to the

3  noteholders going forward?

4      A    As I said earlier, I think we really have

5  two major groups that remain unreconciled to the plan

6  that is on file, that being the first lien banks and

7  the second lien noteholders.  And in truth, their

8  recoveries are related or interrelated.

9      Q    Could you explain that.

10     A    Yes.  Because the -- they are -- they share

11 collateral with the 2L notes, having agreed

12 contractually to subordinate their liens to the 1L

13 notes and banks.  So the satisfaction of the claims

14 of the 1L banks and the 1L notes is -- the prior

15 satisfaction of claims of the 1L notes and 1L banks

16 is something to which the 2Ls are a party as a result

17 of a prepetition subordination agreement.

18              And so if you view -- if you view

19 the estate as a limited sum, potentially supplemented

20 by contributions from CEC as the parent in settlement

21 of its claims, the 2Ls need to -- the 2L's recoveries

22 are dependent on the satisfaction, the prior payment

23 in full in satisfaction of the 1L banks and bonds.

24              So we have the 1L notes on side,

25 having agreed to a set of recoveries that they say

allows value to accrue to the 2Ls.  The banks aren't

there yet.  The banks continue to seek more value,

and that is value that otherwise might go to the 2Ls.

Q    Okay.  Well, we're going to come back to

that point a little later.  But let me turn to the

contribution that CEC is making under the current

plan.

Are you generally familiar with the

contribution?

A    Yes.

Q    And have you and your team valued it?

A    Yes, we have.

MR. BENNETT:  Your Honor, I want to

object to the relevance of this line of questioning,

only because when I read your order, you focused on

the negotiations, not on the value of the

contribution last time.  I think this can go a lot

quicker if this isn't about the value of the

contribution.  If it is about the value of the

contribution, there is going to be a significant

cross-examination of Mr. Millstein on it, and it's a

huge part of our case.

MR. ZOTT:  Let me try it a different

way.  I sort of agree with Mr. Bennett, so let me try

it a different way.

1      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

4   CAESARS ENTERTAINMENT OPERATING )
    COMPANY, INC., et al.,          )   No. 15 B 01145
5                                   )   Chicago, Illinois
                                    )   1:30 p.m.
6                   Debtor.         )   August 17, 2016

7

8      TRANSCRIPT OF PROCEEDINGS BEFORE THE
          HONORABLE A. BENJAMIN GOLDGAR
9

10  APPEARANCES:

11  For the Debtors:              Mr. David Zott;
                                  Mr. Jeffrey Zeiger;
12                                Mr. Joseph Graham;
                                  Mr. Brent Rogers;
13                                Mr. Bill Arnault;

14  For the U.S. Trustee:         Ms. Denise DeLaurent;
                                  Mr. Adam Brief;
15

    For the Noteholder Committee:  Mr. James Johnston;
16

    For the 10.75 Notes Trustee:   Mr. Jason Zakia;
17

    For FERG, LLC and LLTQ
18  Enterprises:                  Mr. Steven Chaiken;

19  For BOKF:                     Mr. Andrew Silfen;

20

21

22  Court Reporter:               Amy Doolin, CSR, RPR
                                  U.S. Courthouse
23                                219 South Dearborn
                                  Room 661
24                                Chicago, IL  60604.

25

1      MR. ARNAULT:  Thanks, Your Honor.

2      MR. CHAIKEN:  Thank you, Your Honor.

3      THE COURT:  Thank you.

4      MR. ZEIGER:  Good afternoon, Your

5  Honor.  Jeffrey Zeiger, Kirkland & Ellis, on behalf

6  of the debtors.

7      Your Honor, we're here on the debtors'

8  motion for a protective order with respect to one

9  deposition for the 105 hearing next week.

10      THE COURT:  Right.  There seems to be

11  some confusion about the issues for the hearing.  The

12  issues for the hearing have not changed.  The issues

13  for the hearing are the same issues that are

14  described in the court of appeals' opinion.

15      What has changed is the amount of time

16  that has passed.  With the passage of time, the

17  burden that the movant has in this situation

18  increases.  And the case law is very clear that you

19  can get this kind of injunction at the early stages

20  of the case.  We're not exactly at the early stages

21  of the case.

22      So I am not inclined to grant your

23  motion for a protective order.  The position that you

24  take on Mr. Stauber really is that he doesn't know

25  anything.  Well, that's why you take depositions, to

1   establish that people don't know anything.

2               They don't have to take your word for

3   that.  And maybe they'd like to explore that for

4   themselves.  And, you know, it's one thing to procure

5   an affidavit from somebody that says that, and it's

6   another thing to extract that from them under the

7   bright lights, you know.

8               So I'm going to grant the motion to

9   compel and deny the motion for a protective order,

10  and have you produce Mr. Stauber.

11              MR. ZEIGER:  We will, Your Honor.  I

12  understand.

13              To be clear, Mr. Stauber -- our point

14  was Mr. Stauber doesn't know anything that Mr. Hayes

15  doesn't also know.  We're making Mr. Hayes available

16  for a deposition.

17              The challenge, Judge, is that

18  obviously this is an accelerated proceeding.  And

19  they have committed to, you know, keeping the scope

20  of discovery within essentially the topics that they

21  listed on page 3 of their motion to compel.  The

22  concern is that, you know, they've obviously wanted

23  to take discovery of the independent directors on

24  standing.  And we kept saying, look, it's going to be

25  duplicative of confirmation.

1          What we don't want to do is these

2   depositions twice.  And so I understand the court's

3   order.  We will produce him this Friday as scheduled.

4   But our view is that it should be limited to the

5   topics as they set out in their motion.

6          THE COURT:  Well, I don't have a

7   problem with the topics limited to matters that are

8   relevant to the hearing.  And it doesn't seem to me

9   that most of the matters that pertain to the

10  derivative standing motion, which has now been

11  continued anyway --

12          MR. ZEIGER:  Correct.

13          THE COURT:  -- are going to be

14  relevant here.  But I think Mr. Stauber should be

15  examined.

16          Why am I not going to hear from Mr.

17  Millstein at the hearing?  He has been your star

18  witness right along.  You know, as time goes on, your

19  case peters out.  I was quite surprised to see that I

20  was not going to have a chance to question him.

21          MR. ZEIGER:  Your Honor, Mr. Millstein

22  has a similar issue to Mr. Zott, and he can't fly

23  right now.  He just had surgery last Friday.

24          THE COURT:  Oh, dear.

25          MR. ZEIGER:  He's unable to fly.

1      THE COURT:  Well, that's too bad.

2      MR. ZEIGER:  So that's why Mr. Hayes

3 will be here instead.

4      THE COURT:  All right.  Well, that

5 will happen, I suppose.

6      I have two comments, though, that I

7 wanted to make in anticipation of the hearing, and I

8 wanted to offer them because these motions suggested

9 some disagreement about the issues with the guaranty

10 plaintiffs, in particular, asserting that the issues

11 have narrowed.

12      And as I said, they haven't.  But my

13 comments may give some guidance to the parties in

14 deciding what evidence to present.  And I offer these

15 as well for another reason:  On the off-chance that

16 they may promote a global settlement in the few days

17 remaining.  Never say "never."

18      The first comment concerns the

19 debtors' position that this is a "textbook case" for

20 the issuance of a section 105 injunction.  I've

21 agreed with that position in the past, because this

22 is a textbook case – in certain respects.  The

23 textbook third-party injunction is issued to stop a

24 lawsuit against a non-debtor who guaranteed one or

25 more of the debtors' obligations, intends to make a

financial contribution to the debtors'

reorganization, and won't be able to make the

contribution if the lawsuit succeeds.  Because CEC

guaranteed certain of CEOC's obligations and is

contributing to its reorganization, and because the

lawsuits against CEC arguably jeopardize the

contribution, to that extent this case takes textbook

form.

But in another important respect, this

isn't a textbook case.  In the textbook case, the

third party that the injunction would protect is a

person – an actual human being – rather than a

corporation.  So, for example, a partner in a debtor

partnership or an officer or shareholder in a debtor

corporation.  In the textbook case, no one stands

behind the third party and its contribution.  A

judgment against a third party consequently spells

doom for the reorganization.  That was true in United

Health Care, in Saxby's Coffee, in Rustic, and Lahman

Manufacturing, in Otero Mills, in every decision

cited in my published opinion after the first hearing

except Lyondell.  It was true in the R&G Properties

case, as well, which was one of mine.

It isn't true here.  CEC is

majority-owned by four LLCs.  Two of those LLCs

1  are owned, in turn, by TPG Capital, LP, a large

2  private equity fund.  The other two LLCs are owned by

3  Apollo Global Management, LLC, also a large private

4  equity fund.  With those entities standing behind

5  CEC, it's hard to argue this is truly the textbook

6  case.

7         That brings me to my second comment.

8  In requesting relief under section 105, the debtors

9  always proceeded under the theory that the denial of

10 an injunction would, as the court of appeals put it,

11 "endanger the success of the bankruptcy proceedings."

12 They reach that conclusion because they contend that

13 successful reorganization depends on CEC's

14 contribution, and that contribution will disappear if

15 CEC loses the guaranty actions.

16         But why should the successful

17 reorganization depend on a contribution from CEC

18 alone?  As I just observed, several other entities

19 stand behind CEC.  Not only that, but the estates

20 here have claims – large ones the examiner found –

21 against some of these entities, entities that include

22 Apollo and TPG, as well as a host of other companies

23 and individuals.

24         The plan the debtors want to confirm

25 would release those claims.  Yet as far as I know,

none of those companies and individuals, all of whom
would benefit from the proposed release, has
contributed so much as a dime under the plan.
Certainly, there's been no evidence to date of any
contribution.  In fact, Mr. Millstein, the debtors'
restructuring advisor, from whom apparently we will
not hear, testified as recently as this past June
that he had not even considered whether these
entities could contribute anything.  The current
motion asserts perfunctorily that "the sponsors" –
Apollo and TPG – are participating in settlement
discussions, but the motion doesn't describe their
participation and gives no indication that it's any
better than pro forma.

                The debtors in these cases are asking
the guaranty plaintiffs, all of them creditors of the
debtors, to take considerably less than they are
owed.  The guaranty plaintiffs are miffed at being
asked to do that when parties potentially liable to
the estates would see the claims against them
released under the plan – and would pay nothing for
that benefit.  They're especially miffed when some of
the released parties are the ultimate owners of the
Caesars enterprise, the very entities that engineered
the leveraged buyout that led to these cases.  The

guaranty plaintiffs don't see the proposed
reorganization here as involving shared pain.  I
don't blame them.

A section 105 injunction is an
equitable remedy.  To receive equity, the saying
goes, one must do equity.  Next week, the debtors
might well want to show – if it can be shown – what
is equitable about stopping the guaranty plaintiffs
from enforcing their contractual rights in order to
let the debtors confirm a plan under which alleged
wrongdoers are released for free.

With that, we can move on to the next
item.  I'll see you Tuesday.

MR. JOHNSTON:  Your Honor, before we
do that, for the record, Jim Johnston of Jones Day on
behalf of Wilmington Savings Fund.

First, thank you for your comments.
That is very helpful for preparing for next week.
You will hear more about those issues in our brief on
Friday and next week.

THE COURT:  Good.

MR. JOHNSTON:  I wanted to raise an
issue that just came to my attention this morning,
and that has to do with another aspect of the
discovery we tendered in connection with the motion,

```
        IN THE UNITED STATES BANKRUPTCY COURT FOR THE
                NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION

IN RE:                    )    No. 15 A 00149
CAESARS ENTERTAINMENT     )    Chicago, Illinois
OPERATING COMPANY, INC.,  )    August 23, 2016
                          )    9:04 a.m.
              Debtors. )       1:40 p.m.

            VOLUME I (Pages 1 - 399)
            TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE A. BENJAMIN GOLDGAR

   APPEARANCES:

For the Debtors:              Mr. Jeffrey Zeiger;
                              Mr. David Zott;

For WSFS:                     Mr. Bruce Bennett;
                              Mr. Sidney Levinson;
                              Mr. James Johnston;

For Trilogy:                  Mr. Frank Velocci;

For the Danner
Defendants:                   Mr. Gordon Novod;

For 1L Ad Hoc
Committee:                    Mr. Kenneth Eckstein;

For Wilmington Savings
Fund Society and the
10.75 Note Trustee:           Mr. Jason Zakia;

For Official Committee
of Unsecured Creditors:       Mr. Paul Possinger;

For Bank Lenders:             Mr. Kenneth Pasquale;

For CEC:                      Mr. Thomas Crowley;

For BOKF:                     Mr. Jackson Toof

  Court Reporters:            AMY M. SPEE, CSR, RPR, CRR
                              JERRI ESTELLE, CSR, RPR
                              United States Courthouse
                              219 South Dearborn Street
                              Room 661
                              Chicago, Illinois 60604
```

1           I N D E X

2

3    WITNESS:                                    PAGE:

4        BRENDAN HAYES

5    Direct Examination By Mr. Zeiger             4
     Cross-Examination By Mr. Bennett          128
6    Cross-Examination By Mr. Velocci          320
     Redirect Examination By Mr. Zeiger        345
7    Recross-Examination By Mr. Bennett        374

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   property in Las Vegas.

2          Does that remain true today?

3      A    Yes, it does.

4      Q    Now, given the strength of the

5   business, why did the debtors file for Chapter 11?

6      A    The company had too much debt.

7      Q    And what, if anything, have the debtors

8   done during these Chapter 11 cases to address that

9   problem?

10     A    We have negotiated with all of the

11  creditor constituencies to significantly reduce

12  the amount of debt on the company on the effective

13  date or post-effective date such that the company

14  has a reasonable amount of debt going forward.

15     Q    And if the current plan is ultimately

16  confirmed, approximately how much debt will the

17  debtor shed through this Chapter 11 process?

18     A    Approximately 10 billion.

19     Q    And from an operational and financial

20  perspective, what is your assessment, if any, as

21  to whether the debtors can successfully

22  reorganize?

23     A    I absolutely believe they can

24  successfully reorganize.

25     Q    Now, let's turn to progress that the

1    debtors have achieved in this case since the court

2    entered the injunction on June 15, 2016.

3              And let's start with the creditors.  If

4    you could turn in your binder, please, sir, to PDX

5    1, Plaintiff's Demonstrative Exhibit 1.

6              MR. ZEIGER:  Your Honor, I believe it's

7    in the back of binder.

8              THE COURT:  You've numbered your

9    demonstratives separately.

10             MR. ZEIGER:  Yes, sir, we have.

11             THE COURT:  Okay.  Just to be clear.

12             MR. ZEIGER:  We have.  It should be in

13   the back in Volume 3 of 3 of the plaintiff's

14   exhibits.

15   BY MR. ZEIGER:

16        Q    Mr. Hayes, do you have PDX-1 in front

17   of you?

18        A    I do.

19        Q    And what is Plaintiff's Demonstrative

20   Exhibit 1?

21        A    It's a summary of the RSAs that have

22   been entered into in this case.

23        Q    And who prepared Plaintiff's

24   Demonstrative Exhibit 1?

25        A    Millstein & Company prepared it.

1    **Q    And were you involved in the**
2    **preparation of it?**

3    **A    I was.**

4    **Q    And is the information contained on**
5    **PDX-1 accurate, to the best of your knowledge?**

6    **A    Yes, it is.**

7    **Q    And would referring to Plaintiff's**
8    **Demonstrative Exhibit 1 assist you in providing**
9    **your testimony to the court today?**

10   **A    Yes, it would.**

11   MR. ZEIGER:  Your Honor, at this point,
12   the debtors would move Plaintiff's Demonstrative
13   Exhibit 1 into evidence for demonstrative purposes
14   only.

15   MR. BENNETT:  No objection for
16   demonstrative purposes.

17   THE COURT:  Plaintiff's Demonstrative 1
18   is admitted.

19   MR. ZEIGER:  Thank you, Your Honor.

20   BY MR. ZEIGER:

21   **Q    Mr. Hayes, if we could start with the**
22   **top line there in I guess it's red.  I think the**
23   **first two columns, Date of RSA and RSA Effective**
24   **Date, are somewhat self-explanatory.**

25   **What does that third column, Estimated**

1  Midpoint Recovery Under RSA, refer to?

2       A    That refers to based on the Millstein

3  midpoint valuation for the consideration being

4  provided in the plan there are recoveries to the

5  various creditor groups.

6       Q    And if you go to the next column,

7  Amount of Claims Supporting Restructuring, what

8  does that refer to?

9       A    That's the total amount of claims in

10 each class that have signed on to the RSA.

11      Q    And how did you calculate that?

12      A    That was based on the signatories to

13 the actual RSAs, plus additional bonds that they

14 had purchased, and in some cases loans.

15      Q    Now, where the debtors have support

16 from greater than two-thirds of the class, why

17 didn't you include the whole class?

18      A    This is simply the -- the parties that

19 have signed on to the RSA.  That's it.

20      Q    And if you had included the full class

21 for the classes where the debtors have greater

22 than two-thirds of the class supporting the plan,

23 what would it have done to the numbers?

24      A    It would have increased the numbers.

25      Q    And if we finish -- or the next column

1  refers to Increase In Recovery Since June 15th,

2  2016.  What's reflected in that column?

3      A    That's the total dollar amount and

4  percentage increase for each of those classes of

5  recoveries under these various RSAs since June

6  15th.

7      Q    And then the final column refers to

8  class claim.  What is that?

9      A    Those are the total claims as of the

10 petition date for each of these classes.

11     Q    Now, there's certain shading on the

12 Plaintiff's Demonstrative Exhibit 1.  What does

13 that represent?

14     A    The shading represents what has

15 occurred since the June 15th date.

16     Q    So if we start with the first row, it

17 refers to 1L bank.  Do you see that?

18     A    Yes.

19     Q    And what is the current status of the

20 debtors' negotiations with the first lien bank

21 debtholders?

22     A    We have an effective RSA with first

23 lien banks.

24     Q    And when did the debtors reach that RSA

25 with the first lien bank group?

1    A    On June 20th.

2    Q    Okay.  Sir, if you could turn in your

3 first binder to PX-4.

4         Let me know when you're there.

5    A    I've got it.

6    Q    What is Plaintiff's Exhibit 4?

7    A    It is the bank RSA.

8    Q    That we were just referring to?

9    A    Correct.

10   Q    And what was your role, if any, in

11 connection with the negotiation of the bank RSA

12 reflected in PX-4?

13   A    Along with a number of other

14 professionals, I helped negotiate the first lien

15 bank RSA.

16   Q    And is Plaintiff's Exhibit 4 a true and

17 accurate copy of that RSA that's the result of

18 those negotiations?

19   A    Yes, it appears to be so.

20        MR. ZEIGER:  Your Honor, the debtors

21 would move Plaintiff's Exhibit 4 into evidence.

22        THE COURT:  Any objection?

23        MR. BENNETT:  No objection.

24        THE COURT:  Plaintiff's 4 is admitted.

25        MR. ZEIGER:  Thank you, Your Honor.

1    THE COURT REPORTER:  Counsel, can I get
2  your name?
3    MR. BENNETT:  Bruce Bennett of Jones
4  Day for the second lien lenders.
5    THE COURT REPORTER:  Thank you.
6  BY MR. ZEIGER:
7    **Q    Mr. Hayes, when did the amended RSA**
8  **with the first lien bank lenders that we just saw**
9  **in Plaintiff's Exhibit 4 become effective?**
10   **A    On June 21st, 2016.**
11   **Q    And what is the total amount of the**
12 **first lien bank debt that's supporting the**
13 **debtors' restructuring?**
14   **A    $5.2 billion.**
15   **Q    What are the approximate recoveries to**
16 **the first lien bank holders under -- first lien**
17 **bank debtholders under the RSA?**
18   **A    Approximately $6.3 billion, or 116**
19 **cents on the dollar.**
20   **Q    Why are the first lien bank debtholders**
21 **recovering greater than a hundred percent,**
22 **according to PDX-1?**
23   **A    This is their recovery on a percentage**
24 **of their petition date claim, and they've accrued**
25 **post-petition interest.**

1    **Q   So the percentages reflect the**

2    **percentage of their petition date claim, and**

3    **additional amounts that have accrued during the**

4    **Chapter 11 case?**

5    **A   Correct.**

6    **Q   How much have recoveries increased for**

7    **the first lien bank debtholders since June 15th,**

8    **2016?**

9    **A   Approximately 60 million.**

10    **Q   And what does that reflect?**

11    **A   That reflects additional payments into**

12    **we assume to be at 2017 as approximately $10**

13    **million a month.**

14    **Q   And what are those in compensation for,**

15    **if you know?**

16    **A   Additional time for the case to**

17    **actually proceed and conclude and the accrual of**

18    **post-petition interest.**

19    **Q   And to the extent that the case goes**

20    **past June 30, 2017, which we all hope that it does**

21    **not, but if it does, would there be additional**

22    **amounts due?**

23    **A   Yes, there would.**

24    **Q   And how much would that be?**

25    **A   $10 million a month.**

1    THE COURT:  Let me ask you a question,

2  and I bet you answered this, but Mr. Zeiger

3  blasted through this chart pretty quickly.

4    The 5.2 billion that is shown as the

5  amount of first lien bank claims supporting the

6  restructuring, does that tell us anything about

7  the percentage of first lien banks?  It doesn't,

8  does it?

9    THE WITNESS:  It does.

10    THE COURT:  How?

11    THE WITNESS:  So if you look at the 5.2

12  billion --

13    THE COURT:  Yes.

14    THE WITNESS:  -- that's a percentage of

15  the 5.4 billion, the far right column.

16    THE COURT:  Oh, okay.  Thank you.  I

17  see.

18    THE WITNESS:  It's a high percentage,

19  obviously.

20    THE COURT:  Yes.  Obviously.  All

21  right.  I understand.

22    Go ahead, Mr. Zeiger.

23    MR. ZEIGER:  Thank you, Your Honor.

24  BY MR. ZEIGER:

25    **Q    Let's go to the next row, the first**

1  lien notes.  What is the current status of the

2  debtors' negotiations with the first lien

3  noteholders?

4       A    We continue to negotiate an amended RSA

5  with the first lien noteholders.

6       Q    And given your comment that you're

7  seeking an amendment, is there an existing RSA

8  you're seeking to amend?

9       A    Yes, there is.

10      Q    And when was that entered into?

11      A    It was in October of 2015.

12      Q    And if you'd turn in your binder, sir,

13  to PX-9.  Let me know when you're there.

14      A    Okay.

15      Q    What is Plaintiff's Exhibit 9?

16      A    It's the first lien notes RSA.

17      Q    And when was this RSA reached?

18      A    In -- or I should say on October 7th,

19  2015.

20      Q    And what was your role, if any, in

21  negotiating the RSA set forth in Plaintiff's

22  Exhibit 9?

23      A    I negotiated the first lien notes RSA

24  along with a number of other professionals and

25  principals.

1      Q     And is Plaintiff's Exhibit 9 a true and

2    accurate copy of the RSA that resulted from those

3    discussions and negotiations?

4          A     Yes, it appears to be so.

5                MR. ZEIGER:  Your Honor, the debtors

6    would move Plaintiff's Exhibit 9 into evidence.

7                THE COURT:  Any objection?

8                MR. BENNETT:  No objection.

9                THE COURT:  Plaintiff's 9 is admitted.

10               MR. ZEIGER:  Thank you, Your Honor.

11   BY MR. ZEIGER:

12         Q     Now, sir, what are the recoveries for

13   the first lien noteholders under the current plan

14   that the debtors are seeking to confirm?

15         A     Approximately 109 cents on the dollar.

16         Q     And that's reflected on the chart under

17   Estimated Midpoint Recovery Under RSA under PDX-1?

18         A     That's correct.

19         Q     And how do those recoveries generally

20   compare to the recoveries that were contemplated

21   under the October 2015 RSA that we just looked at

22   in Plaintiff's Exhibit 9?

23         A     They are approximately 15 points

24   higher.

25         Q     So that would put the October 2015

1  recovery somewhere around 94 percent?

2       A    In that vicinity, yes.

3       Q    And it's now up to 109 percent?

4       A    Correct.

5       Q    And, again, this exceeds -- at least

6  under the plan, it exceeds a hundred percent of

7  the claim.  Why is that?

8       A    That's because, similar to the first

9  lien banks, the first lien notes have accrued

10 post-petition interest.  So the recovery on a

11 percentage of post-petition interest, accrued

12 claim post-petition is lower.

13      Q    If you go to the next column, Amount of

14 Claim Supporting Restructuring, what is the total

15 amount of first lien notes that you've indicated

16 are supporting the restructuring?

17      A    $5.7 billion.

18      Q    And why did you include that amount

19 under that column?

20      A    Because that includes amounts for

21 parties that signed the RSA, as well as notes that

22 they have purchased.

23      Q    And why do the debtors believe that the

24 first lien noteholders are still supporting the

25 RS- -- or the restructuring efforts even though

1  there's no amended RSA?

2      A    They continue to negotiate with us.

3  We're very close to reaching an agreement with the

4  first lien notes.  We've spent much of the summer

5  negotiating with them and should have something

6  done relatively soon.

7      Q    Are you aware that the first lien

8  noteholders have guaranty claims?

9      A    Yes, I am.

10     Q    And those are being asserted by UMB as

11 indenture trustee?

12     A    Yes.

13     Q    And did the debtor sue UMB here?

14     A    No.

15     Q    Why not?

16     A    Because UMB is not supporting the

17 guaranty litigation going forward.

18     Q    Okay.  Let's turn to the next column --

19 or row.  It's labeled SGNs.  Do you see that?

20     A    Yes.

21     Q    And what does SGNs refer to?

22     A    The subsidiary guaranteed notes.

23     Q    And what is the current status of the

24 debtors' negotiations with respect to the

25 subsidiary guaranteed notes?

1     **A**    **We have an effective RSA with SGNs.**

2     **Q**    **And when did the debtors first reach**

3 **the RSA with the SGNs?**

4     **A**    **On June 7th, 2016.**

5     **Q**    **And that was before the last injunction**

6 **was entered, right?**

7     **A**    **Correct.**

8     **Q**    **And when did that RSA become effective?**

9     **A**    **On June 21st, 2016.**

10     **Q**    **And that was after the injunction was**

11 **entered, right?**

12     **A**    **Correct.**

13     **Q**    **All right.  If you turn in your binder**

14 **to Plaintiff's Exhibit 1.**

15     **Are you there?**

16     **A**    **Yeah.**

17     **Q**    **What is Plaintiff's Exhibit 1?**

18     **A**    **It's the SGN RSA.**

19     **Q**    **And what role, if any, did you have in**

20 **negotiating the SGN RSA?**

21     **A**    **Along with a number of other**

22 **professionals and principals, I negotiated the SGN**

23 **RSA.**

24     **Q**    **And is Plaintiff's Exhibit 1 a true and**

25 **accurate copy of the RSA that was negotiated from**

1  those efforts?

2      A    Yes, it appears to be so.

3          MR. ZEIGER:  Your Honor, the debtors

4  would move Plaintiff's Exhibit 1 into evidence.

5          THE COURT:  Any objection?

6          MR. BENNETT:  No objection.

7          THE COURT:  Plaintiff's 1 is admitted.

8          MR. ZEIGER:  Thank you, Your Honor.

9  BY MR. ZEIGER:

10     Q    If we go back to Plaintiff's

11 Demonstrative Exhibit 1, what is the estimated

12 recovery for the subsidiary guaranty notes under

13 the RSA that we just looked at in Plaintiff's

14 Exhibit 1?

15     A    Approximately 84 cents on the dollar.

16     Q    And what is the total amount of

17 subsidiary guaranteed notes that are supporting

18 the restructuring under that RSA?

19     A    $351 million.

20     Q    And for completeness, what is the total

21 class claim of the subsidiary guaranty

22 noteholders?

23     A    $502 million.

24     Q    And if you want to figure out the

25 percentage of subsidiary guaranteed noteholders

1  **who are supporting the debtors' restructuring, you**

2  **take the 351 as compared to the 502?**

3      **A    Yes.**

4          THE COURT:  83 fifths?

5          MR. ZEIGER:  That's -- yes.

6          THE COURT:  What do you think?

7          MR. ZEIGER:  I think that's about

8  right.

9          THE COURT:  Okay.

10         MR. ZEIGER:  I was an English major, so

11 I hesitate to venture out --

12         THE COURT:  Me, too.

13         MR. ZEIGER:  -- too far --

14         THE COURT:  Isn't it difficult?

15         MR. ZEIGER:  It is difficult.  I would

16 go about 60, 60-some percent, I think.

17         THE COURT:  I didn't venture a

18 percentage.

19         MR. ZEIGER:  I worry what the next rows

20 will show, Your Honor.  We better not keep this

21 going.

22 BY MR. ZEIGER:

23     **Q    All right.  The next column refers to**

24 **the UCC.  Do you see that, the next row?**

25     **A    Yes.**

1   **Q**   And what is the current status of the

2   debtors' negotiations with the unsecured creditors

3   committee?

4   **A**   We have an effective RSA.

5   **Q**   And when did the debtors achieve that

6   RSA that has now become effective?

7   **A**   On June 22nd.

8   **Q**   And it became effective the same day?

9   **A**   Correct.

10  **Q**   All right.  If you turn your binder,

11  sir, to Plaintiff's Exhibit 5.  Let me know when

12  you're there.

13  **A**   Got it.

14  **Q**   And what is Plaintiff's Exhibit 5?

15  **A**   The UIC -- sorry -- the UCC RSA.

16  **Q**   And what role, if any, did you have in

17  negotiating the UCC RSA?

18  **A**   I negotiated the UCC RSA along with

19  another -- a bunch of other parties.

20  **Q**   And is Plaintiff's Exhibit 5 a true and

21  accurate copy of the UCC RSA, to the best of your

22  knowledge?

23  **A**   Yes.

24  MR. ZEIGER:  Your Honor, the debtors

25  move Plaintiff's Exhibit 5 into evidence.

1       THE COURT:  Any objection?

2       MR. BENNETT:  No objection.

3       THE COURT:  Plaintiff's 5 is admitted.

4       MR. ZEIGER:  Thank you, Your Honor.

5   BY MR. ZEIGER:

6       **Q      Now if we go back to Plaintiff's**

7   **Demonstrative Exhibit 1, the row refers to UCC**

8   **excluding unsecured notes.**

9       **Do you see that?**

10      **A      Yes, I do.**

11      **Q      And why does that row exclude the**

12  **unsecured notes?**

13      **A      There are certain unsecured noteholders**

14  **who have different views as to their -- their**

15  **recoveries, their rights, particularly as it**

16  **relates to guaranties that have not signed on to**

17  **the RSA.**

18      **Q      So what types of creditors are**

19  **reflected under the UCC row?**

20      **A      Really general unsecured creditors.**

21      **Q      Such as trade creditors, for example?**

22      **A      Correct.**

23      **Q      And what is the estimated recovery for**

24  **those general unsecured creditors or trade**

25  **creditors under the UCC RSA?**

1      A     Approximately 46 cents on the dollar.

2      Q     And you'll see there's an up to

3 159,000,000, 46 percent.  Why did you include the

4 words "up to" on that chart?

5      A     Because it depended upon ultimately

6 what the claims are.

7      Q     Again, there's an amount of claims

8 supporting the restructuring of $350 million.

9 What does that reflect?

10     A     That reflects general unsecured

11 creditors.

12     Q     And how did you come up with the 350 as

13 compared to the total class claim amount here?

14     A     This is the total -- the total general

15 unsecured creditor claims.

16     Q     And why did you include the total for

17 the unsecured creditors as compared to how you've

18 done the other ones?

19     A     Because the claims are TBD based on a

20 claims objection, et cetera.

21     Q     At this point, has the Official

22 Committee of Unsecured Creditors agreed to support

23 the restructuring?

24     A     Yes, they have.

25             THE COURT:  You said TBD, meaning to be

1  determined?

2           THE WITNESS:  Correct.

3  BY MR. ZEIGER:

4      Q     All right.  If we go to the next row,

5  there's a reference to Danner.  Who is Danner?

6      A     Danner is an unsecured noteholder.

7      Q     And who does Mr. Danner purport to

8  represent?

9      A     Approximately $110 million face amount

10  of unsecured notes.

11      Q     And Mr. Danner is the one who filed the

12  class-action suit in the Southern District of New

13  York on behalf of those noteholders?

14      A     That's correct.

15      Q     And what is the status of the debtors'

16  negotiations with Mr. Danner?

17      A     We have an effective RSA.

18      Q     And when did the debtors achieve that

19  effective RSA?

20      A     On August 15th.

21      Q     And that was after the June 15th

22  injunction?

23      A     Correct.

24      Q     All right.  Sir, if you turn in your

25  Volume 1 of exhibits to Plaintiff's Exhibit 8,

1    **what is Plaintiff's Exhibit 8?**

2         **A     This is the Danner RSA.**

3         **Q     And is Plaintiff's Exhibit 8 a true and**

4    **accurate copy of the Danner RSA, to the best of**

5    **your knowledge?**

6         **A     Yes, it appears to be.**

7              MR. ZEIGER:  Your Honor, the debtors

8    would move Plaintiff's Exhibit 8 into evidence.

9              THE COURT:  Any objection?

10             MR. BENNETT:  No objection.

11             THE COURT:  Plaintiff's 8 is admitted.

12   Let me ask you about that claim.  That's a

13   class-action.  Has the class been certified?

14             THE WITNESS:  I'm not sure.

15             THE COURT:  How many notes does Mr.

16   Danner himself own?

17             THE WITNESS:  Less than 20,000, I

18   believe.

19             THE COURT:  $20,000?

20             THE WITNESS:  Correct.

21             THE COURT:  So this settlement, does it

22   assume certification?

23             THE WITNESS:  It -- it -- I don't

24   believe it assumes certification.  It implies

25   certification.

1         THE COURT: I suppose these are legal

2 questions, but I just wonder how he can settle on

3 behalf of an uncertified class, whether that

4 settlement would have to be approved by the

5 District Court. Perhaps the class is certified

6 for purposes of settlement. I haven't done that

7 kind of work in a long time. But you can't answer

8 those questions, can you?

9         THE WITNESS: I can't.

10         THE COURT: Go ahead, Mr. Zeiger.

11         MR. ZEIGER: Your Honor, I may be able

12 to clear that up a little bit on the financial

13 side.

14         THE COURT: Okay.

15         MR. ZEIGER: There may be a way to

16 address that.

17 BY MR. ZEIGER:

18     **Q**   **If you turn, sir, in your binder then**

19 **back one exhibit to Plaintiff's Exhibit 7, what is**

20 **Plaintiff's Exhibit 7?**

21     **A**   **This appears to be the 2L RSA.**

22     **Q**   **Do you have Plaintiff's Exhibit 7 in**

23 **front of you?**

24     **You should still be on the Mr.**

25 **Danner-related document, unless my binder is**

1  wrong.

2      A    I'm sorry.  I was one off.

3           THE COURT:  My Exhibit 7 is a letter --

4           THE WITNESS:  I have it.  My apologies.

5  BY MR. ZEIGER:

6      Q    No problem.  Okay.  Do you have

7  Plaintiff's Exhibit 7 in front of you?

8      A    Yes.

9      Q    And what is Plaintiff's Exhibit 7?

10     A    This is a letter from CAC regarding

11 CAC's support of the Danner settlement.

12     Q    And is this a true and accurate copy of

13 that letter, to the best of your knowledge?

14     A    Yes, it is.

15          MR. ZEIGER:  Your Honor, the debtors

16 move Plaintiff's Exhibit 7 into evidence.

17          THE COURT:  Any objection?

18          MR. BENNETT:  No objection.

19          THE COURT:  Plaintiff's 7 is admitted.

20 Just give me a second.

21          MR. ZEIGER:  Certainly.  And we'll stay

22 with this for a minute.

23          THE COURT:  Oh, you had further

24 questions on this exhibit?

25          MR. ZEIGER:  I was going to ask Mr.

1 Hayes about Plaintiff's Exhibit 7 to see if we

2 could address the question Your Honor had.

3         THE COURT:  Go ahead.

4         MR. ZEIGER:  Okay.

5 BY MR. ZEIGER:

6     **Q    What is your understanding, if any, as**

7 **to the purpose of this letter agreement between**

8 **CAC on the one hand and Mr. Danner's counsel on**

9 **the other?**

10     **A    It's -- it reflects CAC's agreement**

11 **that they will vote the bonds, the unsecured notes**

12 **that they own in favor of the plan that would**

13 **reflect the settlement.**

14     **Q    And do you know approximately how many**

15 **of these bonds CAC owns?**

16     **A    I believe it's around 270 million.**

17     **Q    And what's the approximate percentage**

18 **of the class that CAC owns?**

19     **A    I want to say it's about half.**

20     **Q    And do you have an understanding as to**

21 **why that agreement for CAC to vote about half of**

22 **the bonds in that class was part of the settlement**

23 **that Mr. Danner's counsel negotiated with the**

24 **debtors and others?**

25     **A    Yeah, so that the bonds voting in favor**

1  would carry the class in light of the fact that

2  CAC is the most significant holder.

3      Q     And to the extent the bonds carry the

4  class with CAC's support, what are the additional

5  recoveries that are made available to all of the

6  noteholders in that class?

7      A     Recoveries would go up to roughly 52

8  cents from 46 cents under the current plan.

9      Q     We need to keep the volume up.

10         THE COURT:  Please.

11 BY MR. ZEIGER:

12     Q     Slow down and keep the volume up.

13     A     Yeah.

14     Q     Can you pull that any closer to you?

15     A     Sure.

16     Q     Okay.  Let's go back and ask that

17 again.  To the extent that the class carries based

18 on CAC's support, what additional consideration,

19 if any, would Mr. Danner -- would the class that

20 Mr. Danner purports to represent receive?

21     A     It would be approximately an additional

22 six points to 52 cents on the dollar, 46 under the

23 current plan.

24     Q     And under the Danner settlement, if --

25 even with that support from CAC voting all of its

1   bonds, if that's not enough to carry the class,

2   what additional consideration, if any, does Mr.

3   Danner's class receive under the RSA?

4       A    It would be approximately eight points

5   of additional recovery.

6       Q    Eight points of additional recovery?

7       A    Correct.

8           MR. ZEIGER:  Your Honor, I was going to

9   go back to PX-1 unless you had additional

10  questions on --

11          THE COURT:  No.  No --

12          MR. ZEIGER:  -- PX-7 --

13          THE COURT:  -- I don't.

14          MR. ZEIGER:  -- for Mr. Hayes.  Okay.

15          THE COURT:  Please proceed.

16          MR. ZEIGER:  Very well.

17  BY MR. ZEIGER:

18      Q    If you could go back to Plaintiff's

19  Demonstrative Exhibit No. 1, Mr. Hayes.  We've got

20  the estimated midpoint recovery under the RSA

21  there for Mr. Danner of up to 52 percent.  Do you

22  see that?

23      A    Yes.

24      Q    And how does that relate to the numbers

25  that you just testified about?

1    **A**    It's the same numbers that I just

2    testified to.    Recoveries would be up to 52 cents

3    on the dollar for that class.

4    **Q**    And that recovery assumes that the CAC

5    bonds that vote to now support the plan are

6    sufficient with the other noteholders to carry the

7    class?

8    **A**    Correct.

9    **Q**    The amount of claims supporting the

10   restructuring is very small.    Why is it so small?

11   **A**    That's because Mr. Danner owns a very

12   small amount of bonds.

13   **Q**    You've only included Mr. Danner's bonds

14   in that column?

15   **A**    That's correct.

16   **Q**    And then if we look at the increases in

17   recovery since June 15, 2016, explain to the court

18   how you came up with the up to $16 million.

19   **A**    That's the additional recoveries as a

20   result of recoveries going from 46 cents to 52

21   cents.

22   **Q**    46 cents under the current proposed

23   plan?

24   **A**    Correct.

25   **Q**    And as a result of the RSA, they're now

1  up to 52 cents?

2      A     Correct.

3      Q     All right.  The next line refers to the

4  second lien notes.  Do you see that?

5      A     Yes.

6      Q     And when did the debtors reach an RSA

7  with certain second lien noteholders?

8      A     On July 31st.

9      Q     If you could turn in your binder, sir,

10  to Plaintiff's Exhibit 6.  Let me know when you're

11  there.

12      A     Got it.

13      Q     What is Plaintiff's Exhibit 6?

14      A     This is the second lien notes RSA.

15      Q     And what role, if any, did you have in

16  negotiating the second lien notes RSA?

17      A     I participated in negotiations along

18  with another -- a bunch of other professionals and

19  principals.

20      Q     And is Plaintiff's Exhibit 6 a true and

21  accurate copy of the second lien RSA?

22      A     Yes, it appears to be.

23          MR. ZEIGER:  Your Honor, the debtors

24  move Plaintiff's Exhibit 6 into evidence.

25          THE COURT:  Any objection?

1    MR. BENNETT:  No objection.

2    THE COURT:  Plaintiff's 6 is admitted.

3    MR. ZEIGER:  Thank you, Your Honor.

4 BY MR. ZEIGER:

5    **Q    Mr. Hayes, what total percentage of the**

6 **second lien noteholders have signed the second**

7 **lien RSA?**

8    **A    Approximately 27 percent.**

9    **Q    And are there additional noteholders**

10 **who support the second lien RSA but haven't, in**

11 **fact, signed it?**

12    **A    Yes.  There's approximately another 10**

13 **percent which represents parties who have signed**

14 **other RSAs who also hold second lien notes.**

15    **Q    And can you explain to the court why,**

16 **if you've signed another RSA, that would indicate**

17 **support for the second lien RSA.**

18    **A    Those parties who have signed other**

19 **RSAs are generally supportive of the plan.  This**

20 **would increase recoveries under the plan with**

21 **contributions from CEC, potentially others.  And**

22 **for that reason, we expect that they would support**

23 **the second lien RSA.**

24    THE COURT:  Well, wait a minute.  I

25 mean, wouldn't it be possible to own a first lien

1  note and be only too happy with how that

2  investment is treated and think -- and still feel

3  that your second lien note that you had in drawer,

4  was not being treated adequately?

5          I mean, you're making an assumption,

6  aren't you?

7          THE WITNESS:  I think it's possible,

8  though, based on all of the negotiations that I've

9  had in the case, very unlikely.

10         THE COURT:  But this is an assumption

11  that you're making, that if you're happy with the

12  treatment of one tier that you happen to hold,

13  then you're going to be happy with another.

14         THE WITNESS:  Yes and no.  There are --

15  there are obligations under the first lien RSAs

16  and other RSAs for the parties to support the

17  plan.  And I believe that the language has

18  something to the effect of so long as the

19  modifications to the plan, to the extent there are

20  any, are not materially adverse to the parties.

21         THE COURT:  Wouldn't that bind those

22  parties only in their capacity as holders of

23  particular notes?

24         THE WITNESS:  I believe that there are

25  broader obligations that support the plan.

1    THE COURT:  Go ahead, Mr. Zeiger.

2    MR. ZEIGER:  Thank you, Your Honor.

3 BY MR. ZEIGER:

4    **Q     So if you add together the signatories**

5 **as well as those who are supporting the plan**

6 **through other RSAs, what's the total percentage of**

7 **second lien notes that support the economic deal**

8 **set forth in the second lien RSA?**

9    **A     Approximately 37 percent.**

10    **Q     Now, under the second lien RSA, what is**

11 **the approximate baseline recovery for second lien**

12 **noteholders?**

13    **A     Approximately 55 cents on the dollar.**

14    **Q     Let's break that down to its component**

15 **parts.  To achieve the 55-cent recovery, what do**

16 **you need to do?**

17    **A     There needs to be additional**

18 **contribution under the plan, and that would be**

19 **approximately 900,950 million.**

20    **Q     Let's focus for a moment on the**

21 **recoveries themselves.**

22    **Is there a baseline component to the**

23 **recovery and then additional fees?**

24    **A     Yes, there's --**

25    **Q     Could you explain to the court how that**

1 structure works.

2      A     Sure.   There's a 46-cent baseline

3 recovery, which matches up to the other unsecured

4 creditors in the case.   Then there's an additional

5 four-point fee upon achieving a majority of the

6 notes in support of the RSA.

7           And there's another five-point fee to

8 the extent that the current plan is confirmed as

9 amended to reflect this RSA, and also in the event

10 that there's complete consensus.

11      Q     Now, how do those recoveries, the

12 baseline recovery of 46 cents and the enhanced

13 recovery of 55 cents on the dollar, compare to the

14 recoveries available under the debtors' current

15 plan?

16      A     46 cents is essentially 7 cents higher,

17 and 55 is 16 cents higher.

18      Q     Now, which second lien noteholders can

19 obtain that 55-cent recovery under the second lien

20 RSA?

21      A     Any second lien noteholder who signs

22 the RSA.

23      Q     And is there any limitation on who can

24 sign the second lien RSA, from the debtors'

25 perspective?

1        **A**    **No.**

2        **Q**    **Now, if we go back to your PDX-1,**

3 **there's an estimated midpoint recovery under the**

4 **RSA of up to 3 -- $3 billion, 55 percent.  Do you**

5 **see that?**

6        **A**    **Yes.**

7        **Q**    **And what does that reflect?**

8        **A**    **That reflects 55 cents on the total**

9 **claim of 5.5 billion as of the petition date.**

10       **Q**    **And then if you go over to the next**

11 **column, the amount of second claim -- the amount**

12 **of second lien claims currently supporting the**

13 **restructuring is just over $2 billion, right?**

14       **A**    **Correct.**

15       **Q**    **And what does that reflect?**

16       **A**    **That reflects the signatories to the**

17 **second lien RSA.**

18       **Q**    **And if you move then to the next**

19 **column, there is an increase in recovery since**

20 **June 15, 2016, right?**

21       **A**    **Correct.**

22       **Q**    **And what is that amount?**

23       **A**    **It's $887 million of additional**

24 **recoveries to the class, available to the class,**

25 **which is about a 41 percent recovery.**

1    Q    A 41 percent recovery or increase in

2  recovery?

3    A    A 41 percent increase in recovery.

4  Sorry.

5    Q    And that's been achieved since June 15,

6  2016?

7    A    Correct.

8    Q    And just to close out the chart, what's

9  the total class claim for the second lien

10  noteholders?

11    A    $5.5 billion.

12    Q    And now is the second lien RSA

13  effective at this point?

14    A    It is not.

15    Q    Okay.  What needs to occur before the

16  second lien RSA becomes effective?

17    A    A majority of the second lien notes

18  need to sign on to the second lien RSA.

19    Q    And is there anything else that needs

20  to occur before the second lien RSA becomes

21  effective?

22    A    No.

23    Q    All right.  Are you familiar, sir, with

24  the second lien cooperation agreement?

25    A    I am.

1    **Q    And what is the second lien cooperation**

2    **agreement?**

3    **A    It's an agreement between the 2L**

4    **committee and certain other second lien**

5    **noteholders to both not sign the second lien RSA**

6    **and also vote against the debtors' current plan.**

7    **Q    And to the best of your knowledge,**

8    **what's the approximate amount of second lien**

9    **holders who have signed on to that second lien**

10   **cooperation agreement?**

11   **A    The mid-50 percent range.**

12   **Q    So what impact, if any, does the second**

13   **lien cooperation agreement have on the ability of**

14   **the second lien RSA to go effective?**

15   **A    It makes it impossible.**

16   **Q    Is the second lien RSA currently**

17   **funded?**

18   **A    It is not.**

19   **Q    And what steps, if any, are the debtors**

20   **taking to fund those additional recoveries?**

21   **A    We are working with CEC, the sponsors,**

22   **and potentially certain insurance companies to**

23   **fully fund the plan.**

24   **Q    And given that the second lien RSA is**

25   **not effective and not funded, do you believe it's**

1  still progress?

2      **A    I do.**

3      **Q    Why?**

4      **A    Because I believe, number one, the**

5  **recoveries are substantially higher than they were**

6  **two months ago.**

7          **Number two, I do believe that it will**

8  **be fully funded, both from CEC and certain other**

9  **parties.**

10          THE COURT:  Which other parties?

11          THE WITNESS:  I think ultimately the

12  sponsors and also potentially insurance companies

13  that provide D&O insurance to certain CEC officers

14  and directors.

15          THE COURT:  Go ahead, Mr. Zeiger.

16          MR. ZEIGER:  Thank you, Your Honor.

17  BY MR. ZEIGER:

18      **Q    To the extent you know, Mr. Hayes, are**

19  **all of those parties currently participating in**

20  **the mediation?**

21      **A    Yes.**

22      **Q    All right.  If we go back to**

23  **Plaintiff's Demonstrative Exhibit 1, the last row**

24  **-- the next-to-the-last row refers to CEC, CAC.**

25  **Do you see that?**

1    **A    Yes, I do.**

2    **Q    And what progress, if any, have the**

3   **debtors made with CEC and CAC since the June 15th**

4   **injunction?**

5    **A    We have effective RSAs.**

6    **Q    With both CEC and CAC?**

7    **A    Yes, we do.**

8    **Q    And was that true at the time of the**

9   **last injunction hearing?**

10    **A    No, it was not.**

11    **Q    If you turn, sir, in your binder to**

12   **PX-2 -- and let me know when you're there.**

13    **A    Got it.**

14    **Q    What is PX-2?**

15    **A    PX-2 is the RSA with CEC.**

16    **Q    And what role, if any, did you have in**

17   **negotiating that RSA?**

18    **A    I, along with other professionals and**

19   **principals, helped negotiate this RSA.**

20    **Q    And is Plaintiff's Exhibit 2 a true and**

21   **accurate copy of the CEC RSA?**

22    **A    Yes, it appears to be.**

23        MR. ZEIGER:  Your Honor, the debtors

24   move Plaintiff's Exhibit 2 into evidence.

25        THE COURT:  Any objection?

1        MR. BENNETT:  No objection.

2        THE COURT:  Plaintiff's 2 is admitted.

3        MR. ZEIGER:  Thank you, Your Honor.

4   BY MR. ZEIGER:

5        **Q    Sir, if you turn in your binder to the**

6   **next document, Plaintiff's Exhibit 3.  Let me know**

7   **when you're there.**

8        **A    Got it.**

9        **Q    What is Plaintiff's Exhibit 3?**

10       **A    This is the CAC RSA.**

11       **Q    And what role, if any, did you have in**

12  **negotiating the CAC RSA?**

13       **A    I, along with other professionals and**

14  **principals, helped negotiate the CAC RSA.**

15       **Q    And is Plaintiff's Exhibit 3 a true and**

16  **accurate copy of that RSA, to the best of your**

17  **knowledge?**

18       **A    Yes.**

19       MR. ZEIGER:  Your Honor, the debtors

20  move Plaintiff's Exhibit 3 into evidence.

21       THE COURT:  Any objection?

22       MR. BENNETT:  No objection.

23       THE COURT:  Plaintiff's 3 is admitted.

24       MR. ZEIGER:  Thank you, Your Honor.

25  BY MR. ZEIGER:

1    **Q**    Mr. Hayes, why is it important from the

2    debtors' perspective to have RSAs with CEC and

3    CAC?

4    **A**    Because it evidences their support for

5    our plan, it evidences their support to merge, to

6    create new CEC and make all the contributions that

7    are necessary to confirm the plan.

8    **Q**    And since June 15th, what progress, if

9    any, has been made with respect to the merger of

10   CEC and CAC?

11   **A**    There's now an executed merger

12   agreement.

13   **Q**    And do you recall approximately when

14   that was achieved?

15   **A**    I believe it was mid-July.

16   **Q**    Why is the merger of CEC and CAC

17   important?

18   **A**    Because it creates new CEC.  Without

19   that creation, we would not be able to get all the

20   contributions that are required under the plan.

21   CEC by itself would not be able to make all the

22   contributions.

23   **Q**    Without the merger of CAC and CEC,

24   could the debtors fund the plan?

25   **A**    No.

1      Q    All right.  Now, the last row on

2 Plaintiff's Demonstrative Exhibit 1 refers to

3 total.  Do you see that?

4      A    Yes.

5      Q    Okay.  Assuming all of the second lien

6 noteholders sign on to the second lien RSA and it

7 becomes effective, what is the total approximate

8 recovery for creditors based on the debtors'

9 current plan?

10      A    17.2 billion.

11      Q    And how does that amount of 17.2

12 billion compare to the total claims as of the

13 petition date that the creditors have against the

14 debtors' estates?

15      A    The total amount of claims in the last

16 column, and that's 18.5 billion.  A very high

17 percentage.

18      Q    And I can't do the same math we did

19 with Your Honor earlier, but do you have -- do you

20 have an approximate --

21           MR. ZEIGER:  Mr. Hayes was a math

22 major, if I recall correctly, so we'll put him on

23 the spot.

24 BY MR. ZEIGER:

25      Q    Do you recall approximately how much --

1  what percentage of the total claim amount is being

2  recovered under the debtors' plan?

3      A     It's roughly 92 percent.

4      Q     Now, based on the current plan and the

5  RSAs in effect, how much of the debtors' $18

6  billion capital structure supports the debtors'

7  restructuring?

8      A     13.7 billion.

9      Q     And do you see that in the -- that's

10  the sum total of the amount of claims supporting

11  the restructuring?

12      A     Correct.

13      Q     And assuming all second lien notes sign

14  on to the RSA, the second lien RSA, and it becomes

15  effective, how much have recoveries increased

16  since this court entered the injunction on June

17  15th?

18      A     Almost a billion dollars.

19          THE COURT:  What would be the increase

20  if the second lien RSA did not become effective?

21          THE WITNESS:  It would be approximately

22  $75 million.

23  BY MR. ZEIGER:

24      Q     Now, even if the second lien RSA

25  doesn't become effective, do you believe the fact

1  **that that 55 cent offer is out there represents**

2  **progress?**

3      **A    I do.**

4      **Q    Why?**

5      **A    I believe that it gets us very close to**

6  **an agreed deal with the 2L committee.  I believe**

7  **that we're a few points apart based on my**

8  **participation in the negotiations.**

9          THE COURT:  What makes you think so?  I

10  mean, here we are.

11          (Laughter.)

12          THE COURT:  And if we were close, we

13  wouldn't be here.  You would all be in some room

14  talking, and I would be back in the back working

15  on something else.

16          So why do you think so?

17          THE WITNESS:  For one, in terms of the

18  amount of the delta between the debtors, CEC, and

19  the 2L committee, that amount is very low.  I

20  measured it in a few points of recovery.

21          Number two, this is a very big and

22  complicated case, as you know, and it takes time

23  to work through.  So even if we were to lock

24  ourselves in a room, which we have done for many

25  days over the course of the summer with the

1    parties, it takes time to work through key issues.

2            There's one issue in particular that's

3    occurred over the summer, which is a positive

4    development in the case.  That's the sale of the

5    -- most of the assets of Caesars Interactive.

6    It's approximately 3-plus-billion dollars of -- of

7    net proceeds to CGP, which is one of the CAC and

8    CEC subsidiaries.

9            That will -- that's helpful from a

10   valuation standpoint.  We're essentially agreed

11   from a valuation standpoint with the 2L committee

12   as well as with CEC.  And our expectation is, with

13   the proceeds coming in from CIE, that will allow

14   us to make significant additional progress.

15           But it's a major change to what new CEC

16   will look like post-effective date.  And because

17   of that major change, it will take -- it has taken

18   and will continue to take time to work through the

19   modifications to the plan.

20           THE COURT:  That wasn't what Mr.

21   Seligman told me in court.

22           But in any event -- so if you are

23   suggesting that something is close, then

24   presumably you have a number that you know would

25   satisfy the second lien noteholders who are

1  currently not signatories to the RSA.

2          THE WITNESS:  I do.

3          THE COURT:  Go ahead, Mr. Zeiger.

4          MR. ZEIGER:  It makes it all very

5  tricky, Your Honor, in litigating the ongoing

6  mediation at this moment.

7          THE COURT:  Oh, I don't know.  They

8  have a demand, and the question is whether you're

9  going to meet it or whether something else will

10  happen.  But, in any event, that's not today's

11  issue.

12          MR. ZEIGER:  Very well, Your Honor.

13  BY MR. ZEIGER:

14      **Q    Okay.  Mr. Hayes, we just walked**

15  **through Plaintiff's Demonstrative Exhibit 1, and I**

16  **want to follow up through kind of the course of**

17  **the remaining exam on some of the issues the court**

18  **just asked you about and you raised in your**

19  **answer.**

20          **But just to stay -- I just want to**

21  **close out this chart quickly.**

22          **What creditor groups -- let me start**

23  **that again.**

24          **We just worked through the chart**

25  **showing all the creditor groups that support the**

1    plan, right?

2        A    Yes.

3        Q    And what creditor groups are the

4    debtors still negotiating with to try to reach

5    full consensus and add them to the next version of

6    PDX-1?

7        A    The first lien notes, though I

8    indicated we're very close to agreement with the

9    first lien notes.  We're essentially agreed on all

10   the economic provisions and the RSA with the first

11   lien notes.

12           The next would be the second lien

13   noteholder committee and those with whom they've

14   signed a cooperation agreement.  And, lastly,

15   certain unsecured noteholders who have not signed

16   on to the Danner RSA.

17       Q    And to follow up on a point you made to

18   the court, how has the CIE sale or the sale of the

19   significant assets of CIE impacted your

20   negotiations with the first lien noteholders?

21       A    It has complicated them because it

22   changes, as I said, the constitution of new CEC.

23           Our valuation of new CEC that's in the

24   current disclosure statement is approximately a $6

25   billion equity value, $7 billion if you include

1    the convertible notes on an as-converted basis.

2    So $6 billion.

3              And the value -- and that value of CIE

4    from the sale is approximately $3 billion.  So

5    essentially half of the equity value of new CEC

6    upon the sale of the CIE assets will be sold, and

7    those proceeds will be used in a manner to be

8    determined.  It's currently being negotiated

9    between the parties, including the first lien

10   notes.

11        Q    Just to put a fine point on it, the

12   current plan was assuming that new CEC would

13   include about $6 billion worth of assets; is that

14   right?

15        A    Correct.

16        Q    And --

17        A    Equity value.

18        Q    Equity value.

19        A    Yes.

20        Q    And assuming the sale of the social,

21   mobile gaming business of CIE goes forward, how

22   much of that original 6 billion would be sold?

23        A    Approximately half.

24        Q    And that's what, in part, raises the

25   issues that you were talking about, some of these

1 challenges with the first lien noteholders?

2 A    Correct.  The first lien noteholders,
3 because they will own PropCo, are the
4 beneficiaries of a guaranty from new CEC.  So the
5 use of proceeds from the CIE sale is a key focus
6 of theirs to ensure that new CEC has the right
7 credit profile.

8 Q    And if you can break that down a little
9 bit and explain to the court what the relationship
10 is between the guaranty that we heard so much
11 about when Mr. Millstein was here in June, and
12 then the sale of CIE, what's the relationship
13 between the two of those?

14 A    Well, put simply, if new CEC took $6
15 billion of equity value, sold 3 billion and
16 distributed it to creditors, shareholders, et
17 cetera, most likely the creditors given this case,
18 then the equity value in new CEC would be
19 approximately half of what was originally
20 expected, which would reduce the credit quality of
21 new CEC and reduce the value of the guaranty.

22         It's that reason -- for that reason
23 that the first lien noteholders want to make sure
24 that the use of those CIE proceeds are acceptable
25 to them.

1    **Q    And what are some of those uses that**
2    **are being discussed for those proceeds?**
3    **A    Potential uses related to this plan,**
4    **funding payments under this plan, reductions in**
5    **debt at CEC's subsidiaries, including CEOC OpCo on**
6    **the effective date, as well as certain payments to**
7    **creditors that would otherwise -- creditors of**
8    **CEOC that would otherwise receive shares in new**
9    **CEC.**
10    **Q    So assuming the CIE sale goes forward,**
11    **some creditors who previously would have received**
12    **things like securities or debt may be receiving**
13    **cash?**
14    **A    Correct.**
15    **Q    And how has that been received by the**
16    **creditor?**
17    **A    It's been received very well, and it**
18    **has helped us bridge the gap on valuation.**
19    **Q    And you've mentioned that a couple**
20    **times.  Let's just hit it now.**
21    **When we were last here before the judge**
22    **in June, there was discussion with Mr. Millstein**
23    **and Mr. Hilty as to the value of new CEC.  Were**
24    **you here for that discussion?**
25    **A    I was.**

1    Q    And do you recall approximately what
2    the gap was between the second lien noteholders
3    committee's view and the debtors' view of
4    valuation?
5    A    It was between 500 and a billion
6    dollars of differential.
7    Q    And what is that differential today?
8    A    I believe it's zero.
9    Q    And why have we been able to close that
10   gap on valuation issues with the second lien
11   committee and the debtors' view?
12   A    It's principally the CIE transaction as
13   well as the strong performance of the debtors.
14   Q    And can you explain to the court how
15   the CIE transaction impacted the parties'
16   valuations.
17   A    It impacted our valuation in that our
18   valuation specifically is the assets of CIE was
19   approximately $300 million lower than our
20   expectation of the net proceeds from the sale.
21        So our valuation, all else being equal,
22   would have gone up by 300 million.  And, again, I
23   believe the 2L committee, though I'm not doing
24   their valuation, my understanding is that it's
25   gone up significantly as a result of the CIE

1   transaction.

2       Q    So we have a market indicator of what a

3   portion of the assets are worth that was higher --

4   slightly higher than what your view was and higher

5   than what the noteholder committee's view was?

6       A    Correct.

7       Q    Okay.  So let's move on from the

8   negotiations with the first lien notes and turn to

9   the noteholder committee, the official committee

10  representing the second lien notes.  Okay?

11          Do you know whether the defendants

12  here, WSFS and BOKF, are on the noteholder

13  committee?

14      A    Yes, they are.

15      Q    And in general, what is the current

16  status of negotiations with the noteholder

17  committee?

18      A    We continue to mediate.  I have

19  discussions almost daily with various parties in

20  the 2L group, including professionals.

21      Q    Since the June 15th injunction order

22  was entered, how many in-person mediation sessions

23  have there been between the debtors and the

24  noteholder committee, among other parties?

25      A    I believe around five.

1      Q     And how many of those sessions have you

2   attended on behalf of the debtors?

3      A     I believe all of them.

4      Q     And what other parties have

5   participated in those mediation sessions with

6   respect to the noteholder committee mediation?

7      A     With respect to the noteholder

8   committee mediation, at some sessions, Judge

9   Farnan, the mediator, has requested principals at

10  those sessions.  The principals have participated

11  both from the 2L committee, certain members of

12  CEC, as well as professionals representing all the

13  parties.

14     Q     Has anyone from Apollo participated in

15  those mediation sessions?

16     A     Yes.

17     Q     Who?

18     A     Marc Rowan, David Sambur, and I believe

19  Alex Van Hoek.

20     Q     And can you briefly remind the court

21  who those three individuals are.

22     A     Those three individuals are principals

23  of Apollo.  Marc Rowan and David Sambur are on the

24  board of CEC.

25     Q     And who is Mr. Van Hoek?

1       **A**    **Mr. Van Hoek works at Apollo with and**

2 **for David Sambur and Marc Rowan.**

3       **Q**    **Is Mr. Rowan one of the co-founders of**

4 **Apollo?**

5       **A**    **He is.**

6       **Q**    **Now, has anyone from the TPG, the other**

7 **sponsor, attended these mediation sessions?**

8       **A**    **Yes.**

9       **Q**    **Who is that?**

10      **A**    **Rick Schifter.**

11      **Q**    **And what is Mr. Schifter's role at TPG?**

12      **A**    **I believe he is a senior partner at**

13 **TPG.**

14      **Q**    **If you can keep your voice up --**

15      **A**    **Sure.**

16      **Q**    **-- a little more, it would be helpful.**

17 **And can you explain to the court the extent to**

18 **which the individuals from Apollo and TPG have**

19 **participated in the mediation sessions that you've**

20 **attended?**

21      **A**    **They've participated actively when the**

22 **principals have been requested to be in attendance**

23 **by the mediator.**

24      **Q**    **And can you give the court some**

25 **examples of the extent of their participation.**

1     **A    They've participated directly with the**

2  **principals of the 2L committee, presented**

3  **proposals, you know, received feedback, et cetera.**

4     **Q    In your view, have they been active in**

5  **the mediation?**

6     **A    Yes, they have.**

7     **Q    What's your view, Mr. Hayes, if any, as**

8  **to whether the parties that are participating in**

9  **this mediation have been participating in good**

10  **faith?**

11     **A    I believe all parties have been**

12  **participating in good faith.**

13     **Q    And that would include the second lien**

14  **noteholders?**

15     **A    Yes.**

16     **Q    And CEC?**

17     **A    Yes.**

18     **Q    And the sponsors?**

19     **A    Correct.**

20     **Q    And hopefully the debtors, too?**

21     **A    Yes, we have.**

22     **Q    I think you mentioned this earlier, but**

23  **in addition to these formal mediation sessions,**

24  **have the debtors' principals or advisors also had**

25  **discussions with the noteholder committee**

1   principals or advisors?

2        A   Yes, the debtors' principals have been

3   in attendance, not in all sessions; but when they

4   have been requested, they have been in attendance.

5        Q   And that's at the mediation?

6        A   Correct.

7        Q   Okay.  And who are the debtors'

8   principals, just to close that out?

9        A   Mr. Stauber, Mr. Winograd.

10       Q   And they are the two independent

11  directors on the governance committee of the CEOC

12  board?

13       A   Correct.

14       Q   And you've mentioned they've attended

15  when their presence has been requested.  Who is

16  makings those requests?

17       A   Judge Farnan, the mediator.

18       Q   And in some mediation sessions, he's

19  asked that only advisors be there, and some he's

20  asked principals to attend.

21       A   That's correct.

22       Q   Now, if we set aside the formal

23  mediation process that's ongoing, have you also

24  had conversations with either principals or

25  advisors on the noteholder committee?

1      **A    Yes, I have.**

2      **Q    And how often, approximately, do those**

3 **occur?**

4      **A    I would say almost on a daily basis.**

5      **Q    And, now, the other group that you**

6 **mentioned that's participating in the mediation is**

7 **the ad hoc group of unsecured notes, right?**

8      **A    Yes.**

9      **Q    And do you know whether defendants in**

10 **this action, Trilogy and Relative Value, are on**

11 **the ad hoc group of unsecured notes that's**

12 **participating in the mediation?**

13      **A    Yes, they are.**

14      **Q    And what is the approximate amount of**

15 **the unsecured notes that are represented by that**

16 **group?**

17      **A    I believe we're around 20 million.**

18      **Q    And what is the current status of**

19 **negotiations with respect to the ad hoc group and**

20 **their $20 million worth of holdings?**

21      **A    We're currently in mediation.**

22      **Q    Now, since June 15th, approximately how**

23 **many mediation sessions have you attended with the**

24 **ad hoc group of unsecured noteholders?**

25      **A    Two.**

1    **Q**    And are the debtors, at least in their

2    view, still mediating with the ad hoc group?

3    **A**    Yes.

4    **Q**    Now, we've talked already about the

5    other big factor in the mediation, which is the

6    sale of CIE, right?

7    **A**    Yes.

8    **Q**    And just to make sure that we're all on

9    the same page, can you describe to the court what

10   the asset is that's being sold from CEC?

11   **A**    Sure.  It's the social and mobile

12   gaming business of CIE, which is almost all of the

13   CIE business.  It excludes real money gaming.  And

14   it's being sold in a $4.4 billion gross dollar

15   value transaction.

16   **Q**    And what generally is social, mobile

17   gaming?

18   **A**    It's online gaming where people go on

19   to sites or apps on their phone and game, but not

20   using real money.

21   **Q**    And when was the sale of the social,

22   mobile gaming business of CIE announced?

23   **A**    I believe it was late July.

24   **Q**    And that was after the last injunction

25   was entered?

1          A    Yes, it was.

2          Q    And you mentioned earlier there are a

3    number of positive impacts related to issues, such

4    as the currency available for recoveries and

5    valuation issues as a result of this sale, right?

6          A    Yes.  That's right.

7          Q    What impact, if any, is the sale having

8    on the timing of the mediation and negotiation

9    that's currently ongoing with creditors?

10         A    Although it's a positive impact, it

11   does raise another change to the plan that, as I

12   mentioned, is a material change relative to the

13   constitution of new CEC, which really requires --

14   will require and has required negotiations with

15   all the creditor constituencies.

16         Q    Now, earlier we looked at the list of

17   supporting parties on Plaintiff's Demonstrative

18   Exhibit 1.  Do you recall that?

19         A    Yes.

20         Q    And which of those entities will you

21   need to go back and renegotiate with if the sale

22   goes forward?

23         A    Likely all of them.  I believe that we

24   will be able to -- because this is a positive

25   change to new CEC, the valuations and currency,

1    that we will be able to do so.

2        Q    Now, does that mean you're starting

3    from scratch with all of them?

4        A    No, it does not.

5        Q    So what are some of the types of issues

6    that you'll need to address with each one?

7        A    Just going down the list, the first

8    lien banks, they will be focused on the amount of

9    cash used to reduce the debt at CEOC OpCo because

10   they are the beneficiaries of the syndication of

11   that debt on the effective date.

12       Q    And what impact does the CIE sale have

13   on that syndication?

14       A    It should improve the ability to

15   syndicate that debt because it will reduce the

16   leverage at CEOC OpCo.

17       Q    And, in general, what is syndication of

18   debt and how does it tie into the plan?

19       A    The plan requires that approximately

20   $1.6 billion of debt at CEOC OpCo be raised in the

21   market with the proceeds going to the first lien

22   banks and first lien notes.

23       Q    And what impact would the sale of CIE

24   have on that process?

25       A    It would reduce the amount that needs

¹ to be raised in the market, reduce the leverage,

² and reduce the risk associated with getting that

³ done.

⁴     **Q**    **What are some of the other types of**

⁵ **issues you'll need to revisit with at least some**

⁶ **of the parties supporting the restructuring?**

⁷     **A**    **The first lien notes, as I mentioned,**

⁸ **the use of cash to repay debt versus to provide**

⁹ **cash to creditors that would otherwise receive new**

¹⁰ **CEC equity is a key issue as it relates to their**

¹¹ **guaranty through OpCo.**

¹²     **With respect to the other unsecured**

¹³ **creditors as well as the 2L notes, the amount of**

¹⁴ **cash that's being used to reduce the amount of new**

¹⁵ **CEC equity being provided to the creditors is the**

¹⁶ **principal concern.**

¹⁷     **Q**    **And have the --**

¹⁸     MR. ZEIGER:  Go ahead, Your Honor.

¹⁹     THE COURT:  No.

²⁰ BY MR. ZEIGER:

²¹     **Q**    **And have those discussions, in fact,**

²² **started?**

²³     **A**    **They have.**

²⁴     THE COURT:  So, in other words, because

²⁵ of the sale of CIE, you are going to have to

**SA104**

1  renegotiate every restructuring support agreement

2  you currently have, that's what you're saying, all

3  those agreements are going to be up in the air?

4      THE WITNESS:  I would say that I view

5  these as modifications that will -- that everyone

6  will be supportive of.  The reason for that, for

7  example, is the first lien banks, this improves

8  the likelihood of them getting all the cash that

9  they hoped they would get under the plan.  It

10  otherwise is essentially the same agreement with

11  them.

12  BY MR. ZEIGER:

13      **Q     Are there any creditors, to your**

14  **knowledge, who are disappointed by this sale of**

15  **CIE?**

16      **A     No.**

17      **Q     It's just a matter of how you implement**

18  **the windfall being created?**

19      **A     Correct.**

20      **Q     Okay.  Now, when was the last formal**

21  **mediation session?**

22      **A     I believe it was last week.**

23      **Q     And following that mediation session,**

24  **are you aware that Judge Farnan provided a**

25  **mediator statement to the court?**

1    **A    I am.**

2    **Q    If you turn, sir, in your binder to**

3    **PX-16.**

4    MR. BENNETT:  Well, before we publish

5    the document, we have a little work to do.

6    MR. ZEIGER:  I was just going to have

7    him identify it, and then we can talk about our

8    agreement --

9    MR. BENNETT:  Okay.

10    MR. ZEIGER:  -- as set forth.

11    MR. BENNETT:  Thank you.

12    MR. ZEIGER:  Your Honor, we're going to

13    try to short-circuit some of the arguments that

14    were made last time.  And we've tried to implement

15    the court's ruling on the last mediator statement

16    by agreement to avoid further argument and delay

17    in this proceeding, which is, I think, what Mr.

18    Bennett was referring to.

19    THE COURT:  It sounded like it.  Go

20    ahead.

21    MR. ZEIGER:  Okay.

22    BY MR. ZEIGER:

23    **Q    Mr. Hayes, can -- what is PX-16?**

24    **A    It's the mediator's statement.**

25    **Q    And is it a true and accurate copy of**

1 **the mediator's statement, to the best of your**

2 **knowledge?**

3     **A    Yes.**

4     MR. ZEIGER:  Your Honor, as I previewed

5 a moment ago, we've been in discussions with Mr.

6 Bennett and his colleagues regarding the

7 admissibility of the mediator statement.

8     As Your Honor may recall, the majority,

9 but not all of the last mediator's statement was

10 admitted under the residual exception under

11 Federal Rule of Evidence 807.  And so we started

12 that dialogue and have reached an agreement as to

13 the portion that should come into evidence based

14 on the court's prior ruling.

15     So hopefully we've made a little

16 progress in addition to the financial folks.

17     THE COURT:  So you have an agreement

18 that some of Exhibit 16 is admissible -- or will

19 be admitted --

20     MR. ZEIGER:  Will be admitted.

21     THE COURT:  -- whether it's admissible

22 is another matter.

23     MR. ZEIGER:  They will object to

24 certain portions of it, and we've agreed, based on

25 the court's prior ruling, that certain portions of

1  it should not be admitted, much like the court did

2  before.

3           THE COURT:  Okay.  And how will I find

4  out what I can look at?

5           MR. ZEIGER:  I'm proposed -- I would

6  propose to tell you.

7           Mr. Bennett can tell you, too, if

8  you're tired of hearing from me, Your Honor,

9  but --

10          THE COURT:  No.

11          MR. ZEIGER:  -- I'm happy to walk you

12  through it.

13          THE COURT:  I'm never tired of hearing

14  from you.

15          MR. VELOCCI:  Your Honor, if I may, we

16  haven't been privileged to these discussions about

17  what was objected to and what will be agreed to.

18          THE COURT:  You'd better identify

19  yourself for the record.

20          MR. VELOCCI:  I'm sorry.  I apologize.

21  It's Frank Velocci, Drinker, Biddle & Reath, on

22  behalf of Trilogy.  So this is the first time

23  we're hearing it.  We plan to object to the entire

24  document; but understanding what was ruled on

25  before, we're more than happy to review what's

1  been discussed and perhaps even agree to it.  We

2  just haven't been parties to the discussion.

3            THE COURT:  Do you want to take a break

4  and have a little chat?

5            MR. VELOCCI:  I think that's

6  appropriate.

7            MR. BENNETT:  Right.  I think it's a

8  good idea.  It's probably about the right time

9  anyway.  And I think --

10           THE COURT:  Okay.

11           MR. BENNETT:  -- what we should do is

12  prepare a version that's got blacked out the parts

13  that aren't accepted.

14           THE COURT:  All right.  So what do you

15  think, 15 minutes?

16           MR. BENNETT:  That should be fine.

17           THE CLERK:  All rise.  Court is on a

18  15-minute recess.

19           (Brief recess.)

20           THE CLERK:  Court is reconvened.

21  Please be seated and come to order.

22           MR. ZEIGER:  Good morning, Your Honor.

23  Jeffery Zeiger again, Kirkland & Ellis, on behalf

24  of the debtors.  Your Honor, we have an agreement

25  and a black-line copy for Your Honor --

1      THE COURT:  Okay.

2      MR. ZEIGER:  -- thanks to Nancy

3  Sharkey.  If I may approach.

4      THE COURT:  Sure.

5      MR. ZEIGER:  With respect to WSFS, we

6  have an objection with respect -- still with

7  respect to Trilogy.

8      MR. VELOCCI:  Your Honor, Frank

9  Velocci, Drinker, Biddle & Reath.

10     Your Honor, we did take time to try and

11 look at the proposed redactions and then perhaps

12 try and parse out additional language that would

13 make us comfortable with the document.

14 Unfortunately, we just -- we couldn't get there.

15 Obviously, our primary objection, Your Honor, is

16 that this is hearsay; but, more importantly, we

17 just simply can't, within the context of this

18 document, you know, agree to withdraw our

19 objection because we believe that Judge Farnan

20 doesn't -- doesn't accurately reflect certain of

21 the conversations that we've had with him.

22     I believe that some of his statements,

23 while probably directed primarily at the 2L

24 committee mediation sessions, doesn't specifically

25 state that.  I can give you a for instance.  The

1 last sentence of paragraph 1, Judge Farnan talks

2 about having numerous other in-person and

3 telephonic discussions with the principals and

4 advisors to these parties.

5        I can tell you definitively, and we

6 have a witness here to testify today, that there

7 were no other in-person or telephonic discussions

8 with our ad hoc group of creditors and Judge

9 Farnan.

10        In addition, he talks about material

11 progress, and he just says the mediation without

12 any specific details as to which sessions or which

13 parties.  So it's impossible for me to parse out

14 which ones -- and which statements he's referring

15 specifically to the 2L negotiations and

16 specifically with our negotiations.  And without

17 him available here for cross-examination, and for

18 us to flush that out, I just think it would be

19 highly prejudicial to allow any portion of it in

20 against our ad hoc committee.

21        MR. ZEIGER:  Your Honor, if I may

22 respond.

23        I believe these issues go to the weight

24 of the document.  It sounds like they have a

25 witness here who will clarify.  My understanding

1  is there's really one sentence at issue.  Mr.

2  Hayes also may be able to clarify that last

3  sentence.  And the issue here is that Judge Farnan

4  refers to "I have had numerous other in-person and

5  telephonic discussions with principals and

6  advisors for 'these parties.'"

7           And the question is there's a number of

8  parties, you know, set forth above, and it sounds

9  like Mr. Velocci's position is that that's not

10 true with respect to them.  Nobody else has that

11 issue with respect to that.

12          THE COURT:  These parties would refer

13 back to Caesars insurers or the senior unsecured

14 notes group or both.  I don't think the antecedent

15 could go farther back than that, right?

16          I don't know whether he's referring to

17 one or both of those groups.

18          MR. ZEIGER:  Your Honor, it sounds like

19 they have a witness who will make their position

20 known on the record.

21          THE COURT:  Does that go to weight or

22 does it go to trustworthiness?

23          MR. ZEIGER:  Well, Your Honor, the last

24 time Your Honor found that there were

25 circumstantial guarantees of trustworthiness based

1   on who the statement was from, a federal judge for
2   25 years, including four years as the chief judge,
3   and he was appointed as mediator with consent of
4   all parties.  He was also more probative on these
5   issues than any other evidence that we could bring
6   in because, among other things, you know, the
7   agreement that we all reached allows Judge Farnan
8   to make these reports to the court without running
9   into issues relating to the mediation privilege.
10          So, you know, last time on that basis
11  Your Honor allowed in the statement for both WSFS
12  and Trilogy, and, you know, all of the defendants.
13  And, therefore, we believe, frankly, that that's a
14  judicial estoppel on behalf of -- you know, that
15  they can't now object to a similar statement
16  coming in, given their prior positions.
17          MR. VELOCCI:  A couple of points, Your
18  Honor, on this.  I'm not here to debate Judge
19  Farnan's trustworthiness.  That's not what we're
20  talking about.
21          We had no opportunity before this
22  statement was filed to review it and comment on
23  it.  I believe that there was an agreement in
24  place to provide us with that type of notice, but
25  it was not received.  It was just simply filed on

1    the docket, number one.

2            Number two, again, as written, it

3    doesn't -- it doesn't detail which of his

4    statements he attributes to which mediation

5    session.  And, you know, we have -- we have had

6    two mediation sessions.  At one of those sessions,

7    there was only one -- there was only principals of

8    CEC present, so there were not principals of the

9    debtor, for instance.

10           Our first mediation session, again, we

11   have a witness to testify to this, we met only

12   with Judge Farnan in discussing our claims and not

13   with even professionals of counter-parties to the

14   mediation.

15           So there are many details here that, if

16   they were parsed out and he attributed certain

17   facts to which mediation he was talking about,

18   then perhaps I wouldn't have an issue; but as

19   written, he seems to conflate all of the mediation

20   sessions, and that's just not fair with respect to

21   our group.

22           THE COURT:  Well, if you're not taking

23   issue with 807(a)(1) and circumstantial guarantees

24   of trustworthiness and you're just arguing that a

25   portion of the statement is unclear and possibly

1  wrong, then I'm inclined to agree with Mr. Zeiger,

2  that that goes to weight.

3          You also have an advantage, don't you,

4  if you have a witness who is actually going to

5  testify that part of this is wrong.  And I assume

6  there would be no objection to that --

7          MR. ZEIGER:  There won't be, Your

8  Honor.

9          THE COURT:  -- person being called.  I

10 have only a dim recollection of how I handled the

11 first statement; but given what it said, I assume

12 that it was offered against the debtors and that,

13 therefore, Mr. Velocci, you and some of your

14 cohorts were arguing that that statement should be

15 admitted under 807, and I must have agreed with

16 you.

17         So I think there actually is something

18 of a judicial estoppel here, but I also think

19 you're not harmed particularly because you have

20 the ability to call your witness.

21         So if that's the only objection, then

22 I'll go ahead and admit -- this is Plaintiff's 16,

23 I believe?

24         MR. ZEIGER:  Yes, Your Honor.

25         THE COURT:  In its redacted form over

1  objection.

2          MR. VELOCCI:  Thank you, Your Honor.

3          MR. ZEIGER:  Thank you, Your Honor.

4          THE COURT:  As long as we're talking

5  about things, there were a couple of things I

6  should have cleared up right at the beginning

7  before we even began with Mr. Hayes.

8          One is, as we did last time, no one

9  wants to revisit basics like who the debtors are

10  and what the term "disputed transactions" means.

11  And so I'm going to -- whatever the outcome here,

12  I'm going to rely on those kinds of background

13  findings, as I did before.

14          And I also intend to rely on the

15  transcripts from the past year.  This is -- I

16  think we're dealing with kind of a continuum, and

17  so I'm treating that as evidence as well.

18          The other thing I wanted to ask,

19  although I think it may not be controversial at

20  all, is this:  There were some statements in

21  support of the injunction filed by CEC and a

22  couple of creditor groups.  I think the first lien

23  banks and Mr. Danner filed something.  And I

24  didn't know what the defendants' position was on

25  those.

1  purely about these statements which are before me

2  and what I should do with them.  And the parties,

3  the actual parties to the adversary proceeding

4  have made their arguments and I said I will get to

5  it when I get to it.

6          MR. CROWLEY:  Thank you, Your Honor.

7  That's my only question to ask.

8          THE COURT:  All right.  After that

9  little interlude, Mr. Zeiger, would you like to

10 continue?

11         MR. ZEIGER:  I think so, Your Honor.

12 Let me just figure out where we were.

13         THE COURT:  We had just admitted into

14 evidence Plaintiff's Exhibit 16.

15         MR. ZEIGER:  Yes, sir.

16         THE COURT:  You redacted the mediator's

17 statement.

18         MR. ZEIGER:  Yes, sir.

19 BY MR. ZEIGER:

20     **Q    Okay.  Mr. Hayes, do you have Exhibit**

21 **16 in front of you, Plaintiff's Exhibit 16 in**

22 **front of you?**

23     **A    I do.**

24     **Q    And we've actually worked through most**

25 **of the same points that Judge Farnan makes in**

1   here, so I don't want to belabor it, but if you
2   could turn to the last sentence of paragraph 2,
3   which has not been redacted.  Let me know when
4   you're there.  It's at the top of page 3.
5       A     I've got it.
6       Q     That sentence states, "In addition, the
7   debtors, CEC, and the noteholder committee have
8   been engaged in negotiations regarding the
9   nonmonetary terms of a potential restructuring
10  support agreement among the parties."
11            Do you see that?
12      A     Yes, I do.
13      Q     And can you briefly describe for the
14  court what negotiations have been ongoing
15  regarding the nonmonetary terms of an RSA
16  agreement with the second lien committee.
17      A     It's the actual negotiation of the RSA,
18  excluding economic terms.  So there's been an RSA
19  draft shared between the parties.
20      Q     And that would be, you know, similar to
21  the construct that has been done with the other
22  parties supporting the debtors' restructuring?
23      A     Correct.
24      Q     And those negotiations are also still
25  ongoing?

1    A    Yes, they are.

2    Q    Now, when you left that last formal

3    mediation session one week ago today, what was the

4    plan, if any, for additional sessions?

5    A    I believe the expectation was to meet

6    sometime this week.

7    Q    Now, sir, are you aware that at the

8    omnibus hearing the day after the last formal

9    mediation, the judge suggested we should try to

10   get together between last Wednesday and today?

11   A    I am.

12   Q    You saw that in the transcript.

13   A    I did, yes.

14   Q    And did any formal mediation sessions

15   occur during that last week?

16   A    No, no formal mediation sessions.

17   Q    Why not?

18   A    I believe Judge Farnan had some

19   personal matters to attend to, and he believed

20   that it made sense to meet with him in attendance

21   for the next mediation session.

22          THE COURT:  So when exactly this week

23   were you anticipating meeting with him?

24          THE WITNESS:  After this hearing.

25          THE COURT:  Okay.  Go ahead, Mr.

1  Zeiger.

2  BY MR. ZEIGER:

3  **Q    And what, if anything, did Judge Farnan**

4  **ask you to do to prepare for that next meeting?**

5  **A    He asked us to run some analysis for**

6  **him because we've -- he does not have his own**

7  **financial advisor.  We've been working with him**

8  **closely, essentially outlining the terms of a**

9  **potential proposal that could be shared with the**

10 **parties.**

11 **Q    A mediator's proposal?**

12 **A    Correct.**

13 **Q    And did you provide that information to**

14 **Judge Farnan?**

15 **A    We did.**

16 **Q    And when did you provide that**

17 **information to Judge Farnan?**

18 **A    On Sunday night.**

19 THE COURT:  What's a mediator's

20 proposal?

21 THE WITNESS:  It's an economic proposal

22 around the terms of a settlement between the 2L

23 committee, the debtors, and the CEC parties.

24 THE COURT:  Okay.  It's not a -- I

25 guess I'm confused about the term, which I have

1  not heard before.

2  You don't mean the mediator's own

3  suggestion of what he believes would be an

4  appropriate settlement?

5  THE WITNESS:  I do mean that.

6  THE COURT:  You do mean that?

7  THE WITNESS:  Yes.

8  THE COURT:  Well, you know, there are

9  different kinds of mediation, and some mediators

10  do what's known as facilitative mediation that

11  involves not revealing what the mediator actually

12  thinks the outcome ought to be.

13  And I don't know whether the mediator

14  here is pursuing that model or not, so it's not

15  quite the subject of laughter some people believe.

16  Okay.  Thank you.

17  BY MR. ZEIGER:

18  **Q    All right.  Now, since that August 17th**

19  **omnibus hearing, have there been any discussions**

20  **between the debtors and the second lien noteholder**

21  **advisors outside of mediation?**

22  **A    Yes, there have.**

23  **Q    And who participated in those**

24  **discussions?**

25  **A    I did.**

1    **Q**    **And who participated on behalf of the**
2  **noteholders?**

3    **A**    **A member of Houlihan Lokey.**

4    **Q**    **And when was the most recent discussion**
5  **that you've had with a member of Houlihan Lokey?**

6    **A**    **This past weekend.**

7    **Q**    **Mr. Hayes, were you here for Mr.**
8  **Hilty's testimony last June regarding the**
9  **importance of deadlines?**

10    **A**    **Yes, I was.**

11    **Q**    **And what is your view as to the**
12 **importance of deadlines?**

13    **A**    **I think reasonable deadlines help get**
14 **deals done.**

15    **Q**    **And what do you mean by "reasonable**
16 **deadlines"?**

17    **A**    **I mean reasonable in light of all that**
18 **needs to be accomplished, the complexity of the**
19 **circumstances, the number of creditors, the size**
20 **of the deal, et cetera.**

21    **Q**    **When does the current injunction**
22 **expire?**

23    **A**    **On August 29th.**

24    **Q**    **And when is the hearing set on motions**
25 **for summary judgment in the Southern District of**

1  New York?

2      A    The day after, August 30th.

3      Q    Now, how, if at all, have those

4  deadlines affected the negotiations?

5      A    It's made it -- as time has progressed,

6  it's made it a little bit more difficult to

7  actually get people together and get a deal done

8  because they've been focused on the deadline as

9  opposed to really negotiating the material terms

10  of the deal.

11      Q    And what do you mean by "they've been

12  focused on the deadline"?

13      A    One example is preparing for the

14  hearing that we have here today.  You know, I

15  think that's been a little bit distracting, and

16  we're all sitting here instead of actually sitting

17  down trying to mediate.

18      Q    And what impact, if any, have these

19  deadlines had on the willingness of parties to get

20  to their bottom line?

21      A    I think, again, because of the

22  deadline, as we get closer to that deadline,

23  people start focusing on the deadline and not on

24  actually making material progress.

25      Q    And why is that?

1    **A    Essentially the deadline provides, you**

2    **know, certain parties, in this case, the**

3    **defendants, potentially more leverage as they**

4    **approach those dates.**

5         **Q    Now, in your deposition, you testified**

6    **that you had not noted any difference in the**

7    **parties' respective negotiation leverage since the**

8    **court's June 15th order.  Do you recall that?**

9         **A    Yes.**

10        **Q    And what were you referring to there?**

11        **A    I was referring to the leverage that**

12   **the parties have in the case relative to their**

13   **particular rights and claims.**

14        **Q    And their ultimate overall leverage?**

15        **A    Correct.**

16        **Q    And how is that different from then the**

17   **timing issue that you just described?**

18        **A    Well, I think leverage changes over**

19   **time.  So as you get closer to that deadline, I**

20   **think leverage increases for the defendants in**

21   **this case.**

22        **Q    And because things could change as soon**

23   **as next week with respect to the strength of their**

24   **guaranty claims?**

25        **A    Correct.**

1      **Q**    **Now, the debtors have asked the court**

2  **to extend the injunction through plan**

3  **confirmation. Are you aware of that?**

4      **A**    **I am.**

5      **Q**    **And do you agree with that request?**

6      **A**    **I do.**

7      **Q**    **Why?**

8      **A**    **Because I think it will take that**

9  **period of time to actually negotiate a deal and**

10  **come to full consensus.**

11      **Q**    **And what impact, if any, would**

12  **extending the injunction through confirmation have**

13  **on the timing issue that you've just described?**

14      **A**    **I think it would really eliminate it**

15  **and put everyone's leverage essentially on the**

16  **same timeline in and around confirmation and**

17  **litigating -- hopefully not litigating, but**

18  **potentially litigating confirmation issues at**

19  **confirmation.**

20      **Q**    **As confirmation approaches for all**

21  **parties, all parties would feel the pressure to**

22  **get to a deal?**

23      **A**    **That's correct.**

24      THE COURT: That's just another

25  deadline, isn't it?

**SA125**

1          THE WITNESS:  It is.

2          THE COURT:  And there will be a hearing

3     associated with that, right?

4          THE WITNESS:  Yes.

5          THE COURT:  And there will probably be

6     lots of preparation for that hearing, don't you

7     think?

8          THE WITNESS:  Yes.

9          THE COURT:  Why won't that distract

10     people and prevent people from negotiating?

11          THE WITNESS:  I think it will be

12     distracting as you get closer to January.  But I

13     think January is a reasonable time period away

14     that will allow us to get to a deal ahead of time.

15          THE COURT:  There was a point at which

16     August 29th was a reasonable time period away,

17     right?

18          THE WITNESS:  My belief is -- and I

19     believe we've been asking for an extension through

20     confirmation.  The reason we've been doing so is

21     because we believe confirmation is the deadline

22     that aligns all leverage that the parties have

23     together in trying to get to a deal.

24          As we get closer to the confirmation

25     date, that deadline, you know, becomes a little

1   bit tighter.  We've made progress over the last 60

2   days or so, but there's a lot more work to do.

3           THE COURT:  I thought you said that the

4   gap with the second lien noteholders wasn't that

5   great.

6           THE WITNESS:  It is not, and I think it

7   can be bridged relatively quickly.

8           THE COURT:  But it's going to take from

9   August 29th until January to do that?

10          THE WITNESS:  I think it will take a

11  number of months to do that.  And the reason is,

12  getting to an economic agreement, the period from

13  when that happens to the time period that you

14  actually have a signed RSA, and then line that RSA

15  up so that it works with all the other RSAs and

16  creditor groups, takes months.

17          We've essentially had an economic

18  agreement with the 1L noteholders, for example,

19  throughout the course of the summer, but the CIE

20  transaction, as well as other negotiations around

21  the terms of the deal, have taken significantly

22  more time than originally expected.

23          THE COURT:  There was a time when the

24  debtors were asking for an injunction only until

25  60 days after the examiner's report was issued,

1  right?

2          THE WITNESS:  I believe that that's the

3  case.

4          THE COURT:  Right.  Was that -- that

5  must have been sought on some different theory,

6  then.

7          THE WITNESS:  I think the theory, then,

8  if I remember correctly, was that we had a number

9  of months until the examiner's report, during

10  which there would be negotiations and then, you

11  know, a short period thereafter to try to get to a

12  deal.

13          Now that we're, you know, four or five

14  months away from the confirmation hearing, my view

15  is, you know, having been involved in all of these

16  negotiations, is that we're going to need that

17  time to both get to an economic agreement and then

18  align all the RSAs, get them signed so that we go

19  into a consensual confirmation.

20          THE COURT:  Go ahead, Mr. Zeiger.

21          MR. ZEIGER:  Thank you, Your Honor.

22  BY MR. ZEIGER:

23      **Q    Just following up on His Honor's one**

24  **question the judge just asked you.  Who would the**

25  **confirmation deadline apply to?**

1      **A    It would apply to all the creditors, as**

2  **well as the subjects of the debtors' litigation.**

3  **So that would be CEC, CAC, and various**

4  **subsidiaries, sponsors, officers and directors, et**

5  **cetera.**

6      **Q    And how is that deadline different than**

7  **some of these other deadlines related to the 105**

8  **and the guaranty litigation?**

9      **A    It's really only applicable to certain**

10  **parties in this case, so it sort of puts out a**

11  **balance in the overall negotiation.**

12      **Q    Following up on one other point that**

13  **the judge asked you about before with respect to**

14  **the additional noteholders -- second lien**

15  **noteholders who are supporting the 2L RSA, even**

16  **though they're not signatories to those 2L RSAs.**

17  **Do you recall those questions?**

18      **A    Yes.**

19      **Q    And I believe you said that, to the**

20  **best of your recollection, there were -- that**

21  **issue was addressed in the RSAs.**

22      **A    Yes.**

23      **Q    Do you recall that?**

24      **A    Yes.**

25      **Q    If you turn, sir, to Plaintiff's**

¹ Exhibit 4, which is the first lien bank RSA that

² we looked at earlier.

³          Let me know when you're there.

⁴     A    I've got it.

⁵     Q    Okay.  If you turn to page 13, there is

⁶ a section 2 there in bold that says, "Commitment

⁷ of restructuring support parties."  Do you see

⁸ that?

⁹     A    I'm sorry.  Could you repeat that?

¹⁰    Q    Sure.  On page 13 of Plaintiff's

¹¹ Exhibit 4, there is a section 2 that says,

¹² "Commitment of restructuring support parties."  Do

¹³ you see that?

¹⁴    A    I've got it, yeah.

¹⁵    Q    And then under that, there is a series

¹⁶ of affirmative covenants, right?

¹⁷    A    Yes.

¹⁸    Q    And what generally are affirmative

¹⁹ covenants?

²⁰    A    There are things that the parties must

²¹ do under this particular document.

²²    Q    And if you look down at -- 2(a) says,

²³ you know, "Subject to the terms and conditions

²⁴ hereof for the duration of the restructuring

²⁵ support period, each restructuring support party

1    shall" and if you go down to (iii), it says,

2    "support and complete."  And then it continues on,

3    "the restructuring and all transactions

4    contemplated under the plans, the definitive

5    documentation, and this agreement and, as

6    applicable, vote in favor of the plans when

7    properly solicited to do so under the Bankruptcy

8    Code all claims."  And it continues on from there.

9    Do you see that?

10        A    Yes.

11        Q    And if you look to the definition of

12   claims on page 6.  Let me know when you're there.

13        A    Got it.

14        Q    Page 6 defines claims as "any claim

15   identified on a party's signature block hereto on

16   account of indebtedness issued by CEOC pursuant to

17   the credit agreement, the second lien indentures"

18   --

19             THE COURT:  It says "first lien

20   indentures," doesn't it?

21             MR. ZEIGER:  I'm sorry, Your Honor.

22   You're correct.

23   BY MR. ZEIGER:

24        Q    "The first lien indentures or the

25   non-first lien indentures or any other claim," and

1    it continues on from there, right?

2         A    Yes.

3         Q    Okay.  And is that the provision that

4    you were recalling earlier from the first lien

5    bank RSA?

6         A    Yes, it is.

7         Q    And what's your understanding as to how

8    that provision -- or those two provisions work?

9         A    It means that if one of the signatories

10   to this RSA holds other claims on the debtors,

11   they would support the plan with respect to those

12   other claims.

13        Q    If you turn to Plaintiff's Exhibit 9,

14   which is the first lien notes RSA.  When you get

15   there, we'll start on page 10.

16        A    Okay.  I've got it.

17        Q    And just like the first lien bank RSA

18   we saw, there's a section 2 that's entitled,

19   "Commitment of restructuring support parties."  Do

20   you see that?

21        A    I do.

22        Q    And under that, there's a series of

23   affirmative covenants just like we just saw,

24   right?

25        A    Yes.

1      **Q   And under (iii), there's a similar**

2  **provision to the one we just looked at, right?**

3      **A   Yes.**

4      **Q   Just to finish this off, if you go to**

5  **page 4, there's a definition of claims that**

6  **includes that same "any other claim" concept we**

7  **just looked at.**

8      **A   Yes.**

9      **Q   And is this the provision you had in**

10  **mind with respect to the first lien notes RSA?**

11      **A   Yes, it is.**

12      **Q   Now, if we go back to PDX-1, there's**

13  **that line for the second lien notes RSA at the --**

14  **three lines from the bottom.  Do you see that?**

15  **I'll give you a minute to get there.**

16      THE COURT:  Which line are we looking

17  at?

18      MR. ZEIGER:  Three lines from the

19  bottom, Your Honor.  2L notes.

20      THE COURT:  Right.

21      THE WITNESS:  Yeah, I've got it.

22  BY MR. ZEIGER:

23      **Q   And under Amount of Claims Supporting**

24  **the Restructuring, it lists $2.047 billion.  Do**

25  **you see that?**

1    A    Yes, I do.

2    Q    And does that amount include both the

3    signatories to the RSA as well as those who are

4    supporting the second lien RSA through those

5    provisions we just looked at?

6    A    Yes, it does.

7    Q    Okay.  Let's talk for a moment about

8    contributions.

9         What role, if any, have you had in

10   valuing the contributions from CEC and other

11   parties that are contemplated under the proposed

12   plan of reorganization?

13   A    I have led the team that did the

14   valuation of the contributions.

15   Q    And were you here for Mr. Millstein's

16   testimony in June when he testified that the

17   Millstein valuation of the contributions was

18   between 2.1 and $6.7 billion?

19   A    Yes, I was.

20   Q    And for a midpoint of $4 billion,

21   right?

22   A    Correct.

23   Q    And has the Millstein valuation of

24   these contributions changed since June?

25   A    No, it has not been updated.

1    directors, et cetera.

2            THE COURT:  Well, it sounded to me as

3    if the question was what the sponsors could

4    contribute and in what form.

5            And the answer that you got after

6    waiting a couple of weeks was, that's not our

7    problem; that's a CEC problem.

8            Isn't that what you testified?

9            THE WITNESS:  Yeah.

10           THE COURT:  Okay.

11           THE WITNESS:  Yeah, I don't

12   particularly agree with that.

13           THE COURT:  But that's what they told

14   you?

15           THE WITNESS:  That's what we heard.

16           THE COURT:  All right.

17   BY MR. BENNETT:

18       **Q    We may have to go into more detail**

19   **about this later, but is it still the case that**

20   **Millstein & Co. has done no work at all to**

21   **determine what any individual defendant can**

22   **contribute to settle the claims against that**

23   **defendant?**

24       **A    That is not a hundred percent correct.**

25   **And the reason is that insurance companies provide**

1 **insurance to directors and officers.  So we look**

2 **to the insurance companies, assume that they would**

3 **likely pay first, before individuals would.**

4 THE COURT:  I was going to ask about

5 insurance companies, unless you'd like to.

6 MR. BENNETT:  I'm going to get there

7 sooner or later.

8 But by all means...

9 THE COURT:  No, no, I've injected

10 myself far too frequently.

11 MR. BENNETT:  No, no.  It's been fine.

12 THE COURT:  Go ahead.

13 BY MR. BENNETT:

14 **Q    Excluding insurance, is it the case**

15 **that Millstein & Company has still done no work to**

16 **determine what any individual defendant can**

17 **contribute to settle claims against that**

18 **defendant?**

19 **A    Correct.  We haven't done any due**

20 **diligence on individuals' financial position.**

21 **Q    Okay.  Staying on the topic, but I'm**

22 **going to turn to the 2L RSA for a little while.**

23 **And I want to just make sure, just like at your**

24 **deposition, that we all understand that the 2L RSA**

25 **means the one announced on August 1st and not the**

1    one from last year, okay?

2         A    Yes.

3         Q    I'm going to call it the 2L or second

4    lien RSA, okay?

5              And we can get to it if we need to --

6              MR. BENNETT:  What is the exhibit

7    number for the -- it's already been admitted?

8              MR. MESTER:  DPX 6.

9    BY MR. BENNETT:

10        Q    So if you get out PX 6, because I don't

11   want to tax your memory, but I don't know how much

12   we're really going to have to refer to it, but PX

13   6, the second lien RSA.

14             And isn't it the case that there's

15   something called a non-Caesars contribution amount

16   in the 2L RSA?

17        A    Yes.

18        Q    That's a definition, right?

19        A    Yes.

20        Q    And isn't the effectiveness of the RSA

21   conditioned on many things, but one of the things

22   it's conditioned upon is the receipt of something

23   called the non-Caesars contribution amount; is

24   that correct?

25        A    That's correct.

1  anywhere in the disclosure statement?

2       A    No, I don't believe so.

3       Q    And is it the case that the amount of

4  the non-Caesars contribution amount has not been

5  determined?

6       A    That's correct.

7       Q    And neither you nor anyone else at

8  Millstein & Co. has asked anyone for a non-Caesars

9  contribution amount?

10      A    That's incorrect.

11      Q    Who have you asked for one?

12      A    We just -- we just discussed -- we

13  talked to CEC representatives about fully funding

14  the 2L RSA.

15      Q    That was the same meeting two weeks ago

16  we're talking about?

17      A    Correct.  Yes.

18      Q    I apologize.  Let me change the

19  question.

20           Apart from the meeting you already

21  testified to that took place roughly two weeks

22  ago, neither you nor anyone else at Millstein &

23  Co. has asked anyone for a non-Caesars

24  contribution amount?

25      A    That's correct.

1     **Q    And excluding that meeting, has anyone**

2  **at CEOC or working for CEOC asked anyone for a**

3  **non-Caesars contribution amount?**

4     **A    I don't know whether others related to**

5  **CEOC have asked the sponsors -- or, excuse me, the**

6  **sponsors or other parties for the non-Caesars**

7  **contribution amount.**

8     **Q    But you don't know of any such request**

9  **or demand?**

10     **A    I don't know of what now?**

11     THE COURT:  We're 20 months into this

12  case.  How could this not have occurred to

13  somebody until just in the past few weeks?

14     THE WITNESS:  Because we have -- our

15  focus has been total contributions, and we have

16  not -- we have not necessarily concerned ourselves

17  with whether it comes out of, you know, person A's

18  pocket or person B's pocket, provided that the

19  overall settlement currency is sufficient.

20     THE COURT:  Well, I guess that makes

21  sense if you're only concerned about the top

22  level.  But if you start looking into the wallets

23  of more people, you're likely to end up with more

24  money, aren't you?  So the contribution could have

25  been greater, couldn't it?

1    THE WITNESS:  Ultimately what we're

2    settling here is the estate claims against all of

3    those parties together.  And there is -- my

4    understanding, based on discussions with counsel,

5    there is one number in terms of overall damages

6    associated with the claims.

7    So if we get sufficient settlement

8    currency related to those claims to settle those

9    claims, it does not matter whether it's coming

10   from, again, person A, person B, person C.

11   THE COURT:  But a settlement, my

12   experience, usually involves payment of less than

13   the total liability, right?

14   THE WITNESS:  That's correct.

15   THE COURT:  And a settlement is more

16   likely to be accepted the more the settlement

17   amount tends to approach that liability, correct?

18   THE WITNESS:  That is correct.

19   THE COURT:  And, still, there was no

20   thought to approach any of these other parties

21   potentially liable to the estate to see what they

22   could contribute?

23   THE WITNESS:  No.  And one of the

24   reasons for that is the contribution levels go up,

25   as the recoveries go up, it puts more and more

1        And the second lien noteholder group,

2   there's an RSA outstanding that allows all second

3   lien noteholders, if they choose to get a 55 cent

4   recovery, which is $900 million more than exists

5   under the current plan, or roughly 16 cents on the

6   dollar improvement.

7        Q    But the 900 doesn't exist right now.

8   The only increased consideration that exists right

9   now is the -- is 60 of the 963 million advertised

10  at the bottom of PDX 1; is that correct?

11       A    No.  I believe that the 900 million can

12  be fully funded.  I've explained that to the

13  parties in this case.  It's just a matter of

14  further negotiations.

15       Q    But it's not fully funded now.

16       A    Correct, it's not.

17       Q    And it's solely within CEC and its

18  Strategic Alternatives Committee's discretion as

19  to whether that deal will ever get done?

20       A    It's really up to the parties to get

21  back together, sit in a room and negotiate a deal.

22  And I think it can be done.

23            THE COURT:  Why do you think so?

24            THE WITNESS:  Because I testified

25  earlier that we're only a few points apart from

**SA137.4**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


IN RE:                        )    No. 15 A 00149
                              )
CAESARS ENTERTAINMENT         )    Chicago, Illinois
OPERATING COMPANY, INC.,      )    August 24, 2016
                              )    10:24 a.m.
            Debtors. )    2:00 p.m.


            VOLUME II (Pages 1 - 320)



            TRANSCRIPT OF PROCEEDINGS
    BEFORE THE HONORABLE A. BENJAMIN GOLDGAR


  APPEARANCES:


For the Debtors:              Mr. Jeffrey Zeiger;
                              Mr. David Zott;
                              Mr. Scott Lerner;

For WSFS:                     Mr. Sidney Levinson;
                              Mr. Joshua Mester;
                              Mr. Geoffrey Stewart;


For Trilogy:                  Mr. Frank Velocci;




  Court Reporters:            AMY M. SPEE, CSR, RPR, CRR
                              JERRI ESTELLE, CSR, RPR
                              United States Courthouse
                              219 South Dearborn Street
                              Room 661
                              Chicago, Illinois 60604

**SA138**

1                   I N D E X

2

3   WITNESS:                                             PAGE:

4       BARRY KUPFERBERG

5   Direct Examination By Mr. Velocci          4
   Cross-Examination By Mr. Zott             23

6

      MARC LAMPKIN
7   (Examination by deposition)

8   Direct Examination By Mr. Stewart          52
   Cross-Examination By Mr. Lerner           117
9   Redirect Examination By Mr. Stewart       139

10      DAVID HILTY

11   Direct Examination By Mr. Levinson         148
   Cross-Examination By Mr. Zott            233

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   and then his staff went to leg. counsel.  We never

2   directly, with regard to that drafting, met with,

3   talked to or -- House leg. counsel.

4        Q   Okay.  You just talked to Congressman

5   Hardy?

6        A   Yeah.

7        Q   Who are some of the other members of

8   Congress you spoke with?

9        A   I mean -- and, again, you only need to

10   look at a -- a House directory.  I think I met

11   with or talked to almost every Republican member

12   of the House Financial Services Committee, senior

13   members of the House Financial Services

14   Appropriations, folks and the Speaker both at the

15   tail end -- excuse me --

16        Q   Boehner.

17        A   -- Boehner, Ryan, McCarthy, Scalise.

18   Then a significant number similar in the Senate

19   and some folk on the Transportation Committees,

20   both the approps and the -- the commerce

21   committee, where the transportation bill flowed in

22   the Senate.  Senator McConnell, probably not

23   Cornyn; and talked to, ironic for me, Senator

24   Reid's office a significant number of times.

25        Q   Okay.  When you say "significant

1  number," how many?  What does that mean?

2       A    I have no idea.  I mean, a lot.

3       Q    Altogether how many members on the

4  House side did you -- did speak with?

5       A    Well, members and staff?

6       Q    Yep.  Uh-huh.

7       A    Probably 30-plus.

8       Q    And on the members and staff, senators

9  and staff?

10      A    Probably seven to ten.

11      Q    Okay.  I know I should say -- oh, I'm

12 sorry.  Okay.

13      A    You know I should say the Indian

14 Affairs, the National Resources, and the -- its

15 equivalent committee in the Senate.

16      Q    Uh-huh.

17      A    In addition to those other committees.

18      Q    Why Indian Affairs?

19      A    Well, National Resources.  I corrected

20 myself.  It wasn't -- it -- so it should be

21 Natural Resources, not Indian Affairs.

22      Q    Why Natural Resources?

23      A    Oh, because the last efforts that we

24 endeavored were on the Puerto Rico bailout bill or

25 kind of -- or rescue bill.

1    A    Yes.

2    Q    -- matter which we've already

3  discussed.  Okay.  Good.

4         So I think you -- oh, let me ask

5  another question.  At any point did you arrange or

6  intend or become aware of any meetings in

7  connection with the TIA amendment or modification

8  attended by representatives of Apollo Global

9  Management?

10   A    So really -- yes.

11   Q    Okay.  What meetings were those?

12   A    I believe that the -- Marc Rowan

13 attended two meetings of the TIA.  I am just kind

14 of refreshing my -- you know, kind of remembering.

15   Q    Were you at those meetings, too?

16   A    Yes.

17   Q    Who were the meetings with?

18   A    I believe one was with Maxine Waters.

19   Q    Okay.  When was that?

20   A    It was -- you know, I don't know the

21 definite date, but March/April of this year.

22   Q    So that was in connection with PROMESA?

23   A    Yeah -- well, yes, and broader, because

24 it wasn't just limited to PROMESA, TIA, you know,

25 he had been doing -- he does kind of memo

1  meetings, you know, on broad issues all the time.

2      Q    Okay.  How long did the Maxine Waters

3  meeting last?

4      A    Typical meeting?  30 minutes, maybe.

5      Q    Who was there from Congress besides

6  Representative Waters?

7      A    She had a room full of -- there were

8  probably six or seven staffers.

9      Q    Where were matters left at the end of

10  the meeting between Mr. Rowan and Representative

11  Waters?

12      A    "Nice to meet you."

13      Q    What was the second meeting?

14      A    Probably with representative Kevin

15  McCarthy from -- from California.

16      Q    Okay.  When was that?

17      A    Again, it was in the same stretch.  So

18  probably April of this year.

19      Q    And the subject, once again, was

20  amendment of the TIA?

21      A    Again, more broadly.  I know they

22  talked about market conditions, busy cycle, series

23  of things, so it wasn't -- neither meetings were

24  just limited to or focused on -- you know, on the

25  TIA.

1    Q    But the TIA was discussed, was it not?

2    A    Yes.

3    Q    Okay.  How long did the meeting with

4    Representative McCarthy last?

5    A    Probably around the same 30 minutes.

6         MR. STEWART:  Let's go to page 92, line

7    14.

8    BY MR. STEWART:  (Reading)

9    Q    Okay.  But you are aware, are you not,

10   that in March of this year, you are the -- the

11   examiner was appointed by the bankruptcy judge.

12   A    Yes.

13   Q    Are you aware -- do you know who the

14   examiner was, by the way?

15   A    No.

16   Q    Were you aware that in March, the --

17   March 16th, the examiner filed his report?

18   A    Yes.

19   Q    Did you read that report?

20   A    Not in whole.

21   Q    See any part of it?

22   A    Yes.

23   Q    What part of it did you look at?

24   A    You know, I know someone sent it in an

25   e-mail.  I may have glanced at it, the full

1  binder in front of you.

2      **A**    I'm sorry, DX 12?

3      **Q**    DX 12, yes.

4          And if you can tell me what DX 12 is.

5      **A**    DX 12 appears to be the adversary

6  complaint that the debtor, CEOC, filed against a

7  number of parties.

8          MR. LEVINSON:  Your Honor, I'd move

9  Exhibit DX 12 into evidence.

10          MR. ZOTT:  No objection, Judge.

11          THE COURT:  Defendants' 12 is admitted.

12          MR. LEVINSON:  Thank you, Your Honor.

13  BY MR. LEVINSON:

14      **Q**    Mr. Hilty, of the defendants -- do you

15  know how many defendants are named in this

16  lawsuit?

17      **A**    I believe it is 67.

18      **Q**    Now, you heard Mr. Hayes testify at

19  length yesterday that he believes the sponsors are

20  making a contribution to settlement because,

21  according to Mr. Hayes, the value of their

22  ownership interest in CEC and CAC will be reduced.

23          Do you recall that testimony?

24      **A**    I do.

25      **Q**    If you would turn in your binder to PDX

1  2.  It's the third tab.  This was admitted for

2  demonstrative purposes during the hearing

3  yesterday.

4           Have you reviewed this demonstrative

5  exhibit?

6      A    Yes, I have.

7      Q    And when did you first see this

8  document?

9      A    I saw it Monday morning of this week.

10     Q    Do you agree with the analysis and

11 conclusions that are set forth in this

12 demonstrative exhibit?

13     A    No, I do not.

14     Q    And can you explain why?

15     A    Certainly.  For a couple reasons, the

16 first being we heard, actually, a number of times

17 yesterday from Mr. Hayes that the debtors are

18 looking at everything holistically in terms of

19 they're not looking at contributions from one

20 party or trying to allocate contributions to one

21 party.

22          But yet this page attempts to basically

23 bring the expense or the value of the shares that

24 new CEC is issuing.  It basically looks to

25 attribute those to the sponsors by saying it's a

1  cost to the sponsors.  But we had heard they don't

2  allocate things to the individual parties.

3         So that's the first thing I thought was

4  very unusual about this page.

5     Q    Okay.  And I'd like to, if I could,

6  direct your attention to the line where it says

7  current value of sponsor holdings of CEC/CAC.  And

8  it says $4 billion.

9         Do you see that?

10    A    I do.

11    Q    Okay.  And do you agree or disagree

12  with the analysis and conclusions that led to the

13  inclusion of that line in Demonstrative Exhibit 2?

14    A    I disagree with it.

15    Q    And can you explain why?

16    A    Certainly.  This analysis is really an

17  equity dilution analysis.  It's showing what

18  happens to the CEC shareholders by CEC -- or new

19  CEC, I should say, which is the combination of CEC

20  and CAC having to issue shares to settle claims

21  against it.

22         What it does here, when it is trying to

23  start by saying what's the current value of the

24  sponsor holdings in CEC and CAC, it's looking at

25  and, it was used yesterday, intrinsic value

1  number.  But that value, as was discussed,

2  reflects absolutely no risk, or, I guess, no risk

3  or no impact of the claims of the guaranty

4  litigation that are claims against CEC.

5          This $4 billion number, it basically

6  assumes that there is no risk to CEC and CAC of

7  the guaranty litigation.

8          And I don't think that's a proper way

9  to start in terms of evaluating, you know, how

10  dilution is occurring, because this number would

11  be an -- this number would be an extreme how

12  Apollo or TPG, the sponsors, would try to argue

13  that their shares are being diluted.

14          It's not trying to look at it from the

15  market value today, which affects -- which brings

16  in all the risks of litigation continuing, one

17  side losing litigation, the other side losing

18  litigation, injunctions being continued.  All of

19  that is information known to the market.

20          So in my view, you can't look at the

21  dilution in terms of the impact to current

22  shareholders by looking at a number which doesn't

23  reflect any risk of liabilities or disputes that

24  are against it.

25      Q    So, in other words, the $4 billion

1  number doesn't take into account the fact that CEC

2  is potentially liable on the guaranty claims that

3  are the subject of this proceeding?

4       A    Correct.  It doesn't try to risk adjust

5  it, which I would argue that's what the market is

6  doing when it values the existing CEC and CAC

7  shares.  It's risk adjusting in buyers' and

8  sellers' minds what's going to happen with the

9  litigation claims, an injunction, a settlement.

10  It's the market's view of those risks.

11       This $4 billion number takes the

12  complete other side of that and looks at it on an

13  extreme that there is basically no value at all to

14  the litigation claims of the -- not only the

15  guaranty litigations, but also the estate claims.

16  It effectively assumes that there's no claims

17  against us.

18       The other side, the other extreme, to

19  see the other side of this, would actually be

20  saying the $4 billion is worth zero because

21  there's $11 billion of guaranty claims and even

22  more claims from the estate that are against this

23  value.

24       So this is, say, the far left.  It's

25  not talking about the far right, and it's not also

1  **talking about some risk-adjusted number in the**

2  **middle.**

3     **If I was trying to evaluate what's the**

4  **dilution that the existing CEC or CAC shareholders**

5  **are facing, I would try to look at a number that**

6  **is at least risk adjusted to reflect there's some**

7  **likelihood that the liabilities are real**

8  **liabilities against CEC and CAC.**

9     THE COURT:  Well, if the market price

10  takes care of factoring in risk, then why can't we

11  just use the market price and multiply it times

12  the number of shares and get a valuation that way?

13     THE WITNESS:  That's how I would have

14  done this analysis.  I would have started with the

15  market price.

16     THE COURT:  So you would agree with the

17  $1.68 billion number that I think Mr. Hayes agreed

18  would be the result of that calculation?

19     THE WITNESS:  Yes, in terms of the

20  value, the market value of the sponsors' equity

21  interest in CEC and CAC, yes.  I would generally

22  agree with that, as of Friday, but, yes.

23     THE COURT:  Could you tell me, and I

24  should have asked Mr. Hayes this question, what

25  you mean by intrinsic value?  What does that mean?

1    THE WITNESS:  Well, I'm happy to say it

2  was his term and not mine.

3    THE COURT:  Ah.  Well, you used it, so

4  I figured you knew.

5    THE WITNESS:  I believe what he was

6  trying to say is intrinsic value is a calculated

7  value, not looking at the market prices or things

8  like that.

9    It's using -- whether it's using an

10  comparable company valuation methodology,

11  transaction multiples from comparable

12  transactions, or discounted cash flow, it's using

13  other valuation methods to come up with a gross

14  value of an asset.  In this case, I guess CERP and

15  CGP.  And then he was trying to, again, as I said,

16  as he described, look at it assuming there was no

17  liabilities against it.

18    That's not the reality today.  Today

19  there are liabilities against it, or at least

20  disputed liabilities against it, whether it's the

21  estate claims or whether it's the guaranty claims,

22  which, again, I view that the market is taking

23  that into -- that into view when it comes up with

24  the market prices.

25    THE COURT:  So intrinsic value is not a

1  technical term generally used in corporate finance

2  circles; it's a Brendan Hayes term from his

3  testimony here?

4          THE WITNESS:  I don't commonly use the

5  word intrinsic value when I'm --

6          THE COURT:  Talking about shares?

7          THE WITNESS:  When I'm talking about

8  shares or anything like that.

9          THE COURT:  All right.  Go ahead,

10  Mr. Levinson.

11          MR. LEVINSON:  Thank you, Your Honor.

12  BY MR. LEVINSON:

13      **Q     And in the market that -- the**

14  **marketplace that the court just described, would a**

15  **potential purchaser of the shares in that market**

16  **take into account the liabilities of CEC and CAC,**

17  **including the guaranty litigation claims and the**

18  **estate claims that exist?**

19      **A     Absolutely.  That's what's factored**

20  **into the market prices.**

21      **Q     If you were advising the debtors in**

22  **this case and assisting them in preparing PDX 2,**

23  **what approach would you have used to value the**

24  **stock?**

25      **A     I would use the market price.**

1     Q     And in terms of putting this chart

2 together, again, if you were representing the

3 debtors, would you -- would the goal be to try to

4 come up with something objective, or would the

5 goal be to try to come up with something that

6 provides, you know, one extreme or the other

7 extreme, the two extremes that you described?

8     A     Well, again, if I was trying to share

9 what I thought the estimated dilution would be to

10 the shareholders, I would look at it off of,

11 again, a risk-adjusted valuation, which I believe

12 that is the market prices.

13          This is looking at it, as I mentioned,

14 on an extreme, and, again, as I said, quite

15 frankly, the extreme that Apollo and TPG as the

16 sponsors would look at it, which assumes there's

17 zero likelihood of any of the CEOC estate claims

18 or the guaranty claims being valid claims.

19     Q     Now, I'd like to show you Plaintiff's

20 Exhibit 17.  It's in your binder, PX 17.

21          And what is this document?

22     A     This is the CEC quarterly report filed

23 with the SEC for the period ended June 30th,

24 2016.

25     Q     And is this one of the documents upon

1 which you relied in formulating the views you've

2 expressed today?

3     A    Yes, it's one of the documents I

4 reviewed.

5     MR. LEVINSON:  Your Honor, I move to

6 admit Plaintiff's Exhibit 17.

7     THE COURT:  I assume there's no

8 objection?

9     MR. ZOTT:  No objection, Your Honor.

10     THE COURT:  Plaintiff's 17 is admitted.

11 BY MR. LEVINSON:

12     Q    If you would turn to page 17 of Exhibit

13 PX 17.

14     A    Yes.

15     Q    Do you see the highlighted portion of

16 this exhibit?

17     A    I do.

18     Q    And this was highlighted by the

19 plaintiff.

20     Can you read the first sentence of the

21 highlighted text.

22     A    (As read)

23     "We believe that the noteholder

24 disputes in the parent guaranty lawsuits have a

25 reasonably possible likelihood of an adverse

1  outcome."

2      Q      And is it your understanding the parent

3  guaranty lawsuits include the lawsuits that the

4  debtors are seeking to enjoin in this proceeding?

5      A      Yes, I do.

6      Q      And can you read the last line of the

7  highlighted text.

8      A      (As read)

9             "We are not able to estimate a range of

10 reasonably possible losses should any of the

11 noteholder disputes ultimately be resolved against

12 us, although they could potentially exceed

13 $11 billion."

14     Q      Would a potential purchaser of the

15 sponsors' interest in CEC take that liability into

16 account in determining how much to pay for the

17 stock, or would they simply ignore it in the

18 manner suggested by Plaintiff's Demonstrative

19 Exhibit 2?

20            MR. ZOTT:  I think that

21 mischaracterizes the demonstrative.  I'll object

22 to that, Judge.

23            THE COURT:  I'll overrule it.

24            THE WITNESS:  Yes.  I do think

25 potential purchasers would take into account the

1    potential liabilities against CEC.

2    BY MR. LEVINSON:

3        Q    Now, do you subscribe to Mr. Hayes'

4    suggestion during his testimony that the market

5    price doesn't reflect what he -- his term,

6    intrinsic value, because the market is pricing the

7    possibility of a settlement?

8        A    I don't agree with that.  As I said, I

9    think the market, the market prices in all

10   information that's available to it.  There isn't a

11   settlement right now.  Could there be the prospect

12   of a settlement?  Yes.  Could there be the

13   prospect that there is not a settlement?  Yes.

14             And the market, I think, appreciates

15   that and understands that, sees the potential for

16   the guaranty litigation continuing, sees some risk

17   that the guaranty litigation is stayed.  It's

18   factoring in all of those risks and coming up with

19   what the market prices are.

20       Q    I think you testified a few minutes ago

21   you agreed with the stock -- the market value

22   that -- which Mr. Hayes testified on Friday, the

23   $1.67 billion figure for the CEC and CAC current

24   interest in the shares of those companies?

25       A    Yes.  That's the approximate market

1   value for what the sponsors have in those

2   entities.

3        Q    Have you done any work to determine

4   peak market value of the sponsors' interest in CEC

5   and CAC since the commencement of these bankruptcy

6   cases?

7        A    Yes.  We've gone back and looked at the

8   market prices of the CEC and CAC shares on each

9   day in terms of what the total market value would

10  be on each day, and then also what the market

11  value would be for the sponsors' holdings.

12       Q    And what was the peak market value of

13  the combined shares of CEC and CAC during the

14  period since the commencement of this case?

15       A    My recollection is approximately

16  1.8 billion, and it was back in June of this year.

17       Q    And that compares to the 1.67 billion

18  figure as today's current market value?

19       A    Yes, that's correct.

20       Q    And if that 1.8 billion -- if we go

21  back to Plaintiff's Demonstrative Exhibit 2, is

22  that 1.8 billion higher or lower than the

23  $2 billion post-confirmation pro forma value of

24  the sponsors' holding at plan value that's shown

25  in that exhibit?

1      **A    Slightly lower.**

2      **Q    Now, let's suspend reality for a**

3  **moment, and let's just assume hypothetically that**

4  **the chart in Plaintiff's Demonstrative Exhibit 2**

5  **is correct, such that the current value of the**

6  **sponsors' overall interest in CEC and CAC really**

7  **was $4 billion currently, and that the value of**

8  **the sponsors' overall interest in CEC and CAC**

9  **would decline in value as a result of the plan.**

10     **My question is this:  Would you regard**

11  **that reduction in value as a contribution by the**

12  **sponsors?**

13      **A    No, I would not.**

14      **Q    Why not?**

15      **A    Again, if you look at this chart, what**

16  **this chart is doing, although it's actually not**

17  **presenting the full picture, this is a dilution**

18  **analysis of new CEC, which is going to be CEC and**

19  **CAC combined, having to issue new shares to settle**

20  **claims against it.**

21      **Q    "It" being?**

22      **A    It being new CEC or CEC and CAC, as it**

23  **looks here.**

24     **Those new shares dilute the holdings of**

25  **the existing shareholders, all of the existing**

shareholders, not just the sponsors.  It also
would dilute the public shareholders of CAC and
CEC.

So to really look at this chart
correctly, you actually need another column to the
right of this where this just shows the 62 percent
of CEC and CAC owned by the sponsors.  There's the
remaining 38 percent that is owned by the public
shareholders of CEC and CAC.

And, again, since it's new CEC issuing
these shares, the public shareholders of CEC and
CAC are also being diluted, if you assume this
math is correct, on the exact same ratio, because
the shares are all being treated equally because
this is just new CEC issuing more shares.

So, you know, again, if you start with
the premise of the 4 billion, which I don't, but
the 4 billion would be getting diluted to $2
billion, the value of the public shares would also
be getting diluted down on the same 50 percent
ratio because there's just more total shares
outstanding.

THE COURT:  Why would that mean that
there's not a contribution, though?  Why wouldn't
it just mean that there are a whole lot more

1  contributors?  You have additional contributors

2  being the public shareholders.

3            THE WITNESS:  I don't -- you can't look

4  at it that way, because this is new CEC, or CEC

5  and CAC basically discharging a liability against

6  it.  There are guaranty claims and estate claims

7  against it.  It's issuing shares to basically get

8  itself out of that liability.

9            So by its nature, since it's paying

10  off a liability against its corporation by issuing

11  new shares, that's going to dilute the ownership

12  and the value of the existing shareholders because

13  it's paying off a liability.  It might be a

14  disputed liability, but it's still a liability.

15            So this is not the sponsors

16  contributing.  This is CEC, the corporation,

17  extinguishing a liability.  And I think the fact

18  that the public shareholders are also diluted in

19  the exact same way shows that this is a corporate

20  liability of CEC/CAC that's being extinguished,

21  not anything else.

22            THE COURT:  So you have to credit the

23  extinguished liability in some way in order to get

24  a number that makes sense?

25            THE WITNESS:  Correct.  Because, for

1 example, there aren't any claims against the

2 existing public shareholders of CEC or CAC.

3          THE COURT:  Right.

4          THE WITNESS:  They're just being

5 diluted because the corporation is having to issue

6 more shares in order to satisfy a liability.  So

7 all shareholders get diluted equally.  It's not

8 the sponsors contributing.

9          THE COURT:  Continue, Mr. Levinson.

10          MR. LEVINSON:  Thank you, Your Honor.

11 BY MR. LEVINSON:

12     **Q    So applying the debtors' logic, you**

13 **applied the debtors' logic to the public**

14 **shareholders, how would that logic apply to, say,**

15 **the second lien noteholders and their treatment**

16 **under the debtors' plan of reorganization?**

17     **A    Well, it's only the same logic if you**

18 **assume the second lien claim is roughly 5 1/2**

19 **billion.  And I guess for easy math, assume the 2L**

20 **RSA that's not effective, but even if it gets to**

21 **over 50 percent, it roughly -- that proposes to**

22 **provide them 50 percent.**

23          **Under the same logic, if the second**

24 **lien noteholders are losing 50 percent of their**

25 **claim, the way this is describing things, the**

1    other liabilities against it.

2              So I actually -- it's my view that the
3    guaranty litigation continuing will actually
4    encourage third-party defendants to contribute
5    more to reaching a settlement of the claims
6    against them because they perceive more risk that
7    CEC is going to have to use more of its value to
8    cover the guaranty claims.

9         Q    Now, how does the fact that the
10   guaranty plaintiffs are receiving nothing on
11   account of their guaranty claims under the plan,
12   coupled with the fact that, you know, none of the
13   defendants, other than CEC, and to a small extent
14   CAC, are making contributions under the plan, how
15   does that impact the willingness of the guaranty
16   plaintiffs to acquiesce to the terms of the plan
17   proposed by the debtors?

18        A    I think it makes it more difficult.

19        Q    Why is that?

20        A    Those parties see a limited number of
21   parties participating effectively in the CEOC
22   plan, even though they have the examiner report
23   saying they might have potential liability.

24             So when you've got the guaranty
25   plaintiffs and the second lien noteholders seeing

1  that, I think it's hard to, you know, encourage

2  settlement when they see, you know, a number of

3  other third parties not contributing.

4      Q    Basically it's that people just don't

5  like to be treated unfairly, is that kind of what

6  you're saying in a nutshell?

7      A    I think that's generally correct, yes.

8      Q    And that that can impact trying to get

9  to a deal --

10      A    Yes, absolutely.

11      Q    -- when a party believes that to be the

12  case?

13      A    Absolutely.

14      Q    In arriving at your view that the

15  guaranty plaintiffs want to be treated fairly,

16  have you analyzed whether claims against the

17  non-contributing 65 defendants, and the other

18  potential defendants, are even collectible?

19      A    We haven't.

20      Q    You have not.  And why is that?

21      A    We haven't received any of the

22  financial information on the defendants in order

23  to assess the collectibility of them.

24      Q    And what efforts are you aware of by

25  the noteholder committee to seek through discovery

1  would be voted, are those the same CAC claims that

2  are the basis for the small contribution -- or the

3  relatively small contribution of 44 to 79 million

4  in waiving that claim that was described earlier

5  in your testimony, or do you not know that without

6  looking it up?

7      A    No, I believe those are the same

8  claims.

9      Q    Let's turn to the 2L RSA, which was

10  also the subject of Mr. Hayes'--

11         THE COURT:  Before we do that and we're

12  changing the subject, this might be a good time

13  for a break.

14         MR. LEVINSON:  Of course, Your Honor.

15         THE COURT:  Okay.  So let's take 15

16  minutes.

17             (Brief recess.)

18         THE COURT:  Mr. Levinson, please

19  continue.

20         MR. LEVINSON:  Thank you, Your Honor.

21  BY MR. LEVINSON:

22      Q    Mr. Hilty, do you regard the 2L RSA

23  among the debtors, CEC, and certain holders of

24  second lien notes, as material progress?

25      A    No, I do not.

1      **Q**    **Why is that?**

2      **A**    **It's actually for several reasons.**

3      **I'd say, first of all, it's not an**

4 **agreement that's effective or can go effective**

5 **based on the holders who have signed the amended**

6 **cooperation agreement.**

7      **Second, it has a funding hole, which**

8 **Mr. Hayes talked about yesterday, but a funding**

9 **hole which is -- basically provides in the**

10 **agreement among those who signed it, kind of an**

11 **agreement to agree on how the funding hole is**

12 **going to be satisfied. And if parties aren't**

13 **satisfied with how it's proposed to be funded, the**

14 **agreement -- that those parties won't even be**

15 **bound by the agreement, whether it goes effective**

16 **or not.**

17      **I would also say the second lien RSA**

18 **provides for some of the proposed additional**

19 **enhancements as fees. And it's not -- those**

20 **aren't fees that get paid to the entire class.**

21 **They just get paid to the parties that signed the**

22 **RSA.**

23      **And so I think when you are trying to**

24 **reach enhanced settlements or reach an overall**

25 **settlement with parties, those should be things**

1 that are offered to the entire class, not just to

2 certain holders.

3      Q    Just pause there.

4      Why is that?

5      A    Well, I think you're trying to build

6 consensus among the whole class and have the class

7 treated equally.  And here, you know, the second

8 lien claims are quite large bond issuances, and

9 you want to just make sure all the holders of

10 those issuances are treated equally.  And so I

11 view a resolution as something that's provided to

12 the entire class, assuming the class votes in

13 favor for it.

14      In addition, I would also say the

15 second lien RSA I don't really view as progress in

16 that it took clearly some amount of time during

17 the stay period for them to reach agreement with

18 those other holders who also own other interests

19 and weren't just second lienholders.  And I really

20 think that just delayed the discussions that CEC

21 and the debtors could have been having with the

22 second lien noteholder committee, which is what I

23 thought was going to be happening quite

24 extensively during the stay period.

25      Q    You referenced that the parties to the

1  2L RSA are holders with other interests.  What's

2  your understanding of who those parties are and

3  what their interests are?

4       A    It's my understanding that four parties

5  signed the 2L RSA:  Canyon, Mason, a Soros fund,

6  and Paulson.  And all four of those entities not

7  only hold second lien notes, they also own equity

8  interest in CEC, or CAC, or both, and in other

9  instances also own significant other debt claims

10 in the CEOC bankruptcy.

11      Q    And what's the basis for your

12 understanding as to those parties' ownership

13 interest?

14      A    There's two bases.  One, on the equity

15 interest side, we periodically look at Bloomberg

16 and other sources to see who has bought or built

17 positions in either the CAC or the CEC stocks, and

18 all of those names are listed as significant

19 holders in those stocks.

20           But, in addition, there was a

21 stipulation done for this hearing which actually

22 outlines the specific equity holdings of all those

23 parties, and also it details the actual debt

24 holdings, in addition to the equity holdings of

25 Canyon.

1    **Q    Now, you heard Mr. Hayes testify**

2    **yesterday that he didn't know if the four parties**

3    **to the 2L RSA are among the top ten shareholders**

4    **of CEC and CAC.**

5    **Do you recall that?**

6    **A    I do recall that.**

7    **Q    And have you undertaken to determine**

8    **that?**

9    **A    Yes, we looked -- I looked at the**

10   **current Bloomberg list of the top shareholders.**

11   **Q    And what did Bloomberg tell you as to**

12   **which of those parties are among the top ten**

13   **shareholders of CEC and CAC?**

14   **A    My recollection is three of them are in**

15   **the top ten, both CEC and CAC, and the other ones**

16   **are either like 11 or 15, or something like that.**

17   **They're all within the top 20 for sure.**

18   **Q    And do you recall how many were in the**

19   **top five?**

20   **A    I believe three of the four in the top**

21   **five.**

22   **Q    Three, or -- two, three, four?**

23   **A    I --**

24   **Q    Or you just don't --**

25   **A    I don't recall.**

1    **Q    Okay.   Why does it matter whether the**
2    **parties to the 2L RSA also, for instance, own**
3    **stock in CEC and CAC in terms of your evaluation**
4    **as to whether or not this agreement reflects**
5    **progress?**

6    **A    Well, it reflects that they have other**
7    **interests that they're going to be receiving value**
8    **from as part of this plan or the 2L RSA settlement**
9    **or a different settlement.  But since they own**
10   **other interests which are impacted in this matter,**
11   **you just -- you need to know how they're receiving**
12   **additional value.**

13           **And so in this case, all of them will**
14   **be receiving value as shareholders, depending on**
15   **what the residual value is that either the CEC or**
16   **CAC shareholders retain.**

17           **And at least in the case of Canyon,**
18   **where we know their debt position based on, you**
19   **know, the stipulation, they actually own**
20   **dramatically more first lien note claims and first**
21   **lien bank claims than they own of even second lien**
22   **claims.  So they're actually going to be receiving**
23   **much more significant value on account of those**
24   **claims than they are even for their second lien**
25   **note claims.**

1  So it's just -- it's just helpful to

2  know because it allows you to see that parties who

3  own other interests also have different

4  motivations than just people who own second lien

5  note claims.

6  Q  Are there circumstances where those

7  interests might possibly conflict with one

8  another?

9  A  Yes, there are.

10  Q  And can you describe that in the

11  context of the parties to the 2L RSA?

12  A  Sure.  In the case of parties that own

13  second lien notes and equity interests, whether

14  it's CAC or CEC equity interests since there's

15  going to be the merger, the more shares that -- as

16  part of an overall settlement, or the more or the

17  greater amount of convertible notes that need to

18  be issued to reach agreement, which would bring

19  more value to the second lien notes if those

20  additional shares and additional notes are given

21  to the second lien class, those would be taking

22  value away from CAC and CEC shareholders.

23  However, if you don't move additional

24  consideration to the second lien notes, or if you

25  move less consideration to the second lien notes,

1  people who own those shares will be receiving more
2  value for those shares that they own because new
3  CEC would be issuing less new shares to second
4  lien creditors and less convertible notes.

5       So when you own both, you're actually
6  receiving consideration on your second lien notes,
7  and you're also receiving consideration for your
8  CAC or your CEC shares.  So you just need to know
9  their perspective of getting value in both
10 pockets.

11      And it's the same thing when someone
12 owns other debt claims in a situation like this,
13 such as Canyon, as is outlined in the stipulation,
14 where, you know, they own I believe it's over $900
15 million of first lien note and bank claims that
16 they own, versus it's 400-and-something million
17 dollars of second lien note claims.  So they
18 actually have, you know, over two times the size
19 of claims in first lien claims than they do in
20 second lien claims.

21      And as was highlighted in the chart we
22 looked at earlier, and what Mr. Hayes talked
23 about, those first lien claims are receiving a
24 dramatically higher recovery than the second lien
25 claims.  All of those first lien claims are

1  **receiving above par.  So they're receiving**

2  **something above a hundred percent.**

3              **That clearly drives some motivation,**

4  **you know, if you own that much of them to -- for**

5  **example, just to try to reach a settlement so you**

6  **can try to move forward and realize the value**

7  **that's proposed to be given to your first lien**

8  **claims when they're over double the claim amount**

9  **that you own in second lien claims.**

10              **So when you're dealing with holders**

11  **that own other interests, you just need to know**

12  **what those other interests are because they're**

13  **going to be receiving value for that.**

14              THE COURT:  If you're about to move on,

15  I have some questions on this topic, but if you're

16  not, go ahead.

17              MR. LEVINSON:  I have no more

18  questions, Your Honor.

19              THE COURT:  This is not the first

20  second lien RSA in this case, am I right?

21              THE WITNESS:  That's correct.  There

22  was a second lien RSA --

23              THE COURT:  About a year ago.

24              THE WITNESS:  -- about a year ago, last

25  fall sometime, early fall sometime, I believe

1  that's correct.

2          THE COURT:  And that required a certain

3  number of signatories to become effective, and it

4  never became effective, correct?

5          THE WITNESS:  That's correct.

6          THE COURT:  I don't know if you've

7  compared the two, but if you have, how does the

8  current one differ from where we were last year?

9          THE WITNESS:  The current one does

10  offer if it does go effective and is funded,

11  because there's still the funding hole in it.  If

12  it were to go effective and that funding hole

13  filled, it would offer greater consideration than

14  the one a year ago.

15          I'm trying to recall the specific

16  recovery percentage in the one a year ago, and I

17  don't exactly recall it.  It is -- the current one

18  would be -- if funded and goes effective, would be

19  significantly greater than that one.

20          THE COURT:  Do you know why it took,

21  what, something like six or seven months for

22  another second lien RSA even to be proposed?

23  Because as I recall, the first one lapsed, I

24  think, last October.  And then this one came about

25  in July or so.

1    What was going on?  Do you know?

2    THE WITNESS:  Well, there was the

3  examiner report that came out in between those

4  two -- those two events.

5    THE COURT:  That's true.

6    THE WITNESS:  So I think there was

7  probably between the first one expiring and before

8  people then engaged in the next one, at least

9  people not on the noteholder committee, I think

10  there was the view of waiting to see the examiner

11  report.

12    THE COURT:  All right.  Go ahead, Mr.

13  Levinson.

14    MR. LEVINSON:  I have nothing further,

15  Your Honor.  I'm going to pass the witness.

16    THE COURT:  Very well.  Cross?

17    MR. ZOTT:  I think so, Your Honor.

18    Thank you.

19    CROSS-EXAMINATION

20  BY MR. ZOTT:

21    **Q    Mr. Hilty, as I understand it, one of**

22  **your principal opinions is that a continued stay**

23  **will not enhance the prospect of a successful**

24  **resolution of the case, right?**

25    **A    That's correct.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


IN RE:                        )   No. 15 A 00149
                              )
CAESARS ENTERTAINMENT         )   Chicago, Illinois
OPERATING COMPANY, INC., )        August 25, 2016
                              )   9:30 a.m.
              Debtors. )          2:00 p.m.


        VOLUME III (Pages 1 - 276)



             TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE A. BENJAMIN GOLDGAR


   APPEARANCES:


For the Debtors:              Mr. Jeffrey Zeiger;
                              Mr. David Zott;
                              Mr. Scott Lerner;

For WSFS:                     Mr. Sidney Levinson;
                              Mr. Bruce Bennett;
                              Mr. James Johnston;
                              Mr. Geoffrey Stewart;

For Trilogy:                  Mr. Frank Velocci;

For BOKF:                     Ms. Beth Brownstein;


   Court Reporters:           AMY M. SPEE, CSR, RPR, CRR
                              JERRI ESTELLE, CSR, RPR
                              United States Courthouse
                              219 South Dearborn Street
                              Room 661
                              Chicago, Illinois 60604

I N D E X

WITNESS:                                                    PAGE:

    DAVID R. HILTY

Cross-Examination (Resumed) By Mr. Zott            3
Redirect Examination By Mr. Levinson            101

    RONEN STAUBER
(Examination by deposition)

Direct Examination By Mr. Stewart            121

Cross-Examination By Mr. Casey            160
(As read by Mr. Stewart)

1  So I agree with Your Honor that a part

2  of the goal of this injunction has always been,

3  and it remains, to reach a consensual deal,

4  absolutely.  On the other hand, it cannot rise or

5  fall with whether we reach a consensual deal.

6  Because if it were to rise and fall with that,

7  then you would basically give one creditor group

8  the ability to deprive us of the injunction simply

9  by refusing to negotiate or to negotiate to a

10  deal.  And that's --

11  THE COURT:  I'm not disputing that I

12  have the power.

13  MR. ZOTT:  Right.

14  THE COURT:  I'm disputing that that's a

15  sensible exercise of it.

16  MR. ZOTT:  That's fair.

17  THE COURT:  If I were to have granted

18  the relief that you originally sought, which was

19  sought about two months after the case was filed,

20  and said an injunction right through not just the

21  confirmation hearing, mind you, but a decision on

22  confirmation, and who knows when that will be,

23  wouldn't that effectively be granting CEC the

24  benefit of the automatic stay?  I mean, it's more

25  than just an injunction, isn't it?  That's the

1  automatic stay, at least as to these claims,

2  because it runs right through --

3         MR. ZOTT:  But, Judge, it has nothing

4  to do with CEC, nothing.  What it has to do with

5  is the debtors' effort to reorganize.  It's our

6  view that within CEC are estate assets that we

7  need to bring back in order to reorganize, and

8  they have agreed with us to return those

9  voluntarily to fund our plan.  So it's about the

10 debtors and maximizing value for the debtors'

11 creditors.  It's not about CEC.

12        THE COURT:  Well, but it is.  And I

13 don't see how you can say it isn't.  I mean, it's

14 CEC that is the immediate beneficiary of the

15 injunction.  The judgment will be against CEC.

16 Otherwise, CEC wouldn't care.  And apparently it

17 does care somewhat.

18        MR. ZOTT:  Your Honor, I understand

19 that, obviously, the third-party litigation

20 involves the guaranty claimants and CEC.  But I

21 respectfully submit that the injunction will

22 benefit the debtors and all of the debtors'

23 creditors.  And that is why all the creditors,

24 with the sole exception of the second lien group,

25 or part of the second lien group, support the

1  catastrophic for the creditors that support it.

2           We're close, but we're not there yet.

3  We ask that you grant a stay, obviously in your

4  discretion.  We ask that it be through

5  confirmation, but we ask that we don't do anything

6  that destroys what we've done.

7           Thank you, again, for your time.  I

8  very much appreciate it.  I think I'm on the mark.

9           THE COURT:  You actually had two

10  minutes, but I probably shouldn't tell you that.

11           Thank you very much, Mr. Zott.

12           MR. ZOTT:  I have a few more comments.

13  No, I'm kidding, Your Honor.  Thanks again.  I'm

14  done.  I told you I don't talk a lot.

15           Unless you have questions, Your Honor.

16           THE COURT:  No, I'm fine.  Thanks.

17           Okay.  Mr. Zott suggested that there

18  might be conversations in the wake of this

19  hearing, and Mr. Bennett's folks, in their paper,

20  in their objection to the motion, asked me,

21  actually, not to rule until Monday.

22           Is that what people want?  I mean, I've

23  seen Mr. Bennett and Mr. Sprayregen in here for 48

24  hours now, basically just eyeing each other across

25  the room, during which time they were not

1    apparently talking settlement, unless they're

2    telepathic.  So if people are going to talk, I

3    won't rule until Monday.  But if they're not going

4    to talk, then I'll rule tomorrow.

5              So what would you like me to do, or

6    would you like a minute to think about it?

7              MR. BENNETT:  Why don't we have a

8    minute?

9              THE COURT:  Sure.  We'll take a short

10   recess.

11             (Brief recess.)

12             THE CLERK:  Court is reconvened.

13   Please be seated and come to order.

14             MR. ZOTT:  Your Honor, it's our

15   view that -- and we appreciate Your Honor's

16   inquiry.  Two things.  We think Your Honor should

17   rule as soon as possible, including tomorrow, if

18   we can get there tomorrow.

19             At the same time, we're absolutely

20   going to keep mediating, and we're going to -- as

21   soon as the mediator is available, we'll mediate.

22   And if that's tomorrow or whatever day that is,

23   we'll do it, but we think it would actually help

24   the process to have that ruling as soon as you can

25   do it.

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Chapter 11 |
| COMPANY, INC., et al., | ) | |
| | ) | Adversary Case. No. 15-00149 |
| *Plaintiffs* | ) | |
| vs. | ) | |
| | ) | |
| BOKF, N.A., WILMINGTON SAVINGS FUND | ) | **Hearing Date:  June 3, 2015** |
| SOCIETY, FSB, MEEHANCOMBS GLOBAL | ) | **10:30 a.m. (prevailing Central Time)** |
| CREDIT OPPORTUNITIES MASTER FUND, LP, | ) | |
| RELATIVE VALUE-LONG/SHORT DEBT | ) | |
| PORTFOLIO, A SERIES OF UNDERLYING | ) | |
| FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA | ) | |
| MASTER FUND, LTD., TRILOGY PORTFOLIO | ) | |
| COMPANY, LLC, FREDERICK BARTON | ) | |
| DANNER, AND CAESARS ENTERTAINMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

**<u>DEBTORS' PRETRIAL BRIEF IN SUPPORT OF THEIR MOTION TO STAY, OR IN
THE ALTERNATIVE FOR INJUNCTIVE RELIEF ENJOINING PROSECUTION OF,
CERTAIN LITIGATION AGAINST CAESARS ENTERTAINMENT CORPORATION</u>**

1.     This is a textbook case for a temporary stay of the guaranty litigation.  The

continued prosecution of guaranty claims against CEC by certain CEOC creditors is directly at

odds with the reorganization objectives of the Bankruptcy Code and will impair the Court's

jurisdiction over the Debtors' reorganization by (i) threatening the Debtors' ability to recover

---

[1]   A complete list of the Debtors and the last four digits of their federal tax identification
numbers may be obtained at https://cases.primeclerk.com/CEOC.

estate property for the benefit of all creditors, and (ii) greatly diminishing the prospects of a successful reorganization. Apart from this, the guaranty litigation will deplete property of the estate because the Debtors share insurance with CEC that covers the litigation.[2]

2. The Debtors have substantial claims against CEC that represent one of the principal assets of their estates. Therefore, any reorganization of the Debtors will require a substantial contribution from CEC, either through a settlement or litigation. The Debtors are working towards a reorganization that maximizes value and creditor recoveries through substantial, near-term contributions from CEC. The value of these contributions would be distributed to all creditors in accordance with the statutory priority scheme under a plan in these chapter 11 cases. Instead of allowing this Court to oversee this process, certain of Debtors' creditors are pursuing competing judgments against CEC related to their CEOC debt. CEC, however, cannot pay large judgments in the guaranty litigation to certain of CEOC's creditors and also make substantial contributions to the Debtors' reorganization. CEC only has approximately $257 million in distributable cash and its market capitalization is only $1.4 billion. Under any reasonable valuation, the judgments sought against CEC in the existing guaranty litigation alone exceed CEC's value.

3. The Defendants here—indenture trustees and holders of CEOC's second lien and unsecured notes—seek to recover more than $4.5 billion from CEC on account of guaranties that they say were improperly released. Both the Debtors' estate claims and the pending guaranty claims are against the same defendant, seek to recover from the same limited pool of assets, and arise from the same course of conduct that the Examiner, the Debtors and other parties are investigating in these proceedings. But this is not just about the $4.5 billion in claims that

---

[2] Capitalized terms not defined herein are defined in the Debtors' Complaint [Adv. Proc. Dkt. 1] and Motion to Stay [Adv. Proc. Dkt. 4].

Defendants are currently pursuing against CEC.   CEOC's first lien noteholders hold an additional $6.3 billion in allegedly guaranteed debt.   These senior lenders currently support the RSA and prefer a settlement in bankruptcy to litigating their guaranty claims.   But if the Defendants' guaranty claims are not stayed, the first lien noteholders undoubtedly will join the fray to avoid having junior creditors jump ahead of their claims, resulting in more than $10 billion in guaranty claims against CEC.   As a result, litigation impacting one of the Debtors' principal assets (their claims against CEC) and two-thirds of their capital structure will be resolved outside of this bankruptcy proceeding.

4.      Accordingly, the Debtors seek a temporary stay of the guaranty litigation until 60 days after the Examiner issues his final report.   This represents a material shortening of the stay through confirmation that the Debtors originally sought.   This temporary stay will give all parties time to digest the Examiner's report—including his evaluation of the guaranty litigation itself that Defendants seek to pursue—and, in light of its findings, attempt to reach a consensual or otherwise confirmable plan of reorganization.   The Court can revisit the stay at that time based on the Examiner's conclusions and the reorganization's progress and prospects.   Although temporary, the stay will provide the Debtors with a critically important window to pursue their efforts to reorganize and build consensus around a value-maximizing plan.   The continued prosecution of the guaranty suits jeopardizes CEC's ability to make substantial contributions to the estate for the benefit of all creditors and threatens CEC's continued viability, which may lead to lower creditor recoveries.   In contrast, a temporary stay will not harm Defendants as they will

be able to litigate issues related to their guaranty claims once the stay is lifted or at confirmation.[3]

## ARGUMENT

5.     This Court can enjoin proceedings in other courts upon a showing that (i) the proceedings will impair this Court's jurisdiction; (ii) the debtor has a reasonable likelihood of a successful reorganization; and (iii) an injunction is in the public interest. *Fisher v. Apostolou,* 155 F.3d 876, 882 (7th Cir. 1998) ("The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate or the allocation of property among creditors."); *In re R&G Props.*, No. 09-37463, Feb. 3, 2010 Hr'g Tr. at 4 (Goldgar, J.) (for an injunction pursuant to section 105(a), a debtor "need only show that the proceedings to be enjoined would impair the court's jurisdiction and, of course, must show likelihood of success on the merits"); *see also In re Gander Partners LLC,* 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010).  The evidence at trial will show that these standards are met here.

## I.     THE GUARANTY LITIGATION THREATENS THE COURT'S JURISDICTION OVER THIS REORGANIZATION.

6.     An action against a non-debtor impairs the court's jurisdiction where it "may affect the amount of property in the bankrupt estate," *Fisher*, 155 F.3d at 882, "frustrate the statutory scheme embodied in Chapter 11 or diminish a debtor's ability to formulate a plan of reorganization," *In re Gander Partners*, 432 B.R. at 788; *accord In re R&G Props.*, Feb. 3, 2010 Hr'g Tr. at 4 (enjoining lawsuit that would impair the court's jurisdiction by "interfer[ing] with

---

[3]   Defendant WSFS originally was pursuing fraudulent transfer and other claims against CEC and fiduciary claims against the Debtors' directors.  WSFS has since agreed that those claims are stayed, and it is only seeking to prosecute its guaranty claims against CEC.  WSFS Obj., Adv. Proc. Dkt. 22, ¶ 25 ("WSFS is not challenging the Debtors' position that section 362 operates to stay the Non-Independent Claims.").  Thus, the sole remaining issue before the Court is whether the Defendants should be allowed to continue their guaranty claims against CEC.

accomplishing [a] reorganization"); *In re Kmart Corp.*, 285 B.R. 679, 688 (Bankr. N.D. Ill. 2002) (stay is appropriate to enjoin proceedings that would "divert[] resources need[ed] for [the debtor's] reorganization"). The continued prosecution of the guaranty litigation will impair this Court's jurisdiction in at least three ways.

**A.     The Guaranty Litigation Threatens the Debtors' Ability to Recover Estate Property.**

7.     First, the continuation of the guaranty litigation threatens the Debtors' ability to recover estate property. *See In re Gander Partners*, 432 B.R. at 778 (section 105 injunction appropriate where the actions sought to be enjoined "would interfere with, deplete or adversely affect property of a debtor's estate"); *Fisher*, 155 F.3d at 882 (jurisdiction to stay proceedings extends to actions that "may affect the amount of property in the bankrupt estate").

8.     The Debtors have valuable claims against CEC to recover wrongfully transferred estate property and these claims belong exclusively to the Debtors. They negotiated an RSA that requires CEC to contribute at least $1.5 billion to the estate to settle those claims, and the amount of CEC's contribution is likely to increase as the Debtors continue to negotiate with additional creditor groups. The Defendants, however, seek more than $4.5 billion from the same entity (CEC), from the same pool of assets, and based on the same alleged "scheme" or course of conduct. *See, e.g.*, Debtors Ex. 2 (*MeehanCombs* Am. Compl.) ¶ 85 ("In sum, the foregoing course of conduct, including the Agreement at issue in this Complaint, constituted an aggregate plan or scheme by CEC and CEOC to restructure CEOC's $19.8 billion debt out of court to stack the deck against certain creditors, such as Plaintiffs and the Disenfranchised Noteholders, in advance of CEOC's recently-filed bankruptcy that will favor CEC and other stakeholders and insiders and allow CEC to evade its irrevocable guarantee of the Notes."); *see also id.* ¶¶ 14, 62, 117; Debtors Ex. 4 (*BOKF, N.A.* Compl.) ¶ 70 ("After removing CEOC's most valuable assets

and saddling it with debt and other liabilities, CEC concocted its final strategic maneuvers to preserve the value it created in 'Good Caesars' and ensure that creditors of CEOC or 'Bad Caesars' had no chance of recovery on the Parent Guarantee"); *see also id.* ¶ 3; Debtors Ex. 3 (*Frederick Barton Danner* Compl.) ¶ 12 ("Lastly, the [guaranty] Amendments are part of Caesars' larger plan to move CEOC's most valuable assets beyond the reach of creditors, thus enriching CEC, its shareholders and its affiliates at the expense of CEOC's creditors, including the Non-Preferred Legacy Noteholders."); *see also id.* ¶ 50; Debtors' Ex. 1 (*WSFS* Compl.) ¶ 1 ("This action arises from a series of self-dealing transactions … The purpose and effect of the transfers was to enrich CEC and its affiliates and shareholders at the expense of CEOC and to move CEOC's assets beyond the reach of CEOC's creditors.").

9.     CEC, however, has limited assets. It has only approximately $257 million in unrestricted cash and a $1.4 billion market capitalization. *See* Debtors Ex. 28 (Mar. 31, 2015 Cash Balances); *see also* Debtors Ex. 34 (CEC 10-Q, May 11, 2015) at 9. Under any reasonable valuation, CEC simply does not have the financial wherewithal to make a substantial contribution to the Debtors' estates, either through the RSA, another plan, or litigation, and also satisfy multi-billion dollar guaranty claims. And, every dollar the Defendants recover through their guaranty lawsuits against CEC is a dollar less that CEC has to satisfy the Debtors' claims and otherwise contribute to the Debtors' reorganization for the benefit of all creditors.

**B.    The Guaranty Litigation Will Diminish the Debtors' Ability to Formulate a Plan of Reorganization.**

10.    Second, the continued prosecution of the guaranty lawsuits will "diminish [the] debtor[s'] ability to formulate a plan of reorganization."  *In re Gander Partners*, 432 B.R. at 788; *accord In re R&G Props.*, Feb. 3, 2010 Hr'g Tr. at 4 (enjoining lawsuit where it would impair the court's jurisdiction by "interfer[ing] with accomplishing [a] reorganization").

11.    A lynchpin of any reorganization will be the Debtors' ability to secure substantial contributions from CEC, either voluntarily or through litigation.  The guaranty litigation, however, poses a substantial obstacle on the path to a consensual plan as it threatens CEC's ability and incentive to make *any* contribution to the Debtors' estate, much less the $1.5 billion contribution called for by the RSA.  Indeed, CEC has publicly announced that an adverse result in the guaranty litigation would "raise substantial doubt" about CEC's "ability to continue as a going concern."  Debtors Ex. 34 (CEC 10-Q, May 11, 2015) at 8.  The Debtors believe that CEC likely will file for bankruptcy if judgment is entered against CEC in the guaranty litigation.  This will further diminish the Debtors' ability to reorganize by, among other things, eliminating two of the key elements of the Debtors' value-maximizing restructuring strategy: a substantial and immediate contribution by CEC to settle litigation claims and credit support from CEC for a REIT structure.  Although these cases are already heavily litigious, a CEC bankruptcy will usher in a new level of extended, value-destructive litigation to the detriment of CEOC and its creditors, including litigation over the proper venue for a CEC bankruptcy, whether the CEC and the Debtors' cases should be separately administered, whether the automatic stay in a CEC case would impair the Debtors' ability to collect on their claims, and so on…. Continuation of the guaranty litigation likewise threatens CEC's intended merger with CAC through which CEC will gain access to the resources required to make its contribution under the RSA.  Simply put, the

continued prosecution of the guaranty claims at this juncture will have very real and direct financial, business and litigation consequences for Debtors and their creditors.

12.     Courts in this district have entered injunctions where the continued prosecution of actions against a non-debtor threatened a source of funding for the debtor's reorganization.  For example, in *R&G Properties*, this Court enjoined two state court actions from proceeding against the debtor's partners where the partners' "ability to contribute time and money, particularly money, [would] be jeopardized if the state actions proceed[ed]" and where the partners contemplated bankruptcy absent a stay.  Feb. 3, 2010 Hr'g Tr. at 9–10.  Likewise, in *Gander*, the court enjoined actions against the debtor's guarantors where the actions threatened the guarantors' ability to contribute funds to the reorganization: "If the lawsuits proceed their outcome could impair this court's jurisdiction to help the Debtors to reorganize as the source of funds to assist the reorganization would no longer be available."  432 B.R. at 788; *see also Fisher*, 155 F.3d at 879-883 (enjoining creditors' securities claims against non-debtors to prevent "a race to the courthouse" in pursuit of "the same limited pool of money, in the possession of the same defendants").[4]

---

[4]  In *In re Teknek*, the Seventh Circuit affirmed its ruling in *Fisher* that a bankruptcy court is empowered to stay claims against nondebtors that "may affect the amount of property in the bankrupt estate, or the allocation of property among creditors."  563 F.3d 639, 648–49 (7th Cir. 2009) (citations omitted).  The court affirmed the district court's denial of an injunction in that case, however, because the creditor at issue had secured a judgment "against both the debtor *and an independent non-debtor,* Electronics.  It is Electronics' joint and several liability that makes [the judgment creditor's] claim special."  *Id.* at 644 (emphasis in original).  The underlying defendants had "looted both [the debtor] and [the non-debtor] Electronics.  Those are separate acts, which caused separate injuries to two separate companies, only one of which is in bankruptcy."  *Id.* at 649.  The court reasoned that the creditor's claims were therefore not sufficiently related to the bankruptcy proceedings to warrant an injunction.  *Id.* at 649-650.  The court also deemed "relevant" that the judgment creditor was "the debtor's only major creditor" so allowing its case to proceed "will have no effect on a larger class of creditors" or "'derail the bankruptcy proceedings.'"  *Id.* at 650 (quoting *Fisher*, 155 F.3d at 883).  Here, like *Fisher* and unlike *Teknek*, the Defendants' guarantee claims arise from their creditor relationship with the

13.   Not only do the guaranty claims jeopardize CEC's *ability* to contribute to the Debtors' reorganization, they also remove the *incentive* for CEC and the Debtors' other constituents to engage in plan negotiations while the litigations proceed.   CEC has agreed to make substantial contributions to the Debtors in settlement of all claims against it, including the guaranty claims.   CEC has little incentive to continue pursuing negotiations with the Debtors' creditors, or to make a substantial contribution to the restructuring, if it must simultaneously litigate the guaranty claims—and face the prospect of additional multi-billion dollar judgments— in other courts.   The continued prosecution of the guaranty claims would therefore undercut CEC's proposed settlement and remove its incentive to work out a coordinated resolution of claims for the benefit of all creditors.

14.   The guaranty litigation similarly risks diverting the efforts of other creditors away from negotiating a consensual reorganization.   As of now, CEOC's first lien noteholders have agreed to settle their guaranty claims against CEC as part of the RSA.   Indeed, as part of that agreement, the first lien noteholders have accepted a proposed restructuring that makes them less than whole in an effort to provide additional value to junior creditors to reach a consensual deal. But if the guaranty claims proceed, the first lien noteholders will likely decide to litigate their guaranty claims against CEC outside of the bankruptcy in order to prevent junior creditors from jumping ahead of their claims.   The first lien bank lenders, which have been in stop and start negotiations over the RSA, likewise would have no incentive to continue negotiating once CEC and the first lien noteholders withdraw from the RSA negotiations in favor of litigation.   In short, all eyes would turn to the guaranty litigation, which may take years to resolve as it involves a

---

Debtors, they allege a single scheme to loot the Debtor of assets and thereby thwart creditor recoveries, and the prosecution of their lawsuits outside of bankruptcy will adversely affect other creditors and threaten to derail the bankruptcy proceedings.

novel and controversial theory of liability under the Trust Indenture Act that is the subject of vigorous dispute among the parties, has never been considered by a federal circuit court and likely will lead to lengthy appeals.  This reorganization would come to a grinding, value-destructive halt.  This is true even if only one of the guaranty cases is allowed to go forward (as at least one Defendant apparently intends to argue).  Given the overlapping legal and factual issues among the guaranty actions, permitting even one suit to proceed will remove creditors' incentive to pursue a restructuring in this Court, and impair this Court's jurisdiction, as issues central to their recoveries are being decided elsewhere.

> ### C. Absent a Stay, Litigation Directly Impacting the Debtors' Principal Asset and Involving the Majority of Their Capital Structure Will Be Transferred to Another Court.

15.     The Debtors' claims against CEC are one of the principal assets of their estates.  Currently, the Defendants assert more than $4.5 billion in claims against the same pool of money that the Debtors' seek to recover, either through settlement or litigation.  And, as noted, that is only the beginning of the guaranty claims.  Absent a stay, the first lien noteholders will likely join the fray.  Allowing the Defendants to continue pursuing their guaranty claims against CEC outside of this bankruptcy will thus trigger a race to the courthouse and unravel the Debtors' efforts to recover on these claims for the benefit of all creditors.  *See, e.g. Fisher*, 155 F.3d at 883 (enjoining actions under section 105 where "allowing the creditors to convert the bankruptcy proceeding into a race to the courthouse would derail the bankruptcy proceedings").  The net result will be that litigation directly impacting one of the Debtors' largest assets and involving the majority of its capital structure will be transferred to another court.  It is difficult to imagine a more direct threat to this Court's jurisdiction over this reorganization or the Debtors' efforts to reorganize.

## II.   THE GUARANTY LITIGATION WILL DEPLETE THE ESTATES' PROPERTY INTEREST IN SHARED INSURANCE WITH CEC.

16.     Separately, the guaranty litigation also will deplete the proceeds of insurance policies that are property of the Debtors' estates.  *See* 11 U.S.C. §§ 541(a)(1), 541(a)(6); *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 748 (7th Cir. 1989) (noting that a "policy of insurance is an asset of the estate"); *In re Gladwell*, 2009 WL 140098, at *2 (Bankr. C.D. Ill. 2009) ("Insurance policies and debtor's rights under insurance policies have generally been held to constitute property of the bankruptcy estate."); *In re Allied Prods. Corp.*, 288 B.R. 533, 535-36 (Bankr. N.D. Ill. 2003) ("insurance policies are property of its estate in bankruptcy, under the broad definition of § 541(a) of the Bankruptcy Code").  Where a debtor and non-debtor have "a shared interest in any proceeds" of a policy, the proceeds are property of the estate.  *See In re Feher*, 202 B.R. 966, 970 (Bankr. S.D. Ill. 1996) ("In view of the fact that [the debtor] has a shared interest in any proceeds paid under the policy, the proceeds constitute property of [the debtor]'s bankruptcy estate."); *In re Forty-Eight Insulations, Inc.*, 54 B.R. 905, 908 (Bankr. N.D. Ill. 1985) ("insurance policies and proceeds are property of the estate").

17.     CEC and CEOC share a common Management Liability Insurance Policy ("Policy") that provides coverage to CEC for the guaranty claims, as well as coverage to CEOC, its subsidiaries and its directors.  *See* Debtors Ex. 65 (AIG Insurance Policy) at 20, 22 (defining "Insured" to include "Organization," which in turn includes "each Subsidiary" of CEC, and "Executive," which includes directors of CEC and its subsidiaries).  The insurance structure provides $155 million in coverage for CEC and its subsidiaries, including CEOC.  *See* Debtors Ex. 66 (Chart of Insurance Tower).  AIG, the primary carrier, has acknowledged that the *Danner* and *MeehanCombs* actions are covered by the Policy, and has reserved its rights with respect to the *WSFS* action.  *See* Debtors Ex. 71 (Oct. 17, 2014 AIG Letter); Debtors Ex. 72 (Oct. 31, 2014

11

AIG Letter).  The excess carriers have taken the same position as AIG.  *See, e.g.,* Debtors Ex. 73

(Nov. 1, 2014 HCC Global Letter); Debtors Ex. 74 (Nov. 7, 2014 Axis Letter); Debtors Ex. 75

(Dec. 3, 2014 RSUI Group, Inc. Letter); Debtors Ex. 76 (Dec. 4, 2014 Endurance Letter);

Debtors Ex. 77 (Dec. 29. 2014 Aspen Letter).

18.     Allowing the guaranty litigation to proceed against CEC will reduce the proceeds

available to the Debtors.  The shared insurance covers defense costs in addition to settlements

and judgments.  *See* Debtors Ex. 65 (AIG Insurance Policy) at 9.  The proceeds are paid on a

first-billed, first-paid basis, such that payments on behalf of CEC will reduce the proceeds

available to the Debtors, thereby depleting an asset of the Debtors' estates.  *See In re IFC Credit

Corp.*, 422 B.R. 659, 663 (Bankr. N.D. Ill. 2010) (staying litigation against non-debtors pursuant

to section 105(a) because of risk to debtors' insurance policy proceeds); *In re A.H. Robins Co.,

Inc.*, 788 F.2d 994, 1001–02 (4th Cir. 1986) (proceedings against non-debtors "who qualify as

additional insureds under the [insurance] policy are to be stayed under section 362(a)(3)"); *In re

marchFIRST, Inc.*, 288 B.R. 526, 532-33 (Bankr. N.D. Ill. 2002) (staying shareholder litigation

against non-debtors pursuant to section 105(a) because of risk of depleting insurance proceeds

available to debtor), *aff'd sub nom. Megliola v. Maxwell*, 293 B.R. 443, 449-50 (N.D. Ill. 2003).

Accordingly, the depletion of the Debtors' shared insurance through continuation of the guaranty

litigation provides an independent basis for a temporary stay.  11 U.S. C. § 362(a)(3).

## III.     THE DEBTORS HAVE A REASONABLE LIKELIHOOD OF REORGANIZING SUCCESSFULLY.

19.     "Likelihood of success on the merits, courts have said repeatedly, means

reasonable likelihood of a successful reorganization." *In re R&G Props.*, Feb. 3, 2010 Hr'g Tr. at

4; *accord In re Gander Partners,* 432 B.R. at 788.  "[L]ess evidence is necessary" where the

bankruptcy case is in its early stages, "and doubts … are to be resolved in favor of the debtor."
*In re R&G Props.*, Feb. 3, 2010 Hr'g Tr. at 6.

20.    There is no question the Debtors have a reasonable (indeed a high) likelihood of successful reorganization—at least if the guaranty litigation is stayed.  The Debtors operate a strong and growing business.  The Debtors have a national footprint of quality casinos, anchored by the iconic Caesars Palace in Las Vegas, a famous brand name and a proprietary customer rewards system that is the envy of the industry—all points the Defendants' concede.  *See, e.g.*, G. Lyon Dep. at 114:14-115:4.   The Debtors have generated nearly $1 billion of EBITDA historically, and their first quarter performance demonstrates they are on track to meet this target again this year.  *See* Debtors Ex. 23 (Feb. 28, 2015 CEOC Long Term Financial Projections) at 1; Debtors Ex. 29 (April 13, 2015 Presentation to UCC and 2L Committee - Business Plan) at 7; Debtors Ex. 21 (CEOC February Monthly Creditor Advisory Reporting Package) at 4; Debtors Ex. 25 (CEOC March Monthly Creditor Advisory Reporting Package) at 4.  The strength of the Debtors' business alone makes it likely they will reorganize successfully.

21.    The Debtors are also likely to reorganize successfully given the nature of their restructuring.  The Debtors' restructuring is principally focused on right-sizing their debt to a level they can adequately service, and converting to a REIT structure to maximize distributable value to creditors.  Indeed, the Debtors generate positive cash flow on an unlevered basis and have significant real property holdings that make a REIT structure attractive.  The Debtors' current plan seeks to reduce their debt by $10 billion to a level that the Debtors can support as a REIT structure.  *See generally* Joint Defs. Ex. 73 (Debtors' Joint Plan of Reorganization).  Apart from its sound business, "the Debtors have so far been successful in doing everything they've needed to do to date."  *In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009).  So

far, the Debtors, among other things, have reached agreement with the majority of CEOC's first

lien noteholders and CEC on the economic terms of a restructuring as set forth in the RSA;

established venue in the Northern District of Illinois; obtained first-day relief that was essential

to the Debtors' operations; negotiated for the long-term use of cash collateral; moved for the

appointment of an examiner who has commenced his investigation into certain prepetition

transactions; announced a market test; and obtained a six-month extension of exclusivity.

22.      In short, "the Debtors are proceeding on track, and there is no reason to believe or

suspect that that their reorganization will fail—unless, of course, the actions sought to be

enjoined *cause* it to fail." *In re Lyondell*, 402 B.R. at 590.

## IV.   THE PUBLIC INTEREST STRONGLY FAVORS A TEMPORARY INJUNCTION.

23.      "Promoting a successful reorganization is one of the most important public

interests." *In re Gander Partners*, 432 B.R. at 788 (quoting *In re Integrated Health Services,

Inc.*, 281 B.R. 231, 239 (Bankr. D. Del. 1992)).   Public policy also strongly favors the

consensual resolution of disputes.  *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans

World Airlines, Inc.*, 630 F.2d 1164, 1166 (7th Cir. 1980) ("Federal courts look with great favor

upon the voluntary resolution of litigation through settlement."); *In re Beltran*, 2010 WL

3338533, at *3 (Bankr. N.D. Ill. Aug. 25, 2010) ("Consensual resolution of litigation has been

favored in the law from time immemorial.").

24.      Temporarily staying the guaranty claims will preserve assets necessary to fund the

Debtors' reorganization, and provide a breathing spell for the Debtors to pursue a consensual

plan that will maximize recovery for all parties.

25.      Conversely, the Defendants will suffer no harm from a temporary stay of their

claims until the Examiner issues his report.  If the Debtors are able to achieve a consensual

restructuring that maximizes recovery for all parties, the Defendants will directly benefit.  If the

Debtors achieve a confirmable plan centered around a substantial contribution from CEC and the

Court approves a release of the Defendants' guaranty claims in that context, judicial economy

will also be served as multiple courts will not expend resources adjudicating these issues in the

interim.  The alternative—a likely CEC bankruptcy if found liable on the guaranty claims with

the prospect for endless litigation—will be highly value destructive and likely will lead to lower

recoveries for the Defendants and other creditors.  And if the Debtors cannot achieve substantial

progress towards a consensual restructuring during the stay period, the Court can revisit the stay

in light of the Examiner's report and the reorganization's prospects and progress.

## CONCLUSION

26.     The evidence at trial will confirm that a stay of the guaranty litigation is necessary

to avoid derailing the Debtors' reorganization efforts.  The Debtors respectfully request that the

Court grant the Debtors' motion to stay the guaranty litigation against CEC.

Dated:  May 29, 2015
Chicago, Illinois

/s/ David J. Zott, P.C.
_____

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Paul M. Basta, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors*

16
**SA194**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,[1] | ) ) ) | Case No. 15-01145 (ABG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*, | ) ) ) | Chapter 11 |
| | ) | Adversary Case No. 15-00149 |
| *Plaintiffs* | ) | |
| vs. | ) | |
| | ) | |
| BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD., TRILOGY PORTFOLIO COMPANY, LLC, and FREDERICK BARTON DANNER, | ) ) ) ) ) ) ) ) ) ) ) ) ) | **Hearing Date:  July 22, 2015** **1:30 p.m. (prevailing Central Time)** |
| *Defendants.* | ) | |

## DEBTORS' POST TRIAL BRIEF IN SUPPORT OF THEIR MOTION TO STAY, OR IN THE ALTERNATIVE FOR INJUNCTIVE RELIEF ENJOINING PROSECUTION OF, CERTAIN LITIGATION AGAINST CAESARS ENTERTAINMENT CORPORATION

---

[1]   A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

1.      This is a pivotal moment in this chapter 11 case.  The Debtors have developed a framework for a plan of reorganization that is premised on substantial contributions by CEC, both directly and in the form of credit support for a value-maximizing REIT structure and securities that will be distributed to creditors under a plan.  The Debtors' first lien noteholders support this framework and negotiations continue with other stakeholders to build further consensus.  There is also no dispute that *any* reorganization of these Debtors will require a substantial financial contribution from CEC, either voluntarily or through litigation, because estate causes of action against CEC are one of the estate's primary assets.  Certain CEOC creditors, however, are now seeking judgments against CEC in lawsuits outside of this bankruptcy case to recover $11 billion in alleged guaranty claims, including a lawsuit that the first lien indenture trustee filed after trial seeking more than $6 billion.  One indenture trustee already has filed an expedited motion for summary judgment and another is expected later today.  Thus, the first of these judgments could be entered by August and will likely result in CEC filing for chapter 11—if it even waits that long—regardless of whether the judgment is a declaration of liability or a damages award as CEC lacks the wherewithal to bond an appeal.  Dueling CEC and CEOC bankruptcies will destroy significant value, impair if not eliminate the Debtors' ability to secure substantial contributions from CEC, interfere with the Debtors' duty to marshal estate assets for the benefit of all of its creditors, and imperil Debtors' reorganization efforts.

2.      This Court has the jurisdiction and authority to temporarily enjoin the guaranty litigation from proceeding because it will "affect the amount of property in the bankrupt estate or the allocation of property among creditors."  *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).  The evidence at trial was largely undisputed and proved that the Debtors' request falls squarely within *Fisher*.  As in *Fisher*, Defendants' claims arise from their relationship with

**SA196**

Debtor CEOC (the primary obligor on their notes) and Defendants stand in exactly the same position as creditors holding $11 billion in claims under CEOC-issued (and CEC guaranteed) indentures with very similar (and in some cases identical) guaranty language.  The guaranty claims seek recourse against the same entity (CEC), for the same limited pool of assets and, according to Defendants themselves, arise from the same "aggregate plan or scheme" as the Debtors' estate claims.  Accordingly, as in *Fisher*, the Debtors must have a chance to maximize value for all creditors; Defendants cannot cut to the front of the line and end run this Court's jurisdiction over this case.

3.      *Teknek* does not compel a different result.  563 F.3d 639 (7th Cir. 2009).  *Teknek* affirmed the guiding principles of *Fisher* but held that the claims sought to be enjoined were not sufficiently "related to" the debtor's bankruptcy.  Unlike here, in *Teknek*, the debtor's only creditor sought to enforce a patent infringement judgment against non-debtor affiliates on a claim that was entirely independent of the debtor, not shared with other creditors, and did not implicate the Bankruptcy Court's power over estate property or creditor distributions.

4.      To conclude that the Court's "related to" jurisdiction does not extend far enough to warrant an injunction under the facts and circumstances present here would eliminate section 105 from the Bankruptcy Code.  The guaranty litigation threatens the substantial progress that the Debtors have made towards a consensual restructuring, including the RSA, their ongoing negotiations with other parties in interest, the Examiner investigation and Debtors' market test process.  As set forth below, there is little to lose and nearly everything to gain by staying the guaranty litigation until 60 days after the Examiner issues his final report.

10 (Lyon). The Debtors' principal problem is a highly-levered balance sheet—a problem that chapter 11 is well suited to solve. *Id.* at 322:14–19; June 3 Tr. 60:12–61:19 (Millstein).

52.     Moreover, Debtors "have so far been successful in doing everything they've needed to do to date." *See In re Lyondell*, 402 B.R. at 590. Among other things, the Debtors have reached agreement with a large majority of CEOC's first lien noteholders and CEC on the economic terms of a restructuring as set forth in the RSA, obtained essential first-day relief, negotiated for the long-term use of cash collateral, moved for the appointment of an examiner who has commenced his investigation, announced a market test, and obtained a six-month extension of exclusivity. June 3 Tr. 48:6–9, 63:1–12, 98:19–25 (Millstein); PX 84; Dkt. Nos. 988, 992, 1690. The Debtors' progress shows they are on the path to a successful reorganization if the guaranty suits are stayed. There was no evidence to the contrary.

## VI.    THE PUBLIC INTEREST AND BALANCE OF HARMS STRONGLY FAVORS A TEMPORARY INJUNCTION.

53.     "Promoting a successful reorganization is one of the most important public interests." *Gander Partners*, 432 B.R. at 789. Public policy also strongly favors the consensual resolution of disputes. *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc*., 630 F.2d 1164, 1166 (7th Cir. 1980) ("Federal courts look with great favor upon the voluntary resolution of litigation through settlement."); *In re Beltran*, 2010 WL 3338533, at *3 (Bankr. N.D. Ill. Aug. 25, 2010) ("Consensual resolution of litigation has been favored in the law from time immemorial.").

54.     A temporary injunction would provide a critical window for the Debtors and other parties in interest to try to reach a consensual, value-maximizing plan that contains significant funding contributions and credit support from CEC. To accomplish this, the Debtors need to ensure that the entity from which they seek to extract these contributions (CEC) has the

resources and value to fund them.  A temporary stay will funnel to the reorganization all of the claims that relate to the estate, providing the parties with a strong incentive to reach a consensual resolution in the chapter 11 case.  June 3 Tr. 72:15–73:8 (Millstein).  By avoiding a value-destructive race to the courthouse, a temporary stay will preserve the currency that will fund a plan.  And extending that stay until 60 days after the Examiner issues his final report will allow the parties to attempt to complete those negotiations armed with important and objective reference points about both the estates' and the guaranty claims to the same assets.

55.     Defendants will suffer no harm from a temporary stay.  The threat of their guaranty claims will provide them with powerful leverage to negotiate a favorable consensual deal.  If they can achieve a deal, they are better off.  If not, the stay will lapse 60 days after the Examiner issues his report, and they will be no worse off.  June 3 Tr. 103:6–105:2 (Millstein).

56.     If Defendants instead are permitted to proceed to judgment, they will precipitate the very race to the courthouse that *Fisher* abhors.  And everyone—including the guaranty claimants—likely will be worse off.  Put simply, the guaranty claimants will never collect outside of bankruptcy on their guaranties by litigating with CEC.  Instead, they will succeed only in bankrupting CEC.

## CONCLUSION

Debtors fervently hope that the parties will avoid the litigation meltdown scenario, and value can be preserved and used to achieve a consensual plan.  Through this motion, they ask only for a chance—a chance that could benefit everyone, and will hurt no one.  Based on the largely undisputed record, the Debtors respectfully request that the Court grant the Debtors' motion to stay the guaranty litigation until 60 days after the Examiner issues his report.

No. 1:15-cv-06504

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE: CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Debtors.*

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Plaintiffs-Appellants,*

v.

BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD., TRILOGY PORTFOLIO COMPANY, LLC, AND FREDRICK BARTON DANNER,
*Defendants-Appellees.*

On Appeal from the United States Bankruptcy Court for the
Northern District of Illinois (Goldgar, J.)
Chapter 11 Case No. 15-01145
Adversary Proceeding No. 15-00149

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

John C. O'Quinn
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
655 15th Street, N.W.
Washington, D.C. 20005
Tel:    (202) 879-5000
Fax:    (202) 879-5200

Paul M. Basta, P.C.
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
601 Lexington Avenue
New York, N.Y. 10022
Tel:    (212) 446-4800
Fax:    (212) 446-4900

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Tel:    (312) 862-2000
Fax:    (312) 862-2200

*Counsel for Debtors / Plaintiffs-Appellants*

## INTRODUCTION

This is a pivotal moment in the Debtors' reorganization efforts. Any successful reorganization of the Debtors will require a substantial financial contribution from their non-debtor parent, Caesars Entertainment Company ("CEC"), either voluntarily or through litigation, because estate causes of action against CEC are one of the bankruptcy estate's two primary assets. And the Debtors have an agreement with CEC and certain of the Debtors' significant creditors that calls for CEC to provide substantial contributions and credit support worth at least $1.5 billion to the Debtors' restructuring. However, certain creditors are attempting to jump to the front of the line by litigating to judgment—in other courts—claims to revive previously released guarantees for *multiple billions of dollars* against CEC. If any of those actions move forward and is successful, CEC will be unable to contribute anything meaningful to the Debtors' reorganization for proper distribution to *all* of the Debtors' creditors in accordance with the absolute priority rule, thus imperiling their proposed chapter 11 plan.

This should not be happening. Courts have broad authority under 11 U.S.C. § 105(a) to issue "*any* order ... that is necessary or appropriate" to protect their jurisdiction and carry out the provisions of Title 11. (Emphasis added). It is well-settled that a bankruptcy court may temporarily enjoin actions against non-debtor third parties (like CEC) that will affect the integrity or the administration of the bankruptcy estate. That is what the Debtors sought here.

Although acknowledging that the actions against CEC would have been stayed in most other courts, the bankruptcy court refused to enter an injunction here based solely on the view that the Seventh Circuit— uniquely among all other circuit courts—has restricted § 105(a) relief to situations where the debtor has a claim against the non-debtor defendant that arises from the "same acts" as those underlying the non-bankruptcy litigation sought to be enjoined. Compounding its error, it also held this "same acts" requirement can only be satisfied when the debtor and third-party causes of action require identical proof.

Respectfully, that is not the law. To the contrary, it is well established in the Seventh Circuit and elsewhere that a bankruptcy court has authority to enjoin any third-party actions that threaten the

2

bankruptcy estate, and courts are left to apply that *flexible* standard on a case-by-case basis. Numerous courts both within and outside this district, as the bankruptcy court itself acknowledged, often have used that authority to enjoin third-party actions in nearly identical circumstances.

But even if there were some "same acts" requirement, the Debtors would still satisfy it. At most, that would require that the claims of the debtor and the third-party plaintiff arise from overlapping and closely related acts of alleged misconduct by the non-debtor defendant inflicted against or involving the debtor. That is precisely the case here, where the claims of both the Debtors and the creditors arise from the same capital markets transactions involving the Debtors and their debt. The bankruptcy court concluded otherwise only by erroneously holding—as a matter of law—that the facts in *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), define the outer limits of a court's § 105(a) authority. Yet *Fisher* says exactly the opposite.

The Debtors are entitled to a temporary injunction as a matter of law, and it is time for Appellees' race to judgment to come to an end. The bankruptcy court unquestionably had authority to enjoin Appellees'

3

**SA203**

actions:  those actions affect the amount of property in the bankruptcy estate, the allocation of property among creditors, and the Debtors' ability to formulate a viable reorganization plan.  The other requirements for a § 105 injunction are also satisfied beyond reasonable dispute.  Indeed, it is undisputed that, with a contribution from CEC, the Debtors have a reasonable likelihood of a successful reorganization, and that the public interest strongly favors moving forward with a reorganization that will benefit over 32,000 employees and several dozen communities.  This Court should reverse and remand with instructions to immediately enter the injunction requested by the Debtors.

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court for the Northern District of Illinois (Goldgar, J.) had jurisdiction over this core adversary proceeding "concerning the administration of the estate" under 28 U.S.C. §§ 157(b)(2)(A) and 1334(a).  The bankruptcy court entered a final order denying all requested relief on July 22, 2015.  A62-63.  The Debtors timely filed their notice of appeal on July 24, 2015.  A1098; *see also* Fed. R. Bankr. P. 8002(a)(1).  This Court has jurisdiction to hear

4

**SA204**

after capital expenditures. A1030:12–1031:19; *see also* A1002-03. The Debtors' primary problem is over-leverage, but that is a problem chapter 11 reorganization is well suited to address. A1030:12–1031:19; A1096:14-19. Indeed, there is no evidence or argument that the Debtors are unlikely to reorganize successfully, assuming a significant contribution from CEC. *See In re Lyondell*, 402 B.R. at 590 (finding likelihood of successful reorganization where debtors "have so far been successful in doing everything they've needed to do to date").

### 3. The Public Interest Favors Issuing The Requested Injunction

The temporary injunction that the Debtors seek here is in the public interest. "Promoting a successful reorganization is one of the most important public interests." *Gander Partners*, 432 B.R. at 789. Indeed, the very purpose of bankruptcy is to provide debtors with a breathing spell so they can pursue a consensual resolution with their creditors. *Cf. Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1166 (7th Cir. 1980) ("Federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *aff'd* 455 U.S. 385 (1982). Here, there is no dispute that an injunction and temporary stay of the guaranty

44

lawsuits will avoid a race to the courthouse, preserve a substantial contribution that will fund a plan of reorganization, and provide the parties with a window to pursue a consensual resolution in the chapter 11 case. A1041:15–1042:8.

Nor have Appellees identified any harm that they will suffer from a temporary stay of their guaranty lawsuits other than the inability to improperly jump to the front of the creditor line. The Debtors only seek a temporary—not permanent—injunction. Appellees will still have their claims—and those claims will provide Appellees with significant leverage in negotiating a consensual reorganization. And if no deal is reached, Appellees will be able to pursue their claims.

*　　　　*　　　　*

The bankruptcy court's refusal to enjoin the guaranty actions turns entirely on a mistaken, formalistic reading of Seventh Circuit precedent that transforms § 105(a) from a robust tool for protecting the integrity of a bankruptcy estate into an empty shell, useful only when not really needed. Once that purely legal error is corrected, then based on the undisputed facts and the facts found by the bankruptcy court, it follows that the Debtors are entitled to an injunction. This Court

45

should therefore reverse and order entry of that injunction forthwith. *See, e.g.*, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton,* 752 F.3d 755, 767 (9th Cir. 2014) ("We remand to the district court with instructions for it to enter a preliminary injunction."); *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 142-43 (2d Cir. 2003) ("We find that the plaintiff is likely to succeed on the merits and was entitled to a preliminary injunction. We therefore reverse and remand with instructions to enter a preliminary injunction.").

## II. Even Under A "Same Acts" Requirement, The Debtors Are Entitled To An Injunction

For the reasons explained in Part I.A., *supra*, the legal standard for a § 105 injunction is no different in the Seventh Circuit than anywhere else in the country: Simply put, there is no "same acts" requirement. But even if there were some kind of requirement to that effect for enjoining actions that threaten recovery from a party the debtor has a claim against, the bankruptcy court still should have enjoined the guaranty lawsuits here as a matter of law.

Although not *necessary* for § 105(a) relief, the Seventh Circuit has certainly held that whenever the claims of the estate and the third party arise from "overlap[ping]" and "closely related" acts of misconduct

46

**SA207**

No. 15-3259

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

IN RE: CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Debtors.*

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Plaintiffs-Appellants,*

v.

BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD., TRILOGY PORTFOLIO COMPANY, LLC, AND FREDRICK BARTON DANNER,
*Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of Illinois (Gettleman, J.), No. 1:15-cv-06504

Originating from the United States Bankruptcy Court for the Northern
District of Illinois (Goldgar, J.), Chapter 11 Case No. 15-01145
Adversary Proceeding No. 15-00149

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

John C. O'Quinn
*Counsel of Record*
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
655 15th Street, N.W.
Washington, D.C. 20005
Tel:    (202) 879-5000
Fax:    (202) 879-5200

Paul M. Basta, P.C.
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
601 Lexington Avenue
New York, N.Y. 10022
Tel:    (212) 446-4800
Fax:    (212) 446-4900

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Tel:    (312) 862-2000
Fax:    (312) 862-2200

*Counsel for Debtors/Plaintiffs-Appellants*

# INTRODUCTION

The central question this appeal presents is whether the lower courts were correct in holding that 11 U.S.C. § 105(a) is only available to enjoin third-party litigation that affects the integrity of a bankruptcy estate if the third-party plaintiff's claims against a defendant arise out of the "*same acts*" as the estate's claims against that defendant. The sole basis for that holding—and for denying the Debtors' request for injunctive relief—is their incorrect interpretation of this Court's decisions in *In re Teknek, LLC*, 563 F.3d 639 (7th Cir. 2009), and *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), as imposing a "same acts" requirement. Respectfully, that fundamentally misunderstands this Court's precedent.

It is well-settled in this Circuit and elsewhere that bankruptcy courts have broad authority under 11 U.S.C. § 105(a) to issue "*any* order … that is necessary or appropriate" to protect their jurisdiction and carry out the provisions of Title 11. Section 105(a) has been analogized to the All Writs Act—not just by the Debtors, A52, but by other circuits—as providing "the basis for a broad exercise of power in the administration of a bankruptcy case." *In re Casse*, 198 F.3d 327, 336

(2d Cir. 1999) (internal quotations omitted). By contrast, the bankruptcy court itself recognized that its interpretation rendered this Court a national outlier, candidly observing that "courts have often issued section 105(a) injunctions to halt actions of the kind and under the circumstances the debtors describe." A81. Yet it (erroneously) concluded that this Court follows "a different textbook" than everyone else, A82, and that, "[i]n the Seventh Circuit, the section 105(a) injunction is a more limited remedy than in other courts." A73. Applying similar reasoning, the district court held that the Debtors are wrong that § 105 provides "the bankruptcy court with broad authority to grant injunctive relief to protect the 'integrity of the bankruptcy estate.'" A53. But that is the broad, flexible standard this Court has repeatedly articulated—in *Fisher, Teknek*, and countless other cases—and that other circuits routinely apply. Because this Court is not an outlier, the decision below must be reversed.

The denial of injunctive relief is particularly egregious here. Although Appellees cast their third-party litigation against the Debtors' parent company Caesars Entertainment Company ("CEC") in the U.S. District Court for the Southern District of New York (Schiendlin, J.)

2

and in Delaware state court as run-of-the-mill enforcement of a guaranty, it is anything but. Appellees are themselves second-tier junior creditors of the Debtors. At the time CEC acted as guarantor to the Debtors in transactions with Appellees, CEC had no independent assets, other than its ownership interest in the Debtors. The guarantees, in other words, were ones of convenience, and Appellees knew any recovery would come from the Debtors and the Debtors alone. Debtors' contend that, over time, CEC siphoned off assets from them—giving rise to the estate's claims. The recovery now sought by the Appellees in their guaranty actions against CEC would thus come *directly from the very same assets* that the Debtors allege were fraudulently transferred to CEC; otherwise CEC would have nothing from which Appellees could recover.

That directly affects not just the amount of property in the Debtors' estates, but the allocation of property among creditors. In addition to thwarting the Debtors' multi-billion-dollar restructuring effort, which depends on a substantial contribution from CEC in settlement of the Debtors' claims against it, the upshot of the Appellees' actions is to let them jump the line in front of other creditors, including

3

more senior ones.  In effect, it gives them priority in recovering against assets that should be part of the Debtors' estates—and to which more senior creditors should have priority—but now are in the hands of CEC.

Worse yet, to decide whether or not Appellees can prevail in their guaranty actions against CEC, the Southern District of New York is adjudicating whether the very transactions that, among other things, transferred the disputed assets from the Debtors to CEC were "routine corporate transactions" or were "undertaken as part of a plan to accomplish an out-of-court restructuring" of the Debtors' debt.  *BOKF, N.A. v. Caesars Entm't Corp.*, 2015 WL 5076785, *11 (S.D.N.Y. Aug. 27, 2015).  These are quintessentially issues for the bankruptcy process, not third-party litigation.  If such litigation cannot be temporarily enjoined pursuant to § 105(a), it is hard to see what vitality § 105(a) has left in this Circuit.

Neither *Teknek* nor *Fisher* require such a result.  To the contrary, consistent with other circuits, this Court has repeatedly held that a bankruptcy court has authority to enjoin third-party actions that threaten the bankruptcy estate under an inherently *flexible* standard— not the wooden formalism applied below.  Under the correct standard,

4

the Debtors are entitled to a temporary injunction as a matter of law, and it is time for Appellees' race to judgment to come to an end. With a contribution from CEC, the Debtors have a reasonable likelihood of a successful reorganization, and the public interest strongly favors moving forward with a reorganization that will benefit over 32,000 employees and several dozen communities. This Court should reverse and remand with instructions to grant the Debtors' requested injunction.

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court for the Northern District of Illinois (Goldgar, J.) had jurisdiction over this core adversary proceeding "concerning the administration of the estate" under 28 U.S.C. §§ 157(b)(2)(A) and 1334(a). The bankruptcy court entered a final order denying all requested relief on July 22, 2015. A88-89. The Debtors timely filed their notice of appeal on July 24, 2015. A1223; *see also* Fed. R. Bankr. P. 8002(a)(1).

The United States District Court for the Northern District of Illinois (Gettleman, J.) had jurisdiction under 28 U.S.C. § 158(a)(1). The district court entered a final judgment affirming the bankruptcy

5

"'common case' where a creditor of a bankrupt corporation files a suit against the bankrupt's insurer or guarantor." A54.

This appeal follows.

## SUMMARY OF ARGUMENT

The decisions denying a temporary stay of the guaranty actions are based on an inappropriately rigid and narrow interpretation of 11 U.S.C. § 105(a) and this Court's precedents, which has no basis in law and that ultimately makes no sense. Because of its legally erroneous understanding of § 105(a), the bankruptcy court allowed actions in other courts to proceed that will undermine if not render completely unworkable the RSA at the center of the Debtors' proposed plan of reorganization, that will allow one set of junior creditors to potentially raid the very assets of the Debtors' estates that Debtors allege were fraudulently transferred to CEC, and that will adjudicate issues about the Debtors' transactions that are more appropriate for the bankruptcy court than in third-party litigation. This untenable result is exactly what § 105(a) is supposed to prevent. The district court's decision simply perpetuated the bankruptcy court's error. The Debtors are entitled to the requested injunction.

22

1.     The decisions below are flawed first and foremost because they cannot be reconciled with this Court's well-established precedent that bankruptcy courts have broad authority to temporarily enjoin third-party actions that would defeat or impair the court's jurisdiction or otherwise threaten the integrity of the bankrupt's estate.   The bankruptcy court acknowledged this is the law in other courts.  Yet it held, despite clear precedent to the contrary, that this Court follows "a different textbook." A82.  That is simply not true.  The decisions below hinge entirely on a fundamental misreading of *Fisher* and *Teknek*. Neither of those decisions adopted the "same acts" requirement the lower courts have imposed.

To the contrary, *Fisher* describes a bankruptcy court's authority in broad terms, and it expressly condones § 105(a) injunctions to temporarily halt third-party actions that will "affect the amount of property in the bankrupt estate or the allocation of property among creditors."   *Fisher*, 155 F.3d at 882 (quotation marks and citations omitted).  And *Teknek* focuses principally on the question of who owned a claim and would ultimately be able to recover a final judgment— thereby exhausting the claim—not whether *temporary* injunctive relief

23

was appropriate.  Here, of course, the Debtors merely seek temporary relief until 60 days after the examiner issues his report, so that, through the bankruptcy process, all of the relevant stakeholders can evaluate and respond to the examiner's assessment of the disputed transactions and perhaps achieve consensus on restructuring.

Moreover, the precedent cited in *Fisher* and *Teknek* adopt the same broad language when it comes to the scope of § 105(a), and cite leading § 105(a) decisions from other circuits.  To hold, as the courts below did, that this Court adopted a novel legal rule that breaks from the uniform consensus across the circuits without saying so (and while relying on decisions from other circuits) is far-fetched.  As *Fisher* itself makes clear, enjoining third-party actions arising from the same acts as estate claims is within the heartland of a bankruptcy court's § 105(a) power, not its outer limit.  Yet, the decisions below would limit *Fisher* to its facts.  Ultimately, the decisions below lead to the anomalous situation where a bankruptcy court has broad discretion to enjoin third party actions that will merely "distract" debtors from reorganization or hinder the pace of reorganization, but virtually no authority to *temporarily* enjoin actions that would fundamentally thwart the

24

reorganization, that would effectively change the allocation of property among creditors, and that would permit a subset of junior creditors to leapfrog the others and recover assets that rightfully belong to the estate. That cannot be the law.

2.    Even if some form of "same acts" requirement exists, it is readily satisfied here. The courts below held that injunctive relief was not available because Appellees' "claims against CEC do not in any way depend on CEC's misconduct with respect to CEOC." A51. But there is no support in *Fisher* and *Teknek* for holding that two claims arise from the same acts only if the elements of the respective causes of action require identical proof. Neither case even discussed the elements of the relevant underlying causes of action. Instead, even assuming a debtor must show that its claims involve the "same acts" that give rise to the third-party plaintiff's claim, the question should be whether those claims arise from overlapping or closely related acts of alleged misconduct by the non-debtor defendant involving the debtor. That is precisely the case here, where the claims of both the Debtors and the Appellees arise from the same series of capital market transactions by CEC involving *the very assets* from which Appellees now seek to recover.

25

strong operating business, a "diversified footprint of casinos across a number of states," a strong brand name, and an iconic presence in Las Vegas—all propositions with which Appellees' sole witness agreed. A1215:17-1216:20. Nor is there any dispute that the Debtors have substantial earnings before interest, taxes, depreciation, and amortization (EBITDA)—approximately $1 billion—and free cash flow after capital expenditures. A1057:12–1058:19; *see also* A1028-29. The Debtors' primary problem is over-leverage, but that is a problem chapter 11 reorganization is well-suited to address. A1057:12–1058:19; A1217:14-19. Indeed, there is no evidence or argument that the Debtors are unlikely to reorganize successfully, assuming a significant contribution from CEC. *See In re Lyondell*, 402 B.R. at 590 (finding likelihood of successful reorganization where debtors "have so far been successful in doing everything they've needed to do to date").

### 3. The Public Interest Favors Issuing The Requested Injunction

The temporary injunction that the Debtors seek here is in the public interest. "Promoting a successful reorganization is one of the most important public interests." *Gander Partners*, 432 B.R. at 789 (internal quotations omitted). Indeed, the very purpose of bankruptcy

58

is to provide debtors with a breathing spell so they can pursue a consensual resolution with their creditors. *Cf. Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1166 (7th Cir. 1980) ("Federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *aff'd*, 455 U.S. 385 (1982). Here, there is no dispute that an injunction and temporary stay of the guaranty lawsuits will avoid a race to the courthouse, preserve a substantial contribution that will fund a plan of reorganization, and provide the parties with a window to pursue a consensual resolution in the chapter 11 case. A1068:15–1069:8.

Nor have Appellees identified any legally cognizable harm that they will suffer from a temporary stay of their guaranty lawsuits other than the inability to improperly jump to the front of the creditor line. The Debtors only seek a temporary—not permanent—injunction. Appellees will still have their claims, and those claims will provide Appellees with significant leverage in negotiating a consensual reorganization. On appeal to the district court, Appellees revealed the true reason they do not want the guaranty actions stayed: they fear a plan might be confirmed by the bankruptcy court that could release

59

their claims against CEC. A1289. But that is a dispute for the bankruptcy court to resolve in the context of plan confirmation proceedings. Rather than oppose confirmation at the proper time, however, Appellees seek to sidestep the bankruptcy process and claim exclusively for themselves the very assets from CEC that the Debtors seek for equitable distribution to *all* creditors. This blatant attempt to "defeat or impair" the bankruptcy court's jurisdiction and the bankruptcy process is precisely when a court *should* exercise its § 105 authority. *L & S Indus.*, 989 F.2d at 932.

*      *      *

The lower courts' refusal to enjoin the guaranty actions turns entirely on a mistaken, formalistic reading of Seventh Circuit precedent that transforms § 105(a) from a robust tool for protecting the integrity of a bankruptcy estate into an empty shell, useful only when not really needed. Once that purely legal error is corrected, then given the undisputed facts and the facts found by the bankruptcy court, it follows that the Debtors are entitled to an injunction. This Court should therefore reverse and order entry of that injunction forthwith. *See, e.g.*, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*

60

*Connaughton,* 752 F.3d 755, 767 (9th Cir. 2014) ("We remand to the district court with instructions for it to enter a preliminary injunction."); *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 142-43 (2d Cir. 2003) ("We find that the plaintiff is likely to succeed on the merits and was entitled to a preliminary injunction. We therefore reverse and remand with instructions to enter a preliminary injunction.").

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions to immediately enjoin the guaranty actions until 60 days after the bankruptcy-court-appointed examiner issues his final report.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Chapter 11 |
| COMPANY, INC., *et al.*, | ) | |
| | ) | Adversary Case No. 15-00149 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | **Hearing Date: _____** |
| BOKF, N.A., WILMINGTON SAVINGS FUND | ) | |
| SOCIETY, FSB, MEEHANCOMBS GLOBAL | ) | |
| CREDIT OPPORTUNITIES MASTER FUND, LP, | ) | |
| RELATIVE VALUE-LONG/SHORT DEBT | ) | |
| PORTFOLIO, A SERIES OF UNDERLYING | ) | |
| FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA | ) | |
| MASTER FUND, LTD., TRILOGY PORTFOLIO | ) | |
| COMPANY, LLC, and FREDERICK BARTON | ) | |
| DANNER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEBTORS' NOTICE OF OPINION FROM THE**
**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**
**AND MOTION FOR EMERGENCY REQUEST FOR RULING**

---

[1]    A complete list of the Debtors and the last four digits of their federal tax identification
numbers may be obtained at https://cases.primeclerk.com/CEOC.

Pursuant to Local Rule 9013-1(I), the Debtors hereby respectfully request that the Court promptly rule on and grant the Debtors' motion for an injunction temporarily enjoining Defendants from prosecuting their guaranty claims against the Debtors' ultimate parent Caesars Entertainment Corporation ("CEC"). In support thereof, the Debtors respectfully state as follows:

1. On December 23, the United States Court of Appeals for the Seventh Circuit issued an opinion vacating the denial of the injunction requested by the Debtors in the above-captioned adversary proceeding and remanding the case to this Court to determine whether to issue the injunction under the appropriate legal standard. *See CEOC v. BOKF, N.A.*, Case No. 15-3259 [Dkt. 46] ("Slip Op.") at 9.[2]

2. The Seventh Circuit concluded that this Court and the District Court read Bankruptcy Code section 105(a) too narrowly in holding that only a lawsuit arising from the "same acts" of the non-debtor that gave rise to the disputes in the bankruptcy proceeding may be enjoined under the statute. *Id.* at 4, 9. Instead, section 105(a) grants "broad" and "extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." *Id.* at 3, 4. Thus, the proper statutory inquiry under section 105(a) is whether the requested injunction is "likely to enhance the prospects for a successful resolution of the disputes" related to the bankruptcy and whether "its denial will thus endanger the success of the bankruptcy proceedings." *Id.* at 4. If the answer to these questions is yes, "the grant of the injunction would, in the language of section 105(a), be 'appropriate to carry out the provisions' of the Bankruptcy Code, since successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives." *Id.* at 4–5.

---

[2]   A copy of the Slip Opinion is attached as Exhibit B for the Court's convenience.

2

3.      While reserving any factual questions for this Court, the Seventh Circuit
recognized that the interests of CEOC's creditors in the chapter 11 cases "would be furthered by
a temporary injunction staying the lenders' lawsuits against CEC." *Id.* at 5.  If guarantor liability
were imposed on CEC, "CEC's ability to satisfy CEOC's fraudulent-conveyance claims against
it—and thus pay other creditors—would be impaired." *Id.* at 8–9.  The Seventh Circuit further
recognized that "the issuance of a temporary injunction against a class of creditors could well
facilitate a prompt and orderly wind-up of" what Judge Posner described as "an immense, and
immensely complicated, bankruptcy proceeding." *Id.* at 1, 7.  If freezing the guaranty litigation
for 60 days following the issuance of the Examiner report would give the Debtors' stakeholders a
"clear shot at negotiating an overall settlement of what amounts to a three-cornered battle"
among CEC, the guaranty plaintiffs (which are the Defendants here), and CEOC's other
creditors, the Seventh Circuit concluded "there is nothing in section 105(a) to bar the order
sought by CEOC." *Id.* at 5–6.

4.      Given the Seventh Circuit's opinion and the fact that CEC faces imminent
potentially case-dispositive summary judgment rulings in the guaranty lawsuits, the Debtors
respectfully request that the Court immediately rule on the Debtors' motion and enter the
requested injunction.  The Court already recognized that the Debtors' motion presented a
"familiar"—indeed, "textbook"—pattern for which section 105(a) relief is frequently granted.
Mem. Op. [Dkt. 158] ("Op.")  at 28.  The Court likewise acknowledged that "courts have often
issued section 105(a) injunctions to halt actions of the kind and under the circumstances the
debtors describe," and "[i]n some cases, the mere possibility that the action could impair the
non-debtor's financial support of the debtor's reorganization was enough to warrant relief." *Id.*

3

at 27–28 (citing cases).   But the Court held that no relief was possible because the Seventh

Circuit imposed a "same acts" requirement that the Debtors could not satisfy here.  *Id.* at 28.

5.       The Seventh Circuit has now confirmed that there is no "same acts" requirement.

Slip. Op. at 4.  It also found that this Court's "exercise of jurisdiction over the [guaranty suits]

would have been constitutional."  *Id.* at 3.  Thus, the only questions remaining for this Court on

remand are "whether the injunction sought by CEOC is likely to enhance the prospects for a

successful resolution of the disputes attending to its bankruptcy" and whether denying the

requested relief "will thus endanger the success of the bankruptcy proceedings."  *Id.* at 4.   The

answers to these questions—based on a mountain of undisputed evidence that the Debtors

presented at trial—are yes.

6.       Nothing has changed since the Debtors established at trial that an injunction is

necessary to provide the Debtors with an opportunity to resolve the numerous, complex disputes

plaguing the Debtors' restructuring and to avoid endangering the success of the restructuring

process.  Given the extensive evidence presented on these issues, the Court can now render a

decision on remand based on the trial record.

7.       As established at trial, the Debtors have two principal assets around which to

reorganize: an operating business and estate claims against CEC.  June 3 Tr. 35:14–36:2, 43:20–

45:3 (Millstein).   CEC has agreed to make substantial contributions, both direct financial

contributions and credit support for a value-maximizing REIT structure and securities that will

be distributed to creditors under a plan, to the Debtors' restructuring to settle the estate's claims

against CEC.  *Id.* at 36:3–14, 40:10–14 (Millstein).   CEC's financial advisor valued CEC's

contribution at a minimum of $2.3 to $2.5 billion.  *Id.* at 193:2–195:1 (Zelin).  The Debtors'

former financial advisor, Perella Weinberg, valued it at a minimum of $1.5 billion.  *Id.* at 79:21–

4

**SA225**

80:2, 97:5–8 (Millstein).   CEOC's current financial advisor, Millstein & Co., was still in the

process of valuing the contributions at the time of trial but confirmed they were "substantial."

*Id.* at 40:15–41:22.

8.      A subset of CEOC's creditors, however, has been aggressively seeking judgments

against CEC in lawsuits outside of this bankruptcy case to recover $11 billion in alleged

guaranty claims, including a lawsuit that the first lien trustee filed after trial seeking more than

$6 billion.  *Id.* at 49:17–50:23 (Millstein), 207:2–208:2 (Zelin); *see also* Compl., *UMB Bank,*

*N.A. v. Caesars Entm't Corp.*, No. 1:15-cv-04634-SAS (S.D.N.Y. 2015).[3]   These lawsuits

threaten to render CEC insolvent and prevent the Debtors from recovering *any* assets from CEC.

Indeed, it is undisputed that both the Debtors' estate claims and these creditors' guaranty claims

seek to recover from the same limited pool of assets from the same entity (CEC).  *See* June 3 Tr.

69:24–70:7, 128:25–129:15, 143:24–144:4 (Millstein); June 4 Tr. 308:9–13 (Lyon).   It is

likewise undisputed that CEC lacks the ability to both satisfy the guaranty claims and make any

meaningful contribution to the estate on account of the estate's claims.  *See* June 3 Tr. 49:17–

51:22 (Millstein), 207:11–208:2 (Zelin); DX 78.

9.      Nor can there be a dispute that the guaranty litigation threatens the Debtors'

reorganization.  Litigation that could eliminate the Debtors' ability to recover on one of their

principal estate assets diminishes their ability to efficiently reorganize and maximize creditor

recoveries.  As part of a Restructuring Support Agreement ("RSA"), the Debtors have negotiated

substantial contributions from CEC on account of estate claims. June 3 Tr. 36:3–14, 40:10–14

---

[3]     The Debtors previously asked the Court to take judicial notice of this post-trial complaint.
*See* Dkt. 150.  The Court found that it can take judicial notice of the records of other courts in
related matters.  Op. at 13 n.11, citing *Bank of Commerce & Trust Co. v. Strauss (In re
Strauss)*, 523 B.R. 614, 623 n.7 (Bankr. N.D. Ill. 2014).  A copy of the UMB complaint is
attached as Exhibit C.

5

(Millstein).  Although the Debtors believe the RSA framework is the right blueprint for a value

maximizing plan, the Debtors' ability to formulate *any* plan of reorganization heavily depends on

their ability to recover against CEC on account of estate claims.  *Id.* at 44:16–45:3 (Millstein).

CEC, however, has publicly disclosed that "were a court to find in favor of the claimants in any

of these Noteholder Disputes, such determination could have a material adverse effect on our

business, financial condition, results of operations, and cash flows.   Accordingly, we have

concluded that the material uncertainty related to certain of the Litigation proceeding against

CEC raises substantial doubt about the Company's ability to continue as a going concern…."

PX 34 (CEC 10-Q, May 11, 2015) at 8.  This language is shorthand that CEC itself will file for

bankruptcy if a court finds in favor of the guaranty claimants in any of their cases.  June 3 Tr.

53:9–55:24 (Millstein).   Simply put, an adverse decision in the guaranty litigation would

materially diminish CEC's ability to fund and otherwise support the Debtors' restructuring,

rendering moot the Debtors' chapter 11 plan (predicated on the RSA) currently on file and

putting the Debtors back at square one in their efforts to reorganize.

  10. Consistent with the evidence at trial, the guaranty actions are on a trajectory that

continues to directly threaten the Debtors' reorganization.  At the time of trial, both courts

hearing the guaranty litigation had denied CEC's motions to dismiss.  *See* DX 69

(MeehanCombs Op.) at \*5 ("[T]he Complaint's plausible allegations that the August 2014

Transaction stripped plaintiffs of the valuable CEC Guarantees leaving them with an empty right

to assert a payment default from an insolvent issuer are sufficient to state a claim under section

316(b)."); *see also* DX 70 (WSFS Op.).  Judge Scheindlin also had permitted Defendant BOKF

to seek early summary judgment on an expedited schedule, even before discovery concluded and

over CEC's objection that material factual disputes precluded summary judgment.  *See* DX 136

6

(May 28, 2015 Order) at 3. She reasoned that "I will not limit BOKF from attempting to vindicate noteholders' rights under non-bankruptcy law." *Id.* Shortly after trial, the District Court also permitted UMB to file early summary judgment. June 19, 2015 Order, Case No. 1:15-cv-01561-SAS [Dkt. 27] at 5.[4]

11. On August 27, Judge Scheindlin denied the expedited motions for summary judgment filed by BOKF and UMB. Op. and Order, Case No. 1:15-cv-01561-SAS [Dkt. 54].[5] She found that there were disputed factual issues as to whether CEC violated the Trust Indenture Act by stripping the guaranties as part of an out-of-court restructuring without the consent of the noteholders. *Id.* at 32–33.

12. On November 20, BOKF and UMB filed another motion for summary judgment on the grounds that CEC's sale of five percent of CEOC's stock in May 2014 and CEOC's grant of six percent of its stock in June 2014 to certain directors and officers was not sufficient to release the guaranties as a matter of law under the plain language of the indentures. *See* Mem. in Supp. of Mot. for Summ. J., Case No. 1:15-cv-04634-SAS [Dkt. 69] at 1, 3.[6] BOKF and UMB argue the word "and" between the subparts of the guaranty release provision requires that all three subparts must occur for the guaranty to be released. They assert that because CEC admits two of the subparts have not been satisfied, the guaranty remains in place. *Id.* at 2–3. Judge Scheindlin previously indicated that the contractual interpretation issue raised by BOKF's and UMB's latest summary judgment motion may be dispositive. Op. and Order, Case No. 1:15-cv-

---

[4] As it previously held, this Court can take judicial notice of the records of other courts in related matters. Op. at 13 n.11. A copy of the June 19 order is attached as Exhibit D.

[5] A copy of Judge Scheindlin's August 27 opinion is attached as Exhibit E.

[6] A copy of UMB's and BOKF's joint Memorandum in Support of Summary Judgment is attached as Exhibit F.

7

04634-SAS [Dkt. 54] at 38 ("It may be that the contract interpretation issue related to the release

provision—which the parties have not briefed for this motion—will be dispositive."). The

motion has been fully briefed since December 11 and Judge Scheindlin may rule any day. If

CEC survives summary judgment, the case is set for a two-week jury trial beginning

March 14, 2016. 11/10/15 Status Conference Tr. at 20.[7]

13.     MeehanCombs and Danner likewise have moved for summary judgment on

certain of their claims. They argue that because the Senior Unsecured Notes Transaction in

August 2014 (*see* Op. at 10–11) removed CEC's guaranty without their consent, it violated the

Trust Indenture Act, and breached the indentures as a matter of law. MeehanCombs Mem. in

Supp. of Mot. for Summ. J., Case No. 1:14-CV-07091-SAS [Dkt. 67] at 9–10;[8] Danner Mem. in

Supp. of Mot. for Summ. J., Case No. 1:14-cv-07973-SAS [Dkt. 61] at 1.[9] These motions have

been fully briefed since December 2. If CEC survives summary judgment, trial on these claims

is set for May 9, 2016. 11/10/15 Status Conference Tr. at 34.

14.     Given the imminent rulings on the potentially case-dispositive summary judgment

motions and upcoming trial settings, the first of the guaranty claims can be decided any day, and

will be decided no later than late March 2016. Both CEC's and the Debtors' financial advisors

testified at trial that, because the language of the guaranties is very similar (and in some cases

identical), CEC likely will file for bankruptcy if it suffers an adverse judgment in any of the

guaranty actions. CEC lacks the financial wherewithal to post an appeal bond on a multi-billion

---

[7]     A copy of the transcript from Judge Scheindlin's November 10 status conference, during
which she set trial dates for both of the guaranty actions, is attached as Exhibit G.

[8]     A copy of MeehanComb's Memorandum in Support of Summary Judgment is attached as
Exhibit H.

[9]     A copy of the Danner Plaintiff's Memorandum in Support of Summary Judgment is attached
as Exhibit I.

dollar judgment, meaning that any such judgment entered against it—even with respect to a liability finding only—would be effectively final. June 3 Tr. 49:17–51:22, 53:9–56:22, 115:12–116:7, 138:21–139:11 (Millstein); *see also id.* at 204:17–205:13, 208:3–21, 209:10–17 (Zelin); June 4 Tr. 131:2–132:2 (Zelin).

15.     The requested injunction would preserve, at least in the interim, CEC's ability to participate in the Debtors' restructuring and provide a path forward to a consensual resolution of these bankruptcy cases in the first half of 2016. The injunction would provide a brief—yet critical—60-day window following the issuance of the Examiner report for the Debtors and other parties in interest to try to reach a consensual, value-maximizing plan that contains significant funding contributions and credit support from CEC. June 3 Tr. 71:15–72:14 (Millstein), 212:4–214:4 (Zelin), 191:14–21 (Eisenberg). To accomplish this, the Debtors need to ensure that the entity from which they seek to extract these contributions (CEC) has the resources and value to fund them. A temporary stay will funnel to the reorganization process all of the claims that relate to the estate, providing the parties with a strong incentive to reach a consensual resolution in the chapter 11 case. *Id.* at 72:15–73:8 (Millstein). And extending that stay until 60 days after the Examiner issues his final report will allow the parties to attempt to complete those negotiations armed with important and objective reference points about the estate's and guaranty claims to the same assets. The alternative—a potential CEC chapter 11 filing—would at a minimum substantially delay any hope for a prompt resolution of the numerous disputes related to the chapter 11 cases, dramatically change total creditor and inter-class recoveries, increase professional costs, and leave this Court to sort out one of the great "messes of our time." *Id.* at 56:23–57:9, 59:8–14 (Millstein). In short, there is little to lose and nearly everything to gain by

9

enjoining Defendants from proceeding in the guaranty litigation until 60 days after the Examiner issues his final report.

16.     At a minimum, the Court should enter a temporary injunction staying the guaranty litigation pending resolution of the Debtors' motion for injunctive relief.  As set forth above, no additional evidence is necessary for this Court to decide the motion for an injunction (other than the limited undisputed procedural facts about the status of the guaranty litigation, of which the Court can take judicial notice).  If for whatever reason the Court determines it cannot resolve the motion on the existing record, however, the Court should grant temporary injunctive relief until it conducts whatever additional proceedings it deems necessary.  *See, e.g.*, *Interstate Commerce Comm'n v. Cardinale Trucking Corp.*, 308 F.2d 435, 438 (3d Cir. 1962) (vacating denial of plaintiff's request for injunctive relief and directing district court to issue a temporary restraining order pending disposition of the issues on remand); *Doctor's Assocs., Inc. v. Distajo*, 944 F. Supp. 1007, 1008, 1010 (D. Conn. 1996) (enjoining 16 franchisee state court lawsuits until federal court decided issues on remand regarding franchisor's motion to compel arbitration under franchise agreements).

17.     Here, the Debtors' evidence regarding the status of their reorganization at the time of trial easily establishes a reasonable likelihood of successfully reorganizing assuming the guaranty lawsuits are stayed.  As defense expert Grant Lyons conceded, the Debtors have a strong operating company.  June 4 Tr. 320:17–321:20.  In fact, the Debtors have approximately $1 billion of EBITDA and substantial free cash flow after capital expenditures.  June 3 Tr. 60:12–61:19 (Millstein); *see also* PX 84.  The Debtors also have a "diversified footprint of casinos across a number of states," a strong brand name, and an iconic presence in Las Vegas. June 4 Tr. 321:3–10 (Lyon).  The Debtors' principal problem is a highly-levered balance sheet—

10

a problem chapter 11 is well suited to solve. *Id.* at 322:14–19; June 3 Tr. 60:12–61:19

(Millstein).   At the time of the trial, the Debtors had made significant progress in these

chapter 11 cases.   Among other things, the Debtors at the time of trial had reached agreement

with a large majority of CEOC's first lien noteholders and CEC on the economic terms of a

restructuring as set forth in the RSA, obtained essential first-day relief, negotiated for the

long-term use of cash collateral, moved for the appointment of an examiner who is investigating

a series of disputed transactions, announced a market test, and obtained a six-month extension of

exclusivity.   June 3 Tr. 48:6–9, 63:1–12, 98:19–25 (Millstein); PX 84; Dkt. Nos. 988, 992, 1690.

18.     And, although not necessary for injunctive relief under section 105, the

irreparable harm to the Debtors is clear.   Should the guaranty litigation result in an adverse

decision forcing CEC to file for chapter 11 while this Court is deciding the issues on remand

from the Seventh Circuit, it will severely impair the Debtors' ability to reorganize in the near

term.   Given the Seventh Circuit's opinion, as well as the existing evidentiary record, the

Debtors' motion should ultimately be granted; allowing the very harm an injunction was

intended to prevent to occur while the Debtors' motion is on remand would be unjust.   By

contrast, Defendants will lose nothing if the Court issues a temporary injunction while resolving

the Debtors' request, other than their ability to prosecute the guaranty litigation for the brief

amount of time it will take the Court to decide the issues on remand.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

11

Dated:  December 28, 2015
Chicago, Illinois

*/s/ Jeffrey J. Zeiger, P.C.*

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800

*Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC., *et al.*,<br><br>            *Debtors*. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>(Jointly Administered) |

**MOTION OF NOTEHOLDER COMMITTEE FOR ORDER GRANTING STANDING
TO COMMENCE, PROSECUTE, AND SETTLE CLAIMS ON BEHALF OF THE
DEBTORS' ESTATES**

The Official Committee of Second Priority Noteholders (the "Noteholder Committee")

moves for entry of an order granting it derivative standing to pursue the claims set forth in the

draft Complaint attached as Exhibit A (the "Complaint") as well as any other claims arising out

of the facts plead.[1]  The Complaint includes claims to recover constructive and intentional

fraudulent transfers as well as claims for breach of fiduciary duty, aiding and abetting breach of

fiduciary duty, and other claims against Caesars Entertainment Corporation ("CEC"), the

controlling shareholder of debtor Caesars Entertainment Operating Company, Inc. ("CEOC"),

certain of CEC's and CEOC's directors and officers, the Sponsors, and others for knowingly

participating in the wrongdoing alleged in the Complaint.[2]

---

[1] The final form of the Noteholder Committee's Complaint will include additional information currently designated as confidential, including information contained in the Examiner's report that has, to date, been redacted in the public version of that report.  A revised version of the Complaint that includes such information will be filed when the final form of the Examiner's report is available.

[2] The Noteholder Committee has discussed joint prosecution of these claims with the Statutory Unsecured Claimholders Committee (the "UCC" and, together with the Noteholder Committee, the "Committees").  The Noteholder Committee is willing to prosecute and settle the claims jointly with the UCC, on appropriate terms and conditions.

## I.    PRELIMINARY STATEMENT

1.    The claims to be pursued by the Noteholder Committee arise from a series of self-dealing prepetition transactions between CEOC—which at all relevant times was an insolvent corporation—and entities owned and controlled by CEC or the Sponsors involving asset transfers made for grossly-inadequate consideration and financial transactions intended to benefit CEC and the Sponsors at CEOC's expense.  The purpose and effect of those transactions was to enrich CEC and its affiliates and shareholders by moving billions of dollars of CEOC's assets beyond the reach of CEOC's creditors, and by protecting CEC and the Sponsors and other entities including those termed bankruptcy remote in CEOC's inevitable bankruptcy case.

2.    In his exhaustive report (ECF No. 3401) ("Report" or "Rep."), the Examiner concluded that those insider transactions give rise to claims against CEC, the Sponsors, and numerous other defendants that will generate billions of dollars (in damages and the value of the property returned) for the Debtors and their estates.  Among other things, the Examiner found that CEC and CEOC's directors and officers violated their fiduciary duties to CEOC and its creditors by approving the transfers, and that those repeated breaches of duty were aided and abetted by CEC's directors and Sponsors.

3.    The Debtors, who remain under the control of many of the same individuals who have been identified by the Examiner as wrongdoers and potential defendants, have taken no action to pursue claims against any of those entities.  To the contrary, CEOC repeatedly tried to *extinguish* claims against its insiders and affiliates, first by seeking a declaratory judgment that no viable claims exist and later by agreeing to release all insiders and potential defendants pursuant to various Restructuring Support Agreements (each an "RSA").  Every Plan version filed by the Debtors has provided for the same global releases and immunization of insiders.

- 2 -

4.      The Debtors' two-person Special Governance Committee ("SGC"), which was hand-picked by directors that face liability,[3] lacks sufficient independence to bring or compromise claims against the incumbents who appointed them.  This is evidenced not only by the SGC's abdication of responsibility to preserve the claims, but also by the unfavorable terms of the RSA "settlement" negotiated by the SGC even while discovery collected by the Examiner showed that the deal cut by the SGC was grossly inadequate (and later determined to be a fraction of the probable recoveries the Examiner identified).  Making matters worse, the SGC's financial advisor—on whom the SGC relied in valuing the estate claims—was tainted all along, prompting the Court to conclude that the SGC's analysis and conclusions are "not useful."

5.      In these circumstances, the Debtors cannot be faithful stewards of the estate causes of action, and the Noteholder Committee is the proper entity to preserve those critical assets.  Unlike the Debtors, the Noteholder Committee will maximize the value of the claims, through vigorous prosecution or settlement, for the benefit of the estates and their creditors, free of the inherent conflicts of interest and constraints that taint the Debtors and the SGC. Moreover, if the claims are brought by the Noteholder Committee, as much as $280 million of insurance coverage will be available to the Debtors' estates; if the claims remain in the hands of the Debtors, that insurance vanishes.  With the limitations period approaching, the time has come to authorize the Noteholder Committee to preserve, pursue and recover the claims.

---

[3]     CEC and the Sponsors have previously appointed other special committees to review at least two of the challenged transactions.  (Rep. at 38-39, 48-51.)  Then, as now, CEC had a fiduciary duty to CEOC as its controlling shareholder and then, as now, it was the Sponsors that decided who would serve on those committees.  As the Examiner found, those special committees did nothing to prevent—and, in fact, affirmatively aided and abetted—the very transactions that the Examiner concluded were intentionally fraudulent transfers and constituted breaches of fiduciary duty.  The special committees were mere formalities whose members went through the motions of governance, while obvious fraudulent transfers occurred under their noses.  CEOC received no protection from those earlier special committees, and it would be naive to conclude that this new special committee (the SGC), appointed by the same Sponsor-controlled board, will be any different than its predecessors.

- 3 -

## II.    BACKGROUND

6.    <u>Valuable Claims Exist With Respect To The Fraudulent Prepetition Transactions</u>.
Beginning in 2009 and continuing through the commencement of these bankruptcy cases, the
Debtors' parent (CEC) and Sponsors (Apollo and TPG),[4] together with various insiders and
affiliates, engaged in transactions that were detrimental to the interests of CEOC and its
creditors.  As summarized by the Examiner on the first page of his Report:

> The principal question being investigated was whether in structuring and
> implementing these transactions assets were removed from CEOC to the
> detriment of CEOC and its creditors.
>
> The simple answer to this question is "yes."  As a result, claims of varying
> strength arise out of these transactions for constructive fraudulent transfers, actual
> fraudulent transfers (based on intent to hinder or delay creditors) and breaches of
> fiduciary duty by CEOC directors and officers and CEC.  Aiding and abetting
> breach of fiduciary duty claims, again of varying strength, exist against the
> Sponsors and certain of CEC's directors.  (Rep. at 1.)

7.    The Examiner concluded that "[t]he potential damages from those claims
considered reasonable or strong range from $3.6 billion to $5.1 billion." (Rep. at 1.)  Those
massive damages were attributed just to claims deemed likely to succeed; the Examiner defined
"strong" claims as those "having a high likelihood of success" and "reasonable" claims as those
"having a reasonable, or better than 50/50, chance of success."  (Rep. at 1 n.3.)  The Examiner
did not quantify other claims characterized as "plausible" or "weak" but nevertheless viable,
such as billions of dollars of claims for the value of Caesars Interactive Entertainment, Inc. (Rep.
at 27-28) and challenges to any "good faith" defense asserted by Caesars Growth Partners and
other defendants (Rep. at 78, 412-13, 651-52).  The Examiner's quantification also excluded
several categories of damages determined to be available on the strong and reasonable claims but
not calculated in the Report, such as claims for lost profits (Rep. at 12-13, 20, 26, 423), the

---

[4]    All capitalized terms not otherwise defined have the meaning used in the Report.

- 4 -

appreciation in the value of fraudulently-transferred properties (Rep., App. 5, at 93), the value

impairment caused by the removal of Octavius Tower from Caesars Palace (Rep. at 47), the

transfer to CES of control over the Total Rewards program (Rep. at 58), and prejudgment

interest (Rep. at 412).

      8.    <u>The Debtors And The SGC Abdicated Their Duty To Maximize The Value Of</u>

<u>The Claims</u>.  In late June 2014, CEOC appointed Steven Winograd and Ronen Stauber (together,

the "<u>SGC Directors</u>") to its board as the sole members of a "Special Governance Committee."

The Examiner concluded that the SGC Directors are "independent" under Delaware law, but

there are many reasons to question their appetite and ability to prosecute claims against CEC, the

Sponsors, CEC's and CEOC's directors, and other potential defendants.[5]  For example, in early

July 2014, shortly after appointment of the SGC Directors, CEOC formed the SGC with a charter

granting the SGC Directors "***sole authority and responsibility*** for, inter alia:  (1) the

consideration, negotiation and approval of any 'Related Party Transaction' or other transaction

or ***matter involving a material conflict of interest*** (as determined in the reasonable judgment of

the Committee) affecting any of the Directors or any person or group beneficially owning,

directly or indirectly, more than 5% of outstanding class of equity securities of the Company."

(Rep. at 926 (emphasis added).)  Notwithstanding that grant of "sole authority and

responsibility," the SGC Directors stood by passively when, just four days later, CEOC's

interested directors authorized the filing of a lawsuit to seek a declaration that CEOC had no

---

[5]    And the SGC Directors were oddly pliant.  Both men were recruited as outside directors as early as February 2014, but – at the Sponsors' suggestion – they agreed to postpone joining the CEOC board until the B-7 Transaction and Four Properties Transaction transactions were completed in June.  (Rep. at 540, 929)  Those multi-billion dollar transactions, of course, were found by the Examiner to be fraudulent transfers and breaches of fiduciary duties.   The SGC Directors' willingness to let the Sponsors decide when their fiduciary duties would kick in raises questions from the start about their independence.

viable claims, including claims against the same interested directors and their affiliates.  Those,

of course, were the very claims that the SGC was endowed with "sole authority and

responsibility" to investigate.  The SGC Directors remained silent even though they were not

comfortable with the complaint (a lawsuit the Examiner described as "troubling") and refused to

sign off on it.  (Rep. at 110 n.180; Exhibit B.)

9.    The SGC Directors also stayed quiet during the ensuing six-month period from

July to December 2014, when the Debtors implemented the wholesale transfer of CEOC's

workforce and enterprise services to CES.  The Debtors now claim that those transfers make it

difficult for the Debtors to pursue a "standalone plan" under which the claims could be

prosecuted in a manner that would maximize their value.  (ECF No. 3484, Ex. I.)

10.    Thereafter, in December 2014, the SGC Directors blessed CEOC's execution of

an RSA with CEC and certain holders of CEOC First Lien Notes.  Under that RSA, CEC agreed

to pay money directly to holders of First Lien Notes who signed the RSA.  In exchange for that

payment, those holders agreed, among other things, to vote in favor of a CEOC plan that would

provide CEC and other insider defendants with broad releases of estate and third-party claims.

That RSA would have required CEC to make only a small contribution worth a fraction of the

value of the claims to be released, as illustrated by the chart attached as Exhibit C.  Other

potential defendants who obtained releases, including the CEOC directors and Sponsors who

hand-picked the outside directors, would not have been required to contribute anything.

11.    That settlement apparently was based on the SGC's conclusion, following an

"investigation," that claims belonging to the Debtors had a relatively modest value,[6] dramatically

---

[6]   This information was provided by the Debtors to the Noteholder Committee on March 17,
2015, but was designated by the Debtor as confidential.  The Noteholder Committee will
request the Debtor to redesignate the document containing this information, or otherwise will
seek relief to file the underlying document under seal in support of the Motion.

below the range of damages identified in the Examiner's Report.  The Debtors subsequently

attempted to justify the SGC's endorsement of such a terrible deal by claiming that the RSA was

made "[b]ased on the information available at the time," and that SGC Directors "did not have

sufficient information to determine whether fraudulent transfer claims based on an actual intent

to delay, hinder or defraud creditors were likely to succeed."  (ECF No. 3484, Ex. 1, at 38.)  That

is no excuse.  No responsible, unconflicted fiduciary would ever settle viable causes of action for

pennies on the dollar when it was aware that it lacked sufficient information to make a

reasonable assessment of the claims.

12.    The SGC's abdication of duty did not stop there.  After the petition date, the

Debtors (with the apparent endorsement of the SGC) moved for appointment of an examiner but

tried to inhibit the investigation of CEC and other insiders by proposing to:  (1) limit the

investigation to a set of hand-picked transactions the Debtors had identified; (2) cap the budget

of the examiner and his professionals; (3) limit the duration of the investigation; (4) prohibit the

examiner from accessing privileged information; and (5) enjoin any other party (including the

Noteholder Committee) from conducting its own investigation during the period of the

examiner's investigation.  (ECF No. 363, at 9-10.)  The Court, of course, declined to impose

those constraints, which paved the way for the Examiner's comprehensive report detailing the

multitude of viable claims available against CEC, the Sponsors, and other insiders.

13.    The Debtors continued to pursue the discounted RSA settlements over the course

of the year after the commencement of these cases.  The SGC endorsed this course of action even

though the RSA gave it the right to withhold final approval of the releases and even while

substantial volumes of evidence were collected by the Examiner (to which the SGC had full

access).  Incredibly, the Debtors continued to push the RSA settlements even beyond early

- 7 -

**SA240**

December 2015, when the Examiner provided CEOC and the SGC with his preliminary views of the merits and value of the estate causes of action.

14.    At that time, it was beyond question that the SGC should have understood that the RSA settlements were substantially deficient and well outside of any appropriate range of reasonableness.  Nevertheless, the Debtors (operating through a Special Restructuring Committee, consisting of the two SGC Directors and an Apollo director (ECF No. 4, at 47)) sought to protect the RSAs and the settlement at nearly every turn by, among other things, filing a motion to approve the RSAs, filing multiple flawed unsigned plans and disclosure statements, and seeking to begin a cramdown of those plans before the Examiner had concluded his work.

15.    It remains uncertain whether the Debtors and SGC will, under the Plan, adopt the outcome of the Examiner's investigation, or instead ignore, minimize or reject the Examiner's conclusions as to the existence of potential claims and the amount of damages that can be obtained.  What remains evident under the latest version of the Plan filed by the Debtors (with the endorsement of the SGC), even in its current incomplete form, is that the Debtors are once again are proposing to cramdown a settlement that would immunize CEC, the Sponsors and insiders and affiliates.  Any settlement must account not only for the damages included in the Examiner's range based upon his independent assessment, but also for available damages and value resulting from lost profits, prejudgment interest, the value of CIE, the challenge to any "good faith" defense asserted by Caesars Growth Partners, the appreciation in value of the transferred assets, the impairment to Caesars Palace from the transfer of Octavius Tower, and the degradation to the properties owned by CEOC as a result of the transfers of CEOC's "crown jewels."  (*See id*. at 39-43, 45, 47.)

- 8 -

**SA241**

## III.   RELIEF REQUESTED

16.     The Noteholder Committee seeks entry of an order that grants the Noteholder

Committee standing to pursue claims as set forth in the attached draft Complaint and claims

based upon or arising out of the facts alleged therein.

## IV.   ARGUMENT

### A.   The Court Has Authority To Grant Standing To The Noteholder Committee.

17.     The Bankruptcy Code provides for the establishment of official committees to

protect the rights of creditors.  *See* 11 U.S.C. § 1102.  Creditor committees may "perform such

other services as are in the interests of those represented," *id.* § 1103(c)(5), and "may raise and

may appear and be heard on any issue in a case under this chapter," *id.* § 1109(b).  This right to

be heard would be hollow if a committee did not have the right to assert claims on behalf of the

estate.  *E.g.*, *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics

Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).  Thus, bankruptcy courts are empowered to

confer standing upon a committee in appropriate circumstances.  *See Official Comm. of

Unsecured Creditors of SGK Ventures, LLC v. NewKey Grp., LLC (In re SGK Ventures, LLC)*,

521 B.R. 842, 848 (Bankr. N.D. Ill. 2014) ("[T]he Seventh Circuit has repeatedly recognized the

availability of derivative . . . standing.").

18.     In *In re Perkins*, 902 F.2d 1254 (7th Cir. 1990), the Seventh Circuit described the

three predicates for committee standing:  "(a) the [debtor in possession] unjustifiably refuses a

demand to pursue the action; (b) the creditor establishes a colorable claim or cause of action; and

(c) the creditor seeks and obtains leave from the bankruptcy court to prosecute the action for and

in the name of the [debtor.]"  902 F.2d at 1258; *accord Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir.

2000).  As discussed in the following sections, each predicate exists here.

### B.        The Claims Are More Than "Colorable."

19.        A showing of colorability "is a relatively easy one to make." *Adelphia Commc'ns*

*Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr.

S.D.N.Y. 2005); *In re Midway Airlines, Inc.*, 167 B.R. 880, 884 (Bankr. N.D. Ill. 1994) ("A

colorable claim (one seemingly valid and genuine) is not a difficult standard to meet.").

Authorization to bring claims derivatively "should be denied only if the claims are 'facially

defective.'" *Adelphia*, 330 B.R. at 376 (citation omitted).

20.        Even without the benefit of the Examiner's Report, the claims set forth in the

draft Complaint would easily meet this standard, given the detailed allegations that CEOC,

insolvent and under the control of CEC, made transfers for less than adequate consideration with

the intent to hinder or delay CEOC's creditors.  "There is no basis for the principle . . . that the

directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit

of its parent corporation." *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283,

288 (Bankr. D. Del. 2006) (citation omitted)).  Nor can there be dispute that the directors of

CEC, the Sponsors, and others directed or otherwise knowingly participated in the looting of

CEOC and in so doing breached fiduciary duties owed to CEOC or aided and abetted breaches of

fiduciary duties by CEC's and CEOC's directors.  *See CDX Liquidating Trust v. Venrock*

*Assocs.*, 640 F.3d 209, 219-20 (7th Cir. 2011) ("[T]o aid and abet a breach of fiduciary duty

committed by corporate directors is actionable under Delaware law.").[7]

21.        The claims are colorable, *a fortiori*, given the Examiner's conclusions.  After a

comprehensive, year-long investigation in which the Examiner and his advisors reviewed over

8.8 million pages of documents and conducted 92 interviews, the Examiner issued a detailed

---

[7]    Notably, the Delaware Chancery Court, in an action raising many of the same claims against
       many of the same defendants, found the claims to be colorable.  *See* Exhibits D-E.

Report finding that CEOC possesses claims "for constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty by CEOC directors and officers and CEC." (Rep. at 1.) The Examiner also found that claims for aiding and abetting breaches of fiduciary duty "exist against the Sponsors and certain of CEC's directors." (Rep. at 1.) The Examiner valued just the damages he quantified, on account of claims found to be "strong" or "reasonable," in the range of $3.6 billion and $5.1 billion (Rep. at 80) and, as noted above, the Noteholder Committees believes that realistic recoveries are substantially greater than that.[8]

### C.    CEOC Has Not Litigated And Will Not Litigate The Claims.

22.    Despite having long been on notice of the claims, CEOC has unjustifiably declined to prosecute the claims or allow others to do so. "A [debtor]'s decision to decline the pursuit of a colorable claim is only justified if there is a legal or practical impediment to prosecution." *Home Casual LLC*, 534 B.R. at 354. Here, no such impediment exists. The claims are worth far more than $5 billion (the Noteholder Committee estimates a range no less than $8.1 billion to $12.6 billion), the estate has the resources to pursue them, and the defendants have billions of dollars of assets from which recovery can be collected.

23.    CEOC's creation of the SGC does not alter this conclusion. A purportedly "independent" committee or board cannot refuse to pursue claims without valid justification.

---

[8]    The conclusions of an examiner have been found to be admissible as the conclusions of an expert under the Federal Rules of Evidence or, in at least one instance, as a public record. *E.g., In re FiberMark, Inc.*, 339 B.R. 321, 327 (Bankr. D. Vt. 2006) (examiner's conclusions and opinions admissible under Federal Rule of Evidence 706); *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*, 623 F. Supp. 2d 798, 824 & n.21 (S.D. Tex. 2009) (same); Hr'g Tr. at 20, 27, *In re Latshaw Drilling Co.*, No. 09-13572-R (DLR) (Bankr. N.D. Okla, Sep. 9, 2010) (ECF No. 374) (examiner's report admissible under the public records exception to the hearsay rule, Federal Rule of Evidence 803(8), and examiner's conclusions admissible as an expert opinion).

Moreover, the prior actions and inactions of the SGC make clear that the SGC Directors are in no position to make an independent, conflict-free assessment of the causes of action.

24.    To begin, both of the SGC Directors were appointed by persons and entities who surely knew at the time that they would be defendants on the claims to be investigated by the SGC.  Without question, persons chosen by potential defendants are not those most likely to thoroughly and vigorously pursue recoveries against their benefactors.  "Indeed, if the involved directors expected any result other than a [decision not to litigate claims] at least as to them, they would probably never establish the committee." *Joy v. North*, 692 F.2d 880, 888 (2d Cir. 1982).[9]

25.    Moreover, not only were the SGC Directors appointed by the CEOC board, the Board can presumably remove them from the SGC at any time.  This alone raises a reasonable doubt as to whether the SGC can act impartially.  *See Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015) ("A lack of independence . . . turns on, at the pleading stage, whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel . . . subject to the interested party's dominion . . . .").

26.    The SGC's independence is further called into question by its conduct.  For example, the SGC Directors abstained on the vote to authorize the filing by CEOC of a lawsuit that sought to wipe out the entirety of the estate claims for no consideration whatsoever.  The SGC Directors then allowed the wholesale transfer of valuable employees and enterprise services to CEC affiliates in the Fall of 2014 which, according to the Debtors, now requires them to forgo any standalone plan involving litigation and instead to capitulate to the lousy deal offered by

---

[9]    This is especially true where, as here, the directors who appointed the SGC used the challenged transactions in an effort to exert leverage against the very creditors that would benefit from pursuit of the claims. (*E.g.*, Rep. at 66 (Mr. Bonderman told the Examiner that a benefit of the B-7 refinancing, and the resulting purported release of CEC's parent guarantee of the Notes, "was that it increased the leverage on CEOC's creditors")).

CEC and the Sponsors.  (ECF No. 3484, Ex. I.)  The SGC did nothing to prevent those harmful acts despite its "sole authority and responsibility" to consider and approve matters involving material conflicts of interest.  This abstention and passivity shows that the SGC is "incapable of making a decision with only the best interests of the corporation in mind."  *Oracle Corp. Derivative Litig.*, 824 A.2d at 920 (citation omitted); *see Booth Family Trust*, 640 F.3d at 145 (court allowed derivative suit to proceed where special committee member recused himself from considering claims against director, given "the mere appearance of the special litigation committee's lack of independence").  Thereafter, the SGC allowed the Debtors to try to impede the Examiner by proposing severe constraints on the duration, cost, access (to privileged CEOC documents) and scope of the investigation, and to try to prevent the participation of the Committees in that investigation.  (ECF No. 363, at 9-10; ECF No. 541, at 2.)

27.     The SGC also did not engage independent counsel to represent it in its investigation of the conflicted insiders.  "Both New York and Delaware law contemplate that a special litigation committee be represented by independent counsel."  *In re Par Pharm., Inc. Derivative Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990); *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1190 (N.D. Cal. 1993) (where a special settlement committee acted without the benefit of independent counsel, the "decision to settle and dismiss the derivative action simply does not satisfy the independence and good faith requirements of [Delaware law]").  Here, the SGC's investigation was aided by CEOC's own counsel (Kirkland & Ellis)—the same CEOC controlled by conflicted directors and the same firm that represented CEOC generally.  Even worse, the Court found that the SGC's financial consultant was tainted as a result of its failure to disclose the relationship between Mesirow's principal who led the investigation and counsel for CEC.

- 13 -

28.     Given that lack of independence, the SGC's "investigation" of the estate claims is
not reliable, and its decision not to pursue them is not credible.  Although the SGC concluded
that fraudulent transfer claims existed against CEC, the Debtors originally proposed to settle
them for billions of dollars less than the Examiner's *low* (and, as recognized by the Examiner,
incomplete) estimate of their value.  And the SGC failed to recommend any claims against
CEOC's and CEC's directors, and instead, under the RSA, sought to release claims for no
contribution.  Moreover, the SGC failed to change its position despite the Examiner's collection
of substantial evidence and information that plainly suggested that the SGC's preliminary
conclusions were well off the mark.  The SGC's willingness to forgo prosecution of immensely
valuable causes of action is evidence of an inherent conflict of interest.[10]

**D.     Noteholder Committee Standing Will Generate $280 Million For The Estate.**

29.     If granted standing, the Noteholder Committee will maximize the value of the
estates in another way.  As much as $280 million of insurance coverage is unavailable if the
claims remain in the hands of the Debtors, but available if the Noteholder Committee is
authorized to pursue them.  The policies at issue cover CEC, CEOC, and both entities' directors
and officers as "insureds."  Section 4B.(5) of the primary policy contains an "entity versus

---

[10]   Adding further to concerns about the SGC's independence are the longstanding affiliations
that one of its two members (Steven Winograd) has with Apollo.  *See* Rep. at 926-27
(describing ties between Winograd and Apollo); *Biondi v. Scrushy*, 820 A.2d 1148, 1156
(Del. Ch. 2003) ("If a special litigation committee is comprised of directors with
compromising ties to the key officials who are suspected of malfeasance, . . . its ability to
instill confidence is, at best, compromised . . . .").  Although the Examiner found that certain
of these ties, standing alone, were insufficient to rebut the presumption of the SGC's
independence "in negotiating and approving the RSAs," the Examiner "[took] no position on
what entity under applicable law should pursue any claims against related parties."  (Rep. at
78 & n.106.)  Indeed, when combined with the other circumstances and actions described
above, these ties add to the perception that the SGC is not sufficiently independent to pursue
or settle these claims.  *See Booth Family Tr.*, 640 F.3d at 143 ("[I]n a special litigation
committee case, there is no presumption of independence and the special litigation committee
bears the burden of establishing its own independence by a yardstick that must be like
Caesar's wife—above reproach.") (internal quotation marks and citations omitted).

insured" exclusion, which would bar coverage for claims brought by CEOC against another

insured—including CEC and directors and officers of CEOC and CEC.  (ECF No. 3439, Ex. A,

at 10.)  That exclusion applies even in a bankruptcy case if "the Claim is brought, controlled or

materially assisted by . . . the resulting debtor-in-possession . . . of the debtor Organization or . . .

any Executive of the foregoing."  (*Id.*) (emphasis omitted)  By contrast, the exclusion does *not*

apply to "any Claim brought by [a] . . . *creditors committee*, *bondholder committee*, *equity*

*committee* or any other creditor or group of creditors" on behalf of the debtors' estates.  (*Id.* at

99) (emphasis added.)  *See Cirka v. Nat'l Union Fire Ins.*, No. 20250-NC, 2004 Del. Ch. LEXIS

118, at *35 (Del. Ch. Aug. 6, 2004) (finding that a creditors' committee, authorized by a

bankruptcy court to sue derivatively, brings suit on behalf of the estate, not debtor in possession,

and therefore does not trigger the Insured v. Insured Exclusion").  Thus, derivative standing will

greatly increase the likelihood of a significant recovery by the estates.[11]

## V.    CONCLUSION

For all the reasons above, the Noteholder Committee respectfully requests that the Court

enter an order granting leave, standing and authority to the Noteholder Committee to commence,

prosecute, and settle the causes of action on behalf of the Debtors' estates.

---

[11]    The Debtors may cite to the Court's recent order to continue the UCC's prior standing
motion respecting claims against First Lien Parties (ECF No. 3403) as grounds to continue or
deny the relief sought here.  Previously, the Court concluded that the Debtors were justified,
at least temporarily, in not pursuing such litigation because the Debtors were seeking
confirmation of a Plan that, if approved, would resolve the claims to be pursued.  (*Id.* at 11.)
There, however,  the settlement at issue was between the Debtors and the First Lien Parties—
it was not a settlement among insider affiliates, but rather was negotiated at arms' length.
Here, for the same reason that the Debtors are incapable of prosecuting the claims against
their insiders and affiliates, they are equally ill-equipped to negotiate and pursue settlement
of those claims.  Moreover, unlike before where the filing of the standing motion was
sufficient to meet deadlines imposed by the Cash Collateral Orders (*id.* at 7), the claims set
forth in the Complaint must be brought by no later than January 11, 2017 to ensure that they
are properly preserved.  11 U.S.C. § 108(a).

Dated:  May 13, 2016
Chicago, Illinois

Respectfully submitted,

*/s/ Timothy W. Hoffmann*
Timothy W. Hoffmann (No. 6289756)
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:   (312) 782-3939
Facsimile:   (312) 782-8585
thoffmann@jonesday.com

-and-

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 489-3939
Facsimile:   (213) 243-2539

*Counsel for the Official Committee of Second
Priority Noteholders*

- 16 -

**SA249**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Chapter 11 |
| COMPANY, INC., et al., | ) |
|  | ) Adversary Case. No. 15-00149 (ABG) |
| *Plaintiffs* | ) |
| vs. | ) |
|  | ) |
| BOKF, N.A., WILMINGTON SAVINGS FUND | ) **Evidentiary Hearing Date:  June 8,** |
| SOCIETY, FSB, RELATIVE VALUE- | ) **2016, at 10:30 a.m. (prevailing** |
| LONG/SHORT DEBT PORTFOLIO, A SERIES | ) **Central Time)** |
| OF UNDERLYING FUNDS TRUST, TRILOGY | ) |
| PORTFOLIO COMPANY, LLC, AND | ) |
| FREDERICK BARTON DANNER, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| *Defendants.* | ) |

## NOTICE OF DEBTORS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS

**PLEASE TAKE NOTICE** that on **June 8, 2016, at 10:30 a.m. (prevailing Central Time)** or as soon thereafter as counsel may be heard, the Debtors will appear before the Honorable A. Benjamin Goldgar or any other judge who may be sitting in his place and stead, in Courtroom 642 in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604, for an evidentiary hearing on the attached *Debtors' Emergency*

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

*Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining Defendants
from Further Prosecuting Their Guaranty Lawsuits* (the "Emergency Motion").

**PLEASE TAKE FURTHER NOTICE** that copies of the Emergency Motion and all
other documents filed in these chapter 11 cases are available free of charge by visiting
https://cases.primeclerk.com/CEOC or by calling (855) 842-4123 within the United States or
Canada or, outside of the United States or Canada, by calling +1 (646) 795-6969.  You may also
obtain copies of any pleadings by visiting the Court's website at http://www.ilnb.uscourts.gov in
accordance with the procedures and fees set forth therein.

| | |
|---|---|
| Dated:  June 6, 2016 | */s/ David J. Zott, P.C.* |
| Chicago, Illinois | James H.M. Sprayregen, P.C. |
| | David R. Seligman, P.C. |
| | David J. Zott, P.C. |
| | Jeffrey J. Zeiger, P.C. |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 300 North LaSalle |
| | Chicago, Illinois 60654 |
| | Telephone:     (312) 862-2000 |
| | Facsimile:     (312) 862-2200 |

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

2

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al.,[1] | ) Case No. 15-01145 (ABG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al., | ) Chapter 11 |
| | ) |
| *Plaintiffs* | ) Adversary Case No. 15-00149 (ABG) |
| vs. | ) |
| | ) |
| BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC, AND FREDERICK BARTON DANNER, | ) **Hearing Date:  June 8, 2016, at 10:30 a.m. (prevailing Central Time)** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## DEBTORS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

Pursuant to section 105(a) of the Bankruptcy Code and Rule 7065 of the Federal Rules of

Bankruptcy Procedure, the Debtors respectfully request that the Court issue a temporary restraining

order and preliminary injunction enjoining Defendants from continuing to prosecute guaranty

lawsuits seeking billions of dollars from the Debtors' ultimate parent, Caesars Entertainment

Corporation ("CEC").  As set forth below, the continued prosecution of these actions greatly

endangers the Debtors' restructuring.  In support thereof, the Debtors state as follows:

## PRELIMINARY STATEMENT

1.      In February 2016, this Court entered an injunction to allow the Debtors and their

stakeholders a window of opportunity to try to reach a global settlement following the issuance of

the Examiner report.  With the help of a mediator, the Debtors have negotiated a materially enhanced

contribution from CEC and its affiliates, and made substantial progress toward resolving what the

Seventh Circuit has described as "an immense, and immensely complicated, bankruptcy

proceeding." *Caesars Entm't Op. Co., Inc. v. BOKF, N.A.* (*In re Caesars Entm't Op. Co., Inc.*), 808

F.3d 1186, 1187 (7th Cir. 2015).

2.      The Debtors and CEC have now reached an agreement in principle under which CEC

will support the Debtors' proposed reorganization plan (Dkt. 3832, and as amended from time to

time, the "Plan").  The Plan is predicated on a $4 billion (midpoint valuation) contribution from CEC

and its affiliates.  Negotiations with the Statutory Unsecured Claimholders' Committee ("UCC"), the

ad hoc group of first lien bank lenders and first lien noteholders and the indenture trustee for the

Debtors' subsidiary guaranteed unsecured notes have materially progressed.  But one major

roadblock to the Debtors' ability to pursue the Plan remains:  two second lien indenture trustees and

two groups of noteholders that claim to hold approximately $125 million of senior unsecured notes

are continuing to press guaranty lawsuits that seek to recover billions of dollars from CEC.  Second

lien indenture trustees Wilmington Savings Fund Society ("WSFS") and BOKF, N.A. are

prosecuting two of the suits while groups of senior unsecured noteholders represented by Frederick

Barton Danner ("Danner") and Trilogy Portfolio Company, LLC ("Trilogy") are pursuing the other

two actions (collectively, the "Guaranty Creditors"). Should the Guaranty Creditors prevail in their

lawsuits, it will unravel the Plan the Debtors and their stakeholders have long been trying to achieve,

bankrupt CEC, and return this restructuring to square one.

3.      Rulings on dispositive summary judgment motions in each of the guaranty lawsuits

are imminent. The Delaware Chancery Court could enter judgment against CEC as soon as June 16

on $3.7 billion in claims being pursued by WSFS. The U.S. District Court for the Southern District

of New York likewise could enter judgment between June 24 and July 22 on another $7.7 billion in

claims against CEC.[2]  Absent injunctive relief, CEC could be hit with $11.4 billion in adverse

judgments by the end of this month.

4.      This Court should enjoin the Guaranty Creditors from further prosecuting their

guaranty suits until the Court issues its decision confirming or denying confirmation of the Debtors'

Plan. Given that rulings on dispositive motions are imminent, the Debtors respectfully request that

the Court enter a temporary restraining order prohibiting the parties from proceeding with oral

arguments scheduled for June 16 in Delaware and June 24 in New York to provide the Court time to

determine whether to enter the preliminary injunction. This Court's practical ability to prevent

judgments from being entered in the guaranty suits may be diminished following oral argument. At

that point, the parties will not need to take any additional steps themselves before a judgment may be

---

[2] Two other parties have brought actions against CEC seeking to enforce guaranties. In June 2015, UMB Bank, N.A., as trustee under certain CEOC first lien indentures, sued CEC in the Southern District of New York seeking $6.345 billion. (105 Order at 5) In October 2015, Wilmington Trust, N.A., as successor trustee for the 10.75% Senior Unsecured Notes, sued CEC in the Southern District of New York seeking more than $500 million. (*Id.* at 7) UMB and Wilmington Trust have agreed to abide by the terms of any injunction the Court issues. If the Court denies the Debtors' motion, however, UMB and Wilmington Trust will continue to prosecute their guaranty lawsuits to ensure their interests are not prejudiced in a CEC bankruptcy.

entered.  Thus, an injunction against these parties after oral arguments may not stop the courts from entering judgment.  Either court also could rule on these motions at or immediately after argument.

5.      As the Seventh Circuit previously held, the question for this Court is whether the injunctive relief sought by the Debtors is likely to enhance the prospects for a successful resolution of disputes attending their bankruptcy proceedings.  For the reasons this Court previously enjoined trial of the BOKF lawsuit, the answer is plainly yes.  The facts that entitle the Debtors to a temporary restraining order and preliminary injunction are straightforward and undisputed.  The Debtors' Plan is predicated on a $4 billion (midpoint valuation) contribution from CEC and its affiliates.  As this Court previously found, CEC cannot both sustain adverse judgments in the guaranty litigation and make any meaningful contribution to the Debtors' restructuring.  Without CEC's contribution, there is no Plan.  Moreover, the Debtors are likely to successfully reorganize, at least if an injunction is issued.  The Debtors' core business is strong, and the Debtors continue to make material progress in their Plan negotiations with critical creditor groups.  (Indeed, assuming creditors have an opportunity to vote on the Plan, the Debtors believe there will be support even from certain second lien noteholders given that the most junior creditors will receive at least approximately 40 cent (midpoint valuation) recoveries if they vote for the Plan as a result of the enhanced contributions the Debtors negotiated from CEC and its affiliates.)  Moreover, promoting successful reorganizations and settlements such as the one underlying the Plan is in the public interest.  For these reasons, and as this Court has recognized, the Seventh Circuit "effectively endorsed" granting an injunction on this very theory earlier in these proceedings.  (105 Order at 4)

6.      The requested injunction will provide additional time for the mediator and the Debtors to try to bring the Guaranty Creditors on board to a fully consensual restructuring or, if such a restructuring cannot be achieved, to seek to confirm a Plan that will enjoy wide creditor support.  If

3

the Court confirms the Plan, it will have found that the Plan and the settlement underlying it are in the best interests of the Debtors' bankruptcy estate. Should the Plan fail, the Guaranty Creditors can resume litigating against CEC. But the injunction will have served its purpose: to allow this Court to determine whether a Plan the Debtors and its stakeholders have been pursuing for nearly two years is in the best interests of the bankruptcy estate and should be confirmed. Creditors holding billions in claims should not face the risk that the guaranty litigation derails the Plan before the Court has a chance to review it.

## BACKGROUND

7.      The relevant facts are not in dispute. Many have already been decided by this Court, and other more recent facts are the proper subject of judicial notice.

## I.      CEC AND CEOC ANNOUNCE THAT CERTAIN TRANSACTIONS RELEASED CEC'S GUARANTIES OF CEOC'S OBLIGATIONS.

8.      Before the leveraged buyout, CEOC issued $1.5 billion in senior unsecured notes due in 2016 and 2017. (Order granting in part Debtors' motion for injunctive relief [Dkt. 214] ("105 Order") at 2) CEC guaranteed CEOC's obligations under these senior unsecured notes. (*Id.*) Currently, $530 million of these notes remain outstanding, including approximately $125 million held by noteholders purportedly represented by Defendants Danner and Trilogy. *Caesars Entm't Op. Co. v. BOKF, N.A.*, 533 B.R. 714, 721 n.7 (Bankr. N.D. Ill. 2015). The remaining outstanding notes are held by parties that are not challenging the release of the guaranties.

9.      In 2009, CEOC issued $3.71 billion in second priority secured notes due 2018. WSFS is a successor trustee under the indenture pursuant to which the notes were issued. (105 Order at 2) CEC also guaranteed CEOC's obligations under these notes. *BOKF*, 533 B.R. at 721. In 2010, CEOC issued $750 million in second priority secured notes due 2018. *Id.* BOKF, N.A. is a

successor trustee under the indenture pursuant to which the notes were issued. *Id.* These obligations were also guaranteed by CEC. (105 Order at 2)

10.    In May 2014, CEC and CEOC announced that CEC's guaranty of CEOC's debt was automatically released after CEC sold five percent of CEOC's outstanding common shares to institutional investors unaffiliated with CEC. (*See* CEC & CEOC 5/6/14 8-K)

11.    In August 2014, CEC and CEOC announced they had reached an agreement to purchase notes from holders representing greater than 51 percent of each series of senior unsecured notes that were then held by non-affiliates of CEC and CEOC. With the consent of these noteholders, CEOC and the trustees amended the relevant indentures to remove CEC's guaranties of the senior unsecured notes. (*See* CEC 8/22/14 8-K)

## II.    CREDITORS FILE LAWSUITS CHALLENGING THE GUARANTY RELEASE.

12.    On August 4, 2014, WSFS filed a lawsuit in Delaware Chancery Court against CEC and other defendants. (2014 WL 3885966) The lawsuit, as amended, alleges that CEC breached the WSFS indenture and violated the Trust Indenture Act ("TIA"), and requests a declaration that the guaranty is enforceable. (*Id.* at ¶¶ 128-154) If successful, WSFS would obtain a $3.7 billion judgment against CEC. (105 Order at 2)

13.    On September 3, 2014, Trilogy and other holders of 2016 senior unsecured notes filed suit in the Southern District of New York against CEC and CEOC. (14-cv-7091 (SAS) [Dkt. 1]) On October 2, 2014, Danner filed a class action in the Southern District of New York against CEC and CEOC on behalf of a purported class of 2016 noteholders. (14-cv-7973 (SAS) [Dkt. 1]) The Danner and Trilogy lawsuits allege that the August 2014 transaction breached the relevant indentures and the covenant of good faith and fair dealing, and violated the TIA. *BOKF,* 533 B.R. at 723-24. If successful, Danner and Trilogy collectively could obtain a judgment of approximately $125 million against CEC. (105 Order at 2)

14. On March 3, 2015, BOKF filed a complaint against CEC in the Southern District of New York. (No. 15-cv-1561 (SAS) [Dkt. 1]) BOKF alleges CEC breached the indenture by failing to honor the guaranty, and asserts claims for intentional interference with contractual relations and breach of the duty of good faith and fair dealing. (*Id.* at ¶¶ 160-167, 177-195, 211-224) BOKF also seeks a declaration that the guaranty "has not been terminated or released and remains valid, binding and enforceable against CEC," and any termination or release of the guaranty would violate the TIA. (*Id.* at ¶¶ 168-176, 196-210) If successful, BOKF would obtain a $750 million judgment against CEC. (105 Order at 11)

## III. JUDGMENTS ARE POTENTIALLY IMMINENT IN THE GUARANTY LITIGATION.

15. On March 18, 2016, WSFS filed a case-dispositive motion for summary judgment in Delaware Chancery Court. (2016 WL 1167641) On April 25, CEC filed its opposition brief and a cross-motion for partial summary judgment. (2016 WL 2610285) Both motions will be fully briefed by June 9 and oral argument is scheduled for June 16. (4/21/16 Order, Transaction ID No. 58893739) The Chancery Court has not indicated when it intends to rule on the summary judgment motions, but it will be in a position to do so at the end of the June 16th arguments.

16. The guaranty suits filed by Trilogy, Danner, BOKF and UMB were assigned to Judge Shira Scheindlin in the Southern District of New York. Before discovery was complete, Judge Scheindlin denied two rounds of summary judgment motions by BOKF and UMB as well as a summary judgment motion by Danner and Trilogy. (105 Order at 6) Judge Scheindlin set trial in the BOKF and UMB actions for March 14, 2016 and the Danner and Trilogy actions for May 9, 2016. (No. 14-cv-7973 [Dkt. 91]) In March 2016, however, Judge Scheindlin announced she was retiring and these lawsuits were reassigned to Judge Jed S. Rakoff. (*See, e.g.*, 3/31/16 minute entry [Dkt. 15-cv-1561]) At a status hearing on April 6, 2016, Judge Rakoff questioned whether any disputed

material issues of fact existed now that discovery was complete, and the parties agreed to another

round of summary judgment briefing.  On May 10, BOKF, Danner, and Trilogy (as well as UMB

and Wilmington Trust) filed case-dispositive motions for summary judgment.[3]  CEC also filed cross-

motions for summary judgment.  All motions will be fully briefed by June 14 and oral argument is

scheduled for June 24.  Judge Rakoff has indicated that he will issue a ruling no later than July 22

and have a trial on any remaining claims commencing on August 22.  (4/6/16 Tr. at 41)  Judge

Rakoff exhibited initial skepticism as to whether the guaranties had been released, suggesting that a

disjunctive reading of the relevant indenture provision—which "works out to 'and' being 'or'"—is

"an extraordinary proposition."  (*Id.* at 11)

## IV.   THIS COURT PREVIOUSLY ENJOINED GUARANTY LITIGATION.

17.    On March 11, 2015, the Debtors filed an adversary complaint and motion seeking

injunctive relief under section 105(a) to temporarily halt the prosecution of actions brought by the

Guaranty Creditors.  (*See* Adv. 15-00149)  The Debtors contended that the guaranty actions

threatened their ability to reorganize because CEC could not make a meaningful contribution to the

Debtors' restructuring *and* pay multi-billion dollar judgments to the Guaranty Creditors.  In June

2015, the Court held a two-day evidentiary hearing.  On July 22, 2015, the Court denied the Debtors'

motion on the grounds that relief was only appropriate where the action the Debtors sought to enjoin

against a third party arises from the same acts as Debtors' claims against the third party. *BOKF*, 533

B.R. at 714.  After the District Court affirmed, the Seventh Circuit reversed.  *BOKF*, 808 F.3d at

1191.  Following remand, on February 26, 2016, the Court granted the Debtors' request to enjoin the

BOKF trial, and continued their request with respect to the other guaranty lawsuits.  The Court found

the "evidence adduced at the [June 2015] hearing, as well as events post-hearing, demonstrated that

---

[3] 15-cv-1561 [Dkt. 146]; 15-cv-04634 [Dkt. 148]; 14-cv-7973 [Dkt. 122]; 15-cv-8280 [Dkt. 33]; 14-cv-7091 [Dkt 142]

an injunction is likely to enhance the prospects for a successful reorganization, an injunction will serve the public interest, and the equities weigh in the debtors' favor." (105 Order at 9)  The Court also held that "[t]he guaranty creditors are competing directly with the estate for the same assets." (*Id.* at 15)  The BOKF injunction expired by its terms on May 9. (*Id.* at 18)

18.    On May 4, the Court held a status on the Debtors' request to enjoin the WSFS, Danner, and Trilogy actions.  Because there was no threat of an imminent judgment in these matters, the Debtors had not reached an agreement in principle with CEC on an enhanced contribution, and more progress in creditor negotiations was needed, the Debtors did not ask the Court to extend the existing injunction.  The Court instead carried the matter for status to the disclosure statement hearing.  (5/4/16 Tr. at 3-4)

## V.    THE PRIOR INJUNCTION ALLOWED THE DEBTORS TO MATERIALLY ADVANCE CREDITOR NEGOTIATIONS AND INCREASE CEC'S CONTRIBUTION.

19.    The injunction the Court issued on February 26 provided the parties with a critical window in which to advance Plan negotiations toward a consensual plan.  The parties used the time effectively.  CEC has agreed to increase its contribution from an approximately $1.5 billion minimum contribution to one with a midpoint valuation of $4 billion.  In exchange for its contribution, the CEC Released Parties (as defined in Plan) will receive releases of all of the Debtors' claims and certain claims held by third parties against them, including claims held by the Guaranty Creditors.

20.    The Debtors have also made substantial progress in their negotiations with the UCC, the ad hoc committees representing the first lien bank lenders and first lien notes, and the trustee for the subsidiary-guaranteed notes.  Together, these constituencies hold approximately $12.6 billion of the Debtors' $18 billion in debt.  (*See* Disclosure Statement [Dkt. 3834-1] at 11-12)

21.     As this Court previously found, CEC cannot both sustain adverse judgments in the guaranty litigation and make any meaningful contribution to the Debtors' restructuring. (105 Order at 11)  As of January 2015, CEC had a market capitalization of $1.8 billion and an enterprise value of roughly $3 billion, including not quite $400 million in cash. (*Id.*)  Since then, CEC's ability to withstand adverse judgments has diminished; as of March 31, 2016, CEC only had $218 million in cash (of which $96 million was held by insurance captives). (5/5/16 CEC 10-Q at 10)  If successful, the Guaranty Creditors will obtain judgments exceeding $11 billion against CEC as soon as the end of this month.  Judgments of this magnitude would "deprive CEC of assets needed to satisfy the estate's claims and rule out any contribution to the plan," and "CEC would end up in a bankruptcy case of its own." (*Id.*)  This would lead to "one of the great messes of our time." (*Id.* at 17)

## **ARGUMENT**

22.     There is no question the Court has jurisdiction to enjoin Defendants from proceeding in the guaranty litigation.  *BOKF*, 808 F.3d at 1188.  It also has the statutory authority to enter the requested injunctive relief.  Section 105 grants bankruptcy courts "extensive equitable powers … to perform their statutory duties."  *Id*.  It provides that "the [bankruptcy] court may issue *any* order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a) (emphasis added).

23.     As this Court previously found, it is not necessary to satisfy the traditional elements for injunctive relief to obtain a section 105(a) injunction. (105 Order at 9, citing *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998))  As long as the third-party litigation would defeat or impair the bankruptcy court's jurisdiction over the case before it, the debtor need only show (1) there is a likelihood of success on the merits, which in this context means likelihood of a successful reorganization, and (2) the injunction would serve the public interest. (105 Order at 9-10)  The debtor need not show irreparable harm or inadequate remedy at law. (*Id.*)

9

## I.     THIS REMAINS A TEXTBOOK CASE FOR INJUNCTIVE RELIEF.

24.     The critical question before this Court is whether a temporary injunction "is likely to enhance the prospects for a successful *resolution of the disputes* attending [the CEOC] bankruptcy." *BOKF*, 808 F.3d at 1188 (emphasis added).  The answer is plainly yes.  The Debtors have a Plan that, if approved by the Court, will provide substantial recovery to creditors and resolve what has been a contentious and difficult reorganization.  This Plan is only possible because CEC and its affiliates are making a $4 billion contribution.  This contribution, however, is at risk because of imminent potential multi-billion dollar judgments in the guaranty litigation.

25.     For this reason, the Seventh Circuit previously recognized that the Debtors have a "direct and substantial interest" in the guaranty litigation that "would be furthered by a temporary injunction staying the lenders' lawsuits against CEC."  *Id.* at 1189.  It reasoned:

> If before CEOC's bankruptcy is wound up CEC is drained of capital by the lenders' suits to enforce the guaranties that CEC had given them, there will be that much less money for CEOC's creditors to recover in the bankruptcy proceeding.  CEOC seeks on behalf of the creditors to recover from CEC assets that CEC caused to be fraudulently transferred to it from CEOC, and to use the recovered assets to pay the creditors.  The less capital CEC has for CEOC to recapture through prosecution or settlement of its fraudulent-transfer claims, the less money its creditors will receive in the bankruptcy proceeding.

*Id.*

26.     CEC is close to being "drained of capital" necessary to fund the Debtors' restructuring.  There are case dispositive summary judgment motions pending in each of the six guaranty lawsuits.  As soon as June 16, the Delaware Chancery Court could issue a $3.7 billion judgment against CEC.  Between June 24 and July 22, the Southern District of New York could issue $7.7 billion in judgments against CEC.  There is no dispute that CEC cannot pay judgments of this magnitude.  As this Court previously found, these judgments "would deprive CEC of the assets

needed to satisfy the estate's claims and rule out any CEC contribution to the plan"; instead, "CEC would end up in a bankruptcy case of its own." (105 Order at 11)  That remains equally true today.

27.     This Court twice has noted "these facts describe a 'textbook case' for a section 105(a) injunction." (105 Order at 11; *BOKF*, 533 B.R. at 732)  For this reason, "bankruptcy courts often have enjoined litigation against a non-debtor, usually but not always a guarantor of the debtor's debts, who intends to contribute financially to the debtor's reorganization." (105 Order at 11, citing cases)  This Court, of course, did so earlier in this case. (*Id.* at 18)  Other courts in this district have done likewise. *See In re R&G Props*, No. 09-37463 (Bankr. N.D. Ill.) (Goldgar, J.), Feb. 3, 2010 Tr. 9:13-23 (issuing injunction where guarantors' ability to contribute "time and money, particularly money, [would] be jeopardized if the state actions proceed[ed]"); *Gander Partners LLC v. Harris Bank. N.A. (In re Gander Partners LLC)*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010) ("If the lawsuits proceed their outcome could impair this court's jurisdiction to help the Debtors to reorganize as the source of funds to assist the reorganization would no longer be available.").

28.     The undisputed facts show that this remains a textbook case as the requested injunctive relief is "likely to enhance the prospects for a successful resolution of disputes" attending this highly litigious bankruptcy. *BOKF*, 808 F.3d at 1188.

## II.     THE DEBTORS ARE LIKELY TO SUCCESSFULLY REORGANIZE.

29.     The Debtors are likely to successfully reorganize, at least if an injunction is issued. There is no dispute the Debtors have a strong business.  They have a highly valuable gaming franchise, with a signature hotel and casino, Caesars Palace Las Vegas, centrally located on the Las Vegas Strip. (105 Order at 10)  The Debtors had more than $5 billion in annual revenue and more than $1 billion in EBITDA in the twelve months prior to the June 2015 evidentiary hearing. (*Id.*) This strong performance has continued post-petition. (*See, e.g.,* Disclosure Statement [Dkt. 3834-1] at 87 (the Debtors had $4.54 billion in net revenue, $610 million in income from operations and

substantial free cash flow after accounting for capital expenditures from the petition date through February 29, 2016)) The Debtors also have a Plan that is gaining widespread creditor support across the capital structure. The Debtors expect that support will grow in the days and weeks ahead.

## III.   AN INJUNCTION SERVES THE PUBLIC INTEREST.

30.     The requested injunctive relief also serves the public interest. Both this Court and the Seventh Circuit recognized in their rulings on injunctive relief that successful reorganizations are in the public interest in the bankruptcy context because reorganizations preserve value for creditors and ultimately the public. (105 Order at 14, citing cases; *BOKF*, 808 F.3d at 1189) As the Court found several months ago, the Debtors have considerable value as a going concern and possess valuable claims against CEC. (105 Order at 14) The requested injunctive relief "will maintain the value of those claims (by protecting the CEC assets that would pay them)" while the Court decides whether to confirm the Plan and approve the settlement on which it is based. (*Id.*; *see also BOKF*, 808 F.3d at 1189 (the interest of all creditors in receiving more rather than less in the bankruptcy case "would be furthered by a temporary injunction staying the lenders' lawsuits against CEC."))

31.     The other compelling public interest is in promoting settlements. (105 Order at 14, citing cases) The Seventh Circuit recognized that "successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives." *BOKF*, 808 F.3d at 1189. Public policy also favors settlements generally. *Nat'l Cas. Co. v. White Mountain Reins. Co.*, 735 F.3d 549, 556 (7th Cir. 2013). The Debtors' Plan will resolve complex disputes among its stakeholders. The Debtors also expect the Plan to garner wide support of its creditors. They just need time to complete negotiations and seek confirmation. Under these circumstances, the public interests in successful reorganizations and settlements outweigh the Guaranty Creditors' interests in enforcing their guaranties. (*See* 105 Order at 15)

12

## IV.    THE BALANCE OF EQUITIES WEIGHS IN THE DEBTORS' FAVOR.

32.    The balance of the equities still heavily favors the Debtors.  (105 Order at 15)  As this Court noted, it is unclear whether this factor is even relevant as "neither of the Seventh Circuit decisions setting out the elements of a section 105(a) injunction mentions balancing the equities as one of them."  *BOKF*, 533 B.R. at 728 n.13.  Given this silence and that there is no irreparable harm requirement, the Debtors do not believe the Court needs to reach this issue.

33.    Regardless, the same factors that led the Court to conclude that the "balance of equities also heavily favors" the Debtors still apply.  (105 Order at 15)  The Debtors "stand to suffer very real harm" if an injunction is not granted.  (*Id.*)  If an injunction is not issued and the Guaranty Creditors obtain multi-billion dollar judgments against CEC, CEC will not be able to make a material financial contribution to the Debtors' restructuring and instead will itself become a debtor. (*Id.*)  If CEC files, the Debtors will have to pursue equitable remedies to obtain the return of assets transferred to CEC, which will result in an unrivaled "litigation forum" and massive administrative expenses.  (*Id.* at 15-16)  As the Debtors' financial advisor testified, it would be "one of the great messes of our time."  (*Id.* at 16)

34.    By comparison, the Guaranty Creditors will lose little if the Court grants the injunctive relief.  The Debtors seek an injunction through plan confirmation.  That injunction would allow more time for settlement discussions among the Debtors, CEC, and the Guaranty Creditors without the threat of imminent multi-billion dollar judgments and a CEC bankruptcy filing.

35.    Absent settlement, the Guaranty Creditors will be able to argue at confirmation that the settlement underlying the Plan is not fair and reasonable.  If they prevail, they can proceed with their guaranty claims against CEC.  *See, e.g., Bank of the West v. Fabtech Indus., Inc. (In re Fabtech Indus. Inc.)*, 2010 WL 6452908, at *1-2, 6 (9th Cir. B.A.P. July 19, 2010) (affirming order enjoining creditor from enforcing guaranty against Debtor's CEO through confirmation even though plan

precluded creditor from subsequently pursuing guaranty claims); *Otero Mills Inc. v. Security Bank & Trust (In re Otero Mills)*, 21 B.R. 777, 779 (Bankr. D. NM 1982) (entering permanent injunction to prevent creditor from pursuing judgment against guarantor to "allow the debtor an opportunity to present a plan and put it into operation" but allowing creditor to seek to lift injunction if "the debtor fails to file a plan within the required time or if the plan is not approved"). If the Court confirms the Plan over their objection, it will mean the Court has concluded that the Plan is fair and reasonable to all creditors—including the Guaranty Creditors. But this Court will never have the opportunity to assess whether the Plan, the culmination of nearly two years' worth of efforts, is fair and reasonable if the injunction is not entered. Instead, CEC will be forced into bankruptcy and its $4 billion contribution will go up in smoke. That result is directly contrary to both this Court's and the Seventh Circuit's rationale in recognizing the propriety of an injunction against the guaranty claims.

## V.     A TEMPORARY RESTRAINING ORDER TO PRESERVE THE STATUS QUO IS WARRANTED.

36.     As set forth above, the Debtors have demonstrated each of the elements necessary to obtain a section 105(a) injunction. Nothing more is needed to obtain a temporary restraining order. A party does not need to show irreparable harm or inadequate remedy at law to obtain an injunction under section 105. (105 Order at 9-10, citing *Fisher*, 155 F.3d at 882) And the "standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions." *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001) (citing *Bernina of America, Inc. v. Fashion Fabrics Int'l, Inc.*, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001)). Thus, in the section 105 context, a court may issue a temporary restraining order without considering whether there is irreparable harm or an inadequate remedy at law. *In re Britestarr Homes, Inc.*, 368 B.R. 106, 108 (Bankr. D. Conn. 2007) (explaining "the usual grounds for injunctive relief … such as irreparable

injury, need not be shown in a proceeding for an injunction under section 105(a)," and affirming entry of temporary restraining order to preserve status quo).

37.     Even if irreparable harm and inadequate remedy at law were required, they are present here.  As the Court previously found, the Debtors "stand to suffer very real harm" if an injunction is not granted and multi-billion dollar adverse judgments force CEC to file for bankruptcy. (105 Order at 15)  As discussed, once oral arguments occur on June 16 in Delaware and June 24 in New York, this Court's practical ability to prevent judgments from being entered in the guaranty suits may be diminished.  The parties will not need to take any additional steps themselves before a judgment is entered and so an injunction against these parties may not stop the courts from entering judgment.  Either court also could rule at or immediately after argument on these dispositive motions.  Accordingly, the Court should enter a temporary restraining order to prevent the parties from proceeding with oral argument on these case dispositive motions while the Court considers the Debtors' request for further injunctive relief.

## CONCLUSION

38.     Just three months ago, this Court entered an injunction "[b]ecause the debtors' reorganization depends, one way or another, on the estate's claims against CEC, because CEC does in fact 'lack the money to satisfy all of its obligees,'... and because CEC will indeed be "drained of capital by the lenders' suits to enforce the guaranties' if those suits are not enjoined before adverse judgments are entered."  (105 Order at 14 (internal cites omitted))  The same threat again looms large.  Summary judgment against CEC could be a pen stroke away, with devastating consequences for a Plan that will recover $4 billion for the estate and provide substantial recoveries to creditors.  In accordance with its and the Seventh Circuit's prior rulings, the Court should exercise its extensive equitable powers to prevent the guaranty litigation from endangering the Debtors' restructuring.

Dated:  June 6, 2016
Chicago, Illinois

/s/ David J. Zott, P.C.

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Paul M. Basta, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order Granting Temporary Restraining Order**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Chapter 11 |
| COMPANY, INC., et al., | ) |
| | ) Adversary Case. No. 15-00149 (ABG) |
| *Plaintiffs* | ) |
| vs. | ) |
| | ) |
| BOKF, N.A., WILMINGTON SAVINGS FUND | ) |
| SOCIETY, FSB, RELATIVE VALUE- | ) |
| LONG/SHORT DEBT PORTFOLIO, A SERIES | ) |
| OF UNDERLYING FUNDS TRUST, TRILOGY | ) |
| PORTFOLIO COMPANY, LLC, AND | ) |
| FREDERICK BARTON DANNER, | ) |
| | ) |
| | ) |
| | ) **Re: Docket Nos. _____** |
| | ) |
| *Defendants.* | ) |

## ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER ENJOINING DEFENDANTS FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

**SA270**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>") granting Debtors' emergency motion for a temporary restraining order enjoining Defendants from further prosecuting their guaranty lawsuits, all as more fully set forth in the Motion; and after due deliberation, it is HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      Pursuant to section 105(a) of the Bankruptcy Code, pending further order of this Court, the Defendants are hereby temporarily enjoined from further prosecuting their guaranty lawsuits, styled: *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp.*, C.A. No. 10004 VCG (Del. Ch.); *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-cv-1561 (JSR) (SDNY); *Trilogy Portfolio Co., LLC v. Caesars Entertainment Corp.*, No. 14-cv-07091 (JSR) (SDNY); and *Danner v. Caesars Entertainment Corp.*, No. 14-cv-07093 (JSR) (SDNY).

3.      A hearing on Debtors' motion for a preliminary injunction is set for June _____, 2016 at _____ (prevailing Central Time).

4.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.


Dated: _____, 2016
Chicago, Illinois

_____
The Honorable A. Benjamin Goldgar
United States Bankruptcy Judge

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application.

2

**<u>Exhibit B</u>**

**Proposed Order Granting Preliminary Injunction**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al.,[3] | ) Case No. 15-01145 (ABG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al., | ) Chapter 11 |
| | ) |
| *Plaintiffs* | ) Adversary Case. No. 15-00149 (ABG) |
| vs. | ) |
| | ) |
| BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC, AND FREDERICK BARTON DANNER, | ) |
| | ) |
| | ) **Re: Docket Nos. _____** |
| *Defendants.* | ) |

## ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR
## A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS
## FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS

---

[3] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

Upon the motion (the "Motion")[4] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") granting Debtors' emergency motion for a preliminary injunction enjoining Defendants from further prosecuting their guaranty lawsuits, all as more fully set forth in the Motion; and after due deliberation, it is HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      Pursuant to section 105(a) of the Bankruptcy Code, the Defendants are hereby enjoined from further prosecuting their guaranty lawsuits, styled: *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp.*, C.A. No. 10004 VCG (Del. Ch.); *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-cv-1561 (JSR) (SDNY); *Trilogy Portfolio Co., LLC v. Caesars Entertainment Corp.*, No. 14-cv-07091 (JSR) (SDNY); and *Danner v. Caesars Entertainment Corp.*, No. 14-cv-07093 (JSR) (SDNY). The injunction will remain in place until the Court issues its decision confirming or denying confirmation of the Plan (as may be amended from time to time), or until further Order of the Court.

3.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.


Dated: _____, 2016                    _____
Chicago, Illinois                                         The Honorable A. Benjamin Goldgar
                                                               United States Bankruptcy Judge

---

[4]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Chapter 11 |
| COMPANY, INC., et al., | ) |
| | ) Adversary Case. No. 15-00149 (ABG) |
| *Plaintiffs* | ) |
| vs. | ) |
| | ) |
| BOKF, N.A., WILMINGTON SAVINGS FUND | ) **Hearing Date: August 23, 2016 at 9:00 a.m.** |
| SOCIETY, FSB, RELATIVE VALUE- | ) **(prevailing Central Time)** |
| LONG/SHORT DEBT PORTFOLIO, A SERIES | ) |
| OF UNDERLYING FUNDS TRUST, TRILOGY | ) |
| PORTFOLIO COMPANY, LLC, AND | ) |
| FREDERICK BARTON DANNER, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**NOTICE OF DEBTORS' MOTION TO EXTEND THE**
**SECTION 105 INJUNCTION ENJOINING DEFENDANTS**
**FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS**

      **PLEASE TAKE NOTICE** that on **August 23, 2016, at 9:00 a.m. (prevailing Central Time)** or as soon thereafter as counsel may be heard, the Debtors will appear before the Honorable A. Benjamin Goldgar or any other judge who may be sitting in his place and stead, in Courtroom 642 in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, 60604, for an evidentiary hearing on the attached *Debtors' Motion to*

---

[1]     A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

*Extend the Section 105 Injunction Enjoining Defendants from Further Prosecuting Their Guaranty Lawsuits* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that written objections to the Motion are optional but if filed must be filed with the Court by **August 19, 2016**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion as well as copies of all documents filed in these chapter 11 cases are available free of charge by visiting https://cases.primeclerk.com/CEOC or by calling (855) 842-4123 within the United States or Canada or, outside of the United States or Canada, by calling +1 (646) 795-6969.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  August 8, 2016
Chicago, Illinois

*/s/ David J. Zott, P.C.*
James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[2] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Chapter 11 |
| COMPANY, INC., et al., | ) |
| | ) Adversary Case. No. 15-00149 (ABG) |
| *Plaintiffs* | ) |
| vs. | ) |
| | ) |
| BOKF, N.A., WILMINGTON SAVINGS FUND | ) **Hearing Date: August 23, 2016 at 9:00 a.m.** |
| SOCIETY, FSB, RELATIVE VALUE- | ) **(prevailing Central Time)** |
| LONG/SHORT DEBT PORTFOLIO, A SERIES | ) |
| OF UNDERLYING FUNDS TRUST, TRILOGY | ) |
| PORTFOLIO COMPANY, LLC, AND | ) |
| FREDERICK BARTON DANNER, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## DEBTORS' MOTION TO EXTEND THE SECTION 105 INJUNCTION ENJOINING DEFENDANTS FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS

---

[2]    A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

Pursuant to section 105(a) of the Bankruptcy Code and Rule 7065 of the Federal Rules of Bankruptcy Procedure, the Debtors respectfully request that the Court extend the injunction enjoining Defendants from further prosecuting guaranty lawsuits that seek billions of dollars from the Debtors' ultimate parent, Caesars Entertainment Corporation ("CEC"), until the first omnibus hearing after the Court issues its decision confirming or denying confirmation of the Debtors' plan of reorganization (the "Plan"). In support of their motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

1.      The injunctions have served their intended purpose. Since the Court entered the first injunction, the Debtors have made substantial progress towards a fully consensual plan with numerous key stakeholders:

- **Subsidiary-Guaranteed Noteholders.** On April 26, the Debtors made a settlement offer to the subsidiary-guaranteed noteholders ("SGN"). On June 7, the Debtors entered into an RSA with certain of these noteholders. The RSA went effective on June 21, when holders of more than 65% of the subsidiary-guaranteed notes executed the RSA.

- **Caesars Entertainment Corporation.** On June 7, the Debtors entered into an RSA with CEC. The RSA committed CEC to support the Debtors' Plan and accelerated the timeline for CEC and Caesars Acquisition Company ("CAC") to enter into a merger agreement, which is an important source of funding for the Plan. On July 9, the CEC RSA went effective, and CEC and Hamlet Holdings LLC (the vehicle through which the sponsors hold their equity interests in CEC and CAC) ("Hamlet") entered into a Voting Agreement whereby Hamlet agreed, subject to certain terms and conditions, to vote its shares as a stockholder of CEC in support of the CEC–CAC merger.

- **Caesars Acquisition Company.** On June 12, the Debtors entered into an RSA with CAC that contained similar terms as the CEC RSA. On July 9, the CAC RSA went effective, and CAC and Hamlet entered into a Voting Agreement whereby Hamlet agreed, subject to certain terms and conditions, to vote its shares as a stockholder of CAC in support of the CEC–CAC merger.

- **First Lien Bank Lenders.** On June 20, the Debtors entered into an amended and restated RSA with certain holders of first lien bank debt, under which lenders holding more than 80% of first lien bank debt have committed to support the Debtors' Plan. The amended bank RSA became effective on June 21.

- **Statutory Unsecured Claimholders' Committee.** On June 22, the Debtors entered into an RSA with the Statutory Unsecured Claimholders' Committee (the "UCC"), pursuant

to which the UCC agreed to support the Debtors' Plan. The UCC RSA became effective on June 22.

- **Second Lien Noteholders.** On August 1, the Debtors entered into an RSA with holders of 27% of the second lien notes (the "Second Lien RSA"). When combined with the second lien notes held by parties subject to other RSAs, a total of 37% of the second lien noteholders now support the Debtors' restructuring. The Second Lien RSA, which will go effective if holders owning greater than 50.1% of notes issued under each of two indentures execute it, provides for enhanced recoveries of up to 55% to second lien noteholders that sign the Second Lien RSA (as compared to recoveries under the Plan of approximately 39% at the Debtors' midpoint valuation). As discussed below, the Debtors have continued to negotiate in mediation and otherwise with the Official Committee of Second Priority Noteholders (the "Noteholder Committee") and CEC using the Second Lien RSA as a framework to achieve further consensus.

- **First Lien Noteholders.** The Debtors are continuing to negotiate with the ad hoc committee of first lien noteholders to amend their existing RSA. Although the parties have not yet agreed on an amended RSA, the Plan provides for recoveries to the first lien noteholders of par plus substantial interest. Given these recoveries, the Debtors fully expect the first lien noteholders will continue to support the overall deal, and likewise support extending the injunction to allow the Debtors to pursue that deal.

- **Frederick Barton Danner.** The Debtors recently reached an agreement in principle with Frederick Barton Danner that is subject to final documentation, which the Debtors are working to complete promptly.

2.      Much of this progress has occurred during the first 53 days of the 74-day injunction that the Court entered on June 15. Since then, the SGN, CEC and CAC RSAs all went effective, the Debtors entered into an amended RSA with the first lien bank lenders, and the Debtors entered into new RSAs with the UCC and certain second lien noteholders (all of which are effective except for the Second Lien RSA). The Debtors also reached an agreement in principle with Danner. In total, the Debtors estimate that $14 billion of their $18 billion capital structure currently supports the Debtors' proposed restructuring, which provides billions of dollars of recoveries for creditors and is premised on CEC's ability to make multi-billion dollar contributions under the Plan.

3.      That leaves the Noteholder Committee (which includes Defendants WSFS and BOKF) and the Ad Hoc Group of 5.75% and 6.5% notes (which represents holders of $23 million in claims, including Defendants Trilogy and Relative Value) as the sole remaining creditor groups that

oppose the Plan. The Debtors remain committed to achieving a fully consensual plan and are working hard to reach consensus with all parties. To that end, the Debtors are engaged in active dialogue with both of these groups.

4. Since the Court issued the injunction on June 15, the Debtors, CEC and its affiliates and the Noteholder Committee have participated in three in-person mediation sessions with Joseph J. Farnan, Jr., former Chief Judge of the U.S. District Court for the District of Delaware. A fourth session is scheduled for August 16. In addition, there have been frequent and extensive discussions among principals and advisors for the Debtors, CEC and its affiliates and the Noteholder Committee, as well as among principals and advisors for these parties and the mediator. The Ad Hoc Group of 5.75% and 6.5% notes also has participated in one of the in-person mediation sessions and is involved in additional discussions with the Debtors and CEC to try to resolve its claims.

5. The day after the first mediation session following entry of the current injunction, the Noteholder Committee publicly stated that holders of more than 50.1% in principal amount of second lien notes have agreed in writing to reject the Plan. The Debtors continued negotiations with second lien noteholders that are not on the Noteholder Committee, which led to the Second Lien RSA. The Second Lien RSA would provide $900 million in additional creditor recoveries at the Debtors' midpoint valuation if all of the second lien noteholders agree to it. It also serves as a framework for additional negotiations with the Noteholder Committee in the ongoing mediation.

6. In addition, the Debtors have spent substantial time, both in and out of mediation, engaged in negotiations with the Noteholder Committee and other parties as a result of CAC's announcement on July 30 that it is selling its social mobile gaming business for $4.4 billion in cash.[3]

---

[3] The Debtors have litigation claims related to the assets that are being sold. Accordingly, the Debtors negotiated for, and CAC agreed to provide under the CAC RSA, 30-days' notice to the Debtors of the closing of the transaction. The Debtors have not yet received that notice. The

While this may allow the Debtors to distribute substantial additional cash rather than securities under the Plan and simplify certain valuation issues among the parties, there are significant ongoing negotiations regarding the allocation and use of these proceeds in addition to the negotiations regarding the amount of the ultimate creditor recoveries.

7.    The Debtors also have outperformed their budget while in chapter 11.  This too has led to further negotiations among the parties as to how to allocate this additional value.

8.    All of these discussions and negotiations take time.  The mediator continues to have almost daily discussions with the principals and advisors for the Debtors, CEC and its affiliates, and the remaining parties who have not signed RSAs.  The mediator also has scheduled another in-person mediation session for August 16.

9.    The Debtors are also attempting to eliminate other disputes so the parties can focus on mediation and confirmation.  As previously indicated, the Debtors are working with counsel for the Noteholder Committee to finalize a comprehensive complaint to preserve the estate's claims.  It will be filed this week.  At that time and consistent with the Court's comments, the Debtors also will seek to continue the Noteholder Committee's standing motion, stay all remaining standing-specific discovery and stay any further litigation on the complaint.  If the Court continues the standing motion, following more than a year and a half of disputes in a highly litigious bankruptcy, the parties will be able to focus their efforts on mediation and confirmation.  This too is progress.

10.    While the Debtors have made significant additional progress toward a fully consensual plan since the Court issued the most recent injunction and a fully consensual plan remains their overriding goal, relief under section 105 is not limited to injunctions that help parties

---

Debtors also negotiated for and CAC agreed to escrow under the CAC RSA the majority of the sale proceeds while the parties work through the impact of the sale on the chapter 11 process.  In addition, the Debtors reserved their rights to seek to enjoin the closing.

achieve a fully consensual plan. Such a limitation would contradict the express grant of "extensive equitable powers" inherent in the terms of section 105, and resurrects the very "cramped interpretation" that the Seventh Circuit rejected. *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186, 1188-89 (7th Cir. 2015). Indeed, it would effectively write section 105 out of the Bankruptcy Code as parties could only obtain injunctive relief when they do not need it—where there is a fully consensual restructuring.

11.    Instead, as the Seventh Circuit previously held, the questions for this Court are whether extending the injunction is likely to enhance the prospects for a successful resolution of disputes attending these bankruptcy proceedings, and whether denying the injunction would thus endanger the success of the bankruptcy proceedings.

12.    For the reasons the Court has previously found, the answers to these questions are plainly yes. The Debtors' Plan is predicated on a $4 billion (midpoint valuation) contribution from CEC and its affiliates. CEC cannot both sustain adverse judgments in the guaranty litigation and make any meaningful contribution to the Debtors' restructuring. Without CEC's contribution, there is no Plan. Moreover, the Debtors are likely to successfully reorganize, at least if an injunction is issued through confirmation. The Debtors' core business is strong, and the Debtors continue to make material progress with their critical creditor groups. Finally, promoting successful reorganizations and settlements such as the one underlying the Plan is in the public interest.

13.    The requested extension of the injunction will provide additional time for the mediator and the Debtors to try to bring the remaining creditors on board with a fully consensual restructuring or, if such a restructuring cannot be achieved, for the Debtors to seek to confirm a Plan that enjoys the support of all but two of the Debtors' numerous creditor groups. Either way, the

injunction enhances the prospects for a successful resolution of disputes in this case. Disputes, after all, can be resolved through settlements or the courts.

14.     An unfortunate byproduct of the Court's June injunction order is that it has vested the Noteholder Committee with undue negotiating leverage. The Committee's incentive is to *not* reach a settlement during the injunction period, since the Court has stated a further injunction is unlikely, and the prospect of imminent guaranty judgments means the Noteholder Committee will not have to face the risk of losing a contested Plan confirmation hearing. Negotiating balance can best be restored if all parties—including the Noteholder Committee, CEC and the sponsors, and the Debtors—know that, absent settlement, they face the risk of a contested confirmation hearing. As discovery progresses, and a confirmation trial approaches, pressure will steadily mount to reach a deal. This will restore both the "uncertainty" and the "deadlines" that the Court recognized have the best chance of achieving a fully consensual deal.

15.     If the Court confirms the Plan, it will have found that the Plan and the settlement underlying it are fair and reasonable, and in the best interests of the Debtors' estates. Should the Plan fail, the guaranty plaintiffs can resume litigating against CEC. But the injunction will have served its purpose: to allow this Court to determine whether a Plan that the Debtors and its stakeholders have been pursuing for two years is in the best interests of the bankruptcy estate and should be confirmed. Creditors holding billions in claims should not face the risk that the guaranty litigation derails the Plan before the Court has a chance to review it.

## **BACKGROUND**

## I.      **THIS COURT TWICE PREVIOUSLY ENJOINED THE GUARANTY LITIGATION TO ALLOW THE DEBTORS TO MAKE SUBSTANTIAL PROGRESS ON A PLAN.**

16.     The Court previously has found the relevant background facts regarding CEC's guaranty of certain CEOC obligations, the release of the guaranty, and the lawsuits creditors filed in

response to the release of the guaranty. (*See, e.g.,* Order granting in part Debtors' motion for injunctive relief [Dkt. 214] ("<u>Feb. 105 Order</u>") at 2; *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 533 B.R. 714, 721, 721 n.7 (Bankr. N.D. Ill. 2015))

17.     On March 11, 2015, the Debtors filed a complaint and motion seeking injunctive relief under section 105(a) to temporarily halt the prosecution of actions brought by WSFS, BOKF, Danner and Trilogy (collectively, the "<u>Guaranty Creditors</u>"). (*See* Adv. 15-00149) Following a two-day evidentiary hearing, on July 22, 2015, the Court denied the Debtors' motion on the grounds that relief was only appropriate where the action the Debtors sought to enjoin against a third party arises from the same acts as Debtors' claims against the third party. *BOKF*, 533 B.R. at 727, 735. After the District Court affirmed, the Seventh Circuit reversed. *BOKF*, 808 F.3d at 1191.

18.     Following remand, on February 26, 2016, the Court granted the Debtors' request to enjoin the BOKF trial. The Court found "[t]he evidence adduced at the [June 2015] hearing, as well as events post-hearing, demonstrated that an injunction is likely to enhance the prospects for a successful reorganization, an injunction will serve the public interest, and the equities weigh in the debtors' favor." (Feb. 105 Order at 9) The Court also held that "[t]he guaranty creditors are competing directly with the estate for the same assets." (*Id.* at 15) The BOKF injunction expired by its terms on May 9. (*Id.* at 18)

19.     On June 6, 2016, after reaching an agreement in principle with CEC on an RSA and making significant progress with various creditor groups, the Debtors filed an emergency motion to again enjoin the guaranty litigation. [Dkt. 239] Following a three-day evidentiary hearing, the Court enjoined the guaranty plaintiffs from prosecuting their actions against CEC until the close of business on August 29, 2016. (Order Granting Mot. for TRO and Prelim. Inj. [Dkt. 274] ("<u>June 105 Order</u>") at 1) The Court found that an additional injunction is "likely to enhance the prospects for a

successful resolution of the disputes attending" the CEOC bankruptcy. (*Id.* at 4 (citing *BOKF*, 808

F.3d at 1188)) The Court warned, however, that the "chances of further injunctive relief are slim"

and "encourage[d] the debtors and CEC to make good use of" the additional 74-day period. (*Id.* at 2,

5)

20.    As set forth above, the Debtors have made substantial progress towards a fully

consensual plan since the Court entered the initial injunction.

## II.    CEC FACES AN IMMINENT THREAT OF BILLIONS OF DOLLARS IN POTENTIAL GUARANTY JUDGMENTS.

21.    There are fully briefed cross-motions for summary judgment pending in all six of the

active guaranty actions. (June 105 Order at 1) Following entry of the injunction in June, Judge Jed

S. Rakoff rescheduled argument on the motions pending before him for August 30 at 4 p.m. ET—the

day after the current injunction expires. Oral argument in the Delaware Chancery Court has been

rescheduled to September 13 at 1:30 p.m. Thus, absent further injunctive relief, $11.4 billion in

judgments could be entered against CEC by mid-September.

22.    As this Court previously found, CEC cannot both sustain adverse judgments in the

guaranty litigation and make any meaningful contribution to the Debtors' restructuring. (Feb. 105

Order at 11) Should the Guaranty Creditors prevail, it will unravel the Plan that the Debtors and

their stakeholders have long been trying to achieve, bankrupt CEC, and return this restructuring to

square one.

## <u>ARGUMENT</u>

23.    The Court enjoined the Guaranty Creditors to "facilitate a negotiated resolution of the

disputes in this case." (June 105 Order at 5) As set forth above, the Debtors made material progress

during the injunction periods. It is not clear, however, that the Debtors will be able to reach a fully

consensual plan without reallocating some of the risk back to the Noteholder Committee. At this

point, the Noteholder Committee holds all of the cards in the negotiations given the Court's statements that future injunctive relief is unlikely, which mitigates the risk to the Noteholder Committee of ever facing a contested confirmation hearing.  To be clear, no one wants a "cram down" confirmation hearing.  The risks to the Debtors, CEC, the sponsors, and the Noteholder Committee are enormous in that scenario.  But restoring balance to those risks by extending the injunction to Plan confirmation provides the best path to a fully consensual deal.

## I.   THE COURT HAS THE POWER TO ENJOIN THE GUARANTY LAWSUITS THROUGH PLAN CONFIRMATION.

24.     The Seventh Circuit has described section 105 as a "broad grant of power" which "grants the extensive equitable powers that bankruptcy courts need to be able to perform their statutory duties."  *BOKF*, 808 F.3d at 1188.  Section 105 provides that "the [bankruptcy] court may issue *any* order … that is necessary or appropriate to carry out the provisions of this title."  *Id.* (citing 11 U.S.C. § 105(a)) (emphasis added by Seventh Circuit).  Nothing in the text of the statute limits the Court's authority to issuing injunctions to facilitate fully consensual deals, and the Seventh Circuit has rejected a "cramped interpretation" of the scope of section 105.  *Id.* at 1187-88.  Indeed, other courts have enjoined creditors under section 105 from pursuing guaranty claims to allow a debtor to seek confirmation of its plan.

25.     For example, in *Bank of the West v. Fabtech Indus., Inc. (In re Fabtech Indus., Inc.)*, 2010 WL 6452908 (9th Cir. B.A.P. July 19, 2010), the bankruptcy court enjoined a creditor under section 105 through the date of plan confirmation from continuing its state court action to enforce a guaranty against the debtor's CEO.  *Id.* at 1.  The creditor appealed on the grounds that the proposed plan would limit the creditor's ability to pursue its guaranty claim post-confirmation.  *Id.*  The appellate panel upheld the injunction, concluding it would allow the debtor's CEO to focus on confirming the debtor's plan without being distracted by the guaranty litigation.  *Id.* at 5-6.

26.     Similarly, in *Otero Mills, Inc. v. Sec. Bank & Trust (In re Otero Mills, Inc.)*, 21 B.R. 777 (Bankr. D.N.M. 1982), the court permanently enjoined a creditor under section 105 from enforcing a guaranty judgment against the debtor's president to "allow the debtor an opportunity to present a plan and put it into operation." *Id.* at 779.  The creditor sought to foreclose on property that the debtor's president intended to sell to fund distributions to all creditors. *Id.*  The court reasoned "the debtor is entitled to present a plan which should be considered by all creditors." *Id.*

27.     Simply put, the Court's power under section 105 extends to entering an injunction that would allow the Debtors to seek confirmation of their Plan.  To obtain such relief, the Debtors do not need to satisfy the traditional elements for an injunction.  (Feb. 105 Order at 9, *citing Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998))  As long as the third-party litigation would impair the bankruptcy court's jurisdiction over the case before it, the Court should extend the injunction if (1) there is a likelihood of success on the merits, which in this context means likelihood of a successful reorganization, and (2) the injunction would serve the public interest. (*Id.* at 9-10)  The Debtors need not show irreparable harm or inadequate remedy at law.  (*Id.*)

## II.     THIS REMAINS A TEXTBOOK CASE FOR AN INJUNCTION.

28.     The critical questions before this Court are whether extending the injunction through Plan confirmation is "likely to enhance the prospects for a successful *resolution of the disputes* attending [the CEOC] bankruptcy" and whether "its denial will thus endanger the success of the bankruptcy proceedings." *BOKF*, 808 F.3d at 1188 (emphasis added).  The answers are plainly yes. The Debtors have a Plan that, if approved by the Court, will provide substantial recoveries to creditors and resolve a highly contentious and "immense, and immensely complicated, bankruptcy proceeding." *Id.* at 1187.  This Plan is only possible because CEC and its affiliates are making a $4 billion contribution.  This contribution, however, is at risk because of imminent potential multi-billion dollar judgments in the guaranty litigation.

10

29.     For this reason, the Seventh Circuit previously recognized that the Debtors have a
"direct and substantial interest" in the guaranty litigation that "would be furthered by a temporary
injunction staying the lenders' lawsuits against CEC." *Id.* at 1189.  It reasoned:

> If before CEOC's bankruptcy is wound up CEC is drained of capital by the lenders'
> suits to enforce the guaranties that CEC had given them, there will be that much less
> money for CEOC's creditors to recover in the bankruptcy proceeding.  CEOC seeks
> on behalf of the creditors to recover from CEC assets that CEC caused to be
> fraudulently transferred to it from CEOC, and to use the recovered assets to pay the
> creditors.  The less capital CEC has for CEOC to recapture through prosecution or
> settlement of its fraudulent-transfer claims, the less money its creditors will receive
> in the bankruptcy proceeding.

*Id.*

30.     CEC is close to being "drained of capital" necessary to fund the Debtors'
restructuring.  More than $7.7 billion in judgments could be entered against CEC as soon as August
30 at 4 p.m., when Judge Rakoff has set argument on the cross motions in the five New York
actions.  The Delaware Chancery Court could issue a $3.7 billion judgment against CEC by
September 13.  There is no dispute that CEC cannot pay judgments of this magnitude.  As this Court
previously found, these judgments "would deprive CEC of the assets needed to satisfy the estate's
claims and rule out any CEC contribution to the plan"; instead, "CEC would end up in a bankruptcy
case of its own."  (Feb. 105 Order at 11)  That remains true today.

31.     Moreover, extending the injunction will enhance the prospects of a consensual deal
by rebalancing the parties' negotiating leverage or, absent a consensual deal, preserve CEC's
contribution that is the bedrock of any confirmable plan.  Either way, the undisputed facts show this
remains a textbook case as the requested injunctive relief is "likely to enhance the prospects for a
successful resolution of the disputes" attending this highly litigious bankruptcy.

### III.   THE DEBTORS ARE LIKELY TO SUCCESSFULLY REORGANIZE.

32.     The Debtors are likely to successfully reorganize, at least if the injunction is extended through confirmation.  There is no dispute that the Debtors have a highly valuable gaming franchise. (Feb. 105 Order at 10)  And they have outperformed their budget while in chapter 11.  (June 105 Order at 4)  As set forth above, the Debtors also enjoy widespread creditor support for their Plan.

33.     To satisfy this element, the Debtors do not need to show it is likely they will achieve a fully consensual plan.  *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1097 (9th Cir. 2007) ("it is not a high burden to show a reasonable likelihood of success in reorganization"); *In re Lyondell Chem. Co.*, 402 B.R. 571, 589 (Bankr. S.D.N.Y. 2009) (only a reasonable likelihood of a successful reorganization is required).  Indeed, one court found a debtor was likely to successfully reorganize where it had been in chapter 11 for seven years, competing plans had been filed, and the confirmation process was underway.  *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 33 (Bankr. D. Del. 2008).  Other courts have rejected attempts to limit what constitutes a "successful reorganization."  *Lyondell*, 402 B.R. at 590 (rejecting argument that probability of success requires 100% recoveries by unsecured creditors); *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 830 F.2d 758, 764 (7th Cir. 1987) ("A successful reorganization does not mean all creditors are therefore to be paid in full."); *see also* Collier on Bankruptcy, 2-105 ("If reorganization is at risk due to litigation or other pressures brought to bear on nondebtors … injunctions under section 105 are possible if the litigant can show likely success on the merits -- such as the likelihood of a plan of reorganization…").

### IV.   EXTENDING THE INJUNCTION SERVES THE PUBLIC INTEREST.

34.     The requested injunctive relief also serves the public interest.  Both this Court and the Seventh Circuit recognized that successful reorganizations are in the public interest because they preserve value for creditors and ultimately the public.  (Feb. 105 Order at 14; *BOKF*, 808 F.3d at

1189)  As the Court found several months ago, the Debtors have considerable value as a going concern and possess valuable claims against CEC.  (Feb. 105 Order at 14)  The requested injunctive relief "will maintain the value of those claims (by protecting the CEC assets that would pay them)" while the Court decides whether to confirm the Plan and approve the settlement on which it is based.  (*Id.*; *see also BOKF*, 808 F.3d at 1189)

35.     The other compelling public interest is in promoting settlements.  (Feb. 105 Order at 14, citing cases)  The Seventh Circuit recognized that "successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives." *BOKF*, 808 F.3d at 1189.  Public policy also favors settlements generally. *Nat'l Cas. Co. v. White Mountain Reins. Co.*, 735 F.3d 549, 556 (7th Cir. 2013).  The Debtors' Plan will resolve complex disputes among its stakeholders, and enjoys the wide support of the Debtors' creditors.  Under these circumstances, the public interests in successful reorganizations and settlements outweigh the Guaranty Creditors' interests in enforcing their guaranties.  (*See* Feb. 105 Order at 15)

## V.     THE BALANCE OF EQUITIES WEIGHS IN THE DEBTORS' FAVOR.

36.     The balance of the equities still heavily favors the Debtors.  (Feb. 105 Order at 15) As this Court noted, it is unclear whether this factor is even relevant as "neither of the Seventh Circuit decisions setting out the elements of a section 105(a) injunction mentions balancing the equities as one of them." *BOKF*, 533 B.R. at 728 n.13.  Given this silence and that there is no irreparable harm requirement, the Debtors do not believe the Court needs to reach this issue.

37.     Regardless, the same factors that led the Court to conclude that the "balance of equities also heavily favors" the Debtors still apply.  (Feb. 105 Order at 15)  The Debtors "stand to suffer very real harm" if an injunction is not extended.  (*Id.*)  As noted, if CEC loses the guaranty litigation, it will not be able to make a material financial contribution to the Debtors' restructuring and instead will itself become a debtor.  (*Id.*)  If CEC files, the Debtors will have to pursue equitable

13

remedies to obtain the return of assets transferred to CEC, which will result in an unrivaled "litigation forum" and massive administrative expenses.  (*Id.* at 15-16)

38.     By comparison, the Guaranty Creditors will lose little if the Court extends the injunction.  The Guaranty Creditors expressed concern that the Trust Indenture Act ("TIA") may be amended during the injunction period.  (June 105 Order at 5)  But this is a risk that will exist for years regardless of whether the Court issues the injunction.  Until all appeals are exhausted and a judgment becomes final, Congress may amend the TIA to impact the outcome of the guaranty lawsuits.  *See Berning v. A.G. Edwards & Sons, Inc.*, 990 F.2d 272, 277 (7th Cir. 1993) ("Congress is free to change the law applicable to pending cases, even when … the cases have left the trial courts and are being heard on appeal."); *Georgia Ass'n of Retarded Citizens v. McDaniel*, 855 F.2d 805, 813 (11th Cir. 1988) ("When it so intends, [Congress'] ability to affect the content of a nonfinal judgment in a civil case, through retroactive legislation ceases only when a case's journey through the courts comes to an end.").

39.     Extending the injunction through Plan confirmation would rebalance the leverage among the parties and allow more time for settlement discussions among the Debtors, CEC, the sponsors and the Noteholder Committee without the threat of imminent multi-billion dollar judgments and a CEC bankruptcy filing.  If extended, the Debtors, CEC, the sponsors and the Noteholder Committee will *all* know that absent settlement, they face the looming risks inherent in a contested confirmation hearing.  These risks will increase each day on each of these constituents as the confirmation hearing draws near.  The length of the injunction, which would be in place through an early 2017 confirmation hearing, simply reflects the additional time the Noteholder Committee wanted to prepare for confirmation.  But it also provides additional time for the mediation process to continue and succeed in averting what the Noteholder Committee has promised will be a

14

"monumental confirmation fight." This will create the right mix of "uncertainty" and "deadlines" that the Court recognized have the best chance of getting to a fully consensual deal.

40.     Absent settlement, the Guaranty Creditors will be able to argue at confirmation that the settlement underlying the Plan is not fair and reasonable. If they prevail, they can proceed with their claims against CEC. If the Court confirms the Plan over their objection, it will mean the Court has concluded that the Plan is fair and reasonable to all creditors—including the Guaranty Creditors.

41.     But this Court will never have the opportunity to assess whether the Plan, the culmination of nearly two years' worth of efforts, is fair and reasonable if the injunction is not extended. Instead, CEC will be forced into bankruptcy and its $4 billion contribution will go up in smoke. That result is directly contrary to both this Court's and the Seventh Circuit's rationale in recognizing the propriety of an injunction against the guaranty claims.

## CONCLUSION

42.     The Debtors remain committed to achieving a fully consensual plan and are working hard to reach consensus among all parties. The Debtors have made good use of the 74-day injunction issued by the Court in June. But without an extension, the Debtors soon may be back at square one. In accordance with its and the Seventh Circuit's prior rulings, the Court should exercise its extensive equitable powers to prevent the guaranty litigation from endangering the Debtors' restructuring.

Dated:  August 8, 2016
Chicago, Illinois

*/s/ David J. Zott, P.C.*

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

**SA293**

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Chapter 11 |
| COMPANY, INC., et al., | ) |
| | ) Adversary Case. No. 15-00149 (ABG) |
| *Plaintiffs* | ) |
| vs. | ) |
| | ) |
| BOKF, N.A., WILMINGTON SAVINGS FUND | ) |
| SOCIETY, FSB, RELATIVE VALUE- | ) |
| LONG/SHORT DEBT PORTFOLIO, A SERIES | ) |
| OF UNDERLYING FUNDS TRUST, TRILOGY | ) |
| PORTFOLIO COMPANY, LLC, AND | ) |
| FREDERICK BARTON DANNER, | ) |
| | ) |
| | ) |
| | ) |
| *Defendants.* | ) **Re: Docket No. ___** |
| | ) |

**ORDER GRANTING DEBTORS' MOTION TO EXTEND**
**THE SECTION 105 INJUNCTION ENJOINING DEFENDANTS**
**FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession

(collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>") enjoining the continued prosecution

---

[1]   A complete list of the Debtors and the last four digits of their federal tax identification numbers
may be obtained at https://cases.primeclerk.com/CEOC.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them
in the Motion.

**SA295**

of four lawsuits in two federal and state courts between holders of the Debtors' second lien or unsecured debt (or trustees representing them) and Caesars Entertainment Corporation, all as more fully set forth in the Motion; and after due deliberation, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Pursuant to section 105(a) of the Bankruptcy Code, the Defendants are hereby enjoined from further prosecuting their guaranty lawsuits, styled: *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp.*, C.A. No. 10004 VCG (Del. Ch.); *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-cv-1561 (JSR) (SDNY); *Trilogy Portfolio Co., LLC v. Caesars Entertainment Corp.*, No. 14-cv-07091 (JSR) (SDNY); and *Danner v. Caesars Entertainment Corp.*, No. 14-cv-07093 (JSR) (SDNY). The injunction will remain in place until the first omnibus hearing after the Court issues its decision confirming or denying confirmation of the Plan (as may be amended from time to time), or until further order of the Court.

3.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

Dated: _____, 2016
Chicago, Illinois                                    _____
                                                     The Honorable A. Benjamin Goldgar
                                                     United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| **CAESARS ENTERTAINMENT** | ) **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.*, | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
|  | ) |
|  | ) |

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS

**March 15, 2016**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

-----------------------------------------------------------

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **CAESARS ENTERTAINMENT** | ) **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.*, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
| | ) |
| | ) |

-----------------------------------------------------------

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS

## March 15, 2016

## VOLUME 1

**(Introduction and Executive Summary)**

# INTRODUCTION

The Examiner investigated over fifteen sometimes related transactions between CEOC (the Debtor)[1] and other entities controlled by CEC (its parent) and the LBO Sponsors (Apollo and TPG).  These transactions took place over a more than five-year period and continued through 2014.  The principal question being investigated was whether in structuring and implementing these transactions assets were removed from CEOC to the detriment of CEOC and its creditors.

The simple answer to this question is "yes."  As a result, claims of varying strength arise out of these transactions for constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty by CEOC directors and officers and CEC.  Aiding and abetting breach of fiduciary duty claims, again of varying strength, exist against the Sponsors and certain of CEC's directors.[2]  None of these claims involve criminal or common law fraud.

The potential damages from those claims considered reasonable or strong[3] range from $3.6 billion to $5.1 billion.  Monetary damages are the most common remedy in fraudulent transfer cases, but in certain cases the Court could require that the property that was subject to transfer be returned to CEOC, particularly where damages are difficult to calculate.[4]  In addition, one uncertainty of potentially significant magnitude is the ability of CEOC to recover all or some of the value of the social gaming business of CIE, an entity created in 2009 in connection with the transfer of the World Series of Poker trademark (WSOP) out of CEOC.  A potential recovery of these damages is not included in the above numbers.  Also excluded from the above numbers

---

[1]  References to CEOC or the Debtor should be read to include debtor subsidiaries and affiliates.

[2]  In reaching these conclusions the Examiner is not opining on regulatory issues in any jurisdiction or whether any regulatory inquiries are appropriate.  Indeed, his findings are largely based on bankruptcy related issues where the issues do not necessarily correspond to regulatory requirements.  For example, as discussed below, conduct which might involve no claims if CEOC was solvent become the basis for claims in large part because CEOC was insolvent.  Neither the allegations investigated nor conduct giving rise to claims set forth in this Report had any adverse impact on the day-to-day operation of the casinos.  Moreover, none of these findings apply or to purely operational executives (*e.g.*, John Payne, the current CEO of CEOC) who played no material role in the transactions at issue.

[3]  Claims are being characterized as strong (a claim having a high likelihood of success), reasonable (a claim having a reasonable, or better than 50/50, chance of success), plausible (a claim likely to survive a motion to dismiss but having less than a 50/50 chance of success), weak (a claim with a reasonable chance of surviving a motion to dismiss but unlikely to succeed) or not viable (either likely to be dismissed on motion or highly unlikely to succeed if litigated).

[4]  If the transferee cannot establish its good faith, the transferee will only be entitled to an unsecured claim for the amount of the consideration it paid.  Where good faith is not established and monetary damages are awarded, the damage award thus would be based on the value of the asset transferred and the transferee would not be entitled to an offset in the amount of the consideration.

are (i) lost profits or other appreciation in the value of properties transferred, and related potential liens or offsets to which good faith transferees may be entitled in connection with such increases in value, and (ii) interest. While the various claims discussed in this Report exist, and the Examiner believes many of them are reasonable or strong, it is clear that they will be vigorously contested by the affected parties and all of them thus are subject to litigation risk.

As to constructive fraudulent transfer claims, one defense involves the so-called safe-harbor provisions for securities transactions under section 546(e) of the Bankruptcy Code. The Examiner believes that a court will not find these provisions applicable to the facts surrounding the asset transfers at issue.[5] Nonetheless, this is a complex issue which, like others, will be the subject of intense litigation. At the same time, the availability of this defense likely will not impact the overall quantum of potential damages since it is not applicable to either breach of fiduciary duty or actual fraudulent transfer claims which also arise from these transactions, and which involve the same or similar damages (albeit in the case of breach of fiduciary duty against different parties).

Central to these claims is the fact that throughout this period CEC and the Sponsors treated CEOC as if it was a solvent 100% owned subsidiary when the reality, confirmed in much of the contemporaneous analyses they themselves created, was very different. By December 31, 2008, and continuing through 2014, there is a strong case that CEOC was insolvent, and from the last quarter of 2013 through 2014 (when the most significant transactions took place) it was certainly insolvent. Moreover, precisely because of CEOC's very problematic financial condition, by sometime in late 2012 the Sponsors adopted and began to implement a strategy, which while providing some benefit to CEOC, was designed, among other things, to strengthen CEC's and the Sponsors' position in a potential restructuring negotiation with creditors and improve their position in the event of a CEC or CEOC bankruptcy. Indeed, by the Fall of 2013, while hoping to avoid a CEOC bankruptcy, the Sponsors began planning for what would happen in the event of such a bankruptcy. A consequence of CEOC's insolvency was that CEOC should have had independent directors and advisors in connection with these transactions, but that did not occur until late June 2014.

In assessing the actions of CEC and the Sponsors, it is important to remember that the Sponsors are among the most financially savvy investors in the country, and both TPG and Apollo have extensive experience in dealing with financially troubled companies. This expertise was applied in connection with their investment in Caesars and, indeed, during the relevant period Apollo was the *de facto* chief financial officer of CEOC. In the transactions at issue, the Chief Executive Officer of CEC and CEOC and other senior management also deferred to the Sponsors on key issues, including the selection of which CEOC properties should be sold to

---

[5] Principally, the asset transactions that were undertaken here involved sales or transfers of intellectual property interests or membership interests in limited liability companies, and thus do not qualify as "settlement payments" or as transfers made "in connection with a securities contract," as required under section 546(e). Nor do such transfers appear to have been made, in most instances, "by or through (or for the benefit of)" a "financial participant" (as that term is defined in the Bankruptcy Code). Section 546(e) does, however, provide a defense to a number of the financial transactions that were investigated.

other affiliated companies controlled by CEC and the Sponsors.  Indeed, it appears that the Sponsors' past success in successfully negotiating resolutions involving financially troubled companies was a factor in their assuming they could do so here without the need to pay adequate attention to the requirements associated with being fiduciaries of an insolvent entity.

Analysis of the solvency of CEOC and the valuation of assets transferred in connection with the transactions that were investigated are central to the conclusions in this Report.  Since it therefore is important for everyone to have a clear understanding of the underlying analyses relied on by the Examiner, the main body of the report contains an extensive discussion of these subjects.  Moreover, Appendix 7 provides a detailed explanation of how the Examiner arrived at his conclusions about both the value of the assets transferred and his disagreements with the opinions provided in connection with these transactions by various financial advisors.

In reaching these conclusions the Examiner and his Advisors reviewed over 8.8 million pages of documents and conducted interviews of 92 individuals, with some individuals being interviewed on multiple occasions.[6]  The interviews of 74 individuals were transcribed.  Of great value to the Examiner also was the input – both at meetings and through written presentations – received from various key parties, including CEC, the Sponsors, the two Official Committees, CAC and the Ad Hoc Committees of First Lien Note Holders and First Lien Bank Debt, and their advisors.  Some of this input was through frequent interaction between the Examiner's professionals and those retained by these groups.  The Examiner also, however, met personally with these constituencies on multiple occasions.  In late 2015 he also made detailed presentations of his preliminary views to each of these groups so that he could receive their further input.  In response he had follow-up meetings with key interested parties, and received extensive written and oral submissions on a wide range of factual and legal issues.  The Examiner found this process to be extremely helpful in assisting him in understanding and analyzing the critical issues being investigated.  At the same time, the extensive presentations received from interested parties, as well as the volume and delays in the production of documents, undoubtedly lengthened the investigative process.

---

[6]  One reason individuals had to be interviewed a second time was that document production took far longer than expected.

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CAESARS ENTERTAINMENT OPERATING
COMPANY, INC.; CAESARS LICENSE COMPANY,
LLC; OCTAVIUS LINQ HOLDING CO., LLC; PHW
LAS VEGAS, LLC; CAESARS BALTIMORE
ACQUISITION COMPANY, LLC; PHW MANAGER,
LLC; CAESARS BALTIMORE MANAGEMENT
COMPANY, LLC; 3535 LV CORP; 3535 LV
PARENT, LLC; CORNER INVESTMENT COMPANY
NEWCO, LLC; JCC HOLDING COMPANY II
NEWCO, LLC; PARBALL CORPORATION;
PARBALL PARENT, LLC; CROMWELL
MANAGER, LLC; BALLY'S LAS VEGAS
MANAGER, LLC; THE QUAD MANAGER, LLC;
FHR CORPORATION; FHR PARENT, LLC; LVH
CORPORATION; LVH PARENT, LLC; FLAMINGO-
LAUGHLIN, INC; FLAMINGO-LAUGHLIN
PARENT, LLC; DCH EXCHANGE LLC; LAS
VEGAS RESORT DEVELOPMENT INC.; WINNICK
HOLDINGS LLC; and TRB FLAMINGO LLC,

          Plaintiffs,

   vs.

CAESARS ENTERTAINMENT CORPORATION;
CAESARS ACQUISITION COMPANY; CAESARS
GROWTH PARTNERS, LLC; CAESARS
ENTERTAINMENT RESORT PROPERTIES, LLC;
CAESARS ENTERPRISE SERVICES, LLC;
CAESARS INTERACTIVE ENTERTAINMENT,
INC.; APOLLO GLOBAL MANAGEMENT, LLC;
TPG CAPITAL, LP; HAMLET HOLDINGS LLC;
TPG HAMLET HOLDINGS, LLC; TPG HAMLET
HOLDINGS B, LLC; APOLLO HAMLET
HOLDINGS, LLC; APOLLO HAMLET HOLDINGS
B, LLC; CO-INVEST HAMLET HOLDINGS, SERIES
LLC; CO-INVEST HAMLET HOLDINGS B, LLC;
JEFFREY BENJAMIN; DAVID BONDERMAN;
KELVIN L. DAVIS; JEFFREY HOUSENBOLD;
FRED J. KLEISNER; GARY W. LOVEMAN; KARL
PETERSON; ERIC PRESS; MARC C. ROWAN;
DAVID B. SAMBUR; LYNN SWANN;
CHRISTOPHER WILLIAMS; CHATHAM ASSET
MANAGEMENT LLC; 3535 LV NEWCO, LLC;

Adv. Proc. No. 16-____



**SA302**

BALLY'S LV, LLC; CAESARS GROWTH BALLY'S
LV, LLC; CAESARS GROWTH BALTIMORE FEE,
LLC; CAESARS GROWTH CROMWELL, LLC;
CAESARS GROWTH HARRAH'S NEW ORLEANS,
LLC; CAESARS GROWTH LAUNDRY, LLC;
CAESARS GROWTH PH, LLC; CAESARS GROWTH
PH FEE, LLC; CAESARS GROWTH QUAD, LLC;
CAESARS LINQ, LLC; CAESARS TOURNAMENT,
LLC; CORNER INVESTMENT COMPANY, LLC;
FLAMINGO CERP MANAGER, LLC; FLAMINGO
LAS VEGAS OPERATING COMPANY, LLC;
FLAMINGO LAS VEGAS PROPCO, LLC; HAC
CERP MANAGER, LLC; HARRAH'S ATLANTIC
CITY OPERATING COMPANY LLC; HARRAH'S
ATLANTIC CITY PROPCO, LLC; HARRAH'S LAS
VEGAS, LLC; HARRAH'S LAS VEGAS PROPCO,
LLC; HARRAH'S LAUGHLIN PROPCO, LLC;
HARRAH'S LAUGHLIN, LLC; HIE HOLDINGS,
INC.; HIE HOLDINGS TOPCO, INC.; HLV CERP
MANAGER, LLC; LAUGHLIN CERP MANAGER,
LLC; PARBALL NEWCO, LLC; PARIS CERP
MANAGER, LLC; PARIS LAS VEGAS OPERATING
COMPANY, LLC; PARIS LAS VEGAS PROPCO,
LLC; PHWLV, LLC; RIO CERP MANAGER, LLC;
RIO PROPCO, LLC; RIO PROPERTIES, LLC; JAZZ
CASINO COMPANY, LLC; LAUNDRY NEWCO,
LLC; LVH NEWCO, LLC; FLAMINGO-LAUGHLIN
NEWCO, LLC; AND FHR NEWCO, LLC,

Defendants.

## ADVERSARY COMPLAINT

Plaintiffs Caesars Entertainment Operating Company, Inc. ("CEOC") and certain of its

debtor subsidiaries bring this Adversary Complaint, on information and belief where applicable,

against CEOC's controlling shareholder, Caesars Entertainment Corporation ("CEC"); several of

CEOC's present and past directors and officers; several of CEC's present and past directors and

officers; Caesars Acquisition Company; Caesars Growth Partners, LLC; Caesars Entertainment

Resort Properties, LLC; Caesars Enterprise Services, LLC; Caesars Interactive Entertainment,

Inc.; Apollo Global Management, LLC; TPG Capital, LP; Hamlet Holdings LLC and certain of

2

its affiliates; Chatham Asset Management LLC; and affiliates of CEC that were transferees of

assets fraudulently transferred from CEOC for (a) recovery of fraudulent transfers and the return

to CEOC and its subsidiaries of valuable assets that were wrongly taken from them by the

actions of CEOC's directors, its controlling shareholder, and others, (b) monetary damages

and/or rescission for breaches of fiduciary duties, unjust enrichment, aiding and abetting

breaches of fiduciary duties, civil conspiracy, misappropriation of corporate opportunity, and

waste of corporate assets, and (c) imposition of a constructive trust or equitable lien over the

transferred assets.

### INTRODUCTION

1.      This action arises from a series of self-dealing transactions between CEOC and its

debtor subsidiaries (collectively, the "Debtors") and entities controlled by or under common

control with CEC.  Each of these transactions involved transfers that were made for inadequate

consideration and less than reasonably equivalent value at a time when the transferor was

insolvent, and that were made with the intent to hinder or delay CEOC's creditors.  These

transactions were conceived, crafted, and implemented by Apollo Global Management,

TPG Capital, CEC, and individuals and agents connected with these entities.  The transactions

were effectuated through a series of complex agreements that enabled Apollo, TPG and CEC to

gain control of CEOC's high-growth assets, unencumbered by CEOC debt, and to remove those

assets beyond the reach of CEOC's creditors.  Later, CEC and defendants who were also CEOC

directors filed a lawsuit seeking declaratory relief sanctioning these asset transfers and insulating

CEC, Apollo, TPG, and their affiliates from fraudulent transfer claims and other legal liabilities.

2.      In January 2008, Apollo and TPG, using a vehicle called Hamlet Holdings LLC

and affiliated entities (collectively, "Hamlet"), acquired the company then known as Harrah's

Entertainment Inc.—and now known as CEC—in a highly leveraged $30.7 billion buyout (the

**SA304**

"LBO"). Through Hamlet, Apollo and TPG (with Hamlet, the "Sponsors") continue to own 60%

of the common stock of CEC and controlled all aspects of CEOC's governance and operations

prior to June 2014.

3.     At the time of the LBO, Harrah's operated primarily through a wholly-owned

subsidiary then known as Harrah's Operating Company, Inc.—now known as CEOC—and it

was this operating company that incurred most of the debt used to fund the LBO.[1]  Harrah's

owned and operated a network of casinos in regional markets throughout the country.  It also

owned a significant number of casinos in destination markets—at that time, primarily Las Vegas

and New Orleans.

4.     Harrah's used its customer loyalty program to encourage customers in its regional

markets to give Harrah's a greater share of their local gaming "spend" to earn more reward

credits to use at other Harrah's properties, particularly Harrah's destination properties in

Las Vegas and New Orleans.  Many of these regional casinos were only modestly profitable in

their own right, but they provided Harrah's with the critical ability to interact and deepen

relationships with customers in their home markets.  Harrah's portfolio of regional and

destination properties created a hub-and-spoke business model that let the company capture

customers on a regional basis and feed them to its destination properties.

5.     Harrah's also developed synergies within Las Vegas.  Through various

acquisitions preceding the LBO, Harrah's developed a dominant and concentrated presence in

the center of the Las Vegas Strip, including properties such as Caesars Palace, Paris Las Vegas,

Bally's Las Vegas, The Flamingo Las Vegas, Rio Las Vegas, The Cromwell (formerly Bill's

---

[1]   For purposes of simplicity, Plaintiffs sometimes refer to the collective operations of CEC and
its subsidiaries as "Caesars" and, where appropriate, refer to the two Harrah's entities by
their Caesars names.

4

**SA305**

Gambling Hall & Saloon), Harrah's Las Vegas, and The Quad Resort & Casino (then known as the Imperial Palace), as well as parcels of undeveloped land near the Las Vegas Strip. Control of these contiguous casinos, hotels, restaurants, and entertainment locations was intended to ensure that, once brought to Las Vegas, Harrah's customers would remain within the Harrah's system.

6.    In 1998, Harrah's hired Harvard Business School professor Gary Loveman to refine, develop, and expand Harrah's customer loyalty program. That program, known as Total Rewards, pioneered the use of data analytics and behavioral tracking to maximize play and profitability throughout the Harrah's casino network. As a result of Loveman's innovative approach and the success of Total Rewards, Harrah's became one of the premier operators of casino properties in the world. Loveman was promoted to Harrah's Chief Executive Officer in 2003.

7.    Within months of the LBO, the global financial crisis and ensuing recession crippled the gaming industry. CEOC was especially hard hit as the revenues needed to service its massive debt fell short. At first, CEOC and the Sponsors responded to CEOC's unsustainable capital structure with exchange offers for CEOC's distressed debt and with credit facility amendments, which reduced some of CEOC's indebtedness and extended the maturity of much of the rest.

8.    Soon, though, the Sponsors and CEC realized that CEOC would never be able to repay its enormous debt and embarked upon a new strategy. Beginning in 2009, the Sponsors and CEC devised a plan to salvage their multibillion-dollar investment in CEC by stripping CEOC of valuable assets and moving them to affiliates of CEC that the Sponsors and CEC controlled and which were not liable for CEOC's massive debts. In implementing this plan, the Sponsors' role went beyond mere governance and supervision of CEC and CEOC. Instead,

5

**SA306**

partners and officers from those firms—in particular, Apollo—played an active role in the

day-to-day management of CEOC, in determining the specifics of CEOC's corporate strategy, in

choosing which assets would be transferred, in deciding which CEC affiliates would receive the

assets, in selecting CEOC's financial and legal advisors prior to June 2014, in negotiating for

(and, simultaneously, against) CEOC, and in determining the prices to be paid for assets. Often

this was done with little evident input from the management of CEOC itself, who were relegated

to staffing the strategic initiatives the Sponsors, CEC, and their advisors devised.

9.     In the course of these transfers, the Sponsors, CEC, and their advisors created a

profusion of affiliates, holding companies, intermediate entities, and special purpose vehicles. In

2009, they created an affiliate named Harrah's Interactive Entertainment—now known as

Caesars Interactive Entertainment ("CIE")—which was owned by two layers of holding

companies, each with multiple classes of stock. In 2013, they created Caesars Entertainment

Resort Properties, LLC ("CERP") which, with various affiliated entities, took ownership of six

existing properties indirectly owned by CEC (the "CMBS Properties") and two CEOC

properties. Also in 2013, the Sponsors, CEC, and their advisors created an entity called Caesars

Acquisition Company and a subsidiary, Caesars Growth Partners, to receive the transfer of

properties from CEOC. In 2014, they created a "services company" called Caesars Enterprise

Services, which, among other things, took control of CEOC's Total Rewards program, its

enterprise services (including most of its employee workforce built over many years, and

predating the LBO), and its property management business. Each of these affiliates was directly

or indirectly controlled by CEC and the Sponsors, and each was created for the purpose of or in

connection with transferring assets beyond the reach of CEOC's creditors. In fact, in some

6

**SA307**

cases, the Sponsors and CEC openly characterized these affiliates as "bankruptcy remote"; that is, remote from the CEOC bankruptcy they knew was coming.

10.    In May 2009, the Sponsors and CEC engineered the transfer of CEOC's online gaming business, including CEOC's World Series of Poker trademarks and intellectual property rights, to Caesars Interactive Entertainment.  In August 2010, the Sponsors and CEC ordered CEOC to transfer its intellectual property rights in the CMBS Properties to CEC affiliates that managed those properties and, later, to transfer those rights to CERP.  In September 2011, CEC and the Sponsors forced CEOC to sell CIE its rights to hold World Series of Poker tournaments. In October 2013, CEC and the Sponsors caused CEOC to convey two of CEOC's significant Las Vegas properties to CERP.  The next month, CEOC was instructed to transfer two other valuable properties to Growth Partners, along with valuable management fee streams.  In March 2014, the Sponsors and CEC engineered CEOC's sale of four of its most important remaining properties to Growth Partners, along with valuable management fee streams and 31 acres of undeveloped land.  As part of that same transaction, CEOC transferred its rights in Total Rewards to a CES—a vehicle controlled by CERP and Growth Partners.

11.    In mid-2014, the Sponsors and CEC announced a number of further initiatives designed to enrich CEC and the Sponsors at the expense of CEOC and its creditors.  In May 2014, the Sponsors orchestrated what they described as a sale of 5% of CEOC's common stock in an attempt to extricate CEC from its guarantee of CEOC's bond debt.  Also in May 2014, the Sponsors and CEC launched a tender offer for CEOC's 5.625% Senior Notes due June 2015 and 10% Second Priority Notes due 2015.  Although those notes had been trading at a significant discount to their face value, the Sponsors and CEC had CEOC spend over $1 billion to redeem them at par, plus a premium, plus accrued interest, largely from Growth Partners and a hedge

7

**SA308**

fund that on information and belief had been cooperating with Apollo. A few weeks later, the

Sponsors ordered CEOC to repay all amounts remaining under an intercompany revolver facility

between CEC and CEOC, exhausting another $261.8 million of CEOC's dwindling cash. In

June 2014, the Sponsors and CEC caused CEOC to announce the closure of its modestly

profitable Showboat Atlantic City property and to direct its VIP customers to a casino owned by

CERP. In August 2014, the Sponsors, CEC, and CEOC filed a lawsuit in New York seeking a

declaratory judgment that none of their fraudulent transfers and other acts had been illegal.

      12.     The Sponsors and CEC's strategy had several purposes. The first was to move

CEOC's most valuable assets into new entities that would be insulated from CEOC's inevitable

bankruptcy and improve the otherwise dismal prospects for the Sponsors' investment in CEC.

The net effect was to divide Caesars' business into two segments: one a "Good Caesars,"

consisting of CIE, Growth Partners, CERP, and CES, that owned and controlled the prime assets

formerly belonging to CEOC; the other, a "Bad Caesars," consisting of CEOC, which remains

burdened by substantial debt and whose remaining properties consist primarily of regional

casinos. Only the "Bad Caesars" remains liable for the vast majority of the debts incurred in the

2008 LBO.

      13.     But there also was a second, and equally crucial, objective: once the principal

benefits of the synergies of the Caesars' network of properties and control of the Total Rewards

customer loyalty program had been transferred to the Sponsors and CEC, CEOC's remaining

regional assets would have greatly reduced value to any potential third-party purchaser. And by

severing CEOC from its assets and from the core enterprise functions that it previously

performed, the Sponsors and CEC were able to create certain risks to CEOC's ability to

formulate a plan of reorganization (in addition to structural issues that already existed) that

would allow CEOC to emerge from chapter 11 as a standalone entity.  Thus, when the

long-expected bankruptcy came, the Sponsors and CEC hoped to acquire cheaply the assets that

remained in CEOC and recreate the synergistic Caesars network without CEOC's troublesome

debt.[2]

14.      This second objective was, in essence, the willful destruction of CEOC's value.

Ordinarily, such efforts would have been prevented by CEOC's board, which owed fiduciary

duties to the company.  Because CEOC was insolvent, these duties required CEOC's board to

maximize the value of CEOC.  CEOC's board, however, at the time was completely dominated

by CEC and the Sponsors.  At most times, it consisted of only two directors, both of whom were

officers or directors of CEC and neither of whom was independent.   In fact, CEOC had no

independent directors until June 2014.  In addition, CEOC did not have, and was not afforded,

separate legal counsel or financial advisors to advise it on the transfers; CEOC's board did not

create special committees of disinterested directors to assess the proposed transfers; there was no

market process to ensure that CEOC received reasonably equivalent value for the assets it

transferred; and, in virtually all cases, the board did not ask for or receive independent fairness

opinions.

15.      A third objective—admitted by the Sponsors—was to strengthen the Sponsors'

hand in restructuring negotiations with CEOC's creditors.  With CEOC's valuable assets stripped

from CEOC and now firmly under the Sponsors' control, the Sponsors would enjoy leverage in

their negotiations with creditors with respect to a CEOC restructuring.  If creditors balked at a

---

[2]   CEC subsequently agreed to a new-value bankruptcy plan where it proposed to buy CEOC's assets for a
contribution of at least $1.5 billion.  *See* CEOC 8-K filed on Dec. 31, 2014.  Almost simultaneously, CEC
announced its plans to merge with Caesars Acquisition Corporation, thus recapturing the properties CEOC had
transferred to Growth Partners.  *See* CEC 8-K filed on December 22, 2014.  As part of the proposed plan, the
Sponsors proposed that CEOC would grant all persons and entities involved in the transfers general releases
from any claims CEOC might have against them.

restructuring, the Sponsors would have nonetheless created—in their words—a "war chest" to use against the creditors in CEOC's inevitable bankruptcy.

\*                     \*                     \*

16.     Because the consideration received by CEOC for these transfers was wholly inadequate and because the transfers were intended to enrich CEC and the Sponsors at the expense of CEOC and its creditors, the transfers were unlawful and avoidable.

17.     In addition, the transfers were made with actual intent to hinder, delay or defraud CEOC's creditors and thus the transfers should be avoided or the value of the property transferred must be returned to CEOC. Defendants also are liable for monetary damages for their role in these transactions.

18.     CEC, as CEOC's controlling shareholder, CEC's directors (by virtue of their domination over CEOC and its board), and CEOC's directors and officers owed fiduciary duties to CEOC. Because CEOC was insolvent at all relevant times, these defendants had a duty to maximize CEOC's value. Defendants breached their fiduciary duties or aided and abetted others in breaching fiduciary duties, and are therefore liable for damages to CEOC.

19.     The conduct of the defendants named in this lawsuit has already been the subject of a comprehensive investigation conducted by a court-appointed examiner, Richard Davis (the "Examiner"). As summarized by the Examiner at the outset of his 930-page report:

> The principal question being investigated was whether in structuring and implementing these transactions assets were removed from CEOC to the detriment of CEOC and its creditors.

> The simple answer to this question is "yes." As a result, claims of varying strength arise out of these transactions for constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty by CEOC directors and officers and CEC. Aiding and abetting breach of fiduciary duty claims, again of varying strength, exist against the Sponsors and certain of CEC's directors.

10

**SA311**

The Examiner concluded that "[t]he potential damages from those claims considered reasonable or strong range from $3.6 billion to $5.1 billion." The Examiner defined "strong" claims as those "having a high likelihood of success" and "reasonable" claims as those "having a reasonable, or better than 50/50, chance of success." That range of potential damages excluded other claims that were characterized by the Examiner as viable, albeit with a less than a 50/50 chance of success. Nor did the Examiner's range include certain types of damages that the Examiner determined may be available on strong and reasonable claims, but that the Examiner did not quantify. Many of the allegations and claims set forth in this Complaint are based on the Examiner's comprehensive investigation.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over the claims for relief in this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

21.     Venue for this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409.

## PARTIES

**A.     Plaintiffs**

22.     Plaintiff Caesars Entertainment Operating Company, Inc. ("CEOC") is a Delaware corporation that owns, operates, and manages casinos and other entertainment properties in Las Vegas and elsewhere in the United States. CEOC's headquarters are located at One Caesars Palace Drive, Las Vegas, Nevada 89109.

23.     Plaintiff Caesars License Company, LLC ("CLC") (f/k/a Harrah's License Company, LLC) is a wholly owned subsidiary of CEOC that owned certain intellectual property that was transferred or licensed through the transactions set forth in this Complaint.

11

**SA312**

24.     Plaintiff Octavius Linq Holding Co., LLC is a wholly owned subsidiary of CEOC that owned the equity of Octavius Linq Intermediate Holding Co., which in turn owned Octavius Tower, Linq Retail, RDE Casino and the Observation Wheel, and certain undeveloped land, which were transferred through the transactions set forth in this Complaint.

25.     Plaintiff PHW Las Vegas, LLC is a wholly owned subsidiary of CEOC that owned the equity of Planet Hollywood Las Vegas, which was transferred through the transactions set forth in this Complaint.

26.     Plaintiff Caesars Baltimore Acquisition Company, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in Caesars Baltimore Investment Co., LLC, which were transferred through the transactions set forth in this Complaint.

27.     Plaintiff PHW Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in management fees generated from Planet Hollywood Las Vegas, a portion of which were transferred through the transactions set forth in this Complaint.

28.     Plaintiff Caesars Baltimore Management Company, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in management fees generated from Horseshoe Baltimore, a portion of which were transferred through the transactions set forth in this Complaint.

29.     Plaintiff 3535 LV Corp. is a wholly owned subsidiary of CEOC that owned certain undeveloped land, which was transferred through the transactions set forth in this Complaint.

30.     Plaintiff 3535 LV Parent, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in 3535 LV NewCo, LLC and certain undeveloped land, which were transferred through the transactions set forth in this Complaint.

SA313

31. Plaintiff Corner Investment Company Newco, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in Corner Investment Company, LLC, which were transferred through the transactions set forth in this Complaint.

32. Plaintiff JCC Holding Company II NewCo, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in JCC Holding Company III, LLC, which were transferred through the transactions set forth in this Complaint.

33. Plaintiff Parball Parent, LLC (together with its subsidiaries) is a wholly owned subsidiary of CEOC that owned CEOC's interests in Parball NewCo, LLC and certain undeveloped land, which were transferred through the transactions set forth in this Complaint.

34. Plaintiff Parball Corporation (together with its subsidiaries) is a wholly owned subsidiary of CEOC that owned certain undeveloped land, which was transferred through the transactions set forth in this Complaint.

35. Plaintiff Cromwell Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in certain management fees, a portion of which were transferred through the transactions set forth in this Complaint.

36. Plaintiff Bally's Las Vegas Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in certain management fees, a portion of which were transferred through the transactions set forth in this Complaint.

37. Plaintiff The Quad Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in certain management fees, a portion of which were transferred through the transactions set forth in this Complaint.

38. Plaintiff FHR Corporation is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

SA314

39.     Plaintiff FHR Parent, LLC is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

40.     Plaintiff LVH Corporation is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

41.     Plaintiff LVH Parent, LLC is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

42.     Plaintiff Flamingo-Laughlin, Inc. is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

43.     Plaintiff Flamingo-Laughlin Parent, LLC is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

44.     Plaintiff DCH Exchange LLC is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

45.     Plaintiff Las Vegas Resort Development Inc. is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

46.     Plaintiff Winnick Holdings LLC is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

47.     Plaintiff TRB Flamingo LLC is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

**B.      Corporate Defendants**

48.     Defendant Caesars Entertainment Corporation ("CEC") is a Delaware corporation that, through subsidiaries, joint ventures, and other arrangements, owns, operates, and manages gambling casinos and properties in the United States and foreign countries.  CEC's offices are

14

**SA315**

located at One Caesars Palace Drive, Las Vegas, Nevada.  The Sponsors own approximately

60% of the voting stock of CEC and have the right to appoint CEC's entire board of directors.

49.    Defendant Caesars Acquisition Company ("CAC") is a Delaware corporation

CEC formed in 2013 to make an equity investment in Growth Partners.  CAC is a public

company whose stock is listed and traded on NASDAQ.  66% of the voting stock of CAC is

owned by affiliates of the Sponsors.  The Sponsors also control CAC pursuant to an Omnibus

Voting Agreement that gives them the right to appoint CAC's entire board of directors.  CAC's

offices are located at One Caesars Palace Drive, Las Vegas, Nevada.

50.    Defendant Caesars Growth Partners, LLC ("Growth Partners") is a Delaware

limited liability company that was formed in 2013 as a joint venture between CEC and CAC to

acquire assets from CEOC and CEC.  All of the voting units of Growth Partners are owned by

CAC.  All of the non-voting units of Growth Partners are owned by CEC or its subsidiaries and

affiliates.  Upon information and belief, Growth Partners' offices are located at

One Caesars Palace Drive, Las Vegas, Nevada.[3]

51.    Defendant Caesars Entertainment Resort Properties, LLC ("CERP") is a Delaware

limited liability company that was formed in October 2013 as a wholly-owned subsidiary of CEC

for the purpose of acquiring, holding, and operating certain Caesars properties.  CERP's offices

are located at One Caesars Palace Drive, Las Vegas, Nevada.[4]

---

[3]    For purposes of this Complaint, Growth Partners is defined to include all of the direct and indirect subsidiaries, affiliates, holding companies, and other entities owned by, controlled by, or under common ownership or control with Growth Partners that received assets or ownership interests in conjunction with any of the relevant transfers.

[4]    For purposes of this Complaint, CERP is defined to include all of the direct and indirect subsidiaries, affiliates, holding companies, and other entities owned by, controlled by, or under common ownership or control with CERP that received assets or ownership interests in conjunction with any of the relevant transfers.

15

**SA316**

52.   Defendant Caesars Enterprise Services, LLC ("CES") is a Delaware limited

liability company that was formed on April 4, 2014, for the purpose of acquiring and managing

the enterprise-wide assets of CEOC for the benefit of CEC, CEOC, Growth Partners, and CERP.

Upon information and belief, CEC's offices are located at One Caesars Palace Drive, Las Vegas,

Nevada.

53.   Defendant Caesars Interactive Entertainment, Inc. ("CIE") is a Delaware

corporation formed in April 2009 by CEC.  CIE operates an online gaming business that includes

so-called "play for fun" games as well as "real money" games in certain jurisdictions.  In

addition, CIE owns the World Series of Poker tournaments and brand.  The majority of the

voting stock of CIE is owned by Growth Partners.  Upon information and belief, CIE's offices

are located at 1411 Peel, Montreal, Canada.

54.   The following chart illustrates the Caesars organizational structure following the

creation of Growth Partners and CERP in 2013, the transfer by CEC of 11% of its equity stake in

CEOC beginning in May 2014, and the creation of CES:



55.   CEC, CEOC, CERP, CAC, and Growth Partners have created and do business

through dozens of direct and indirect subsidiaries, affiliates, holding companies, and other

entities, all of which are owned or controlled by these companies or by the Sponsors.  CEC,

SA317

CEOC, CERP, CAC, and Growth Partners frequently create new such entities, or abandon older ones, to conceal the nature or details of transfers or other improper purposes. Because these entities are owned, controlled, and dominated by the Sponsors, CEC, CEOC, CERP, CAC, or Growth Partners, and have been used for improper purposes, their independent identities should be disregarded and they should be treated as alter egos of their ultimate owners.

56.     Defendant Apollo Global Management, LLC is a Delaware limited liability company formed on July 3, 2007. Apollo's global headquarters are located at 9 West 57th Street, New York, New York. For purposes of this Complaint, Apollo is defined to include all of its funds, subsidiaries, or vehicles that have invested in CEC or any of its affiliates.

57.     Defendant TPG Capital, LP is a Delaware limited partnership formed on November 15, 2011. Upon information and belief, TPG's global headquarters are located at 345 California Street, San Francisco, California. For purposes of this Complaint, TPG is defined to include all of its funds and/or subsidiaries that invested in CEC or any of its affiliates.

58.     Defendant Hamlet Holdings LLC is a Delaware limited liability company. Upon information and belief, Hamlet Holdings LLC was formed in 2002 and is headquartered in Fort Worth, Texas. Hamlet Holdings LLC and its affiliates, including Defendants Apollo Hamlet Holdings, LLC, Apollo Hamlet Holdings B, LLC, TPG Hamlet Holdings, LLC, TPG Hamlet Holdings B, LLC, Co-Invest Hamlet Holdings, Series LLC, and Co-Invest Hamlet Holdings B, LLC (collectively with Hamlet Holdings LLC, "Hamlet"), are the vehicles by which the Sponsors raised money to invest in and execute the LBO, control CEC, and invest in and control CAC. According to SEC filings, Hamlet Holdings LLC's members consist of five persons from Apollo and TPG. The Sponsors, together with investment vehicles they created, at all relevant times owned approximately 60% of the voting common stock of CEC and 66% of the voting

17

**SA318**

common stock of CAC.  According to SEC filings, Apollo and TPG gave an irrevocable proxy to defendant Hamlet Holdings LLC under which Hamlet Holdings LLC has sole voting and sole dispositive power with respect to these shares of CEC and CAC.

### C.   Individual Defendants

59.   Defendant Jeffrey Benjamin was at all relevant times a director of CEC and a senior advisor to Apollo.  Upon information and belief, Benjamin stood to benefit personally from some or all of the transactions described in this Complaint.

60.   Defendant David Bonderman was at all relevant times a director of CEC and is currently a director of CEOC.  Bonderman is a founding partner of TPG and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

61.   Defendant Kelvin L. Davis was at all relevant times a director of CEC and is currently a director of CEOC.  Davis is a senior partner of TPG and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

62.   Defendant Jeffrey Housenbold was a CEC director from December 2011 to March 2014 and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

63.   Defendant Fred J. Kleisner became a CEC director in July 2013.  Upon information and belief, Kleisner stood to benefit personally from some or all of the transactions described in this Complaint.

64.   Defendant Gary Loveman was at all relevant times the Chairman and a director of CEC and CEOC.  Loveman also was the Chief Executive Officer and President of CEC and CEOC until June 30, 2015.  Upon information and belief, Loveman stood to benefit personally from some or all of the transactions described in this Complaint.

18

**SA319**

65.     Defendant Karl Peterson was at all relevant times a partner at TPG and from 2008 until July 2013 a director of CEC.  Upon information and belief, Peterson stood to benefit personally from some or all of the transactions described in this Complaint.

66.     Defendant Eric Press was at all relevant times a director of CEC and a partner at Apollo.  Upon information and belief, Press stood to benefit personally from some or all of the transactions described in this Complaint.

67.     Defendant Marc C. Rowan was at all relevant times a director of CEC and from June 2014 to March 2016 was a director of CEOC.  Rowan is a founding partner of Apollo and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

68.     Defendant David B. Sambur has been a director of CEC since 2010 and a director of CEOC since June 2014.  Sambur is a partner of Apollo and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

69.     Defendant Lynn Swann was at all relevant times a director of CEC and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

70.     Defendant Christopher Williams was at all relevant times a director of CEC and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

71.     According to CEC's proxy statements, CEC does not consider Messrs. Loveman, Bonderman, Davis, Rowan, Sambur, Benjamin, Peterson, and Press to be independent directors because of their relationships with affiliates of the Sponsors or other relationships with CEC.

19

**SA320**

**D.   Other Defendants**

72.   Defendant Chatham Asset Management LLC is an asset management company with its principal place of business at 26 Main Street, Chatham Township, New Jersey. Chatham is a limited liability company organized under the laws of Delaware.

**E.   Transferee Defendants**

73.   In addition to CIE, CEC, CERP, CAC, and Growth Partners, the Sponsors and CEC formed numerous entities that received transfers of real property, tangible and personal property, intellectual property, and other assets from CEOC and from affiliates of CEOC. Upon information and belief and unless otherwise indicated, the offices and premises of each of these defendants are located at the same Las Vegas address as CEC.

74.   The "2009 Transferees" are the entities that received assets and the business that CEOC transferred from its online gaming business. These include the following defendants:

    a.   CEC and CIE;

    b.   HIE Holdings Topco, Inc., a Delaware corporation;

    c.   HIE Holdings, Inc., a Delaware corporation;

    d.   Caesars Tournament, LLC, a Delaware limited liability company; and

    e.   Rio Properties, LLC, a Nevada limited liability company.

75.   The "CMBS PropCos" are the entities that received assets that CEOC transferred in 2010 as a result of the CMBS Loan Agreement Amendment and Trademarks Transfer. These include the following defendants:

    a.   CEC;

    b.   Rio PropCo, LLC, a Delaware limited liability company;

    c.   Harrah's Las Vegas PropCo, LLC, a Delaware limited liability company;

**SA321**

d.   Harrah's Atlantic City PropCo, LLC, a Delaware limited liability
company;

e.   Harrah's Laughlin PropCo, LLC, a Delaware limited liability company;

f.   Flamingo Las Vegas Propco, LLC, a Delaware limited liability company;
and

g.   Paris Las Vegas PropCo, LLC, a Delaware limited liability company.

76.   The "WSOP Transaction Transferees" are the entities that received assets that

CEOC transferred in 2011 as a result of the WSOP Transaction.  These include the following

defendants:

a.   CEC;

b.   CIE;

c.   Caesars Tournament, LLC; and

d.   Rio Properties, LLC.

77.   The "Linq/Octavius Transferees" are the entities that received assets that CEOC

transferred in 2013 as a result of the Linq and Octavius transfers.  These include defendants CEC

and Rio Properties, LLC.

78.   The "2013 Transferees" are the entities that received assets CEOC transferred in

2013 as a result of the 2013 Transaction Agreement.  These include the following defendants:

a.   CEC, CAC, and Growth Partners;

b.   Caesars Growth PH Fee, LLC, a Delaware limited liability company;

c.   Caesars Growth Baltimore Fee, LLC, a Delaware limited liability
company;

d.   PHWLV, LLC, a Nevada limited liability company; and

e.   Caesars Growth PH, LLC, a Delaware limited liability company.

79.   The "Services Transferees" are the entities that received management services from CEOC and access to CEOC's Total Rewards program pursuant to the 2010 Shared Services Agreement, the 2013 Shared Services Agreement, and the Management Services Agreements. These include the following defendants:

a.   CMBS PropCos, CEC, CERP, and Growth Partners;

b.   Flamingo Las Vegas Operating Company, LLC, a Nevada limited liability company;

c.   Paris Las Vegas Operating Company, LLC, a Nevada limited liability company;

d.   Harrah's Laughlin, LLC, a Nevada limited liability company;

e.   Rio CERP Manager, LLC, a Nevada limited liability company;

f.   Paris CERP Manager, LLC, a Nevada limited liability company;

g.   Laughlin CERP Manager, LLC, a Nevada limited liability company;

h.   HLV CERP Manager, LLC, a Nevada limited liability company;

i.   HAC CERP Manager, LLC, a New Jersey limited liability company;

j.   Harrah's Las Vegas, LLC, a Nevada limited liability company;

k.   Flamingo CERP Manager, LLC, a Nevada limited liability company;

l.   3535 LV Newco, LLC, a Delaware limited liability company;

m.   Parball NewCo, LLC, a Delaware limited liability company;

n.   Corner Investment Company, LLC, a Nevada limited liability company; and

o.   Jazz Casino Company, LLC, a Louisiana limited liability company.

22

**SA323**

80.     The "2014 Transferees" are the entities that received properties from CEOC as a result of the 2014 Transaction Agreement.  These include the following defendants:

    a.     CEC, CAC, Growth Partners, 3535 LV Newco, LLC, Parball NewCo, LLC, and Corner Investment Company, LLC;

    b.     Caesars Growth Bally's LV, LLC, a Delaware limited liability company;

    c.     Caesars Growth Quad, LLC, a Delaware limited liability company;

    d.     Caesars Growth Cromwell, LLC, a Delaware limited liability company;

    e.     Caesars Growth Harrah's New Orleans, LLC, a Delaware limited liability company;

    f.     Caesars Linq, LLC, a Delaware limited liability company;

    g.     Caesars Growth Laundry, LLC, a Delaware limited liability company;

    h.     FHR NewCo, LLC, a Delaware limited liability company;

    i.     Flamingo-Laughlin NewCo, LLC, a Delaware limited liability company;

    j.     LVH NewCo, LLC, a Delaware limited liability company; and

    k.     Laundry NewCo, LLC, a Delaware limited liability company.

81.     The "Easement Transferees" are the entities that were granted easements in 2011 on four lots of unimproved real estate, comprising approximately 25.8 acres, directly east of various Caesars properties.  These include the following defendants:

    a.     Flamingo Las Vegas Propco, LLC and Caesars Linq, LLC, each of whom is identified above; and

    b.     3535 LV Corp. (formerly known as Harrah's Imperial Palace Corporation), a Nevada corporation (which is not named as a defendant as it subsequently transferred its interests in the Quad to Growth Partners).

23

**SA324**

82.     The "Total Rewards Transferees" are the entities that received access to or rights

in Total Rewards as a result of the 2014 Transaction Agreement and the formation of CES.

These include the following defendants:

    a.      CEC, CERP, Growth Partners, and CES;

    b.      Caesars Growth Bally's LV LLC, a Delaware company;

    c.      Flamingo Las Vegas Operating Company, LLC;

    d.      Harrah's Las Vegas, LLC;

    e.      Harrah's Laughlin, LLC;

    f.      Paris Las Vegas Operating Company, LLC;

    g.      Rio CERP Manager, LLC;

    h.      Paris CERP Manager, LLC;

    i.      Laughlin CERP Manager, LLC;

    j.      HLV CERP Manager, LLC;

    k.      HAC CERP Manager, LLC; and

    l.      Flamingo CERP Manager, LLC.

## BACKGROUND

### A.     THE CAESARS ENTITIES

83.     In January 2008, the Sponsors acquired CEC in a $30.7 billion leveraged buyout.

The acquisition was financed with approximately $24 billion of new debt.  More than two thirds

of this new debt was issued by CEOC (at the time, Harrah's Entertainment Operating Company).

Most of the debt issued by CEOC was also guaranteed by CEC.  The Sponsors and other

investors also contributed approximately $6.1 billion in cash, and the balance of the LBO was

funded through other borrowings.

24

**SA325**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., *et al.,*[1] | ) |
| | ) |
| *Debtors.* | ) (Jointly Administered) |
| | ) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Chapter 11 |
| COMPANY, INC., *et al.,* | ) |
| | ) Adversary Case. No. 15-00149 (ABG) |
| *Plaintiffs* | ) |
| vs. | ) |
| | ) |
| BOKF, N.A., *et al.* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

<u>**MEDIATOR'S STATEMENT**</u>

As previously reported to the Court, I am the mediator for the voluntary process commenced by the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") to mediate issues surrounding the development of a plan of reorganization in these chapter 11 cases. I am submitting this statement to update the Court on the progress and current status of discussions since the last statement I submitted on June 6, 2016. As part of the last two months of the mediation, I have mediated discussions (1) among the Debtors, Caesars Entertainment Corporation ("<u>CEC</u>", and together with certain of its affiliates, the "<u>CEC Parties</u>"), and the Official Committee of Second Priority Noteholders (the "<u>Noteholder Committee</u>"), (2) among the Debtors, CEC, and the Ad Hoc Group of 5.75% and 6.5% Senior

---

[1]    A complete list of the Debtors may be obtained at <u>https://cases.primeclerk.com/CEOC</u>.

**SA326**

Notes (which includes Trilogy and Relative Value) (the "Senior Unsecured Notes Group"), and (3) with the insurers for the Caesars enterprise.

1.      Since my last statement to the Court, there has been material progress in the mediation.  This includes four in-person mediation sessions among the Debtors (represented by Kirkland & Ellis LLP and Millstein & Co.), the CEC Parties (represented by Milbank, Tweed, Hadley & McCloy LLP and PJT Partners), and the Noteholder Committee (represented by Jones Day and Houlihan Lokey).  Two of these mediation sessions were primarily with principals for the parties and two were primarily with legal and financial advisors.  I have also mediated two in-person mediation sessions with the Senior Unsecured Notes Group and one session with Caesars' insurers.  In addition, I have had numerous other in-person and telephonic discussions with principals and advisors for these parties outside of the official mediation sessions, including in-person meetings and telephonic discussions with Marc Rowan, a founding principal of Apollo Global Management, LLC, as well as with a senior principal at TPG.

2.      Each of these mediation sessions has been productive, and I believe the parties are making progress towards a consensual resolution of the Debtors' cases and the related litigation against the CEC Parties, while also addressing real time developments relevant to the Plan.  In particular, CEC and the Debtors recently entered into a restructuring support agreement with certain second lien noteholders that provides for materially enhanced recoveries to second lien noteholders under the Debtors' plan of reorganization (the "2L RSA").  ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████  The mediation is also focused on issues related to the allocation of proceeds from the anticipated sale

of Caesars Interactive Entertainment, a recent development that requires thoughtful negotiations among the many interested parties involved while also creating new settlement currency.  In addition, the Debtors, CEC, and the Noteholder Committee have been engaged in negotiations regarding the non-monetary terms of a potential restructuring support agreement among the parties.

3.      This is a very complicated mediation involving multiple parties and issues.  The process of working through and resolving those issues necessarily takes time.  ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

Dated:  August 16, 2016                    Respectfully,

                                           /s/ Joseph J. Farnan, Jr.
                                           JOSEPH J. FARNAN, JR.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

---

**DISCLOSURE STATEMENT FOR THE DEBTORS'**
**SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

Dated: July 11, 2016

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.



9901145160727000000000001

**SA329**

Generally, the Non-First Lien Claimants will share a Pro Rata portion of the Non-First Lien Recovery Consideration. However, Holders of Undisputed Unsecured Claims and Disputed Unsecured Claims, if they vote as a Class to accept the Plan, will also receive Cash from the Unsecured Creditor Cash Pool (which will be comprised of up to approximately $6.2 million contributed by New CEC) on the terms set forth in the Plan. Similarly, Holders of Insurance Covered Unsecured Claims, after accounting for insurance, will also receive Cash from the Unsecured Insurance Creditor Cash Pool (which will be comprised of up to approximately $300,000 contributed by New CEC) on the terms set forth in the Plan. In addition, with respect to the Par Recovery Unsecured Claims, Winnick Unsecured Claims, Caesars Riverboat Casino Unsecured Claims, and Chester Downs Management Unsecured Claims, Holders of such Claims shall receive Non-First Lien Recovery Consideration in an amount equal to 100%, 67%, 71%, and 87%, respectively, of such Holders' Claim.[17] And Subsidiary-Guaranteed Notes Claims will receive Non-First Lien Recovery Consideration in an amount equal to approximately 85% (midpoint) of such Holders' Claims. The Convenience Unsecured Claims will receive recoveries from the Convenience Cash Pool, which consists of $12.5 million, and will not receive any recoveries from the Non-First Lien Recovery Consideration. Additionally, the Non-Obligor Unsecured Claims will receive payment in full in cash due to the fact that the Non Obligor Debtors are not liable for any of the Debtors' funded debt obligations.

The following pie charts illustrate the approximate allocation of the various forms of Plan consideration (cash, debt, and equity) that comprise the recovery of each class of funded debt and unsecured claims:

| Class A – 100% Recovery | Class B – 100% Recovery |
|---|---|
| Cash 100% | Cash 100% |



---

[17] As described more fully in Article VIII.B.2 and **Exhibit D**, the Debtors have carefully reviewed the result of their Liquidation Analysis and have determined that certain of the Debtor entities, including the Non-Obligor Debtors, the Par Recovery Debtors, Winnick Holdings, LLC, Caesars Riverboat Casino, LLC, and Chester Downs Management Company, LLC are likely to achieve greater recoveries in a liquidation scenario than those otherwise available to Holders of Non-First Lien Claims under the Plan. Recoveries for these Debtors have been adjusted accordingly under the Plan.

**SA330**



| Class C – 100% Recovery | Class D – Prepetition Credit Agreement Claims [18] |
|---|---|
| | Class F Rejects – 113% - 117% Recovery |
| | Class F Accepts – 112% - 115% Recovery |

Cash 100%

Equity 6%
Debt 37%
Cash 58%

| Class E – Secured First Lien Notes Claims[1] | Class F – Second Lien Notes Claims |
|---|---|
| Class F Rejects – 96% - 128% Recovery | Accept: 29% - 48% Recovery |
| Class F Accepts – 94% - 124% Recovery | Reject: 22% - 34%  Recovery |

Cash 28%
Equity 46%
Debt 27%

Equity 100%

| Class G – Subsidiary-Guaranteed Notes Claims | Class H – Senior Unsecured Notes Claims |
|---|---|
| 61%-105% Recovery | Accept: 33% - 56% Recovery |
| | Reject: 22% - 33% Recovery |

Equity 100%

Equity 100%

---

[18] Pie chart reflects consideration split in scenario where Class F rejects the Plan

KE 34442788



Importantly, the Plan is a joint plan of reorganization for all Debtors in the Chapter 11 Cases, and the Plan takes into account the different rights and claim priorities at each Debtor in allocating recoveries as well as the various intercreditor arrangements between the Debtors' various funded debt stakeholders. The recoveries described above are improved recoveries based on each respective Class voting to accept the Plan. Recoveries under the Plan may be less for Holders of Claims in a particular Class if that Class does not vote to accept the Plan.

KE 34442788

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

---

## DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

---

| | |
|---|---|
| James H.M. Sprayregen, P.C. | Paul M. Basta, P.C. |
| David R. Seligman, P.C. | Nicole L. Greenblatt, P.C. |
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 300 North LaSalle | 601 Lexington Avenue |
| Chicago, Illinois 60654 | New York, New York 10022-4611 |
| Telephone:  (312) 862-2000 | Telephone:  (212) 446-4800 |
| Facsimile:  (312) 862-2200 | Facsimile:  (212) 446-4900 |

Counsel to the Debtors and Debtors in Possession

Dated:  July 11, 2016

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. A complete list of the Debtors (as defined herein) and the last four digits of their federal tax identification numbers are identified on **Exhibit A** attached hereto.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE REORGANIZED DEBTORS, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

E.      *Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

F.      *No Distributions Pending Allowance.*

If an objection to a Claim or Interest or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest, unless otherwise agreed to by the Reorganized Debtors.

G.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  Unless otherwise agreed to by the Reorganized Debtors and the Disbursing Agent, on the first Quarterly Distribution Date after the date that the order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction with jurisdiction over the Disputed Claim) allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or Affiliates with respect to any Claim or

KE 33843292

Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

B. **_Debtor Release._**

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released by each and all of the Debtors, the Estates, and the Reorganized Debtors from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of each and all of the Debtors, the Estates, or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that each and all of the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in its or their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, any or all of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any debt, security, asset, right, or interest of any or all of the Debtors or the Reorganized Debtors, the Restructuring Support Agreements, the Upfront Payment, the RSA Forbearance Fees, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including the Restructuring Support Agreements), any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to the Debtors or the Estates, including, for the avoidance of doubt, all claims, Causes of Action, or liabilities arising out of or relating to the Challenged Transactions, the Caesars Cases, and the Prepetition CEC Guarantees; _provided_ that the foregoing Debtor Release shall not operate to waive or release any right, Claim, or Cause of Action (1) in favor of any Debtor, Reorganized Debtor, or New Property Entity, as applicable, arising under any contractual obligation owed to such Debtor or Reorganized Debtor not satisfied or discharged under the Plan or (2) as expressly set forth in the Plan or the Plan Supplement.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any or all of the Debtors or their respective Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

KE 33843292

*C.* *Third-Party Release.*

Effective as of the Effective Date, each and all of the Releasing Parties (regardless of whether a Releasing Party is a Released Party) conclusively, absolutely, unconditionally, irrevocably, and forever discharges and releases (and each Entity so discharged and released shall be deemed discharged and released by the Releasing Parties) each and all of the Released Parties and their respective property from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including with respect to any rights or Claims that could have been asserted against any or all of the Released Parties with respect to the Guaranty and Pledge Agreement (but only to the extent released in connection with the Bank Guaranty Settlement), the Upfront Payment, the RSA Forbearance Fees, any derivative claims, asserted or assertable on behalf of any or all of the Debtors, the Estates, or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any or all of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Restructuring Support Agreements, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any debt, security, asset, right, or interest of any or all of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring or any alleged restructuring or reorganization of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents, or related agreements, instruments, or other documents (including the Restructuring Support Agreements and, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to the Debtors or the Estates, including, for the avoidance of doubt, all claims, Causes of Action, or liabilities arising out of or relating to each and all of the Challenged Transactions, the Caesars Cases, and the Prepetition CEC Guarantees (including but not limited to any claim under any Indenture or under the Trust Indenture Act). Notwithstanding anything to the contrary in the foregoing, the Third-Party Release shall not release (1) any obligation or liability of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (2) any postpetition settlement agreements between any Released Party and a creditor of the Debtors or the Estates, or (3) any postpetition liabilities incurred in the ordinary course by the Released Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

*D.* *Exculpation.*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either of the Debtor Release or Third-Party Release, and except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, each New Property Entity, each Estate, and each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any prepetition or postpetition action taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan (including the Restructuring Support Agreements), the Disclosure Statement, the New Governance Documents, the Restructuring Transactions, and/or the Separation Structure or selling or issuing the New Debt, the New Interests, the New CEC Convertible Notes, the New CEC Common Equity, any New CEC Capital Raise, and/or any other Security to be offered, issued, or

distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases following the Petition Date, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Each of the Debtors, the Reorganized Debtors, the New Property Entities, the Estates, and each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## E.    Injunction.

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, or any documents, instruments, or agreements (including those set forth in the Plan Supplement) executed to implement the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to Article VIII.B or Article VIII.C of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any or all of the Debtors, the Reorganized Debtors, the New Property Entities, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right prior to the Effective Date in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

## F.    Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for any Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall automatically revert to the applicable Debtor and its successors and assigns.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,<br><br>            Debtors. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>(Jointly Administered) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*<br><br>            *Plaintiff*,<br><br>      -against-<br><br>BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD., TRILOGY PORTFOLIO COMPANY, LLC, AND FREDERICK BARTON DANNER,<br><br>            *Defendants*. | Chapter 11<br><br>Adversary Case No. 15-00149 |

**STIPULATION BETWEEN WILMINGTON SAVINGS FUND SOCIETY, FSB, BOKF, N.A., TRILOGY PORTFOLIO COMPANY, LLC, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, FREDERICK BARTON DANNER, AND THE DEBTORS CONCERNING 2L RSA PARTIES**

Pursuant to the Court's July 20, 2016 *Order Setting Deadline for and Hearing on Further Motion for Injunctive Relief* [ECF No. 283] and in order to minimize the need for unnecessary witness testimony or documentary evidence, Caesars Entertainment Operating Company, Inc. ("CEOC") and its affiliated debtors (with CEOC, the "Debtors"), Defendant

Wilmington Savings Fund Society, FSB ("WSFS"), Defendant BOKF, N.A. ("BOKF"), Defendant Trilogy Portfolio Company, LLC ("Trilogy"), Defendant Relative Value-Long/Short Debt Portfolio, A Series of Underlying Funds Trust ("Relative Value") and Defendant Frederick Barton Danner ("Danner") stipulate to the facts below.

IT IS HEREBY STIPULATED AND AGREED AS FOLLOWS:

1.      Quantum Partners, L.P c/o Soros Fund Management LLC ("Quantum Partners"), Paulson & Co. Inc. ("Paulson"), Canyon Capital Advisors LLC ("Canyon") and Mason Capital Management LLC ("Mason," and together with Quantum Partners, Paulson, and Canyon, the "2L RSA Parties") are signatories to the Restructuring and Support Agreement dated as of July 31, 2016, between and among CEOC, Caesars Entertainment Corp. ("CEC") and the 2L RSA Parties (the "2L RSA").

2.      The Debtors have produced a redacted, executed copy of the 2L RSA, bates labeled CEOC_105_Adversary_008601 – 008667.

3.      The 2L RSA Parties executed the 2L RSA as of Sunday, July 31, 2016.

4.      As of the date they executed the 2L RSA, Quantum Partners owned 3,301,393 shares of the equity in CEC, Paulson owned 14,441,000 shares of the equity in CEC, and Mason owned 5,723,608 shares of the equity in CEC.

5.      As of the date they executed the 2L RSA, Quantum Partners owned 6,510,083 shares of the equity in Caesars Acquisition Company ("CAC"), Paulson owned 13,141,098 shares of the equity in CAC, and Mason owned 944,900 shares of the equity in CAC.

6.      The holdings as of July 31, 2016 of the funds and accounts managed by Canyon Capital Advisors LLC and its affiliates were as follows:

| | |
|---|---|
| CEOC First Lien Senior Secured Notes (9% due 2020; 11.25% due 2017 and 8.5% due 2020) | $833,452,000 |
| CEOC 10% Second-Priority Senior Secured Notes due 2018 | $454,342,239.61 |
| CEOC Third A&R Credit Agreement dated July 25, 2014 | $90,565,849.78 |
| CERP Debt (L+600 1st Lien Term Loan due 2020) | $10,387,558 |
| CAC Debt (Caesar Drai's Term Loan) | $7,667,439 |
| No. of CEC Shares | 3,018,274 |
| No. of CAC Shares | 1,866,647 |

7.     As of August 1, 2016, common stock outstanding for CEC was 146,922,790 shares.

8.     As of August 1, 2016, the Class A common stock outstanding for CAC was 137,422,736 shares.

9.     The 2L RSA Parties collectively own approximately 27% of Second Lien Notes.[1]

*[Remainder of page intentionally left blank]*

---

[1] The term "Second Lien Notes" refers to, collectively, the 12.75% Second-Priority Senior Secured Notes due 2018, the 10.00% Second-Priority Senior Secured Notes due 2018, and the 10.00% Second-Priority Senior Secured Notes due 2015.

SA340

Dated:  August 22, 2016

Respectfully submitted,

___/s/ Edmund A. Aronowitz_____
Edmund S. Aronowitz, Esq.
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street
Suite 1200
Chicago, IL 60602
Tel:  (312) 214-0000
Fax:  (312) 214-0001
earonowitz@gelaw.com


-and-

Gordon Z. Novod, Esq. (admitted *pro hac vice*)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
29th Floor
New York, NY 10017
Tel: (646) 722-8523
Fax: (646) 722-8501


-and-

Mark C. Gardy, Esq. (admitted *pro hac vice*)
James S. Notis, Esq. (admitted *pro hac vice*)
Meagan Farmer, Esq. (admitted *pro hac vice*)
**GARDY & NOTIS, LLP**
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: (212) 905-0509
Fax: (212) 905-0508


*Attorneys for Frederick Barton Danner*

___/s/ Timothy W. Hoffmann_____
Timothy W. Hoffmann, Esq. (IL # 6289756)
**JONES DAY**
77 West Wacker
Chicago, IL  60601-1692
Tel:  (312) 782-3939
Fax:  (312) 782-8585
thoffmann@jonesday.com

-and-

Bruce Bennett, Esq.
James O. Johnston, Esq.
Sidney P. Levinson, Esq.
Joshua M. Mester, Esq.
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Tel:  (213) 489-3939
Fax:  (213) 243-2539

*Counsel for Wilmington Savings Fund
Society, FSB, as successor indenture trustee*

4

**SA341**

___/s/ Mark F. Hebbeln_____
Mark F. Hebbeln, Esq.
Lars A. Peterson, Esq.
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Tel:  (312) 832-4394
Fax:  (312) 832-4700
mhebbeln@foley.com
lapeterson@foley.com

-and-

Andrew I. Silfen, Esq. (admitted *pro hac vice*)
Mark A. Angelov, Esq. (admitted *pro hac vice*)
Michael S. Cryan, Esq. (admitted *pro hac vice*)
**ARENT FOX LLP**
1675 Broadway
New York, NY 10019
Tel:  (212) 484-3900
Fax:  (212) 484-3990

Jackson D. Toof, Esq. (admitted *pro hac vice*)
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20006
Tel:  (202) 857-6000
Fax:  (202) 857-6395

*Attorneys for Defendant BOKF, N.A.*

___/s/ Jeffrey J. Zeiger_____
James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
300 North LaSalle
Chicago, Illinois 60654
Tel: (312) 862-2000
Fax: (312) 862-2200

- and –

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
601 Lexington Avenue
New York, New York 10022-4611
Tel:  (212) 446-4800
Fax:  (212) 446-4900

*Counsel to the Debtors and Debtors in
Possession*

**SA342**

_____
Timothy R. Casey (IL no. 6180828)
**DRINKER BIDDLE & REATH LLP**
191 N. Wacker Drive, Ste. 3700
Chicago, IL 60606
Tel: (312) 569-1201
Fax: (312) 569-3201
timothy.casey@dbr.com

-and-

James H. Millar
Kristin K. Going (admitted *pro hac vice*)
1177 Avenue of the Americas
41st Floor
New York, NY 10036
Tel: (212) 248-3140
Fax: (212) 248-3141
james.millar@dbr.com
kristin.going@dbr.com

*Counsel to Trilogy Portfolio Company, LLC,*
*and Relative Value-Long/Short Debt Portfolio,*
*A Series of Underlying Funds Trust*

**SA343**