No. 1:16-cv-08423

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

IN RE: CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Debtors.*

CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL.,
*Plaintiffs-Appellants,*

v.

BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC, AND FREDRICK BARTON DANNER,
*Defendants-Appellees.*

On Appeal from the United States Bankruptcy Court for the
Northern District of Illinois (Goldgar, J.)
Chapter 11 Case No. 15-01145
Adversary Proceeding No. 15-00149

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

John C. O'Quinn
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
655 15th Street, N.W.
Washington, D.C. 20005
Tel:    (202) 879-5000
Fax:    (202) 879-5200
john.oquinn@kirkland.com

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
601 Lexington Avenue
New York, N.Y. 10022
Tel:    (212) 446-4800
Fax:    (212) 446-4900

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Tel:    (312) 862-2000
Fax:    (312) 862-2200

*Counsel for Debtors/Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................6

I.  APPELLEES' ARGUMENTS SUPPORTING THE BANKRUPTCY COURT'S SETTLEMENT-FOCUSED ANALYSIS ARE UNAVAILING................................................6

  A. The Seventh Circuit's *Caesars* Decision Does Not Mandate The Bankruptcy Court's Unprecedented And Unworkable "Consensual Reorganization" Requirement................................................7

  B. The Bankruptcy Court, Not The Debtors, Made Settlement The Focus Of These Proceedings ........................................13

II. ENJOINING THIRD-PARTY ACTIONS THROUGH PLAN CONFIRMATION SHOULD NOT BE A "NON-STARTER" IN BANKRUPTCY PROCEEDINGS ................................................17

III. THERE IS NO BASIS FOR FURTHER DELAYING INJUNCTIVE RELIEF ....................................................21

  A. The Bankruptcy Court's Analysis Starts From A Flawed Premise........................................................21

  B. None of Appellees' Arguments Against An Injunction Create A Material Factual Dispute ................................26

    1. The Guaranty Actions Threaten The Integrity Of The Bankruptcy Estate And The Debtors' Ability To Reorganize ..........27

    2. The Public Interest Favors An Injunction ................................31

    3. Balancing The Harms Is Not Part Of The § 105 Analysis, But The Balance Strongly Favors The Debtors ................................33

CONCLUSION ................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bertstrom, Inc. v. Glacier Bay, Inc.*,
  2010 WL 257253 (N.D. Ill. Jan. 22, 2010)...........................................12

*Caesars Entertainment Operating Co., Inc. v. BOKF, N.A.*
  *(Caesars III)*,
  808 F.3d 1186 (7th Cir. 2015)................................2, 8, 9, 10, 25, 27, 29

*Christmas v. City of Chicago*,
  682 F.3d 632 (7th Cir. 2012).................................................................7

*Clark v. Stapleton Corp.*,
  957 F.2d 745 (10th Cir. 1992)..............................................................12

*In re Energy Co-Op, Inc.*,
  886 F.2d 921 (7th Cir. 1989)............................................................9, 12

*In re Fabtech Indus., Inc.*,
  2010 WL 6452908 (B.A.P. 9th Cir. July 19, 2010)...........................18

*Fisher v. Apostolou*,
  155 F.3d 876 (7th Cir. 1998)...................................9, 12, 18, 29, 33, 35

*In re Gander Partners, LLC*,
  432 B.R 781 (Bankr. N.D. Ill. 2010) ...................................................31

*Kress v. CCA of Tenn., LLC*,
  694 F.3d 890 (7th Cir. 2012).................................................................7

*In re L & S Indus., Inc.*,
  989 F.2d 929 (7th Cir. 1993).........................................................19, 33

*In re Lyondell Chem. Co.*,
  402 B.R. 571 (Bankr. S.D.N.Y. 2009)...........................................11, 31

*New West, L.P. v. City of Joliet*,
  491 F.3d 717 (7th Cir. 2007)................................................................35

*In re Otero County Hospital Ass'n, Inc.*,
   551 B.R. 463 (Bankr. D.N.M. 2016) .................................................... 19

*In re Otero Mills, Inc.*,
   21 B.R. 777 (Bankr. D.N.M. 1982) ...................................................... 18

*In re Phar-Mor, Inc. Securities Litig.*,
   166 B.R. 57 (W.D. Pa. 1994) ......................................................... 11, 30

*In re Sentinel Mgmt. Grp.*,
   728 F.2d 660 (7th Cir. 2013) ............................................................... 25

*In re Western Real Estate Fund*,
   922 F.2d 592 (10th Cir. 1990) ....................................................... 18, 19

*Zerand-Bernal Group, Inc. v. Cox*,
   23 F.3d 159,162 (7th Cir. 1994) .................................................... 28, 29

**Statutes**

11 U.S.C. § 105................................................................................. *passim*

11 U.S.C. § 507............................................................................................ 29

11 U.S.C. § 1129(a)(8)................................................................................. 9

11 U.S.C. § 1129(b)(1)................................................................................. 9

iv

## INTRODUCTION

As Appellees readily concede, the bankruptcy court concluded that issuing a § 105 injunction to protect anything other than a fully consensual reorganization is "not sensible," SA175, and that enjoining third-party actions through confirmation is categorically "a non-starter," A73. That should be the beginning and end of this appeal. Nothing in the bankruptcy code purports to limit § 105 to promoting fully consensual restructurings, and numerous cases have recognized that injunctive relief through confirmation is not only appropriate, but often necessary. Whether the bankruptcy court believed it lacked the *power* to grant injunctions under these circumstances, or it simply believed it should *never* do so, is a distinction without a difference. What is undisputed is that the bankruptcy court categorically rejected granting a § 105 injunction through confirmation because it believed doing so would not foster a fully consensual reorganization. That was *legal* error. Once the flawed legal premise of the bankruptcy court's decision is stripped away, there is no reasonable basis for denying the requested injunction to protect the integrity of the Debtors' estates.

Appellees' arguments to the contrary largely consist of repeating the bankruptcy court's flawed reasoning. Like the bankruptcy court,

Appellees contend that focusing on whether a § 105 injunction would facilitate a fully consensual reorganization is "entirely proper" because that "is exactly what the Seventh Circuit said." Appellees Br. 33. Not so. The Seventh Circuit's decision last year in *Caesars Entertainment Operating Co., Inc. v. BOKF, N.A. (Caesars III)*, 808 F.3d 1186 (7th Cir. 2015), rejected the bankruptcy court's previous attempt to artificially limit the purpose of § 105 injunctions. In so doing, it did not simultaneously impose artificial limitations of its own.

Appellees, following the bankruptcy court's lead, also seek to shift responsibility to the Debtors for the focus on progress toward settlement. The bankruptcy court, however, is the one that has insisted on asking whether an injunction would foster a fully consensual settlement—beginning in February 2016, based on a misreading of *Caesars III*. The Debtors' evidence at subsequent evidentiary hearings merely responded to the bankruptcy court's settlement-focused expectations. The bankruptcy court's approach—not any actions by the Debtors—is also what gives holdout creditors with guaranty claims the ability to veto § 105 relief and vitiate § 1129's protections against

2

attempts to extract unreasonable holdout value at other creditors' expense. That cannot be right.

Appellees' assertion that an injunction through confirmation is legally impermissible because the Debtors' plan would release Appellees' claims against third parties without the Appellees being paid in full likewise misses the mark. Courts across the country have enjoined third-party actions through plan confirmation, and they have done so even when a debtor's proposed plan includes contested releases. Appellees' flawed arguments nonetheless make clear that their real motive in pursuing the guaranty actions and opposing a § 105 injunction is to thwart confirmation of a plan of reorganization that they oppose. But Appellees' opposition to the contemplated releases is a matter for a confirmation proceeding; it is not grounds to deny a § 105 injunction, thereby enabling them to circumvent the bankruptcy process through third party actions pursuing the very same assets Debtors allege were fraudulently taken from them. In other words, the place for Appellees to litigate the terms of the Debtors' proposed plan is *in the bankruptcy court*, not through an end-run around the bankruptcy process. Appellees' goals having been laid bare, this Court should

clarify the law and enter the requested injunction, so that no one set of creditors obtains an unfair advantage over the others as the Debtors attempt to reorganize for the benefit of *all* creditors. That is a blackletter law purpose of a § 105 injunction.

Appellees' concerns about the bankruptcy court confirming a plan over their objections is largely no longer a concern anyway. As of this filing, all of the Appellees except Trilogy have reached an agreement in principle to support a proposed plan centered around contributions from CEC and its Sponsors. But even that plan too could fall apart if Trilogy is allowed to press its claims, or if either the Southern District of New York or the Delaware Chancery Court rule on the remaining Appellees' pending summary judgment motions while the parties finish reducing their agreement in principle to a definitive agreement and seek confirmation of an amended plan based on it. The Debtors' requested § 105 injunction is thus needed now more than ever. A minority holdout—particularly one with only a *de minimis* claim—should not derail a reorganization supported by the overwhelming majority of Debtors' $18 billion capital structure.

Finally, on the issue of remedy, Appellees argue that, if this Court finds the bankruptcy court applied the wrong legal test, it should merely remand rather than order entry of the requested injunction. But there is simply no reason to delay granting injunctive relief when the relevant factors for § 105 relief are unquestionably satisfied. Section 105 injunctions are supposed to protect the integrity of the bankruptcy estate and promote successful reorganizations. That is exactly what is at stake here. Appellees' arguments to the contrary flip the Seventh Circuit's standard for assessing the risk of harm to the estate on its head and allege potential harms from a stay that are trivial or irrelevant. Indeed, the only meaningful "harm" that Appellees identify from the grant of an injunction is the possibility that their claims against CEC could be released as part of a confirmed plan of reorganization. Again, the wisdom of any releases is a fight for another day.

If the Court nevertheless decides to remand, it should leave the current injunction in place until seven days after the bankruptcy court issues a decision on remand. To do otherwise would effectively deprive the Debtors of the very relief they are seeking on appeal. The Southern

District of New York and the Delaware Chancery Court have both scheduled hearings on fully briefed summary judgment motions for less than forty-eight hours after this Court's current stay pending appeal expires, and any gap in injunctive relief would only give opportunistic Appellees a window to race towards judgment in the guaranty actions. That would vitiate the prospects for a confirmable (and indeed what appears likely to now be an overwhelmingly consensual) plan of reorganization. The risk to this complex, but nonetheless fragile, reorganization effort from any lapse in the current § 105 injunction is simply too great at this critical moment in this bankruptcy case.

## ARGUMENT

### I. Appellees' Arguments Supporting The Bankruptcy Court's Settlement-Focused Analysis Are Unavailing

Appellees attempt to defend the bankruptcy court's decision not to enter an injunction here by asserting (1) that the bankruptcy court did not limit § 105 relief to injunctions that enhance the prospects for a fully consensual reorganization; and (2) that the Debtors are responsible for the focus on settlement and the parties' negotiations below. Appellees are wrong on both scores. Because the bankruptcy court's reliance on a legally erroneous rule is by definition an abuse of

6

discretion, the decision below must be reversed. *See Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 892 (7th Cir. 2012); *Christmas v. City of Chicago*, 682 F.3d 632, 638 (7th Cir. 2012).

### A. The Seventh Circuit's *Caesars* Decision Does Not Mandate The Bankruptcy Court's Unprecedented And Unworkable "Consensual Reorganization" Requirement

Appellees barely defend the bankruptcy court's reasoning that a § 105 injunction was only appropriate for facilitating a fully consensual reorganization. Instead, Appellees largely deny that the bankruptcy court adopted that approach, asserting that the court "never held an injunction only could issue in support of a fully consensual plan of reorganization." Appellees Br. 32. Appellees, however, never attempt to reconcile their gloss on the bankruptcy court's decision with the bankruptcy court's *actual decision*. That decision announced a new requirement that a § 105 injunction must "enhance the prospects for" a *fully* "*consensual* resolution of th[e]" bankruptcy proceeding. A66, A70.

Appellees nonetheless insist that the court below understood it "had authority to issue" the Debtors' requested injunction but "exercised its discretion to not deploy that power." Appellees Br. 33. This is a semantic game. It makes no difference whether a court denies it has

7

the power or says that the power should never be used. The assertion that enjoining third-party actions to protect a partially contested reorganization is categorically not "a sensible exercise of" its authority is a categorical limitation that is unsupported by the bankruptcy code. SA175. So too the bankruptcy court's finding that a § 105 injunction through confirmation is "always" a "non-starter." A73; *see* Part II, *infra*.

The bankruptcy court's decision leaves no doubt that it believes Seventh Circuit precedent limits § 105 relief to fully consensual reorganizations, regardless of whether it is denominated as a restriction on a court's power or on a court's sensible exercise of its authority. In the bankruptcy court's view, when the Seventh Circuit stated that the relevant question under § 105 is whether an injunction "is likely to enhance the prospects for a successful resolution of the disputes attending [the Debtors'] bankruptcy," *Caesars III*, 808 F.3d at 1188, *"consensual resolution ...* was unquestionably what the court of appeals had in mind," A70 (emphasis added). Appellees agree, asserting that "is exactly what the Seventh Circuit said." Appellees Br. 33. But there is no reason to limit "successful resolution[s]" to *fully* consensual

reorganizations, as Appellees assert, and such a reading of the Seventh Circuit's decision here would render it inconsistent with past precedent. The bankruptcy code recognizes contested and consensual plans are both legitimate ways to resolve bankruptcy disputes and reorganize a debtor. *See* 11 U.S.C. §§ 1129(a)(8), (b)(1).

Indeed, Appellees and the bankruptcy court offer no explanation why § 105(a) would discriminate against partially contested plans, and the text and purposes of that provision do not support such a distinction. *See* 11 U.S.C. § 105(a) ("The court may issue *any order* … that is necessary or appropriate to carry out the provisions of this title."). The point of a § 105 injunction is to protect the integrity of the estate, and with it, a debtor's ability to reorganize and the allocation of property among creditors. *See Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998); *In re Energy Co-Op, Inc.*, 886 F.2d 921, 929 (7th Cir. 1989). Such threats are most likely to exist when there are hold-out creditors, not when all the stakeholders agree on a reorganization strategy and the allocation of estate assets.

Finding a "consensual plan" requirement lurking in *Caesars III* would be beyond strange. *Caesars III* specifically embraced the Seventh

9

Circuit's well-established standard for § 105 relief—a standard that makes no mention of whether a reorganization is fully consensual or partially contested—and reaffirmed that § 105 provides a "broad grant of power." 808 F.3d at 1188. In doing so, the Seventh Circuit observed that § 105 "grants [ ] extensive equitable powers" with few limits beyond "tak[ing] an action prohibited by another provision of the Bankruptcy Code." *Id.* And the Seventh Circuit's decision *rejected* the artificial "same acts" requirement the bankruptcy court previously adopted, holding that "nothing in 11 U.S.C. § 105(a) authorizes th[is] limitation on the powers of a bankruptcy judge." *Id.* This is not the language of a decision artificially circumscribing a bankruptcy court's power or discretion in an unprecedented way.

Similarly unavailing is Appellees' argument that there is nothing perverse about giving hold-out creditors a veto over § 105 relief and effectively eliminating cramdown plans for creditors holding guaranty claims against a third party vital to a successful reorganization. *See* Appellees Br. 39. This is the natural consequence of the bankruptcy court's "consensual plan" requirement. *See* Debtors Br. 37-39. According to Appellees, however, "[c]reditors are entitled to enforce

10

their rights against non-debtors … absent extraordinary and drastic circumstances." Appellees Br. 39. This argument is a reprise of Appellees' argument in the previous appeal that actions to enforce guarantees are sacrosanct and should rarely, if ever, be enjoined. This argument finds no support in *In re Lyondell Chem. Co.*, 402 B.R. 571, 593-94 (Bankr. S.D.N.Y. 2009), or the other cases Appellees cite. Appellees Br. 55-56. *Lyondell enjoined* guaranty actions against a non-debtor, holding it did "not believe that the law does or should require that the enforcement of guaranties can *never* be blocked." *Id.* at 593-94 (emphasis in original).

Appellees likewise misunderstand why courts often do not enjoin guaranty actions. It has nothing to do with the supposedly "extraordinary" and "drastic" nature of that relief—relief that is not drastic at all. Courts generally do not enjoin litigation against a debtor's guarantors because those actions rarely have any effect on the debtor's estate. A debtor generally does not have a claim against the guarantor that is a vital asset of the estate, and even if it does, the guarantor is generally solvent enough to pay both the estate and the third-party claim in full. *See, e.g., In re Phar-Mor, Inc. Securities Litig.*,

11

166 B.R. 57, 63 (W.D. Pa. 1994). Third-party guaranty actions, in other words, rarely "threaten the integrity of the bankrupt's estate," *Energy Co-Op*, 886 F.2d at 929, or threaten to potentially "derail the bankruptcy proceedings," *Fisher*, 155 F.3d at 883. Allowing the guaranty actions to proceed here (or in any other case involving vital assets), in contrast, would do exactly that.

Appellees leave completely unaddressed the Debtors' arguments about why the bankruptcy court's approach creates pernicious effects that *discourage* consensual resolution by putting mediation and settlement discussions on trial. There is a reason that "revealing statements or comments made at a settlement conference is a serious breach of confidentiality." *Clark v. Stapleton Corp.*, 957 F.2d 745, 746 (10th Cir. 1992). "Without confidentiality, the discussions and exchange of information necessary to the settlement process may not occur." *Bertstrom, Inc. v. Glacier Bay, Inc.*, 2010 WL 257253, *2 (N.D. Ill. Jan. 22, 2010). Revealing those consequences is an unavoidable side-effect of the bankruptcy court's "consensual reorganization" requirement, and another reason the bankruptcy court's decision cannot be the law and must be set aside.

### B. The Bankruptcy Court, Not The Debtors, Made Settlement The Focus Of These Proceedings

Rather than defend the consequences of the bankruptcy court's decision, Appellees attempt to shift responsibility to the Debtors for "put[ting] 'sensitive settlement negotiations' at issue." Appellees Br. 34. That is simply not true. In its February 2016 order initially staying the guaranty actions, the bankruptcy court expressly premised injunctive relief on protecting the "opportunity to negotiate an overall settlement." A121. As the bankruptcy court explained in its order, it was only because of the prospect of a consensual plan that "injunctive relief [was] clearly appropriate." *Id.* (quotation marks omitted). Elsewhere in its opinion, the bankruptcy court recounted the Debtors' settlement progress before and after its June 2015 evidentiary hearing, *see* A114-15, and relied on its view that "uncertainty produces *settlements* because *settlements* avoid risk" to reject Appellees' argument that "allowing their claims to go to judgment" would actually aid the reorganization process. A117 (emphasis added). The bankruptcy court thus made clear by February 2016 that progress towards a global settlement and a consensual plan was crucial if the Debtors wanted § 105 relief.

The bankruptcy court's June 2016 order was even more clear. *See* A98-102. Justifying its decision to enter a second § 105 injunction in this case, the bankruptcy court explained that "the debtors' progress *on the settlement front* is enough to show a continued likelihood of a successful reorganization." A102 (emphasis added). Consistent with this explanation, it considered the appropriate length of the injunction based on "[w]hat w[ould] enhance the likelihood of *a settlement*," and settled on a relatively short duration "[b]ecause deadlines … spur *settlement*." A103 (emphasis added). It warned as well that "[t]he purpose of granting injunctive relief is to facilitate a negotiated resolution of the disputes in this case," "*not* to give the debtors and CEC an opportunity to … cram down a plan." *Id.*

The Debtors presented "witnesses describing mediation and settlement negotiations in their direct testimony" at the June and August 2016 trials in response to these orders. Appellees Br. 34. The Debtors would have been content limiting their witnesses' testimony instead to the evidence of their strong core business, the likelihood of successfully emerging from bankruptcy, and the importance of CEC's

14

contribution. The bankruptcy court's February and June orders foreclosed that option.

For the same reasons, it is the bankruptcy court—not the Debtors—who "put[] the mediation on trial." Appellees' Br. 34 n.10. The bankruptcy court, rather than the Debtors, faulted the mediator's statement for not "describ[ing]" the mediation "discussions themselves," disclosing "any proposal[s] exchanged," or divulging how much additional money the Debtors would need to offer to satisfy Appellees. A69 (imputing to the mediator the view "that progress consists primarily of frequent meetings and discussions," and criticizing that perspective); A2711. The Debtors similarly played no role in the bankruptcy court's decision to criticize the mediator for not "testify[ing], so [that] there was no opportunity to probe" the "assertion[s]" in his statement. A69. The bankruptcy court thus was not "forced to hear" unwanted testimony about the mediation, as Appellees contend. Appellees Br. 34 n.10. The court wanted to hear *more* about the mediation based on its legally flawed view that § 105 exists to protect fully consensual plans.

Nor is it true, as Appellees contend, that "all of the Debtors' requests for relief were premised on the idea that an injunction was needed to promote settlement." Appellees Br. 3. The Debtors' theory has always been that § 105(a) relief is necessary to protect CEC's vital contribution to the estate. In their original complaint, for instance, the Debtors alleged that a "substantial source of recovery by the Debtors' stakeholders will be a[] contribution … from CEC," and that the guaranty actions "threaten[ed]" that contribution and the reorganization. A654 ¶ 27. The Debtors have consistently pressed this theory ever since, telling the bankruptcy court in their May 2015 pre-hearing brief, June 2015 post-hearing brief, and June 2016 emergency motion that § 105 relief is necessary to protect CEC's contribution—one of the most important sources of recovery for the Debtors' creditors. (*See, e.g.*, Bankr. Ct. Dkt. Nos. 129 ¶ 13, 151 ¶ 26, and 241 ¶¶ 24-26). To be sure, the Debtors also hoped an injunction would lead to consensus—and it has, bringing the holders of approximately $14 billion of their capital structure to agreement and execution of RSAs as of the latest § 105 hearing and bringing all but $10 million of their $18 billion capital structure to an agreement at least in principle today.

16

But settlement was always just a means to protect CEC's contribution and get to a confirmable plan of reorganization, it was not an end unto itself.

## II. Enjoining Third-Party Actions Through Plan Confirmation Should Not Be A "Non-Starter" In Bankruptcy Proceedings

Equally unpersuasive is Appellees' defense of the bankruptcy court's legally erroneous view that a stay through confirmation is not permissible. Once again, Appellees insist the bankruptcy court "did not hold that it lacked the power to issue an injunction through confirmation." Appellees Br. 26. And once again, Appellees ignore the bankruptcy court's unequivocal statement that a stay through confirmation is "a non-starter … and always has been," before remarking in the next breath that "[h]ad Congress intended to permit that sort of remedy for non-debtors, it would have provided it." A73. The bankruptcy court's statement (squeezed in the middle) that courts may nonetheless have "the power to grant one" is irrelevant. *Id.* A power the bankruptcy court believes it cannot use absent a more specific congressional command is tantamount to no power at all.

Appellees attempt to defend the bankruptcy court's categorical approach by dismissing the decisions of other courts enjoining third-

party actions through plan confirmation fares no better. As an initial matter, they complain that "*Fisher* … said nothing about extending an injunction through plan confirmation." Appellees Br. 37. But the Seventh Circuit in *Fisher* affirmed an injunction staying litigation against third parties "pending the outcome of the bankruptcy proceeding." 155 F.3d at 883. That is a stay through plan confirmation even if *Fisher* did not use those exact words. Next, while not disputing that the other decisions the Debtors cite (*see* Debtors Br. 52) stayed third-party litigation through plan confirmation, Appellees argue that reliance on those cases "is misleading" because courts in those circuits supposedly have no authority to issue third-party releases. Appellees Br. 37-38 (distinguishing *In re Fabtech Indus., Inc.*, 2010 WL 6452908, *2, 7 (B.A.P. 9th Cir. July 19, 2010); *In re Western Real Estate Fund*, 922 F.2d 592, 600, 602 (10th Cir. 1990); *In re Otero Mills, Inc.*, 21 B.R. 777, 779 (Bankr. D.N.M. 1982)). That is not a relevant distinction. Regardless of whether courts in those jurisdictions can confirm a plan that releases third-party claims, those decisions establish bankruptcy courts have the power to enjoin third-party actions through plan

18

confirmation—a power the bankruptcy court erroneously held it either did not have or could not exercise.[1]

Nonetheless, Appellees' objection to the potential for third-party releases in a plan does reveal the true reason they do not want the guaranty actions stayed. Appellees did not like the distribution of estate assets the Debtors proposed at the time of the § 105 hearing or the releases necessary to secure CEC's multi-billion-dollar plan contribution. *See* Appellees Br. 38-39. But rather than oppose confirmation at the proper time, Appellees sought to sidestep the bankruptcy process and claim the funds currently earmarked for equitable distribution to *all* creditors exclusively for themselves through the guaranty actions. This blatant attempt to "defeat or impair" the bankruptcy court's jurisdiction and the bankruptcy process is precisely when a court *should* exercise its § 105 authority. *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993). Appellees' complaint that their claims could be extinguished through third-party releases is an issue for

---

[1] It is also dubious whether third-party releases are categorically impermissible in the Tenth Circuit. *Western Real Estate* held courts may not use pre-plan injunctions to permanently release claims without addressing whether courts may do so in a confirmed plan. *See In re Otero County Hospital Ass'n, Inc.*, 551 B.R. 463, 475-76 & n.11 (Bankr. D.N.M. 2016).

plan confirmation—it is not a reason to deny § 105 relief and, thereby, attempt to prevent the Debtors from getting to a confirmation hearing in the first place.

Finally, the Debtors never "specifically represented they were seeking nothing more than a 'temporary' injunction" that would terminate before plan confirmation. Appellees Br. 37. The Debtors sought to enjoin the guaranty actions through plan confirmation in their original complaint, in their June 2016 emergency motion, and in their August 2016 motion, the denial of which resulted in this appeal. *See, e.g.*, A648 ¶ 12 (requesting an injunction "during the pendency of the Debtors' chapter 11 cases"); A659 ¶ 50 (requesting an injunction "until the effective date of a restructuring plan or further order of this Court"); (Bankr. Ct. Dkt. Nos. 241 ¶4, 284 at 1). In any event, whether the Debtors *previously* requested a temporary injunction is also beside the point. The Debtors requested an injunction through plan confirmation at the August 2016 hearing, and their prior requests cannot justify the bankruptcy court's legal errors in denying that relief. The bankruptcy court's categorical refusal to consider § 105 injunctive

relief through confirmation proceedings is a *legal* error that alone requires reversal.

## III. There Is No Basis For Further Delaying Injunctive Relief

Once the bankruptcy court's legal errors are stripped away, the facts—including the remaining factual findings made in February, June, and August—compel entry of the requested § 105 relief.

### A. The Bankruptcy Court's Analysis Starts From A Flawed Premise

Appellees defend the district court's decision to deny § 105 relief here by claiming the bankruptcy court's "factual findings" insulate its decision from review. But the fundamental premise of the bankruptcy court's decision is that "the point of the injunction always has been … to gain time to reach a settlement" through "a consensual plan"—"not [ ] a cramdown plan confirmed after a contested confirmation hearing." A72. Its conclusion that a further stay of the guaranty actions is unlikely "to enhance the prospects for a successful resolution" (by which it meant a fully consensual resolution) followed directly from that flawed premise. A66. So did the bankruptcy court's emphasis on the supposedly "troubling" facts Appellees recount. Appellees Br. 41.

The finding that "it isn't injunctive relief that promotes settlement here but rather its absence" and that "an injunction" is therefore *not* "likely to enhance the prospects for a successful resolution" of the bankruptcy case necessarily assumes § 105 only protects consensual reorganizations. A66; A69. The bankruptcy court was likewise "disturbed" by the fact that TPG Capital, L.P. and Apollo Global Management, LLC were not asked to make a contribution until early August solely because doing so earlier could have resulted in a "consensual resolution" earlier in the case, remarking that the Debtors had supposedly squandered the "'clear shot'" at settlement that the Seventh Circuit "had in mind" when it previously reversed the bankruptcy court. A69-70 (noting that the bankruptcy case has been pending "[f]or almost 20 months" without a fully consensual plan). The bankruptcy court did not mention a contribution from TPG and Apollo in the rest of its analysis, and in particular did not suggest the possibility of such a contribution meant the guaranty actions no longer posed a threat to the Debtors' reorganization efforts. In any event, "factual" findings that are premised on whether a stay would enhance or reduce the chance for settlement are legally irrelevant.

22

Appellees' attempts to come up with a plausible explanation other than the bankruptcy court's erroneous emphasis on settlement for its shifting views on the threat the guaranty actions pose and whom the equities favor likewise fall short. The bankruptcy court's analysis of the equities and the threat to the estate did not discuss most of the "substantial new evidence" Appellees cite. Appellees Br. 44. This Court cannot defer to factual findings the bankruptcy court never made. The one item Appellees list that the bankruptcy court did consider—CEC's lobbying efforts (not those of the Debtors)—is protected First Amendment conduct that a court cannot hold against *the Debtors*, the parties before the court.

The bankruptcy court was much more candid about its analysis than Appellees, admitting in its August decision that "in [its] June 15 ruling, [it] noted all of th[e]" evidence concerning potential harm and the equities to reach *the opposite conclusion*. The bankruptcy court likewise candidly acknowledged that the only changed circumstance between June and August was "the debtors' progress on the settlement front." A75.

23

The evidence the bankruptcy court actually considered is the *same evidence* it relied upon previously to reach *the opposite conclusion*. The bankruptcy court, unlike Appellees, candidly admitted as much, acknowledging that "in [its] June 15 ruling, I noted all of this evidence" to reach the opposite result. A75. For example, in August, the bankruptcy court relied on the testimony of the Debtors' expert at the June evidentiary hearing to conclude that the denial of an injunction would not endanger the reorganization. A73-75. Yet, in June, the bankruptcy court found that "the prospect that a CEC bankruptcy will bring on 'one of the great messes of our time' … remains plausible" and that "denying relief would [ ] endanger the success of the bankruptcy proceedings" *based on the same evidence*. A102; *see also* A75. The bankruptcy court similarly concluded that the potential harm to the Debtors is "[n]ot so great" and based on events that are "just possibilities" based on the same evidence that convinced the Court in June that "the debtors stand to suffer a very real harm" absent injunctive relief. A102, 119. The only thing that changed between June and August, as the bankruptcy court frankly acknowledged, was "the debtors' progress on the settlement front." A75. The bankruptcy court's

24

new findings based on its legally erroneous interpretation of the law deserve no deference.

Appellees point out that the bankruptcy court also had a change of heart concerning whether this is a "textbook" scenario for injunctive relief. Appellees Br. 52. Whereas the court acknowledged that Debtors' situation presents "a textbook case" for injunctive relief in its first two § 105 decisions, A115; A149, it warned at an August hearing over protective order issues that "this isn't a textbook case." SA40. Although not part of its § 105 decision, this is yet another example of the bankruptcy court changing its findings. The significant "inconsisten[cies]" between the bankruptcy court's findings in its prior decisions and the findings in its recent denial of injunctive relief are reason alone to set aside its decision as an abuse of discretion. *In re Sentinel Mgmt. Grp.*, 728 F.2d 660, 670 (7th Cir. 2013).

Finally, the bankruptcy court based its denial of injunctive relief on a fundamental misunderstanding of its authority and responsibility under § 105. What the Seventh Circuit described as a "broad grant of power," *Caesars III*, 808 F.3d at 1188, Appellees and the bankruptcy court treat as reserved for rare, "drastic" situations. A73. And it makes

no sense to suggest, as Appellees do, that a § 105 injunction enjoining third-party litigation is a truly "extraordinary" action. Appellees Br. 1. The debtors have cited more than a dozen examples—and could have cited many more—in which courts have enjoined state and federal litigation under § 105.

## B. None of Appellees' Arguments Against An Injunction Create A Material Factual Dispute

After the legal errors and flawed assumptions in the decision below are corrected, it follows that § 105 relief should be granted. Appellees' arguments (1) that the guaranty actions do not threaten the integrity of the estate or a successful reorganization, (2) that an injunction is not in the public interest, and (3) that the equities favor denying relief all are unsupported—the opposite is unquestionably true.

There is also no reason to delay granting injunctive relief. The Southern District of New York and the Delaware Chancery Court have both scheduled hearings on fully briefed summary judgment motions for less than forty-eight hours after this Court's current stay pending appeal expires, and any gap in injunctive relief would only give Appellees a window to race towards judgment in the guaranty actions in an attempt to jump to the front of the creditor line and unravel the

26

almost fully consensual reorganization that promises to resolve this "immensely complicated" case. *Caesars III*, 808 F.3d at 1187.

### 1. The Guaranty Actions Threaten The Integrity Of The Bankruptcy Estate And The Debtors' Ability To Reorganize

Many of the arguments Appellees advance regarding the integrity of the Debtors' estate and the threat that the guaranty actions pose flip the Seventh Circuit's standard for § 105 relief on its head. Appellees predict that an adverse judgment in those actions would not necessarily "preclude a reorganization centered around a CEC contribution," "would not *necessarily* require CEC to file for bankruptcy," and "even if CEC filed for bankruptcy, there still *could* be a reorganization involving a CEC contribution." Appellees Br. 42 (emphasis added). In other words, Appellees insist the guaranty actions pose no threat to the estate as long as the *mere possibility* of a reorganization remains even if those actions succeed. But the relevant inquiry is essentially the opposite: whether the guaranty actions *"could conceivably have an effect"* on CEC's contribution and thus "on the estate," *In re Lemco Gypsum*, Inc., 910 F.2d 784, 788 (11th Cir. 1990) (emphasis added), not whether there is any scenario under which the guaranty actions could proceed and

27

CEC could still make a significant contribution. *See also Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159,162 (7th Cir. 1994) (relying on *Lemco*).

Appellees likewise simply ignore the significant harm adverse judgments in the guaranty actions would inflict even if the Debtors could eventually salvage a contribution from CEC. CEC's public statements for more than a year have consistently warned that adverse rulings will likely force CEC to makes its own bankruptcy filing soon after an adverse judgment is entered. A2637; A2667. The resulting contest over CEC's limited assets would unleash years of costly litigation that, at a minimum, would greatly disrupt and delay the Debtors' reorganization efforts. A769:23-70:21; A773:15-76:8; A782:21-83:11. Meanwhile, the delay alone would destroy roughly $3.5 million in value *every day* from additional administrative expenses and accumulating interest. A2066:24-70:4. This lost value is property that is for all intents and purposes no longer part of the bankruptcy estate. The record is, thus, clear that an adverse ruling in the guaranty actions would at the very least substantially delay a successful reorganization.

Applying the proper standard, the guaranty actions unquestionably "may affect the amount of property in the bankrupt

estate," *Zerand-Bernal*, 23 F.3d at 161, and "the allocation of property among creditors," *Fisher*, 155 F.3d at 882. That should be the end of the matter. It is undisputed that one of the estate's two primary assets is its claims arising from the Disputed Transactions. A767.01:20-.02:3; A767.05:14-.07:2. And the bankruptcy court itself acknowledged an adverse judgment in the guaranty litigation would "risk" the "loss of the CEC contribution" and consequently the amount of property in the Debtors' estate. A76-77; *see also Caesars III*, 808 F.3d at 1189.

That the Debtors and Appellees are seeking the same limited pool of funds likewise demonstrates Appellees are attempting to jump to the front of the creditor line and thereby affect the allocation of property among the Debtors' creditors. Any contribution from CEC will be distributed by the Debtors in accordance with the bankruptcy code's statutory priority scheme. *See* 11 U.S.C. § 507. But the guaranty actions seek to divert that contribution to Appellees, all of whom are unsecured creditors or second-lien noteholders, seeking to jump ahead of the distributions to the Debtors' more senior creditors. To contend otherwise, Appellees must ignore the undisputed evidence that CEC

29

cannot satisfy any judgment in the guaranty actions and contribute to the Debtors' estate.  A767.11:4-22; A2637; A2669.

*Phar-Mor* does not condone such attempts to circumvent the bankruptcy code's priority rules as Appellees contend.  The non-debtor defending against both estate and third-party claims in that case was "a solvent partnership" with sufficient capital "to satisfy any and all judgments which may be rendered against it."  166 B.R. at 63.  Thus, unlike here, any third-party judgment against the non-debtor partnership did not imperil the equitable distribution of assets among creditors and would not be paid out of assets that originally and still rightfully belong to the Debtors.

Nor does the supposed availability of possible recoveries from "seventy-two insider targets" justify Appellees' attempts to claim CEC's contribution for themselves.  Appellees Br. 47, 49-50.  Whatever other sources of recovery the Debtors may have, it cannot change the reality that any recovery in the guaranty actions eliminates *CEC*'s contribution to compensate the Debtors and their creditors for *CEC*'s wrongdoing. The record is also clear that, although other restructuring alternatives may exist, the Debtors' ability to formulate *any* plan of reorganization

heavily depends on their ability to recover on the estate claims against CEC. *See* A767.03:23-.07:3; A2804:16-2805:6.

## 2.     The Public Interest Favors An Injunction

Appellees conclude their brief with the remarkable assertion that the public interest favors thrusting CEC into bankruptcy and derailing the Debtors' largely consensual reorganization. Appellees Br. 53-55. That argument makes no sense, and finds no support in principle or precedent. None of the cases Appellees cite support their argument that public policy favors enforcing their guarantees at the expense of a successful reorganization and settlements with every major creditor group, including all of the Appellees except Trilogy.

This is a case where "the needs and concerns of other creditors simply trump" the interests of a small number of alleged guaranty holders. *Lyondell*, 402 B.R. at 594. "Promoting a successful reorganization is one of the most important public interests," *In re Gander Partners, LLC*, 432 B.R 781, 789 (Bankr. N.D. Ill. 2010), and allowing the guaranty actions to proceed here would make a successful reorganization significantly more difficult. Appellees' only response— that the Debtors should attempt to reorganize with contributions from

CEC *and* its Sponsors—is now a moot point. The Debtors have secured in principle a significant contribution from CEC's sponsors. D.I. 79 ¶¶ 3-4. But regardless, a § 105 injunction remains necessary to protect against any remaining holdouts from pursuing guaranty actions and imperiling CEC's critical contribution to this reorganization. That reality puts the lie to Appellees' assertion that a successful reorganization is realistic without a meaningful contribution from CEC. The public interest in successful reorganizations accordingly strongly favors enjoining the guaranty actions here.

Appellees' attempt to discount the public interest in settlement is equally baseless. In their view, settlements with the holders of $11 billion in debt who are receiving "a good deal" and with holders of $2 billion in debt who are also "CEC shareholders" do not count. Appellees Br. 55. The public apparently only has an interest in protecting "settlements with impaired creditors *like the Appellees*." *Id.* (emphasis added). Appellees cite no case adopting this remarkably self-serving standard. But the Debtors' then-existing settlements with the holders of approximately $14 billion in debt (and its announced settlement in

principle with all but a few million dollars-worth of the Debtors' $18 billion capital structure) cannot be so easily discounted.

### 3. Balancing The Harms Is Not Part Of The § 105 Analysis, But The Balance Strongly Favors The Debtors

Shifting from one dubious set of arguments to another, Appellees claim "the equities do not favor further injunctive relief." Appellees Br. 48. But the balance of the equities or the harms is not a factor in the § 105 analysis, *see, e.g., Fisher*, 155 F.3d at 882, and imposing such a balancing inquiry is simply inconsistent with the Seventh Circuit's clear guidance that a debtor need not establish irreparable harm to receive § 105 relief, *see L & S Indus.*, 989 F.2d at 932.

Appellees' only claims of harm are easily dismissed anyway. The alleged "harm" from having "one jury trial and two sets of summary judgment hearings enjoined" is so inconsequential the bankruptcy court did not even mention it. Appellees Br. 50-51. It is also harm allegedly caused by the *previous* § 105 injunctions, and thus irrelevant to whether the Court should grant further § 105 relief. The bankruptcy court likewise did not take seriously Appellees' complaint that the Debtors, with bankruptcy court approval, may "cram down a plan that

extinguishes" their guarantee claims—a complaint about what might happen at a future confirmation proceeding. Although Appellees block quote the bankruptcy court's misgivings about the releases at a separate hearing, *see* Appellees Br. 48, the court did not once mention the releases in its equitable balancing. *See* A60-96. With good reason: any harm from the releases is not a basis for denying a § 105 injunction. The Debtors' requested *injunction* does not extinguish anything, and any complaints about contemplated releases in a plan are disputes for the plan confirmation proceedings. *See* 6/7/2016 Hr'g Tr. at 64:10-14 ("The validity of the release is a matter for confirmation.").

That leaves the alleged harm from CEC's lobbying efforts (*not actions by the Debtors*) to amend the Trust Indenture Act in ways that could eliminate some of Appellees' guaranty claims. Appellees insist there is no constitutional problem with deeming CEC's exercise of its First Amendment rights "inequitable" because the bankruptcy court's decision leaves CEC "free to lobby Congress as much as it wants." Appellees Br. 50 n.16. But the Constitution bars *any* government effort to penalize the exercise of constitutionally protected rights; it is not limited to policing impermissible restraining orders. *See New West, L.P.*

34

*v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). Beyond the constitutional problems, however, *CEC*'s behavior cannot be held against the *Debtors*. Contrary to Appellees' assertions, the Debtors are not seeking § 105 relief to benefit CEC. They seek an injunction to protect *their* claim to *their* assets, which they assert were fraudulently transferred to CEC. CEC's conduct should not deprive the Debtors of the opportunity to recover from CEC.

The bottom line is that Appellees will suffer no harm if the guaranty actions are stayed through plan confirmation; conversely, allowing the guaranty actions to go forward risks the Debtors' entire reorganization effort. In this circumstance, the courts have "the authority and the responsibility" to enjoin those actions. *Fisher*, 155 F.3d at 823. On these facts, the injunction should have been granted here.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions to immediately enjoin the guaranty actions through plan confirmation.

Dated:  September 30, 2016            */s/ John C. O'Quinn*
James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

Paul M. Basta, P.C.
Nicole L. Greenblatt, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

John C. O'Quinn
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200

*Counsel to Debtors / Appellant-Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. Bankr. P. 8015(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. Bankr. P. 8015(a)(7)(B)(iii), the brief contains  6,769 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook font.  As permitted by Fed. R. Bankr. P. 8015(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


Dated:  September 30, 2016          */s/ John C. O'Quinn*
                                   John C. O'Quinn

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September, 2016, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all CM/ECF participants, resulting in service upon all counsel of record.

/s/ John C. O'Quinn
John C. O'Quinn